1   Lawrence Rosenzweig (SBN 72443)
    LRPCorp@aol.com
2   Brent Rosenzweig (SBN 219071)
3   Brent.Rosenzweig@gmail.com
    LAWRENCE ROSENZWEIG, PC
4   2730 Wilshire Boulevard, Suite 425
5   Santa Monica, California  90403
    Telephone:    (310) 453-0348
6   Facsimile:    (310) 453-3358
7
    *Attorneys for Plaintiffs*
8   *Additional Co-Counsel on Subsequent Pages*

FILED
CLERK, U.S. DISTRICT COURT

AUG - 5 2010
10:32

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

9

### IN THE UNITED STATES DISTRICT COURT

10

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12   MAIRI NUNAG-TAÑEDO, INGRID CRUZ,
     DONNABEL ESCUADRA, ROLANDO
13   PASCUAL, and TOMASA MARI, on behalf
     of themselves and other similarly situated
14   individuals,

                                          Civ. No. SACV10-1172-AG(MLGx)
15
16          Plaintiffs,

17   v.

18   EAST BATON ROUGE PARISH SCHOOL
     BOARD, CHARLOTTE D. PLACIDE,             **COMPLAINT**
19   MILLIE WILLIAMS, ELIZABETH DURAN
20   SWINFORD, UNIVERSAL PLACEMENT
     INTERNATIONAL, INC., LOURDES            **CLASS ACTION**
21   "LULU" NAVARRO, HOTHELLO "JACK"
22   NAVARRO, PARS INTERNATIONAL
     PLACEMENT AGENCY, EMILIO V.            **JURY TRIAL DEMANDED**
23   VILLARBA, ROBERT B. SILVERMAN,
24   and SILVERMAN & ASSOCIATES,

25          Defendants.

26

27

28

1

*(Continued from first page)*

Daniel Werner (*pro hac vice admission pending*)
Daniel.Werner@splcenter.org
James M. Knoepp (*pro hac vice admission pending*)
Jim.Knoepp@splcenter.org
Jennifer Tse (SBN 260764, *application for admission pending*)
Jennifer.Tse@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, Georgia  30303
Telephone:     (404) 521-6700
Facsimile:      (404) 221-5857

Mary C. Bauer (*pro hac vice admission pending*)
Mary.Bauer@splcenter.org
Sam Brooke (*pro hac vice admission pending*)
Sam.Brooke@splcenter.org
Morris S. Dees (*pro hac vice admission pending*)
Judy.Bruno@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:     (334) 956-8200
Facsimile:      (334) 956-8481

Dennis B. Auerbach (*pro hac vice admission pending*)
dauerbach@cov.com
Candice N. Plotkin (*pro hac vice admission pending*)
cplotkin@cov.com
Jillian Willis (*pro hac vice admission pending*)
jwillis@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:     (202) 662-6000
Facsimile:      (202) 662-6291

Susan P. Johnston (*pro hac vice admission pending*)
sjohnston@cov.com
Pamela A. Carter (*pro hac vice admission pending*)
pcarter@cov.com
COVINGTON & BURLING LLP

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone:    (212) 841-1000
Facsimile:    (212) 841-1010

Dan McNeil (*pro hac vice admission pending*)
dmcneil@aft.org
AMERICAN FEDERATION OF TEACHERS
LEGAL DEPARTMENT
555 New Jersey Ave., N.W.
Washington, DC  20001
Telephone:    (202) 393-6305
Facsimile:    (202) 393-6385

*Attorneys for Plaintiffs*

Complaint

## I.   **PRELIMINARY STATEMENT**

1.    Over the past three school years, more than 350 highly-skilled Filipino teachers have been trafficked into Louisiana through the federal government's H-1B "specialty occupation" visa program to serve as teachers in public schools.  The teachers were systematically defrauded and exploited in the recruitment and hiring process in the Philippines by Defendants, who utilized the promise of a unique opportunity to teach in Louisiana to ensnare teachers in a psychologically coercive and financially ruinous trafficking scheme that subjected the teachers to exorbitant debt and forced labor.  Once in the United States, the teachers were further abused and exploited by Defendants, who used a variety of coercive tactics, including abuse of legal process, isolation and segregation, and threats of deportation, to attempt to control the teachers' actions.  When the teachers organized collectively for better conditions, they were victims of severe retaliation.

2.    The Plaintiffs in this action are victims of human trafficking and were brought to the United States to work in the East Baton Rouge Parish School District, Recovery School District, Jefferson Parish Public School System, Caddo Public School District, East Carroll Parish School System, Avoyelles Parish School District, Advance Baton Rouge Charter School Association, Madison Parish School District, and Lafourche Parish Public Schools (hereinafter referred to as the "Louisiana School Districts").

3.    Plaintiffs bring this action on behalf of themselves and similarly situated teachers to recover damages and to seek declaratory and injunctive relief against the fraudulent and malicious recruiters (referred to collectively as "Recruiter

4

Defendants") and legal facilitators (referred to collectively as "Legal Facilitator Defendants") who the Louisiana School Districts hired, as well as from one of their employers, the East Baton Rouge Parish School Board ("EBRPSB"), and agents of EBRPSB (referred to collectively as "Employer Defendants"), who were aware, or reasonably should have known of the Recruiter Defendants' egregious conduct, and who took steps to ensure the trafficking scheme was viable.

4.     The Louisiana School Districts chose and retained Lourdes "Lulu" Navarro to recruit teachers from the Philippines. The School Districts selected Ms. Navarro despite her prior conviction and imprisonment for defrauding the California Medi-Cal system of more than $1,000,000, and despite the fact that she had also pled guilty to money laundering in New Jersey. In her role as teacher-recruiter, Lourdes Navarro was given enormous responsibility to recruit and hire teachers for the School Districts. In concert with the other Recruiter Defendants involved in this scheme, Ms. Navarro arranged for the teachers to be interviewed by Louisiana School District representatives, either in person in the Philippines or by videoconference and teleconference. The Recruiter Defendants told the teachers who were selected that they must quickly pay a recruitment fee in cash, which varied from $5,000 to $5,500 per teacher. This was an enormous financial investment, representing more than one and a half times the average annual household income in the Philippines. The Recruiter Defendants willfully, maliciously, and fraudulently tricked the teachers into reasonably believing that this fee constituted all or nearly all of their obligations to the Recruiter Defendants, inducing the teachers to liquidate assets, take out loans from family, friends, and/or

Complaint

1  public and private lending institutions, and mortgage properties to cover the
2  expense.

3     5.     Later, after teachers had paid the first fee in cash, the Recruiter
4  Defendants informed the teachers that there would be a second, much larger fee
5  representing thirty percent of their expected annual income in the United States,
6  plus the cost of airfare to the United States.  In an act of claimed "generosity," the
7  Recruiter Defendants required teachers to pay only twenty percent before they left
8  the Philippines; the remaining ten percent was to be collected during the teachers'
9  second year of teaching in the United States.  The teachers were surprised by these
10 new costs, which required a titanic financial commitment of $16,000—five times
11 the average annual household income in the Philippines.  But the teachers could not
12 back out, given the first massive fee they had already paid, which the Recruiter
13 Defendants would not refund.  The Recruiter Defendants additionally pressured and
14 coerced the teachers into signing contracts promising to pay this new fee, and
15 confiscated the teachers' passports and visas to ensure that the fee would be paid.
16 The Recruiter Defendants also referred teachers to private lending businesses to
17 borrow the money at usurious and exploitative interest rates of between 3 percent
18 and 5 percent per month (which compounded monthly equates to an annual interest
19 rate of 43 percent to 80 percent) because they realized the teachers would not
20 otherwise be able to cover the fee.

21    6.     After the teachers arrived in the United States, the Recruiter
22 Defendants orchestrated a system of psychological coercion and intimidation to
23 exert continued control over the teachers, including:  filing lawsuits against teachers

who complained publicly; isolating teachers from other Filipinos; and threatening deportation or non-renewal of teacher visas.

7.     Employer Defendants were knowing beneficiaries of the illegal human trafficking scheme perpetrated by Recruiter Defendants, knew or should have known of the scheme, and aided and abetted the scheme by taking steps to ensure its success.   Employer Defendants became aware early on of the unconscionable fees being charged, and took steps to ensure the success of Recruiter Defendants' scheme, including submitting false letters to federal immigration officials at the request of the Recruiter Defendants, and reporting to Recruiter Defendants those teachers who voiced complaints about the process or who attempted to circumvent the Recruiter Defendants by applying directly to EBRPSB for employment.

8.     Plaintiffs assert class action claims for damages under the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.*; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and various provisions of applicable state law.   Plaintiffs also assert class action claims for damages against the Legal Facilitator Defendants who facilitated the Recruiter Defendants' actions for breach of fiduciary duty and attorney malpractice committed in furtherance of the trafficking scheme.  Plaintiffs seek compensatory, declaratory and injunctive relief against the Recruiter Defendants, and a declaration that the illegal contracts coerced by the Recruiter Defendants are null and void. Finally, Plaintiffs assert class action claims against the Employer Defendants for their involvement in this trafficking scheme, and for negligently hiring the Recruiter

1   Defendants in the first instance.

2   ## II.   JURISDICTION AND VENUE

3   9.   The Court has jurisdiction over this action pursuant to 28 U.S.C.
4   § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18
5
6   U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1332(d) (class action jurisdiction). The
7   Court has supplemental jurisdiction over the state law causes of actions asserted in
8   this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part
9
10   of the same case or controversy as the federal law claims.

11   10.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)
12   because a substantial part of the events and omissions giving rise to Plaintiffs'
13
14   claims occurred in this District.

15   11.   Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a)
16   because some or all defendants reside, are found, have agents, and/or transact
17   his/her/its affairs in the Central District of California.
18
19   12.   Venue is also proper in this District pursuant to 18 U.S.C. § 1965(b)
20   because the ends of justice require that other parties residing in other districts be
21   brought before this Court.

22   13.   In addition, venue is proper in this District because one of the two
23   principal standardized contracts at issue in this matter specifies that "this agreement
24
25   shall be enforced within any competent court within the County of Los Angeles,
26   State of California, United States of America."

27   ## III.   PARTIES
28   ### A.   Plaintiffs

8

EBRPSS Teacher Plaintiffs

14.     Plaintiff Mairi Nunag-Tañedo is a national of the Republic of the Philippines and resides in Louisiana.  Ms. Nunag-Tañedo works as a teacher in the East Baton Rouge Parish School System ("EBRPSS").

15.     Plaintiff Ingrid Cruz is a national of the Republic of the Philippines and resides in Louisiana.  Ms. Cruz works as a teacher in EBRPSS.

16.     Plaintiff Donnabel Escuadra is a national of the Republic of the Philippines and resides in Louisiana.  Ms. Escuadra works as a teacher in EBRPSS.

17.     Throughout this complaint, Plaintiffs Nunag-Tañedo, Cruz, and Escuadra are referred to collectively as "EBRPSS Teacher Plaintiffs."

Non-EBRPSS Teacher Plaintiffs

18.     Plaintiff Rolando Pascual is a national of the Republic of the Philippines and resides in Louisiana.  Mr. Pascual works as a teacher in the Caddo Public School District, located in the Caddo Parish in Louisiana.

19.     Plaintiff Tomasa Mari is a national of the Republic of the Philippines and resides in Louisiana.  Ms. Mari works as a teacher in the Recovery School District, which is a school district administered by the State of Louisiana Department of Education.

20.     Throughout this complaint, Plaintiffs Pascual and Mari are referred to collectively as "Non-EBRPSS Teacher Plaintiffs."

**B.     Defendants**

Employer Defendants

9

Complaint

21.     Defendant East Baton Rouge Parish School Board ("EBRPSB") is responsible for the oversight of the East Baton Rouge Parish School System ("EBRPSS").  EBRPSB oversees the operations of EBRPSS, including, *inter alia*, determining the number and location of schools and the number and selection of teachers to work in these schools, as well as promulgating and enforcing local policies and supervising the Superintendent of EBRPSS.  EBRPSB is the body corporate for EBRPSS, and has the authority to sue and be sued on behalf of EBRPSS.  EBRPSB's principal place of business at 1050 South Foster Drive, Baton Rouge, Louisiana 70806.

22.     Defendant Charlotte D. Placide is the former Superintendent for EBRPSS.  Placide was Superintendent for EBRPSS from 2004 until June 30, 2009. Placide resides in Louisiana.  Placide is sued in her individual capacity, and in her capacity as an agent for EBRPSS.

23.     Defendant Millie Williams is the Director of Personnel Services for EBRPSS, and held this position throughout the period covered in this Complaint. Williams resides in Louisiana.  Williams is sued in her individual capacity, and in her capacity as an agent for EBRPSS.

24.     Defendant Dr. Elizabeth Duran Swinford is the Associate Superintendent for Human Resources for EBRPSS, and held this position throughout the period covered in this Complaint.  Duran Swinford resides in Louisiana.  Swinford is sued in her individual capacity, and in her capacity as an agent for EBRPSS.

25.     Throughout this complaint, Defendants EBRPSS, Placide, Williams,

and Duran Swinford are referred to collectively as "Employer Defendants."

26.    Throughout this complaint, Defendants Placide, Williams, and Duran Swinford are referred to collectively as "Individual Employer Defendants."

Recruiter Defendants

27.    Defendant Universal Placement International, Inc., ("Universal") is a corporation organized under the laws of California that maintains its principal place of business in Los Angeles, California, within the Central District of California. Universal is engaged in the business of recruiting teachers from the Philippines for employment in the United States.

28.    Defendant Lourdes "Lulu" Navarro is the owner and President of Universal.   Lourdes Navarro resides in Glendale, California, within the Central District of California.

29.    Defendant Hothello "Jack" Navarro is a director of Universal. Hothello Navarro resides in Glendale, California, within the Central District of California.

30.    Defendant PARS International Placement Agency ("PARS") is a corporation organized under the laws of the Philippines that maintains its principal place of business in Quezon City, which is located in the metropolitan area of Manila, Philippines.  PARS is engaged in the business of recruiting teachers from the Philippines for employment in the United States.

31.    Defendant Emilio V. Villarba is registered as the Official Representative of PARS with the Philippines Overseas Employment Administration.  Villarba is the owner of PARS.  Villarba resides in Quezon City,

11

Philippines. He is the brother of Defendant Lourdes Navarro.

32. At all relevant times, Defendant Universal and Defendant PARS failed to treat each other as separate legal entities and acted with disregard to their separate corporate forms, such that it is appropriate to treat Universal and PARS as interchangeable and alter egos for purposes of liability. Specifically, Universal and PARS disregarded their separate legal identities by, *inter alia*:

a. Defendant Universal and Defendant PARS did not operate at arm's length in their dealings with each other;

b. Defendant Lourdes Navarro and Universal represented to third parties, including Employer Defendants, that they had an "office" in the Philippines, which was the office of Defendant PARS;

c. Defendant Villarba and Defendant PARS represented to third parties, including Plaintiffs and other Class Members, that it had an "office" in the United States, which was the office of Defendant Universal;

d. Defendant Lourdes Navarro distributed business cards which listed both contact information for the Universal office in California and the PARS office in Manila;

e. Defendant PARS maintained a website which listed its contact information as both the Universal office in California and the PARS office in Manila;

f. Defendant Villarba and PARS permitted Defendant Lourdes Navarro to determine how much applicants would pay and when the payments would be due, even for fees that ostensibly were being paid to Defendant PARS

12

only;

g.    Defendant PARS entered into contracts with Plaintiffs and other Class Members that stated that Class Members would pay fees for certain items to PARS, but when those fees were paid, PARS issued receipts showing payment was made to Defendant Universal; and

h.    Defendant PARS collected money from Plaintiffs and other Class Members in the Philippines and issued receipts from both Defendant PARS and Defendant Universal.

33.    Alternatively, at some or all relevant times, Defendant Lourdes Navarro and Hothello Navarro were agents of Defendant PARS.

34.    At some or all relevant times, the Recruiter Defendants were agents of Employer Defendants in that they were charged with recruiting Filipino teachers on behalf of the Employer Defendants.

35.    Throughout this Complaint, Defendants Universal, Lourdes Navarro, Hothello Navarro, PARS, and Villarba are referred to collectively as "Recruiter Defendants."

### Legal Facilitator Defendants

36.    Defendant Robert B. Silverman is an attorney who maintains his principal offices in Westminster, California, within the Central District of California. Silverman resides in the Central District of California.

37.    Defendant Silverman & Associates is a law office located in Westminster, California, within the Central District of California.

38.    Throughout this Complaint, Defendants Silverman and Silverman &

13

Associates are referred to collectively as "Legal Facilitator Defendants."

### RICO Defendants

39.    Throughout this Complaint, Recruiter Defendants, Individual Employer Defendants, and Legal Facilitator Defendants are referred to collectively as "RICO Defendants."

### All Defendants

40.    Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts with the Central District of California, and the claims in this case arise in significant part from conduct by the Recruiter Defendants and the Legal Facilitator Defendants that occurred in the Central District of California.

41.    Defendants have been engaged in and continue to engage in ongoing contacts with Plaintiffs and other Class Members, including recruiting, obtaining labor, contracting, seeking to collect on contracts, providing immigration-related services to, transporting, harboring, providing and/or employing Plaintiffs and/or other Class Members.

### IV.    CLASS ACTION ALLEGATIONS

42.    The Class Representative Plaintiffs bring claims for damages, injunctive and declaratory relief on behalf of themselves and all similarly situated persons pursuant to Rule 23. The Class Representative Plaintiffs bring class claims for actual, punitive and treble damages pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), and class claims for injunctive and declaratory relief pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

43.     This action involves a class represented by all Plaintiffs, referred to herein as "the Louisiana Teacher Class," and a subclass represented by EBRPSS Teacher Plaintiffs, referred to herein as "the EBRPSS Teacher Subclass."

**A.     Louisiana Teacher Class**

44.     Class claims for compensatory, treble, and/or punitive damages are brought pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  For the purpose of claims for compensatory, treble, and/or punitive damages, the Louisiana Teacher Class is defined as all Filipino nationals who have obtained H-1B visas through Recruiter Defendants and Legal Facilitator Defendants during the period January 1, 2007 through the present, where a Louisiana school district or Louisiana school system executed the H-1B visa petition on behalf of the visa-holder.

45.     Class claims for injunctive and declaratory relief are brought pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.  For the purpose of claims for injunctive and declaratory relief, the Louisiana Teacher Class is defined as all Filipino nationals who have obtained or will obtain non-immigrant or immigrant visas through any of the Recruiter Defendants and/or Legal Facilitator Defendants for employment at school districts or school systems in Louisiana.

46.     The Louisiana Teacher Class seeks relief from Recruiter Defendants and Legal Facilitator Defendants only.

Rule 23(a)

47.     Only the Recruiter Defendants and Legal Facilitator Defendants know the precise number of individuals in the Louisiana Teacher Class, but upon

15

information and belief the class includes over 350 individuals. The Louisiana Teacher Class is so numerous that joinder of all members of the Louisiana Teacher Class is impracticable.

48. This action involves questions of law common to the Louisiana Teacher Class, including:

a. Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct as set forth in the First Claim for Relief violated the forced labor and trafficking provisions of the TVPA (18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b));

b. Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct as set forth in the Second Claim for Relief violated RICO Sections 1962(c) and 1962(d);

c. Whether Recruiter Defendants' conduct as set forth in the Third Claim for Relief violated the Employment Agency and Job Services Act (Cal. Civ. Code § 1812.508);

d. Whether Recruiter Defendants' conduct as set forth in the Fourth Claim for Relief violated the California Unfair Business Practices Act (Cal. Business and Professional Code § 17200);

e. Whether Recruiter Defendants' conduct as set forth in the Fifth Claim for Relief constituted fraud;

f. Whether contracts entered into between Louisiana Teacher Class members and Defendant Universal and Defendant PARS are void because they were the result of undue influence, as set forth in the Sixth Claim for Relief;

16

   g. Whether contracts entered into between Louisiana Teacher Class members and Defendant Universal and Defendant PARS are void because they are illegal, as set forth in the Seventh Claim for Relief;

   h. Whether fees collected by Defendant Universal and Defendant PARS that were not pursuant to any written contract were illegal, as set forth in the Eighth Claim for Relief;

   i. Whether Legal Facilitator Defendants' conduct as set forth in the Ninth Claim for Relief constituted a breach of a fiduciary duty;

   j. Whether Legal Facilitator Defendants' conduct as set forth in the Tenth Claim for Relief constituted legal malpractice;

   k. The nature of damages available to Plaintiffs and other Class Members, including the applicability of compensatory, treble, and/or punitive damages; and

   l. Whether and what kinds of injunctive relief are appropriate.

  49. This action involves questions of fact common to the class, including:

   a. Whether Recruiter Defendants and Legal Facilitator Defendants threatened Plaintiffs and other Louisiana Teachers Class members with serious financial harm and/or abuse of legal process to obtain Plaintiffs' and other Louisiana Teachers Class members' labor or services;

   b. Whether Recruiter Defendants and Legal Facilitator Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other Louisiana Teachers Class members for the purpose of subjecting them to forced labor;

c.    Whether   Recruiter   Defendants   and   Legal   Facilitator Defendants conducted one or more enterprises through a pattern of racketeering activity;

d.    Whether   Recruiter   Defendants   and   Legal   Facilitator Defendants committed or agreed to commit the predicate racketeering acts identified in the Second Claim for Relief; and

e.    The source and amount of Plaintiffs' and other Class Members' damages.

50.    The claims of the Plaintiffs asserted in the First through Tenth Claims for Relief are typical of the claims of the Louisiana Teachers Class.

51.    The Plaintiffs will fairly and adequately protect the interests of the Louisiana Teachers Class.

52.    Plaintiffs have retained counsel who are experienced in handling class action litigation on behalf of immigrant workers like Plaintiffs and are prepared to advance costs necessary to litigate this action.

Rule 23(b)(2)

53.    Recruiter Defendants and Legal Facilitator Defendants have acted or refused to act on grounds that apply generally to the Louisiana Teacher Class, so that declaratory relief and final injunctive relief are appropriate with respect to the Louisiana Teacher Class as a whole.  Recruiter Defendants' and Legal Facilitator Defendants' actions and inactions include, *inter alia*:

a.    Illegally enforcing contracts that are the result of undue influence and coercion, as set forth in the Sixth Claim for Relief;

b.      Illegally enforcing contractual terms that are illegal, as set forth in the Seventh Claim for Relief;

c.      Illegally collecting fees prohibited under the law, as set forth in the Eighth Claim for Relief; and

d.      Illegally forcing Louisiana Teacher Class members to pay for fees in the H-1B visa process that are the sole obligation of the employer / petitioner, as set forth in the Ninth and Tenth Claims for Relief.

54.     The Louisiana Teacher Class seeks to enjoin enforcement of the contracts and the collection of further fees as set forth in the Seventh through Ninth Claims for Relief.

55.     The Louisiana Teacher Class also seeks to enjoin each Recruiter Defendant and each Legal Facilitator Defendant from engaging in the unlawful acts described in this Complaint in the future.

Rule 23(b)(3)

56.     Common questions of law and fact relevant to the First through Tenth Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.

57.     A class action is superior to other available methods of adjudicating the claims set forth in the First through Tenth Claims for Relief because, *inter alia*:

a.      Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.      The Louisiana Teacher Class members are foreign nationals

who are in substantial debt, lack the means and/or resources to secure individual legal assistance, and are often unaware of their rights to prosecute these claims;

c.     No member of the Louisiana Teacher Class has already commenced litigation to determine the questions presented.   The only litigation bearing on issues raised in this case are:

i.     Baseless lawsuits filed by Defendant Universal against a few Louisiana Teacher Class members, which constitute an abuse of legal process in furtherance of Recruiter Defendants' trafficking scheme, as described below; and

ii.     An administrative hearing at the Louisiana Workforce Commission, which via opinion dated April 14, 2010 concluded that Defendant Universal was not properly licensed under the Louisiana Private Employment Services Law, but did not rule on the validity of the contracts themselves, finding this was outside of its jurisdictional mandate; and

d.     A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized recruitment and record-keeping practices throughout the time period at issue.

**B.     EBRPSS Teacher Subclass**

58.     Class claims for compensatory, treble, and/or punitive damages are brought pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.   For the purpose of claims for compensatory, treble, and/or punitive damages, the EBRPSS Teacher Subclass is defined as all Filipino nationals (i) who have obtained H-1B visas through Recruiter Defendants and Legal Facilitator

Defendants during the period from January 1, 2007 through the present, and (ii) whose H-1B visa petition was executed by an agent of EBRPSS for employment at EBRPSS.

59.     Class claims for injunctive and declaratory relief are brought pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.   For the purpose of claims for injunctive and declaratory relief, the EBRPSS Teacher Subclass is defined as all foreign nationals who have obtained or will obtain immigrant or non-immigrant visas for employment at EBRPSS.

60.     The EBRPSS Teacher Subclass seeks relief from all Defendants.

Rule 23(a)

61.     Only the Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants know the precise number of individuals in the EBRPSS Teacher Subclass, but upon information and belief the class includes over 200 individuals.   The EBRPSS Teacher Subclass is so numerous that joinder of all members of the EBRPSS Teacher Subclass is impracticable.

62.     The questions of law common to the EBRPSS Teacher Subclass are the same as the questions of law identified for the Louisiana Teacher Class in ¶ 48, *supra*.  In addition, the following questions of law are unique and common to the EBRPSS Teacher Subclass:

a.     Whether Individual Employer Defendants' conduct as set forth in the Second Claim for Relief violated RICO Sections 1962(c) and 1962(d);

b.     Whether Employer Defendants knowingly benefited from participation in the venture with Recruiter Defendants and Legal Facilitator

21

Defendants that deprived Plaintiffs and other EBRPSS Teacher Subclass members of their right to be free from forced labor, as set forth in the Twelfth Claim for Relief;

      c.    Whether Employer Defendants knew or should have known that such venture engaged in a violation of Chapter 77 of Title 18 of the United States Code, as set forth in the Twelfth Claim for Relief;

      d.    Whether Recruiter Defendants and Legal Facilitator Defendants were agents of the Employer Defendants; and

      e.    Whether Defendant EBRPSS's conduct as set forth in the Thirteenth Claim for Relief constituted negligent hiring.

63.    This action involves all the questions of fact common to the class identified for the Louisiana Teacher Class in ¶ 49, *supra*.

64.    The claims of EBRPSS Teacher Subclass asserted in the Second, Eleventh, and Twelfth Claims for Relief are typical of the claims of the EBRPSS Teacher Subclass.

65.    The EBRPSS Teacher Subclass Representative Plaintiffs Nunag-Tañedo, Cruz, and Escuadra will fairly and adequately protect the interests of the EBRPSS Teacher Subclass.

66.    Plaintiffs have retained counsel who are experienced in handling class action litigation on behalf of immigrant workers like Plaintiffs and are prepared to advance costs necessary to litigate this action.

Rule 23(b)(2)

      a.    Employer Defendants have acted or refused to act on grounds

that apply generally to the EBRPSS Teacher Subclass, so that declaratory relief and final injunctive relief are appropriate with respect to the EBRPSS Teacher Subclass as a whole.   Employer Defendants' actions and inactions include, *inter alia*: illegally requiring EBRPSS Teacher Subclass members to pay visa processing fees that are the legal obligation of the petitioner for the H-1B visa, not the beneficiary.

67.     The EBRPSS Teacher Subclass seeks to enjoin Employer Defendants from engaging in the unlawful acts described in this Complaint in the future.

Rule 23(b)(3)

68.     Common questions of law and fact relevant to the Second, Eleventh, and Twelfth Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.

69.     A class action is superior to other available methods of adjudicating the claims set forth in the Second, Eleventh, and Twelfth Claims for Relief because, *inter alia*:

a.     Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.     The EBRPSS Teacher Subclass members are foreign nationals who are in substantial debt, lack the means and/or resources to secure individual legal assistance, and are often unaware of their rights to prosecute these claims;

c.     No member of the EBRPSS Teacher Subclass has already commenced litigation to determine the questions presented.   The only litigation bearing on issues raised in this case are:

23

Complaint

i.  Baseless lawsuits filed by Defendant Universal against a few EBRPSS Subclass members, which constitute an abuse of legal process in furtherance of Recruiter Defendants' trafficking scheme, as described below; and

ii.  An administrative hearing at the Louisiana Workforce Commission, which via opinion dated April 14, 2010 concluded that Defendant Universal was not properly licensed under the Louisiana Private Employment Services Law, but did not rule on the validity of the contracts themselves, finding this was outside of its jurisdictional mandate; and

d.  A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized recruitment, record-keeping, and, with respect to the Employer Defendants, employment practices throughout the time period at issue.

## V.   STATEMENT OF FACTS

70.  Plaintiffs and other members of the Louisiana Teacher Class and the EBRPSS Teacher Subclass (collectively, "Class Members") are teachers and Filipino nationals who were trafficked from the Philippines to the United States by Defendants at various times between 2007 and the present.

71.  Plaintiffs and other Class Members are or were holders of "H-1B visas," which permit foreign nationals with special skills to work for a specified employer in the United States for a period of up to six years.

72.  Recruiter Defendants operated a trafficking scheme to recruit Plaintiffs and other Class Members from the Philippines for work in Louisiana

24

public schools.  Defendant Lourdes Navarro primarily ran Recruiter Defendants' operations in the United States, while her brother Defendant Villarba primarily ran Recruiter Defendants' operation in the Philippines.

73.    Defendant Lourdes Navarro traveled periodically to the Philippines in furtherance of Recruiter Defendants' operations.

74.    Defendant Lourdes Navarro and Defendant Villarba were charged in California with health benefits (Medi-Cal) fraud, grand theft, identity theft, money laundering, forged identification and white collar crime in 2000.  Lourdes Navarro pled *nolo contendere* to the charges that she, with others, willfully defrauded more than $1,000,000 from Medi-Cal, and served time in Orange County Jail for this conviction.  A warrant to arrest Villarba was issued, but years later was recalled by the court and the action against Villarba was dismissed.  Upon information and belief, Villarba fled the jurisdiction.

75.    Defendant Lourdes Navarro pled guilty to a charge of money laundering in New Jersey in 2003.

76.    EBRPSS and the non-defendant Louisiana School Districts contracted with Recruiter Defendants and Legal Facilitator Defendants to recruit highly skilled teachers from the Philippines, utilizing the H-1B visa process.

77.    EBRPSS had hired teachers through the H-1B visa process in the past, before EBRPSS contracted with Recruiter Defendants and Legal Facilitator Defendants to recruit Plaintiffs and other Class Members.

**A.    Factual Allegations Related to Laws Regulating the Recruitment of Philippine Nationals for Employment within Louisiana**

1.   Regulations of the Philippine Overseas Employment
     Administration

78.   In the Philippines, the Philippine Overseas Employment Administration ("POEA"), a government entity, regulates the recruitment of nationals from the Philippines to work abroad.

79.   The POEA requires any person, partnership, or corporation engaged in the recruitment and placement of workers abroad for a fee, which is charged directly or indirectly to the workers or employers or both, to obtain a license from the POEA.

80.   The POEA refers to any person, partnership, or corporation, as defined in ¶ 79, *supra*, as a "Private Employment Agency."

81.   The POEA's rules and regulations state that unless otherwise provided, the employer will be responsible for the payment of the visa fee, airfare, POEA processing fee, and Philippine Overseas Workers Welfare Administration membership fee.

82.   The POEA's rules and regulations prohibit private employment agencies from charging more than one month's salary from the workers for whom the agencies acquire overseas employment.   Documentation costs including authentication costs may also be charged to the worker.   However, the POEA's rules and regulations provide that no other charges in whatever form, manner, or purpose shall be imposed on or paid by the worker without prior approval from the POEA.

2.   Federal United States Regulations of the United States
     Government regarding H-1B Visa Workers

83.     The Immigration and Nationality Act ("INA") § 101(a)(15)(H)(i)(b), 8 U.S.C. § 1101(a)(15)(H)(i)(b), provides for the admission into the United States of certain temporary workers.  These workers are referred to as "H-1B workers," and "H-1B" designates the type of visa that the worker receives.  Provisions related to the administration of the H-1B visa program are found in INA § 214, 8 U.S.C. § 1184, and 8 C.F.R. § 214.2(h) (Department of Homeland Security regulations), and 20 C.F.R. Part 655 (Department of Labor regulations).

84.     The process for obtaining an H-1B visa application and process is controlled by the employer, not the worker.  The employer must submit a Labor Conditions Application ("LCA") to the Department of Labor.  After the LCA is approved the employer must submit an "I-129 Petition for a Nonimmigrant Worker" to the United States Citizenship and Immigration Services ("USCIS"), a component of the United States Department of Homeland Security.  If USCIS approves the petition, the worker may then appear at a designated U.S. Embassy or Consulate for an interview.  If the worker passes the interview, the worker will be issued an H-1B visa.

85.     As part of the I-129 Petition for a Nonimmigrant Worker, the petitioning employer must also fill out a form entitled "I-129 H-1B Data Collection and Filing Fee Exemption Supplement" (hereinafter referred to as the "H-1B Filing Fee form") to determine the fee the petitioner must pay to file the petition.  The H-1B Filing Fee form provides that, at a minimum, a petitioner must pay a $320 filing fee and a $500 anti-fraud fee.

3.     Regulations of the Louisiana Workforce Commission

86.     The Louisiana Workforce Commission administers the Louisiana Private Employment Services Law, La. R.S. 23:101, *et seq.* (hereinafter referred to as "LPES").

87.     The LPES provides that any person, company, corporation, or partnership must be licensed by the Louisiana Workforce Commission before it may operate, solicit, or advertise as an employment service within Louisiana.

88.     The LPES provides that any contract between an employment service and an applicant or candidate must first be approved by the Louisiana Workforce Commission.

89.     The LPES provides that any fees charged by an employment service must be based on a schedule of fees as applied to the applicant's projected first year's gross earnings.

90.     Regulations implementing the LPES provide that an employment service may not charge or receive a fee from an applicant prior to the actual commencement of work on a job procured by the employment service.

**B.      Factual Allegations Related to the Trafficking Scheme**

1.      Trafficking Step 1:  Employer Defendants Recruiter Defendants, and Legal Facilitator Defendants Agree to a Joint Venture to Recruit Teachers from the Philippines to Teach in Louisiana

91.     From 2006 to present, Recruiter Defendants advertised their services and the services of Legal Facilitator Defendants to school districts throughout the United States, including Employer Defendants and the non-defendant Louisiana School Districts.  Recruiter Defendants represented themselves as specializing in

the recruitment of highly qualified teachers from the Philippines, and placement of these teachers within school districts in the United States. Recruiter Defendants also claimed to specialize in teachers of special education, math, and science.

92.    At all relevant times, Recruiter Defendants were operating as an "employment service" within Louisiana as that term is defined by Section 23:101 of the Louisiana Revised Statutes.

93.    At no time did any Recruiter Defendant become licensed as an employment service, as required by Section 23:104 of the Louisiana Revised Statutes.

94.    Recruiter Defendants informed Employer Defendants that although the school districts would pay the salaries of any teachers they hired, Employer Defendants would not be required to pay any fees for Recruiter Defendants' services.    Upon information and belief, Recruiter Defendants made similar representations to the non-defendant Louisiana School Districts, with the exception of the Recovery School District, which paid some fees to Recruiter Defendants. However, the money paid by the Recovery School District was targeted to serve as an incentive to teacher-employees to work in the Recovery School District after Hurricane Katrina; Class Members working at Recovery School District did not receive this incentive money, and were told that some of it was used to pay Recruiter Defendants, instead.

95.    Employer Defendants and the non-defendant Louisiana School Districts agreed to utilize the services offered by Recruiter Defendants and Legal Facilitator Defendants to recruit and place teachers within their school districts.

Pursuant to this joint venture, Employer Defendants and the non-defendant Louisiana School Districts were to receive, and did knowingly receive, numerous benefits including:

      a.    The benefit of having teachers recruited from the Philippines;

      b.    The benefit of having Recruiter Defendants and Legal Facilitator Defendants navigate the H-1B visa process; and

      c.    The benefit of not being required to pay for any of the fees related to the H-1B visa process or to pay for the procurement of Filipino teachers with H-1B visas.

      2.    <u>Trafficking Step 2: Employer Defendants Interview Plaintiffs and the Class Members</u>

96.    Plaintiffs and other Class Members are teachers, and were recruited because they were experienced teachers.

97.    Plaintiffs and other Class Members learned of the opportunity to teach in the United States through advertisements by Recruiter Defendants placed in Philippine newspapers, and/or through word of mouth from other teachers.

98.    Plaintiffs and other Class Members presented themselves to Recruiter Defendants to be interviewed for possible teaching positions with Employer Defendants and with some of the non-defendant Louisiana School Districts.

99.    Representatives of Employer Defendants, including Defendant Duran Swinford, interviewed EBRPSS Teacher Plaintiffs in person in the Philippines or by teleconference and/or videoconference.

100.    Representatives of the non-defendant Louisiana School Districts

interviewed non-EBRPSS Teacher Plaintiffs in person in the Philippines or by teleconference and/or videoconference.

101. Recruiter Defendants paid or reimbursed all expenses incurred by Employer Defendants and the non-defendant Louisiana School Districts in interviewing Plaintiffs and other Class Members, including airline tickets, hotel reservations, and a *per diem* for those who traveled to the Philippines.

        3.    Trafficking Step 3: Recruiter Defendants Charge First Recruitment Fee, but Hide from Class Members an Undisclosed Second Recruitment Fee

102. Shortly after the interviews, Recruiter Defendants informed Plaintiffs and other Class Members that they had been selected to teach in the United States. Recruiter Defendants then told Plaintiffs and other Class Members about some, but not all, of the next steps in the recruitment process. In particular, Recruiter Defendants only disclosed that Class Members would need to collect and submit certain documents in support of their H-1B visa application, and that Class Members would have to pay a recruitment fee (hereinafter referred to as the "First Recruitment Fee").

103. The First Recruitment Fee typically totaled between $5,000 to $5,500 per Class Member. The First Recruitment Fee consisted of three parts.

        a.    Recruiter Defendants claimed that part of the First Recruitment Fee was for visa processing (hereinafter referred to as the "Visa Processing Fee"). The Visa Processing Fee typically totaled from $3,920 to $4,000, and included a "petition filing" fee of $320, an "anti-fraud" fee of $500, a "premium processing" fee of $1,000, a "mailing" fee of between $100 and $180, and a "legal services" fee

1    of $2,000.

2         b.    Recruiter Defendants claimed that part of the First Recruitment

3    Fee was for an evaluation of the Class Member's Filipino teaching credentials

4

5    (hereinafter referred to as the "Credentials Evaluation Fee").   An evaluation of

6    foreign teaching credentials is necessary to obtain the teaching license necessary to

7    teach in a Louisiana public school.  The Credential Evaluation Fees typically ranged

8    from $570 to $725.

9

10        c.    The First Recruitment Fee included an agency fee (the

11   "Agency Fee") that was typically $1,000, though approximately twenty class

12   members were permitted to pay a lesser amount.

13

14        104.   Recruiter Defendants threatened Plaintiffs and other Class Members

15   that if they did not pay the First Recruitment Fee, they would be replaced by other

16   applicants.

17        105.   For Plaintiffs and other Class Members, who were working as

18   teachers in the Philippines, the First Recruitment Fee of $5,000 to $5,500 was very

19   high. According to data from the National Statistics Office of the Republic of the

20   Philippines for 2006, which is the latest year that data is available, a fee of $5,000

21

22   to $5,500 represents more than one and a half times the average annual household

23   income in the Philippines.[1]

24

25        106.   Plaintiffs and other Class Members had to take out loans from family,

26

27   _____

28   [1] Average household income in 2006 was 173,000 Philippine Pesos.  *See* National Statistics Office,
     Philippines, Official Web Site, *available at* http:// www.census.gov.ph.  On January 1, 2006, the average
     interbank exchange rate was 1 Philippine Peso to 0.01882 U.S. Dollars.  At that rate, $5,500 is equivalent to
     292,242 Philippine Pesos.

friends, banking institutions, and/or private lenders to pay the First Recruitment Fee. Some Plaintiffs and other Class Members also needed to liquidate assets to pay the First Recruitment Fee.

107.   Plaintiffs and other Class Members delivered the First Recruitment Fee to the office of Defendant PARS in the Philippines. Plaintiffs and other Class Members were required to pay the First Recruitment Fee in cash. PARS usually issued hand-written receipts that identified the recipient as Defendant Universal.

108.   At this stage in the trafficking process, Recruiter Defendants fraudulently did not disclose to Plaintiffs and other Class Members that they would be required to pay a second and much larger recruitment fee before they would be permitted to leave for the United States.

a.   As described in ¶¶ 118–127, *infra*, Recruiter Defendants later required Plaintiffs and other Class Members to pay three months of their projected salary as teachers in the United States (the "Undisclosed Second Recruitment Fee"), and to pay for their airfare to the United States. Recruiter Defendants collected two months of each Class Member's projected salary before the Class Member departed from the Philippines, and intended to collect a third month of salary after the teachers were in the United States for one year. Because the school year is typically ten months long, and Plaintiffs and other Class Members would only earn income from their schools for ten months per year, this exorbitant fee was a full 30 percent of one year's salary.

b.   Recruiter Defendants were at all times aware that they would require Plaintiffs and other Class Members to pay this Undisclosed Second

33

Recruitment Fee, and a charge for airfare, before they would return Plaintiffs' and other Class Members' passports and visas to them, and permit them to travel to the United States.

109.    Plaintiffs and other Class Members reasonably relied on Recruiter Defendants' fraudulent omission and reasonably assumed that the First Recruitment Fee they had paid, totaling approximately $5,000 to $5,500, would be all or nearly all that they would be charged.  Plaintiffs and other Class Members based this reasonable assumption on several grounds, including public information available on the website of the POEA, which states that the maximum fee that may be charged is the equivalent of one month's salary, and the common knowledge in the Philippines about how the foreign worker recruitment process typically operated there.

110.    Upon information and belief, after Plaintiffs and other Class Members paid the First Recruitment Fee, Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts arranged to send documents from the United States, through electronic mail or facsimile, for Plaintiffs and other Class Members to execute.  These documents included a job offer from Employer Defendants or from the non-defendant Louisiana School Districts.  The job offers were signed by Plaintiffs and other Class Members in the Philippines, and by Employer Defendants or the non-defendant Louisiana School Districts in the United States.

       4.    <u>Trafficking Step 4:  Recruiter Defendants Seize and Control Documents</u>

111.   After Plaintiffs and other Class Members received their job offers, Recruiter Defendants informed them that their petitions for an H-1B visa had been preliminarily approved, and that the Plaintiffs and other Class Members would need to be interviewed at the U.S. Embassy to obtain their H-1B visas.

112.   Recruiter Defendants arranged Plaintiffs' and other Class Members' interview schedules at the U.S. Embassy in Manila and charged Plaintiffs and other Class Members for arranging the interviews.

113.   Recruiter Defendants required Plaintiffs and other Class Members to attend a meeting conducted by Defendant Villarba before their interviews at the U.S. Embassy.  In these sessions, Villarba instructed the Plaintiffs and other Class Members that if they were asked how the fees and costs for the visas had been paid, that they were to admit that they paid for the certification of their school transcripts only, and they were not to admit that they paid any other fees.  Villarba told Plaintiffs and other Class Members that if the U.S. Embassy learned that they had paid any additional fees, the Embassy would not issue their visas, and Plaintiffs and other Class Members would forfeit all the money they had already paid.  (Upon information and belief, Plaintiffs and other Class Members were not in fact asked about the payment of fees during their U.S. Embassy interviews.)

114.   It is standard practice for an H-1B visa applicant to bring her passport with her to an Embassy interview, and if the interview is successful, to leave her passport at the Embassy with instructions for delivery after the H-1B visa has been inserted into the passport.

115.   Recruiter Defendants required Plaintiffs and other Class Members to

1    instruct the U.S. Embassy to have their passports delivered directly to Recruiter

2    Defendants' office in the Philippines rather than to Plaintiffs' and other Class

3
     Members' home addresses.
4

5         · 116.   Plaintiffs' and other Class Members' visas were approved, and their

6    visas and passports were sent directly to Recruiter Defendants' office in the

7    Philippines.

8
          117.   Recruiter Defendants retained possession of Plaintiffs' and other
9

10   Class Members' passports and refused to return them to Plaintiffs and other Class

11   Members.   Recruiter Defendants stated that Plaintiffs and other Class Members

12
     would receive their passports back only after they paid all fees imposed and
13

14   Recruiter Defendants were ready for Plaintiffs and other Class Members to fly to

15   the United States.

16
              5.    Trafficking Step 5:  Recruiter Defendants Announce
17                  Previously Undisclosed Second Recruitment Fee (Three
                    Months of Salary to be Earned in United States) and Fee for
18                  Airfare

19        118.   After Plaintiffs and other Class Members had already paid the non-

20   refundable First Recruitment Fee of between $5,000 to $5,500 in cash, which was
21
     well in excess of a year's wages in the Philippines, Recruiter Defendants told
22

23   Plaintiffs and other Class Members for the first time that they would have to pay a

24   second and much larger recruitment fee, as well as the cost of their airfare to the

25
     United States.
26

27            a.    Recruiter Defendants explained, orally and through documents

28   they required Plaintiffs and other Class Members to sign, that the Undisclosed

Second Recruitment Fee would be an amount equal to three months of Plaintiffs' and other Class Members' expected United States salary.

     b.    Recruiter Defendants explained that Plaintiffs and other Class Members would be required to pay a fee equal to two months of their expected United States salaries before the Recruiter Defendants would return their visas and passports, and before they would be permitted to depart for the United States. The remaining fee (equal to an additional month's salary) would be collected later, after Plaintiffs and other Class Members had been in the United States for one year.

     c.    Recruiter Defendants informed Plaintiffs and other Class Members what their monthly salaries would be, based on a salary schedule that Recruiter Defendants claimed was in effect at the schools where Plaintiffs and other Class Members would be teaching. However, the salary stated by Recruiter Defendants was often inaccurate, and was often higher than the salaries Plaintiffs and other Class Members would actually earn, resulting in many Plaintiffs and other Class Members paying up-front fees equivalent to even more than two-months' worth of their expected salaries.

     d.    Teachers at EBRPSS and the non-defendant Louisiana School Districts typically work ten months per school year, and their annual salaries are therefore typically paid over the course of ten months. The Undisclosed Second Recruitment Fee was based on a ten month salary system. Accordingly, the Undisclosed Second Recruitment Fee represented a full 30 percent of the expected annual income of Plaintiffs and other Class Members—20 percent payable before a teacher left the Philippines and the remaining 10 percent payable after the teacher

had been in the United States for one year.

　　　　e.　　According to Recruiter Defendants' records, Plaintiffs and other Class Members were required to pay from $6,300 to $12,000 to cover the 20 percent fee due before departing the Philippines. The average charge was $9,238 and the median charge was $9,400.

　　119.　Recruiter Defendants also told Plaintiffs and other Class Members that they would have to purchase plane tickets through PARS, and that they were not permitted to purchase their own plane tickets.

　　　　a.　　The ticket prices charged typically averaged between $800 and $1,200 for a one-way ticket.

　　　　b.　　Plaintiffs and other Class Members could have obtained tickets at a lower price than what they were charged by Recruiter Defendants.

　　120.　The Recruiter Defendants told Plaintiffs and other Class Members that if they did not pay the two-month fee and cost of the plane ticket, they would forfeit the substantial sums they had already paid, they would not be permitted to travel to the United States, and they would not be given their visas.

　　121.　Plaintiffs and other Class Members were surprised by these new and exorbitant fees, which were in addition to the substantial fees they had already been charged. However, they felt powerless to do anything other than conform to Recruiter Defendants' demands because they did not have control over their passports, and if they did not come to work in the United States, they would suffer severe financial harm because of the overwhelming non-refundable debt they had already accumulated.

122.   Plaintiffs and other Class Members had no personal funds or assets to cover the Undisclosed Second Recruitment Fee and the cost of the plane ticket, and almost all Plaintiffs and other Class Members lacked other personal or community resources on which to draw to satisfy these new charges.

123.   Recruiter Defendants anticipated that Plaintiffs and other Class Members likely lacked the resources to cover the Undisclosed Second Recruitment Fee and referred Plaintiffs and other Class Members to private lending businesses where the Plaintiffs and other Class Members could borrow the outstanding balance.  The private lenders identified by Recruiter Defendants were FG Financial Company, Inc., and AG Finance, Inc.

124.   FG Financial Company, Inc., and AG Finance, Inc. charged usurious and exploitative interest rates of between 3 percent and 5 percent per month.  Upon information and belief, these interest rates were compounding monthly, and therefore equate to an annual interest rate of 43 percent to 80 percent per year.

125.   Upon information and belief, Recruiter Defendants received compensation from FG Financial Company, Inc., and AG Finance, Inc. for referring Plaintiffs and other Class Members to them.

126.   Recruiter Defendants gave hand-written receipts to Plaintiffs and other Class Members for the portion of the Undisclosed Second Recruitment Fee paid in the Philippines, showing that half of the fee (one month's salary) was received by Defendant PARS, and half of the fee (another month's salary) was received by Defendant Universal.

127.   According to Recruiter Defendants' records, each Plaintiff and other

Class Member paid Recruiter Defendants aggregate fees, on average, of approximately $16,000 before he or she left the Philippines.

6.  Trafficking Step 6:  Recruiter Defendants Require Signature of Illegal Contracts in the Philippines

128.  Recruiter Defendants required Plaintiffs and other Class Members to sign contracts in the Philippines before they departed for the United States.

129.  Upon information and belief, the contracts were signed after Recruiter Defendants, Employer Defendants, and Plaintiffs and other Class Members had completed all or substantially all of the work necessary to obtain H-1B visas.

130.  Plaintiffs and other Class Members were required to sign a contract in the Philippines on Defendant PARS's letterhead (the "PARS Contract").

131.  The PARS Contract was not pre-approved by the Louisiana Workforce Commission, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and were not pre-approved by the POEA.

132.  Upon information and belief, the PARS contract specified that the teacher must:

a.  make an up front payment to PARS equal to one month's promised salary;

b.  pay a legal fee for an immigration attorney; and

c.  pay a visa processing fee.

133.  Plaintiffs and other Class Members were denied copies of the PARS Contract, even though several asked for a copy of the contract.

134.  Some Plaintiffs and some other Class Members were required to sign

40

a contract in the Philippines on Defendant Universal's letterhead (the "Universal Philippine Contract").

135.   The Universal Philippine Contract was not pre-approved by the Louisiana Workforce Commission, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and the fees contemplated in the Contract were not pre-approved by the POEA.

136.   Upon information and belief, the Universal Philippine Contract specified that Plaintiffs and other Class Members would pay ten percent of their gross monthly income for twenty-four months to Defendant Universal.

137.   Plaintiffs and other Class Members were denied copies of the Universal Philippine Contract, even though several asked for a copy of the contract.

138.   Plaintiffs and other Class Members were rushed into signing the PARS Contract and the Universal Philippine Contract.  Plaintiffs and other Class Members did not have an opportunity to review the PARS Contract or the Universal Philippine Contract before signing them.

139.   Given Plaintiffs' and other Class Members' enormous debt and severe financial exposure, they reasonably believed that they had no choice but to sign the contracts and travel to the United States to work in order to repay these substantial financial obligations.

      7.    <u>Trafficking Step 7:  Recruiter Defendants Direct Plaintiffs and other Class Members to California, Compel Signatures on Illegal Contracts in California, and Control Documents</u>

140.   The plane tickets arranged by Recruiter Defendants required Plaintiffs and other Class Members to fly to the Los Angeles International Airport, where

41

they were required to meet with Recruiter Defendants' representatives in California: Defendant Lourdes Navarro, Defendant Hothello Navarro, and/or other agents of Defendant Universal.

141.   Recruiter Defendants took Plaintiffs and other Class Members to Recruiter Defendants' office in California, confiscated their passports and visas, and forced them to sign another contract (hereinafter referred to as "Universal California Contract").

142.   The Universal California Contract was not pre-approved by the Louisiana Workforce Commission, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and the fees contemplated in the Contract were not pre-approved by the POEA.

143.   The Universal California Contract provided that Plaintiffs and other Class Members would pay ten percent of their gross monthly income for twenty-four months to Defendant Universal.

144.   Plaintiffs and other Class Members were rushed in reading the Universal California Contract.   Some Plaintiffs and other Class Members questioned the terms of the contract when they were in the Recruiter Defendants' office in California.   Recruiter Defendants or their representatives threatened that Plaintiffs and other Class Members would be immediately sent back to the Philippines if they did not sign the contract as written.

145.   Plaintiffs and other Class Members signed the Universal California Contract because they reasonably believed they had no choice but to sign the contracts in order to be able to work in the United States, which was the only way

42

they could possibly repay the enormous debt they had incurred as a result of Recruiter Defendants' scheme.

8.   Trafficking Step 8:  Recruiter Defendants Dictate Housing Arrangements

146.   While in California, Plaintiffs and other Class Members were informed that Recruiter Defendants had arranged for their housing in Louisiana. Plaintiffs and other Class Members were neither permitted to arrange for their own housing, nor even to select their roommates and housemates.

147.   While still in California, Plaintiffs and other Class Members were required to pay an initial fee for their housing in Louisiana.  Plaintiffs and other Class Members paid approximately $300 each to Defendant Universal and/or Defendant Lourdes Navarro.

148.   Recruiter Defendants executed the leases for the housing provided to the Plaintiffs and other Class Members.

149.   Upon information and belief, the housing that the Recruiter Defendants mandated for the EBRPSS Teacher Subclass was not safe.  For example, there were numerous burglaries at the mandated apartment complex in EBRPSS.

150.   Upon information and belief, the housing was priced above the market rate, and Recruiter Defendants received a portion of the rent paid each month by Plaintiffs and other Class Members.

151.   When Plaintiffs and other Class Members complained to Recruiter Defendants regarding the price, quality, and/or safety of the housing, Recruiter

43

Defendants told them they could not leave the housing.  Upon information and belief, Recruiter Defendants required Class Members to reside in such housing in order to isolate them from the broader Filipino community and thus enhance their ability to control members of the EBRPSS Teacher Subclass.

152.   One member of the EBRPSS Teacher Subclass, Jave Pajuelas, approached his principal, Sherry Brock of the Westdale Middle School, to seek assistance in obtaining alternate housing that would be closer to the school where he was teaching.   Principal Brock informed him that she could not help him find alternative housing because it would upset and anger Defendant Lourdes Navarro. Mr. Pajuelas informed some of the other Louisiana Teacher Class Members of this conversation, and those individuals reasonably understood that if they tried to leave the housing Lourdes Navarro had selected, they would face possible punishment by Lourdes Navarro.

9.      Trafficking Step 9:  Visa Renewal Process

153.   H-1B visas are typically issued for three years, even if there is no guarantee that the job will last for the full three years.

154.   Upon information and belief, Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts were aware that H-1B visas may be obtained for a three-year period.

155.   Employer Defendants have secured H-1B visas for foreign-national teachers who are not members of the Louisiana Teacher Class.  Some, if not all, of those teachers received three-year H-1B visas.

156.   Recruiter Defendants arranged for Legal Facilitator Defendants to

44

handle obtaining and renewing H1-B visas for Plaintiffs and other Class Members. Legal Facilitator Defendants, in conjunction with Recruiter Defendants, Employer Defendants, and non-defendant Louisiana School Districts, secured one-year visas for Plaintiffs and other Class Members instead of three-year visas.

157.   Upon information and belief, Defendants obtained one-year visas in order to enhance their ability to control Plaintiffs and other Class Members. Specifically, Recruiter Defendants could continually threaten non-renewal and forced departure if Plaintiffs and other Class Members did not conform to their demands.

158.   Legal Facilitator Defendants and Recruiter Defendants charged excessive fees to renew the H-1B visas each year.

          10.   <u>Trafficking Step 10: Ongoing Methods of Intimidation and Manipulation by Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants</u>

159.   Defendant Lourdes Navarro threatened abuse of legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening that she could have teachers deported:

          a.   In November 2007, Plaintiff Mari and other Class Members working at the Recovery School District complained to Defendant Lourdes Navarro that the housing she had arranged for them was too expensive, and that they were going to move out.  Lourdes Navarro became very upset at this, telling Mari and other Class Members that they could not move out, and warning that she could have them sent back to the Philippines if they did so.

          b.   On or about August 28, 2008, Defendant Lourdes Navarro

threatened teachers, including Plaintiff Mairi Nunag-Tañedo, that the teachers could be sent back to the Philippines if they did not obey her instructions. Lourdes Navarro forced Nunag-Tañedo and some other EBRPSS Teacher Subclass members to move overnight into a different apartment complex, without any credible explanation as to why this move was necessary.

c.      On or about October 8, 2008, Defendant Lourdes Navarro warned Plaintiff Pascual that he could not bring his family to the United States with him, even though he was permitted to do so under the H-1B visa program, and that if he did try to bring his family with him she could have him sent back to the Philippines;

d.      On or about June 10, 2009, EBRPSS Teacher Subclass member Araceli Garcia complained to a reporter at a Baton Rouge television station about abuses she suffered at the hands of Recruiter Defendants. Defendant Lourdes Navarro was outraged, and with the help a teacher in Baton Rouge, Rafaela Flores, arranged a conference call with Garcia and approximately sixteen other EBRPSS Teacher Subclass members. The call lasted approximately four hours, and Lourdes Navarro repeatedly threatened to get back at Garcia, and that she would have Garcia deported.

e.      Upon information and belief, Defendant Lourdes Navarro made these threats of deportation in an effort to intimidate and control Class Members.

160.   Defendant Lourdes Navarro threatened abuse of legal process and abused legal process in an effort to intimidate and control Plaintiffs and other Class

Members by, *inter alia*, threatening to sue, and suing, Class Members who voiced criticisms about Recruiter Defendants' trafficking scheme:

      a.    In 2008, individuals voiced complaints about Defendants on a blog named "Pinoy Teachers Hub." In retaliation against the bloggers, Defendant Lourdes Navarro and Defendant Universal sued teachers whom they believed authored the blog, including Ingrid Cruz and Janet Añober. Cruz and Añober are members of the EBRPSS Teacher Subclass. The California Court of Appeals dismissed the claims against Cruz in *Navarro v. Cruz*, No. B216885 (Cal. Ct. App., June 2, 2010), pursuant to California's anti-SLAPP law. The anti-SLAPP law is designed to quickly dispose of baseless litigation filed to dissuade or punish exercise of the constitutional rights of free speech and petition for the redress of grievances.

      b.    In approximately late May or early June 2009, Defendant Lourdes Navarro held a meeting with Class Members working at the Caddo Public Schools District, including Plaintiff Pascual. During that meeting Lourdes Navarro threatened that if teachers in Caddo started speaking out against her, they would be "punished" like the teachers in Baton Rouge; Pascual and others understood Lourdes Navarro to mean that she would sue them as she had sued Cruz and Añober.

      c.    Upon information and belief, Recruiter Defendants and Legal Facilitator Defendants lacked any legal or factual basis for the lawsuits related to the Pinoy Teachers Hub blog and filed these lawsuits in an effort to intimidate teachers who were voicing opposition to Recruiter Defendants.

161.   Defendant Lourdes Navarro threatened abuse of legal process and abused legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening to sue, and suing, Class Members who refused to pay on the illegal Universal California Contract during the second year of their employment in the United States:

a.   Defendant Universal filed baseless lawsuits based on the illegal contracts against, *inter alia*, EBRPSS Teacher Subclass members Ingrid Cruz, Janet Añober and Melissa Idong.  Universal also sued Plaintiff Tomasa Mari and Class Member Margaret Aguirre, who teach in the Recovery School District.

b.   In late January or early February 2009, Defendant Lourdes Navarro conducted a meeting in Baton Rouge with many EBRPSS Teacher Subclass members, including Plaintiff Escuadra.  During that meeting, Lourdes Navarro warned teachers that if they defied her, or if they refused to follow the written terms of the Universal California Contract, she would sue them.  Lourdes Navarro represented that she had already successfully sued another teacher.

c.   Upon information and belief, Recruiter Defendants selectively sued teachers to intimidate other teachers into complying with Recruiter Defendants' demands.

162.   Defendant Lourdes Navarro threatened abuse of legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening that she could arrange to have Class Members' visas expire without renewal, and/or to have Class Members' employment terminated:

a.   In August 2008, at a meeting in Baton Rouge between

Defendant Lourdes Navarro and various EBRPSS Teacher Subclass members, Plaintiff Escuadra asked for a refund, based on the fact that the annual salary promised by Recruiter Defendants was higher than what she (and other EBRPSS Teacher Subclass member) was being paid by Defendant EBRPSS. Lourdes Navarro became furious, and told Escuadra that she might not have a job the next year.

> b.   During several phone conversations between Defendant Lourdes Navarro and Plaintiff Nunag-Tañedo in the Fall of 2008 regarding problems with Nunag-Tañedo's housing, Lourdes Navarro told her to stop complaining about housing issues, and questioned whether Nunag-Tañedo would get a job the next year.

163.   Defendant Lourdes Navarro threatened Class Members that if they did not pay the fees required by the illegal Universal California Contract, she would refuse to provide their renewed visas. Lourdes Navarro made this threat on or about September 11, 2009 to several teachers at the Jefferson Parish Public School System. However, when the Jefferson Parish Public School System insisted that Lourdes Navarro deliver the teachers' visa renewal documents, she relented.

164.   Recruiter Defendants attempted to isolate Plaintiffs and other Class Members as much as possible, in an effort to manipulate and control Plaintiffs and other Class Members.

> a.   Recruiter Defendants repeatedly warned Plaintiffs and other Class Members not to associate with the surrounding Filipino community. Such warnings were given before Plaintiffs and other Class Members left the Philippines,

1  when Plaintiffs and other Class Members were in California, and when Plaintiffs

2  and other Class Members were in Louisiana.

3            b.     On or about July 22, 2008, Employer Defendants invited

4  members of the EBRPSS Teacher Subclass and members of the Filipino American

5  Association of Greater Baton Rouge ("FAAGBR") to a recruiting event in Baton

6  Rouge.  At that event, Defendant Lourdes Navarro told the President of FAAGBR

7  to stay away from Plaintiffs and other Class Members, and not to associate with

8  them.  Lourdes Navarro warned that she would sue members of FAAGBR if they

9  interacted with Plaintiffs and other Class Members.  Lourdes Navarro made these

10  and similar threats in the presence of Defendant Duran Swinford and other EBRPSS

11  agents.

12            c.     Recruiter Defendants told Plaintiffs and other Class Members

13  that they were not permitted to bring their families with them to the United States,

14  even though immigration law permits family members to accompany H-1B visa

15  holders.  Upon information and belief, Recruiter Defendants did this in an effort to

16  further isolate Class Members in the United States.

17            d.     Recruiter Defendants required members of the Louisiana

18  Teacher Class to reside in housing selected by Recruiter Defendants in order to

19  isolate them from the broader Filipino community.

## C.    Factual Allegations that Legal Facilitator Defendants Facilitated the Illegal Trafficking Scheme

165.    Legal Facilitator Defendants actively facilitated Recruiter Defendants'

trafficking scheme.