James M. Knoepp (admitted *pro hac vice*)
Jim.Knoepp@splcenter.org
Jennifer L. Tse (SBN 260764)
Jennifer.Tse@splcenter.org
Daniel Werner (admitted *pro hac vice*)
Daniel.Werner@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, GA  30303
Telephone:  (404) 521-6700
Facsimile:  (404) 221-5857

*Attorneys for Plaintiffs*
*Additional Co-Counsel on Subsequent Pages*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EAST BATON ROUGE PARISH SCHOOL BOARD, et al., <br><br> Defendants. | Civ. No.: 10-01172-AG-MLG <br><br> **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES "LULU" NAVARRO AND HOTHELLO "JACK" NAVARRO** <br><br> **HEARING DATE:  MARCH 7, 2011** <br> **TIME:            10:00 a.m.** <br> **COURTROOM:   10D** <br><br> **HON. ANDREW J. GUILFORD** |

Civ. No. 10-01172-AG-MLG

PLAINFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

*(Attorney listing continued from first page)*

Daniel Werner (admitted *pro hac vice*)
Daniel.Werner@splcenter.org
Jennifer L. Tse (SBN 260764)
Jennifer.Tse@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, Georgia  30303
Telephone:  (404) 521-6700
Facsimile:   (404) 221-5857

Mary C. Bauer (admitted *pro hac vice*)
Mary.Bauer@splcenter.org
Sam Brooke (admitted *pro hac vice*)
Sam.Brooke@splcenter.org
Morris S. Dees (admitted *pro hac vice*)
Judy.Bruno@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:  (334) 956-8200
Facsimile:   (334) 956-8481

Dennis B. Auerbach (*admitted pro hac vice*)
dauerbach@cov.com
Candice N. Plotkin (*admitted pro hac vice*)
cplotkin@cov.com
Jillian Willis (*admitted pro hac vice*)
jwillis@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 662-6000
Facsimile:   (202) 662-6291

Civ. No. 10-01172-AG-MLG

PLAINIFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

Susan Johnston (admitted *pro hac vice*)
sjohnston@cov.com
Pamela A. Carter (*admitted pro hac vice*)
pcarter@cov.com
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone:  (212) 841-1000
Facsimile:   (212) 841-1010

Daniel J. McNeil (*admitted pro hac vice*)
dmcneil@aft.org
AMERICAN FEDERATION OF TEACHERS
LEGAL DEPARTMENT
555 New Jersey Ave., N.W.
Washington, DC  20001
Telephone:  (202) 393-6305
Facsimile:   (202) 393-6385

Lawrence Rosenzweig (SBN 72443)
LRPCorp@aol.com
Brent Rosenzweig (SBN 219071)
Brent.Rosenzweig@gmail.com
LAWRENCE ROSENZWEIG, PC
2730 Wilshire Boulevard, Suite 425
Santa Monica, California  90403
Telephone:  (310) 453-0348
Facsimile:   (310) 453-3358

*Attorneys for Plaintiffs*

Civ. No. 10-01172-AG-MLG

PLAINIFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

# **TABLE OF CONTENTS**

I.     **INTRODUCTION** ................................................................................................ 1

II.    **STATEMENT OF FACTS** ................................................................................ 2

III.   **ARGUMENT** ...................................................................................................... 6

      A.    Plaintiffs Have Properly Stated a TVPA Claim Against Universal and Navarro. ...... 6

      B.    The Amended Complaint Properly States a RICO Claim Against Universal and Navarro        ........................................................................... 9

      C.    Plaintiffs' Fraud Claim Is Pled With the Requisite Particularity. ............................ 12

      D.    Plaintiffs' Claim for False Representations by an Employment Agency Is Likewise Pled With the Requisite Particularity........................................................ 15

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Bryant v. Mattel*, No. CV 04-9049 DOC (RNBx), 2010 U.S. Dist. LEXIS 103851 (C.D. Cal. Aug. 2, 2010)...................................................................11

*Flatley v. Mauro*, 39 Cal. 4th 299, 46 Cal. Rptr. 3d 606 (2006) ............................10

*Goodman v. Kennedy*, 18 Cal. 3d 335, 134 Cal. Rptr. 375 (1976).........................14

*Lacher v. Superior Court*, 230 Cal. App. 3d 1038, 281 Cal.Rptr. 640 (Cal. Ct. App. 4th Dist. 1991) ..........................................................................................13

*LiMandri v. Judkins*, 52 Cal. App. 4th 326, 60 Cal. Rptr. 2d 539 (Cal. Ct. App. 4th Dist. 1997) ..........................................................................................14

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp*., 6 Cal. App. 4th 603, 7 Cal. Rptr. 2d 859 (Cal. Ct. App. 2d Dist. 1992)...............................................13

*Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir. 1989) ....................12

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)...........................................9

*Schmuck v. United States*, 489 U.S. 705, 109 S. Ct. 1443, 103 L. Ed. 2d 734 (1989).........................................................................................................11

*Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 346 (1985).........................................................................................................9

*United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008)................................7, 8, 9

*United States v. Dann*, No. C 08-00390 CW, 2009 U.S. Dist. LEXIS 122774 (N.D. Cal. Dec. 23, 2009) ............................................................................8

*United States v. Garcia*, Case No. 02-CR-110S-01, 2003 U.S. Dist. LEXIS 22088 (W.D.N.Y. Dec. 2, 2003)....................................................................8

*United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996) .......................................11

*Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 85 Cal. Rptr. 444 (1970).........................................................................................................14

## STATUTES

18 U.S.C. § 1589(a) ...................................................................................................6

18 U.S.C. § 1589(c) ...................................................................................................7

18 U.S.C. § 1592.........................................................................................................9

18 U.S.C. § 1592(a) ...................................................................................................9

18 U.S.C. § 1595(a) ...............................................................................................6, 9

18 U.S.C. §§ 1581, *et seq.* .......................................................................................5

18 U.S.C. §§ 1589(a), (b) ..........................................................................................6

18 U.S.C. §§ 1961, *et seq.* ....................................................................5

Cal. Civ. Code § 1709....................................................................13

Cal. Civ. Code § 1812.508(a) ........................................................15

Cal. Penal Code § 518....................................................................10

**REGULATIONS**

8 CFR § 214.1(e) ........................................................................2, 7

**RULES**

Fed. R. Civ. P. 9(b) ...............................................................11, 12, 16

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 106-939, 106th Cong., 2d Sess. 99-101 (2000)......................7

# I.   **INTRODUCTION**

It is not surprising that the moving Defendants here open their motion to dismiss with an attempt to reduce this human trafficking case affecting over 350 Filpino teachers and extortion of over $5 million in fees to nothing more than "an action to reform a few contracts." But it is also not surprising that in distilling the detailed allegations of Plaintiffs' 127-page Amended Complaint into a brisk 4 1/2 pages, Defendants omit most of the facts on which their liability rests and grossly distort the remainder. The Statement of Facts below will provide the Court with an accurate account of what Plaintiffs actually allege, predicated on the Amended Complaint itself rather than Defendants' whitewash.

In considering the motion to dismiss, the Court must accept the facts in the Amended Complaint as true. As pled, those facts amply demonstrate that Plaintiffs and others similarly situated were victims of human trafficking perpetrated by the moving Defendants and their confederates. The Amended Complaint accurately, and adequately, pleads that Defendants ensnared the teachers in a psychologically coercive and financially ruinous trafficking scheme that subjected them to exorbitant debt and forced labor, using a variety of coercive tactics, including abuse of legal process, isolation and segregation, and threats of deportation, to attempt to control the teachers' actions. The Amended Complaint also adequately pleads claims for racketeering, fraud, and false representations by an employment agency, as discussed in detail below. Defendants' motion to dismiss these claims should be denied.[1]

---

[1]   The moving Defendants are Universal Placement International, Inc., Lourdes "Lulu" Navarro, and Hothello "Jack" Navarro. Plaintiffs have agreed to dismiss Jack Navarro without prejudice, subject to tolling until they have the opportunity to take discovery regarding his role. Accordingly, this opposition concerns only Defendants Universal and Lulu Navarro.

## II.  STATEMENT OF FACTS

Beginning in 2007, several public school districts in Louisiana retained Defendant Universal Placement International, Inc. ("Universal"), a California corporation, and its owner, Defendant Lourdes "Lulu" Navarro ("Navarro"), to recruit qualified teachers from the Philippines.  The teachers were brought to the United States pursuant to the H-1B specialty occupation visa program, which allows U.S. employers to hire foreign nationals possessing certain special skills for up to six years.  (Am. Compl. ¶ 73.)  The H-1B visa permits a foreign worker to work in the United States only for the specific employer that sponsored his or her visa.  (*Id.*; *see also* 8 CFR § 214.1(e))

Navarro, Universal, and Universal's Philippine alter ego (*see* Am. Compl. ¶ 31), Defendant PARS International Placement Agency ("PARS"), advertised for teachers in the Philippines and held a series of meetings there to recruit qualified applicants.  (*Id.* ¶¶ 94, 98, 100-103.)  Several Louisiana school districts, including principally the East Baton Rouge Parish Public School System ("EBR"), interviewed teachers procured by these Recruiter Defendants.  (*Id.* ¶¶ 102-103.)  During the course of the three school years beginning in 2007, the districts selected more than 350 teachers for placement— including more than 200 at EBR, the principal beneficiary of the trafficking scheme.  (*Id.* ¶¶ 6, 9, 12, 61, 72, 78.)

Universal and Navarro told the selected teachers, in a series of group meetings, that they must pay certain fees, totaling $5,000 to $5,500.  (*Id.* ¶¶ 105-106, 113.)  This included fees for procuring H-1B visas, which, pursuant to federal regulations, must be paid by the *petitioning employer*—not the visa applicant.  (*Id.* ¶ 87-88, 112.)  Universal and Navarro conspired with their confederates to file fraudulent documents with U.S. authorities in an effort to hide their non-compliance with federal regulations.  (*Id.* ¶¶ 115-116, 175, 180, 182, 198, 205-245.)

The $5,000 to $5,500 in fees charged to each teacher was enormous by Philippine standards, equaling more than one-and-a-half times the average annual household income in the Philippines.  (*Id.* ¶ 108.)  To raise such substantial funds, the teachers were

forced to take on debt and, in some cases, to liquidate assets. (*Id.* ¶ 109.) The teachers were effectively ensnared in Defendants' trafficking scheme at that point, because only by obtaining jobs as teachers in the United States could they repay their huge debts. (*Id.* ¶¶ 124-133.)

After paying the fees, the teachers were interviewed by U.S. officials at the United States Embassy in the Philippines. (*Id.* ¶¶ 117-118.) Universal, through its Philippine alter ego, warned the teachers in group meetings before these interviews that if they told Embassy officials they had paid fees for visa processing, visas would not be issued and the teachers would forfeit the substantial amounts they had already paid. (*Id.* ¶ 119.) It also instructed the teachers that they should have the Embassy deliver their passports containing issued visas to its office in the Philippines, and that the passports would be returned only when the teachers were ready to travel to the United States. (*Id.* ¶ 121-123.)

The trafficking scheme then turned even more sinister. After the teachers went into debt to pay the $5,000 to $5,500 in fees, Universal, Navarro, and their Philippine alter egos presented them with the devastating news that they would have to pay another, previously undisclosed fee equal to 30 percent of their expected annual income in the United States (the "Second Recruitment Fee"), as well as the cost of airfare to the United States. (*Id.* ¶¶ 111, 124-125.) They provided the teachers with a schedule of what they claimed would be their salaries, and demanded the equivalent of two months' gross pay and the cost of the plane ticket up front, with the remainder of the Second Recruitment Fee due after the teacher had been in the United States for one year. (*Id.* ¶¶ 124b-c.) They also required the teachers to sign a standard form contract in the Philippines regarding these additional fees. (*Id.* ¶¶ 134-136, 140, 142-144.) Because the recruiters would not refund the fees previously paid and because the teachers were already mired in debt incurred to pay the initial fee, the teachers had no practical alternative but to do what they were told. (*Id.* ¶ 126-127, 145.)

3

The additional fee that the teachers were required to pay in the Philippines exceeded $10,000 for most of the teachers—more than three times the average annual household income in the Philippines.  (*Id.* ¶¶ 108 n.1, 124-125, 133.)  Recruiter Defendants knew that the teachers lacked the resources to pay this enormous additional sum, and referred them to selected private lenders who would lend the money at interest rates of 3-5 percent *per month*.  (*Id.* ¶¶ 128-130.)  This 3-5 percent per month interest rate translates to a whopping 43-80 percent per year (due to compounding), thereby ensnaring the teachers even more deeply in the trafficking scheme.  (*Id.* ¶ 129-133.)  On information and belief, Recruiter Defendants received kickbacks from the lenders to whom the teachers were referred.  (*Id.* ¶ 131.)

Having become mired in crushing debt to pay the almost $16,000 in total fees extracted by Universal, Navarro, and its Philippine alter egos (approximately $5,000 to $5,500 initially, plus the more than $10,000 in previously undisclosed fees and related travel costs), the teachers finally traveled to the United States.  (*Id.* ¶¶ 133, 146.)  They arrived in California and were brought to Universal's office in Los Angeles, where Universal and its agents again confiscated their passports and visas.  (*Id.* ¶¶ 146, 147.)  Universal compelled the teachers to sign a second contract providing for payment of fees.  (*Id.* ¶ 147-151.)  When some of the teachers questioned the contract's terms, Universal and Navarro told them that they would be sent back to the Philippines immediately if they did not sign the contract as written.  (*Id.* ¶ 150.)  Left with no real choice, the teachers signed the contracts and proceeded to travel to Louisiana to begin work.  (*Id.* ¶¶ 149-151.)

Universal, Navarro, and their confederates enhanced their control over the teachers by manipulating the visa process.  H-1B visas may be obtained for a three-year period, then renewed for an additional three years, and the school districts had obtained three-year visas for non-Filipino teachers previously employed under the H-1B program.  Here, however, the school districts, at the behest of Recruiter Defendants, procured only *one-year* visas for the teachers.  This allowed Universal and Navarro to assert even

4

greater control over the teachers because they could threaten non-renewal of the visas and subsequent deportation if the teachers did not comply with their demands.  (*Id*. ¶¶ 159-163.)

Universal, Navarro, and their confederates also flagrantly abused legal process in furtherance of the trafficking scheme.  When teachers complained about the mistreatment to which they were subjected, Navarro threatened them with deportation and lawsuits.  (*Id*. ¶¶ 165-168.)  For example, when some of the teachers voiced complaints on a blog, the "Pinoy Teachers Hub," Navarro and Universal filed a lawsuit in California against the teachers whom they believed authored the blog.  (*Id*. ¶¶ 166, 187b.)  The California Court of Appeals upheld a dismissal of the suit pursuant to California's anti-SLAPP law, which is designed to quickly dispose of baseless litigation filed to dissuade or punish exercise of the constitutional right to free speech.  (*Id*. ¶ 166.) But Navarro continued to threaten teachers with lawsuits and/or deportation if they did not comply with her fee and other demands, in an effort to intimidate the entire teacher group.  (*Id.* ¶¶ 150, 167-168.)

Contrary to Defendants' argument, the foregoing alleged facts and the others pleaded in the Amended Complaint are more than sufficient to state claims against Universal and Navarro under the Trafficking Victims Protection Reauthorization Act ("TVPA"),[2] RICO,[3] and California state law.

---

[2]  18 U.S.C. §§ 1581, *et seq.*
[3]  18 U.S.C. §§ 1961, *et seq.*

Civ. No.: 10-01172-AG-MLG

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

# III.   ARGUMENT

A.   Plaintiffs Have Properly Stated a TVPA Claim Against Universal and Navarro.

As explained in Plaintiffs' concurrently-filed opposition to the motions to dismiss of the EBR defendants, the fundamental issue under the TVPA's civil remedies provision, 18 U.S.C. § 1595(a), is whether a defendant knowingly procures or obtains a person's labor through a means prohibited by the statute, or knowingly benefits from participation in a venture that does so.  *See* 18 U.S.C. §§ 1589(a), (b); 18 U.S.C. § 1595(a).  The prohibited means include "serious harm or threats of serious harm"; "abuse or threatened abuse of law or legal process"; and "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

The Amended Complaint contains detailed allegations that Universal and Navarro procured the teachers' labor by such prohibited means.  They ensnared the teachers in their fraudulent scheme by promising to provide teaching jobs in the United States in exchange for fees of $5,000 to $5,500—an enormous sum by Philippine standards, which required the teachers to go into debt and/or liquidate assets.  (Am. Compl. ¶¶ 106-109.)

Only after the teachers were thus ensnared did Universal and Navarro announce that their much higher Second Recruitment Fee would be due, payable up front in the Philippines before the teachers had worked a single day in the United States.  Universal and Navarro refused to refund the fees previously paid, thus precluding any of the teachers from extricating themselves from the scheme.  Given their financial burden from the earlier fees, the teachers had no effective choice but to pay the additional fee and proceed with the employment process.  (*Id.* ¶¶ 124-133.)  To get the money to pay the enormous additional fee, the teachers had to go even further into debt.  As explained

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

above, Universal and Navarro referred them to lenders, who charged interest as high as 80% annually on a compounded basis.  (*Id.* ¶¶ 129-133.)

As a result of this systematic fraud and extortion, the teachers were under crushing debt when they finally arrived in the United States.  Pursuant to their H-1B visas, they could work for only a single employer in the United States:  the school district that was the visa sponsor.  (*Id.* ¶ 73); *accord* 8 CFR § 214.1(e) (H-1B nonimmigrant may engage only in authorized employment and "[a]ny unauthorized employment by a nonimmigrant constitutes a failure to maintain status").  To have any hope of repaying the debt to which they were subjected by Defendants' scheme, they thus had no practical alternative, absent another sponsor, but to work and continue working for that school district.  (*See, e.g., id.* ¶¶ 127, 151.)

In this context, Defendants' contention that the teachers were not technically "required" to work for the school districts is entirely off base and reflects a fundamental misunderstanding of the TVPA.  Liability under the TVPA does not depend on physical coercion.  In enacting the TVPA, Congress intended section 1589 to be read broadly to "address the increasingly *subtle methods* of traffickers" including those who "restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence."  H.R. Conf. Rep. No. 106-939, 106th Cong., 2d Sess. 99-101 (2000) (emphasis added).  A defendant need not have subjected a victim to involuntary servitude to be liable.  *Id.* at 101.

Consistent with Congress's clear intent, section 1589 provides for liability in situations like that here, where a plaintiff's labor is procured by means other than physical force.  *See* 18 U.S.C. § 1589(c) (defining "serious harm" as including "physical or nonphysical, including psychological, financial, or reputational harm").  It is sufficient that a defendant's misconduct has created a situation where ceasing to labor would cause plaintiff serious financial harm.  *See United States v. Calimlim*, 538 F.3d 706, 711-12, 714 (7th Cir. 2008) (finding that "serious harm" includes financial harm and noting that violations of section 1589 are not limited to overt physical coercion);

7

*United States v. Dann*, No. C 08-00390 CW, 2009 U.S. Dist. LEXIS 122774, at \*5-\*7 (N.D. Cal. Dec. 23, 2009) (threat of serious financial harm sufficient to establish forced labor).

Here, Universal's and Navarro's systematic fraud and extortion forced Plaintiffs to take on crushing debt, which they could not possibly repay absent continued employment by the school districts.  Given that debt, ceasing to work would have resulted in their financial ruin, plain and simple.  Plaintiffs could not readily quit and work somewhere else given their immigration status.  *See Calimlim*, 538 F.3d at 712 ("[The trafficking victim] did not have an exit option:  because the threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm.").

The teachers' labor was also obtained through Defendants' abuse and threatened abuse of the legal process—another prohibited means under section 1589(a).  (Am. Compl. ¶¶ 162-163, 165-169, 185-187.)  Universal and Navarro subjected the teachers to repeated threats of deportation and non-renewal of their visas, as well as frivolous lawsuits and threats of additional lawsuits for speaking out.  (*Id.*); *see Calimlim*, 538 F.3d at 710-11, 713 (implicit threats of deportation were "threatened abuse of the law or the legal process" under Section 1589); *United States v. Garcia*, Case No. 02-CR-110S-01, 2003 U.S. Dist. LEXIS 22088, at \*23 (W.D.N.Y. Dec. 2, 2003) (threatening victims with deportation "clearly fall[s] within the concept and definition of 'abuse of legal process'").

While Universal and Navarro argue that these abuses of process were not associated with procuring Plaintiffs' labor, they were in fact part and parcel of the fraudulent scheme.  As explained above, the teachers needed to continue working for their school district visa sponsor to have any hope of paying off the enormous debt to which they were subjected.  In this context, the threats of deportation and non-renewal of H-1B visas were an extremely effective tool to control the teachers, stifle criticism, and extract additional illegal fees—*i.e.*, to ensure that the teachers would continue laboring

8

under the conditions imposed.  The teachers' labor was thus procured through abuse of legal process within the meaning of section 1589.  *See Calimlim,* 538 F.3d at 710-11; *Garcia,* 2003 U.S. Dist. LEXIS 22088, at *23.

Plaintiffs have also adequately alleged that Universal and Navarro violated 18 U.S.C. § 1592 by illegally confiscating and possessing Plaintiffs' passports and restricting their travel until they paid the fraudulent and illegal fees demanded.  (Am. Compl. ¶¶ 10, 120-124.)  Upon the teachers' arrival in the United States, they again confiscated and possessed the teachers' passports until they signed illegal contracts requiring payment of additional fees.  (*Id.* ¶ 147.)  Because this misconduct occurred in the course of the section 1589 and 1590 violations described above, Plaintiffs have adequately pled a violation of section 1592(a).  Defendants assert that Navarro surrendered the passports upon demand by a Louisiana school district (ECF No. 67 at 14), but that grossly distorts the Amended Complaint:  the paragraph Defendants cite only states that at a later time, Navarro relented on a threat not to renew teacher visas, at the insistence of a school district that is not a defendant in this action.  (Am. Compl. ¶ 169).  Universal, Navarro, and their Philippine alter egos did not surrender the teachers' *passports* until the teachers fully complied with their demands.  (*Id.* ¶¶ 123, 147.)

Based on these violations, Universal and Navarro are civilly liable both as perpetrators and as knowing beneficiaries of TVPA violations under 18 U.S.C. § 1595(a).  Accordingly, their motion to dismiss the TVPA claim should be denied.

B.   The Amended Complaint Properly States a RICO Claim Against Universal and Navarro

As explained in Plaintiffs' opposition to the motions to dismiss of the EBR Defendants, the Amended Complaint properly pleads each element of a claim under RICO:  it alleges "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 3284-85, 87 L. Ed. 346, 358-59 (1985)).  Universal and Navarro dispute that they committed RICO

predicate acts.  But the Amended Complaint alleges multiple acts of trafficking, extortion, and mail or wire fraud by each of them.

The predicate acts of trafficking by Universal and Navarro are described in detail in section III.A. above.  Their predicate acts of extortion are likewise clearly pled in the Amended Complaint.  Section 518 of the California Penal Code defines extortion as the "obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear, or under color of official right."  Cal. Penal Code § 518.  Universal and Navarro did precisely that here:  they extracted exorbitant and illegal fees as well as labor from the teachers through fraud, threats of severe financial harm, confiscation of passports, calculated acts of intimidation, and other abuses of legal process.  *See* Section II, *supra*.  Even the EBR Defendants refer to such acts by Universal and Navarro alleged in the Amended Complaint as extortion.  (*See* ECF No. 45-2 at 28.)

Universal and Navarro argue that their lawsuits to collect fees cannot be deemed extortion, but they ignore the fact that it is context that counts under section 518.  Even a threat that is perfectly legal in and of itself can constitute extortion in California if it is part of a broader scheme to intimidate and defraud.  *See Flatley v. Mauro*, 39 Cal. 4th 299, 326-27, 46 Cal. Rptr. 3d 606, 626-27 (2006).  That is precisely what the Amended Complaint alleges here.  Moreover, the lawsuits seeking collection of the fraudulent fees comprise only a small part of the extortion alleged in the Amended Complaint, and Defendants do not even try to dispute that their other wrongful acts to extract fraudulent and illegal fees and otherwise intimidate the teachers fall within the purview of section 518.

Finally, the Amended Complaint properly pleads predicate acts of mail and wire fraud by Universal and Navarro.  "A claim for mail fraud or wire fraud must allege that the defendant: (1) devised or intended to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) used the mail or wires for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)."  *Bryant v. Mattel*, No. CV 04-9049 DOC (RNBx), 2010 U.S. Dist. LEXIS 103851, at *20-*21 (C.D. Cal. Aug.

2, 2010) (citation and internal quotation marks omitted).  As explained in Plaintiffs'
Opposition to the motions to dismiss of the EBR Defendants, it is only necessary that
there was a scheme to defraud, and that the mail or wires were used in furtherance of the
scheme.  *United States v. Hubbard*, 96 F.3d 1223, 1228 (9th Cir. 1996).  The
communications by mail or wire need only be "incident to an essential part of the
scheme" or "a step in the plot" to constitute mail or wire fraud.  *Schmuck v. United
States*, 489 U.S. 705, 711, 109 S. Ct. 1443, 1448, 103 L. Ed. 2d 734, 743 (1989) (citation
and internal quotation marks omitted).  The communication itself need not be fraudulent.
*See Schmuck*, 489 U.S. at 715; *Hubbard*, 96 F.3d at 1228; *Bryant*, 2010 U.S. Dist.
LEXIS 103851, at *29.

Universal and Navarro engaged in multiple acts of mail or wire fraud here.  The
Amended Complaint alleges that Universal and Navarro had extensive communications
with Louisiana school districts in furtherance of their fraudulent trafficking scheme over
the course of three years.  Most of these communications between California and
Louisiana were necessarily by mail, email, phone or fax, and, indeed, the Amended
Complaint specifically alleges that Universal and Navarro "utilized the telephone,
facsimile, postal system, and/or e-mail of the United States to organize, plan, and
coordinate the RICO Enterprise."  (Am. Compl. ¶ 287.)  The Amended Complaint
further articulates that, in furtherance of their scheme to defraud the teachers, Universal
and Navarro worked with their confederates to send visa applications and related
documents by electronic mail and facsimile.  (*Id.* ¶¶ 115-116.)

Although Defendants contend that the alleged mail and wire fraud are not pled
with necessary particularity, "[e]very act of mail or wire fraud need not be pled with the
'particularity' required by Fed. R. Civ. P. 9(b)."  *Bryant*, 2010 U.S. Dist. LEXIS 103851,
at *29.  The particularity requirements "only apply to (1) the scheme itself; and (2) any
mail or wire communications alleged to be fraudulent."  *Id.* at *30.  Here, the Amended
Complaint alleges continuous mail and wire communications with the school districts
and others over several years.  These communications were not themselves fraudulent,

but were certainly in furtherance of the fraudulent trafficking scheme.  Accordingly, they constitute predicate acts of mail and wire fraud that need not be pled with particularity under Rule 9(b).[4]

Because the Amended Complaint adequately pleads that Universal and Navarro engaged in a pattern of racketeering activity, as well as the other requisite elements of a RICO claim, Defendants' motion to dismiss Plaintiffs' RICO count should be denied.

C.    Plaintiffs' Fraud Claim Is Pled With the Requisite Particularity.

Contrary to Defendants' assertion, Plaintiffs' state law fraud claim is pled with the particularity required by Fed. R. Civ. P. 9(b).  A pleading is sufficient under Rule 9(b) "if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  The Amended Complaint easily meets that standard.

Paragraphs 189-204 of the Amended Complaint describe with acute precision the particulars of numerous false misrepresentations and fraudulent omissions by Universal and Navarro.  The time, place, speaker, recipient, and substance of the false statement or omission is alleged in each instance.  (*See, e.g.,* Am. Compl. ¶ 189 ("On or about March 28, 2008, at the Waterfront Hotel in Cebu City, Philippines, Defendant Lourdes Navarro informed Plaintiff Nunag-Tanedo that she would collect various supporting documents, pay a First Recruitment Fee of $5,515 . . . to obtain her job offer and to complete the H-1B visa process.  However, Lourdes Navarro willfully, maliciously and fraudulently failed to inform Nunag-Tanedo that before she would be permitted to leave the Philippines, she would need to pay an Undisclosed Second Recruitment Fee of two months of her expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after she was in the United States for one year.").)

---

[4]  As explained in Section III.C, *infra*, Universal and Navarro also made numerous false statements that constitute fraud under state law, but which do not constitute mail or wire fraud because they did not involve use of the mail or wires.

These detailed allegations state the requisite elements of a fraud claim under the California Civil Code. *See* Cal. Civ. Code § 1709 ("one who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damages which he thereby suffers.")  Defendants represented that the teachers would obtain a teaching placement in consideration of the initial fee of roughly $5,000 to $5,500.  That representation was patently false:  Universal, Navarro, and their Philippine alter egos intended ultimately to charge three times that amount.  (*See* Am. Compl. ¶¶ 189-194.)[5]  The teachers reasonably relied on Defendants' misrepresentation in paying the initial fees, to their obvious detriment.  (*Id.*)  As previously explained, the fraud also had the effect of ensnaring the teachers in Defendants' trafficking scheme, which resulted in even greater subsequent harm.  *See* Section III.A, *supra*.  In paying fees for visa processing that were the legal responsibility of the school districts, the teachers likewise reasonably relied on the false representations made by Universal and Navarro on that subject and suffered damages.  (Am. Compl. ¶¶ 195-204; 333.)

Universal and Navarro also violated Cal. Civ. Code § 1709 by fraudulently concealing the Second Recruitment Fee in their initial statements to the teachers.  *See Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612-13, 7 Cal. Rptr. 2d 859, 864 (Cal. Ct. App. 2d Dist. 1992) (elements of claim for fraud based on concealment are concealment of a material fact; a duty to disclose such fact; intent to defraud; plaintiff's unawareness of the non-disclosed fact; and damage based on the concealment).  Defendants' intention to charge the Second Recruitment Fee was obviously a material fact.[6]  Because of the concealment, the teachers were caused to believe that recruiting fees would be roughly $5,000 to $5,500—about what an

---

[5]  Because their Philippine confederates were alter egos of Universal and Navarro (*see* Am. Compl. ¶ 31), the fraud of those confederates is imputed to Universal and Navarro.

[6]  *See Lacher v. Superior Court*, 230 Cal. App. 3d 1038, 1049, 281 Cal.Rptr. 640, 645 (Cal. Ct. App. 4th Dist. 1991) ("A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment.") (citation and internal quotation marks omitted).

employment agency is permitted to charge under Philippine law.  (*See* Am. Compl. ¶¶ 83-84.)  Instead, Universal, Navarro, and their Philippine alter egos ultimately charged the teachers almost $16,000 in fees and costs before they could even leave the Philippines—more than five times the average annual income in that country.  (*Id.* ¶ 133.)  Defendants' concealment induced the teachers to become ensnared in the trafficking scheme—an obvious alteration of their positions, which had very substantial detrimental effects.  (*Id.* ¶¶ 9-10, 113, 124-133, 332.)

Universal and Navarro had a clear duty to disclose that the teachers would be required to pay a Second Recruitment Fee.  They entered into a transaction with the teachers, knowing that the teachers would not receive the services promised absent payment of the much larger Second Recruitment Fee.  This fact could not reasonably have been discovered by the teachers.  Accordingly, the transaction gave rise to a disclosure duty on Universal's and Navarro's part.  *See Goodman v. Kennedy*, 18 Cal. 3d 335, 347, 134 Cal. Rptr. 375, 383 (1976) ("duty of disclosure…may exist when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party"); *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294, 85 Cal. Rptr. 444, 449 (1970) (in transactions which do not involve fiduciary or confidential relations, cause of action for non-disclosure may arise, *inter alia*, where "the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff").[7]

Universal and Navarro similarly had a duty to disclose that visa processing fees were the legal obligation of the petitioning school districts, not the teachers, because they were aware of that important fact, which Filipino teachers could not reasonably have known on their own.  Indeed, Universal and Navarro actively abetted this

_____

[7]  *See also LiMandri v. Judkins*, 52 Cal. App. 4th 326, 335, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 4th Dist. 1997).

Civ. No.: 10-01172-AG-MLG

14

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES "LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

concealment of facts regarding the petitioning school district's duties by requiring the teachers to work with a California lawyer, Defendant Robert Silverman, who conspired with other Defendants to purposefully withhold this information.  (*See* Am. Compl. ¶¶ 173, 175c.)

The Amended Complaint properly alleges the final three elements of a claim for fraudulent concealment:  it alleges that Universal and Navarro knew throughout the process that they intended to charge a Second Recruitment Fee and that visa processing fees were the legal obligation of the petitioning school district (Am. Compl. ¶¶ 9, 189-204, 329-331); it alleges that the teachers would not have participated in the recruitment process under the terms imposed had they known the truth (*id.* ¶ 332); and it alleges that the teachers suffered damages in at least the amount of the fees fraudulently extracted from them.  (*Id.* ¶¶ 329-334.)  Consequently, Defendants' motion to dismiss Plaintiffs' fraud claim must be denied.

D.    Plaintiffs' Claim for False Representations by an Employment Agency Is Likewise Pled With the Requisite Particularity.

Defendants' motion to dismiss Plaintiffs' claim for false representations under Cal. Civ. Code § 1812.508(a) fails for much the same reason:  the Amended Complaint details numerous false statements and omissions by Universal and Navarro, which resulted in harm to the teachers.

As an initial matter, Defendants mischaracterize section 1812.508(a) as a "false advertising" statute.  In fact, the provision specifies that "[n]o employment agency shall make, or cause to be made, any false, misleading, or deceptive advertisements *or representations* concerning the services that the agency will provide to jobseekers."  *Id.* (emphasis added).  Section 1812.508(a) thus protects individuals working with a California employment agency from both false advertising and false, misleading, or deceptive *representations* made by the agency.

Universal and Navarro made numerous such misleading or deceptive misrepresentations here, as set forth in section III.C above.  The Amended Complaint describes them in extensive detail, easily satisfying the pleading requirement of Fed. R.

Civ. P. 9(b).  (*See, e.g.,* Am. Compl. ¶¶ 189-204.)  Accordingly, Defendants' motion to dismiss the section 1812.508(a) claim also fails.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted this 14th day of February, 2011.


   /s/ James M. Knoepp
James M. Knoepp
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, Georgia  30303
*On behalf of Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF
UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES
"LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO

CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to all counsel of record.

     I HEREBY CERTIFY that I have this date emailed and caused to be mailed by first-class mail, postage pre-paid, a copy of the foregoing to the email and mailing address on file for Robert B. Silverman with the State Bar of California:

> Robert B. Silverman
> Silverman & Associates
> silveratty@gmail.com
> 25 S. Oak Knoll Ave., Apt. 504
> Pasadena, CA  91101.

/s/ James M. Knoepp
February 14, 2011.

Civ. No.: 10-01172-AG-MLG