## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 10-1172-AG(MLGx) | Date | March 7, 2011 |
|---|---|---|---|
| Title | MAIRI NUNAG-TANEDO, ET AL v EAST BATON ROUGE SCHOOL BOARD, ET AL | | |

| Present: The Honorable | ANDREW J. GUILFORD, U.S. District Judge |
|---|---|

| Lisa Bredahl | Denise Paddock |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Dennis Auerbach | Shelton Blunt |
| James Knoepp | Brandi Cole |
| Jennifer Tse | Don Hernandez |
| Daniel McNeil | |

**Proceedings:**      1. DEFENDANTS' MOTION TO DISMISS CLAIMS AGAINST EAST BATON ROUGE PARISH SCHOOL BOARD
       2. MOTION TO DISMISS CHARLOTTE PLACID, MILLIE WILLIAMS, AND ELIZABETH DURAN SWINFORD [DKT #44]
       3. DEFENDANTS UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES "LULU" NAVARRO, AND HOTHELLO "JACK" NAVARRO TO DISMISS PLAINTIFFS' FIRST, SECOND, THIRD AND FIFTH CLAIMS FOR RELIEF AGAINST THEM [DKT #60]

Cause is called for hearing and counsel make their appearances.  Counsel argue the tentative rulings, copies of which are attached to this minute order.  Matters are taken under submission.

|  | : | 40 |
|---|---|---|
| Initials of Preparer | lmb | |

1
2
3
4
5
6
7
8                    UNITED  STATES  DISTRICT  COURT

9               FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10

11  MAIRI NUÑAG-TANEDO, ET AL.,     )         CASE NO. SACV 10-1172-AG (MLGx)
                                    )
12                                  )
              Plaintiffs,           )         [TENTATIVE] ORDER GRANTING IN
13                                  )         PART AND DENYING IN PART
          v.                        )         MOTION TO DISMISS OF
14                                  )         DEFENDANT EAST BATON ROUGE
                                    )         PARISH SCHOOL BOARD
15  EAST BATON ROUGE PARISH         )
    SCHOOL BOARD, ET AL.,           )
16                                  )
                                    )
17            Defendants.           )
                                    )
18                                  )
                                    )
19  _____)

20         This putative class action involves allegations of fraud, human trafficking, and

21  racketeering.  Defendant East Baton Rouge Parish School Board ("Defendant" or "School

22  Board") now brings a Motion to Dismiss ("Motion") the First Amended Complaint ("FAC")

23  filed by Plaintiffs Mairi Nuñag-Tanedo, et al. ("Plaintiffs") for lack of personal jurisdiction and

24  failure to state a claim.  After considering the papers and arguments submitted, Defendant's

25  Motion to Dismiss for lack of personal jurisdiction is DENIED.  Further, Defendant's Motion to

26  Dismiss for failure to state a claim is GRANTED in part and DENIED in part.  Defendant's

27  Motion is GRANTED as to Plaintiffs' TVPA claims but is DENIED as to Plaintiffs' negligent

28  hiring claim.

**BACKGROUND**

The following factual allegations are taken from Plaintiffs' FAC, and as it must for this Motion, the Court assumes them to be true.

Plaintiffs are teachers and Filipino nationals who came from the Philippines to work in the United States at various times beginning in 2007.  (FAC ¶ 72.)  Plaintiffs were holders of H-1B visas that permit foreign nationals with special skills to work in the United States for a specified employer for up to six years.  (*Id.* ¶ 73.)  Three of these Plaintiffs are currently employed as teachers by Defendant.  (*Id.* ¶ 14–17.)

Defendant is the governing body of a local government entity in Louisiana charged with the management of the public school system in East Baton Rouge Parish.  (*Id.* ¶ 20.)  Defendant contracted with Universal Placement International, Inc. ("UPI") to recruit teachers from the Philippines.  (*Id.* ¶ 78.)

UPI, its president Lourdes Navarro ("Navarro"), and attorney Robert B. Silverman ("Silverman") are all located in California (collectively the "California Defendants").  (*Id.* ¶¶ 26, 27, 35.)  California Defendants allegedly engaged in fraudulent activity related to human trafficking and forced labor.  (For a summary of the allegations against California Defendants, see this Court's Order Granting in Part and Denying in Part Motion to Dismiss FAC of Lourdes Navarro and UPI (the "UPI Order").)

Defendant's recruitment contract with UPI obligated Defendant to pay the salary and benefits of any hired teachers, without any additional expenses.  (*Id.* ¶¶ 97–98.)  Defendant received multiple benefits from the contract: (1) having capable and experienced teachers; (2) having California Defendants navigate the H-1B visa process; and (3) not having to pay for any of the fees and expenses related to the H-1B visa process.  (*Id.* ¶¶ 98, 181.)

Before entering into the recruitment contract, Defendant failed to inquire into California Defendants' background. (*Id.* ¶ 398.)  California Defendants were under investigation by the U.S. embassy in Manila and Navarro was previously convicted for defrauding the government and money laundering.  (*Id.* ¶¶ 183–84.)

Plaintiffs further allege that Defendant participated in the trafficking venture by (1) interviewing teachers in person and via teleconference; (2) selecting Plaintiffs from the applicants interviewed; (3) issuing job offers via email; and (4) working collectively with California Defendants to prepare and submit Labor Conditions Applications ("LCAs"), H-1B visa applications, and H-1B visa renewal applications. (*Id.* ¶ 180.)

Lastly, Defendant colluded with California Defendants to (1) only seek one-year visas (*Id.* ¶ 186) and (2) stymie criticisms of the scheme (*Id.* ¶ 187). Through its employees, Defendant also allegedly submitted fraudulent documents to the federal government. (*Id.* ¶¶ 205–225.)

Based on these factual allegations and others, Plaintiffs bring twelve claims against multiple defendants in this matter. (*See* the UPI Order.) Plaintiffs bring two of these claims against Defendant, the eleventh and twelfth claims: (11) violations of the Trafficking Victims Protection Act ("TVPA"); and (12) negligent hiring. Defendant now moves to dismiss these two claims based on Rule 12(b)(2) and Rule 12(b)(6).

**LEGAL STANDARD**

**1.   RULE 12(b)(2)**

Under Rule 12(b)(2), a defendant may bring a motion to dismiss for lack of personal jurisdiction. Although the defendant is the moving party, the plaintiff bears the burden of making a prima facie showing of facts establishing personal jurisdiction by a preponderance of the evidence. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Lawful exercise of jurisdiction over a nonresident defendant must comport with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Concerns of fairness require that a court exercise jurisdiction only if the

1   defendant's actions in the forum are such that "he should reasonably anticipate being haled into

2   court there." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

3

4   **2.      RULE 12(b)(6)**

5

6          A court should dismiss a complaint when its allegations fail to state a claim upon which

7   relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint need only include "a short and plain

8   statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

9   "'[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

10  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). The Court must accept as

11  true all factual allegations in the complaint and must draw all reasonable inferences from those

12  allegations, construing the complaint in the light most favorable to the plaintiff. *Pollard v. Geo

13  Group, Inc.*, 607 F.3d 583, 585 n.3 (9th Cir. 2010); *Westlands Water Dist. v. Firebaugh Canal*,

14  10 F.3d 667, 670 (9th Cir. 1993).

15         But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim

16  that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "A

17  claim has facial plausibility when the pleaded factual content allows the court to draw the

18  reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at

19  1940 (citing *Twombly*, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause

20  of action's elements, supported by mere conclusory statements," *Iqbal*, 129 S. Ct. at 1940, or

21  "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

22  inferences," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The Ninth

23  Circuit recently stated that a complaint must be (1) "sufficiently detailed to give fair notice to the

24  opposing party of the nature of the claim so that the party may effectively defend against it," and

25  (2) "sufficiently plausible that it is not unfair to require the opposing party to be subjected to the

26  expense of discovery." *Starr v. Baca*, No. 09-55233, 2011 WL 477094, at *14 (9th Cir. Feb. 11,

27  2011). Dismissal without leave to amend is appropriate only when the Court is satisfied that the

28

4

1  deficiencies of the complaint could not possibly be cured by amendment.  *Jackson v. Carey*, 353

2  F.3d 750, 758 (9th Cir. 2003).

3

4  **ANALYSIS**

5

6  _____As noted, Defendant moves to dismiss Plaintiffs' claims for lack of personal jurisdiction

7  under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6).  The Court will first

8  address Defendant's Rule 12(b)(2) argument and then proceed to Defendant's Rule 12(b)(6)

9  argument.

10

11  **1.    DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL**

12  **JURISDICTION**

13

14  **1.1    Personal Jurisdiction Analysis**

15

16  When a court decides a motion to dismiss for lack of personal jurisdiction before

17  conducting a trial or evidentiary hearing, the plaintiff need only make a prima facie showing that

18  personal jurisdiction exists.  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  A plaintiff

19  makes a prima facie showing if the plaintiff produces admissible evidence which, if believed,

20  would be sufficient to establish the existence of personal jurisdiction.  *Harris Rutsky & Co. Ins.*

21  *Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003).  For a Rule 12(b)(2)

22  motion brought before trial or an evidentiary hearing, a court accepts as true the complaint's

23  uncontroverted factual allegations and resolves any factual conflicts in the plaintiff's favor.  *Id.*

24  Otherwise, defendants could prevent plaintiffs from meeting their burden simply by contradicting

25  plaintiffs' affidavits.  *Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911,

26  912 (9th Cir. 1990).

27  A plaintiff can establish a defendant's minimum contacts with a given forum under a

28  theory of general or specific jurisdiction.  *Helicopteros*, 466 U.S. at 414–16.  General jurisdiction

1    exists where a defendant has "substantial" or "continuous and systematic" contacts with the

2    forum state. *Id.* at 415. If general jurisdiction exists, the forum state has jurisdiction over the

3    defendant regardless of where the events giving rise to the litigation occurred. *Id.* at 415.

4          If a defendant's contacts with the forum state are not sufficient to establish general

5    jurisdiction, specific jurisdiction may still be shown. Specific jurisdiction exists where

6    defendants have purposefully availed themselves of "the benefits and protections" of the laws of

7    the forum through specific acts giving rise to the litigation at hand. *See Burger King Corp.*, 471

8    U.S. at 472–73 (citing *Helicopteros*, 466 U.S. at 414). Once it is established that defendants

9    purposefully availed themselves of the benefits and protections of the forum, or purposefully

10   directed their actions toward the forum, the forum's exercise of jurisdiction is "presumptively

11   reasonable." *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991).

12         Plaintiffs here do not allege general jurisdiction over Defendant exists. Instead, Plaintiffs

13   argue that personal jurisdiction over Defendant exists under either specific jurisdiction or an

14   agency theory. The Court addresses these arguments in turn.

15

16   **1.2    Specific Jurisdiction**

17

18         Specific jurisdiction is determined by a three-part test. First, plaintiffs must show that the

19   defendant "purposefully direct[ed] . . . activities or consummate[d] some transaction with the

20   forum or resident thereof; or perform[ed] some act by which [the defendant] purposefully

21   avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the

22   benefits and protections of its laws." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007)

23   (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Second,

24   plaintiffs must show that the claim "arises out of or relates to the defendant's forum-related

25   activities." *Id.* Finally, the exercise of jurisdiction must "comport with fair play and substantial

26   justice, i.e. it must be reasonable." *Id.* If plaintiffs show the first two elements by a

27   preponderance of the evidence, then reasonableness is presumed and the burden shifts to the

28

defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802; *see also Roth*, 942 F.2d at 625.

### 1.2.1 The First Prong of the Specific Jurisdiction Test: Purposeful Direction of Activity towards California

As noted, the first element of whether specific jurisdiction exists concerns whether Defendant "purposefully directed" its activities towards California. (Motion at 8:3–4; Opp'n at 4:2; Reply at 10:5–8.) The parties agree on this point, but they disagree on what test should be used to determine whether Defendant purposefully directed activity toward California. (Motion at 8:13–17; Opp'n at 5:2–8; Reply at 10:12–3.)

Defendant argues that the "effects" test, stated in *Yahoo! Inc. v. La Lique Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) and *Menken*, 503 F.3d at 1057 (9th Cir. 2007), should apply. In *Yahoo!*, the Ninth Circuit stated that in tort cases, the courts typically apply "an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred with the forum." *Id.* The "effects" test requires that for purposeful direction of activity, the defendant allegedly must have (1) committed an intentional act (2) expressly aimed at California (3) that caused harm that is suffered in the forum state and that the defendant knows is likely to be suffered in the forum state. *See Yahoo!*, 433 F.3d at 1206. Under the effects test the Court "must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Id.* at 1207.

Plaintiffs argue that the effects test should not apply because their claims against Defendant are not intentional tort claims. (Opp'n at 5:2–8 (citing *Holland Am. Line, Inc. v. Wartsilla N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007).) Plaintiffs argument fails. First, Plaintiffs' claims actually do include a possible intentional tort, violations of the TVPA. But regardless, the Ninth Circuit has expanded the applicability of the effects test to encompass all tortious actions, stating that "[i]n tort cases, [the courts] typically inquire whether a defendant

'purposefully directs his activities' at the forum state, applying an 'effects' test that focuses on the forum in which defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo!*, 433 F.3d at 1206 (9th Cir. 2006) (en banc); *see also Menken,* 503 F.3d at 1059 (holding the effects test applicable to claims including negligence, wrongful interference with contractual relations, and civil extortion because they primarily arose in tort). The Ninth Circuit makes clear that the distinction is between tort and contract claims, not between intentional and unintentional torts. *See Yahoo!*, 433 F.3d at 1206; *Menken*, 503 F.3d at 1057.

Here, as noted, Plaintiffs bring two tort claims against Defendant. Thus, under *Yahoo* and *Menken*, the effects test applies. As noted, to show purposeful direction of activity toward California the effects test requires that the defendant must have (1) committed an intentional act (2) expressly aimed at California (3) which caused harm that is suffered in the forum state and that the defendant knows is likely to be suffered in the forum state. *Yahoo!*, 433 F.3d at 1206. The Court now reviews whether Plaintiffs have satisfied these elements.

### 1.2.1.1 *The First Prong of the Effects Test: Committing an Intentional Act*

For the first prong of the effects test, the Ninth Circuit states that intent refers "to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Brayten Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)

Plaintiffs argue that Defendant committed multiple intentional acts by (1) hiring UPI to recruit teachers in the Philippines and (2) engaging Silverman to procure the necessary H-1B visas. (Opp'n at 4:15–18; 5:15–18; FAC ¶¶ 9, 33, 78, 98, 175g.) Further, Plaintiffs cite a long list of communications between Defendant and California-based UPI, Navarro, and Silverman. (Opp'n at 5:18–6:24; FAC ¶¶ 185b, 187a–e; Declaration of James Knoepp ("Knoepp Decl."),

1  Exs. B–H.) They also cite visa forms submitted to a United States Citizenship and Immigration

2  Services ("USCIS") California office. (Opp'n at 7:1–7; FAC ¶¶ 205–225; Knoepp Decl., Ex. J.)

3        Defendant argues that the Court should not consider most of the conduct cited by Plaintiffs

4  during the jurisdictional inquiry. (Reply at 6–9.) To support this contention, Defendant argues

5  that most of the documents and allegations do not concern the named Plaintiffs. (*Id.* at 6:11–12,

6  n.6.) Defendant also argues that Plaintiffs cannot rely on the H-1B visa filings in California,

7  since those are covered by the government exception. (*Id.* at 7:10–8:4.)

8        After subtracting the conduct covered by Defendant's proposed limitations, Defendant

9  states that Plaintiffs are left with only the following contacts concerning the named Plaintiffs: (1)

10  Swinford's email about a blog critical of California Defendants (FAC ¶ 187b); (2) a letter

11  confirming Defendant's acceptance of UPI's recruitment offer (Knoepp Decl., Ex. C); and (3) a

12  FedEx package transmitting checks to Navarro for hotel and airfare (*id.*, Ex. G). Defendant

13  argues that this fails to establish jurisdiction.

14        Defendant's argument is unpersuasive. Even if the Court were to disregard all the contacts

15  to which Defendant objects, Defendant itself concedes that three contacts remain. And as the

16  Ninth Circuit stated in *Yahoo!*, "[a] single forum state contact can support jurisdiction if the cause

17  of action . . . arises out of that particular purposeful contact of the defendant with the forum

18  state." *Yahoo!*, 433 F.3d at 1210. And although Defendant glosses over its most significant

19  intentional act, entering into a recruitment contract with UPI, this recruitment contract alone is a

20  sufficient intentional act.

21        Plaintiffs therefore have sufficiently shown that Defendant committed intentional acts

22  when they hired UPI and Silverman and when they sent the alleged communications. Thus,

23  Plaintiffs meet the first prong of the effects test.

24

25

26

27

28

1.2.1.2      *The Second Prong of the Effects Test: Expressly Aimed at California*

The second element of the effects test "requires that the defendant's conduct be expressly aimed at the forum." *Brayton*, 606 F.3d at 1129. The Court looks at "all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo!*, 433 F.3d at 1207.

Plaintiffs argue that Defendant's acts were aimed at California because UPI is a California corporation and Silverman is a California attorney. And Plaintiffs allege that Defendant knew these services would be performed in California. (Opp'n at 5:15–18; FAC ¶¶ 9, 33, 78, 98, 175g.) Plaintiffs also cite the same list of communication as above to support their argument that Defendant's actions were aimed at California. (Opp'n at 5:18–7:7; FAC ¶¶ 185b, 187a–e, 205–225;"Knoepp Decl.", Exs. B–H, J.)

Defendant argues that even if all of the conduct is considered, there is no personal jurisdiction. Defendant argues that all of its "contacts with California were incidental to the recruiting contract with . . . [UPI], a contract which called for services to be rendered in the Philippines." (*Id.* at 11:11–13.) Defendant further argues that Plaintiffs "cannot show that [Defendant's] contacts with California were made for the purpose of furthering any interest of [Defendant] in California." (*Id.* at 11: 23–25.)

Defendant's argument that all of its contacts with California were incidental to its recruiting contract fails. Here, Defendant intentionally retained the California Defendants' recruiting services with the express purpose of recruiting teachers from the Philippines. This contract is an intentional contact with California. And as noted, even "[a] single forum state contact can support jurisdiction if the cause of action . . . arises out of that particular purposeful contact of the defendant with the forum state." *Yahoo!*, 433 F.3d at 1210.

Even if the other contacts are incidental to the recruiting contract, the contract and hiring UPI directly give rise to the negligent hiring claim and also forms the basis for Plaintiffs' TVPA

1  claim. Thus, Plaintiffs have shown that Defendant aimed its acts at California, and they meet the

2  second prong of the effects test.

3

4        1.2.1.3        *The Third Prong of the Effects Test: Harm Suffered in the*

5                        *Forum State*

6

7        The final element of the effects test requires that a defendant's act caused harm that is

8  suffered in the forum state that the defendant knows is likely to be suffered there. *See Yahoo!*,

9  433 F.3d at 1206. The Ninth Circuit has held that this element "is satisfied when defendant's

10  intentional act has 'foreseeable effects' in the forum." *Brayton*, 606 F.3d at 1131.

11        Defendant argues that Plaintiffs have not shown foreseeable harm that took place in

12  California. First, it argues that Plaintiffs cannot show that any activity by Defendant caused harm

13  to Plaintiffs in California. Second, it argues that none of the alleged harm in California was

14  foreseeable by Defendant. (*Id.* at 11:27–12:1.) Defendant argues that Plaintiffs cite "no

15  communication which might have put [Defendant] on notice that any of the named Plaintiffs

16  would ever be present in California, much less that they would suffer harm in that forum." (*Id.* at

17  12:10–13.) Both arguments fail.

18        Plaintiffs have sufficiently alleged harm suffered in California due to the recruitment

19  contract. This harm includes allegedly forcing Plaintiffs to pay exorbitant fees to California

20  corporation UPI, subjecting Plaintiffs to legal malpractice by California attorney Silverman, and

21  compelling Plaintiffs to sign illegal contracts of adhesion with UPI while in California. (Opp'n at

22  7:8–18; FAC ¶ 5, 9–10, 147–151, 166–169, 175–179, 182d, 185c, 187, 295–296.)

23        The crucial issue is whether Defendant could have foreseen that Plaintiffs would suffer

24  this harm in California. Looking specifically at Plaintiffs' negligent hiring claim, Plaintiffs allege

25  that (1) Defendant had reason to know that California Defendants were unfit to be employment

26  recruiters; (2) Defendant had duty to inquire into fitness and failed to do so; and (3) Defendant's

27  failure caused the alleged harm to Plaintiffs. (FAC ¶¶ 395–99.)

28

Thus, Plaintiffs sufficiently allege that Defendant could have reasonably foreseen that Plaintiffs would suffer harm in California. Defendant apparently chose not to investigate the Navarro's criminal history and thus did not gain sufficient information about her business practices. The Court further discusses the negligent hiring claim and its foreseeable effect in Section 2.2.2. Thus, Plaintiffs satisfy the third prong of the effects test as well showing that foreseeable harm was suffered in California.

### 1.2.1.4     *Effects Test Conclusion*

Plaintiffs have met all three elements of the effects test, and therefore have sufficiently shown that Defendant purposefully directed its activities towards California. Plaintiffs have therefore established the first element of specific jurisdiction, and the Court now turns to the remaining two elements.

### 1.2.2   The Second Prong of the Specific Jurisdiction Test: Claims Arising out of California-related Activities

For the second prong of the specific jurisdiction test, the Ninth Circuit applies a "but-for" test in determining whether claims arise out of forum-related activities. *Menken*, 503 F.3d at 1058. A plaintiff "must show that he would not have suffered an injury 'but for' [defendant's] forum-related conduct." *Id.*

Plaintiffs argue that they "would not have suffered their injuries but for [Defendant's] purposeful contacts with California." (Opp'n at 8:15–16.) Plaintiffs argue that had Defendant not hired UPI and Silverman, "the teachers could not have been trafficked to work in the East Baton Rouge Parish Public School System, and the [trafficking] scheme could not have succeeded." (*Id.* at 8:18–20.)

Defendant argues that Plaintiffs cannot show that the claim arises out of Defendant's California-related activities because the claims depend on conduct in the Philippines and

1  Louisiana. (Reply at 13:14–14:1.) Further, Defendant also contests Plaintiffs' argument that the

2  trafficking scheme could not have succeeded without Defendant's participation, since other

3  school districts in Louisiana and across the country were allegedly involved. (*Id.* at 13, n.9.)

4  Plaintiffs satisfy the required "but-for" test for the forum-related activities. The recruiting

5  contract between Defendant and UPI is the starting point for the harm that Plaintiffs allege. Later

6  events in the Philippines and Louisiana that also contributed to the harm do not change this fact.

7  If Defendant had not hired UPI and Silverman, Plaintiffs would not have been harmed by this

8  allegedly fraudulent conduct. Thus, Plaintiffs have established the second element of specific

9  jurisdiction.

10

11     1.2.3  The Third Prong of the Specific Jurisdiction Test: Reasonableness of

12       Jurisdiction

13

14  For the third prong of the specific jurisdiction test, the Ninth Circuit looks at seven factors

15  to determine the reasonableness of exercising personal jurisdiction over a defendant:

16    (1) the extent of the defendants' purposeful interjection into the
  forum state's affairs; (2) the burden on the defendant of defending in

17    the forum; (3) the extent of conflict with the sovereignty of the
  defendants' state; (4) the forum state's interest in adjudicating the

18    dispute; (5) the most efficient judicial resolution of the controversy;
  (6) the importance of the forum to the plaintiff's interest in

19    convenient and effective relief; and (7) the existence of an
  alternative forum.

20

21  *Menken*, 503 F.3d at 1058. As noted, if plaintiffs show the first two elements of specific

22  jurisdiction by a preponderance of the evidence, then reasonableness is presumed and the burden

23  shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not

24  be reasonable." *Schwarzenegger*, 374 F.3d at 802; *see also Roth*, 942 F.2d at 625. Here,

25  Plaintiffs have shown that they have met the first two prongs by a preponderance of the evidence,

26  and therefore Defendant must present a compelling case that the exercise of jurisdiction is

27  unreasonable. Defendant fails to do so.

28  The Court now addresses that parties' arguments concerning the seven factors.

13

1      1.2.3.1          *Reasonableness: Purposeful Interjection*

2

3          Plaintiffs argue that Defendant purposefully interjected itself into California by retaining

4   UPI and Silverman and derived significant benefits from this relationship.  (Opp'n at 9:17–22.)

5   Defendant argues that UPI and Silverman solicited Defendant's business in Louisiana.  Thus,

6   Defendant argues, it did not purposefully interject itself in California.  (Reply at 14:9–17.)  As

7   discussed above, Defendant intentionally entered into the California recruitment contract.

8   Through this contract, Defendant was able to hire a number of qualified teachers.  The fact that

9   the California Defendants solicited Defendant's business does not greatly change the analysis.

10   Defendant could have chosen from numerous recruiters, but it chose one located in California.

11   This factor weighs in favor of exercising jurisdiction.

12

13      1.2.3.2          *Reasonableness: Burden on Defendant*

14

15          Plaintiffs argue that modern transportation has significantly lessened Defendant's burden

16   of litigating in California, especially in light of Defendant's ability to travel to the Philippines to

17   recruit teachers.  (Opp'n at 10:3–13.)  Defendant argues that since Plaintiffs and Defendant are

18   both from Louisiana, they share the same burden of litigating in California, this should weigh

19   against the exercise of personal jurisdiction.  (Reply at 14:22–28.)  Although at least a significant

20   portion of a large amount of the discovery will likely occur in California, since a greater number

21   of wrongful acts are alleged against the California Defendants than the School Board, Defendant

22   is correct that it will bear some burden if it must litigate in California.  Thus, this factors weighs

23   slightly against exercising jurisdiction.

24

25      1.2.3.3          *Reasonableness: Louisiana's Sovereignty*

26

27          Plaintiffs argue that Louisiana's sovereignty is not implicated in this case, since Defendant

28   does not enjoy Eleventh Amendment immunity according to *Minton v. Pernard Parish Sch. Bd.*,

803 F.2d 129, 132 (5th Cir. 1986).  (Opp'n at 10:14–20.)  Defendant counters that Louisiana's sovereign interests extend beyond the Eleventh Amendment, that education is one of the basic functions of the state, and that the Louisiana Workforce Commission has already made UPI and Silverman's actions the object of regulatory scrutiny.  (Reply at 15:1–13.)  While the Louisiana Workforce Commission might also have an interest in this case, this does not mean that Louisiana's sovereignty is implicated to the point where the exercise of jurisdiction is unreasonable.  Thus, this factor does not weigh strongly against exercising jurisdiction.

### 1.2.3.4    *Reasonableness: California's Interest*

Plaintiffs argue that California has significant interests in this dispute due to the involvement of UPI and Silverman.  (Opp'n at 10:21–28.)  Defendant's reply is that California's interest ends with the relationship between Plaintiffs and UPI and Silverman.  (Reply at 15:14–19.)  The Court agrees with Plaintiffs.  The actions by UPI and Silverman are of interest to California and so are the actions of other entities aiding them in the alleged trafficking scheme.  California has a clear interest in monitoring the business practices of companies in its state.  Thus, this factor weighs in favor of exercising jurisdiction.

### 1.2.3.5    *Reasonableness: Efficiency*

Plaintiffs argue that if claims against Defendant are litigated in California, this will greatly reduce inefficiency.  (Opp'n at 11:1–9.)  Specifically, Plaintiffs argue that its claims against Navarro and UPI will be litigated in California since at least one contract in this matter states "this agreement shall be enforced within any competent court within the County of Los Angeles . . . ."  (FAC ¶ 5.)  Therefore, Plaintiffs argue, allowing claims against Defendant to proceed in Louisiana would needlessly duplicate litigation.  (*Id.*)  Further, Plaintiffs argue that most of the relevant documents in this case are located in California.  (Opp'n at 11:1–9.)

1   Defendant argues that Plaintiffs minimize the fact that both Plaintiffs and Defendant are
2   located in Louisiana, that other Louisiana school districts would be involved if class certification
3   was granted, and that the bulk of discovery would take place in Louisiana. (Reply at
4   15:20–16:8.)
5       Based on these considerations, inefficiencies will result regardless of the forum chosen,
6   and efficiency does not weigh strongly in either direction.
7
8               1.2.3.6        *Reasonableness: Convenience*
9
10      Plaintiffs argue that "litigating this case in California is important given the central role
11  California defendants played in the trafficking scheme." (Opp'n at 11:10–12.) Defendant argues
12  that "relief would in fact be more convenient and just as effective in the alternate forum of
13  Louisiana," since the majority of the parties are located there. (Motion at 10:10–15.) Like with
14  efficiency, convenience does not weigh strongly in either direction at this time.
15
16              1.2.3.7        *Reasonableness: Alternate Forum*
17
18      Plaintiffs argue that the mere existence of Louisiana as an alternate forum is insufficient to
19  establish reasonableness. (Opp'n at 9:8–15.) Since none of the factors weigh strongly against
20  exercising jurisdiction, the existence of an alternate forum does not change the analysis.
21
22              1.2.3.8        *Reasonableness: Conclusion*
23
24      Defendant failed to present a compelling case that exercising jurisdiction over it would be
25  unreasonable. Thus, Plaintiffs have also established the third element of specific jurisdiction.
26
27
28

1.2.4   Specific Jurisdiction Conclusion

Plaintiffs have sufficiently established the first two elements of personal jurisdiction. Plaintiffs showed that Defendant purposefully directed its activity at California and that their claims arise out of Defendant's California-related conduct.  Further, Defendant was unable to show that exercising jurisdiction would be unreasonable in this case.  When Defendant entered into a recruitment contract with the California Defendants, Defendant should have "reasonably anticipate[d] being haled into court" in California, at the very least for Defendant's actions related to the recruiting activities.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984); *World-Wide Volkswagen*, 444 U.S. at 297.   Thus, the Court has personal jurisdiction to hear Plaintiffs' claims against Defendant.

**1.3    Plaintiffs' Agency Argument**

Since the Court has found that personal jurisdiction exists over Defendant due to specific jurisdiction, the Court need not address Plaintiffs' alternative agency argument.

**2.    DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

As noted, Defendant also brings this Motion to Dismsis for failure to state a claim as to two of Plaintiffs' claims: violations of the TVPA and negligent hiring.  The Court turns now turns to the merits of Defendant's Motion as to these claims.

**2.1    Plaintiffs' TVPA Claims**

The TVPA is "an Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through

17

prevention, through prosecution and enforcement against traffickers, and through protection and

assistance to victims of trafficking." H.R. Rep. No. 106-939, at 1 (2000). The purpose of the act

is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are

predominantly women and children, to ensure just and effective punishment of traffickers, and to

protect their victims." *Id.* at 3. Many of the victims "are trafficked into the international sex

trade, often by force, fraud, or coercion. *Id.* But "trafficking also involves violations of other

laws, including labor and immigration codes and laws against kidnaping, slavery, false

imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

An individual who is a victim of a violation may bring a civil action for violations of the

TVPA. 18 U.S.C. § 1595. Plaintiffs bring TVPA claims against Defendant for human trafficking

and forced labor under 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a),(b). The Court now reviews

whether Plaintiffs have stated valid claims against Defendant under these statutes. The Court

begins with whether Defendant, a governmental entity, is a proper defendant under § 1595.

A civil action may be brought under the TVPA against "the perpetrator (or whoever

knowingly benefits, financially or by receiving anything of value from participation in a venture

which that person knew or should have known has engaged in an act in [violation of the

TVPA]) . . . ." 18 U.S.C. § 1595. Defendant argues that as a matter of law it can neither be "the

perpetrator" or a person that "knowingly benefits" from violations of the TVPA. The Court

agrees.

"[I]t is evident that Congress drafted the TVPA in such a manner as to limit liability to

natural persons." *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1127 (9th Cir. 2010). "The TVPA

consistently uses 'individual' throughout the statute to refer both to the torturer and the victim of

torture." *Id.*

> [T]he legislative history demonstrates that Congress rejected the
> notion of corporate liability. When first introduced in 1987, the
> TVPA imposed liability on any "person" who subjected another to
> torture. *See* The Torture Victim Protection Act: Hearing and Markup
> before the H. Comm. on Foreign Affairs on H.R. 1417, 100th Cong.
> 82, 85 (1988). The House Foreign Affairs Committee amended the
> bill to substitute "individual" for "person" in order to "make it clear
> [they were] applying [the Act] to individuals and not to corporations."
> *Id.* When introduced five years later, the TVPA still spoke of liability

for individuals. . . . We thus conclude that both the text and legislative history indicate Congress did not intend to allow suits against corporations under the TVPA.

*Id.*

Just as Congress "did not intend to allow suits against corporations under the TVPA," Congress also did not intend to allow suits against governmental entities. As the Ninth Circuit stated, Congress made it clear it was applying the TVPA only to individuals. And nothing in the statute or legislative history shows that liability should be extended beyond this limit. Accordingly, Plaintiffs' claims against Defendant for violations of the TVPA must fail.

Defendant's Motion is GRANTED as to Plaintiffs' claims under the TVPA.

### 2.2 Plaintiffs' Negligent Hiring Claim

Plaintiffs also bring a negligent hiring claim against Defendant. Plaintiffs allege that Defendant "knew or had reason to believe that Recruiter Defendants, and particularly Defendant Lourdes Navarro and Defendant [UPI], were unfit for the tasks for which they were hired." (FAC ¶ 395.) To support their negligent hiring claim Plaintiffs primarily cite Navarro's previous convictions for "defrauding the California Medi-Cal system of more than $1,000,000" and money laundering. (FAC ¶ 9.)

Plaintiffs' negligent hiring claim is a state common-law claim. To determine whether Plaintiffs' have sufficiently stated a claim for negligent hiring, the Court must first decide which state's laws govern this claim.

#### 2.2.1 Choice of Law

"In a federal question action that involves supplemental jurisdiction over state law claims, we apply the choice of law rules of the forum state—here, California." *Paulsen v. CNF Inc.*,

559 F.3d 1061, 1080 (9th Cir. 2009) (citations omitted).  "Under California's choice of law rules,

California will apply its own rule of decision unless a party invokes the law of a foreign state that

'will further the interest of the foreign state and therefore that it is an appropriate one for the

forum to apply . . . .'"  *Id.* (citations omitted).  California courts employ a "governmental interest

analysis" to assess whether California law or non-forum law should apply:

> To determine the correct choice of law, we apply a three-step
> analysis.  First, we determine whether the two concerned states have
> different laws.  Second, we consider whether each state has an
> interest in having its law applied to this case.  Finally, if the laws are
> different and each state has an interest in having its own law applied,
> we apply the law of the state whose interests would be more impaired
> if its policy were subordinated to the policy of the other state.

*Id.*  The parties do not dispute that California and Louisiana have different laws concerning

negligent hiring, and therefore the Court turns to the remaining two steps in the analysis.

Here, despite this Court having personal jurisdiction over Defendant for Plaintiffs'

negligent hiring claim, and both states having an interest in having their laws applied, Louisiana's

interest for the negligent hiring claim is slightly greater.  All parties involved with this claim are

located in Louisiana.  Further, Louisiana, not California, has a strong interest in determining

when its own public entities may be liable.  Finally, both parties appear to agree that applying

Louisiana law for Plaintiffs' negligent hiring claim is appropriate.  Accordingly, the Court applies

Louisiana law to determine whether Plaintiffs have stated a claim against Defendant for negligent

hiring.


### 2.2.2   The Negligent Hiring Claim


Under Louisiana law, "[a] principal generally is not liable for the offenses committed by

an independent contractor while performing its contractual duties."  *Ledent v. Guaranty Nat. Ins.

Co.*, 723 So.2d 531, 537 (La. App. 2d Cir. 1998).  "Two exceptions to this general rule exist: (1)

where the work is ultra hazardous; and (2) if the principal reserves the right to supervise or

control the work of the independent contractor."  *Id.*  But despite this general rule against

vicarious liability, "Louisiana law imposes a separate duty on principals to exercise reasonable

Case 8:10-cv-01172-AG -MLG   Document 94   Filed 03/07/11   Page 22 of 66   Page ID
#:895

1  care in selecting or hiring an independent contractor." *Bourg v. BT Operating Co.*, Case No. 09-

2  0596, 2009 U.S. Dist. LEXIS 29574 at *30 (citing *Hemphill v. State Farm Ins. Co.*, 472 So.2d

3  320, 324 (La. Ct. App. 3d Cir. 1985) ("One who hires an irresponsible independent contractor

4  may be independently liable.")).

5       In other words, a plaintiff may have difficulty establishing vicarious liability against a

6  principal if the principal took due care in hiring an independent contractor that commits a tort.

7  But if a principal negligently hired the contractor, a principal may be liable for the contractor's

8  torts due to the principal's negligence in hiring the contractor.  The court must therefore analyze

9  whether Plaintiffs have sufficiently alleged that Defendant breached this duty of care in hiring

10  Navarro and UPI.

11       Here, Plaintiffs have sufficiently alleged that Navarro and UPI were at the very least the

12  independent contractors of Defendant.  Therefore Defendant had a duty to exercise reasonable

13  care to ensure that UPI and Navarro were responsible, and Defendant breached this duty if it

14  knew or should have known that UPI and Navarro were irresponsible.  *Cf. Bourg*, 2009 U.S. Dist

15  LEXIS 29574 at *30.

16       As noted, Plaintiffs allege that "the School Districts selected Ms. Navarro despite her prior

17  conviction and imprisonment for defrauding that California Medi-Cal system of more than

18  $1,000,000, and despite the fact that she had also pled guilty to money laundering in New

19  Jersey."  (FAC ¶ 9.)  These allegations sufficiently allege that UPI and Navarro were

20  irresponsible and that Defendant should have known that they were irresponsible after a

21  reasonable background check.  Further, Plaintiffs have also sufficiently alleged causation and

22  damages given their allegations concerning Navarro's scheme to defraud Plaintiffs, including the

23  large amounts of fees paid to Navarro and UPI. (*E.g*, *id.* ¶ 105; *see also* the UPI Order.)  Thus,

24  Plaintiffs have sufficiently stated a claim for negligent hiring against Defendant.

25       Defendant argues that "Plaintiffs do not allege that there existed an employment

26  relationship between the School Board and the California Defendants."  (Motion at 21:25–22:1.)

27  Therefore, Defendant argues, Plaintiffs have failed to state a claim for negligent hiring.  (*Id.* at

28  22:15–17.)  But this argument fails.  As noted, a principal may be liable for the negligent hiring

21

of an independent contractor—an employer-employee relationship need not exist. Thus, even if Navarro and UPI were only agents of Defendant, as Plaintiffs have sufficiently alleged, liability is still possible.

Defendant next argues that Plaintiffs negligent hiring claim fails because "there was no contract for hire between the School Board and UPI. The School Board did not hire or compensate UPI in any way for services. No money changed hands." (Reply at 22:15–19.) Not so. Plaintiffs specifically allege that "[t]he Louisiana School Districts chose and retained [UPI] and [Navarro] to recruit teachers from the Philippines." (FAC ¶ 9.) Perhaps if Defendant eventually produces evidence showing a lack of any principal-agent relationship, this will bolster its chances at summary judgment. But for purposes of this motion to dismiss, Plaintiffs have sufficiently alleged that a principal-agent relationship existed between the parties. (*Id.* ¶¶ 9, 114–16.)

Finally, Defendant argues that Louisiana recognizes only a limited claim for negligent hiring, and that it had no duty to protect Plaintiffs from the alleged criminal activities of Navarro and UPI. (Reply at 23:1–5 (citing *Smith v. Orkin Exterminating Co.*, 540 So.2d 363, 366 (La. App. 1st Cir. 1989.))) Therefore, Defendant argues, it had no duty to protect Plaintiffs from Navarro's allegedly fraudulent actions. This argument fails.

"Duty is a question of law. Generally there is no duty to protect others from the criminal activity of third persons. . . . [But] when an employer hires an employee who in the performance of his duties will have a unique opportunity to commit a crime against a third party, he has a duty to exercise reasonable care in the selection of that employee." *Orkin*, 540 So. 2d at 366 (citations omitted).

In *Orkin*, a pest control company employee, while exterminating a home, unlocked a window to ensure that he would later have access to the home. *Id.* at 365. Two days later, the employee returned and sexually assaulted the homeowner. *Id.* The *Orkin* Court held that "[u]nder the unique circumstances of Orkin's business, we [ ] believe that there is a continuing duty to exercise reasonable care in the retention of its employees." *Id.* at 366. And since the court held that the company negligently administered a polygraph examination that would have

22

1    led to termination of the employee if properly administered, the company could be liable for

2    negligent hiring.  *Id.*

3      Similarly, Plaintiffs here sufficiently allege that UPI and Navarro were presented a unique

4    opportunity to harm Plaintiffs.  They worked directly and exclusively with Plaintiffs during the

5    recruiting process.  Plaintiffs had to rely on UPI and Navarro's representations throughout the

6    recruiting process concerning program terms and costs.  And due to this reliance, UPI and

7    Navarro had a clear opportunity to fraudulently take Plaintiffs' money.

8      Further, this alleged harm was certainly foreseeable.  Plaintiffs allege that Navarro has

9    been convicted of no less than two separate fraudulent financial schemes.  (FAC ¶ 9.)  In one of

10   these schemes, Plaintiffs allege that Navarro defrauded the California Medi-Cal system of more

11   than $1,000,000.  (*Id.*)  Defendant therefore had clear constructive notice of Navarro's alleged

12   dishonesty and possibility of committing acts highly similar to the fraudulent acts alleged here.

13     Defendant cites two cases to support its argument that the alleged harm caused by Navarro

14   was not foreseeable.  In the first case, a court held that even if an employer had discovered a

15   janitor's previous conviction record of stealing welfare checks over five years before the date of

16   employment, it did not follow that arson was reasonably foreseeable.  *Lou-Con, Inc. v. Gulf*

17   *Building Services, Inc.*, 287 So.2d 192 (La. App. 4th Cir. 1973).  In the other case, a court held

18   that it was unforeseeable that a man with a past history of property-related crimes would commit

19   a rape.  *Mays v. Pico Finance Co., Inc.*, 229 So.2d 381, 385 (La. App. 2nd Cir. 1997).  But these

20   cases are easily distinguished.  In both of these cases, crimes related to finances and property

21   were followed crimes of destruction and violence, respectively—a clear difference in the nature

22   of the crimes committed.  By contrast, Navarro's alleged past and present acts all involve

23   financial fraud for her own personal gain.  Unlike in *Lou-Con* and *Mays*, the high degree of

24   similarity between the past and present acts shows the foreseeability of Navarro's alleged fraud

25   and Defendant's duty to prevent it.

26     In sum, given the unique opportunity presented to Navarro and UPI to financially defraud

27   Plaintiffs, and given the high degree of similarity between this opportunity and Navarro's

28   previous fraudulent financial schemes for which Navarro was allegedly convicted, Defendant had

1    a duty to exercise reasonable care in selecting recruiters. Plaintiffs have sufficiently alleged that
2    Defendant breached that duty.

3
4            2.2.3   Conclusion
5
6            Under Louisiana law, Plaintiffs have sufficiently stated a claim for negligent hiring, and
7    therefore Defendant's Motions as to Plaintiffs' negligent hiring claim is DENIED.

8
9    **DISPOSITION**
10
11           The Motion is GRANTED in part and DENIED in part, with leave to amend. Plaintiffs
12   may file an amended complaint within 21 days of this order, if they so choose, preferably in red-
13   line format.

14
15   IT IS SO ORDERED.

16
17   DATED: March 7, 2011

18
19                                    _____
20                                            Andrew J. Guilford
21                                         United States District Judge
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| MAIRI NUÑAG-TANEDO, ET AL., | ) | CASE NO. SACV 10-1172-AG (MLGx) |
| | ) | |
| Plaintiffs, | ) | [TENTATIVE] ORDER GRANTING IN |
| | ) | PART AND DENYING IN PART |
| v. | ) | MOTION TO DISMISS OF |
| | ) | DEFENDANTS CHARLOTTE |
| | ) | PLACIDE, MILLIE WILLIAMS, AND |
| EAST BATON ROUGE PARISH | ) | ELIZABETH DURAN SWINFORD |
| SCHOOL BOARD, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | | |

This putative class action involves allegations of fraud, human trafficking, and racketeering. Defendants Charlotte Placide ("Placide"), Millie Williams ("Williams"), and Elizabeth Duran Swinford ("Swinford"), collectively the Individual Louisiana Defendants (the "ILDs"), now bring a Motion to Dismiss ("Motion") the First Amended Complaint ("FAC") filed by Plaintiffs Mairi Nuñag-Tanedo, et al. ("Plaintiffs") for lack of personal jurisdiction and failure to state a claim. After considering the papers and arguments submitted, the Court DENIES the ILDs' Motion for lack of personal jurisdiction, the Court GRANTS the ILDs' Motion to Dismiss for failure to state a claim as to the alleged RICO predicate acts of mail fraud,

wire fraud, and extortion, and the Court DENIES the Motion to Dismiss for failure to state a claim as to Plaintiffs' remaining claims.

**BACKGROUND**

The following factual allegations are taken from Plaintiffs' FAC, and as it must for this Motion, the Court assumes them to be true.

Plaintiffs are teachers and Filipino nationals who came from the Philippines to work in the United States at various times beginning in 2007. (FAC ¶ 72.) Plaintiffs were holders of H-1B visas that permit foreign nationals with special skills to work in the United States for a specified employer for up to six years. (*Id.* ¶ 73.)

The ILDs are Louisiana residents, are present or former employees of East Baton Rouge Parish School System (the "School System"), and agents of co-Defendant East Baton Rouge Parish School Board (the "School Board"). (*Id.* ¶¶ 14–23.) (For a summary of the allegations against the School Board, see this Court's Order Granting in Part and Denying in Part Motion to Dismiss FAC of Defendant East Baton Rouge Parish School Board (the "School Board Order").) Placide is the former Superintendent, Williams is the current Director of Personnel Services, and Swinford is the former Associate Superintendent for Human Resources. (FAC ¶¶ 21–23.) The School Board is the governing body of a local government entity in the State of Louisiana charged with the management of the public school system in East Baton Rouge Parish. (*Id.* ¶ 20.)

The School Board retained Universal Placement International, Inc. ("UPI") to recruit teachers from the Philippines. (*Id.* ¶ 78.) UPI, its president, Lourdes Navarro ("Navarro"), and attorney Robert B. Silverman ("Silverman") are all located in California (collectively, the "California Defendants"). (*Id.* ¶¶ 26, 27, 35.) California Defendants allegedly engaged in fraudulent activity related to human trafficking and forced labor. (For a summary of the allegations against California Defendants, see this Court's Order Granting in Part and Denying in Part Motion to Dismiss FAC of Lourdes Navarro and UPI (the "UPI Order").) The School

1  Board's recruitment contract with UPI obligated the School Board to pay the salary and benefits

2  of any hired teachers, without any additional expenses. (FAC ¶¶ 97–98.)

3        As to the ILDs, Plaintiffs allege that (1) the ILDs knew about the exorbitant fees being

4  charged to Plaintiffs because they were told about the fees multiple times and because the School

5  Board was not paying any recruitment fees (*id.* ¶ 182a, d); and (2) the ILDs gained knowledge of

6  the overall scheme through participation (*id.* ¶¶ 170b, 180, 181, 182c, 185b, 186, 187, 208, 212,

7  219).

8        Plaintiffs also allege facts as to the ILDs individually. Concerning Placide, Plaintiffs

9  allege that (1) she signed I-129 petitions requesting the issuance of H-1B visas, which included

10  money orders provided by California Defendants, and derived from Plaintiffs' fees, to cover the

11  payment of visa fees (*Id.* ¶¶ 85–88, 198, 207–08, 210, 214–15, 217, 221–22, 224); (2) she

12  submitted separate Labor Conditions Applications ("LCAs") promising to comply with the

13  regulations governing the H-1B program, which Plaintiffs allege were fraudulent (*Id.* ¶¶ 9,

14  114–16, 182, 205–24); and (3) she requested one-year instead of three-year visas (*Id.* ¶¶ 159–62,

15  186.)

16        Concerning Williams, Plaintiffs allege that she authored a letter requesting the cancellation

17  of a visa issued to a non-party named Genna Balneg, and Plaintiffs allege that the letter made

18  fraudulent representations. (*Id.* ¶ 185(b).)

19        And concerning Swinford, Plaintiffs allege that she interviewed prospective applicants in

20  the Philippines (*Id.* ¶ 102); (2) she was contacted by the U.S. Embassy in Manila inquiring about

21  California Defendants (*Id.* ¶ 183); (3) she was present when Navarro told a non-party not to

22  associate with Plaintiffs (*Id.* ¶¶ 170(b), 188); and (4) she stymied criticism of California

23  Defendants and aided the trafficking scheme. (*Id.* ¶ 187.)

24        Based on these factual allegations and others, Plaintiffs bring twelve claims against

25  multiple defendants in this matter. (*See* the UPI Order.) Plaintiffs raise two claims against the

26  ILDs, the second and eleventh claims: (2) violations of the Racketeer Influenced and Corrupt

27  Organizations ("RICO") statute, 18 U.S.C. §§ 1962 *et seq.*; and (11) violations of the Trafficking

28

1    Victims Protection Act ("TVPA").  The ILDs now move to dismiss these two claims under Rule

2    12(b)(2) and Rule 12(b)(6).

3

4    **LEGAL STANDARD**

5

6    **1.     RULE 12(b)(2)**

7

8           Under Rule 12(b)(2), a defendant may bring a motion to dismiss for lack of personal

9    jurisdiction.  Although the defendant is the moving party, the plaintiff bears the burden of making

10   a prima facie showing of facts establishing personal jurisdiction by a preponderance of the

11   evidence.  *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).  When

12   a court decides the motion before conducting a trial or evidentiary hearing, the plaintiff need only

13   make a prima facie showing that personal jurisdiction exists.  *Ballard v. Savage*, 65 F.3d 1495,

14   1498 (9th Cir. 1995).  A plaintiff makes a prima facie showing if the plaintiff produces

15   admissible evidence which, if believed, would be sufficient to establish the existence of personal

16   jurisdiction.  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129

17   (9th Cir. 2003).  For a Rule 12(b)(2) motion brought before trial or an evidentiary hearing, a court

18   accepts as true the complaint's uncontroverted factual allegations and resolves any factual

19   conflicts in the plaintiff's favor.  *Id.*  Otherwise, defendants could prevent plaintiffs from meeting

20   their burden simply by contradicting plaintiffs' affidavits.  *Farmers Ins. Exchange v. Portage La

21   Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990).

22          "The Due Process Clause protects an individual's liberty interest in not being subject to

23   the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or

24   relations.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (citing *Int'l Shoe Co.

25   v. Washington*, 326 U.S. 310, 319 (1945)).  Lawful exercise of jurisdiction over a nonresident

26   defendant must comport with "traditional notions of fair play and substantial justice."  *Int'l Shoe*,

27   326 U.S. at 316.  Concerns for fairness require that a court exercise jurisdiction only if the

28

4

1  defendant's actions in the forum are such that "he should reasonably anticipate being haled into

2  court there." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

3  A plaintiff can establish a defendant's minimum contacts with a given forum under a

4  theory of general or specific jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466

5  U.S. 408, 414–16 (1984). General jurisdiction exists where a defendant has "substantial" or

6  "continuous and systematic" contacts with the forum state. *Id.* at 415. If general jurisdiction

7  exists, the forum state has jurisdiction over the defendant regardless of where the events giving

8  rise to the litigation occurred. *Id.* at 415.

9  If a defendant's contacts with the forum state are not sufficient to establish general

10  jurisdiction, specific jurisdiction may still be shown. Specific jurisdiction exists where

11  defendants have purposefully availed themselves of "the benefits and protections" of the laws of

12  the forum through specific acts giving rise to the litigation at hand. *See Burger King Corp.*, 471

13  U.S. at 472–73 (citing *Helicopteros*, 466 U.S. at 414). Once it is established that defendants

14  purposefully availed themselves of the benefits and protections of the forum, or purposefully

15  directed their actions toward the forum, the forum's exercise of jurisdiction is "presumptively

16  reasonable." *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991).

17

18  **2.     RULE 12(b)(6)**

19

20  **2.1     Rule 8 Pleading Standard**

21

22  A court should dismiss a complaint when its allegations fail to state a claim upon which

23  relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint need only include "a short and plain

24  statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

25  "'[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

26  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). The Court must accept as

27  true all factual allegations in the complaint and must draw all reasonable inferences from those

28  allegations, construing the complaint in the light most favorable to the plaintiff. *Pollard v. Geo*

*Group, Inc.*, 607 F.3d 583, 585 n.3 (9th Cir. 2010); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).

But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1940 (citing *Twombly*, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," *Iqbal*, 129 S. Ct. at 1940, or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The Ninth Circuit recently stated that a complaint must be (1) "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it," and (2) "sufficiently plausible that it is not unfair to require the opposing party to be subjected to the expense of discovery." *Starr v. Baca*, No. 09-55233, 2011 WL 477094, at *14 (9th Cir. Feb. 11, 2011). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

## 2.2   Rule 9(b) Pleading Standards

Fraud claims include "a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Moore v. Brewster*, 96 F.3d 1240, 1245 (9th Cir. 1996) (superceded by statute on other grounds). These claims must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires enough specificity to give a defendant notice of the particular misconduct to be able to defend against the charge. *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted). To satisfy this specificity requirement, "the who, what, when, where, and how" of the misconduct must be alleged. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997) (internal quotation marks omitted). Thus, factual

1    allegations must include "the time, place, and specific content of the false representations as well
2    as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756,
3    764 (9th Cir. 2007).

4         Rule 9(b) serves many purposes. One is to "furnish the defendant with certain definite
5    charges which can be intelligently met." *Kincade v. Trojan Express, LLC*, No. SACV 08-1362
6    AG (ANx), 2009 WL 799390, at *2 (C.D. Cal. Mar. 23, 2009). Other purposes include "to deter
7    the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants]
8    from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from
9    unilaterally imposing upon the court, the parties, and society enormous social and economic costs
10   absent some factual basis." *Anderson v. Clow* (*In re Stac Elecs. Sec. Litig.*), 89 F.3d 1399, 1405
11   (9th Cir. 1996) (internal quotations omitted); *see Semegen v. Weidner*, 780 F.2d 727, 731 (9th
12   Cir. 1985).

13        To comply with Rule 9(b), a plaintiff must plead "with particularity" the time and place of
14   the fraud, the statements made and by whom made, an explanation of why or how such
15   statements were false or misleading when made, and the role of each defendant in the alleged
16   fraud. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49 & n.7 (9th Cir. 1994) (en banc)
17   (reversed concerning securities fraud claims); *Lancaster Community Hospital v. Antelope Valley
18   Hospital District*, 940 F.2d 397, 405 (9th Cir. 1991); *see also Edwards v. Marin Park, Inc.*, 356
19   F.3d 1058, 1066 (9th Cir. 2004) (holding that Rule 9(b) requires a plaintiff to "state the time,
20   place, and specific content of the false representations as well as the identities of the parties to the
21   misrepresentation"). Where the allegations in support of a claim fail to satisfy the heightened
22   pleading requirements of Rule 9(b), the claim is subject to dismissal. *See Vess v. Ciba-Geigy
23   Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). Dismissal for failure to comply with Rule 9(b)
24   "should ordinarily be without prejudice . . . if it appears at all possible that the plaintiff can
25   correct the defect." *Id.* at 1108 (internal quotation marks and citation omitted).

26

27

28

## ANALYSIS

_____As noted, Defendant moves to dismiss Plaintiffs' claims for lack of personal jurisdiction and for failure to state a claim. The Court will first address Defendant's Rule 12(b)(2) argument and then proceed to Defendant's Rule 12(b)(6) argument.

## 1. ILDS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

In the School Board Order, the Court held that it has personal jurisdiction over the School Board. As is discussed in greater detail in the School Board Order, Plaintiffs have sufficiently shown that the School Board purposefully directed its activities toward California, their claims arise out of the School Board's California-related activities, and Defendant did not show that the exercise of jurisdiction would be unreasonable. The Court held this largely due to the School Board's contractual relationship with UPI and Navarro and the alleged harm that took place in California due to this relationship. (*See generally* the School Board Order.)

Based on the same contractual relationship and alleged harm, and the ILDs alleged actions related to recruiting operations, Plaintiffs have also sufficiently alleged that personal jurisdiction is proper over the ILDs, whom Plaintiffs allege are the former Superintendent, the current Director of Personnel Services, and the former Associate Superintendent for the School System and agents of the School Board. (FAC ¶ 21–23.) Thus, for the same reasons stated in the School Board Order, this Court also has personal jurisdiction over the ILDs, and the Court DENIES the ILDs' Motion to Dismiss for lack of jurisdiction. The Court now turns to the merits of Defendants' Motion to Dismiss for failure to state a claim.

1    **2. ILDS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

2

3    As noted, the ILDs also move to dismiss Plaintiffs' TVPA and RICO claims under Rule

4    12(b)(6). The Court now turns to the merits of the ILDs' Motion as to these claims, and for

5    clarity the Court reviews Plaintiffs' TVPA claims first.

6

7    **2.1    Plaintiffs' TVPA Claims**

8

9    The TVPA is "an Act to combat trafficking of persons, especially into the sex trade,

10   slavery, and slavery-like conditions, in the United States and countries around the world through

11   prevention, through prosecution and enforcement against traffickers, and through protection and

12   assistance to victims of trafficking." H.R. Rep. No. 106-939, at 1 (2000). The purpose of the act

13   is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are

14   predominantly women and children, to ensure just and effective punishment of traffickers, and to

15   protect their victims." *Id.* at 3. Many of the victims "are trafficked into the international sex

16   trade, often by force, fraud, or coercion. *Id.* But "trafficking also involves violations of other

17   laws, including labor and immigration codes and laws against kidnaping, slavery, false

18   imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

19   A civil action may be brought under the TVPA against "the perpetrator (or whoever

20   knowingly benefits, financially or by receiving anything of value from participation in a venture

21   which that person knew or should have known has engaged in an act in [violation of the

22   TVPA]) . . . ." 18 U.S.C. § 1595. Defendants argue that Plaintiffs have failed to state a TVPA

23   claim. The Court disagrees.

24   As the Court discussed in the UPI Order, Plaintiffs have sufficiently stated TVPA claims

25   against UPI and Navarro. And § 1595 allows civil liability against the perpetrator or "whoever

26   knowingly benefits, financially or by receiving anything of value from participation in a venture

27   which that person knew or should have known has engaged in an act" in violation of the TVPA.

28   § 1595. Thus, the ILDs can be liable under the TVPA as either perpetrators or beneficiaries of

9

the TVPA violations. The Court first turns to whether Plaintiffs have sufficiently alleged beneficiary liability.

The beneficiary-liability provision of § 1595 requires that the defendant (1) knowingly benefitted financially or by receiving anything of value; (2) from participation in a venture; (3) that the defendant knew or should have known was engaged in violations of the TVPA. § 1595(a). Plaintiffs sufficiently allege each of these elements.

As discussed in the School Board Order and the UPI Order, Plaintiffs sufficiently allege that the ILDs, UPI, and Navarro participated together in the venture of recruiting Plaintiffs. Further, Plaintiffs allege that the ILDs received multiple benefits from this venture. These benefits include receiving highly qualified teachers, free recruitment and legal services, and reimbursement for costs related to interviewing teacher applicants that the ILDs would have otherwise had to pay. (FAC ¶¶ 97–104, 181, 381–390.) Finally, Plaintiffs sufficiently allege that the ILDs knew or should have known of the alleged TVPA violations. Plaintiffs allege that the ILDs knew of various alleged wrongs committed by Navarro and UPI, including that Defendant Navarro was allegedly charging illegal fees and threatening Plaintiffs with the abuse of legal process. (*Id.* ¶¶ 9, 12, 182, 187.)

The ILDs argue that Plaintiffs have not met Rule 8 pleading requirements. The ILDs particularly note that Plaintiffs often allege claims against the ILDs as a group, rather than specifying acts that each individual has taken to further the alleged TVPA scheme. Therefore, the ILDs argue, Plaintiffs' claim must fail. The Court disagrees.

Plaintiffs have stated allegations as to the ILDs that are "sufficiently detailed" and "sufficiently plausible" to state a valid claim. *Starr*, 2011 WL 477094 at *14. Plaintiffs have alleged that the School Board, and the ILDs acting as high-ranking officials of the School Board, received multiple benefits for their schools due to TVPA violations by UPI and Navarro. And Plaintiffs also sufficiently allege that these benefits are a direct result of the recruiting contract between the School Board and UPI. Finally, Plaintiffs allege sufficient conduct by the individual ILDs to show that the individuals knew or should have known about the alleged TVPA violations. Given these allegations, along with Plaintiffs' additional detailed claims against the

School Board that are discussed in greater detail in the School Board Order, the ILDs have clear notice of the claims stated against them.

Accordingly, since Plaintiffs have sufficiently stated claims against Navarro for TVPA violations, (*see* UPI Order), and because Plaintiffs have sufficiently alleged beneficiary liability against the ILDs under the TVPA, Plaintiffs have sufficiently stated claims for TVPA violations against the ILDs.  Further, because Plaintiffs have sufficiently alleged beneficiary liability under the TVPA, the Court need not address the parties' arguments concerning the ILDs' potential perpetrator liability.

The ILDs' Motion as to Plaintiffs' claims for violations of the TVPA is DENIED.

## 2.2     Plaintiffs' RICO Claim

_____To state a civil claim under RICO, a plaintiff must plead that the defendant violated the Act, and that the plaintiff was injured as a result of the violation.  "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's business or property." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  "Racketeering activity . . . is defined to include a number of generically specified criminal acts as well as the commission of one of a number of listed predicate offenses."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939 (9th Cir. 2006) (citing § 1961(1)).  "A 'pattern of racketeering activity' requires at least two acts of racketeering activity."  18 U.S.C. § 1961(5).

Plaintiffs allege RICO violations based on the following alleged acts: "Forced labor in violation of 18 U.S.C. § 1589"; "[t]rafficking persons with respect to forced labor in violation of 18 U.S.C. § 1592(a)"; "[u]nlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a)"; "[m]ail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341"; "[w]ire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343"; and "[e]xtortion as defined in Cal. Penal Code § 518."  (FAC ¶ 286.)

11

1    The Court has already held that Plaintiffs have sufficiently stated separate TVPA claims

2    against the ILDs for forced labor, human trafficking, and unlawful document-related practices,

3    and therefore these claims may also serve as underlying predicate acts for Plaintiffs' RICO claim.

4    Thus, the Court now reviews the remaining potential predicate acts to determine whether

5    Plaintiffs have stated a valid RICO claim.

6

7             2.2.1   Mail Fraud and Wire Fraud

8

9             For mail fraud as a RICO predicate act, "it is necessary to show that (1) the defendants

10   formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused

11   a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with

12   the specific intent to deceive or defraud." *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th

13   Cir. 2004) (internal citations and quotations omitted).  Meanwhile, for wire fraud as a RICO

14   predicate act, it is necessary to show "(1) a scheme to defraud; (2) use of the wires in furtherance

15   of the scheme; and (3) a specific intent to deceive or defraud."  *United States v. Green*, 592 F.3d

16   1057, 1064 (9th Cir. 2010) (internal citations and quotations omitted).

17            As noted, "Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud . . . , a

18   party must state with particularity the circumstances constituting fraud . . . ."  *Sanford v.

19   MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).  Specifically, "the complaint must specify

20   such facts as the times, dates, places and benefits received, and other details of the alleged

21   fraudulent activity."  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). Thus, when mail

22   fraud and wire fraud are the alleged RICO predicate acts, a plaintiff must meet these heightened

23   pleading standards.  *Id.*

24            Here, Plaintiffs fail to sufficiently plead mail and wire fraud against the ILDs.  Although

25   Plaintiffs have sufficiently alleged that the ILDs were beneficiaries of alleged TVPA violations

26   by UPI and Navarro, Plaintiffs fail to sufficiently allege that the ILDs formed an artifice to

27   scheme or defraud.  Plaintiffs fail to sufficiently allege sufficient facts against the ILDs that show

28   who made representations, when and where the representations were made, how they were made,

and the specific fraudulent content of the representations. And while Plaintiffs do allege certain acts taken by the ILDs, (*e.g.* ¶ 187), Plaintiffs do not sufficiently show that these acts were a part of a scheme or artifice to defraud by the ILDs, nor do they sufficiently show the use of mail or wires to further the fraud. Thus, Plaintiffs have failed to meet Rule 9(b) pleading requirements, and their mail and wire fraud claims as to the ILDs must fail.

Accordingly, the ILDs' Motion as to the predicate acts of mail and wire fraud is GRANTED.

### 2.2.2 Extortion

For extortion as a RICO predicate act, it is necessary to show "[1] extortion and [2] a nexus between [the] defendant's acts and interstate commerce." *United States v. Atcheson*, 94 F.3d 1237, 1240–41 (9th Cir. 1997). "Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right." Cal. Penal Code § 518. The obtaining element requires a showing that the extortioner or a third party received something of value from the victim of the alleged extortion. *See United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009) (internal citations and quotations omitted).

"Extortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal." *Flatley v. Mauro*, 39 Cal. 4th 299, 326 (2006). "It is the means employed to obtain the property of another which the law denounces . . . ." *Id.* For purposes of extortion, it is immaterial that the money a defendant sought to obtain through threats may have been justly due. *Id.* at 327 (citing *Gomez v. Garcia*, 81 F.3d 95, 97 (9th Cir. 1996) (internal quotations and brackets omitted). The ILDs argue that Plaintiffs have not sufficiently stated a claim for extortion. The Court agrees.

Although Plaintiffs' extortion claims do not require that Plaintiffs meet Rule 9(b) pleading requirements, Plaintiffs' extortion claims fail largely for the same reason as their mail and wire fraud claims. Specifically, while Plaintiffs have sufficiently alleged beneficiary liability under

the TVPA and alleged fraudulent acts of UPI and Navarro, Plaintiffs have not sufficiently alleged that the ILDs themselves committed acts of fraud or extortion.  Thus, Plaintiffs' claim for extortion against Defendants fails.

Accordingly, Defendants Motion as to the predicate act of extortion is GRANTED.

### 2.2.3   Conclusion

While Plaintiffs have failed to sufficiently allege the RICO predicate acts of mail fraud, wire fraud, and extortion against the ILDs, Plaintiffs have sufficiently alleged the predicate acts of forced labor, human trafficking, and unlawful document-related practices.  Thus, Plaintiffs' have sufficiently alleged multiple RICO predicate acts, as required by 18 U.S.C. § 1961(5).  Further, it appears that the parties do not dispute that Plaintiffs' have met the remaining requirements to state a valid RICO claim.  Accordingly, the ILDs' Motion as to Plaintiffs' RICO claim is DENIED.

## DISPOSITION

The Motion is GRANTED in part and DENIED in part, with leave to amend.  Plaintiffs may file an amended complaint within 21 days of this order, in red-line format, if they so choose.

IT IS SO ORDERED.

DATED: March 7, 2011

_____

Andrew J. Guilford

United States District Judge

1
2
3
4
5
6
7
8                    UNITED  STATES  DISTRICT  COURT

9               FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10

11   MAIRI NUÑAG-TANEDO, ET AL.,   )          CASE NO. SACV 10-1172-AG (MLGx)
                                   )
12               Plaintiffs,       )          [TENTATIVE] ORDER GRANTING IN
                                   )          PART AND DENYING IN PART
13          v.                     )          MOTION TO DISMISS OF
                                   )          DEFENDANTS LOURDES NAVARRO
14                                 )          AND UNIVERSAL PLACEMENT
                                   )          INTERNATIONAL, INC.
15   EAST BATON ROUGE PARISH       )
     SCHOOL BOARD, ET AL.,         )
16                                 )
                                   )
17               Defendants.       )
                                   )
18                                 )
                                   )
19   _____

20

21          Enticed by promises of lucrative and exciting employment through a work program, a

22   foreign worker speaks with recruiters about working in the United States.  After the recruiters

23   explain the terms and costs to join the work program, the worker obtains a large loan and

24   voluntarily uses it to join the program.  But once the worker joins the program and begins

25   employment, he finds that he is unhappy.  Yet, if he quits his employment, he will be forced to

26   return home with a massive amount of debt that he knows he may never be able to repay.

27   Working in the program is the only way to repay his loan.  Is this forced labor?  Fraud?  No.  It

28   is a bargained-for exchange.  Despite the worker's unhappiness, he knew the terms and costs of

1  the program, and he voluntarily obtained the loan to join the program.  His eventual discontent
2  does not transform the valid contract between he and the recruiters into something illegal.

3  　　　　But now assume that after the worker made his payment, the recruiters alter the program
4  terms and costs.  The recruiters demand an additional payment of double what the worker has
5  already paid.  They threaten to kick him out of the program if he doesn't make the additional
6  payment, and they keep the initial payment regardless of his decision to continue with the
7  program.  The worker is therefore faced with a choice of forfeiting the first payment, knowing he
8  may never be able to repay this debt, or paying the additional money the recruiters now demand.
9  Knowing that working in this program is his only way to repay his initial debt, he pays the
10  additional sum and continues working in the program.

11  　　　　Once the worker begins his employment, his complaints about the payments and working
12  conditions are met with continued threats of termination and deportation.  Knowing that this job
13  is the only way to repay his debt, he remains silent and continues working.  Is this forced labor?
14  Fraud?

15  　　　　These appear to be the questions now before this Court. This putative class action
16  involves allegations of fraud, human trafficking, and racketeering.  Defendants Lourdes Navarro
17  ("Navarro") and Universal Placement International, Inc. ("UPI") (collectively, "Defendants")
18  now bring a Motion to Dismiss ("Motion") multiple claims filed by Plaintiffs Mairi Nuñag-
19  Tanedo, et al. ("Plaintiffs") for failure to state a claim.  After considering the papers and
20  arguments submitted, the Court GRANTS the Motion as to the predicate acts of mail and wire
21  fraud under Plaintiffs' Racketeer Influenced and Corruption Organization Act ("RICO") claims,
22  GRANTS the Motion as to the TVPA claims against UPI, and DENIES the Motion as to
23  Plaintiffs' remaining claims.

24
25  **BACKGROUND**
26
27  　　　　The following factual allegations are taken from Plaintiffs' First Amended Complaint
28  ("FAC"), and as it must for this Motion, the Court assumes them to be true.

2

1    Plaintiffs are teachers and Filipino nationals who came from the Philippines to work in

2    the United States.  (FAC ¶ 72.)  Plaintiffs were holders of H-1B visas that permit foreign

3    nationals with special skills to work in the United States for a specified employer for up to six

4    years.  (*Id.* ¶ 73.)

5    Defendant UPI is engaged in the business of recruiting teachers from the Philippines for

6    employment in the United States.  (*Id.* ¶ 26.)  Defendant Navarro is the owner and President of

7    UPI.  (*Id.* ¶ 27.)  Defendants worked closely with another company, PARS International

8    Placement Agency ("PARS"), and PARS's Official Representative, Emilio Villarba ("Villarba")

9    (Defendants, PARS, and Villarba collectively, the "Recruiter Defendants") during recruiting

10   operations.  Navarro and UPI were under investigation by the U.S. embassy in Manila when

11   recruiting operations were taking place.  (*Id.* ¶¶ 183–84.)  Further, Navarro was previously

12   convicted for defrauding the government and money laundering.  (*Id.* ¶¶ 183–84.)

13   Beginning in 2006, Recruiter Defendants advertised their teacher recruiting services to

14   school districts throughout the United States.  (*Id.* ¶ 94.)  These services included the

15   "recruitment of highly qualified teachers from the Philippines, and placement of these teachers

16   within school districts in the United States."  (*Id.*)  Plaintiffs learned of the opportunity to teach

17   in the United States through Recruiter Defendants' advertisements in Philippine newspapers and

18   through word of mouth.  (*Id.* ¶ 100.)

19   After interviewing Plaintiffs for possible teaching positions, Recruiter Defendants

20   informed Plaintiffs that they had been selected to teach in the United States.  (*Id.* ¶ 105.)

21   Recruiter Defendants then told Plaintiffs about some, but not all, of the next steps in the

22   recruitment process.  (*Id.*)  Specifically, Recruiter Defendants disclosed that Plaintiffs would

23   need to collect and submit certain documents to support their H1-B visa application and that

24   Plaintiffs would have to pay a recruitment fee of approximately $5,000 (the "First Recruitment

25   Fee").  (*Id.*)  But Recruiter Defendants did not disclose that Plaintiffs would be required to pay a

26   second, much larger recruitment fee before Plaintiffs would be permitted to leave for the United

27   States.  (*Id.* ¶ 111.)  Recruiter Defendants also did not disclose that Plaintiffs' future employers,

28

3

1   and not Plaintiffs, were responsible for various costs for which they were not reimbursed.  (*Id.* ¶ 112.)

2       Plaintiffs paid the non-refundable First Recruitment Fee and received job offers to teach

3   in the United States.  (*Id.* ¶¶ 114, 117.)  Plaintiffs then interviewed at a U.S. Embassy to obtain

4   their H-1B visas.  (*Id.* ¶ 117.)  Recruiter Defendants required Plaintiffs to instruct the U.S.

5   Embassy to have Plaintiffs' passports delivered directly to Recruiter Defendants' office

6   following the Embassy interviews, and Plaintiffs' passports and visas were both sent to Recruiter

7   Defendants' office in the Philippines.  (*Id.* ¶¶ 121–122.)

8       Once Recruiter Defendants had the visas and passports, Recruiter Defendants told

9   Plaintiffs for the first time that Plaintiffs would have to pay a second, larger recruitment fee (the

10  "Second Recruitment Fee") as well as the cost of their airfare to the United States.  (*Id.* ¶ 124.)

11  Recruiter Defendants explained that a second payment was required before Recruiter Defendants

12  would return Plaintiffs' visas and passports and before Plaintiffs would be permitted to depart

13  for the United States.  (*Id.*)  Recruiter Defendants told Plaintiffs that if they did not pay the

14  additional fees, Plaintiffs would forfeit fees already paid, would not be permitted to travel to the

15  United States, and would not be given their visas.  (*Id.* ¶ 126.)  Plaintiffs felt that they had to

16  comply with Recruiter Defendants' demands since they needed to work in the United States to

17  repay their debts.  (*Id.* ¶ 127.)

18      Plaintiffs complied with Recruiter Defendants' demands and began working in Lousiana.

19  (*See generally* FAC.)  But the situation did not improve once Plaintiffs began working.

20  Defendant Navarro "threatened abuse of legal process in an effort to intimidate and control

21  Plaintiffs and other Class Members by, *inter alia*, threatening that she could have teachers

22  deported."  (*Id.* ¶ 165.)  For example, when certain teachers stated that they planned to change

23  their housing arrangements due to high costs, Defendant Navarro became upset, told the teachers

24  that they could not move, and threatened to deport them.  (*Id.* ¶ 165a.)  Navarro also threatened

25  to deport a teacher for "complaining to a reporter at a Baton Rouge television station about

26  abuses she suffered at the hands of Recruiter Defendants."  (*Id.* ¶ 165d.)

27      Plaintiffs allege that Defendant Navarro also threatened Plaintiffs who voiced criticisms

28  about Recruiter Defendants' alleged trafficking scheme.  (*Id.* ¶ 166.)  For example, Defendants

4

1   filed suit against certain Baton Rouge teachers whom Defendants believed authored a blog, and

2   Defendant Navarro "threatened that if [other teachers] started speaking out against her, they

3   would be 'punished' like the teachers in Baton Rogue . . . ." (*Id.* ¶¶ 166a,b.)  Finally, Recruiter

4   Defendants made additional threats to sue, allow visas to expire, and terminate teachers if the

5   teachers did not pay additional fees demanded by Defendants.  (*Id.* ¶¶ 167–70.)

6        Based on these factual allegations and others, Plaintiffs bring claims against multiple

7   defendants in this matter, numbered as follows: (1) violations of the Victims of Trafficking and

8   Violence Protection Act of 2000 ("TVPA") as to a plaintiff subclass against Recruiter

9   Defendants and other defendants; (2) RICO violations; (3) violations of California's

10  Employment Agency, Employment Counseling, and Job Listing Services Act, under California

11  Civil Code § 1812.508; (4) Unfair Business Practices in violation of California Business and

12  Professions Code §§ 17200 *et seq.* ("Section 17200"); (5) fraud; (6) declaratory relief concerning

13  the validity of certain contracts due to undue influence; (7) declaratory relief concerning the

14  validity of certain contracts due to illegality; (8) declaratory relief concerning the legality of fees

15  collected; (9) breach of fiduciary duty; (10) legal malpractice; (11) violations of the TVPA as to

16  a separate plaintiff subclass against separate defendants; and (12) negligent hiring.  Defendants

17  move to dismiss claims 1, 2, 3, and 5.  Plaintiffs bring additional claims against Defendants that

18  Defendants do not move to dismiss.

19

20  **LEGAL STANDARD**

21

22  **1.    RULE 8 PLEADING STANDARDS**

23

24       A court should dismiss a complaint when its allegations fail to state a claim upon which

25  relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint need only include "a short and plain

26  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

27  "'[D]etailed factual allegations' are not required."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940

28  (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (stating that "a complaint

1   attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations")).  The

2   Court must accept as true all factual allegations in the complaint and must draw all reasonable

3   inferences from those allegations, construing the complaint in the light most favorable to the

4   plaintiff.  *Pollard v. Geo Group, Inc.*, 607 F.3d 583, 585 n.3 (9th Cir. 2010); *Westlands Water*

5   *Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).

6       But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim

7   to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at

8   570).  "A claim has facial plausibility when the pleaded factual content allows the court to draw

9   the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.

10  Ct at 1940 (citing *Twombly*, 550 U.S. at 556).  A court should not accept "threadbare recitals of

11  a cause of action's elements, supported by mere conclusory statements," *id.*, or "allegations that

12  are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v.*

13  *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  The Ninth Circuit recently stated that

14  a complaint must be (1) "sufficiently detailed to give fair notice to the opposing party of the

15  nature of the claim so that the party may effectively defend against it," and (2) "sufficiently

16  plausible that it is not unfair to require the opposing party to be subjected to the expense of

17  discovery."  *Starr v. Baca*, No. 09-55233, 2011 WL 477094, at *14 (9th Cir. Feb. 11, 2011).

18  Dismissal without leave to amend is appropriate only when the Court is satisfied that the

19  deficiencies of the complaint could not possibly be cured by amendment.  *Jackson v. Carey*, 353

20  F.3d 750, 758 (9th Cir. 2003).

21

22  **2.    RULE 9 PLEADING STANDARDS**

23

24      Fraud claims include "a false representation, knowledge of its falsity, intent to defraud,

25  justifiable reliance, and damages."  *Moore v. Brewster*, 96 F.3d 1240, 1245 (9th Cir. 1996)

26  (superceded by statute on other grounds).  These claims must meet the heightened pleading

27  standard of Federal Rule of Civil Procedure 9(b), which requires enough specificity to give a

28  defendant notice of the particular misconduct to be able to defend against the charge.  *Bly-*

1   *Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted). To satisfy this

2   specificity requirement, "the who, what, when, where, and how" of the misconduct must be

3   alleged. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997) (internal quotation marks omitted).

4   Thus, factual allegations must include "the time, place, and specific content of the false

5   representations as well as the identities of the parties to the misrepresentations." *Swartz v.*

6   *KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

7        Rule 9(b) serves many purposes. One is to "furnish the defendant with certain definite

8   charges which can be intelligently met." *Kincade v. Trojan Express, LLC*, No. SACV 08-1362

9   AG (ANx), 2009 WL 799390, at *2 (C.D. Cal. Mar. 23, 2009). Other purposes include "to deter

10   the filing of complaints as a pretext for the discovery of unknown wrongs, to protect

11   [defendants] from the harm that comes from being subject to fraud charges, and to prohibit

12   plaintiffs from unilaterally imposing upon the court, the parties, and society enormous social and

13   economic costs absent some factual basis." *Anderson v. Clow* (*In re Stac Elecs. Sec. Litig.*), 89

14   F.3d 1399, 1405 (9th Cir. 1996) (internal quotations omitted); *see Semegen v. Weidner*, 780 F.2d

15   727, 731 (9th Cir. 1985).

16        To comply with Rule 9(b), a plaintiff must plead "with particularity" the time and place of

17   the fraud, the statements made and by whom made, an explanation of why or how such

18   statements were false or misleading when made, and the role of each defendant in the alleged

19   fraud. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49 & n.7 (9th Cir. 1994) (en banc)

20   (reversed with respect to securities fraud claims); *Lancaster Community Hospital v. Antelope*

21   *Valley Hospital District*, 940 F.2d 397, 405 (9th Cir. 1991); *see also Edwards v. Marin Park,*

22   *Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (holding that Rule 9(b) requires a plaintiff to "state the

23   time, place, and specific content of the false representations as well as the identities of the

24   parties to the misrepresentation"). Where the allegations in support of a claim fail to satisfy the

25   heightened pleading requirements of Rule 9(b), the claim is subject to dismissal. *See Vess v.*

26   *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). Dismissal for failure to comply

27   with Rule 9(b) "should ordinarily be without prejudice . . . if it appears at all possible that the

28   plaintiff can correct the defect." *Id.* at 1108 (internal quotation marks and citation omitted).

**ANALYSIS**

As noted, Defendants move to dismiss Plaintiffs' claims numbered as follows: (1) violations of the TVPA; (2) RICO violations; (3) violations of California's Employment Agency, Employment Counseling, and Job Listing Services Act under California Civil Code § 1812.508; and (5) fraud. The Court now proceeds to the merits of Defendants' Motion. For clarity, the Court first reviews Defendants' Motion as to Plaintiffs' fraud claim and then reviews the remaining claims in order.

**1. PLAINTIFFS' FIFTH CLAIM, FOR FRAUD, UNDER CALIFORNIA CIVIL CODE § 1709**

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civil Code § 1709. A deceit, within the meaning of § 1709 includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ." § 1710(3).

To state a claim for fraud, a plaintiff must show (1) misrepresentation, including false representation, concealment, or nondisclosure; (2) knowledge of falsity constituting scienter; (3) intent to defraud, specifically to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Diaz v. Federal Express Corp.*, 373 F. Supp. 2d 1034 (2005) (citations omitted).

As noted, under Rule 9(b), "[i]n all averments of fraud or mistake, circumstances constituting fraud or mistake shall be stated with particularity." Specifically, "the complaint must specify such facts as the times, dates, places and benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). Defendants argue that Plaintiffs haven not met this heightened pleading standard for their fraud claim. The Court disagrees.

Plaintiffs allege that the Recruiter Defendants told

8

1    Plaintiffs and other Class Members about some, but not all, of the []
     steps in the recruitment process. In particular, Recruiter Defendants
2    *only* disclosed that Class Members would need to collect and submit
     certain documents in support of their H-1B visa application, and that
3    Class Members would have to pay [the First Recruitment Fee].

4  (FAC ¶ 105.) And Plaintiffs further allege that

5    [a]t this stage in the trafficking process, Recruiter Defendants
     fraudulently did not disclose to Plaintiffs and other Class Members
6    that they would be required to pay a second and much larger
     recruitment fee before they would be permitted to leave for the
7    United States . . . .

8  (*Id.* ¶ 111.)

9  Plaintiffs support these general allegations with *specific* statements detailing fraud by

10  Defendants that include dates, locations, representations, and omissions. For example, Plaintiffs

11  state

12    [o]n or about March 28, 2008, at the Waterfront Hotel in Cebu City,
      Philippines, Defendant Lourdes Navarro informed Plaintiff Nuñag-
13    Tanedo that she would need to collect various supporting documents
      [and pay various fees including the First Recruitment Fee] to obtain
14    her job offer and to complete the H1-B visa process. However,
      Lourdes Navarro willfully, maliciously, and fraudulently failed to
15    inform Nuñag-Tanedo that before she would be permitted to leave
      the Philippines, she would need to pay an Undisclosed Second
16    Recruitment Fee of two months of her expected salary in the United
      States, as well as the cost of airfare to the United States, with a third
17    month's fee due after she was in the United States for one year.
      Nuñag-Tanedo relied on this fraudulent omission and paid the First
18    Recruitment Fee.

19
20  (*Id.* ¶189.)

21  With these specific fraud allegations, along with additional specific allegations

22  implicating Navarro, UPI, PARS, and PARS's agents (*e.g.*, *id.* ¶¶ 190–94), Plaintiffs have

23  sufficiently alleged all the necessary fraud elements. As noted, Plaintiffs have alleged the

24  nondisclosure of the additional fees and requirements to work in the teaching program, and they

25  have done so with sufficient particularity. (*E.g.*, *id.* ¶ 189.) Plaintiffs have also alleged that

26  Defendants knew of and committed omissions with intent to defraud Plaintiffs and induce

27  reliance (*E.g*, *id.* ¶¶ 190–94, 331–332.) Further, Plaintiffs have sufficiently alleged that they

28  justifiably relied on Defendants' representation and omissions, stating, for example, that

1  "Plaintiffs and other Class Members were unaware of the falsity of Recruiter Defendants'

2  representations.  In reliance on these representations, Plaintiffs and other Class Members paid

3  the First Recruitment Fee." (*Id.* ¶ 332.)  Finally, Plaintiffs sufficiently allege resulting damages.

4  This includes monetary damages from paying the First Recruitment Fee and additional fees,

5  which Plaintiffs allege they would not have paid had they known the actual program terms and

6  costs. (*Id.* ¶¶ 332–34.)

7      Defendants argue that Plaintiffs fail to allege that Defendants had any duty to disclose

8  that Plaintiffs would be required to pay additional fees after the First Recruitment Fee, as is

9  required by California Civil Code § 1710. (Motion at 9:20–21.)  Therefore, Defendants argue,

10 Plaintiffs fail to sufficiently state their fraud claim. (*See id.*)  This argument fails.

11     As noted, a deceit, within the meaning of § 1709 includes "[t]he suppression of a fact, *by*

12 *one who is bound to disclose it*, or who gives information of other facts which are likely to

13 mislead for want of communication of that fact . . . ." § 1710 (emphasis added).  In fraud claims

14 grounded on omissions, a duty to disclose "may exist when one party to a transaction has sole

15 knowledge or access to material facts and knows that such facts are not known to or reasonably

16 discoverable by the other party." *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976) (a duty to

17 disclose omissions may also exist where there are allegations that any representation was likely

18 to mislead for want of disclosures, or where defendants actively concealed undisclosed matters).

19     Here, Plaintiffs have sufficiently shown that Defendants had a duty to disclose all

20 material program terms and costs.  Plaintiffs allege that Defendants actively recruited Plaintiffs

21 and that the parties worked together directly when Plaintiffs were considering joining the

22 program. (*E.g.*, FAC ¶ 189.)  Plaintiffs further allege that Defendants explained to Plaintiffs

23 various program terms and costs during the recruiting process. (*E.g.*, *id.* ¶¶ 111, 189, 332.)

24 Plaintiffs' allegations that Defendants took such an active role in the recruiting process

25 sufficiently show that Defendants had duty to disclose all material costs to Plaintiffs, not simply

26 the non-refundable First Recruitment Fee.  In fact, Defendants' argument that they need not

27 disclose $10,000 in additional fees during the recruiting process is somewhat perplexing.  A

28

10

1  ruling supporting this argument would clearly have undesirable consequences on the efficacy of

2  practically any contract.

3        Defendants alternatively argue that Plaintiffs' fraud claims fail because "nothing forced

4  the five Plaintiffs to pay the additional fees; they could have backed out . . . ." (Motion at

5  10:5–7.) Defendants name another individual that apparently did back out of the program after

6  learning of the additional fees. (*Id.*) Even if the Court could properly consider the example of

7  this individual that Defendants cite for this Motion, Defendants' argument fails.

8        If Plaintiffs could have walked away with a full refund, their fraud claim may very well

9  fail. After all, individuals who could have gotten their money back after learning of additional

10  fees would have serious difficultly proving any damages. But Plaintiffs allege that backing out

11  with a full refund was not an option here, clearly stating that the First Recruitment Fee was non-

12  refundable. (FAC ¶¶ 124, 126.) Thus, Plaintiffs state they had the choice of either walking

13  away and losing $5,000 or paying $10,000 more to join the program. And Plaintiffs allege that

14  even $5,000 is a very large amount in the Philippines—"more than one-and-a-half times the

15  average [annual] household income . . . ." (*Id.* ¶ 108.) Thus, neither options available to

16  Plaintiffs would allow them to avoid a massive loss.

17        In sum, Plaintiffs sufficiently state their fraud claim. Plaintiffs have alleged essentially a

18  bait-and-switch scheme where they had to either forfeit their initial $5,000 payment or

19  unexpectedly pay another $10,000 to continue with the program. And given Plaintiffs' detailed

20  factual allegations concerning this scheme, Plaintiffs met Rule 9(b) pleading requirements.

21        Accordingly, Defendants' Motion is DENIED as to Plaintiffs' fifth claim, for fraud.

22

23  **2.      PLAINTIFFS' FIRST CLAIM, FOR VIOLATIONS OF THE TVPA**

24

25        The TVPA is "an Act to combat trafficking of persons, especially into the sex trade,

26  slavery, and slavery-like conditions, in the United States and countries around the world through

27  prevention, through prosecution and enforcement against traffickers, and through protection and

28  assistance to victims of trafficking." H.R. Rep. No. 106-939, at 1 (2000). The purpose of the act

is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id.* at 3. Many of the victims "are trafficked into the international sex trade, often by force, fraud, or coercion. *Id.* But "trafficking also involves violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

Civil liability is allowed against individuals who violate the TVPA. 18 U.S.C. § 1595. Plaintiffs bring various TVPA claims against Defendants for human trafficking and forced labor under 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a),(b). The Court now reviews whether Plaintiffs have stated valid TVPA claims against Defendants under each of these statutes, and begins with whether UPI, a corporation, is a proper defendant under § 1595.

## 2.1 UPI as a TVPA Defendant

A civil action may be brought under the TVPA against "the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in [violation of the TVPA]) . . . ." 18 U.S.C. § 1595.

"[I]t is evident that Congress drafted the TVPA in such a manner as to limit liability to natural persons." *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1127 (9th Cir. 2010). "The TVPA consistently uses 'individual' throughout the statute to refer both to the torturer and the victim of torture." *Id.*

> [T]he legislative history demonstrates that Congress rejected the notion of corporate liability. When first introduced in 1987, the TVPA imposed liability on any "person" who subjected another to torture. *See* The Torture Victim Protection Act: Hearing and Markup before the H. Comm. on Foreign Affairs on H.R. 1417, 100th Cong. 82, 85 (1988). The House Foreign Affairs Committee amended the bill to substitute "individual" for "person" in order to "make it clear [they were] applying [the Act] to individuals and not to corporations." *Id.* When introduced five years later, the TVPA still spoke of liability for individuals. . . . We thus conclude that

both the text and legislative history indicate Congress did not intend
to allow suits against corporations under the TVPA.

*Id.*

As the Ninth Circuit stated, Congress made it clear it was applying the TVPA only to individuals. And nothing in the statute or legislative history shows that liability should be extended beyond this limit. Accordingly, Plaintiffs' claims against UPI for violations of the TVPA must fail.

Defendants' Motion is GRANTED as to Plaintiffs' TVPA claims against UPI. The Court now turns to the merits of Plaintiffs' TVPA claims against Defendant Navarro.

**2.1 Section 1589**

Section 1589 prohibits forced labor obtained by any of multiple possible means. The statute states, in relevant part,

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means . . . .
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
> shall be punished as provided under subsection (d). . . .
>
> (c) In this section:
> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
> (2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

13

1   § 1589(a),(c).

2   Plaintiffs allege that

3       Defendants knowingly provided the labor of Plaintiffs by means of
        abuse and threatened abuse of law or legal process and by means of a
4       scheme, pattern, or plan intended to cause the Plaintiffs . . . to
        believe that, if he or she did not perform the labor, he or she would
5       suffer serious harm

6   in violation of the TVPA under § 1589(a)(3),(4).  (FAC ¶ 256.)  Defendants argue that Plaintiffs

7   have failed to sufficiently state a clam for violations of the TVPA.  The Court disagrees.

8       Plaintiffs allege multiple threats made by Recruiter Defendants to Plaintiffs to support

9   their claim under § 1589(a)(3).  For example, Plaintiffs allege that Recruiter Defendants

10  threatened deportation (1) after certain teachers stated that they planned to move due to high

11  living costs (*id.* ¶ 165a); (2) where a certain teacher tried to bring his family with him to the

12  United States from the Philippines (*id.* ¶ 165c); and (3) after a certain teacher complained to a

13  reporter about poor treatment in the work program (*id.* ¶ 165d).  Plaintiffs also allege that

14  Defendant Navarro threatened to sue Plaintiffs for voicing criticisms about Recruiter

15  Defendants' business operations.  (*Id.* ¶ 166.)  Finally, Plaintiffs state that Defendant Navarro

16  threatened to allow Plaintiffs' visas to expire without renewal and to have Plaintiffs'

17  employment terminated when certain teachers asked for refunds of fees and complained about

18  housing issues.  (*Id.* ¶¶ 168, 169.)

19      Plaintiffs also state their previously discussed fraud allegations to support their TVPA

20  claim under § 1589(a)(4).  As noted, Plaintiffs argue that Defendants' "systematic fraud and

21  extortion forced Plaintiffs to take on crushing debt, which they could not possibly repay absent

22  continued employment by the school districts."  (Opp'n at 8:4–6.)  Given this debt, Plaintiffs

23  argue, ceasing to work for the school districts would have resulted in Plaintiffs' financial ruin.

24  (*Id.* at 8:6–8.)

25      Specifically, as noted, Plaintiffs allege that Defendants informed Plaintiffs of massive

26  additional fees only after Plaintiffs paid the non-refundable First Recruitment Fees.  (*See, e.g.*,

27  FAC ¶¶ 105, 106.)  Thus, Plaintiffs were left with the choice of either walking away from the

28  program with approximately $5,000 in debt or obeying Defendants' commands and paying

14

1  approximately $10,000 more. (*See, e.g.*, *id.* ¶¶ 106, 124–25.) Plaintiffs allege that they were

2  "powerless to do anything other than conform to Recruiter Defendants' demands because they

3  did not have control over their passports, and if they did not come to work in the United States,

4  they would suffer severe financial harm because of the overwhelming debt they had already

5  accumulated." (*Id.* ¶ 127.) And as noted, The $5,000 debt allegedly caused Plaintiffs severe

6  financial harm largely because it is a very large sum of money in the Philippines—"more than

7  one-and-a-half times the average [annual] household income . . . ." (*Id.* ¶ 108.)

8       Based on these factual allegations, including allegations of threats and fraud, Plaintiffs

9  have sufficiently alleged that Defendants violated the TVPA under § 1589(a).

10       Defendants argue that Plaintiffs fail to state a claim under § 1589(a), and their argument

11  largely centers around a perceived lack of severity of Plaintiffs' financial situation and working

12  conditions. For example, Defendants cite the previously referenced House of Representatives

13  Conference Report accompanying the TVPA bill that states that the intent of the act is to

14  "combat trafficking of persons, especially into the sex trade, slavery, and slavery-like

15  conditions . . . ." H.R. Rep. No. 106-939, at 1 (2000). Defendants argue that "[t]eaching high

16  school math and science hardly qualifies as the type of activity targeted by Congress," (Reply at

17  3 n.1), and Defendants cite *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), a case in

18  which convictions were upheld under the TVPA, to support their argument.

19        In *Calimlim*, an individual came to the United States from the Philippines and began

20  working for a family as a housekeeper. *Id.* at 708. Once she arrived, the family subjected the

21  individual to terrible living conditions. She typically worked sixteen-hour days, seven days a

22  week. *Id.* Further, in the nineteen years that the individual worked for the family, she was rarely

23  allowed outside, and only spoke with her family on a few occasions. *Id.* at 709. And she was

24  "told repeatedly . . . that if anyone discovered her she could be arrested, imprisoned, and

25  deported, and she would not be able to send any more money back to her family. Fear of that

26  consequence kept her from breaking any of the rules or appearing outside the house." *Id.* The

27  family in *Calimlim* "knew that not sending money back home was, for [the individual], a

28  'serious harm.'" *Id.* The individual was also told that if she did not do everything she was told,

15

1   the family would not send money back home for her.  *Id.* at 711.  As noted, the Seventh Circuit
2   upheld the convictions of the family members for TVPA violations.  *Id.* at 718.

3       *Calimlim* certainly appears to involve circumstances more severe than those presented
4   here.  The family in *Calimlim* essentially forced an individual into slavery by threatening to have
5   her "arrested, imprisoned, and deported" and refused to send money to her family if she did not
6   do everything she was commanded.  *Id.* at 709.  By contrast, Plaintiffs here voluntarily incurred
7   debt to join a teaching program, and they do not make factual allegations describing
8   circumstances as dire as the slavery-like conditions in *Calimlim*.  But the discussion concerning
9   whether Plaintiffs have stated a valid claim under § 1589 does not end simply because Plaintiffs
10  do not allege the same severe physical and psychological harm that was present in *Calimlim*.

11      This is because § 1589 "is not written in terms limited to overt physical coercion, and we
12  know that when Congress amended the statute it expanded the definition of involuntary
13  servitude to include nonphysical forms of coercion."  *Id.* at 714.  It is sufficient that a
14  defendant's misconduct has created a situation where ceasing labor would cause a plaintiff
15  serious harm.  *Id.* at 711–12, 714.  Further, as noted, while many of the victims "are trafficked
16  into the international sex trade, often by force, fraud, or coercion[,] . . . "trafficking also involves
17  violations of other laws, including labor and immigration codes and laws against kidnaping,
18  slavery, false imprisonment, assault, battery, pandering, fraud, and extortion."  H.R. Rep. No.
19  106-939, at 3, 4 (2000).  In other words, the TVPA not only protects victims from the most
20  heinous human trafficking crimes, but also various additional types of fraud and extortion
21  leading to forced labor.

22      *Calimlim* supports this finding.  The family in that case "caused [the individual] to
23  believe that she might be deported and her family seriously harmed because she would no longer
24  be able to send money [back home].  They also implicitly threatened her with deportation
25  proceedings."  While the holding in *Calimlim* largely focused on whether the terms "serious
26  harm" and "threatened abuse of the law or the legal process" were unconstitutionally overbroad
27  or vague, the *Calimlim* Court held that

28

> [t]he evidence showed that the [family] intentionally manipulated the situation so that [the individual] would feel compelled to remain. They kept her passport, never admitted that they too were violating the law, and never offered to try to regularize her presence in the United States. Their vague warnings that someone might report [her] and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave. That is all the jury needed to convict. (Notably, the Calimlims did not challenge the sufficiency of evidence supporting the jury's findings of intent.)

*Id.* at 713.

Another case similarly holds that serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion." *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (vacated on other grounds 545 U.S. 1101). In *Bradley*, employers were convicted under TVPA for obtaining the services of Jamaican immigrants for their tree removal company by threats of serious harm. *Id.* at 148–49. This included psychological coercion such as seizing immigrants' passports to restrict their ability to flee. *Id.* Similarly, Defendants in this case are alleged to have used Plaintiffs' passports as a means of coercing Plaintiffs to comply with Defendants' demands, and ultimately restricting their ability to walk away free and clear. (*Id.* ¶ 127.)

Like in *Calimlim* and *Bradley*, Plaintiffs here allege that Defendants intentionally manipulated the situation so that Plaintiffs would feel compelled to remain and would obey all of Defendants' demands. As previously discussed, Plaintiffs have sufficiently alleged that Defendants engaged in a fraudulent scheme where Defendants demanded an extra $10,000 to continue with the teaching program. And Plaintiffs further allege that the initial $5,000 debt would be crushing to Plaintiffs without access to the promised teaching jobs in the United States, and therefore Plaintiffs had not choice but to work in the program after they paid the non-refundable First Recruitment Fee.

Further, as noted, the alleged fraudulent scheme to financially manipulate Plaintiffs is accompanied by numerous allegations that Defendants repeatedly threatened Plaintiffs. This includes threats to fire Plaintiffs, sue them, allow their visas to expire, or deport them over

17

various issues that generally concerned complaints about living conditions and pay. (*E.g.*, FAC ¶¶ 165a–69.) Specifically, threatening deportation for violation of immigration laws "clearly fall[s] within the concept and definition of 'abuse of legal process' since the alleged objective for [such conduct] was to intimidate and coerce [Plaintiffs] into 'forced labor.'" *United States v. Garcia*, 2003 U.S. Dist. LEXIS 22088, at *23 (W.D.N.Y. Dec. 2, 2003). These allegations, along with Plaintiffs' previously discussed fraud allegations, sufficiently state a claim under § 1589(a). *Cf. Calimlim*, 538 F.3d at 711–14.

Defendants argue that Plaintiffs' pleadings actually show Plaintiffs' desire to continue working in the teaching program and avoid being fired. (Motion at 13:21–24.) Therefore, Defendants argue, Plaintiffs fail to sufficiently allege that they were subjected to forced labor. (*See id.*) But this argument cuts against Defendants. Plaintiffs' allegations largely focus on the point that they *had to* work for Defendants' so that they would be able to repay the massive debt they incurred due to Defendants' fraud. In other words, after incurring $5,000 in debt, if Plaintiffs lost their teaching jobs they would be unable to repay the debt, thus causing them immense financial harm. Thus, based on Plaintiffs' allegations it is not surprising that Plaintiffs not only wanted, but *needed* to continue working in the program.

In sum, Plaintiffs have sufficiently stated that Defendants threatened the abuse of legal process and serious harm to provide forced labor, and therefore Defendants' Motion is DENIED as to Plaintiffs' claims under § 1589(a).


## 2.2    Section 1590


Section 1590 prohibits human trafficking to further forced labor. The statute states that "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be [fined, imprisoned, or both]." § 1590(a).

Just as Defendants' Motion as to Plaintiffs' claims under § 1589(a) fail, their Motion as to Plaintiffs' claims under § 1590 also fail. As noted, Plaintiffs have sufficiently alleged that

Defendants are involved in a fraudulent scheme involving forced labor, and given the international nature of this matter, Plaintiffs have also sufficiently alleged that Defendants recruited, transported, and provided Plaintiffs for that forced labor. In particular, Plaintiffs clearly and repeatedly allege that Defendants recruited them to teach in Louisiana.

Thus, Defendants' Motion is DENIED as to Plaintiffs' claims under § 1590.

### 2.3    Section 1592

Section 1592 prohibits destroying or confiscating travel- and immigration-related documents "in the course of a violation" or "with intent to violate" the TVPA. Specifically, the statute states

> (a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person--
> (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a); [or]
> (2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; . . . [shall be fined or imprisoned.]

As discussed, Plaintiffs have sufficiently alleged that Defendants are involved in a fraudulent scheme involving human trafficking. Further, Plaintiffs have alleged instances where Defendants possessed and refused to return passports and visas "in the course of" violating the TVPA. Accordingly, Plaintiffs have sufficiently stated a claim under § 1592.

Thus, Defendants' Motion is DENIED as to Plaintiffs' claims under § 1592.

### 2.4    Section 1594(a),(b)

Section 1594(a) states "[w]hoever attempts to violate section 1581, 1583, 1584, 1589, 1590, or 1591 shall be punishable in the same manner as a completed violation of that section." Section 1594(b) states "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section."

19

1    Just as Plaintiffs have stated claims under §§ 1589, 1590, and 1592, Plaintiffs state a

2    claim under § 1594.  As noted, Plaintiffs have alleged sufficient facts showing that Defendants

3    were involved a forced labor scheme, and Plaintiffs have also alleged sufficient facts showing an

4    attempt and conspiracy to do so.

5        Thus, the Court DENIES Defendants' Motion as to Plaintiffs' claims under § 1594(a),(b).

6

7        **2.5    Conclusion**

8

9        The Court takes allegations of forced labor seriously.  And while the Court understands

10   Defendants' argument that the alleged facts here are somewhat less shocking than those in

11   situations like the one in *Calimlim*, Congress has made it clear that forced labor and human

12   trafficking also involve "violations of other laws, including labor and immigration codes and

13   laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and

14   extortion."  H.R. Rep. No. 106-939, at 4 (2000).  This shows the broad reach of the TVPA and

15   the broad class of individuals whom it protects.  Thus, it is the duty of this Court to provide a

16   forum for the alleged victims of forced labor, regardless of the severity of the alleged

17   circumstances.

18       Accordingly, because Plaintiffs have sufficiently alleged violations of the TVPA against

19   Navarro, Defendants' Motion as to Plaintiffs' TVPA claims against Navarro is DENIED.

20

21   **3.    PLAINTIFFS' SECOND CLAIM, FOR RICO VIOLATIONS**

22

23       To state a civil claim under RICO, a plaintiff must plead that the defendant violated the

24   Act, and that the plaintiff was injured as a result of the violation.  "The elements of a civil RICO

25   claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of

26   racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's business or

27   property."  *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c),

28   1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  "Racketeering activity . . . is

1  defined to include a number of generically specified criminal acts as well as the commission of

2  one of a number of listed predicate offenses."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939 (9th

3  Cir. 2006) (citing § 1961(1)).  "A 'pattern of racketeering activity' requires at least two acts of

4  racketeering activity."  18 U.S.C. § 1961(5).

5      Plaintiffs allege RICO violations based on the following alleged acts: "Forced labor in

6  violation of 18 U.S.C. § 1589"; "[t]rafficking persons with respect to forced labor in violation of

7  18 U.S.C. § 1592(a)"; "[u]nlawful document-related practices in furtherance of trafficking in

8  violation of 18 U.S.C. § 1592(a)"; "[m]ail fraud to further their unlawful scheme in violation of

9  18 U.S.C. § 1341"; "[w]ire fraud to further their unlawful scheme in violation of 18 U.S.C.

10  § 1343"; and "[e]xtortion as defined in Cal. Penal Code § 518."  (FAC ¶ 286.)

11      The Court has already held that Plaintiffs have sufficiently stated separate claims for

12  forced labor, human trafficking, and unlawful document-related practices, and therefore these

13  claims may also serve as underlying predicate acts for Plaintiffs' RICO claim.  The Court

14  therefore turns to the remaining alleged predicate acts to determine whether Plaintiffs have

15  stated a valid RICO claim.

16

17      **3.1   Mail and Wire Fraud**

18

19      For mail fraud as a RICO predicate act, "it is necessary to show that (1) the defendants

20  formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused

21  a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with

22  the specific intent to deceive or defraud." *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th

23  Cir. 2004) (internal citations and quotations omitted).  Meanwhile, for wire fraud as a RICO

24  predicate act, it is necessary to show "(1) a scheme to defraud; (2) use of the wires in furtherance

25  of the scheme; and (3) a specific intent to deceive or defraud." *United States v. Green*, 592 F.3d

26  1057, 1064 (9th Cir. 2010) (internal citations and quotations omitted).

27      As noted Rule 9(b) provides that "[i]n alleging fraud . . . , a party must state with

28  particularity the circumstances constituting fraud . . . ." *Sanford v. MemberWorks, Inc.*, 625 F.3d

21

1    550, 558 (9th Cir. 2010).  Thus, when mail fraud and wire fraud are the alleged RICO predicate

2    acts, a plaintiff must meet heightened pleading standards under Rule 9(b) for those acts.  *Id.*

3           Here, Plaintiffs do not specifically allege any use of wires or United States mails by

4    Defendants  to further a scheme or artifice to defraud.  While Plaintiffs' FAC generally alleges

5    that "RICO Defendants utilized the telephone, facsimile, postal system, and/or email of the

6    United States to organize, plan, and coordinate the RICO Enterprise," (FAC ¶ 287), this

7    statement does not sufficiently allege that either Navarro or UPI specifically used mail or wires,

8    when they used them, or how any such use was connected to a scheme to defraud.  And while

9    Plaintiffs do state some examples of other parties using mail and wires at various times, (*see,*

10   *e.g.*, *id.* ¶¶ 114, 115, 205–45), Plaintiffs do not specifically allege any acts that Defendants

11   performed.

12          While the Ninth Circuit has "occasionally relaxed the particularity requirement where

13   'plaintiffs cannot be expected to have personal knowledge of the relevant facts,'" *Neubronner v.*

14   *Milken*, 6 F.3d 666, 672 (9th Cir. 1993), here, it is not unreasonable to expect Plaintiffs to have

15   personal knowledge of the relevant facts concerning the communications at issue.  *Sanford*, 625

16   F.3d at 558 (holding that "the failure to plead who placed [ ] telephone calls was insufficient

17   under Rule 9(b)" to state a wire fraud claim).

18          Plaintiffs have failed to sufficiently allege specific mailings or wire usage by Defendants,

19   and therefore they fail to satisfy Rule 9(b)'s particularity requirement.  *See id.* (citing *Lancaster*

20   *Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)).

21          Accordingly, Defendants' Motion as to the predicate acts of mail and wire fraud is

22   GRANTED.

23

24   **3.2    Extortion**

25

26          For extortion as a RICO predicate act, it is necessary to show "[1] extortion and [2] a

27   nexus between [the] defendant's acts and interstate commerce."  *United States v. Atcheson*, 94

28   F.3d 1237, 1240–41 (9th Cir. 1997).  "Extortion is the obtaining of property from another, with

1   his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of

2   force or fear, or under color of official right." Cal. Penal Code § 518.  The "obtaining" element

3   requires a showing that the extortioner or a third party received something of value from the

4   victim of the alleged extortion.  *See United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009).

5   The "wrongful use of . . . fear" element requires a showing that the use of fear is in fact

6   wrongful.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (internal citations and

7   quotations omitted).

8        "Extortion has been characterized as a paradoxical crime in that it criminalizes the

9   making of threats that, in and of themselves, may not be illegal." *Flatley v. Mauro*, 39 Cal. 4th

10  299, 326 (2006).  "It is the means employed to obtain the property of another which the law

11  denounces . . . ." *Id.*  For purposes of extortion, it is immaterial that the money a defendant

12  sought to obtain through threats may have been justly due.  *Id.* at 327 (citing *Gomez v. Garcia*,

13  81 F.3d 95, 97 (9th Cir. 1996)).

14       Plaintiffs allege that Defendants threatened Plaintiffs with "deportation and financial ruin

15  in violation of Cal. Penal Code §§ 518–519 if they did not pay the fees required under [multiple

16  contracts]."  (FAC ¶ 243.)  Defendants argue that Plaintiffs have not sufficiently stated a claim

17  for extortion.  The Court disagrees.

18       Defendants argue that "Plaintiffs in this action fail to allege either that [Defendants]

19  forced them to come to this country or to continue working here under threats of deportation or

20  legal action." (Reply at 6:3-5.)  Therefore, Defendants argue, Plaintiffs fail to sufficiently allege

21  the predicate act of extortion.  This argument fails.

22       Defendants cite *Pasamba v. HCAA Int'l, Inc.*, Case No. 08-0247, 2008 WL 2562928 (D.

23  Ariz. June 24, 2008), to support their argument.  In *Pasamba*, a woman was recruited from the

24  Philippines to work in the United States as a nurse. *Id.* at *1.  The defendant stated that it would

25  pay expenses related to the woman's training, and that she would be paid wages comparable to

26  those paid to nurses with her experience. *Id.*  The woman signed an employment contract with

27  the defendant, and agreed that if her employment was terminated in less than two years, she

28  would have to reimburse the defendant for a maximum of $10,000 for defendant's "expenses

23

1  and costs directly attributable to the woman's training" and other related expenses. *Id.* Then,

2  before the woman left for the United States, the defendant required the woman to sign, without

3  consideration, an amendment to the agreement that increased the maximum amount recoverable

4  to $60,000. *Id.*

5       The *Pasamba* Court held that based on these factual allegations, the woman had failed to

6  sufficiently allege extortion and theft as RICO predicate acts. *Id.* at *5-6. The Court rejected the

7  woman's argument that she "'signed the $60K Note under duress, including the threat of having

8  her visa process terminated to her detriment if she wanted to obtain a subsequent United States

9  visa and the threat of owing $10,000 on the first promissory note.'" *Id.* at *5. The *Pasamba*

10  Court noted that the

11          promissory note [the woman] signed expressly limited her obligation
            to repay [the defendant] for the expenses the [defendant] incurred for
12          her benefit. Further, Plaintiff's only allegations regarding threats of
            deportation refer to communications before she was granted a work
13          visa, moved to the United States, and began employment. Plaintiff
            does not allege she was forced to come to the United States and work
14          in a hospital here or that she was prevented from quitting after she
            began working in the United States. . . .

15

16  *Id.* The Court further noted that

17

18          [b]ased on [the woman's] allegations, if [the woman] had refused to
            sign the amendment to the promissory note and [the defendant]
19          terminated her employment agreement, there would have been no
            possibility of deportation, and if [the defendant] attempted to enforce
20          the original promissory note, Plaintiff could have refused if it was
            unenforceable or could have paid [the defendant] the expenses it had
            incurred in the few weeks since she signed it.

21

22  *Id.* at *6.

23       The facts in *Pasamba* starkly differ from the facts here. The woman in *Pasamba* did not

24  dispute that either promissory note she signed expressly limited her obligations to repay the

25  defendant solely to expenses incurred by the defendant. *Id.* at *5. Further, the woman's

26  allegations regarding threats of deportation referred to communications before she was granted a

27  work visa, moved to the United States, and began employment. *Id.* As the *Pasamba* Court

28

24

1  stated, the woman did not allege "she was forced to come to the United States and work in a

2  hospital or that she was prevented from quitting after she began working in the United States."

3        But here, by means of a fraudulent scheme, Defendants allegedly forced Plaintiffs to

4  choose between forfeiting their initial $5,000 or paying approximately $10,000 more to join the

5  teaching program.  The woman in *Pasamba* did not allege such inevitable financial harm.

6  Further, Plaintiffs allege that Defendants ensured that profits remained high and that complaints

7  remained low by threatening deportation once Plaintiffs were working in the United States.  And

8  Plaintiffs allege that Defendants threatened to deport Plaintiffs if they did not make payments

9  under various contracts.  (*E.g.*, FAC ¶¶ 11, 294.)  The woman in *Pasamba* did not make such

10 allegations.  *Id.* at *6.

11       Plaintiffs allege that Defendants' demands and conduct put them in fear of financial harm

12 and deportation.  (FAC ¶¶ 11, 108, 294.)  While the Ninth Circuit has adopted a somewhat

13 narrow reading of the term "wrongful use of . . . fear" for extortion claims, the circumstances

14 alleged here meet that reading.  *See Sosa*, 437 F.3d at 940.  Plaintiffs do not solely allege fear of

15 economic loss, but also allege fear of deportation.  Given the circumstances surrounding

16 Plaintiffs' recruitment, as immigrant workers who had already incurred approximately $15,000

17 in debt to work in the United States, this threatened deprivation of income and ability to continue

18 working in the United States was wrongful.  And it was this alleged wrongful use of fear that

19 was the "operating or controlling cause compelling" Plaintiffs' continued participation in

20 Defendants' employment scheme.  *See California v. Goodman*, 323 P.2d 536, 541 (Cal. Ct.

21 App. 1958).

22       Based on these allegations, Plaintiffs have plausibly alleged that Defendants wrongfully

23 forced Plaintiffs to fear that they would lose their $5,000 First Recruitment Fee if they did not

24 pay additional fees.  It is also plausible that once Plaintiffs were in the United States, Defendants

25 wrongfully threatened to deport Plaintiffs if they complained about additional fees and other

26 matters.  Therefore Plaintiffs have sufficiently alleged the RICO predicate act of extortion

27 against Defendants based on the alleged threats of deportation and severe financial harm.

28       Accordingly, Defendants' Motion as to the predicate act of extortion is DENIED.

### 3.3 Conclusion

While Plaintiffs have failed to sufficiently allege the RICO predicate acts of mail and wire fraud, Plaintiffs have sufficiently alleged the predicate acts of forced labor, human trafficking, unlawful document-related practices, and extortion. Thus, Plaintiffs' have sufficiently alleged multiple RICO predicate acts, as required by 18 U.S.C. § 1961(5). Further, it appears that the parties do not dispute that Plaintiffs' have met the remaining elements of a RICO claim. Accordingly, Defendants' Motion as to Plaintiffs' RICO claim is DENIED.

## 4. PLAINTIFFS' THIRD CLAIM, FOR VIOLATIONS OF CALIFORNIA'S EMPLOYMENT AGENCY, EMPLOYMENT COUNSELING, AND JOB LISTING SERVICES ACT, UNDER CALIFORNIA CIVIL CODE § 1812.508

California's Employment Agency, Employment Counseling, and Job Listing Services Act prohibits employment agencies from making various false or misleading representations. Under California Civil Code § 1812.508(a), "[n]o employment agency shall make, or cause to be made, any false, misleading, or deceptive advertisements or representations concerning the services that the agency will provide to jobseekers."

For the reasons previously discussed, Plaintiffs have stated a valid claim under § 1812.508. Plaintiffs have sufficiently alleged, for example, that Defendants made misleading representations concerning the amount that Plaintiffs would have to pay to join the teaching program and work in the United States. (*E.g.*, FAC ¶ 310.) This, with Plaintiffs' other factual allegations, sufficiently states a claim under § 1812.508.

Accordingly, Defendants' Motion as to Plaintiffs' claim under § 1812.508 is DENIED.

_____

1   **DISPOSITION**

2

3         The Motion is GRANTED in part and DENIED in part, with leave to amend.  Plaintiffs

4   may file an amended complaint within 21 days of this order, if they so choose, preferably in red-

5   line format.

6

7   IT IS SO ORDERED.

8

9   DATED: March 7, 2011

10

11                                          _____

12                                              Andrew J. Guilford

13                                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28