1   James M. Knoepp (admitted *pro hac vice*)
    Jim.Knoepp@splcenter.org
2   Jennifer L. Tse (SBN 260764)
    Jennifer.Tse@splcenter.org
3   Daniel Werner (admitted *pro hac vice*)
    Daniel.Werner@splcenter.org
4   IMMIGRANT JUSTICE PROJECT
    SOUTHERN POVERTY LAW CENTER
5   233 Peachtree Street NE, Suite 2150
    Atlanta, GA  30303
6   Telephone:  (404) 521-6700
    Facsimile:  (404) 221-5857
7
8   *Attorneys for Plaintiffs*
    *Additional Co-Counsel on Subsequent Pages*
9

10                  UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
11                        SOUTHERN DIVISION

12

13   MAIRI NUNAG-TAÑEDO, et al.,          Civ. No.: 10-01172-AG-MLG

14        Plaintiffs,

15        v.                              **PLAINTIFFS' MEMORANDUM IN
                                          SUPPORT OF MOTION FOR CLASS
16   EAST BATON ROUGE PARISH              CERTIFICATION**
     SCHOOL BOARD, et al.,
17                                        **HEARING DATE:   MAY 2, 2011
          Defendants.                     TIME:            10:00 a.m.
18                                        COURTROOM:       10D**

19                                        **HON. ANDREW J. GUILFORD**

20

21

22

23

24

25

26

27

28

*(Attorney listing continued from first page)*

Mary C. Bauer (admitted *pro hac vice*)
Mary.Bauer@splcenter.org
Sam Brooke (admitted *pro hac vice*)
Sam.Brooke@splcenter.org
Morris S. Dees (admitted *pro hac vice*)
Judy.Bruno@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:  (334) 956-8200
Facsimile:   (334) 956-8481

Dennis B. Auerbach (admitted *pro hac vice*)
dauerbach@cov.com
Candice N. Plotkin (admitted *pro hac vice*)
cplotkin@cov.com
Jillian Willis (admitted *pro hac vice*)
jwillis@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 662-6000
Facsimile:   (202) 662-6291

Susan Johnston (admitted *pro hac vice*)
sjohnston@cov.com
Pamela A. Carter (admitted *pro hac vice*)
pcarter@cov.com
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone:  (212) 841-1000
Facsimile:   (212) 841-1010

Daniel J. McNeil (admitted *pro hac vice*)
dmcneil@aft.org
AMERICAN FEDERATION OF TEACHERS

PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION

LEGAL DEPARTMENT
555 New Jersey Ave., N.W.
Washington, DC  20001
Telephone:  (202) 393-6305
Facsimile:    (202) 393-6385

Lawrence Rosenzweig (SBN 72443)
LRPCorp@aol.com
Brent Rosenzweig (SBN 219071)
Brent.Rosenzweig@gmail.com
LAWRENCE ROSENZWEIG, PC
2730 Wilshire Boulevard, Suite 425
Santa Monica, California  90403
Telephone:  (310) 453-0348
Facsimile:    (310) 453-3358

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................1

II.   FACTUAL BACKGROUND ...............................................................2

III.   THE PROPOSED CLASS AND SUBCLASS ....................................7

IV.   ARGUMENT .....................................................................................9

    A.   Plaintiffs Satisfy the Requirements of Rule 23(a)....................9

        1.   The Class Exceeds 350 Foreign National and Joinder is Thus Impracticable. ...........................................................9

        2.   Common Questions of Law and Fact Abound. .......................11

        3.   The Claims of the Named Plaintiffs Are Typical of the Claims of Absent Class and Subclass Members. ....................13

    B.   Plaintiffs Meet the Requirements for Certification Under Fed. R. Civ. P. 23(b)(3). .........................................................16

        1.   Common Issues Predominate. .............................................16

        2.   A Class Action Is Superior to Other Methods of Adjudication ..............18

    C.   In the Alternative, Plaintiffs Satisfy the Certification Requirements of Rule 23(b)(2). .............................................20

    D.   Plaintiffs Satisfy the Other Rule 23 Requirements. ...............21

# TABLE OF AUTHORITIES

## CASES

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ................................................................................................................16

*Arkansas Ed. Ass'n v. Board of Ed. of Portland, Oregon School Dist.*, 446 F.2d 763 (8th Cir. 1971)...............................................................................................................10

*Badhdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383 (C.D. Cal. 2009) ..........................9

*Cicero v. DirecTV, Inc.*, No. EDCV07-1182, 2010 U.S. Dist. LEXIS 86920 (July 27, 2010)....18

*Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010) ..............................19

*Dukes v. Wal-Mart Stores Inc.*, 603 F.3d 571 (9th Cir.), *cert. granted*, ___ U.S. ___, 131 S. Ct. 795, 178 L. Ed. 2d 530 (2010)..................................................9, 11, 19, 20

*East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977) ......................................................................................................22

*Gerardo v. Quong Hop & Co.*, No. C 08-3953 JF (PVT), 2009 U.S. Dist. LEXIS 60900 (N.D. Cal. July 7, 2009) ..........................................................................................10

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)..............................11, 15, 16, 18

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ....................................13

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F. 2d 909 (9th Cir. 1964).................9

*In re First Alliance Mortg Co.*, 471 F.3d 977 (9th Cir. 2006) ..................................17

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) .............................17

*In re Lifelock, Inc.*, MDL No. 08-1977-MHM, 2010 U.S. Dist. LEXIS 102612 (D. Ariz. Aug. 31, 2010)..........................................................................................................21

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009) .................16

*In re: Complaint of the La. Fed'n of Teachers and the Am. Fed'n of Teachers o/b/o Certain Filipino Teacher Local Members* (La. Work Force Comm'n Apr. 14, 2010), *available at* http://www.laworks.net/Downloads/PR/PR20100416......................19

*Jones v. E*Trade Mortg. Corp.*, No. 02-1123, 2006 U.S. Dist. LEXIS 9566 (S.D. Cal. Feb. 17, 2006)................................................................................................................17

*Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507 (9th Cir. 1978).......................20

*O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998)............................22

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008)...............................................11

*Rannis v. Recchia*, 380 Fed. Appx. 646 (9th Cir. 2010) ...........................................9

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010)................................................14

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) .........................18, 20

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ....................................................11

*Westways World Travel, Inc.v. AMR Corp.*, 218 F.R.D. 223 (C.D. Cal. 2003)..........16

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) .............14, 17

1

**REGULATIONS**

2

20 C.F.R. § 655.731(c)(9)(iii)(C) (2000) ...................................................................3

3

4

**RULES**

5

Fed. R. Civ. P. 23(a)(1) ................................................................................9

6

Fed. R. Civ. P. 23(a)(2) ..............................................................................11

Fed. R. Civ. P. 23(a)(4) ..............................................................................15

7

Fed. R. Civ. P. 23(b) ....................................................................................9

8

Fed. R. Civ. P. 23(b)(2) ..............................................................................20

Fed. R. Civ. P. 23(b)(3) ........................................................................16, 18

9

10

**OTHER AUTHORITIES**

11

5 MOORE'S FEDERAL PRACTICE § 23.20 (2010) .........................................................21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   <u>INTRODUCTION</u>

In this human trafficking and racketeering case, a California labor contractor and its confederates ensnared hundreds of Filipino teachers in an illegal scheme wherein the teachers' labor was procured through threats of serious financial harm and abuse of legal process.  The scheme was perpetrated through a common course of conduct directed at the entire teacher class, which included, among other things, submitting fraudulent documents to the United States government to secure the H-1B "specialty occupation" visas that were central to the scheme; withholding crucial information from the teachers regarding the amount of fees they would be charged to secure employment at Louisiana public schools until the teachers were so far mired in debt that they could not realistically extricate themselves from the scheme; and threatening teachers with deportation and other abuse of legal process to control the teachers' actions.  The teachers seek damages, injunctive and declaratory relief under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581, *et seq.* ("TVPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), and applicable provisions of California and Louisiana law.

Plaintiffs — five of the teachers whom Defendants ensnared in their scheme — now move for class certification of their claims pursuant to Rule 23 of the Federal Rules of Civil Procedure.  As explained below, this is a classic case for certification as a class action.  The Plaintiff class consists of more than 350 foreign nationals, such that joinder would be impracticable; because the case concerns a common course of conduct by Defendants to ensnare and exploit hundreds of Filipino teachers, the principal factual and legal questions are common to the entire class and vastly predominate over individual issues; the injuries that the named Plaintiffs suffered are virtually identical to those suffered by the other teachers the Defendants victimized; and judicial economy would be substantially served by adjudicating the overwhelmingly common issues surrounding Defendants' trafficking and racketeering scheme in a single class proceeding.

Plaintiffs principally seek class certification under Fed. R. Civ. P. 23(b)(3).  In the alternative, certification should be granted pursuant to Fed. R. Civ. P. 23(b)(2). Defendants include the California corporation that recruited the teachers from the Philippines, together with its owner and Philippine confederates ("Recruiter Defendants"); the California lawyer and law firm that facilitated and otherwise participated in the scheme ("Legal Facilitator Defendants"); and the Louisiana school district, together with certain of its agents, which hired the majority of the teachers, abetted the Recruiter Defendants' scheme, and knowingly benefited from it ("Employer Defendants").

## II.    FACTUAL BACKGROUND

Defendants' scheme is detailed in Plaintiffs' First Amended Complaint ("Am. Compl.," ECF No. 20).  Beginning in 2007, several public school districts in Louisiana retained Defendant Universal Placement International, Inc. ("Universal"), a California corporation, and its owner, Defendant Lourdes "Lulu" Navarro, to recruit qualified teachers from the Philippines.  The teachers were brought to the United States pursuant to the H-1B visa program, which allows U.S. employers to hire foreign nationals possessing certain special skills for up to six years.  (Am. Compl. ¶ 73.)

Universal and its Philippine alter ego, Defendant PARS International Placement Agency ("PARS"), advertised for teachers in the Philippines and held a series of group meetings there to recruit qualified applicants.  Several Louisiana school districts, including principally Defendant East Baton Rouge Parish School Board ("EBR"), interviewed teachers procured by the Recruiter Defendants.  During the course of the three school years beginning in 2007, the districts selected more than 350 teachers for placement, including almost 250 at EBR.  (McNeil Decl. Ex. A (document produced by Defendant Universal showing they provided 363 individuals pursuant to H-1B visas to work at all Louisiana schools and 239 of those individuals to work specifically at EBR).)

The Recruiter Defendants told the selected teachers, in a series of group meetings, that they must pay certain fees, totaling approximately $5,500.  This included fees for procuring H-1B visas, which, pursuant to federal regulations, are business expenses that must be paid by the petitioning employer, not the visa applicant.  (Am. Compl. ¶¶ 87-88; McNeil Decl. Ex. B (showing categories and amounts of various fees paid by class members); *see also* 20 C.F.R. § 655.731(c)(9)(iii)(C) (2000).)

The Legal Facilitator Defendants and the school districts that hired the teachers colluded with Recruiter Defendants to file fraudulent documents with the U.S. Department of Labor and the U.S. Customs and Immigration Service, falsely representing that the school districts would comply with federal regulations regarding the H-1B visa program.  (Am. Compl. ¶¶ 205-245.)  In fact, the teachers paid fees that the school districts were legally obligated to pay.  This fraud was an essential component of Defendants' scheme because visas would not have been issued absent such certifications of compliance, and Defendants would not have been able to traffic the teachers into the United States.  (Am. Compl. ¶¶ 115-116.)

The roughly $5,500 in fees charged to each teacher was enormous by Philippine standards, equaling more than one-and-a-half times the average annual household income in the Philippines.  (Am. Compl. ¶¶ 9, 108 & n.1; *see also* Nunag-Tanedo Decl. ¶ 5 (earned approximately $570/month); Cruz Decl. ¶ 5 (earned approximately $200-$300/month); Pascual Decl. ¶ 5 (earned approximately $675/month); Mari Decl. ¶ 5 (earned approximately $215-$325/month).)  To raise such substantial funds, the teachers were forced to take on enormous debt and, in some cases, to liquidate assets.  (Am. Compl. ¶ 109; *see also* Nunag-Tanedo Decl. ¶ 11; Cruz Decl. ¶ 10; Escuadra Decl. ¶ 9; Pascual Decl. ¶¶ 11-12, 15; Mari Decl. ¶ 9.)  The teachers were effectively ensnared in Defendants' trafficking scheme at that point, because only by obtaining jobs as teachers in the United States could they repay their huge debts.  (Am. Compl. ¶ 127; *see also* Nunag-Tanedo Decl. ¶ 15; Cruz Decl. ¶ 13; Pascual Decl. ¶ 18; Mari Decl. ¶ 12.)

officials at the United States Embassy in the Philippines.  The Recruiter Defendants instructed the teachers that they should have the Embassy deliver their passports containing issued visas to the Recruiter Defendants' office in the Philippines.  (Nunag-Tanedo Decl. ¶ 12; Cruz Decl. ¶ 11; Pascual Decl. ¶¶ 16; Mari Decl. ¶ 10.)  The Recruiter Defendants only returned the passports when the teachers paid all of the Recruiter Defendants' fees and were ready to travel to the United States.  (Am. Compl. ¶¶ 119-123; *see also* Nunag-Tanedo Decl. ¶ 14; Cruz Decl. ¶ 15; Escuadra Decl. ¶ 16; Pascual Decl. ¶¶ 20; Mari Decl. ¶ 11.)

The trafficking scheme then turned even more sinister.  After the teachers went into debt to pay the $5,500 in fees charged by Recruiter Defendants, the Recruiter Defendants presented them with the devastating news that they would have to pay another, previously undisclosed fee equal to 30 percent of their expected annual income in the United States (the "Second Recruitment Fee"), as well as the cost of airfare to the United States.  (Am. Compl. ¶¶ 124-125; *see also* Nunag-Tanedo Decl. ¶¶ 10-11, 13, 16; Cruz Decl. ¶ 10; Escuadra Decl. ¶ 9; Pascual Decl. ¶¶ 11-12, 15; Mari Decl. ¶ 9.)  The Recruiter Defendants provided the teachers with a schedule of what they claimed would be their salaries, and demanded the equivalent of two months' gross pay and the cost of the plane ticket up front, with the remainder of the Second Recruitment Fee due after the teacher had been in the United States for one year.  (Am. Compl. ¶¶ 124-125; *see also* Nunag-Tanedo Decl. ¶ 13; Cruz Decl. ¶ 12; Escuadra Decl. ¶¶ 12-13; Pascual Decl. ¶ 17; Mari Decl. ¶ 11.)  The Recruiter Defendants required the teachers to sign standard form contracts in the Philippines regarding these additional fees.  (Am. Compl. ¶ 134; McNeil Decl. Exs. D-H (Universal contracts for the five named Plaintiffs).)  Because the recruiters would not refund the fees previously paid and because the teachers were already mired in crushing debt incurred to pay the Initial Fees, the teachers had no practical alternative but to do what they were told.  (Am. Compl. ¶ 127; *see also* Nunag-Tanedo Decl. ¶ 15; Cruz Decl. ¶ 13; Escuadra Decl. ¶¶ 10, 17; Pascual Decl. ¶ 18; Mari Decl. ¶ 12.)

The additional fees the teachers were required to pay upfront in the Philippines to continue with the visa process totaled close to $10,000 for most of the teachers — more than three times the average annual household income in the Philippines. (Am. Compl. ¶ 108 n.1.) The Recruiter Defendants knew that the teachers lacked the resources to pay this enormous additional sum, and referred them to selected private lenders who would lend the money at interest rates of 3-5 percent <u>per month</u>. (*Id.* ¶¶ 129-133; *see also* Escuadra Decl. ¶ 9, Pascual Decl. ¶¶ 15, 18; Mari Decl. ¶ 12.) This 3-5 percent per month interest rate translates to an effective rate of 43-80 percent per year (due to compounding), thereby ensnaring the teachers even more deeply in Defendants' trafficking scheme.

Having become mired in crushing debt to pay the more than $15,000 in total fees extracted by the Recruiter Defendants in the Philippines (approximately $5,500 initially, plus approximately $10,000 in previously undisclosed recruitment fees), the teachers finally traveled to the United States. (McNeil Decl. Exs. B, C (detailing the types and amounts of fees required to be paid by the teachers, including the 10% upfront "placement fee" paid just to Universal).) Class members typically arrived in California and were brought to Defendant Universal's office in Los Angeles, where Universal compelled them to sign a second standard form contract providing for them to pay Universal 10% of their gross salary for 24 months. (Am. Compl. ¶¶ 147, 149; *see also* Nunag-Tanedo Decl. ¶ 16; Cruz Decl. ¶ 16; Escuadra Decl. ¶ 18; Pascual Decl. ¶ 22; Mari Decl. ¶ 16.) When some of the teachers questioned the contract's terms, Universal and Defendant Lourdes Navarro told them that they would be sent back to the Philippines immediately if they did not sign the contract as written. (Am. Compl. ¶ 150; Nunag-Tanedo Decl. ¶ 16; Cruz Decl. ¶ 16.) Left with no choice, the teachers signed the contracts and proceeded to travel to Louisiana to begin work. (Am. Compl. ¶ 151.)

Defendants enhanced their control over the teachers by manipulating the visa process. H-1B visas may be obtained for a three-year period, then renewed for an additional three years, and the school districts had obtained three-year visas for non-

Filipino teachers previously employed under the H-1B program.  Here, however, the school districts, at the behest of the Recruiter Defendants with the assistance of the Legal Facilitator Defendants, procured only <u>one-year</u> visas for the teachers.  This allowed Defendants to assert even greater control over the teachers because they could threaten non-renewal of the visas and subsequent deportation if the teachers did not comply with their demands.  (Am. Compl. ¶¶ 159-163.)

The Recruiter Defendants and Legal Facilitator Defendants also flagrantly abused legal process in furtherance of the trafficking scheme.  When teachers complained about the mistreatment to which they were subjected, Defendant Lourdes Navarro threatened them with deportation and lawsuits.  (Nunag-Tanedo Decl. ¶¶ 17-18; Cruz Decl. ¶¶ 18-19, 22; Escuadra Decl. ¶¶ 19-20; Pascual Decl. ¶¶ 21-23; Mari Decl. ¶¶ 17-18.)  For example, when some of the class members voiced complaints on a blog, the "Pinoy Teachers Hub," Navarro and Universal filed a lawsuit against Plaintiff Ingrid Cruz in California in the false belief that Ms. Cruz had authored the blog.  (Am. Compl. ¶ 166; Nunag-Tanedo Decl. ¶ 18; Cruz Decl. ¶ 22.)  The Legal Facilitator Defendants verified the Complaint against Plaintiff Cruz, thereby aiding and abetting a frivolous and abusive law suit against their own client.  (Am. Compl. ¶ 175.)  The California Court of Appeals ultimately upheld the dismissal of the suit pursuant to California's anti-SLAPP law, which is designed to quickly dispose of baseless litigation filed to dissuade or punish exercise of the constitutional right to free speech.  (*Id.* ¶ 166.)  But Lourdes Navarro continued to threaten teachers with lawsuits and/or deportation if they did not comply with her demands, in an effort to intimidate the entire teacher class.  (*Id.* ¶¶ 167-168; Mari Decl. ¶ 18 (sued in small claims court in California for not paying second year fees.)  Navarro also attempted to isolate the teachers from the broader Filipino community by demanding that the teachers live in segregated housing that she had arranged (at above-market rental rates), and threatening deportation for any teacher who sought to live elsewhere.  (Am. Compl. ¶¶ 152-158; *see also* Nunag-Tanedo Decl. ¶ 17; Cruz Decl. ¶¶ 17, 20-21; Escuadra Decl. ¶ 19; Pascual Decl. ¶ 22; Mari Decl. ¶ 17.)

The Employer Defendants were the most significant beneficiaries of the scheme described in the First Amended Complaint.  Employer Defendant EBR had an urgent need for qualified teachers to meet a teacher shortage in its schools.  It retained Universal as its agent to recruit needed teachers from the Philippines, largely outsourcing its human resources function to Universal.  Universal and the other Recruiter Defendants, in turn, procured almost 250 qualified teachers for EBR.  (McNeil Decl. Ex. A.)  EBR incurred no fees or costs in connection with such recruitment and was well aware of the enormous fees that the Recruiter Defendants were charging the teachers.  (Am. Compl. ¶ 182.)  The Employer Defendants not only benefited from the scheme in this manner; they also affirmatively participated by, *inter alia*, filing fraudulent visa-related documents with the U.S. government; colluding with Recruiter Defendants and Legal Facilitator Defendants to seek only one-year rather than three-year visas for the teachers so that the teachers could be more readily controlled; and otherwise helping Recruiter Defendants intimidate the teachers and abuse legal process. (*Id.* ¶¶ 182, 185-188, 205-225.)

As discussed more fully below, the foregoing facts alleged in the First Amended Complaint set forth a common course of conduct by Defendants directed at the entire teacher class, and warrant certification of this case as a class action.

### III.   THE PROPOSED CLASS AND SUBCLASS

Plaintiffs seek certification of a "Louisiana Teacher Class" to pursue claims against the Recruiter Defendants and the Legal Facilitator Defendants.  The Louisiana Teacher Class is defined as:

> all Filipino nationals who obtained their initial H-1B visas through Recruiter Defendants and Legal Facilitator Defendants during the period January 1, 2007, through the present, where a Louisiana school district or Louisiana school system was the petitioner. (Am. Compl. ¶ 43.)

The Louisiana Teacher Class seeks relief against the Recruiter Defendants and the Legal Facilitator Defendants.

Plaintiffs also seek certification of an "EBR Teacher Subclass" consisting of

7

teachers within the Louisiana Teacher Class who were recruited to work for EBR — the system that employed the vast majority of the teachers.  The EBR Teacher Subclass is defined as:

> all Filipino nationals (i) who have obtained H-1B visas through Recruiter Defendants and Legal Facilitator Defendants during the period from January 1, 2007 through the present, and (ii) whose initial H-1B visa petition was executed by an agent of EBR for employment at EBR.  (Am. Compl. ¶ 58.)

The EBR Teacher Subclass seeks relief against the Employer Defendants, as well as the Recruiter Defendants and the Legal Facilitator Defendants.

The claims of the foregoing class and subclass are all based on the same nucleus of operative facts described in Section II above.  Plaintiffs allege that Recruiter Defendants violated the TVPA by, *inter alia*, procuring the teachers' labor through threats of serious financial harm and abuse of legal process, *see* 18 U.S.C. §§ 1589-1590, and by confiscating the teachers' passports in furtherance of their scheme.  *See* 18 U.S.C § 1592.  They also allege that Legal Facilitator Defendants and Employer Defendants aided and abetted these TVPA violations and that all defendants knowingly benefited from them — thus rendering all defendants liable under the TVPA's civil damages provision, 18 U.S.C. § 1595.  Plaintiffs' RICO claims, in turn, are based on defendants' predicate TVPA violations, as well as numerous acts of mail and wire fraud committed in furtherance of the scheme.  (*See* Am. Compl. ¶¶ 288-293.)  Plaintiffs also assert state law claims alleging that the Recruiter Defendants' actions constitute fraud, unfair business practices, and unlawful conduct by an employment agency (*id.* ¶¶ 306-335) under applicable state law, and that the illegal form contracts that Recruiter Defendants required the teachers to sign in the course of their trafficking scheme are null and void.  (*Id.* ¶¶ 336-353.)  Plaintiffs further allege that the Legal Facilitators' actions to facilitate the trafficking scheme constitute legal malpractice and breaches of fiduciary duty; and the EBR Plaintiffs allege that EBR's retention of Universal as its agent to recruit teachers from the Philippines constitutes negligent hiring.  (*Id.* ¶¶ 361-

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

373; 392-400.)  All of Plaintiffs' claims are asserted on behalf of the entire class or subclass, all are based on Defendants' common course of conduct directed at the entire class and subclass, and all are subject to common proof.

## IV.   **ARGUMENT**

For a class and subclass to be certified, Plaintiffs must satisfy the requirements of Rule 23(a) and at least one of the three criteria for certification under Rule 23(b).  Fed. R. Civ. P. 23(b).  District courts must conduct a rigorous Rule 23 analysis, but "may not analyze any portion of the merits of a claim that do not overlap with the Rule 23 requirements."  *Dukes v. Wal-Mart Stores Inc.*, 603 F.3d 571, 594 (9th Cir.), *cert. granted*, ___ U.S. ___, 131 S. Ct. 795, 178 L. Ed. 2d 530 (2010).  "Plaintiffs must raise questions that the district court concludes, after a rigorous analysis, are susceptible to common resolution at a later stage."  *Id.*, 603 F.3d at 590.  "Any doubts a court has about class certification should be resolved in favor of certification."  *Badhdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 386 (C.D. Cal. 2009) (citation omitted).

As demonstrated below, Plaintiffs satisfy the Rule 23 requirements here.

**A.**   **Plaintiffs Satisfy the Requirements of Rule 23(a).**

**1.**   **The Class Exceeds 350 Foreign National and Joinder is Thus Impracticable.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F. 2d 909, 913-14 (9th Cir. 1964) (internal quotes and citation omitted).  Generally, courts find that the numerosity requirement is satisfied when a class contains at least 40 members. *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (affirming grant of class certification involving 20 members).

Here, there are more than 350 members of the Louisiana Teacher Class and almost 250 members of the EBR Teacher Subclass.  (McNeil Decl. at Ex. A (H-1B

teacher list provided by Defendant Universal broken down by Louisiana school district).)  The proposed class and subclass are sufficiently numerous that joinder is impracticable.

Joinder is also impracticable because some members of the class and subclass have reason to fear retaliation if they bring individual actions.  As detailed in the First Amended Complaint, Lourdes Navarro and Universal filed suit against class representative Ingrid Cruz, who Navarro and Universal believed criticized them in blog posts.  (Cruz Decl. ¶ 22; *see also* Mari Decl. ¶ 18 (class representative sued in small claims court in California for not paying second year fees).)  Although the case against Ms. Cruz was dismissed by the court pursuant to California's anti-SLAPP statute, Navarro has threatened to "punish" other class members if they speak out against her. (Am. Compl. ¶¶ 166-168; *see also* Escuadra Decl. ¶¶ 19-20; Pascual Decl. ¶ 21; Mari Decl. ¶ 17.)  Employees of EBR, i.e., members of the EBR Teacher Subclass, also may fear retaliation based on filing suit against their employer.  *See, e.g.*, *Arkansas Ed. Ass'n v. Board of Ed. of Portland, Oregon School Dist.*, 446 F.2d 763, 765 (8th Cir. 1971) (joinder impractible because, *inter alia*, "those teachers who remain in the school system[s] could have a natural fear or reluctance to bring this action on an individual basis").

Finally, joinder is impracticable because most class members are not familiar with the U.S. legal system.  Although the teachers are educated and fluent in English, they are, by definition, foreign nationals who only recently arrived in the United States. Courts have found impracticability of joinder in these circumstances.  *See, e.g.*, *Gerardo v. Quong Hop & Co.*, No. C 08-3953 JF (PVT), 2009 U.S. Dist. LEXIS 60900, at *6 (N.D. Cal. July 7, 2009) (finding Rule 23(a)(1) requirement satisfied by class of thirty-six workers where "potential class members are not legally sophisticated" making it difficult for them to bring individual suits).

For all these reasons, plaintiffs satisfy the requirements of Rule 23(a)(1).

PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION

## 2.   Common Questions of Law and Fact Abound.

Plaintiffs likewise satisfy Rule 23(a)(2) because there are extensive common issues of fact and law to be determined by the Court regarding Defendants' scheme.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Moreover, "[t]he commonality test is qualitative rather than quantitative — one significant issue common to the class may be sufficient to warrant certification." *Dukes,* 603 F.3d at 599 (internal quotes omitted).

The Rule 23(a)(2) commonality requirement is aimed at "(1) ensuring that absentee members are fairly and adequately represented; and (2) ensuring practical and efficient case management." *Walters v. Reno,* 145 F.3d 1032, 1045 (9th Cir. 1998) (citation omitted). "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008).

Common questions of both fact and law abound here. As explained above, Defendants engaged in a common course of conduct to ensnare class members in an illegal trafficking scheme. For the Louisiana Teacher Class, the common questions of fact include:

a.   Whether Recruiter Defendants and Legal Facilitator Defendants provided the labor of Plaintiffs and other Louisiana Teacher Class members through threats of serious financial harm and/or abuse of legal process, and recruited, harbored, or transported them for that purpose;

b.   Whether Recruiter Defendants and Legal Facilitator Defendants perpetrated such scheme by filing fraudulent documents with the United States government, withholding crucial information from the teachers about the amount of fees they would be charged, confiscating the teachers' passports, abusing legal process, requiring the teachers to sign standard form contracts of adhesion, and

11

securing one year rather than standard three-year visas;

c. Whether Recruiter Defendants and Legal Facilitator Defendants participated in a common enterprise;

d. Whether Recruiter Defendants and Legal Facilitator Defendants were involved in conducting the affairs of such enterprise;

e. Whether Recruiter Defendants and Legal Facilitator Defendants committed or agreed to commit the predicate racketeering acts identified in the First Amended Complaint; and

f. The source and amount of the damages suffered by Plaintiffs and other Class Members.

(*See generally* Am Compl. ¶ 48.) The common questions of law applicable to the Louisiana Teacher Class, in turn, include:

a. Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct violated the TVPA, specifically, 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b);

b. Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct violated RICO Sections 1962(c) and 1962(d);

c. Whether Recruiter Defendants' conduct violated the California Employment Agency and Job Services Act (Cal. Civ. Code § 1812.508);

d. Whether Recruiter Defendants' violated the California Unfair Business Practices Act by engaging in unfair business practices (Cal. Business and Professional Code § 17200);

e. Whether Recruiter Defendants' conduct constituted fraud;

f. Whether the form contracts entered into between the Louisiana Teacher Class members and Defendant Universal and Defendant PARS are void because they were the result of undue influence;

g. Whether the form contracts entered into between the Louisiana Teacher Class members and Defendant Universal and Defendant PARS are void because they are illegal;

h. Whether fees collected by Defendant Universal and Defendant PARS that were not pursuant to any written contract were illegal;

i. Whether Legal Facilitator Defendants' conduct constituted a breach of a fiduciary duty;

j. Whether Legal Facilitator Defendants' conduct constituted legal malpractice;

k. The nature of damages available to Plaintiffs and other Class Members, including the applicability of compensatory, treble, and/or

12

PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION

punitive damages; and

        l.     Whether and what kinds of injunctive relief are appropriate.

(*See generally* Am. Compl. ¶ 47.)  Additional issues of fact and law are common to the EBR Teacher Subclass, including:

        a.     Whether Employer Defendants participated in a joint venture with Recruiter Defendants and Legal Facilitator Defendants;

        b.     Whether Employer Defendants knowingly benefited from participation in such venture;

        c.     Whether Employer Defendants knew or should have known that such venture was engaged in violations of the TVPA;

        d.     Whether Employer Defendants perpetrated TVPA violations by taking affirmative steps to help Recruiter Defendants extract fees from Plaintiffs and other EBR Teacher Subclass members, and otherwise intimidate members of the subclass;

        e.     Whether Individual Employer Defendants' conduct violated RICO Sections 1962(c) and 1962(d);

        f.     Whether Recruiter Defendants and Legal Facilitator Defendants were agents of the Employer Defendants; and

        g.     Whether Defendant EBR's conduct in selecting Defendants Universal and Navarro as their exclusive recruiting agents for purposes of hiring H-1B teachers from the Philippines constituted negligent hiring.

(Am. Compl. ¶ 62.)  Because these are the central factual and legal questions to be determined in this case, Plaintiffs meet the Rule 23(a)(2) commonality requirement.

### 3. The Claims of the Named Plaintiffs Are Typical of the Claims of Absent Class and Subclass Members.

    The named Plaintiffs' claims are also "typical of the claims…of the class," thereby satisfying Fed. R. Civ. P. 23(a)(3).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir.

13

2010) (citation omitted).  Accordingly, "[t]ypicality can be satisfied despite different factual circumstances." *Id.* (citation omitted).  "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).

The named Plaintiffs and the other members of the Louisiana Teacher Class suffered virtually identical injuries here that arise from a common course of conduct by the Defendants:

- Like the named Plaintiffs, the labor of other class members was provided and obtained by means of serious financial harm, threats of serious financial harm, abuse of legal process, and unlawful confiscation and possession of passports and immigration documents.  (Am. Compl. 105-179);

- like the named Plaintiffs, other class members were required to pay fraudulent and illegal fees in excess of $15,000 before they left the Philippines — including (i) a Second Recruitment Fee that was not disclosed until the teachers were already ensnared in the trafficking scheme, and (ii) visa processing and other fees that were charged to the teachers in violation of federal law.  (Am. Compl. ¶¶ 124-126, 87-88; *see also* McNeil Decl. Exs. B, C (detailing some of the amounts paid); Nunag-Tanedo Decl. ¶¶ 10-11, 13; Cruz Decl. ¶¶ 9-10, 12-14; Escuadra Decl. ¶¶ 8-9, 12-13 ; Pascual Decl. ¶¶ 8, 11-12, 15, 17; Mari Decl. ¶¶ 6, 11);

- like the named Plaintiffs, other class members were required to sign standard form contracts providing for them to pay an additional fraudulent and illegal fee equivalent to one month's salary after they had been in the United States for one year (Nunag-Tanedo Decl. ¶¶ 14, 16; Cruz Decl. ¶¶ 15-16; Escuadra Decl. ¶¶ 16-17; Pascual Decl. ¶ 20; Mari Decl. ¶ 15; *see also* McNeil Decl. Exs. D-H (Universal contracts));

- like the named Plaintiffs, other class members were mired in crushing debt as a result of Defendants' scheme and thus had no choice but to sign the standard form contracts concerning payment of the fraudulent Second Recruitment Fee, and otherwise continue laboring under the conditions imposed upon them. (Am. Compl. ¶¶ 127, 151; *see also* Nunag-Tanedo Decl. ¶¶ 10-11, 15; Cruz Decl. ¶¶ 10, 14; Escuadra Decl. ¶¶ 9, 15-17; Pascual Decl. ¶¶ 11-12, 15, 18, 20; Mari Decl. ¶¶ 9, 11-12, 15);

- like the named Plaintiffs, other class members had their passports confiscated until they signed the contracts and/or paid the fees that the Recruiter Defendants demanded.  (Am. Compl. ¶ 123; *see also* Nunag-Tanedo Decl. ¶ 14; Cruz Decl. ¶ 15; Escuadra Decl. ¶¶ 16-17; Pascual Decl. ¶ 20; Mari Decl. ¶¶ 11, 15); and

- like the named Plaintiffs, other class members received one-year rather than the standard three-year visas so that they could be more readily controlled by Defendants.  (Am. Compl. ¶ 163).

PLAINTIFFS' MEMORANDUM IN SUPPORT
                                                                          OF MOTION FOR CLASS CERTIFICATION

For similar reasons, the three named Plaintiffs within the EBR Teacher Subclass have claims that are typical of the subclass: like the named EBR Plaintiffs, other subclass members were recruited to work in EBR public schools pursuant to a fraudulent trafficking scheme, and suffered virtually identical injuries.

Because the claims of class and subclass members arise from the same conduct and are based on the same legal theories as the claims of the named Plaintiffs, the typicality requirement is satisfied.

**4.    Plaintiffs Will Adequately Protect the Interests of the Class and Subclass.**

Finally, Plaintiffs satisfy the fourth requirement of Rule 23(a): that the "representative parties…fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy of representation requirement involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (citation omitted).

Here, the interests of the named Plaintiffs are completely aligned with those of other class and subclass members. First, the named Plaintiffs were recruited and employed under substantially the same conditions as the class and subclass members they seek to represent, and, as indicated above, suffered virtually identical injuries. Second, all members of the class and subclass will benefit from the monetary, declaratory, and injunctive relief Plaintiffs seek.

Moreover, counsel for the named Plaintiffs are experienced in federal class action litigation, and will vigorously prosecute this matter on behalf of the class and subclass. (Knoepp Decl. ¶¶ 2-6.) In particular, the Southern Poverty Law Center ("SPLC") has been approved as class counsel in a number of cases, (*id.* ¶¶ 5-6), and has associated in this case with experienced attorneys from Covington & Burling LLP, the American Federation of Teachers ("AFT"), and the Lawrence Rosenzweig law firm. (*Id.* ¶ 7.) SPLC, Covington & Burling, and AFT are advancing costs for this litigation, and have

15

sufficient funds available to finance the case.  (*Id.* ¶ 8.)  Plaintiffs and their counsel will vigorously prosecute this action on behalf of the class and subclass.  The final Rule 23(a) requirement is thus satisfied.

**B.   Plaintiffs Meet the Requirements for Certification Under Fed. R. Civ. P. 23(b)(3).**

Because Plaintiffs satisfy Rule 23(a), the Court should certify the proposed class and subclass if one or more of the grounds for maintaining a class action under Rule 23(b) is met.  Here, certification is most clearly appropriate under Rule 23(b)(3) because common issues predominate over individual ones, and a class action is the superior procedure for adjudicating such common issues.

**1.   Common Issues Predominate.**

Under the predominance prong of Rule 23(b)(3), the Court must find that "the questions of law or fact common to the members of the class predominate over any questions of law or fact affecting only individual members."  Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 2249, 138 L. Ed. 2d 689, 712 (1997).  The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022 (citation omitted).

In particular, where plaintiff "alleges a 'common course of conduct' of misrepresentations, omissions and other wrongdoing that allegedly affected all the class members in the same manner, common questions predominate."  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 239 (C.D. Cal. 2003) (*citing Blackie v. Barrack*, 524 F.2d 891, 905-08 (9th Cir. 1975) (internal quotes omitted)).  The Ninth

16

Circuit "has followed an approach that favors class treatment of fraud claims stemming from a common course of conduct." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *accord, e.g., Jones v. E*Trade Mortg. Corp.*, No. 02-1123, 2006 U.S. Dist. LEXIS 9566, *6-*7 (S.D. Cal. Feb. 17, 2006) ("common questions predominate where a complaint alleges a common course of conduct that affects all class members in the same manner").

As explained above in the Rule 23(a)(2) context, common issues abound in this case, and they vastly predominate over individual issues in both number and importance for purposes of Rule 23(b)(3). The central issues involve not just the named Plaintiffs, but rather <u>all</u> members of the class and subclass they represent, who were victimized by Defendants' common course of conduct—as shown in detail in Section IV.A.2., *supra*. The evidence relevant to these core issues will be common to the entire class and subclass. *See, e.g., Wolin*, 617 F.3d at 1174 (finding predominance where class claims were subject to common proof). Moreover, because all of Plaintiffs' claims arise out of the same nucleus of operative facts, i.e., the scheme described in Section II above, the federal claims and the supplemental state-law claims are subject to common proof.

By contrast to the critical common issues in the case, there are few individual issues to be determined. While damages will need to be ascertained separately for each class and subclass member, the method for calculating damages will be common, and, in any event, the need for individualized damage calculations "does not defeat class action treatment." *Blackie*, 524 F.2d at 905. Moreover, the amount of money paid by the class and subclass members as part of the trafficking scheme is easily obtained from the records of Defendant Universal, which maintained a detailed accounting by category and amount of each expenditure they extracted from the class and subclass members. (McNeil Decl. Exs. B, C.) Any other individual issues pale in comparison to the common ones. Accordingly, the Rule 26(b)(3) predominance requirement is satisfied. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (certifying class in civil RICO action based on common course of conduct by

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

1   defendants).

2         **2.    A Class Action Is Superior to Other Methods of Adjudication**

3         The superiority prong of Rule 23(b)(3) is likewise met.

4         In evaluating whether class action is superior, a court must consider (i) the

5   interest of class members in individually controlling prosecution of separate actions, (ii)

6   the extent and nature of any pending litigation concerning the controversy, (iii) the

7   desirability of having litigation of claims in particular forum where class action is filed,

8   and (iv) difficulties likely to be encountered in managing class action.  Fed. R. Civ. P.

9   23(b)(3).  A class action is superior "[w]here classwide litigation of common issues will

10  reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace,*

11  *Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  The superiority determination "necessarily

12  involves a comparative evaluation of alternative mechanisms of dispute resolution."

13  *Hanlon*, 150 F.3d at 1023.  A class action is superior to separate litigation by each class

14  member where "[t]he potential recovery of each individual Plaintiff would not justify

15  the litigation expense and risk of inconsistent judgments."  *Cicero v. DirecTV, Inc.*, No.

16  EDCV07-1182, 2010 U.S. Dist. LEXIS 86920, at *12-*13 (C.D. Cal. July 27, 2010).

17        A class action is far superior to any alternative manner of litigating the claims in

18  this case.  First, it is extremely unlikely that the individual class members have an

19  interest in instituting or controlling their own individual actions:  they are foreign

20  nationals who are not familiar with the U.S. legal system; many of them remain in debt

21  as a result of Defendants' scheme and lack the means to retain separate counsel; and

22  while the amount each individual would recover is not insubstantial, it is relatively small

23  compared to the costs of suit.

24        Second, there is no pending litigation concerning the class claims.  While AFT

25  filed an administrative action against Defendant Universal before the Louisiana Work

26  Force Commission ("LWC") on behalf of the teachers seeking a determination that

27  certain fees charged by Universal were illegal because Universal was not licensed as an

28  employment agency in Louisiana, the LWC held that it did not have jurisdiction to rule

18

on whether the contracts that the Recruiter Defendants required class members to sign are null and void.  The LWC also lacked jurisdiction to adjudicate the federal trafficking and racketeering claims that are at the core of this proceeding.  Moreover, the Legal Facilitator Defendants and Employer Defendants were not parties in the LWC case.  *See In re:  Complaint of the La. Fed'n of Teachers and the Am. Fed'n of Teachers o/b/o Certain Filipino Teacher Local Members* (La. Work Force Comm'n Apr. 14, 2010), *available at* http://www.laworks.net/Downloads/PR/PR20100416.pdf.[1]

Third, it is desirable to have the litigation in this forum.  Recruiter Defendant Universal and its principal, Lulu Navarro, as well as the Legal Facilitator Defendants, are located in this District and maintain offices here, and many of the records pertaining to the recruitment process are likewise located here.  While the Employer Defendants are located in Louisiana, they purposefully engaged with California Defendants in an illegal recruiting scheme substantially based in this District, and retained California Defendants as their recruiting agents and legal counsel.

Fourth, a class action does not present any insurmountable difficulties in case management.  The class is limited in size and geographic reach, and thus does not raise the kinds of manageability issues raised by, for instance, a nationwide class with millions of members.  *See, e.g., Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 640-41 (S.D. Cal. 2010) (certifying class with several hundred potential members after finding such a class would be manageable); *see also Dukes*, 603 F.3d at 625-28 (even nationwide class with hundreds of thousands of potential members may be manageable).  Although the precise amount of damages due to each class member may be determined individually, the method for calculating the damages will be based on the amount of fees each individual paid and will thus be consistent across the class.  (*See* McNeil Decl. Exs.

---

[1]  AFT also filed an administrative complaint with the United States Department of Labor (USDOL) in October, 2009.  AFT has been receiving periodic updates stating only that an investigation is in progress and that they will be notified at its conclusion.  The USDOL investigation does not involve either the TVPA or RICO, both of which fall outside the agency's enforcement authority.

B, C.)  By contrast, requiring separate individual cases would likely result in far greater manageability problems, including duplicative discovery, repeated adjudication of similar controversies (with the resultant risk of inconsistent judgments), and excessive costs.  *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) ("Numerous individual actions would be expensive and time-consuming and would create the danger of conflicting decisions as to persons similarly situated").

Finally, "classwide litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino*, 97 F.3d at 1234.  As explained above, this case involves a common course of conduct by Defendants and the core issues are overwhelmingly common.  Judicial economy will be substantially served by adjudicating the legality of Defendants' common course of conduct in a single class proceeding.  *See Dukes*, 603 F.3d at 628 (class certification preferable to "clogging the federal courts with innumerable individual suits litigating the same issues repeatedly").

For all these reasons, the Court should certify this case as a class action under Rule 23(b)(3).

**C.**    **In the Alternative, Plaintiffs Satisfy the Certification Requirements of Rule 23(b)(2).**

In its recent ruling in *Dukes*, the Ninth Circuit held that "Rule 23(b)(2) certification is not appropriate where monetary relief is 'predominant' over injunctive relief or declaratory relief."  603 F.3d at 617.  Although the injunctive and declaratory relief sought by the Louisiana Teacher Class and the EBR Teacher Subclass in this case is critical, Plaintiffs recognize that their claims for monetary relief predominates, and thus seek certification under Rule 23(b)(2) only if class (or subclass) certification under Rule 23(b)(3) is denied on some or all of their claims.

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). As explained above, the Recruiter Defendants have acted on grounds

that apply generally to the class here.  With respect to all Louisiana Teacher Class members, the Recruiter Defendants have, *inter alia*, (1) procured the teachers' labor through threats of serious financial harm and abuse of legal process, in violation of the TVPA; and (2) attempted to enforce illegal contracts that are the result of undue influence and coercion.  The Legal Facilitator Defendants, in turn, have facilitated and otherwise participated in the trafficking scheme directed at all class members, while the Employer Defendants have done so insofar as the scheme was directed at members of the EBR Teacher Subclass.  *See In re Lifelock, Inc.*, MDL No. 08-1977-MHM, 2010 U.S. Dist. LEXIS 102612, at *11-*12 (D. Ariz. Aug. 31, 2010) (Rule 23(b)(2) certification appropriate based on "uniform nature" of defendant's alleged conduct).

Plaintiffs seek final injunctive relief and declaratory relief against the Recruiter Defendants on behalf of all members of the Louisiana Teacher Class enjoining enforcement of the illegal contracts of adhesion and collection of further fees from the class members.  As all members of the Louisiana Teacher Class were compelled to sign form contracts providing for them to pay fraudulent and illegal fees, all class members share a common interest in obtaining this relief.  Plaintiffs also seek to enjoin the unlawful conduct alleged in the First Amended Complaint.  Because all class and subclass members were victims of this conduct, all of them will likewise benefit from such injunctive relief.  Accordingly, the Rule 23(b)(2) requirements are met.

### D.     Plaintiffs Satisfy the Other Rule 23 Requirements.

Plaintiffs also satisfy the remaining requirements of Rule 23:  the proposed class and subclass are precisely defined and the named plaintiffs are members of the proposed class and subclass, as appropriate.

### 1.     The Class and Subclass are Precisely Defined.

For a class action to be certified it is essential that there be an identifiable class. *See* 5 MOORE'S FEDERAL PRACTICE § 23.20 (2010).  "A class definition should be precise, objective, and presently ascertainable," although "the class need not be so ascertainable that every potential member can be identified at the outset of the

21

litigation." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotations omitted).  "A class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Id.* (citation omitted).

Here, both the class and subclass are well-defined.  The Louisiana Teacher Class is limited to Filipino teachers whose H-1B visas were obtained by the Recruiter Defendants and Legal Facilitator Defendants between January 1, 2007, and the present, where a Louisiana school district or school system was the petitioning employer. Likewise, the EBR Teacher Subclass is limited to Filipino teachers whose H-1B visas were obtained by the Recruiter Defendants and the Legal Facilitator Defendants between January 1, 2007, and the present where the H-1B visa petition was executed by an agent of EBR for employment at EBR.  Because of these precise definitions, it is a simple matter to determine whether a given individual is or is not a member of the class and subclass.

### 2.    The Named Plaintiffs are Members of the Class and Subclass

It is likewise essential that "[a] class representative . . . be part of the class." *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 1896, 52 L. Ed. 2d 453, 462 (1977).  Here, all of the named Plaintiffs meet the criteria for membership in the Louisiana Teacher Class:  each is a Filipino teacher employed by a Louisiana school district whose H-1B visa was obtained through the Recruiter Defendants and Legal Facilitator Defendants on or after January 1, 2007.  (McNeil Decl. Ex. A (listing teachers along with their petitioning employers and dates of arrival); Nunag-Tanedo Decl. ¶ 3; Cruz Decl. ¶ 3; Escuadra Decl. ¶ 3; Pascual Decl. ¶ 3; Mari Decl. ¶ 3.)  Three of the named Plaintiffs, Ms. Nunag-Tanedo, Ms. Cruz and Ms. Escuadra, are Filipino teachers whose H-1B visas were obtained through the Recruiter Defendants and the Legal Facilitator Defendants on behalf of EBR on or after January 1, 2007, thereby satisfying the criteria for membership in the EBR Teacher Subclass. McNeil Decl. Ex. A (showing each of the proposed EBR Teacher Subclass

representatives was petitioned for by EBR and arrived after January 1, 2007); Nunag-Tanedo Decl. ¶¶ 3, 16; Cruz Decl. ¶¶ 3, 16; Escuadra Decl. ¶¶ 3, 18.)

## CONCLUSION

For the reasons set forth in this memorandum and other supporting materials, the Court should permit this matter to proceed as a class action under Fed. R. Civ. P. 23(b)(3), or, in the alternative, under Fed. R. Civ. P. 23(b)(2).  Plaintiffs respectfully request that the Court certify the Louisiana Teacher Class and the EBR Teacher Subclass, and appoint Plaintiffs' counsel to represent such class and subclass.


Respectfully submitted this 14th day of March, 2011.

  __/s/ James M. Knoepp_____
James M. Knoepp
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, Georgia  30303
*On behalf of Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to all counsel of record.


/s/ James M. Knoepp_____

March 14, 2011.