IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EAST BATON ROUGE PARISH SCHOOL BOARD, et al., <br><br> Defendants. | Civ. No.: 10-01172-AG-MLG |

## DECLARATION OF MAIRI NUNAG-TANEDO



1.  My name is Mairi Nunag-Tanedo. I am one of the Plaintiffs and proposed class representatives in this case. I have personal knowledge of the facts in this declaration.

2.  I am a national of the Philippines. I currently reside in Baton Rouge, Louisiana.

3.  I am employed by the East Baton Rouge Parish School System pursuant to an H-1B visa. I teach Special Education.

4.  Prior to my arrival in the United States, I taught for three years as a licensed teacher in a private developmental center for children with special needs and two years in a public day care center in the Philippines.

5.  In the Philippines, I made about 4,000 to 5,000 pesos (approximately $115) per month working as a teacher. On average, a teacher with similar qualifications to me would make about 8,000 pesos (approximately $180) per month in the Philippines. I taught at a small institution so I made less than an average teacher in the Philippines. In the Philippines, teaching

was my second job. Combined in my two jobs I earned about 25,000 pesos (approximately $570) per month in the Philippines.

6. On or about March 28, 2008, I went to the Waterfront Hotel in Cebu City as a walk-in applicant to interview for a teaching position through PARS International Placement Agency (PARS) and Universal Placement International (Universal). I paid 1,000 pesos (approximately $25) in cash as an entrance fee. At the time I arrived around 12:00 noon there were still more than 200 other prospective teacher candidates at the meeting waiting to be interviewed. I had heard there were more than 700 candidates in attendance earlier in the day.

7. Throughout the day, interviews were conducted by American school administrators. I was interviewed by Karl Sam who runs the magnet program in East Baton Rouge. After our interviews were done, we were told to wait.

8. After the interviews were complete, the names of the applicants who passed the interview were announced. I was included in that group. Those of us who qualified were directed to another room.

9. There were approximately 75 of us who qualified. I personally know many of the people who qualified that day and later went to work in Louisiana because I know some of them now, and I see many of them in Baton Rouge. Lulu Navarro, the owner of Universal, came into the room and addressed us. Emilio Villarba, the owner of PARS, was also there. Lulu provided an overview of the process and told all of us to prepare our passports and transcripts. She then told us about the fees associated with the process.

10. We were told that we needed to deposit $1,000 into the PARS bank account by Monday, March 31, 2008, or our papers would not be processed. This was referred to as "earmark money" so that we would be locked in and could not go to another agency. We were

2

told there would be fees for evaluations and fees for processing our visas. We were also told it would be about $595 for the credential evaluation fee, and $3,920 to process our visas. Neither Lulu Navarro or Emilio Villarba mentioned anything about our having to pay for our own airfare or any additional amounts for a placement fee.

11. I made all of the payments that were announced at the initial meeting, borrowing money from family members. At no time prior to my paying all of the initial fees did Lulu Navarro, Emilio Villarba, or anyone else tell me anything about the large placement fee I would later be required to pay, or that I would be required to pay additional fees during the second year of my employment in the U.S.

12. In June 2008, I had my embassy interview so that I could obtain my visa to work in the United States. I met with Emilio Villarba before my interview. At the PARS office, there were about 40 or 50 other teachers present, and Emilio talked to us in groups of five or six at a time. He told us to bring our passports and other documents for the embassy interview. He also told us to put the PARS address as the return address for the visas.

13. Sometime in the last week of June 2008, after my embassy interview, I received a call telling me that I needed to go to the PARS office in Manila for a medical examination and to collect my visa and passport. At the PARS office, Emilio Villarba met with each one of us individually. Based on my prior teaching experience and my credentials, he told me that I needed to pay $9,800 for a placement fee, and $1,200 for one-way airfare to the United States. I had no idea I would have to pay that much money in order to get my visa. In fact, if I had known at the beginning that it would cost a total of more than $15,000 to complete this process I never would have done it.

14. My passport and approved visa were held at the office and not given to me until I paid the placement fee and airfare. About the third week of July 2008, I paid $9,800 and $1,200 to PARS in cash. After I paid, I was then given my passport and visa. I also was required to sign a contract after I paid the fees.

15. In order to pay for the cost of this second set of fees that I did not initially know about, I had to borrow approximately $12,000 from a local lending institution with an interest rate of about 4% per month. Even though this was a very large amount of money, by this time I had already paid so much money that I felt like I had no choice but to pay the additional money to complete the H-1B process and go work in the United States to pay off my debt.

16. On or about July 24, 2008, I arrived in Los Angeles, California, with about 18 other teachers. We were taken first to a small hotel, then to the Universal offices in Los Angeles where we were told to turn in our passports with the I-94 form. We were instructed that we had to sign a contract as we had in the Philippines. We had questions for the staff, but they told us not to ask questions because it would make Lulu upset. Lulu was not present at the Universal office, but while we were there she called and told us that if we did not sign the contract she would send us back to the Philippines. It was only at this time that I was made aware of the fact that I would be required to pay an additional 10% of my monthly salary as a fee during my second year of teaching.

17. I have been personally threatened by Lulu Navarro on more than one occasion. Whenever I have spoken with Lulu over the phone or otherwise, if I asked her any questions or raised any issues or concerns with her, she would always threaten me about my visa extension. For example, after I was transferred to the Savoy Apartments in August 2008, I asked Lulu to be

transferred to another unit because my unit was roach infested and dirty. Lulu replied with the threat, "Are you sure you will be renewed next year?" I was never transferred to another unit.

18. I have also witnessed fellow teachers being threatened and sued by Universal and Lulu Navarro. For example, I was aware that some Louisiana teachers, including my friend Janet Anober, had been sued in California for not paying their 10% fee during their second year. I was also aware that another fellow Louisiana teacher, Ingrid Cruz, had been sued in California for her alleged participation in a blog in which people complained about Lulu Navarro and her business.

19. Under penalty of perjury under the laws of the United States, I declare that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 13, 2011

Mairi Nunag-Tanedo