IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EAST BATON ROUGE PARISH SCHOOL BOARD, et al., <br><br> Defendants. | Civ. No.: 10-01172-AG-MLG |

## DECLARATION OF INGRID CRUZ

1. My name is Ingrid Cruz. I am one of the Plaintiffs and proposed class representatives in this case. I have personal knowledge of the facts in this declaration.

2. I am a national of the Philippines. I currently reside in Baton Rouge, Louisiana.

3. I am employed by the East Baton Rouge Parish School System pursuant to an H-1B visa. I teach science and robotics.

4. Prior to my arrival in the United States, I taught biology, genetics, plant physiology, economics, and cell biology at a collegiate level for three years.

5. In the Philippines, I was earning about $200 to $300 per month working as a teacher. I was making about what an average teacher with similar experience would make. Other teachers with more experience teaching the same subjects would earn about $500 per month.

6. Around June 2007, I sent my resume to PARS International Placement Agency (PARS) looking for employment as a teacher in the United States. Shortly after, I received a call from the PARS office to tell me there would be an interview scheduled at their offices.

7. On or about July 10, 2007, I went to the PARS office in Quezon City, Manila, Philippines. There were about 20 to 25 other prospective teacher candidates present. Emilio Villarba, the owner of PARS, and an employee named Divine were present and managing the interviews via videoconference for us with personnel from the East Baton Rouge Parish School District (EBR).

8. At this first meeting at the PARS office, there was no discussion as to possible expenses; the focus was on doing well in the interview so that we could secure a teaching position with EBR. Shortly after this meeting, I learned that I passed my first interview and that I needed to return to the PARS office for a second interview.

9. I returned to the PARS office and did the second interview. Shortly after, I learned that I had passed the second interview over text message. The text said to report to the PARS office. At the office, Divine told me that after I signed the employment offer from EBR I would need to come up with $5,000 for visa processing and an out-of-state certification. Divine made no mention of the large placement fee I would later learn I had to pay, or the fact that I would be required to pay 10% of my salary during the second year of teaching in the U.S.

10. On or about July 24, 2007, I went to the PARS office and gave $5,000 in cash to Emilio Villarba for the processing fee for my visa and for an out of state teaching certificate. In order to pay this amount, my parents loaned me the money by themselves taking

out a loan with the bank, using their retirement funds as collateral. I have since paid my parents back.

11. I returned to the PARS office when the notice of action approving the H-1B visa arrived so I could schedule my embassy interview. One day before I was scheduled to have my embassy interview, I met with Emilio Villarba and about five or six other teachers at the PARS office. At the office, Emilio prepared us for our embassy interview. He also gave us the address to the PARS office and instructed us to use that address to send our passport and visa after passing the embassy interview.

12. After I passed my embassy interview I returned to the PARS office. There were about five or six other teachers present at the time. At the office, Emilio Villarba individually took us aside to let us know how much we would have to pay for a placement fee. He told me that I had to pay a fee of two months of my expected gross income. He looked up my salary and said that I owed $7,400 for my placement fee.

13. This was a lot of money, but I knew that if I did not pay it I would lose the $5,000 I had already paid. I felt as if I had no choice but to go forward because I had already incurred debt, and the only way to pay off this debt was to go work in the U.S. If I had known about the large placement fee and been informed about the total amount of money I would have had to pay for the teaching opportunity from the beginning, I would not have gone through this process.

14. I was referred by PARS to AG Finance to obtain a loan, but because the interest rate was so high, I asked my parents if they could loan me more money. I had gotten into an argument with my parents about how high the placement fee was and my dad was concerned about the legitimacy of the job. My mom eventually convinced my dad to loan me the

3

money, and my parents took out a loan under their names from a bank, with interest, and loaned me the money I needed. I have since paid my parents back, including interest.

15. On or about September 26, 2007, the day before I traveled to the United States, I went to the PARS office to pay my placement fee. There were about 8 of us present at the office. Emilio Villarba had held onto my passport and visa until I paid my final placement fee, and I knew I would not be able to receive my passport until I paid. I gave $7,400 in cash to Emilio Villarba. I had to sign a contract with PARS before I was able to leave the country. Emilio also handed us a single sheet for us to sign. The sheet had a symbol on it that I did not recognize. I later realized that the symbol was the logo for Universal Placement International (Universal). Emilio said that the sheet was simply a formality that we needed to sign stating that we understand about our second year fee payment. I did not fully understand what this meant, but I signed the sheet anyway since I had already paid all the fees and needed to travel to the U.S.

16. On or about September 27, 2007, I flew from the Philippines to Los Angeles, California along with 7 other teachers from the Philippines. Two women picked us up at the airport, and one of them introduced herself as Lulu Navarro's sister. I met Lulu Navarro for the first time when we arrived at her office in Los Angeles. At the office, Lulu asked for our passports, and we were given contracts to sign. Lulu explained that this was just a formality, that the contract was a different version of what we already signed in the Philippines. One of the teachers asked questions about the contract, and Lulu replied that if he did not sign the contract then he could just go back to the Philippines. We all signed the contracts.

17. Sometime after we started our jobs, Lulu came to visit the teachers for a meeting. There were about 40 teachers at this meeting. At this meeting, Lulu warned us to stay

4

away from the Filipino community. I spoke up and said that it does not make sense to do this because in case anything happened to us, we would have community support. After the meeting, Lulu called me and demanded to know why I insisted on defending the Filipino community. I believe that at this time Lulu pegged me as someone who might cause trouble.

18. Around April 2008, a group of teachers started talking about the renewing of our visas and how expensive it cost if we renewed with Lulu. Lulu was charging us $1,750 for a visa renewal. Before we were to speak with Lulu over the phone to discuss the renewal process I suggested to some of the teachers that maybe it might be cheaper if we went to another lawyer to process our renewals. But after the discussion, the teachers decided that we should just go with Lulu since she seemed to know what she was doing, and I agreed to go along with the decision.

19. Around June 2008, Lulu called and confronted me about this suggestion of trying to contact another lawyer for renewing our visas even though in April we had paid her for visa renewals. She was upset and said that she would make an example out of me and out of the other teachers. She said that she was not afraid of lawsuits and that she had gone to court before and would sue me for making trouble.

20. At a later date, Lulu held a meeting with the teachers at the Savoy Plaza Apartment. About 50 to 60 teachers were present. Lulu had checked apartment numbers and checked a list of those teachers living in their assigned apartments and those who did not. She singled out those who were not living in their apartments and wanted to talk to them during this meeting. To the group, Lulu addressed our relationship with the Filipino community. She again told us not to affiliate with other Filipinos. In front of everyone, Lulu confronted those teachers

who received help from the community. She targeted a couple teachers who received furniture from other Filipinos and she demanded that they throw out the furniture.

21.	In July 2008, a new set of teachers arrived in Louisiana. I was in California at this time. I had heard that the Filipino community held a welcoming event for the new teachers and that Lulu arrived the next day to address the teachers. I did not know about the new teachers' arrival or about the event. She was upset that the community held the event. Even though I was in California, Lulu called me and blamed me for the event. She also told the Filipino community to stay away from the teachers. Lulu called me and demanded to know the names and addresses of the leaders of the Filipino community so she could contact them.

22.	Sometime during the Fall of 2008, I received a letter warning me that if I did not shut down a blog that was speaking badly about Lulu, I would be sued. I did not know anything about this blog. Around November 2008, while I was in my classroom, I received a summons for a lawsuit. Lulu sued me in California for writing the blog that spoke out against her. The lawsuit was ultimately dismissed.

23.	Under penalty of perjury under the laws of the United States, I declare that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 13, 2011

_____ 3/13/2011
Ingrid Cruz

6