IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EAST BATON ROUGE PARISH SCHOOL BOARD, et al.,<br><br>Defendants. | Civ. No.: 10-01172-AG-MLG |

## DECLARATION OF DONNABEL ESCUADRA

1. My name is Donnabel Escuadra. I am one of the Plaintiffs and proposed class representatives in this case. I have personal knowledge of the facts in this declaration.

2. I am a national of the Philippines. I currently reside in Baton Rouge, Louisiana.

3. I am employed by the East Baton Rouge Parish School System pursuant to an H-1B visa. I teach special education in elementary schools.

4. Prior to coming to the United States I had 12 years of teaching experience in the Philippines. I taught high school level social studies at the University of San Jose-Recoletos.

5. On Friday, March 28, 2008, I went to the Waterfront Hotel in Cebu City, Philippines to interview for a teaching position in the United States. While waiting to be interviewed, I noticed there were many applicants. A woman at the registration table mentioned that there were about 700 applicants present that day. I was scheduled for an interview with Dr. Elizabeth Duran Swinford and principals from Louisiana and Boston.

6. After my interview, I waited the rest of the afternoon until an announcement was made of those who were hired or being considered for the Louisiana schools. I was one of the teachers selected. After the names were called, we were told to go outside to meet Dr. Swinford because she wanted to speak with us. We were then told to go back to the interview area because Lulu Navarro, the owner of Universal Placement International (Universal), would discuss with us what we needed to prepare for the visa processing.

7. At this time, only about 80 teachers were left. I, along with the group of others who were accepted for positions, listened to Lulu and Mr. Emilio Villarba, the owner of PARS Placement Service (PARS), speak. Lulu and Mr. Villarba discussed the documents that we needed to prepare for the processing of the teaching opportunity. There were many of us asking about how much we were expected to spend so that we could prepare the proper payments ahead of time.

8. Mr. Villarba emphasized that we needed to pay $1,000 that must be deposited into the PARS bank account on Monday, March 31, 2008. The amount was to be deposited as a "reservation fee." I understood this to mean that this would reserve my position and I could not back out of the opportunity. Lulu reiterated that only those who deposited the money on that specified date and time could proceed with the entire processing for the teaching jobs. She told us that those who could not pay the $1,000 would be replaced by other applicants. Another person in the group complained about the amount of money that needed to be sent in a quick amount of time, and Lulu fussed at him and quickly moved on to other questions. Eventually, we were told that we would have to prepare about $5,000 for the processing fee, for attorney fees, and for an evaluation of our credentials. Neither Lulu or Mr. Villarba mentioned at this time anything about the large placement fee we would later have to pay them.

9. I paid the money that was required to begin the process of obtaining my H-1B visa. Because I did not have very much money, Mr. Villarba referred me to AG Finance so that I could obtain a loan to pay these fees. I borrowed about $2,000 from AG Finance in order to pay some of the initial fees that were required.

10. Before making one of the payments as part of the initial fees in the process, I asked a PARS employee named Lorna if I could get a refund of my money if for some reason I needed to back out of the process. Lorna told me that I could not get a refund.

11. Sometime in June 2008, after I had paid approximately $6,000 in initial fees, I received a call from PARS that it was time for my embassy interview.

12. After the group I was with for the embassy interview were done at the embassy, we were told to return to the PARS office because Mr. Villarba would be talking to us about the next step. He told me that I would receive $5,400 every month from my employer in Baton Rouge because of my Masters degree and teaching experience. He said because of this, I would need to pay $10,800 as a placement fee. I had no idea I would have to pay such a large amount of money in addition to the fees I had already paid.

13. When I left Mr. Villarba's office, Lorna told us that we would have other expenses, including paying for our plane ticket to the United States, so we owed $1,200 more to PARS for our ticket. When we asked if it would be possible for us to book our own flights so that we could lessen the expense, Lorna told us that we were not allowed to do this.

14. After the meeting with Mr. Villarba and knowing that I had to pay an additional $12,000 to what I had already paid, I worried about how to obtain the money to pay for the process. My family is poor and could not help me. I cried a lot and suffered mental stress and spent sleepless nights trying to find a way to pay this money while supporting my two

kids alone. If I had known at the beginning of the process that I would have to pay more than $15,000 to get a visa to teach in the United States, I never would have continued with the process.

15. In order to pay these additional fees and the travel expenses, I obtained a loan from Citiwide Lending using my house, my father's house and lot, and my Godparents' house and lot as collateral. I do not remember exactly, but I believe the interest rate on this loan was at least 3% per month.

16. Before I left for the United States, I went to the PARS office to pay my placement fee. There were about 20 to 25 other teachers there waiting to pay their fees to PARS. PARS had our passports and visas at this time, and would not release them to us until we paid the placement fee and signed a contract. I was not given sufficient time to read the contract before being required to sign.

17. There was a lot of chaos in the PARS office that day. Mr. Villarba was in his office with another teacher, and I could hear him shouting angrily and forcefully. He got out of his office and shouted at the teacher. He then said to the group of us that whoever questions him or asks questions about our payment would be forbidden to go to the United States, that he would not let any of them go. This stunned us into silence. We all felt the tension and panic so we quickly signed the contracts so that we could get our passports and secure our travel to the United States.

18. On or about July 23, 2008, along with three other teachers, I flew to Los Angeles, California. We were led to the Universal office in Los Angeles and were given a contract that we had to sign. When I asked for time to read the contract the Universal personnel told me that it is a copy of the contract that I signed for PARS and that Universal would just like

4

to have a copy. We were rushed into signing the contract. I did not have time to read the contract and I was not given a copy of it for myself.

19. Sometime at the end of August 2008, Lulu came to Louisiana and held a meeting at the Great Wall restaurant. More than 100 teachers attended the meeting. At this meeting, some teachers started to complain to Lulu. Lulu was very upset because of our complaints. Lulu warned us not to mingle with Americans or even other Filipinos in the community. The meeting was almost over and I decided to question Lulu about some of our concerns regarding the fees we paid, so I stood up to raise the question. Lulu became very furious. In an outburst, she threatened me and told me that I should not start complaining when I still did not have a guarantee of a job the following year. After this encounter I became scared and this added to my stress.

20. On or about January or February 2009, Lulu held a meeting at the Savoy Plaza Apartment. There were about 50 other teachers present. At the meeting, Lulu threatened all of us that wherever we planned to go in the United States, she could find us and she could spend millions of dollars to sue us if we didn't pay an additional 10% fee, which she was demanding during our second year of teaching, and which was not disclosed during the March 28, 2008, meeting. When Lulu was threatening, she also presented to the group documents and copies of the complaints for those teachers she had already sued.

21. Under penalty of perjury under the laws of the United States, I declare that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 13, 2011

_____
Donnabel Escuadra