IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EAST BATON ROUGE PARISH SCHOOL BOARD, et al.,<br><br>Defendants. | Civ. No.: 10-01172-AG-MLG |

## DECLARATION OF ROLANDO PASCUAL

1. My name is Rolando Pascual. I am one of the Plaintiffs and proposed class representatives in this case. I have personal knowledge of the facts in this declaration.

2. I am a national of the Philippines. I currently reside in Shreveport, Louisiana.

3. I am employed by the Caddo Public School District pursuant to an H-1B visa. I currently teach third, fourth, and fifth grade.

4. Prior to coming to the United States, I had 11 years of teaching experience, including special education and college-level computer and software programming in Philippine universities.

5. In the Philippines, I earned about 30,000 pesos (approximately $675) per month teaching in universities.

6. Around January or February of 2008, I sent an application to PARS International Placement Agency (PARS), and a few days later I received a text message stating that because of my qualifications in special education, I should attend a seminar in March in

Quezon City, Manila, Philippines.  It said to prepare 1,000 pesos (approximately $25) for the entrance fee for the seminar.

7. In March 2008, I went to seminar and paid the entrance fee.  There were over 100 other prospective candidates present.  Emilio Villarba, the owner of PARS, made a presentation to the group of us about how to obtain a teaching job.

8. Emilio told us that if we passed the job interview, we would have to pay $1,920 for a marketing/processing fee, $1,000 for credential fees, and 13,812 pesos (approximately $315) for evaluation fees.  There was no mention at this meeting of the large placement fee I would later learn was required as part of the process, and no mention of a 10% fee that I later learned was required to be paid during my second year of teaching in the U.S.  At the end of the meeting, Emilio announced that there would be interviews at the Manila Hotel.

9. I went to the Manila Hotel to attend my interview for a teaching position in the United States.  There were about 300 people present.  Lulu Navarro, the owner of Universal Placement International (Universal), was present also.

10. There were two sessions of interviews, one in the morning for Baton Rouge, and the other in the afternoon for Boston.  There were about 300 or more other applicants in the morning session, but I cannot recall how many were present in the afternoon session because I only concentrated on my interview with Baton Rouge.

11. I interviewed with three personnel from Baton Rouge, but I learned later that I did not pass the interview.  However, I was later placed on a list of teachers who would possibly go to Boston to teach and I paid $1,000 to PARS to secure my name on the list.  In order to pay the $1,000 fee I had to borrow money from my mother.

12. After paying the $1,000 fee, I was told that I would need to pay the evaluation fee of 13,812 pesos (approximately $315), and $1,920 for my processing fee. To make these payments I borrowed money from my mother and my step-father.

13. Sometime during June of 2008, PARS sent me a message that said there would be an interview at a hotel in Manila with the Boston schools. There were about 100 candidates present for the interviews. However, Lulu Navarro told us there were only a few openings in Boston so some of us would instead be interviewed by the Caddo Parish School District.

14. When my name was called I went to the designated room and interviewed with the Caddo Parish School District personnel. The next day I received a text from Lorna from PARS congratulating me on passing the interview.

15. I was later called by Divine, the PARS employee, who told me that I needed to pay $2,000 for my attorney fees. Divine told me that I could obtain a loan to pay this fee from AG Finance. I went to AG Finance and obtained a loan, and AG Finance transferred $2,000 into the PARS bank account on my behalf.

16. Before my embassy interview, I met with Emilio Villarba at the PARS office. There were about 10 other people present at the office. Emilio prepared us for our embassy interviews by telling us how to answer the questions. He also told us that we should have our passport and visa sent to the PARS office after the interview.

17. Shortly after I passed my interview at the embassy, the group of 10 of us went back to the PARS office. Emilio sat down in front of us to discuss how much money we would need to pay for a placement fee. I had taught for almost 10 years, so Emilio told me that I had to pay a placement fee of $9,000 based on an expected salary of $45,000.

3

18. When I learned of the placement fees, I was really worried about how much money it cost. I knew that I could not get the money back that I had already paid or walk away because I had already paid so much. I felt like I had no choice but to pay the placement fee and continue with the process, so I obtained an $8,000 loan from AG Finance, the finance company that PARS had referred me to earlier. AG Finance then made a transfer on my behalf to the PARS bank account for the placement fee. I borrowed the remaining $1,000 for the placement fee from a lender named PGH and paid $1,000 in cash at the PARS office.

19. If I had known at the beginning that I would have to pay around $15,000 to get a teaching job in the United States, and have to pay a percentage of my salary in the U.S. during my second year of teaching, I never would have gone through the process.

20. On the day that I was scheduled to fly to the United States, I went to the PARS office in the morning to pay for my airfare. Emilio Villarba held onto my passport and visa until I paid for my airline ticket. After I paid, I received my passport and my airline ticket. That day, I also was required to sign a contract.

21. I arrived in Los Angeles, California, on or about October 9, 2008, and Jack Navarro, who I understand is Lulu Navarro's husband, picked me and one other teacher up from the airport. He took us to Lulu's sister's house for dinner. At dinner, Lulu told us that she is a very powerful lady in the United States and that if any of the teachers stepped out of line or disobeyed her, she could and she has sued them. She mentioned having problems with teachers being stubborn in Baton Rouge and that they were disobeying her rules.

22. The next day, we went to the Universal office to pay for our rent fees and to sign a contract with Universal. Lulu told us not to join the Filipino community in my area. She said they would not help us and that we should stay in our apartment. She also said that we should do our best at our schools, and that if we do not perform well, she will send us back to the

Philippines, just like she has already done to some teachers in Baton Rouge. I was scared of Lulu and believed she could do this because this was my first time in the United States and I did not know about U.S. laws.

23. I always felt that I had to perform adequately and to not complain or else Lulu would send me back to the Philippines and have me replaced with someone else. I needed to work at Caddo in order to pay off the debts that I owed to the finance company.

24. Under penalty of perjury under the laws of the United States, I declare that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 13, 2011

_____
Rolando Pascual