O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAIRI NUÑAG-TANEDO, ET AL., | CASE NO. SACV 10-1172-AG (MLGx) |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS OF DEFENDANTS LOURDES NAVARRO AND UNIVERSAL PLACEMENT INTERNATIONAL, INC. |
| v. | |
| EAST BATON ROUGE PARISH SCHOOL BOARD, ET AL., | |
| Defendants. | |

Enticed by promises of lucrative and exciting employment through a work program, a foreign worker speaks with recruiters about working in the United States.  The recruiters explain the terms and costs of the work program, and the worker gets a large loan and voluntarily uses it to join the program.

After the worker joins the program and begins employment, the worker becomes unhappy.  But if the worker quits, awaiting is a trip home with a massive amount of debt that will be impossible to repay.  Working in the program is the only way to repay the loan.  Is this forced labor? Fraud? No.  It is a bargained-for exchange.  Despite the worker's unhappiness,

the terms and costs of the program were known, and the worker voluntarily obtained the loan to join the program.  The worker's eventual discontent does not transform the valid contract with the recruiters into something illegal.

But what if after the worker made the payment, the recruiters alter the program terms and costs?  The recruiters demand an additional payment of double what the worker has already paid.  They threaten to kick the worker out of the program if additional payments aren't made, and they keep the initial payment even if the worker decides to leave to program.  The worker is therefore faced with a choice of forfeiting the first payment, knowing that repayment of the debt may be impossible, or paying the additional money the recruiters now demand.  Knowing that working in this program is the only way to repay the initial debt, the worker pays the additional sum and continues working in the program.

Once the worker begins employment, complaints about the payments and working conditions are met with continued threats of termination and deportation.  Knowing that this job is the only way to repay the debt, the worker remains silent and continues working.  Is this forced labor?  Fraud?

These are the questions now before this Court. This putative class action involves allegations of fraud, human trafficking, and racketeering.  Defendants Lourdes Navarro ("Navarro") and Universal Placement International, Inc. ("UPI") (collectively, "Defendants") now bring a Motion to Dismiss ("Motion") multiple claims filed by Plaintiffs Mairi Nuñag-Tanedo, et al. ("Plaintiffs") for failure to state a claim.  The Court GRANTS the Motion as to the predicate acts of mail and wire fraud under Plaintiffs' Racketeer Influenced and Corruption Organization Act ("RICO") claims and DENIES the Motion as to Plaintiffs' remaining claims.

## BACKGROUND

The following factual allegations are taken from Plaintiffs' First Amended Complaint ("FAC"), and as it must for this Motion, the Court assumes them to be true.

Plaintiffs are teachers and Filipino nationals who came from the Philippines to work in the United States.  Plaintiffs were holders of H-1B visas that permit foreign nationals with special skills to work in the United States for a specified employer for up to six years.

Defendant UPI recruits teachers from the Philippines for employment in the United States.  Defendant Navarro is the owner and President of UPI.  Defendants worked closely with another company, PARS International Placement Agency ("PARS"), and PARS's Official Representative, Emilio Villarba ("Villarba") (Defendants, PARS, and Villarba collectively, the "Recruiter Defendants") during recruiting operations.  Navarro and UPI were under investigation by the U.S. embassy in Manila when recruiting operations were taking place, and Navarro was previously convicted for defrauding the government and money laundering.

Beginning in 2006, Recruiter Defendants advertised their teacher recruiting services to school districts throughout the United States.  These services included the "recruitment of highly qualified teachers from the Philippines, and placement of these teachers within school districts in the United States."  Plaintiffs learned of the opportunity to teach in the United States through Recruiter Defendants' advertisements in Philippine newspapers and through word of mouth.

After interviewing Plaintiffs for possible teaching positions, Recruiter Defendants informed Plaintiffs that they had been selected to teach in the United States.  Recruiter Defendants then told Plaintiffs about some, but not all, of the next steps in the recruitment process.  Specifically, Recruiter Defendants disclosed that Plaintiffs would need to collect and submit certain documents to support their H1-B visa application and that Plaintiffs would have to pay a recruitment fee of approximately $5,000 (the "First Recruitment Fee").  But Recruiter Defendants did not disclose that Plaintiffs would be required to pay a second, much larger recruitment fee before Plaintiffs would be permitted to leave for the United States.  Recruiter Defendants also did not inform Plaintiffs that various other expenses paid by Plaintiffs were actually the responsibility of other parties, Plaintiffs' future employers.

Plaintiffs paid the non-refundable First Recruitment Fee and received job offers to teach in the United States.  Plaintiffs then interviewed at a U.S. Embassy to obtain their H-1B visas.  Recruiter Defendants required Plaintiffs to instruct the U.S. Embassy to have Plaintiffs'

passports delivered directly to Recruiter Defendants' office following the Embassy interviews, and Plaintiffs' passports and visas were both sent to Recruiter Defendants' office in the Philippines.

After Recruiter Defendants had the visas and passports, Recruiter Defendants told Plaintiffs for the first time that Plaintiffs would have to pay a second, larger recruitment fee (the "Second Recruitment Fee") as well as the cost of their airfare to the United States.  Recruiter Defendants explained that a second payment was required before Recruiter Defendants would return Plaintiffs' visas and passports and before Plaintiffs would be permitted to depart for the United States.  Recruiter Defendants told Plaintiffs that if they did not pay the additional fees, Plaintiffs would forfeit fees already paid, would not be permitted to travel to the United States, and would not be given their visas.  Plaintiffs felt that they had to comply with Recruiter Defendants' demands since they needed to work in the United States to repay their debts.

Plaintiffs complied with Recruiter Defendants' demands and began working in Louisiana. But the situation did not improve.  Defendant Navarro "threatened abuse of legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening that she could have teachers deported."  For example, when certain teachers stated that they planned to change their housing arrangements due to high costs, Navarro became upset, told the teachers that they could not move, and threatened to deport them.  Navarro also threatened to deport a teacher for "complaining to a reporter at a Baton Rouge television station about abuses she suffered at the hands of Recruiter Defendants."

Plaintiffs allege that Defendant Navarro also threatened Plaintiffs who voiced criticisms about Recruiter Defendants' alleged trafficking scheme.  For example, Defendants filed a lawsuit against certain Baton Rouge teachers believed to have authored a blog, and Defendant Navarro "threatened that if [other teachers] started speaking out against her, they would be 'punished' like the teachers in Baton Rogue . . . ."  Finally, Recruiter Defendants made additional threats to sue, allow visas to expire, and terminate teachers if the teachers did not pay additional fees demanded by Defendants.

1        Based on these factual allegations and others, Plaintiffs bring claims against multiple

2   defendants in this matter, numbered as follows: (1) violations of the Victims of Trafficking and

3   Violence Protection Act of 2000 ("TVPA") as to a plaintiff subclass against Recruiter

4   Defendants and other defendants; (2) RICO violations; (3) violations of California's

5   Employment Agency, Employment Counseling, and Job Listing Services Act, under California

6   Civil Code § 1812.508; (4) Unfair Business Practices in violation of California Business and

7   Professions Code §§ 17200 *et seq.* ("Section 17200"); (5) fraud; (6) declaratory relief concerning

8   the validity of certain contracts due to undue influence; (7) declaratory relief concerning the

9   validity of certain contracts due to illegality; (8) declaratory relief concerning the legality of fees

10  collected; (9) breach of fiduciary duty; (10) legal malpractice; (11) violations of the TVPA as to

11  a separate plaintiff subclass against separate defendants; and (12) negligent hiring.  Defendants

12  move to dismiss claims 1, 2, 3, and 5.  Plaintiffs bring additional claims against Defendants that

13  Defendants do not move to dismiss.

14

15  **LEGAL STANDARD**

16

17       A court should dismiss a complaint when its allegations fail to state a claim upon which

18  relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint need only include "a short and plain

19  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

20  "'[D]etailed factual allegations' are not required."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940

21  (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (stating that "a complaint

22  attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations")).  The

23  Court must accept as true all factual allegations in the complaint and must draw all reasonable

24  inferences from those allegations, construing the complaint in the light most favorable to the

25  plaintiff.  *Pollard v. Geo Group, Inc.*, 607 F.3d 583, 585 n.3 (9th Cir. 2010); *Westlands Water*

26  *Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).

27       But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim

28  to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at

570).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct at 1940 (citing *Twombly*, 550 U.S. at 556).  A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," *id.*, or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  The Ninth Circuit recently stated that a complaint must be (1) "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it," and (2) "sufficiently plausible that it is not unfair to require the opposing party to be subjected to the expense of discovery."  *Starr v. Baca*, 633 F.3d 1191, 1204 (9th Cir. 2011).  Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment.  *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

Fraud claims must include "a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages."  *Moore v. Brewster*, 96 F.3d 1240, 1245 (9th Cir. 1996) (superceded by statute on other grounds).  These claims must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires enough specificity to give a defendant notice of the particular misconduct to be able to defend against the charge.  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted).  To satisfy this specificity requirement, "the who, what, when, where, and how" of the misconduct must be alleged.  *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997) (quotations omitted).  And when a defendant is a business entity and not a person, Plaintiffs must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.  *See Pentalpha Macau Commercial Offshore Ltd. v. Reddy*, Case No. 03-5914, 2004 WL 2624001, at *2 (N.D. Cal. Jul. 8, 2004).  Thus, factual allegations must include "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

Rule 9(b) serves many purposes.  One is to "furnish the defendant with certain definite charges which can be intelligently met."  *Kincade v. Trojan Express, LLC*, Case No. SACV 08-1362 AG (ANx), 2009 WL 799390, at *2 (C.D. Cal. Mar. 23, 2009).  Other purposes include "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties, and society enormous social and economic costs absent some factual basis."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (quotations omitted); *see Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

**ANALYSIS**

As noted, Defendants move to dismiss Plaintiffs' claims numbered as follows: (1) violations of the TVPA; (2) RICO violations; (3) violations of California's Employment Agency, Employment Counseling, and Job Listing Services Act under California Civil Code § 1812.508; and (5) fraud.  For clarity, the Court first reviews Defendants' Motion as to Plaintiffs' fraud claim and then reviews the remaining claims in order.

**1.      PLAINTIFFS' FIFTH CLAIM, FOR FRAUD, UNDER CALIFORNIA CIVIL CODE § 1709**

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."  Cal. Civil Code § 1709.  A deceit, within the meaning of § 1709 includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ." § 1710(3).  Defendants argue that Plaintiffs have not met Rule 9(b) pleading standards for their fraud claim brought under § 1709.  The Court disagrees.

Plaintiffs allege that the Recruiter Defendants told

1               Plaintiffs and other Class Members about some, but not all, of the []
steps in the recruitment process.  In particular, Recruiter Defendants
2               *only* disclosed that Class Members would need to collect and submit
certain documents in support of their H-1B visa application, and that
3               Class Members would have to pay [the First Recruitment Fee].

4   (FAC ¶ 105.)  And Plaintiffs further allege that

5               [a]t this stage in the trafficking process, Recruiter Defendants
fraudulently did not disclose to Plaintiffs and other Class Members
6               that they would be required to pay a second and much larger
recruitment fee before they would be permitted to leave for the
7               United States . . . .

8   (*Id.* ¶ 111.)

9       Plaintiffs support these general allegations with *specific* statements detailing fraud by

10   Defendants that include dates, locations, representations, and omissions.  For example, Plaintiffs

11   state

12               [o]n or about March 28, 2008, at the Waterfront Hotel in Cebu City,
Philippines, Defendant Lourdes Navarro informed Plaintiff Nuñag-
13               Tanedo that she would need to collect various supporting documents
[and pay various fees including the First Recruitment Fee] to obtain
14               her job offer and to complete the H1-B visa process.  However,
Lourdes Navarro willfully, maliciously, and fraudulently failed to
15               inform Nuñag-Tanedo that before she would be permitted to leave
the Philippines, she would need to pay an Undisclosed Second
16               Recruitment Fee of two months of her expected salary in the United
States, as well as the cost of airfare to the United States, with a third
17               month's fee due after she was in the United States for one year.
Nuñag-Tanedo relied on this fraudulent omission and paid the First
18               Recruitment Fee.

19   (*Id.* ¶189.)

20       With these specific fraud allegations, along with additional specific allegations

21   implicating Navarro, UPI, PARS, and PARS's agents (*e.g.*, *id.* ¶¶ 190–94), Plaintiffs have

22   sufficiently alleged all the necessary fraud elements.  As noted, Plaintiffs have alleged the

23   nondisclosure of the additional fees and requirements to work in the teaching program, and they

24   have done so with sufficient particularity.  (*E.g.*, *id.* ¶ 189.)  Plaintiffs have also alleged that

25   Defendants knew of and committed omissions with intent to defraud Plaintiffs and induce

26   reliance  (*E.g*, *id.* ¶¶ 190–94, 331–332.)  Further, Plaintiffs have sufficiently alleged that they

27   justifiably relied on Defendants' representation and omissions, stating, for example, that

28   "Plaintiffs and other Class Members were unaware of the falsity of Recruiter Defendants'

representations.  In reliance on these representations, Plaintiffs and other Class Members paid

the First Recruitment Fee."  (*Id.* ¶ 332.)  Finally, Plaintiffs sufficiently allege resulting damages.

This includes monetary damages from paying the First Recruitment Fee and additional fees,

which Plaintiffs allege they would not have paid had they known the actual program terms and

costs.  (*Id.* ¶¶ 332–34.)

Defendants attack the fraud claim by arguing the failure to allege that Defendants had a

duty to disclose the requirement to pay additional fees.  (Motion at 9:20–21.)  This argument

fails.

As noted, a deceit, within the meaning of § 1709 includes "[t]he suppression of a fact, *by

one who is bound to disclose it*, or who gives information of other facts which are likely to

mislead for want of communication of that fact . . . ."  § 1710 (emphasis added).  In fraud claims

grounded on omissions, a duty to disclose "may exist when one party to a transaction has sole

knowledge or access to material facts and knows that such facts are not known to or reasonably

discoverable by the other party."  *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976) (a duty to

disclose omissions may also exist where there are allegations that any representation was likely

to mislead for want of disclosures, or where defendants actively concealed undisclosed matters).

Here, Plaintiffs have sufficiently alleged that Defendants had a duty to disclose all

material program terms and costs.  Plaintiffs state that Defendants actively recruited Plaintiffs

and that the parties worked together directly when Plaintiffs were considering joining the

program.  (*E.g.*, FAC ¶ 189.)  Plaintiffs further state that Defendants explained to Plaintiffs

various program terms and costs during the recruiting process.  (*E.g.*, *id.* ¶¶ 111, 189, 332.)

Plaintiffs' statements that Defendants took such an active role in the recruiting process are

sufficient to allege that Defendants had duty to disclose all material costs to Plaintiffs, not

simply the non-refundable First Recruitment Fee.  In fact, Defendants' argument that they need

not disclose $10,000 in additional fees during the recruiting process is somewhat perplexing.  A

ruling supporting this argument would clearly have undesirable consequences on the efficacy of

practically any contract.

1    Defendants alternatively argue that Plaintiffs' fraud claims fail because "nothing forced

2    the five Plaintiffs to pay the additional fees; they could have backed out . . . ."  (Motion at

3    10:6–7.)  Defendants name another individual that apparently did back out of the program after

4    learning of the additional fees.  (*Id.*)  Even if, for this Motion, the Court could properly consider

5    the example of this individual that Defendants cite, Defendants' argument fails.

6    If Plaintiffs could have walked away with a full refund, their fraud claim may very well

7    fail.  After all, individuals who could have gotten a refund after learning of additional fees would

8    have serious difficultly proving any damages.  But Plaintiffs allege that backing out with a full

9    refund was not an option here, clearly stating that the First Recruitment Fee was non-refundable.

10   (FAC ¶¶ 124, 126.)  Thus, Plaintiffs allege that they had the choice of either walking away and

11   losing $5,000 or paying $10,000 more to join the program.  Neither option would allow them to

12   avoid a massive loss.

13   In sum, Plaintiffs sufficiently state their fraud claim.  Plaintiffs have alleged essentially a

14   bait-and-switch scheme where they had to either forfeit their initial $5,000 payment or

15   unexpectedly pay another $10,000 to continue with the program.  And given Plaintiffs' detailed

16   factual allegations concerning this scheme, Plaintiffs have met Rule 9(b) pleading requirements.

17   Accordingly, Defendants' Motion is DENIED as to Plaintiffs' fifth claim, for fraud.

18

19   **2.     PLAINTIFFS' FIRST CLAIM, FOR VIOLATIONS OF THE TVPA**

20

21   The TVPA is "an Act to combat trafficking of persons, especially into the sex trade,

22   slavery, and slavery-like conditions, in the United States and countries around the world through

23   prevention, through prosecution and enforcement against traffickers, and through protection and

24   assistance to victims of trafficking."  H.R. Conf. Rep. 106-939, at 1 (2000).  The purpose of the

25   act is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims

26   are predominantly women and children, to ensure just and effective punishment of traffickers,

27   and to protect their victims."  *Id.* at 3.  Many of the victims "are trafficked into the international

28   sex trade, often by force, fraud, or coercion.  *Id.*  But "trafficking also involves violations of

other laws, including labor and immigration codes and laws against kidnapping, slavery, false

imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

Civil liability is allowed against individuals who violate the TVPA.  18 U.S.C. § 1595.

Plaintiffs bring various TVPA claims against Defendants for human trafficking and forced labor

under 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a), (b).  The Court now reviews whether

Plaintiffs have stated valid TVPA claims against Defendants under each of these statutes.

## 2.1     Section 1589

Section 1589 prohibits forced labor obtained by any of multiple possible means.  The

statute states, in relevant part,

> (a) Whoever knowingly provides or obtains the labor or services of a
> person by any one of, or by any combination of, the following
> means . . . .
>> (3) by means of the abuse or threatened abuse of law or legal
>> process; or
>> (4) by means of any scheme, plan, or pattern intended to
>> cause the person to believe that, if that person did not perform
>> such labor or services, that person or another person would
>> suffer serious harm or physical restraint,
> shall be punished as provided under subsection (d). . . .
>
> (c) In this section:
>> (1) The term "abuse or threatened abuse of law or legal
>> process" means the use or threatened use of a law or legal
>> process, whether administrative, civil, or criminal, in any
>> manner or for any purpose for which the law was not
>> designed, in order to exert pressure on another person to cause
>> that person to take some action or refrain from taking some
>> action.
>> (2) The term "serious harm" means any harm, whether
>> physical or nonphysical, including psychological, financial, or
>> reputational harm, that is sufficiently serious, under all the
>> surrounding circumstances, to compel a reasonable person of
>> the same background and in the same circumstances to
>> perform or to continue performing labor or services in order
>> to avoid incurring that harm.

§ 1589(a), (c).

Plaintiffs allege that

> Defendants knowingly provided the labor of Plaintiffs by means of
> abuse and threatened abuse of law or legal process and by means of a
> scheme, pattern, or plan intended to cause the Plaintiffs . . . to
> believe that, if he or she did not perform the labor, he or she would
> suffer serious harm

in violation of the TVPA under § 1589(a)(3), (4).  (FAC ¶ 256.)   Defendants argue that

Plaintiffs have failed to sufficiently state a clam for violations of the TVPA.  The Court

disagrees.

Plaintiffs allege multiple threats made by Recruiter Defendants to Plaintiffs to support

their claim under § 1589(a)(3).  For example, Plaintiffs allege that Recruiter Defendants

threatened deportation (1) after certain teachers stated that they planned to move due to high

living costs (*id.* ¶ 165a); (2) if a certain teacher tried to bring his family with him to the United

States from the Philippines (*id.* ¶ 165c); and (3) after a certain teacher complained to a reporter

about poor treatment in the work program (*id.* ¶ 165d).  Plaintiffs also allege that Defendant

Navarro threatened to sue Plaintiffs for voicing criticisms about Recruiter Defendants' business

operations.  (*Id.* ¶ 166.)  Finally, Plaintiffs state that Navarro threatened to allow Plaintiffs' visas

to expire without renewal and to have Plaintiffs' employment terminated when certain teachers

asked for refunds of fees and complained about housing issues.  (*Id.* ¶¶ 168, 169.)

Plaintiffs also state their previously discussed fraud allegations to support their TVPA

claim under § 1589(a)(4).  As noted, Plaintiffs argue that Defendants' "systematic fraud and

extortion forced Plaintiffs to take on crushing debt, which they could not possibly repay absent

continued employment by the school districts."  (Opp'n at 8:4–6.)  With this debt, Plaintiffs

argue, ceasing to work for the school districts would have resulted in Plaintiffs' "financial ruin."

(*Id.* at 8:6–8.)

Specifically, as noted, Plaintiffs allege that Defendants informed Plaintiffs of massive

additional fees only after Plaintiffs paid the non-refundable First Recruitment Fees.  (*See, e.g.*,

FAC ¶¶ 105, 106.)  Thus, Plaintiffs were left with the choice of either walking away from the

program with approximately $5,000 in debt or obeying Defendants' commands and paying

approximately $10,000 more.  (*See, e.g.*, *id.* ¶¶ 106, 124–25.)  Plaintiffs allege that they felt

"powerless to do anything other than conform to Recruiter Defendants' demands because they

did not have control over their passports, and if they did not come to work in the United States, they would suffer severe financial harm because of the overwhelming debt they had already accumulated." (*Id.* ¶ 127.)  Plaintiffs allege that the $5,000 debt allegedly caused Plaintiffs severe financial harm largely because it is a very large sum of money in the Philippines—"more than one-and-a-half times the average [annual] household income . . . ." (*Id.* ¶ 108.)

Based on these factual allegations, including allegations of threats and fraud, Plaintiffs have sufficiently alleged that Defendants violated the TVPA under § 1589(a).

Defendants argue that Plaintiffs fail to state a claim under § 1589(a), and their argument largely centers around a perceived lack of severity of Plaintiffs' financial situation and working conditions.  For example, Defendants cite the previously referenced House of Representatives Conference Report accompanying the TVPA bill stating that the intent of the act is to "combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions . . . ." H.R. Conf. Rep. 106-939, at 1 (2000).  Defendants argue that "[t]eaching high school math and science hardly qualifies as the type of activity targeted by Congress," (Reply at 3 n.1), and Defendants cite *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), a case where convictions were actually upheld under the TVPA, to support their argument.

In *Calimlim*, an individual came to the United States from the Philippines and began working for a family as a housekeeper.  *Id.* at 708.  After she arrived, the family subjected the individual to terrible living conditions.  She typically worked sixteen-hour days, seven days a week.  *Id.*  Further, in the nineteen years that the individual worked for the family, she was rarely allowed outside, and only spoke with her family on a few occasions.  *Id.* at 709.  And she was "told repeatedly . . . that if anyone discovered her she could be arrested, imprisoned, and deported, and she would not be able to send any more money back to her family.  Fear of that consequence kept her from breaking any of the rules or appearing outside the house."  *Id.*  The family in *Calimlim* "knew that not sending money back home was, for [the individual], a 'serious harm.'"  *Id.*  The individual was also told that if she did not do everything she was commanded, the family would not send money back home for her.  *Id.* at 711.  The Seventh Circuit upheld the convictions of the family members for TVPA violations.  *Id.* at 718.

13

*Calimlim* certainly appears to involve circumstances more severe than those presented here.  The family in *Calimlim* essentially forced an individual into slavery by threatening to have her "arrested, imprisoned, and deported" and refused to send money to her family if she did not do everything commanded.  *Id.* at 709.  By contrast, Plaintiffs here voluntarily incurred debt to join a teaching program, and they do not make factual allegations describing circumstances as dire as the slavery-like conditions in *Calimlim*.  But the discussion concerning whether Plaintiffs have stated a valid claim under § 1589 does not end simply because Plaintiffs do not allege the same severe physical and psychological harm that was present in *Calimlim*.

This is because § 1589 "is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion."  *Id.* at 714.  It is sufficient that a defendant's misconduct has created a situation where ceasing labor would cause a plaintiff serious harm.  *Id.* at 711–14.  Further, as noted, while many of the victims "are trafficked into the international sex trade, often by force, fraud, or coercion[,] . . . "trafficking also involves violations of other laws, including labor and immigration codes and laws against kidnaping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion."  H.R. Conf. Rep. 106-939, at 3, 4 (2000).  In other words, the TVPA not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor.

*Calimlim* supports this finding.  The family in that case "caused [the individual] to believe that she might be deported and her family seriously harmed because she would no longer be able to send money [back home].  They also implicitly threatened her with deportation proceedings."  *Calimlim*, 538 F.3d at 710.  While the holding in *Calimlim* largely focused on whether the terms "serious harm" and "threatened abuse of the law or the legal process" were unconstitutionally overbroad or vague, the *Calimlim* Court also held that

> [t]he evidence showed that the [family] intentionally manipulated the situation so that [the individual] would feel compelled to remain. They kept her passport, never admitted that they too were violating the law, and never offered to try to regularize her presence in the United States.  Their vague warnings that someone might report [her]

> and their false statements that they were the only ones who lawfully
> could employ her could reasonably be viewed as a scheme to make
> her believe that she or her family would be harmed if she tried to
> leave. That is all the jury needed to convict. (Notably, the
> Calimlims did not challenge the sufficiency of evidence supporting
> the jury's findings of intent.)

*Id.* at 713.

A case from the First Circuit similarly holds that serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion." *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005). In *Bradley*, employers were convicted under TVPA for obtaining the services of Jamaican immigrants for their tree removal company by threats of serious harm. *Id.* at 148–49. This included psychological coercion such as seizing immigrants' passports to restrict their ability to flee. *Id.*

Like in *Calimlim* and *Bradley*, Plaintiffs here allege that Defendants intentionally manipulated the situation so that Plaintiffs would feel compelled to remain and would obey all of Defendants' demands. As previously discussed, Plaintiffs have sufficiently alleged that Defendants engaged in a fraudulent scheme where Defendants demanded an extra $10,000 to continue with the teaching program. And Plaintiffs further allege that the initial $5,000 debt would be crushing to Plaintiffs without access to the promised teaching jobs in the United States, and therefore Plaintiffs had not choice but to work in the program after they paid the non-refundable First Recruitment Fee.

Further, as noted, the alleged fraudulent scheme to financially manipulate Plaintiffs is accompanied by numerous allegations that Defendants repeatedly threatened Plaintiffs. This includes threats to fire Plaintiffs, sue them, allow their visas to expire, or deport them over various issues that generally concerned complaints about living conditions and pay. (*E.g.*, FAC ¶¶ 165–69.) Threatening deportation for violation of immigration laws "clearly fall[s] within the concept and definition of 'abuse of legal process' since the alleged objective for [such conduct] was to intimidate and coerce [Plaintiffs] into 'forced labor.'" *United States v. Garcia*, Case No. 02-CR-110S-01, 2003 U.S. Dist. LEXIS 22088, at *23 (W.D.N.Y. Dec. 2, 2003). These

1    allegations, along with Plaintiffs' previously discussed fraud allegations, sufficiently state a

2    claim under § 1589(a).  *Cf. Calimlim*, 538 F.3d at 711–14.

3          Defendants argue that Plaintiffs' pleadings actually show Plaintiffs' desire to continue

4    working in the teaching program and avoid being fired.  (Motion at 13:21–24.)  Therefore,

5    Defendants argue, Plaintiffs fail to sufficiently allege that they were subjected to forced labor.

6    (*See id.*)  But this argument actually cuts against Defendants.  Plaintiffs' allegations largely

7    focus on the point that they *had to* work for Defendants' so that they would be able to repay the

8    massive debt they incurred due to Defendants' fraud.  In other words, after incurring $5,000 in

9    debt, if Plaintiffs lost their teaching jobs they would be unable to ever repay the debt.  Based on

10   Plaintiffs' allegations it is not surprising that Plaintiffs not only wanted, but *needed* to continue

11   working in the program.

12          In sum, Plaintiffs have sufficiently alleged that Defendants threatened the abuse of legal

13   process and serious harm to provide forced labor, and Defendants' Motion is DENIED as to

14   Plaintiffs' claims under § 1589(a).

15

16   **2.2    Section 1590**

17

18          Section 1590 prohibits human trafficking to further forced labor.  The statute states that

19   "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person

20   for labor or services in violation of this chapter shall be [fined, imprisoned, or both]."

21   § 1590(a).

22          Just as Defendants' Motion as to Plaintiffs' claims under § 1589(a) fail, their Motion as to

23   Plaintiffs' claims under § 1590 also fail.  As noted, Plaintiffs have sufficiently alleged that

24   Defendants are involved in a fraudulent scheme involving forced labor, and with the

25   international nature of this matter, Plaintiffs have also sufficiently alleged that Defendants

26   recruited, transported, and provided Plaintiffs for that forced labor.  In particular, Plaintiffs

27   clearly and repeatedly allege that Defendants recruited them to teach in Louisiana.

28          Thus, Defendants' Motion is DENIED as to Plaintiffs' claims under § 1590.

### 2.3     Section 1592

Section 1592 prohibits destroying or confiscating travel-related and immigration-related documents "in the course of a violation" or "with intent to violate" the TVPA.  Specifically, the statute states

> (a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person--
> (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a); [or]
> (2) with intent to violate section 1581, 1583, 1584, 1589, 1590, or 1591; . . . [shall be fined or imprisoned.]

As discussed, Plaintiffs have sufficiently alleged that Defendants are involved in a fraudulent scheme involving human trafficking.  Further, Plaintiffs have alleged instances where Defendants possessed and refused to return passports and visas "in the course of" violating the TVPA.  Accordingly, Plaintiffs have sufficiently stated a claim under § 1592.

Thus, Defendants' Motion is DENIED as to Plaintiffs' claims under § 1592.

### 2.4     Section 1594(a), (b)

Section 1594(a) states "[w]hoever attempts to violate section 1581, 1583, 1584, 1589, 1590, or 1591 shall be punishable in the same manner as a completed violation of that section." Section 1594(b) states "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section."

Just as Plaintiffs have stated claims under §§ 1589, 1590, and 1592, Plaintiffs state a claim under § 1594.  Plaintiffs have alleged sufficient facts showing that Defendants were involved a forced labor scheme, and Plaintiffs have also alleged sufficient facts showing an attempt and conspiracy to engage in such a scheme.

The Court DENIES Defendants' Motion as to Plaintiffs' claims under § 1594(a), (b).

### 2.5    Conclusion

The Court takes allegations of forced labor seriously.  And while the Court understands Defendants' argument that the alleged facts here are somewhat less shocking than those described in cases such as *Calimlim*, Congress has made it clear that forced labor and human trafficking also involve "violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion." H.R. Conf. Rep. 106-939, at 4 (2000).  This shows the broad reach of the TVPA and the broad class of individuals whom it protects.  Thus, it is the duty of this Court to provide a forum for the alleged victims of forced labor, regardless of the severity of the alleged circumstances.

Plaintiffs have sufficiently stated factual allegations to support their forced labor and trafficking claims and survive at this initial pleading stage.  Defendants' Motion as to Plaintiffs' TVPA claims is DENIED.

### 3.    PLAINTIFFS' SECOND CLAIM, FOR RICO VIOLATIONS

To state a civil claim under RICO, a plaintiff must plead that the defendant violated the Act, and that the plaintiff was injured as a result of the violation.  "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's business or property." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  "Racketeering activity . . . is defined to include a number of generically specified criminal acts as well as the commission of one of a number of listed predicate offenses." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939 (9th Cir. 2006) (citing § 1961(1)).  "A 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

Plaintiffs allege RICO violations based on the following alleged predicate acts: "Forced labor in violation of 18 U.S.C. § 1589"; "[t]rafficking persons with respect to forced labor in violation of 18 U.S.C. § 1592(a)"; "[u]nlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a)"; "[m]ail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341"; "[w]ire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343"; and "[e]xtortion as defined in Cal. Penal Code § 518."  (FAC ¶ 286.)

The Court has already ruled that Plaintiffs have stated valid claims for forced labor, human trafficking, and unlawful document-related practices, and these claims may also serve as underlying predicate acts for Plaintiffs' RICO claim.  Thus, Plaintiffs have sufficiently alleged multiple RICO predicate acts, as required by 18 U.S.C. § 1961(5).  Further, it appears that the parties do not dispute that Plaintiffs' have met the remaining elements of their RICO claim.  Accordingly, Plaintiffs have sufficiently stated a claim for RICO violations, and Defendants' Motion as to Plaintiffs' RICO claim is DENIED.

Although Plaintiffs' forced labor allegations alone are enough to support their RICO claim, the Court must determine the sufficiency of Plaintiffs' claims for each of their alleged RICO predicate acts.  The Court now turns to these acts.

### 3.1   Mail and Wire Fraud

For mail fraud as a RICO predicate act, "it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud."  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004) (citations and quotations omitted).  Meanwhile, for wire fraud as a RICO predicate act, it is necessary to show "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud."  *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (citations and quotations omitted).

As noted Rule 9(b) provides that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).  Thus, when mail fraud and wire fraud are the alleged RICO predicate acts, a plaintiff must meet heightened pleading standards under Rule 9(b) for those acts.  *Id.*

Here, Plaintiffs do not specifically allege any use of wires or United States mails by Defendants  to further a scheme or artifice to defraud.  While Plaintiffs' FAC generally alleges that "RICO Defendants utilized the telephone, facsimile, postal system, and/or email of the United States to organize, plan, and coordinate the RICO Enterprise" (FAC ¶ 287), this is not a sufficient allegation that either Navarro or UPI specifically used mail or wires, when they used them, or how any such use concerned a scheme to defraud.  And while Plaintiffs do state some examples of other parties using mail and wires at various times, (*see, e.g.*, *id.* ¶¶ 114, 115, 205–45), Plaintiffs do not specifically allege any such acts performed by Defendants.

While the Ninth Circuit has occasionally relaxed the particularity requirement where "plaintiffs can not be expected to have personal knowledge of the relevant facts," *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993), here, it is not unreasonable to expect Plaintiffs to have personal knowledge of the communications at issue.  *Sanford*, 625 F.3d at 558 (holding that "the failure to plead who placed [ ] telephone calls was insufficient under Rule 9(b)" to state a wire fraud claim).

Plaintiffs have failed to sufficiently allege specific mailings or wire usage by Defendants, and therefore they fail to satisfy the particularity requirement of Rule 9(b).  *See id.* (citing *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)). Defendants' Motion as to the predicate acts of mail and wire fraud is GRANTED.

### 3.2    Extortion

For extortion as a RICO predicate act, it is necessary to show "[1] extortion and [2] a nexus between a defendant's acts and interstate commerce." *United States v. Atcheson*, 94 F.3d 1237, 1240–41 (9th Cir. 1997).  "Extortion is the obtaining of property from another, with his

1   consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force

2   or fear, or under color of official right."  Cal. Penal Code § 518.  The "obtaining" element

3   requires a showing that the extortioner or a third party received something of value from the

4   victim of the alleged extortion.  *See United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009).

5   The "wrongful use of . . . fear" element requires a showing that the use of fear is in fact

6   wrongful.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (citations and

7   quotations omitted).

8          "Extortion has been characterized as a paradoxical crime in that it criminalizes the

9   making of threats that, in and of themselves, may not be illegal."  *Flatley v. Mauro*, 39 Cal. 4th

10  299, 326 (2006).  "It is the means employed to obtain the property of another which the law

11  denounces . . . ."  *Id.* (citations and quotations omitted).  With extortion, it doesn't matter that the

12  money a defendant sought to obtain through threats may have been justly due.  *Id.* at 327 (citing

13  *Gomez v. Garcia*, 81 F.3d 95, 97 (9th Cir. 1996)).

14         Plaintiffs allege that Defendants threatened Plaintiffs with "deportation and financial ruin

15  in violation of Cal. Penal Code §§ 518–519 if they did not pay the fees required under [multiple

16  contracts]."  (FAC ¶ 243.)  Defendants argue that Plaintiffs have not sufficiently stated a claim

17  for extortion.  The Court disagrees.

18         Defendants argue that "Plaintiffs in this action fail to allege either that [Defendants]

19  forced them to come to this country or to continue working here under threats of deportation or

20  legal action."  (Reply at 6:3-5.)  Therefore, Defendants argue, Plaintiffs fail to sufficiently allege

21  the predicate act of extortion.  This argument fails.

22         Defendants cite *Pasamba v. HCAA Int'l, Inc.*, Case No. 08-0247, 2008 WL 2562928 (D.

23  Ariz. June 24, 2008), to support their argument.  In *Pasamba*, a woman was recruited from the

24  Philippines to work in the United States as a nurse.  *Id.* at *1.  The defendant stated that it would

25  pay expenses related to the woman's training, and that she would be paid wages comparable to

26  those paid to nurses with her experience.  *Id.*  The woman signed an employment contract with

27  the defendant, and she agreed that if her employment was terminated in less than two years, she

28  would have to reimburse the defendant for a maximum of $10,000 for defendant's "expenses and

1   costs directly attributable to the woman's training." *Id.*  But before the woman left for the

2   United States, the defendant required the woman to sign, without consideration, an amendment

3   to the agreement that increased the maximum amount recoverable to $60,000.  *Id.*

4         The *Pasamba* Court held that based on these factual allegations, the woman had failed to

5   sufficiently allege extortion and theft as RICO predicate acts.  *Id.* at *5-6.  The Court rejected the

6   woman's argument that she "'signed the $60K Note under duress, including the threat of having

7   her visa process terminated to her detriment if she wanted to obtain a subsequent United States

8   visa and the threat of owing $10,000 on the first promissory note.'" *Id.* at *5.  The *Pasamba*

9   Court noted that the

10      promissory note [the woman] signed expressly limited her obligation to repay [the defendant] for the expenses the [defendant] incurred for

11  her benefit.  Further, Plaintiff's only allegations regarding threats of deportation refer to communications before she was granted a work

12  visa, moved to the United States, and began employment. Plaintiff does not allege she was forced to come to the United States and work

13  in a hospital here or that she was prevented from quitting after she began working in the United States. . . .

14

15  *Id.*  The Court further noted that

16

17      [b]ased on [the woman's] allegations, if [the woman] had refused to sign the amendment to the promissory note and [the defendant]

18  terminated her employment agreement, there would have been no possibility of deportation, and if [the defendant] attempted to enforce

19  the original promissory note, Plaintiff could have refused if it was unenforceable or could have paid [the defendant] the expenses it had

20  incurred in the few weeks since she signed it.

21  *Id.* at *6.

      The facts in *Pasamba* starkly differ from the facts here.  The promissory notes there

22  expressly limited her repayment obligations to expenses incurred by the defendant.  *Id.* at *5.

23  Further, the woman's allegations regarding threats of deportation referred to communications

24  before she was granted a work visa, moved to the United States, and began employment.  *Id.*  As

25  the *Pasamba* Court stated, the woman did not allege "she was forced to come to the United

26  States and work in a hospital or that she was prevented from quitting after she began working in

27  the United States."  *Id.*

28

But here, Defendants allegedly forced Plaintiffs to choose between forfeiting their initial $5,000 or paying approximately $10,000 more to join the teaching program.  The woman in *Pasamba* did not allege such inevitable financial harm.  Further, Plaintiffs allege that Defendants ensured that profits remained high and that complaints remained low by threatening deportation once Plaintiffs were working in the United States.  And Plaintiffs allege that Defendants threatened to deport Plaintiffs if they did not make payments under various contracts.  (*E.g.*, FAC ¶¶ 11, 294.)  The woman in *Pasamba* did not make such allegations.  *Pasamba*, 2008 WL 2562928, at *6.

Plaintiffs allege that Defendants' demands and conduct put them in fear of financial harm and deportation.  (FAC ¶¶ 11, 108, 294.)  While the Ninth Circuit has adopted a somewhat narrow reading of the term "wrongful use of . . .  fear" for extortion claims, the alleged circumstances here meet that reading.  *See Sosa*, 437 F.3d at 940.  Plaintiffs do not solely allege fear of  economic loss, but also allege fear of deportation.  With the alleged circumstances surrounding Plaintiffs' recruitment, as immigrant workers who had already incurred approximately $15,000 in debt to work in the United States, this threatened deprivation of income and ability to continue working in the United States was wrongful.  And it was this alleged wrongful use of fear that was the "operating or controlling cause compelling" Plaintiffs' continued participation in Defendants' employment scheme.  *See California v. Goodman*, 323 P.2d 536, 541 (Cal. Ct. App. 1958).

Based on these allegations, Plaintiffs have plausibly alleged that Defendants wrongfully forced Plaintiffs to fear that they would lose their $5,000 First Recruitment Fee if they did not pay massive additional fees.  It is also plausible that after Plaintiffs were in the United States, Defendants wrongfully threatened to deport Plaintiffs if they complained about additional fees and other matters.  Plaintiffs have sufficiently alleged the RICO predicate act of extortion against Defendants based on the alleged threats of deportation and severe financial harm.

Accordingly, Defendants' Motion as to the predicate act of extortion is DENIED.

### 3.3    Conclusion

While Plaintiffs have failed to sufficiently allege the RICO predicate acts of mail and wire fraud, Plaintiffs have sufficiently alleged the predicate acts of forced labor, human trafficking, unlawful document-related practices, and extortion.  Thus, Plaintiffs have sufficiently alleged multiple RICO predicate acts, as required by 18 U.S.C. § 1961(5).  Defendants' Motion as to Plaintiffs' RICO claim is DENIED.

## 4.    PLAINTIFFS' THIRD CLAIM, FOR VIOLATIONS OF CALIFORNIA'S EMPLOYMENT AGENCY, EMPLOYMENT COUNSELING, AND JOB LISTING SERVICES ACT, UNDER CALIFORNIA CIVIL CODE § 1812.508

California's Employment Agency, Employment Counseling, and Job Listing Services Act prohibits employment agencies from making various false or misleading representations.  Under California Civil Code § 1812.508(a), "[n]o employment agency shall make, or cause to be made, any false, misleading, or deceptive advertisements or representations concerning the services that the agency will provide to jobseekers."

For the reasons previously discussed, Plaintiffs have stated a valid claim under § 1812.508.  Plaintiffs have sufficiently alleged, for example, that Defendants made misleading representations concerning the amount that Plaintiffs would have to pay to join the teaching program and work in the United States.  This, with Plaintiffs' other factual allegations, sufficiently states a claim under § 1812.508.

Accordingly, Defendants' Motion as to Plaintiffs' claim under § 1812.508 is DENIED.

1  **DISPOSITION**

2

3       The Motion is GRANTED in part and DENIED in part, with leave to amend.  Plaintiffs

4  may file an amended complaint within 21 days of this order, if they so choose, preferably in red-

5  line format.

6

7  IT IS SO ORDERED.

8

9  DATED: May 11, 2011

10

11  _____

12                          Andrew J. Guilford

13                     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28