FILED

2011 JUN -2  AM 10: 42

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1   Lawrence Rosenzweig (SBN 72443)
    LRPCorp@aol.com
2   Brent Rosenzweig (SBN 219071)
    Brent.Rosenzweig@gmail.com
3   LAWRENCE ROSENZWEIG, PC
4   2730 Wilshire Boulevard, Suite 425
5   Santa Monica, California  90403
    Telephone:  (310) 453-0348
6   Facsimile:   (310) 453-3358
7   *Attorney for Plaintiffs*
    *Additional Co-Counsel on Subsequent Pages*
8

9

10              **IN THE UNITED STATES DISTRICT COURT**

11           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

13   MAIRI NUNAG-TAÑEDO, INGRID
14   CRUZ, DONNABEL ESCUADRA,
     ROLANDO PASCUAL, and TOMASA
15   MARI, on behalf of themselves and          Civ.No. 10-01172-JAK-MLG
16   other similarly situated individuals,

17        Plaintiffs,

18
     v.
19

20   EAST BATON ROUGE PARISH
     SCHOOL BOARD, ELIZABETH                    **SECOND AMENDED**
21   DURAN SWINFORD, UNIVERSAL                  **COMPLAINT**
22   PLACEMENT INTERNATIONAL,
     INC., LOURDES "LULU" NAVARRO,
23   PARS INTERNATIONAL                         **CLASS ACTION**
24   PLACEMENT AGENCY, EMILIO V.
     VILLARBA, ROBERT B.                        **DEMAND FOR JURY TRIAL**
25   SILVERMAN, and SILVERMAN &
26   ASSOCIATES,

27        Defendants.

28

                                  1

Second Amended Complaint

1   *(Attorney listing continued from first page)*

2   Daniel Werner (*admitted pro hac vice*)
3   Daniel.Werner@splcenter.org
    James M. Knoepp (*admitted pro hac vice*)
4   Jim.Knoepp@splcenter.org
5   IMMIGRANT JUSTICE PROJECT
    SOUTHERN POVERTY LAW CENTER
6   233 Peachtree St. NE, Suite 2150
7   Atlanta, Georgia  30303
    Telephone:  (404) 521-6700
8   Facsimile:   (404) 221-5857

9
    Mary C. Bauer (*admitted pro hac vice*)
10  Mary.Bauer@splcenter.org
11  Sam Brooke (*admitted pro hac vice*)
    Sam.Brooke@splcenter.org
12  Morris S. Dees (*admitted pro hac vice*)
13  Judy.Bruno@splcenter.org
    IMMIGRANT JUSTICE PROJECT
14  SOUTHERN POVERTY LAW CENTER
15  400 Washington Avenue
    Montgomery, Alabama  36104
16  Telephone:  (334) 956-8200
17  Facsimile:   (334) 956-8481

18
    Jennifer L. Tse SBN 260764
19  Jennifer.Tse@splcenter.org
20  IMMIGRANT JUSTICE PROJECT
    SOUTHERN POVERTY LAW CENTER
21  233 Peachtree St. NE, Suite 2150
22  Atlanta, Georgia  30303
    Telephone:  (404) 521-6700
23  Facsimile:   (404) 221-5857

24
    Dennis B. Auerbach (*admitted pro hac vice*)
25  dauerbach@cov.com
26  Candice N. Plotkin (*admitted pro hac vice*)
    cplotkin@cov.com
27  Jillian Willis (*admitted pro hac vice*)
28  jwillis@cov.com
    COVINGTON & BURLING LLP

2

1 | 1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
2 | Telephone: (202) 662-6000
3 | Facsimile: (202) 662-6291

4 | Susan Johnston (*admitted pro hac vice*)
5 | sjohnston@cov.com
Pamela A. Carter (*admitted pro hac vice*)
6 | pcarter@cov.com
7 | COVINGTON & BURLING LLP
The New York Times Building
8 | 620 Eighth Avenue
9 | New York, New York 10018
Telephone: (212) 841-1000
10 | Facsimile: (212) 841-1010

11 |
Daniel J. McNeil (*admitted pro hac vice*)
12 | dmcneil@aft.org
13 | AMERICAN FEDERATION OF TEACHERS
LEGAL DEPARTMENT
14 | 555 New Jersey Ave., N.W.
15 | Washington, DC 20001
Telephone: (202) 393-6305
16 | Facsimile: (202) 393-6385
17 | *Attorneys for Plaintiffs*[1]

18

19

20

21

22

23

24

25

26

27

28 | [1]   A red-lined version of this Second Amended Complaint is attached as Exhibit A

# TABLE OF CONTENTS

I.  JURISDICTION AND VENUE ...................................................7

II.  PRELIMINARY STATEMENT...................................................8

III.  PARTIES.............................................................................13

    A.  Plaintiffs.....................................................................13

    B.  Defendants ................................................................14

IV.  CLASS ACTION ALLEGATIONS .........................................19

    A.  Louisiana Teacher Class ..............................................19

    B.  EBR Teacher Subclass.................................................27

V.  STATEMENT OF FACTS.......................................................32

    A.  Factual Allegations Related to Laws Regulating the Recruitment of Philippine Nationals for Employment within Louisiana................................................................34

        1.  Regulations of the Philippine Overseas Employment Administration ...................................................34

        2.  Regulations of the United States Government regarding H-1B Visa Workers.............................35

        3.  Regulations of the Louisiana Workforce Commission .......................................................37

    B.  Factual Allegations Related to the Trafficking Scheme...............38

        1.  Trafficking Step 1: Employer Defendants, Recruiter Defendants, and Legal Facilitator Defendants Agree to a Joint Venture to Recruit Teachers from the Philippines to Teach in Louisiana ...................................38

        2.  Trafficking Step 2: Employer Defendants Interview Plaintiffs and the Class Members.........................40

        3.  Trafficking Step 3: Recruiter Defendants Charge First Recruitment Fee, but Hide from Class Members an Undisclosed Second Recruitment Fee..........41

4

4.    Trafficking Step 4:  Recruiter Defendants Seize and Control Documents.................................................................45

5.    Trafficking Step 5:  Recruiter Defendants Announce Previously Undisclosed Second Recruitment Fee (Three Months of Salary to be Earned in United States) and Charge for Airfare.........................................47

6.    Trafficking Step 6:  Recruiter Defendants Require Signature of Illegal Contracts in the Philippines...............51

7.    Trafficking Step 7:  Recruiter Defendants Direct Plaintiffs and other Class Members to California, Compel Signatures on Illegal Contracts in California, and Control Documents....................................54

8.    Trafficking Step 8:  Recruiter Defendants Dictate Housing Arrangements...........................................................55

9.    Trafficking Step 9:  Visa Renewal Process.........................57

10.   Trafficking Step 10:   Ongoing Methods of Intimidation and Manipulation by Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants...........................................................58

C.    Factual Allegations that Recruiter Defendants Used the U.S. Mails and Wires in Furtherance of the Fraudulent Trafficking Scheme...................................................................64

D.    Factual Allegations that Legal Facilitator Defendants Facilitated the Illegal Trafficking Scheme.........................69

E.    Factual Allegations That Employer Defendants were Beneficiaries of the Illegal Trafficking Scheme.............73

F.    Factual Allegations That Employer Defendants Facilitated the Illegal Trafficking Scheme, or Alternatively Knew or Reasonably Should Have Known of the Illegal Trafficking Scheme.......................................................................................74

G.    Factual Allegations of Fraudulent Omission of Second Recruitment Fee......................................................................81

5

| | H. | Factual allegations of Fraudulent Omission of Employer's Obligation to Pay Visa Processing Fees | 85 |

| | I. | Factual Allegations Regarding the Submission of Fraudulent LCA and Related Documents to U.S. Governmental Agencies | 87 |

| | J. | Factual Allegations Regarding the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d)) | 97 |

| VI. | CLAIMS FOR RELIEF | | 97 |

| VII. | PRAYER FOR RELIEF | | 135 |

6

# I.   JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1332(d) (class action jurisdiction).   The Court has supplemental jurisdiction over the state law causes of actions asserted in this Second Amended Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

3.     Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) because some or all defendants reside, are found, have agents, and/or transact his/her/its affairs in the Central District of California.

4.     Venue is also proper in this District pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that other parties residing in other districts be brought before this Court.

5.     In addition, venue is proper in this District because one of the two principal standardized contracts at issue in this matter specifies that "this agreement shall be enforced within any competent court within the County of Los Angeles, State of California, United States of America."

## II.   PRELIMINARY STATEMENT

6.     Over the course of three school years, more than 350 highly-skilled Filipino teachers have been trafficked into Louisiana through the federal government's H-1B "specialty occupation" visa program to serve as teachers in public schools.  The teachers were systematically defrauded and exploited in the recruitment and hiring process in the Philippines by Defendants, who utilized the promise of a unique opportunity to teach in Louisiana to ensnare teachers in a psychologically coercive and financially ruinous trafficking scheme that subjected the teachers to exorbitant debt and forced labor.  Once in the United States, the teachers were further abused and exploited by Defendants, who used a variety of coercive tactics, including abuse of legal process, isolation and segregation, and threats of deportation, to attempt to control the teachers' actions.   When the teachers organized collectively for better conditions, they were victims of severe retaliation.

7.     The Plaintiffs and class members in this action are victims of human trafficking and were brought to the United States to work in the East Baton Rouge Parish School District, Recovery School District, Jefferson Parish Public School System, Caddo Public School District, East Carroll Parish School System, Avoyelles Parish School District, Advance Baton Rouge Charter School Association, Madison Parish School District, and Lafourche Parish Public Schools (hereinafter referred to as the "Louisiana

School Districts").

8.      Plaintiffs bring this action on behalf of themselves and similarly situated teachers to recover damages and to seek declaratory and injunctive relief based on the fraudulent and malicious practices of the recruiters (referred to collectively as "Recruiter Defendants") and legal facilitators (referred to collectively as "Legal Facilitator Defendants") whom the Louisiana School Districts hired, as well as from one of their employers, the East Baton Rouge Parish School System ("EBRPSS"), and an agent of EBRPSS (referred to collectively as "Employer Defendants"), who was aware, or reasonably should have known of the Recruiter Defendants' and Legal Facilitator Defendants' egregious conduct, and who took steps to ensure the trafficking scheme was viable.

9.      The Louisiana School Districts chose and retained Universal Placement International, Inc. and Lourdes "Lulu" Navarro to recruit teachers from the Philippines.  The Louisiana School Districts selected Ms. Navarro, and continued to use her services, despite her prior conviction and imprisonment for defrauding the California Medi-Cal system of more than $1,000,000, and despite the fact that she had also pled guilty to money laundering in New Jersey.  In her role as teacher-recruiter, Lourdes Navarro was given enormous responsibility to recruit and hire teachers for the School Districts.  In concert with the other Recruiter Defendants involved in this

scheme, Ms. Navarro arranged for the teachers to be interviewed by Louisiana School District representatives, either in person in the Philippines or by videoconference and teleconference.   The Recruiter Defendants told the teachers who were selected that they must quickly pay a recruitment fee in cash, which varied from $5,000 to $5,500 per teacher.  This was an enormous financial investment, representing more than one-and-a-half times the average annual household income in the Philippines.   The Recruiter Defendants willfully, maliciously, and fraudulently tricked the teachers into reasonably believing that this fee constituted all or nearly all of their obligations to the Recruiter Defendants, inducing the teachers to liquidate assets, take out loans from family, friends, and/or public and private lending institutions, and mortgage properties to cover the expense.  The Employer Defendants and the non-defendant Louisiana School Districts, with the full knowledge and assistance of the Recruiter Defendants and Legal Facilitator Defendants, also willfully and fraudulently represented to United States federal governmental agencies that they would comply with the regulations governing the H-1B visa program, knowing full-well that part of the $5,000 to $5,500 initial payment collected from each teacher was to be used for fees and expenses the federal regulations required the petitioning employers to pay.

        10.   Later, after teachers had paid the first fee in cash, the Recruiter Defendants informed the teachers there would be a second, much

larger fee representing thirty percent of their expected annual income in the United States, plus the cost of airfare to the United States.  In an act of claimed "generosity," the Recruiter Defendants required teachers to pay only twenty percent before they left the Philippines; the remaining ten percent was to be collected during the teachers' second year of teaching in the United States.  The teachers were surprised by these new costs, which required a financial commitment of $16,000—five times the average annual household income in the Philippines.  But the teachers could not afford to back out, given the first massive fee they had already paid, which the Recruiter Defendants would not refund.  The Recruiter Defendants additionally pressured and coerced the teachers into signing contracts providing for payment of this new fee, and confiscated the teachers' passports and visas to ensure the teachers would pay the fee.  The Recruiter Defendants also referred teachers to private lending businesses to borrow the money at usurious and exploitative interest rates of between 3 percent and 5 percent per month (which compounded equates to an annual interest rate of 43 percent to 80 percent) because they realized the teachers would not otherwise be able to pay the additional fee.

11.    After the teachers arrived in the United States, the Recruiter Defendants orchestrated a system of psychological coercion and intimidation to exert continued control over the teachers, including:  filing

11

lawsuits against teachers who complained publicly; isolating teachers from other Filipinos; and threatening deportation or non-renewal of teacher visas.

12.    Employer Defendants were knowing beneficiaries of the illegal human trafficking scheme perpetrated by Recruiter Defendants, knew or should have known of the scheme, and aided and abetted the scheme by taking steps to ensure its success. Employer Defendants became aware early on of the illegal and unconscionable fees being charged, and took steps to ensure the success of Recruiter Defendants' scheme, including submitting false letters to federal immigration officials at the request of the Recruiter Defendants, and reporting to Recruiter Defendants those teachers who voiced complaints about the process or who attempted to circumvent the Recruiter Defendants by applying directly to EBRPSS for employment. Employer Defendants were also aware that the teachers, rather than the petitioning employer, were paying fees and expenses that federal regulations governing the H-1B visa program required the petitioning employer to pay.

13.    Plaintiffs assert class action claims for damages under the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.*; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and various provisions of applicable state law. Plaintiffs also assert class action claims for damages against the Legal Facilitator Defendants, who facilitated the Recruiter Defendants' actions, for breach of fiduciary duty and

attorney malpractice committed in furtherance of the trafficking scheme. Plaintiffs seek compensatory, declaratory and injunctive relief against the Recruiter Defendants, and a declaration that the illegal contracts coerced by the Recruiter Defendants are null and void.   Finally, Plaintiffs assert class action claims against the Employer Defendants for their involvement in this trafficking scheme, and against Defendant East Baton Rouge Parish School Board ("EBRPSB") for negligently hiring the Recruiter Defendants in the first instance.

### III.   PARTIES

#### A.   Plaintiffs

EBR Teacher Plaintiffs

14.   Plaintiff Mairi Nunag-Tañedo is a national of the Republic of the Philippines and resides in Louisiana.   Ms. Nunag-Tañedo works as a teacher in EBRPSS.

15.   Plaintiff Ingrid Cruz is a national of the Republic of the Philippines and resides in Louisiana.   Ms. Cruz works as a teacher in EBRPSS.

16.   Plaintiff Donnabel Escuadra is a national of the Republic of the Philippines and resides in Louisiana. Ms. Escuadra works as a teacher in EBRPSS.

17.   Throughout this Second Amended Complaint, Plaintiffs

Nunag-Tañedo, Cruz, and Escuadra are referred to collectively as "EBR Teacher Plaintiffs."

Non-EBR Teacher Plaintiffs

18.     Plaintiff Rolando Pascual is a national of the Republic of the Philippines and resides in Louisiana.  Mr. Pascual works as a teacher in the Caddo Public School District, located in the Caddo Parish in Louisiana.

19.     Plaintiff Tomasa Mari is a national of the Republic of the Philippines and resides in Louisiana.  Ms. Mari works as a teacher in the Recovery School District, which is a school district administered by the State of Louisiana Department of Education.

**B.     Defendants**

Employer Defendants

20.     Defendant EBRPSB is responsible for the oversight of the EBRPSS.  EBRPSB oversees the operations of EBRPSS, including, *inter alia*, determining the number and location of schools and the number and selection of teachers to work in these schools, as well as promulgating and enforcing local policies and supervising the Superintendent of EBRPSS.  EBRPSB is the body corporate for EBRPSS, and has the authority to sue and be sued on behalf of EBRPSS.  EBRPSB's principal place of business is at 1050 South Foster Drive, Baton Rouge, Louisiana  70806.

21.     Defendant Dr. Elizabeth Duran Swinford is the former

14

Associate Superintendent for Human Resources for EBRPSS, and held this position until August, 2010.  Duran Swinford resided in Louisiana when this action was filed, but on information and belief she is no longer employed by EBRPSS and currently resides in Mississippi.  Duran Swinford is sued in her individual capacity, and in her capacity as an agent for EBRPSB.

22.    Throughout this Second Amended Complaint, Defendants EBRPSB and Duran Swinford are referred to collectively as "Employer Defendants."

Recruiter Defendants

23.    Defendant Universal Placement International, Inc., ("Universal") is a corporation organized under the laws of California that maintains its principal place of business in Los Angeles, California, within the Central District of California.   Universal is engaged in the business of recruiting teachers from the Philippines for employment in the United States.

24.    Defendant Lourdes "Lulu" Navarro is the owner and President of Universal.  Lourdes Navarro resides in Glendale, California, within the Central District of California.

25.    Defendant PARS International Placement Agency ("PARS") is a corporation organized under the laws of the Philippines that maintains its principal place of business in Quezon City, which is located in the metropolitan area of Manila, Philippines.   PARS is engaged in the

15

business of recruiting teachers from the Philippines for employment in the United States.

26.     Defendant Emilio V. Villarba is registered as the Official Representative of PARS with the Philippines Overseas Employment Administration.  Villarba is the owner of PARS.  Villarba resides in Quezon City, Philippines.  He is the brother of Defendant Lourdes Navarro.

27.     At all relevant times, Universal and PARS failed to conduct themselves as separate legal entities and acted without regard to their separate corporate forms, such that it is appropriate to treat Universal and PARS as interchangeable and alter egos for purposes of liability. Specifically, their disregard of their separate legal identities is evidenced by the following:

a.     Universal and PARS did not operate at arm's length in their dealings with each other;

b.     Lourdes Navarro and Universal represented to third parties, including Employer Defendants, that they had an "office" in the Philippines, which was the office of Defendant PARS;

c.     Villarba and PARS represented to third parties, including Plaintiffs and other Class Members, that PARS had an "office" in the United States, which was the office of Universal;

d.     Lourdes Navarro distributed business cards which listed

16

contact information for the Universal office in California and the PARS office in Manila;

e.      PARS maintained a website which listed its contact information as the Universal office in California and the PARS office in Manila;

f.      Villarba and PARS permitted Lourdes Navarro to determine how much applicants would pay and when the payments would be due, even for fees that ostensibly were being paid to PARS only;

g.      PARS entered into contracts with Plaintiffs and other Class Members that stated that Plaintiffs and Class Members would pay fees for certain items to PARS, but when those fees were paid, PARS issued receipts showing payment was made to Universal; and

h.      PARS collected money from Plaintiffs and other Class Members in the Philippines and issued receipts on behalf of both PARS and Universal.

28.      Alternatively, at some or all relevant times, Defendant Lourdes Navarro was an agent of Defendant PARS.

29.      At some or all relevant times, the Recruiter Defendants were agents of Employer Defendants and the non-Defendant Louisiana School Districts in that they were charged with recruiting Filipino teachers on behalf of the Employer Defendants and the non-Defendant Louisiana School

17

Districts.

30.    Throughout this Second Amended Complaint, Defendants Universal, Lourdes Navarro, PARS, and Villarba are referred to collectively as "Recruiter Defendants."

Legal Facilitator Defendants

31.    Defendant Robert B. Silverman is an attorney who maintains his principal office in Westminster, California, within the Central District of California.  Silverman resides in the Central District of California.

32.    Defendant Silverman & Associates is a law office located in Westminster, California, within the Central District of California.    On information and belief, Defendant Silverman conducts business in the name of Silverman & Associates.

33.    Throughout this Second Amended Complaint, Defendants Silverman and Silverman & Associates are referred to collectively as "Legal Facilitator Defendants."

RICO Defendants

34.    Throughout this Second Amended Complaint, Recruiter Defendants, Duran Swinford and Legal Facilitator Defendants are referred to collectively as "RICO Defendants."

All Defendants

35.    Individually    and    through    their    agents,    associates,

attorneys, and/or employees, all Defendants have significant contacts with the Central District of California, and the claims in this case arise in significant part from conduct by the Recruiter Defendants and the Legal Facilitator Defendants that occurred in the Central District of California.

36.    Defendants have been engaged in and continue to engage in ongoing contacts with Plaintiffs and other Class Members, including recruiting, obtaining labor, contracting, seeking to collect on contracts, providing immigration-related services to, transporting, harboring, providing and/or employing Plaintiffs and/or other Class Members.

## IV.    CLASS ACTION ALLEGATIONS

37.    The Class Representative Plaintiffs bring claims for damages, injunctive, and declaratory relief on behalf of themselves and all similarly situated persons pursuant to Rule 23.   The Class Representative Plaintiffs bring class claims for actual, punitive, and treble damages pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), and class claims for injunctive and declaratory relief pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

38.    This action involves a class represented by all Plaintiffs, referred to herein as the "Louisiana Teacher Class," and a subclass represented by EBR Teacher Plaintiffs, referred to herein as the "EBR Teacher Subclass."

### A.    Louisiana Teacher Class

19

39.   The Louisiana Teacher Class asserts claims for compensatory, treble, and/or punitive damages pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  For the purpose of claims for compensatory, treble, and/or punitive damages, the Louisiana Teacher Class is defined as all Filipino nationals who obtained their initial H-1B visas through Recruiter Defendants and Legal Facilitator Defendants during the period January 1, 2007 through the present, where a Louisiana school district or Louisiana school system was the petitioner.

40.   The Louisiana Teacher Class asserts claims for injunctive and declaratory relief pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.  For the purpose of claims for injunctive and declaratory relief, the Louisiana Teacher Class is defined as all Filipino nationals who obtained or will obtain H-1B visas through any of the Recruiter Defendants and/or Legal Facilitator Defendants for employment at school districts or school systems in Louisiana.

41.   The Louisiana Teacher Class (as distinct from the EBR Teacher Subclass) seeks relief from Recruiter Defendants and Legal Facilitator Defendants only.

<u>Rule 23(a)</u>

42.   Only the Recruiter Defendants and Legal Facilitator Defendants know the precise number of individuals in the Louisiana Teacher

20

Class, but upon information and belief the class includes over 350 individuals. The Louisiana Teacher Class is so numerous that joinder of all members of the Louisiana Teacher Class is impracticable.

43.   This action involves questions of law common to the Louisiana Teacher Class, including:

a.   Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct as set forth in the First Claim for Relief violated the forced labor and trafficking provisions of the TVPA (18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b));

b.   Whether Recruiter Defendants' and Legal Facilitator Defendants' conduct as set forth in the Second Claim for Relief violated RICO Sections 1962(c) and 1962(d);

c.   Whether Recruiter Defendants' conduct as set forth in the Third Claim for Relief violated the Employment Agency and Job Services Act (Cal. Civ. Code § 1812.508);

d.   Whether Recruiter Defendants' conduct as set forth in the Fourth Claim for Relief violated the California Unfair Business Practices Act (Cal. Business and Professional Code § 17200);

e.   Whether Recruiter Defendants' conduct as set forth in the Fifth Claim for Relief constituted fraud;

f.   Whether Recruiter Defendants' conduct as set forth in the

1  Sixth Claim for Relief constituted negligent misrepresentation;

2          g.      Whether contracts entered into between Louisiana Teacher
3
   Class members and Defendant Universal and Defendant PARS are void
4
5  because they were the result of undue influence, as set forth in the Seventh
6  Claim for Relief;

7          h.      Whether contracts entered into between Louisiana Teacher
8
9  Class members and Defendant Universal and Defendant PARS are void
10 because they are illegal, as set forth in the Eighth Claim for Relief;

11         i.      Whether fees collected by Defendant Universal and
12
13 Defendant PARS that were not pursuant to any written contract were illegal,
14
   as set forth in the Ninth Claim for Relief;
15
16         j.      Whether Legal Facilitator Defendants' conduct as set forth
17 in the Tenth Claim for Relief constituted a breach of a fiduciary duty;

18         k.      Whether Legal Facilitator Defendants' conduct as set forth
19
20 in the Eleventh Claim for Relief constituted legal malpractice;

21         l.      The nature of damages available to Plaintiffs and other
22
   Class Members, including the applicability of compensatory, treble, and/or
23
24 punitive damages; and

25         m.      Whether and what kinds of injunctive relief are
26
   appropriate.
27
28         44.     This action involves questions of fact common to the

class, including:

  a. Whether Recruiter Defendants and Legal Facilitator Defendants threatened Plaintiffs and other Louisiana Teachers Class members with serious financial harm and/or abuse of legal process to obtain Plaintiffs' and other Louisiana Teachers Class members' labor or services;

  b. Whether Recruiter Defendants and Legal Facilitator Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other Louisiana Teachers Class members for the purpose of subjecting them to forced labor;

  c. Whether Recruiter Defendants and Legal Facilitator Defendants conducted one or more enterprises through a pattern of racketeering activity;

  d. Whether Recruiter Defendants and Legal Facilitator Defendants committed or agreed to commit the predicate racketeering acts identified in the Second Claim for Relief; and

  e. The source and amount of Plaintiffs' and other Class Members' damages.

  45. The claims of the Plaintiffs asserted in the First through Eleventh Claims for Relief are typical of the claims of the Louisiana Teacher Class.

  46. The Plaintiffs will fairly and adequately protect the

23

interests of the Louisiana Teacher Class.

47.   Plaintiffs have retained counsel who are experienced in handling class action litigation on behalf of immigrant workers like Plaintiffs and the other class members, and are prepared to advance costs necessary to litigate this action.

48.   If certified, Plaintiffs will send individual notices containing the information required by Rule 23(c)(2)(B) to all members of the class by U.S. mail and electronic mail, which is the best notice that is practicable.

<u>Rule 23(b)(2)</u>

49.   Recruiter Defendants and Legal Facilitator Defendants have acted or refused to act on grounds that apply generally to the Louisiana Teacher Class, so that declaratory relief and final injunctive relief are appropriate with respect to the Louisiana Teacher Class as a whole.  Recruiter Defendants' and Legal Facilitator Defendants' actions and inactions include, *inter alia*:

a.   Illegally enforcing contracts that are the result of undue influence and coercion, as set forth in the Seventh Claim for Relief;

b.   Illegally enforcing contractual terms that are illegal, as set forth in the Eighth Claim for Relief;

c.   Illegally collecting fees prohibited under the law, as set

forth in the Ninth Claim for Relief; and

        d.     Illegally forcing Louisiana Teacher Class members to pay for fees in the H-1B visa process that are the sole obligation of the petitioner, as set forth in the Tenth and Eleventh Claims for Relief.

        50.     The Louisiana Teacher Class seeks to enjoin enforcement of the contracts and the collection of further fees as set forth in the Eighth through Tenth Claims for Relief.

        51.     The Louisiana Teacher Class also seeks to enjoin each Recruiter Defendant and each Legal Facilitator Defendant from continuing to engage in the unlawful acts described in this Second Amended Complaint.

<u>Rule 23(b)(3)</u>

        52.     Common questions of law and fact relevant to the First through Eleventh Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.  Specifically and without limitation, as set forth in this Second Amended Complaint, Recruiter Defendants and Legal Facilitator Defendants have engaged in a common course of conduct directed at the entire Louisiana Teacher Class, which has resulted in substantially similar injuries to class members.

        53.     A class action is superior to other available methods of adjudicating the claims set forth in the First through Eleventh Claims for Relief because, *inter alia*:

a.     Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.     The Louisiana Teacher Class members are foreign nationals, many of whom are in substantial debt, lack the means and/or resources to secure individual legal assistance, and/or are unaware of their rights to prosecute these claims;

c.     No member of the Louisiana Teacher Class has already commenced litigation to determine the questions presented.   The only litigation bearing on issues raised in this case are:

i.     Baseless lawsuits filed by Defendant Universal against a few Louisiana Teacher Class members, which constitute an abuse of legal process in furtherance of Recruiter Defendants' trafficking scheme, as described below; and

ii.     An administrative hearing at the Louisiana Workforce Commission, which via opinion dated April 14, 2010 (subsequently affirmed by the Louisiana 19th Judicial District Court) concluded that Defendant Universal was not properly licensed under the Louisiana Private Employment Services Law, but did not rule on the validity

26

of the contracts themselves, finding this was outside of its jurisdictional mandate[2]; and

> d.    A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized recruitment and record-keeping practices throughout the time period at issue.

**B.    EBR Teacher Subclass**

> 54.    The EBR Teacher Subclass asserts claims for compensatory, treble, and/or punitive damages pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  For the purpose of claims for compensatory, treble, and/or punitive damages, the EBR Teacher Subclass is defined as all Filipino nationals (i) who have obtained H-1B visas through Recruiter Defendants and Legal Facilitator Defendants during the period from January 1, 2007 through the present, and (ii) whose initial H-1B visa petition was executed by an agent of EBRPSS for employment at EBRPSS.

> 55.    The EBR Teacher Subclass asserts claims for injunctive and declaratory relief pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.  For the purpose of claims for injunctive and declaratory relief, the EBR Teacher Subclass is defined as all foreign

---

[2]    The United States Department of Labor has also instituted an investigation concerning visa-related fees that should have been borne by the Louisiana School Districts, but were instead borne by the teachers.

nationals who have obtained or will obtain H-1B visas for employment at EBRPSS.

56.     The EBR Teacher Subclass seeks relief from all Defendants.

Rule 23(a)

57.     Only the Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants know the precise number of individuals in the EBR Teacher Subclass, but upon information and belief the class includes over 200 individuals.   The EBR Teacher Subclass is so numerous that joinder of all members of the EBR Teacher Subclass is impracticable.

58.     The questions of law common to the EBR Teacher Subclass are the same as the questions of law identified for the Louisiana Teacher Class in ¶ 43, *supra*.   In addition, the following questions of law are unique and common to the EBR Teacher Subclass:

a.      Whether Defendant Duran Swinford's conduct as set forth in the Second Claim for Relief violated RICO Sections 1962(c) and 1962(d);

b.      Whether Employer Defendants knowingly benefited from participation with Recruiter Defendants and Legal Facilitator Defendants in the venture that deprived Plaintiffs and other EBR Teacher Subclass members of their right to be free from forced labor, as set forth in the Thirteenth Claim

1     for Relief;

2           c.      Whether Employer Defendants knew or should have

3

4 known that such venture engaged in a violation of Chapter 77 of Title 18 of

5 the United States Code, as set forth in the Thirteenth Claim for Relief;

6           d.      Whether Recruiter Defendants and Legal Facilitator

7

8 Defendants were agents of the Employer Defendants; and

9           e.      Whether Defendant EBRPSB's conduct as set forth in the

10 Fourteenth Claim for Relief constituted negligent hiring.

11

12           59.      This action involves all the questions of fact common to

13 the class identified for the Louisiana Teacher Class in ¶ 44, *supra*.

14           60.      The claims of EBR Teacher Subclass asserted in the

15

16 Second, Twelfth and Thirteenth Claims for Relief are typical of the claims of

17 the EBR Teacher Subclass.

18           61.      The EBR Teacher Subclass Representative Plaintiffs

19

20 Nunag-Tañedo, Cruz, and Escuadra will fairly and adequately protect the

21 interests of the EBR Teacher Subclass.

22           62.      Plaintiffs have retained counsel who are experienced in

23

24 handling class action litigation on behalf of immigrant workers like Plaintiffs

25 and other class members, and are prepared to advance costs necessary to

26 litigate this action.

27

28           63.      If certified, Plaintiffs will send individual notices

containing the information required by Rule 23(c)(2)(B) to all members of the subclass by U.S. mail and electronic mail, which is the best notice that is practicable.

### Rule 23(b)(2)

64.   Employer Defendants have acted or refused to act on grounds that apply generally to the EBR Teacher Subclass, so that declaratory relief and final injunctive relief are appropriate with respect to the EBR Teacher Subclass as a whole.   Employer Defendants' actions and inactions include, *inter alia*:   taking steps to further Recruiter Defendants' trafficking scheme; and fraudulently representing to United States governmental agencies that they would comply with the regulations governing the H-1B visa program while at the same time illegally requiring EBR Teacher Subclass members to pay fees and expenses that were the legal obligation of the petitioner for the H-1B visa, not the beneficiary.

65.   The EBR Teacher Subclass seeks to enjoin Employer Defendants from continuing to engage in the unlawful acts described in this Second Amended Complaint.

### Rule 23(b)(3)

66.   Common questions of law and fact relevant to the Second, Twelfth and Thirteenth Claims for Relief, as identified above, predominate over any pertinent questions involving only individual members.   Specifically

and without limitation, as set forth in this Second Amended Complaint, Defendants have engaged in a common course of conduct directed at the entire EBR Teacher Subclass, which has resulted in substantially similar injuries to subclass members.

67.    A class action is superior to other available methods of adjudicating the claims set forth in the Second, Twelfth and Thirteenth Claims for Relief because, *inter alia*:

a.    Common issues of law and fact, as identified in part above, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b.    The EBR Teacher Subclass members are foreign nationals, many of whom are in substantial debt, lack the means and/or resources to secure individual legal assistance, and/or are unaware of their rights to prosecute these claims;

c.    No member of the EBR Teacher Subclass has already commenced litigation to determine the questions presented.    The only litigation bearing on issues raised in this case are:

i.    Baseless lawsuits filed by Defendant Universal against a few EBRPSS Subclass members, which constitute an abuse of legal process in furtherance of Recruiter Defendants' trafficking scheme, as described below; and

ii.    An   administrative   hearing   at   the   Louisiana Workforce   Commission,   which   via   opinion   dated   April   14,   2010 (subsequently affirmed on appeal) concluded that Defendant Universal was not properly licensed under the Louisiana Private Employment Services Law, but did not rule on the validity of the contracts themselves, finding this was outside of its jurisdictional mandate.

d.    A class action can be managed with efficiency and without undue   difficulty   because   Defendants   have   systematically   and   regularly committed the violations complained of herein and have used standardized recruitment, record-keeping, and, with respect to the Employer Defendants, employment practices throughout the time period at issue.

## V.    **STATEMENT OF FACTS**

68.    Plaintiffs and other members of the Louisiana Teacher Class and the EBR Teacher Subclass (collectively, "Class Members") are teachers and Filipino nationals who were trafficked from the Philippines to the United States by Defendants at various times beginning in 2007.

69.    Plaintiffs and other Class Members are or were holders of "H-1B visas," which permit foreign nationals with special skills to work for a specified employer in the United States for a period of up to six years.

70.    Recruiter Defendants operated a trafficking scheme to recruit Plaintiffs and other Class Members from the Philippines for work in

Louisiana public schools. Defendant Lourdes Navarro primarily ran Recruiter Defendants' operations in the United States, while her brother Defendant Villarba primarily ran Recruiter Defendants' operation in the Philippines.

71. Defendant Lourdes Navarro traveled periodically to the Philippines in furtherance of Recruiter Defendants' operations.

72. In 2000, the State of California charged Defendant Lourdes Navarro and Defendant Villarba with health benefits (Medi-Cal) fraud, grand theft, identity theft, money laundering, forged identification and white collar crime. Lourdes Navarro pled *nolo contendere* to the charges that she, with others, willfully defrauded more than $1,000,000 from Medi-Cal, and served time in Orange County Jail for this conviction. A warrant to arrest Villarba was issued, but Villarba fled the jurisdiction and years later the court recalled the warrant and dismissed the action against Villarba.

73. Defendant Lourdes Navarro pled guilty to a charge of money laundering in New Jersey in 2003.

74. EBRPSS and the non-defendant Louisiana School Districts contracted with Recruiter Defendants and Legal Facilitator Defendants to recruit highly skilled teachers from the Philippines, utilizing the H-1B visa process.

75. EBRPSS had hired teachers through the H-1B visa process

in the past, before EBRPSS contracted with Recruiter Defendants and Legal Facilitator Defendants to recruit Plaintiffs and other Class Members.

**A.    Factual Allegations Related to Laws Regulating the Recruitment of Philippine Nationals for Employment within Louisiana**

　　　　1.    Regulations of the Philippine Overseas Employment Administration

76.    In the Philippines, the Philippine Overseas Employment Administration ("POEA"), a government entity, regulates the recruitment of nationals from the Philippines to work abroad.

77.    The POEA requires any person, partnership, or corporation engaged in the recruitment and placement of workers abroad for a fee, which is charged directly or indirectly to the workers or employers or both, to obtain a license from the POEA.

78.    The POEA refers to any person, partnership, or corporation, as defined in ¶ 74, *supra*, as a "Private Employment Agency."

79.    The POEA's rules and regulations state that unless otherwise provided, the employer will be responsible for the payment of the visa fee, airfare, POEA processing fee, and Philippine Overseas Workers Welfare Administration membership fee.

80.    The POEA's rules and regulations prohibit private employment agencies from charging more than one month's salary and documentation costs, including authentication costs, from the workers for

whom the agencies acquire overseas employment.  The POEA's rules and regulations provide that no other charges in whatever form, manner, or purpose shall be imposed on or paid by the worker without prior approval from the POEA.  The POEA has determined that Defendant PARS violated POEA regulations with respect to the practices at issue in this case.

2.    Regulations of the United States Government regarding H-1B Visa Workers

81.    The    Immigration    and    Nationality    Act    ("INA") § 101(a)(15)(H)(i)(b),  8  U.S.C.  § 1101(a)(15)(H)(i)(b),  provides  for  the admission  into  the  United  States  of  certain  temporary  workers.    These workers are referred to as "H-1B workers," and "H-1B" designates the type of visa that the worker receives.  Provisions related to the administration of the H-1B  visa  program  are  found  in  INA  § 214,  8  U.S.C.  § 1184,  8  C.F.R. § 214.2(h) (Department of Homeland Security regulations), and 20 C.F.R. Part 655 (Department of Labor regulations).

82.    The process for obtaining an H-1B visa is controlled by the petitioning employer, not the worker.  The employer must submit a Labor Conditions  Application  (LCA)  to  the  United  States  Department  of  Labor (USDOL).  After the LCA is approved, the employer must submit an "I-129 Petition for a Nonimmigrant Worker" to the United States Citizenship and Immigration  Services  ("USCIS"),  a  component  of  the  United  States Department of Homeland Security.  If USCIS approves the petition, the

35

worker may then appear at a designated U.S. Embassy or Consulate for an interview.  If the worker passes the interview, the worker will be issued an H-1B visa.

83.    As part of the LCA, the petitioning employer must agree to comply with the USDOL regulations found at 20 C.F.R. part 655, Subparts H and I and certify such compliance.  These regulations preclude a sponsoring H-1B employer from recouping its business expenses from the visa beneficiary, specifically barring recoupment of "attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer (e.g., preparation and filing of LCA and H-1B petition)."  20 C.F.R. § 655.731(c)(9)(iii)(C).  Consistent with these regulations, the USDOL specifically states on its website that an H-1B employer "may not require [an H-1B worker] to pay, either directly or indirectly, any part of the petition filing fee; or to pay a financial penalty for leaving employment before a date set in the employment contract; or to pay employer business expenses (such as attorneys fees for preparation and filing of the H-1B Labor Condition Application)."

84.    As part of the I-129 Petition for a Nonimmigrant Worker, the petitioning employer must submit its approved LCA and also fill out a form entitled "I-129 H-1B Data Collection and Filing Fee Exemption Supplement" (hereinafter referred to as the "H-1B Filing Fee form") to

determine the fee the petitioner must pay to file the petition.  The H-1B Filing Fee form provides that, at a minimum, a petitioner must pay a $320 filing fee and a $500 anti-fraud fee.

> 3.   Regulations of the Louisiana Workforce Commission

85.   The Louisiana Workforce Commission administers the Louisiana Private Employment Services Law, La. R.S. 23:101, *et seq.* (hereinafter referred to as "LPES").

86.   The LPES provides that any person, company, corporation, or partnership must be licensed by the Louisiana Workforce Commission before it may operate, solicit, or advertise as an employment service within Louisiana.

87.   The LPES provides that any contract between an employment service and an applicant or candidate must first be approved by the Louisiana Workforce Commission.

88.   The LPES provides that any fees charged by an employment service must be based on a schedule of fees as applied to the applicant's projected first year's gross earnings.

89.   Regulations implementing the LPES provide that an employment service may not charge or receive a fee from an applicant prior to the actual commencement of work on a job procured by the employment service.

Second Amended Complaint

**B.    Factual Allegations Related to the Trafficking Scheme**

1.    Trafficking Step 1:  Employer Defendants, Recruiter Defendants, and Legal Facilitator Defendants Agree to a Joint Venture to Recruit Teachers from the Philippines to Teach in Louisiana

90.    Beginning in 2006, Recruiter Defendants advertised their services and the services of Legal Facilitator Defendants to school districts throughout the United States, including Employer Defendants and non-defendant Louisiana School Districts.   Recruiter Defendants represented themselves as specializing in the recruitment of highly qualified teachers from the Philippines, and placement of these teachers within school districts in the United States.   Recruiter Defendants also claimed to specialize in teachers of special education, math, and science.

91.    At all relevant times, Recruiter Defendants were operating as an "employment service" within Louisiana as that term is defined by Section 23:101 of the Louisiana Revised Statutes.

92.    At no time did any Recruiter Defendant become licensed as an employment service, as required by Section 23:104 of the Louisiana Revised Statutes.

93.    Recruiter Defendants informed Employer Defendants that although the school districts would pay the salaries of any teachers they hired, Employer Defendants would not be required to pay any fees for Recruiter Defendants' or Legal Facilitator Defendants' services.  Upon information and

38

belief, Recruiter Defendants made similar representations to the non-defendant Louisiana School Districts, with the exception of the Recovery School District, which paid some fees to Recruiter Defendants. However, the money paid by the Recovery School District was targeted to serve as an incentive to teacher-employees to work in the Recovery School District after Hurricane Katrina; Louisiana Teacher Class members working at Recovery School District did not receive this incentive money, and were told that some of it was used to pay Recruiter Defendants instead.

94.     Employer Defendants and the non-defendant Louisiana School Districts faced serious teacher shortages and agreed to utilize the services offered by Recruiter Defendants and Legal Facilitator Defendants to recruit and place teachers within their school districts. Pursuant to this joint venture, Employer Defendants and the non-defendant Louisiana School Districts were to receive, and did knowingly receive, numerous benefits including:

a.     The benefit of having capable and experienced teachers recruited from the Philippines to meet the teacher shortages faced by the school districts;

b.     The benefit of having Recruiter Defendants and Legal Facilitator Defendants navigate the H-1B visa process; and

c.     The benefit of not being required to pay for any of the fees

39

and expenses related to the H-1B visa process or to pay for the procurement of Filipino teachers with H-1B visas.

2.      Trafficking Step 2:  Employer Defendants Interview Plaintiffs and the Class Members

95.      Plaintiffs and other Class Members are teachers, and were recruited because they were experienced teachers.

96.      Plaintiffs and other Class Members learned of the opportunity to teach in the United States through advertisements by Recruiter Defendants placed in Philippine newspapers, and/or through word of mouth.

97.      Plaintiffs and other Class Members presented themselves to Recruiter Defendants to be interviewed for possible teaching positions with Employer Defendants and non-defendant Louisiana School Districts.

98.      Representatives of Employer Defendants, including Defendant Duran Swinford, interviewed EBR Teacher Plaintiffs and EBR Teacher Subclass members in person in the Philippines or by teleconference and/or videoconference.

99.      Representatives of the non-defendant Louisiana School Districts interviewed non-EBR Teacher Plaintiffs and Louisiana Teacher Class members in person in the Philippines or by teleconference and/or videoconference.

100.      Recruiter Defendants paid or reimbursed all expenses incurred by Employer Defendants and the non-defendant Louisiana School

40

Districts in interviewing Plaintiffs and other Class Members, including airline
tickets, hotel accommodations, and a *per diem* for those who traveled to the
Philippines.

        3.     <u>Trafficking Step 3:   Recruiter Defendants Charge First
Recruitment Fee, but Hide from Class Members an
Undisclosed Second Recruitment Fee</u>

     101.   Shortly   after   the   interviews,   Recruiter   Defendants
informed Plaintiffs and other Class Members that they had been selected to
teach in the United States.  Recruiter Defendants then told Plaintiffs and other
Class Members about some, but not all, of the next steps in the recruitment
process.   In particular, Recruiter Defendants only disclosed that Class
Members would need to collect and submit certain documents in support of
their H-1B visa application, and that Class Members would have to pay a
recruitment fee (hereinafter referred to as the "First Recruitment Fee").
Recruiter Defendants made this partial disclosure for the purpose of
concealing the whole truth about the fees to which Plaintiffs and other Class
Members would ultimately be subjected.

     102.   The First Recruitment Fee typically totaled between
$5,000 to $5,500 per Class Member.  The First Recruitment Fee consisted of
three parts.

     103.   Recruiter Defendants claimed that part of the First
Recruitment Fee was for visa processing (hereinafter referred to as the "Visa

41

Processing Fee"). The Visa Processing Fee typically totaled from $3,920 to $4,000, and included a "petition filing" fee of $320, an "anti-fraud" fee of $500, a "premium processing" fee of $1,000, a "mailing" fee of between $100 and $180, and a "legal services" fee of $2,000.

104. Recruiter Defendants claimed that part of the First Recruitment Fee was for an evaluation of the Class Member's Filipino teaching credentials (hereinafter referred to as the "Credentials Evaluation Fee"). An evaluation of foreign teaching credentials is necessary to obtain the teaching license necessary to teach in a Louisiana public school. The Credential Evaluation Fees typically ranged from $570 to $725.

105. The First Recruitment Fee included an agency fee (the "Agency Fee") that was typically $1,000, though approximately twenty class members were permitted to pay a lesser amount.

106. Recruiter Defendants threatened Plaintiffs and other Class Members that if they did not pay the First Recruitment Fee, they would be replaced by other applicants.

107. For Plaintiffs and other Class Members, who were working as teachers in the Philippines, the First Recruitment Fee of $5,000 to $5,500 was very high. According to data from the National Statistics Office of the Republic of the Philippines for 2006, which is the latest year that data is available, $5,000 to $5,500 represents more than one-and-a-half times the

42

average annual household income in the Philippines.[3]

108.   Plaintiffs and other Class Members had to take out loans from family, friends, banking institutions, and/or private lenders to pay the First Recruitment Fee.  Some Plaintiffs and other Class Members also needed to liquidate assets to pay the First Recruitment Fee.

109.   Plaintiffs and other Class Members delivered the First Recruitment Fee to the office of Defendant PARS in the Philippines. Plaintiffs and other Class Members were required to pay the First Recruitment Fee in cash.  PARS usually issued hand-written receipts that identified the recipient as Defendant Universal.

110.   At this stage in the trafficking process, Recruiter Defendants fraudulently did not disclose to Plaintiffs and other Class Members that they would be required to pay a second and much larger recruitment fee before they would be permitted to leave for the United States, as described in ¶¶ 123-139, *infra*.

111.   Recruiter Defendants also fraudulently did not disclose to Plaintiffs and other Class Members that money they were being required to pay as part of the First Recruitment Fee was for fees and expenses that were

_____

[3]  Average household income in 2006 was 173,000 Philippine Pesos. *See* National Statistics Office, Philippines, Official Web Site, *available at* http:// www.census.gov.ph.  On January 1, 2006, the average interbank exchange rate was 1 Philippine Peso to 0.01882 U.S. Dollars.  At that rate, $5,500 is equivalent to 292,242 Philippine Pesos.

actually the responsibility of the petitioning employers pursuant to regulations governing the H-1B visa program.

112.   Plaintiffs and other Class Members reasonably relied on Recruiter Defendants' fraudulent representations and omissions and reasonably assumed that the First Recruitment Fee they had paid, totaling approximately $5,000 to $5,500, would be all or nearly all that they would be charged.   Plaintiffs and other Class Members based this reasonable assumption on several grounds, including, in some cases, public information available on the website of the POEA, which states that the maximum fee that may be charged is the equivalent of one month's salary, and the common knowledge in the Philippines about how the foreign worker recruitment process typically operated there.

113.   Upon information and belief, after Plaintiffs and other Class Members paid the First Recruitment Fee, Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts arranged to send documents from the United States, through electronic mail or facsimile, for Plaintiffs and other Class Members to execute.   These documents included a job offer from Employer Defendants or from the non-defendant Louisiana School Districts.   The job offers were signed by Plaintiffs and other Class Members in the Philippines, and by Employer Defendants or the non-defendant Louisiana School Districts

44

in the United States.

114.  After Plaintiffs and other Class Members paid the First Recruitment Fee, Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts prepared and arranged to be sent, and did send, the LCAs for the Plaintiffs and other Class Members to the USDOL by electronic mail.  Those LCAs fraudulently represented to the United States government that the Employer Defendants and the non-defendant Louisiana School Districts would comply with the regulations governing the H-1B program, when Employer Defendants and the non-defendant Louisiana School Districts knew certain fees and expenses that they as the petitioners were legally obligated to pay were actually being paid by the Plaintiffs and other Class Members.

115.  After Plaintiffs and other Class Members paid the First Recruitment Fee, Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts prepared and arranged to be sent, and did send, the I-129 applications for the Plaintiffs and other Class Members to the USCIS by regular and/or express mail, including the fraudulent LCAs approved by the USDOL.

4.     Trafficking Step 4:     Recruiter Defendants Seize and Control Documents

116.  After Plaintiffs and other Class Members received their job offers, Recruiter Defendants informed them that their petitions for an H-

45

1B visa had been preliminarily approved, and that the Plaintiffs and other Class Members would need to be interviewed at the U.S. Embassy to obtain their H-1B visas.

117.   Recruiter Defendants arranged Plaintiffs' and other Class Members' interview schedules at the U.S. Embassy in Manila and charged Plaintiffs and other Class Members additional fees for arranging the interviews.

118.   Recruiter Defendants required Plaintiffs and other Class Members to attend a meeting conducted by Defendant Villarba before their interviews at the U.S. Embassy.   In these sessions, Villarba instructed the Plaintiffs and other Class Members that if they were asked how the fees and costs for the visas had been paid, they were to say they paid for the certification of their school transcripts only, and they were not to say they paid any other fees.  Villarba told Plaintiffs and other Class Members that if the U.S. Embassy learned they had paid any additional fees, the Embassy would not issue their visas, and Plaintiffs and other Class Members would forfeit all the money they had already paid.  Upon information and belief, Plaintiffs and other Class Members were not in fact asked about the payment of fees during their U.S. Embassy interviews.

119.   It is standard practice for a H-1B visa applicants to bring their passport with them to an Embassy interview, and if the interview is

successful, to leave their passport at the Embassy with instructions for delivery after the H-1B visa has been inserted into the passport.

120.   Recruiter Defendants required Plaintiffs and other Class Members to instruct the U.S. Embassy to have their passports delivered directly to Recruiter Defendants' office in the Philippines rather than to Plaintiffs' and other Class Members' home addresses.

121.   Plaintiffs' and other Class Members' visas were approved, and their visas and passports were sent directly to Recruiter Defendants' office in the Philippines.

122.   Recruiter Defendants retained possession of Plaintiffs' and other Class Members' passports and refused to return them to Plaintiffs and other Class Members.   Recruiter Defendants stated that Plaintiffs and other Class Members would receive their passports back only after they paid all fees imposed and Recruiter Defendants were ready for Plaintiffs and other Class Members to fly to the United States.

5.   <u>Trafficking Step 5:   Recruiter Defendants Announce Previously Undisclosed Second Recruitment Fee (Three Months of Salary to be Earned in United States) and Charge for Airfare</u>

123.   After Plaintiffs and other Class Members had already paid the non-refundable First Recruitment Fee of between $5,000 to $5,500 in cash, which was well in excess of a year's wages in the Philippines, Recruiter Defendants told Plaintiffs and other Class Members for the first time that they

47

would have to pay a second and much larger recruitment fee (the "Undisclosed Second Recruitment Fee"), as well as the cost of their airfare to the United States.

124.    Recruiter Defendants explained, orally and through documents that they required Plaintiffs and other Class Members to sign, that the Undisclosed Second Recruitment Fee would be an amount equal to three months of Plaintiffs' and other Class Members' expected United States salary.

125.    Recruiter Defendants explained that Plaintiffs and other Class Members would be required to pay a fee equal to two months of their expected United States salaries before the Recruiter Defendants would return their visas and passports, and before they would be permitted to depart for the United States.   The remaining fee, equal to an additional month's salary, would be collected later, after Plaintiffs and other Class Members had been in the United States for one year (the "Year 2 Placement Fee").

126.    Recruiter Defendants informed Plaintiffs and other Class Members what their monthly salaries would be, based on a salary schedule that Recruiter Defendants claimed was in effect at the schools where Plaintiffs and other Class Members would be teaching.   However, the salary stated by Recruiter Defendants was often inaccurate, and was often higher than the salaries Plaintiffs and other Class Members would actually earn, resulting in many Plaintiffs and other Class Members paying up-front fees equivalent to

1   even more than two months' of their expected salaries.

2       127.   Teachers at EBRPSS and the non-defendant Louisiana

3
4   School Districts typically work ten months per year, and their annual salaries

5   are typically paid over the course of ten months.  The Undisclosed Second

6   Recruitment Fee was based on a ten-month salary system.  Accordingly, the

7
8   Undisclosed Second Recruitment Fee represented a full 30 percent of the

9   expected annual income of Plaintiffs and other Class Members—20 percent

10  payable before a teacher left the Philippines and the remaining 10 percent

11
12  payable after the teacher had been in the United States for one year.

13      128.   According to Recruiter Defendants' records, Plaintiffs and

14
15  other Class Members were required to pay from $6,300 to $12,000 to cover

16  the 20 percent fee due before departing the Philippines.  The average charge

17  was $9,238 and the median charge was $9,400.

18      129.   Recruiter Defendants also told Plaintiffs and other Class

19
20  Members that although PARS would purchase their plane tickets for them,

21  Plaintiffs and other Class Members would have to reimburse PARS.

22
23  Plaintiffs and other Class Members were told by Recruiter Defendants that

24  they could not purchase their own tickets.

25      130.   The ticket prices charged by Recruiter Defendants

26
27  typically averaged between $800 and $1,200 for a one-way ticket.

28      131.   Plaintiffs and other Class Members could have obtained

tickets at lower prices than those charged by Recruiter Defendants.

132. The Recruiter Defendants told Plaintiffs and other Class Members that if they did not pay the two-month fee and cost of the plane ticket up front, they would forfeit the substantial sums they had already paid, they would not be permitted to travel to the United States, and they would not be given their visas.

133. Plaintiffs and other Class Members were surprised by these new and exorbitant fees, which were in addition to the substantial fees they had already paid. However, they felt powerless to do anything other than conform to Recruiter Defendants' demands because they did not have control over their passports, and if they did not come to work in the United States, they would suffer severe financial harm because of the overwhelming debt they had already accumulated.

134. Plaintiffs and other Class Members had no personal funds or assets to cover the Undisclosed Second Recruitment Fee and the cost of the plane ticket, and almost all Plaintiffs and other Class Members lacked other personal or community resources on which to draw to satisfy these new charges.

135. Recruiter Defendants anticipated that Plaintiffs and other Class Members likely lacked the resources to cover the Undisclosed Second Recruitment Fee and referred Plaintiffs and other Class Members to private

lending businesses where the Plaintiffs and other Class Members could borrow the outstanding balance.  The private lenders identified by Recruiter Defendants included FG Financial Company, Inc., and AG Finance, Inc.

136.  FG Financial and AG Finance charged usurious and exploitative interest rates of between 3 percent and 5 percent per month. Upon information and belief, these interest rates compounded monthly, and therefore equated to an annual interest rate of 43 percent to 80 percent per year.

137.  Upon information and belief, Recruiter Defendants received compensation from private lenders for referring Plaintiffs and other Class Members to them.

138.  Recruiter Defendants gave hand-written receipts to Plaintiffs and other Class Members for the portion of the Undisclosed Second Recruitment Fee paid in the Philippines, showing that half of the fee (one month's salary) was received by Defendant PARS, and half of the fee (another month's salary) was received by Defendant Universal.

139.  According to Recruiter Defendants' records, each Plaintiff and other Class Member paid Recruiter Defendants aggregate fees, on average, of approximately $16,000 before he or she left the Philippines.

6.  <u>Trafficking Step 6:  Recruiter Defendants Require Signature of Illegal Contracts in the Philippines</u>

140.  Recruiter Defendants required Plaintiffs and other Class

51

Members to sign contracts in the Philippines before they departed for the United States.

141.   Upon information and belief, the contracts were signed after Recruiter Defendants, Employer Defendants, the non-defendant Louisiana School Districts, and Plaintiffs and other Class Members had completed all or substantially all of the work necessary to obtain H-1B visas.

142.   Plaintiffs and other Class Members were required to sign a contract in the Philippines on Defendant PARS's letterhead (the "PARS Contract").

143.   The Louisiana Workforce Commission did not pre-approve the PARS Contract, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and the POEA did not pre-approve the fees contemplated in the PARS Contract.

144.   The PARS Contract specified that the teacher must:

    a.    make an up front payment to PARS equal to one month's promised salary;

    b.    pay a legal fee for an immigration attorney; and

    c.    pay a visa processing fee.

145.   Plaintiffs and other Class Members were denied copies of the PARS Contract, even though several asked for a copy of the contract.

146.   Some Plaintiffs and some other Class Members were

required to sign a contract with Universal in the Philippines on Defendant Universal's letterhead (the "Universal Philippine Contract").

147.   The Louisiana Workforce Commission did not pre-approve the Universal Philippine Contract, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and the POEA did not pre-approve the fees contemplated in the Universal Philippine Contract.

148.   The Universal Philippine Contract specified that Plaintiffs and other Class Members would pay ten percent of their gross monthly income for twenty-four months to Defendant Universal, in addition to all the other fees demanded by the Recruiter Defendants.

149.   Plaintiffs and other Class Members were denied copies of the Universal Philippine Contract, even though several asked for a copy of the contract.

150.   Plaintiffs and other Class Members were rushed into signing the PARS Contract and the Universal Philippine Contract. Plaintiffs and other Class Members did not have an opportunity to review the PARS Contract or the Universal Philippine Contract before signing them.

151.   Given Plaintiffs' and other Class Members' enormous debt and severe financial exposure, they reasonably believed they had no choice but to sign the contracts and travel to the United States to work in order to repay the substantial financial obligations to which they had been subjected.

7.     <u>Trafficking Step 7:  Recruiter Defendants Direct Plaintiffs
and other Class Members to California, Compel
Signatures on Illegal Contracts in California, and Control
Documents</u>

152.    The plane tickets arranged by Recruiter Defendants required Plaintiffs and other Class Members to fly to the Los Angeles International Airport, where they were required to meet with Recruiter Defendants' representatives in California: Defendant Lourdes Navarro, and/or other agents of Defendant Universal.

153.    Recruiter Defendants took Plaintiffs and other Class Members to Recruiter Defendants' office in California, confiscated their passports and visas, and forced them to sign another contract (hereinafter referred to as the "Universal California Contract").

154.    The Louisiana Workforce Commission did not pre-approve the Universal California Contract, as required by Section 23:111(B)(3) of the Louisiana Revised Statutes, and the POEA did not pre-approve the fees contemplated in the Universal California Contract.

155.    The Universal California Contract provided that Plaintiffs and other Class Members would pay ten percent of their gross monthly income for twenty-four months to Defendant Universal.

156.    Plaintiffs and other Class Members were rushed in reading the Universal California Contract.  Some Plaintiffs and other Class Members questioned the terms of the contract when they were at Universal's office in

54

California.   Recruiter Defendants or their representatives threatened that Plaintiffs and other Class Members would be immediately sent back to the Philippines if they did not sign the contract as written.

157.   Plaintiffs and other Class Members signed the Universal California Contract because they reasonably believed they had no choice but to sign the contracts to be able to work in the United States, which was the only way they could possibly repay the enormous debt they had incurred as a result of Recruiter Defendants' scheme.

8.     Trafficking Step 8:  Recruiter Defendants Dictate Housing Arrangements

158.   While in California, Plaintiffs and other Class Members were informed that Recruiter Defendants had arranged for their housing in Louisiana.   Plaintiffs and other Class Members were neither permitted to arrange for their own housing, nor even to select their roommates and housemates.

159.   While still in California, Plaintiffs and other Class Members were required to pay an initial fee for their housing in Louisiana. Plaintiffs and other Class Members each paid approximately $300 to Defendant Universal and/or Defendant Lourdes Navarro.

160.   Recruiter Defendants executed the leases for the housing provided to the Plaintiffs and other Class Members.

161.   Upon information and belief, the housing that the

Recruiter Defendants mandated for the EBR Teacher Subclass was not safe. For example, there were numerous burglaries at the mandated apartment complex in East Baton Rouge.

162. Upon information and belief, the leases executed by Recruiter Defendants charged rents above the market rate, and Recruiter Defendants received a portion of the rent paid each month by Plaintiffs and other Class Members.

163. When Plaintiffs and other Class Members complained to Recruiter Defendants regarding the price, quality, and/or safety of the housing, Recruiter Defendants told them they could not leave the housing. Upon information and belief, Recruiter Defendants required Class Members to reside in such housing to isolate them from the broader Filipino community and thus to enhance their ability to control Class Members.

164. One Class Member, Jave Pajuelas, approached his principal, Sherry Brock of the Westdale Middle School, to seek assistance in obtaining alternate housing that would be closer to the school where he was teaching. Principal Brock informed him that she could not help him find alternative housing because it would upset and anger Defendant Lourdes Navarro. Mr. Pajuelas informed some of the other Class Members of this conversation, and those individuals reasonably understood that if they tried to leave the housing Lourdes Navarro had selected, they would face possible

punishment by Lourdes Navarro.

### 9. Trafficking Step 9: Visa Renewal Process

165. H-1B visas are typically issued for three years, even if there is no guarantee that the job will last for the full three years.

166. Recruiter Defendants, Legal Facilitator Defendants, Employer Defendants, and the non-defendant Louisiana School Districts knew that H-1B visas may be obtained for a three-year period.

167. Employer Defendants have secured H-1B visas for foreign-national teachers who are not members of the Louisiana Teacher Class. Some, if not all, of those teachers received three-year H-1B visas.

168. Recruiter Defendants arranged for Legal Facilitator Defendants to handle obtaining and, in some cases, renewing H-1B visas for Plaintiffs and other Class Members. Legal Facilitator Defendants, in conjunction with Recruiter Defendants, Employer Defendants, and non-defendant Louisiana School Districts, secured one-year visas for Plaintiffs and other Class Members instead of three-year visas.

169. Upon information and belief, Defendants obtained one-year visas to enhance their ability to control Plaintiffs and other Class Members. Recruiter Defendants could continually threaten non-renewal and forced departure if Plaintiffs and other Class Members did not conform to their demands.

170.   Legal Facilitator Defendants and Recruiter Defendants charged excessive fees for H-1B visa renewals.

10.   Trafficking Step 10:   Ongoing Methods of Intimidation and Manipulation by Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants

171.   Defendant Lourdes Navarro threatened abuse of legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening that she could have teachers deported:

a.   In November 2007, Plaintiff Mari and other Class Members working at the Recovery School District complained to Defendant Lourdes Navarro that the housing she had arranged for them was too expensive, and that they were going to move out.  Lourdes Navarro became very upset to hear this, and told Plaintiff Mari and other Class Members they could not move out, and warned that she could have them sent back to the Philippines if they did.

b.   On or about August 28, 2008, Defendant Lourdes Navarro threatened teachers, including Plaintiff Mairi Nunag-Tañedo, that the teachers could be sent back to the Philippines if they did not obey her instructions.

c.   On or about October 8, 2008, Defendant Lourdes Navarro warned Plaintiff Pascual that he could not bring his family to the United States with him, even though he was permitted to do so under the H-1B visa program, and that if he did try to bring his family with him she could have

him sent back to the Philippines;

       d.    On or about June 10, 2009, EBR Teacher Subclass member Araceli Garcia complained to a reporter at a Baton Rouge television station about abuses she suffered at the hands of Recruiter Defendants. Defendant Lourdes Navarro was outraged, and with the help of a teacher in Baton Rouge, Rafaela Flores, arranged a conference call with Garcia and approximately sixteen other EBR Teacher Subclass members.  The call lasted approximately four hours, and Lourdes Navarro repeatedly threatened to retaliate against Garcia, and that she would have Garcia deported.

       e.    Upon information and belief, Defendant Lourdes Navarro made these threats of deportation in an effort to intimidate and control Class Members.

       172.   Defendant Lourdes Navarro threatened abuse of legal process and abused legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening to sue, and suing, Class Members who voiced criticisms about Recruiter Defendants' trafficking scheme:

       a.    In 2008, individuals voiced complaints about Defendants on a blog named "Pinoy Teachers Hub."  In retaliation against the bloggers, Defendant Lourdes Navarro and Defendant Universal, with the assistance of the Legal Facilitator Defendants, filed suit in California against teachers

whom they believed authored the blog, including Plaintiff Ingrid Cruz and Class Member Janet Añober.  The California Court of Appeals dismissed the claims against Cruz in *Navarro v. Cruz*, No. B216885 (Cal. Ct. App., June 2, 2010), pursuant to California's anti-SLAPP law.  The anti-SLAPP law is designed to quickly dispose of baseless litigation filed to dissuade or punish exercise of the constitutional rights of free speech and petition for the redress of grievances.

      b.    In approximately late May or early June 2009, Defendant Lourdes Navarro held a meeting with Class Members working at the Caddo Public School District, including Plaintiff Pascual.  During that meeting Lourdes Navarro threatened that if teachers in Caddo started speaking out against her, they would be "punished" like the teachers in Baton Rouge; Pascual and others understood Lourdes Navarro to mean that she would sue them as she had sued Cruz and Añober.

      c.    Upon information and belief, Recruiter Defendants and Legal Facilitator Defendants lacked any legal or factual basis for the lawsuits related to the Pinoy Teachers Hub blog and filed the lawsuits in an effort to intimidate teachers who were voicing opposition to Recruiter Defendants.

      173.  Defendant Lourdes Navarro threatened abuse of legal process and abused legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening to sue, and

suing, Class Members who refused to pay the Year 2 Placement Fee:

a.     Defendant Universal filed baseless lawsuits based on the illegal contracts against, *inter alia*, Plaintiff Ingrid Cruz and Class Members Janet Añober and Melissa Idong.  Universal also sued Plaintiff Tomasa Mari and Class Member Margaret Aguirre, who teach in the Recovery School District.

b.     In late January or early February 2009, Defendant Lourdes Navarro conducted a meeting in Baton Rouge with many Class Members, including Plaintiff Escuadra.  During that meeting, Lourdes Navarro warned teachers that if they defied her, or if they refused to pay the Year 2 Placement Fee or otherwise refuse to follow the written terms of the illegal Universal California Contract, she would sue them.  Lourdes Navarro represented that she had already successfully sued another teacher.

c.     Upon information and belief, Recruiter Defendants selectively sued teachers to intimidate other teachers into complying with Recruiter Defendants' demands.

174.  Defendant Lourdes Navarro threatened abuse of legal process in an effort to intimidate and control Plaintiffs and other Class Members by, *inter alia*, threatening that she could arrange to have Class Members' visas expire without renewal, and/or to have Class Members' employment terminated:

a.      In August 2008, at a meeting in Baton Rouge between Defendant Lourdes Navarro and various Class Members, Plaintiff Escuadra asked for a refund, based on the fact that the annual salary promised by Recruiter Defendants was higher than what she (and other Class Members) was being paid by EBRPSS.  Lourdes Navarro became furious, and told Escuadra that she might not have a job the next year.

b.      During several phone conversations between Defendant Lourdes Navarro and Plaintiff Nunag-Tañedo in the Fall of 2008 regarding problems with Nunag-Tañedo's housing, Lourdes Navarro told her to stop complaining about housing issues, and questioned whether Nunag-Tañedo would get a job the next year.

175.   Defendant Lourdes Navarro threatened Class Members that if they did not pay the Year 2 Placement Fee, she would refuse to provide their renewed visas.  Lourdes Navarro made this threat on or about September 11, 2009, to several teachers at the Jefferson Parish Public School System.  However, when the Jefferson Parish Public School System insisted that Lourdes Navarro deliver the teachers' visa renewal documents, she relented.

176.   Recruiter Defendants attempted to isolate Plaintiffs and other Class Members as much as possible, in an effort to manipulate and control Plaintiffs and other Class Members.

a.      Recruiter Defendants repeatedly warned Plaintiffs and

62

other Class Members not to associate with the surrounding Filipino community.    Such warnings were given before Plaintiffs and other Class Members left the Philippines, when Plaintiffs and other Class Members were in California, and when Plaintiffs and other Class Members were in Louisiana.

        b.     On or about July 22, 2008, Employer Defendants invited Class Members and members of the Filipino American Association of Greater Baton Rouge ("FAAGBR") to a recruiting event in Baton Rouge.    At that event, Defendant Lourdes Navarro told the President of FAAGBR to stay away from Plaintiffs and other Class Members, and not to associate with them.    Lourdes Navarro warned that she would sue members of FAAGBR if they interacted with Plaintiffs and other Class Members.    Lourdes Navarro made these and similar threats in the presence of Defendant Duran Swinford and other EBRPSS agents.

        c.     Recruiter Defendants told Plaintiffs and other Class Members that they were not permitted to bring their families with them to the United States, even though immigration law permits family members to accompany H-1B visa holders.    Upon information and belief, Recruiter Defendants did this in an effort to further isolate Plaintiffs and other Class Members in the United States.

        d.     Recruiter Defendants required Class Members to reside in

housing selected by Recruiter Defendants in order to isolate them from the broader Filipino community.

**C. Factual Allegations that Recruiter Defendants Used the U.S. Mails and Wires in Furtherance of the Fraudulent Trafficking Scheme**

177. Recruiter Defendants made their fraudulent statements to Plaintiffs and other Class Members in the Philippines, as described in paragraphs 101-112, but they and their agents repeatedly used the U.S. mails and wires in executing and attempting to execute their fraudulent scheme. Such uses of the U.S. mails and wires were in furtherance of and/or incident to essential parts of the scheme.

178. Recruiter Defendants' uses of the U.S. mails and wires to further their fraudulent scheme included, *inter alia*:

a. Repeated phone calls and email transmissions to Employer Defendants and the non-defendant Louisiana School Districts. These communications were in furtherance of the fraudulent scheme because Recruiter Defendants would not have been able to carry out their fraud and extract fraudulent and extortionate fees without the participation of the school districts that sponsored the teachers' visa applications and hired them to work in Louisiana public schools;

b. Mail and wire transmissions to Plaintiffs and other Class Members demanding payment of the Year 2 Placement Fee. These

64

communications were in furtherance of the fraudulent scheme because Recruiter Defendants fraudulently misrepresented the amount of fees to which the teachers would be subjected as described in paragraphs 101-112 above, and failed to disclose that the teachers would be required to pay the Undisclosed Second Recruitment Fee, including the Year 2 Placement Fee, until the teachers were already ensnared in Recruiter Defendants' scheme. The mail and wire communications demanding payment of the Year 2 Placement Fee constituted an effort to collect such amounts procured through fraud and thus were directly in furtherance of the fraud;

c.    Phone calls and letters to Plaintiffs and other Class Members threatening retaliation for resisting Recruiter Defendants' fee demands, and/or retaliation for complaining about the mistreatment to which the teachers were subjected; and

d.    Communications to the Louisiana School Districts in an effort to ensure that only one-year visas would be issued to Plaintiffs and other Class Members.  The issuance of one-year rather than the typical three-year visas was critical to the fraudulent scheme because it allowed Universal and Lourdes Navarro to credibly threaten the teachers with non-renewal of their visas and subsequent deportation if the teachers refused to pay the fraudulent Year 2 Placement Fee.

179.    Defendants Lourdes Navarro and Universal, directly or

65

through their agents, made, *inter alia*, the following specific communications through the U.S. mails or wires in furtherance of Recruiter Defendants' fraudulent scheme:

   a. On October 24, 2006, Defendant Lourdes Navarro faxed a letter to Daphne Donaldson, an agent of EBRPSS, offering Defendant Universal's services to recruit "highly qualified fully credentialed teachers" at no charge to EBRPSS.

   b. Defendants Universal and Lourdes Navarro, and their agents, made numerous mail and wire transmissions to Plaintiffs and other Class Members demanding payment of the fraudulently-procured Year 2 Placement Fee, including —

- Universal bills dated October 1, 2009, March 1, 2010, and April 1, 2010, sent by mail to Plaintiff Escuadra, demanding payment of the Year 2 Placement Fee.

- Letter dated February 26, 2010, sent by mail from Breazeale, Sachse & Wilson, LLP, a law firm retained by Defendant Universal, to Plaintiff Escuadra demanding payment of the Year 2 Placement Fee.

- Universal bill dated December 16, 2009, sent by mail to Plaintiff Mari, demanding payment of the Year 2 Placement Fee.

- Letter dated February 26, 2010, sent by mail from Breazeale, Sachse & Wilson, LLP, a law firm retained by Defendant Universal, to Plaintiff Mari demanding payment of the Year 2 Placement Fee.

- Universal bill dated November 17, 2008, sent by mail to Plaintiff Cruz, demanding payment of the Year 2 Placement Fee.

- Letter dated January 13, 2009, sent by mail from Universal to Class Member Margaret Aguirre demanding payment of the Year 2 Placement Fee.

- Letters dated March 12, 2009, March 31, 2009, April 3, 2009, April 28, 2009, and May 20, 2009, sent by mail from Universal to Class Member Janet Añober, demanding payment of the Year 2 Placement Fee.

- Letter dated July 7, 2009, sent by mail from Universal to Class Member Bernard Pagusara, demanding payment of the Year 2 Placement Fee.

- Letter dated July 9, 2009, sent by mail from Universal to Class Member Antonio Limjoco, demanding payment of the Year 2 Placement Fee.

- Letter dated February 26, 2010, sent by mail from Breazeale, Sachse & Wilson, LLP, a law firm retained by Universal, to Class Member Natividad Seribo, demanding payment of the Year 2 Placement Fee.

- Letter dated March 23, 2010, sent by mail from Breazeale, Sachse & Wilson LLP to Class Member Jemma Manuel, demanding payment of the Year 2 Placement Fee.

c.     During a telephone call on or about August 28, 2008, Defendant Lourdes Navarro threatened Plaintiff Nunag-Tañedo and other Class Members that they could be sent back to the Philippines if they did not follow Navarro's demands.

d.     During a phone call lasting almost four hours on June 10, 2009, Defendant Lourdes Navarro repeatedly threatened deportation and other retaliation against EBR Teacher Subclass member Araceli Garcia and

67

approximately sixteen other EBR Teacher Subclass members, based on Garcia's statements to a reporter complaining about the mistreatment to which he and other teachers were subjected by Recruiter Defendants.

e.     By email dated April 9, 2009, Defendant Lourdes Navarro complained to Defendant Duran Swinford that EBRPSS was obtaining three-year visa renewals for a small number of teachers, instead of the one-year visas that Legal Facilitator Defendants and Recruiter Defendants sought. Navarro complained, "You know I have been having problems with those teachers already and this will create a lot of problems with teachers renewing with us." Navarro wanted EBRPSS to obtain only one-year rather than three-year visas so that Recruiter Defendants could more readily collect the fraudulent Year 2 Placement Fee and otherwise control the teachers by threatening non-renewal of their visas and subsequent deportation.

f.     During a telephone call on or about September 11, 2009, Defendant Lourdes Navarro threatened Class Members Charmy Casteñeda, Richard Santiago and others that their visas would not be renewed if they did not pay the fraudulent Year 2 Placement Fee.

g.     On January 24, 2008, Defendant Lourdes Navarro emailed EBRPSS agent Daphne Donaldson, asking EBRPSS to pursue cancellation of a visa issued to Genna Balneg, a teacher applicant in the Philippines who refused to pay the fraudulent fees demanded by Recruiter Defendants. This

wire transmission was in furtherance of Recruiter Defendants' fraudulent scheme because it constituted an effort to retaliate against a Filipino teacher who refused to pay Recruiter Defendants' fraudulent fees, and intimidate other teachers into paying such fees.

D.   **Factual Allegations that Legal Facilitator Defendants Facilitated the Illegal Trafficking Scheme**

180.   Legal Facilitator Defendants actively facilitated Recruiter Defendants' trafficking scheme.

181.   At all times relevant to this Second Amended Complaint, Recruiter Defendants acted as agents for Legal Facilitator Defendants.

182.   Recruiter Defendants engaged in a scheme to exploit Plaintiffs and other Class Members by promising them an opportunity to teach in the United States without disclosing the exorbitant fees that would be charged until the Plaintiffs and other Class Members were so far in debt they had no choice but to continue, and by failing to disclose that some of the fees Plaintiffs and other Class Members were required to pay were actually the legal responsibility of their petitioning employers.   Legal Facilitator Defendants actively facilitated this scheme and knew that certain fees were being paid by Plaintiffs and other Class Members instead of their petitioning employers.

183.   Legal Facilitator Defendants were fully aware of and involved in the recruitment scheme.   Their roles in this scheme included, at a

69

minimum, the following:

a.   Legal Facilitator Defendants entered into an attorney-client relationship with Plaintiffs and other Class Members. Specifically, Legal Facilitator Defendants submitted G-28 Notice of Entry of Appearance forms with each H-1B visa petition stating that Legal Facilitator Defendants represented both the Plaintiffs and other Class Members, and the petitioning school districts;

b.   Plaintiffs and other Class Members were the only parties to pay fees to Legal Facilitator Defendants for the purported purpose of the Legal Facilitator Defendants' legal work procuring their H-1B visas;

c.   Legal Facilitator Defendants conspired with Recruiter Defendants, Employer Defendants, and the non-defendant Louisiana School Districts to require Plaintiffs and other Class Members to pay all Visa Processing Fees and attorneys' fees, even though federal law required the petitioner/school district, not the beneficiary/teacher, to pay such fees;

d.   Legal Facilitator Defendants conspired with Recruiter Defendants, Employer Defendants, and the non-defendant Louisiana School Districts to prepare and submit fraudulent LCAs to the USDOL stating that the petitioners would comply with regulations regarding the H-1B visa program while knowing they were requiring the Plaintiffs and other Class Members to pay fees and expenses that were the responsibility of the

petitioner pursuant to those regulations;

e.     Legal Facilitator Defendants conspired with Recruiter Defendants, Employer Defendants, and the non-defendant Louisiana School Districts to prepare and submit I-129 applications for H-1B visas to the USCIS that contained the fraudulent LCAs approved by the USDOL;

f.     Legal Facilitator Defendants conspired with Recruiter Defendants, Employer Defendants, and the non-defendant Louisiana School Districts to apply for one-year visas for the Plaintiffs and other Class Members, instead of the more typical three-year visas.   This required Plaintiffs and other Class Members to pay additional fees to Recruiter Defendants and Legal Facilitator Defendants to process renewal applications after just one year and allowed the Recruiter Defendants to assert continued control over Plaintiffs and other Class Members through the threat of visa non-renewals;

g.     Legal Facilitator Defendants filed all initial H-1B visa petitions on behalf of EBRPSS and non-defendant Louisiana School Districts and Plaintiffs and other Class Members, resulting in H-1B visas being issued to Plaintiffs and other Class Members;

h.     Legal Facilitator Defendants filed many renewal petitions in subsequent years after the initial visas expired;

i.     Legal Facilitator Defendants drafted and requested a

71

fraudulent statement from EBRPSS in an effort to terminate the visa of a teacher who refused to pay the exorbitant fees demanded by Recruiter Defendants, as detailed in ¶ 193, *infra*;

j.    Defendant Silverman conspired with Recruiter Defendants concerning a baseless lawsuit against Plaintiff Ingrid Cruz — his own client — in retaliation for efforts by teachers to organize and protest Defendants' practices: specifically, Defendant Silverman submitted a verification for the complaint against Ms. Cruz, purporting to verify the "facts" alleged in the complaint.  The complaint, which was dismissed under California's anti-SLAPP statute, sought to retaliate against Ms. Cruz for her alleged role in operating a blog critical of Recruiter Defendants, and to collect the illegal and fraudulent Year 2 Placement Fee.

184.    Despite their attorney-client relationships with Plaintiffs and other Class Members, Legal Facilitator Defendants never interacted directly with Plaintiffs and other Class Members.  Instead, Plaintiffs and other Class Members were required to work strictly with Recruiter Defendants, who were agents of the Legal Facilitator Defendants.  Any communications from or to Plaintiffs and other Class Members and Legal Facilitator Defendants were conveyed via Recruiter Defendants.  Plaintiffs and other Class Members also paid purported legal fees to Legal Facilitator Defendants through Recruiter Defendants, rather than directly to Legal Facilitator Defendants.

72

185.   Upon information and belief, Employer Defendants and the non-defendant Louisiana School Districts never paid any fees for legal services to Legal Facilitator Defendants.   All fees were instead paid by Plaintiffs and other Class Members.

186.   Upon information and belief, Legal Facilitator Defendants were aware of numerous conflicts between Plaintiffs and other Class Members on the one hand, and the Recruiter Defendants, Employer Defendants, and non-defendant Louisiana School Districts on the other.

187.   Upon information and belief, Legal Facilitator Defendants never sought nor obtained a waiver of conflicts of interest from any Plaintiff or other Class Member.

**E.   Factual Allegations That Employer Defendants were Beneficiaries of the Illegal Trafficking Scheme**

188.   Employer Defendants participated in a common venture with Recruiter Defendants and Legal Facilitator Defendants to recruit teachers from the Philippines and transport them to the United States.   In furtherance of this venture, EBRPSS and its agents, including Defendant Duran Swinford, participated in the following activities, among others:   (a) they hired Defendants Universal and Lourdes Navarro as EBRPSS's recruiting agents, and continued to employ them in such capacity for a substantial period; (b) they interviewed teachers through teleconferencing technology, and they traveled to the Philippines in 2007 and in 2008 to interview applicants; (c)

73

they selected Plaintiffs and other Class Members from among the applicants they interviewed; (d) they issued job offers and sent them via electronic mail to the Plaintiffs and other Class Members in the Philippines, which were executed by both parties; and (e) they worked collectively with Recruiter Defendants and Legal Facilitator Defendants to prepare and submit LCAs, H-1B visa applications, and H-1B visa renewal applications.

189.   Employer Defendants knowingly benefited from the illegal human trafficking scheme perpetrated by Recruiter Defendants.  Not only were they able to procure the services of needed teachers from the Philippines; they were also able to avoid all fees and costs typically associated with identifying and recruiting qualified educators—including visa fees and attorneys' fees that they, as the petitioning employers, were required to pay under federal law.

F.   **Factual Allegations That Employer Defendants Facilitated the Illegal Trafficking Scheme, or Alternatively Knew or Reasonably Should Have Known of the Illegal Trafficking Scheme**

190.   Employer Defendants had express knowledge of the fees that Recruiter Defendants imposed, and the crippling financial harm this caused Plaintiffs and other Class Members:

a.      Employer Defendants did not pay Recruiter Defendants for their recruitment efforts or Legal Facilitator Defendants for their legal services.  Indeed, Employer Defendants did not have to pay anything toward

the recruitment process, and were reimbursed for all costs related to interviewing applicants in the Philippines.

b. Upon information and belief, Employer Defendants knew that Recruiter Defendants and Legal Facilitator Defendants were engaged in a for-profit venture.

c. Employer Defendants were aware of the costs of filing a petition for an H-1B visa. They learned of these fees by, *inter alia*, reviewing the H-1B documents they signed, which disclosed some of the fees, and by reviewing written materials sent to them by Recruiter Defendants, which explained the costs of filing for an H-1B visa petition. EBRPSS's Superintendent also signed certifications on the LCAs submitted to the USDOL and the USCIS that Employer Defendants would comply with the regulations governing the H-1B program, which set forth the fees and expenses required to be paid by petitioning employers;

d. Employer Defendants were also aware of the various recruitment fees and related fees charged by Recruiter Defendants through their trafficking scheme. Upon information and belief, Employer Defendants were told of the exorbitant fees in or before November 2007, again in April 2008, and many times thereafter.

191. Employer Defendants were aware by no later than May 2008, that the U.S. Embassy in Manila was investigating the conduct of

Recruiter Defendants, when Defendant Duran Swinford was contacted by an agent from the U.S. Embassy in Manila to inquire about Recruiter Defendants.

192.   Employer Defendants were informed by no later than November 2008, and should have known substantially before November 2008, that Defendant Lourdes Navarro had been convicted of defrauding the government and of money laundering.

193.   Employer Defendants were aware that Recruiter Defendants were abusing legal process in order to intimidate and control job applicants—indeed, Employer Defendants assisted in such abuse:

a.   On at least three occasions, Employer Defendants were contacted directly by applicants who had successfully interviewed with Employer Defendants in the Philippines, and who were seeking to complete the H-1B visa process by a means other than through Recruiter Defendants because of the exorbitant fees Recruiter Defendants were charging.  In these instances, Employer Defendants informed Recruiter Defendants of these applicants' attempts to circumvent Recruiter Defendants' scheme, and told the applicants that EBRPSS would not consider hiring them, even though EBRPSS had hired H-1B visa teachers in the past without using Recruiter Defendants;

b.   In January 2008, an applicant named Genna Balneg

76

refused to pay Recruiter Defendants the exorbitant placement fee they sought to extract after her visa was approved.   EBRPSS colluded with Recruiter Defendants and Legal Facilitator Defendants to submit a fraudulent statement to the U.S. Government to obtain cancellation of Ms. Balneg's visa.   The fraudulent statement appears in a letter dated January 24, 2008, from an EBRPSS agent to Defendant Silverman, on EBRPSS letterhead, asking for the cancellation of Balneg's visa because Balneg "has attempted to defraud the East Baton Rouge Parish School System by falsely representing her intention to work for us in order to gain access to the United States." EBRPSS knew this statement was false, and that Balneg had simply refused to pay the exorbitant and illegal fee that Recruiter Defendants sought to extract. Balneg's visa was cancelled as a result of the fraudulent statement;

c.   Employer Defendants assisted Recruiter Defendants in attempting to enforce the illegal contracts Plaintiffs and other Class Members were forced to sign in California.  For example, on two occasions in 2008, Principal Sherry Brock of the Westdale Middle School in the EBRPSS called Louisiana Teacher Class member Janet Añober into her office in the middle of the school day and put her on the phone with Defendant Lourdes Navarro, who told Ms. Añober—in Brock's presence—that she was obligated to pay the fee charged by Recruiter Defendants. Principal Sherry Brock further told Ms. Añober that she should pay the money Recruiter Defendants were

demanding.

194.   Employer Defendants colluded with Recruiter Defendants and Legal Facilitator Defendants to ensure that Plaintiffs and other Class Members received one-year instead of three-year visas, even though Employer Defendants were aware three-year visas were available, and Employer Defendants had applied for three-year visas in the past for other H-1B visa teachers who were not recruited by Recruiter Defendants.   In particular, EBRPSS Superintendent Charlotte Placide signed all LCAs and visa petitions for Plaintiffs and other Class Members, and thus she (as well as other EBRPSS agents) knew that one-year rather than three-year visas were being requested.   Placide had previously signed LCAs and H-1B visa petitions on behalf of individuals who are not Class Members seeking and obtaining three-year visas.

195.   Employer Defendants colluded with Recruiter Defendants to stymie criticisms of the Recruiter Defendants' trafficking scheme, and to aid in the furtherance of that scheme, by taking the following actions, *inter alia*:

a.   On or about August 13, 2008, Defendant Duran Swinford informed Defendant Lourdes Navarro by email that EBRPSS was receiving public criticism about the housing arrangements made for EBR Teacher Subclass members, and that some EBR Teacher Subclass members were

1    publicly complaining that "recruiters" had taken all of the Subclass members'

2    money.  Duran Swinford told Lourdes Navarro that these "rumors" were

3    problems for EBRPSS.  Duran Swinford volunteered to forward the name(s)

4    of those making public complaints to Lourdes Navarro when they became

5    available.  Duran Swinford asked Lourdes Navarro for advice on how to

6

7    handle the situation;

8

9         b.    On or about November 6, 2008, after the Pinoy Teachers

10   Hub blog's web address had been submitted to EBRPSS through its website,

11   Defendant Duran Swinford informed Defendant Lourdes Navarro by email

12

13   about the blog.  The only substantive entry on the blog, which was sharply

14   critical of Recruiter Defendants, had been posted the previous evening;

15

16        c.    On or about April 9, 2009, Defendant Lourdes Navarro

17   contacted Defendant Duran Swinford by email to complain that Defendant

18   EBRPSB was starting to obtain three-year renewal visas for a small number

19

20   of teachers, instead of the one-year visas Legal Facilitator Defendants and

21   Recruiter Defendants were providing.  Navarro complained, "You know I

22   have been having problems with those teachers already and this will create a

23

24   lot of problems with teachers renewing with us."  Duran Swinford responded

25   by email that EBRPSS would check each renewal petition and make sure that

26   it requested only a one-year rather than a three-year renewal;

27

28        d.    No later than October 2009, Recruiter Defendants began

79

having problems renewing visas for teachers whose initial petitions had been signed by agents for Defendant EBRPSB, but who were teaching instead in other school systems. These teachers had never taught for the EBRPSB, and upon information and belief, Recruiter Defendants had redirected the teachers to other schools for employment. At the behest of the Recruiter Defendants, Defendant Duran Swinford, on behalf of Defendant EBRPSB, drafted letters and sent them by mail to the USCIS to explain that although the EBRPSB had intended to hire these teachers, the teachers arrived too late in the school year, and EBRPSB no longer had openings for these teachers. Upon information and belief, Defendant Duran Swinford knew this reason for the placement of these teachers at other school districts was false but nevertheless made this statement to support the Recruiter Defendants' scheme; and

e.    No later than November 2009, Defendant PARS came under investigation in the Philippines by the POEA regarding its recruiting practices in response to complaints filed by teachers who alleged that PARS was violating POEA rules. Defendant Lourdes Navarro, acting on behalf of PARS and Defendant Villarba, asked Defendant Duran Swinford to supply information about teachers who were working or who had previously worked at EBRPSS and who were complaining to the POEA. Upon information and belief, Defendant Duran Swinford sent Lourdes Navarro information about the teachers by mail, including (a) termination letters; (b) teacher evaluations;

and/or (c) statements that the teachers were still employed with EBRPSS. Upon information and belief, the documents transmitted by Defendant Duran Swinford to Defendant Lourdes Navarro are confidential, and in any event were sent without the consent or knowledge of the individual teachers.

196.   Employer Defendants were aware that Recruiter Defendants attempted to keep Plaintiffs and other Class Members from associating with local Filipinos in Baton Rouge, and Defendant Duran Swinford witnessed Defendant Lourdes Navarro tell the leader of a local Filipino association to stay away from Plaintiffs and other Class Members.

### G.   Factual Allegations of Fraudulent Omission of Second Recruitment Fee

197.   On or about March 28, 2008, at the Waterfront Hotel in Cebu City, Philippines, Defendant Lourdes Navarro informed Plaintiff Nunag-Tañedo that she would need to collect various supporting documents, pay a First Recruitment Fee of $5,515 (involving a Visa Processing Fee of $3,920, a Credentials Evaluation Fee of $595, and an Agency Fee of $1,000) to obtain her job offer and to complete the H-1B visa process.   However, Lourdes Navarro willfully, maliciously, and fraudulently failed to inform Nunag-Tañedo that before she would be permitted to leave the Philippines, she would need to pay an Undisclosed Second Recruitment Fee of two months of her expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after she was in the

81

United States for one year. Nunag-Tañedo relied on this fraudulent omission and paid the First Recruitment Fee.

198.   On or about July 3, 2007, at the PARS office in Quezon City, Manila, Philippines, an agent for Defendant PARS named Divine, who upon information and belief is the sibling of Defendant Villarba and Defendant Lourdes Navarro, informed Plaintiff Cruz that she would need to collect various supporting documents and pay a First Recruitment Fee of $5,000 (involving a Visa Processing Fee of $3,955, a Credentials Evaluation Fee of $645, and an Agency Fee of $400) in order to obtain her job offer and to complete the H-1B visa process. However, Divine willfully, maliciously, and fraudulently failed to inform Cruz that before she would be permitted to leave the Philippines, she would need to pay an Undisclosed Second Recruitment Fee of two months of her expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after she was in the United States for one year. Cruz relied on this fraudulent omission and paid the First Recruitment Fee.

199.   On or about March 28, 2008, at the Waterfront Hotel in Cebu City, Philippines, Defendant Lourdes Navarro informed Plaintiff Escuadra that she would need to collect various supporting documents, pay a First Recruitment Fee of $5,515 (involving a Visa Processing Fee of $3,920, a Credentials Evaluation Fee of $595, and an Agency Fee of $1,000) in order to

82

obtain her job offer and to complete the H-1B visa process.   However, Lourdes Navarro willfully, maliciously, and fraudulently failed to inform Escuadra that before she would be permitted to leave the Philippines, she would need to pay an Undisclosed Second Recruitment Fee of two months of her expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after she was in the United States for one year.   Escuadra relied on this fraudulent omission and paid the First Recruitment Fee.

200.   On or about June 27, 2008 in a restaurant near the PARS office called "Cravings Restaurant" in Quezon City, Manila, Philippines, Defendant Villarba informed Plaintiff Pascual that he would need to collect various supporting documents, pay a First Recruitment Fee of $5,515 (involving a Visa Processing Fee of $3,920, a Credentials Evaluation Fee of $595, and an Agency Fee of $1,000) in order to obtain his job offer and to complete the H-1B visa process.   However, Villarba willfully, maliciously, and fraudulently failed to inform Pascual that before he would be permitted to leave the Philippines, he would need to pay an Undisclosed Second Recruitment Fee of two months of his expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after he was in the United States for one year.   Pascual relied on this fraudulent omission and paid the First Recruitment Fee.

201.   On or about July 28, 2007, Plaintiff Mari telephoned Defendant PARS to learn if she had passed her job interview, which had occurred on or about July 25, 2007.   Defendant Villarba informed Plaintiff Mari that she would need to collect various supporting documents, pay a First Recruitment Fee of $5,565 (involving a Visa Processing Fee of $3,920, a Credentials Evaluation Fee of $645, and an Agency Fee of $1,000) in order to obtain her job offer and to complete the H-1B visa process.   However, Villarba willfully, maliciously, and fraudulently failed to inform Mari that before she would be permitted to leave the Philippines, she would need to pay an Undisclosed Second Recruitment Fee of two months of her expected salary in the United States, as well as the cost of airfare to the United States, with a third month's fee due after she was in the United States for one year.   Mari relied on this fraudulent omission and paid the First Recruitment Fee.

202.   Other Class Members also were required to pay the First Recruitment Fee.   Recruiter Defendants willfully, maliciously, and fraudulently failed to inform other Class Members at the times of such payments that, before they would be permitted to leave the Philippines, they would need to pay an Undisclosed Second Recruitment Fee of two months of their expected salaries in the United States, as well as the cost of airfare to the United States, with a third month's fee due after they were in the United States for one year.   Other Class Members paid the First Recruitment Fee

84

based on these fraudulent omissions.

**H.     Factual allegations of Fraudulent Omission of Employer's Obligation to Pay Visa Processing Fees**

203.   The Visa Processing Fees described in ¶ 103, *supra*, were collected from Plaintiffs and other Class Members by Defendant PARS, which was acting as an agent and/or alter ego for Defendant Universal, Defendant Lourdes Navarro, and Legal Facilitator Defendants.

204.   Plaintiffs and other Class Members were informed of the Visa Processing Fees by Defendant Lourdes Navarro, Defendant Villarba, or another agent of Defendant PARS.

205.   Defendant PARS, through its agents, issued hand-written receipts from Defendant Universal after collecting the Visa Processing Fees from Plaintiffs and other Class Members.

206.   Recruiter Defendants and Legal Facilitator Defendants were aware that certain parts of the Visa Processing Fees were required to be paid by the petitioner/employer and not the beneficiary/employee.   In particular, the H-1B Filing Fee form states that the $320 filing fee and the $500 anti-fraud fee must be paid by the U.S. employer.   The H-1B Filing Fee form was submitted with each and every I-129 Petition for a Nonimmigrant Worker prepared by Legal Facilitator Defendants and Defendant Universal on behalf of Defendant EBRPSB and the non-defendant Louisiana School Districts.

207.   On or about March 28, 2008, at the Waterfront Hotel in Cebu City, Philippines, Defendant Lourdes Navarro informed Plaintiff Nunag-Tañedo that she would need to pay $3,920 for her visa.   Lourdes Navarro failed to inform Nunag-Tañedo that part or all of this fee was the legal obligation of her petitioner, Defendant EBRPSB.   Nunag-Tañedo reasonably relied on this fraudulent omission, and paid the entire fee.

208.   On or about July 16, 2007, at the PARS office in Quezon City, Manila, Philippines, Defendant Villarba informed Plaintiff Cruz that she would need to pay $3,920 for her visa.   Villarba failed to inform Cruz that part or all of this fee was the legal obligation of her petitioner, Defendant EBRPSB.   Cruz reasonably relied on this fraudulent omission, and paid the entire fee.

209.   On or about March 28, 2008, at the Waterfront Hotel in Cebu City, Philippines, Defendant Lourdes Navarro informed Plaintiff Escuadra that she would need to pay $3,920 for her visa.   Lourdes Navarro failed to inform Escuadra that part or all of this fee was the legal obligation of her petitioner, Defendant EBRPSB.   Escuadra reasonably relied on this fraudulent omission, and paid the entire fee.

210.   On or about June 27, 2008, in a restaurant near the PARS office called "Cravings Restaurant" in Quezon City, Manila, Philippines, Defendant Villarba informed Plaintiff Pascual that he would need to pay

86

$3,920 for his visa.  Villarba failed to inform Pascual that part or all of this fee was the legal obligation of his petitioner, non-defendant Caddo Parish School Board.  Pascual reasonably relied on this fraudulent omission, and paid the entire fee.

211.  On or about July 28, 2007, over the telephone, Defendant Villarba informed Plaintiff Mari that she would need to pay $3,920 for her visa.  Villarba failed inform Mari that part or all of this fee was the legal obligation of her petitioner, non-defendant Recovery School District.  Mari reasonably relied on this fraudulent omission, and paid the entire fee.

212.  Recruiter Defendants required other Class Members to pay amounts of approximately $3,920 for their visas, and failed to inform them that part or all of this fee was the legal obligation of the petitioning employers.  Other Class Members paid the entire fee based on these fraudulent omissions.

I.  **Factual Allegations Regarding the Submission of Fraudulent LCA and Related Documents to U.S. Governmental Agencies**

213.  On or about May 1, 2008, EBRPSS Superintendent Charlotte Placide, with the assistance of Legal Facilitator Defendants, prepared, signed, and electronically submitted to the USDOL an LCA related to Plaintiff Nunag-Tañedo.  The LCA fraudulently stated and represented to the USDOL that EBRPSS would comply with the regulations governing the H-1B program while Employer Defendants knew at the time that Plaintiff

87

Nunag-Tañedo would be required to pay for fees and expenses that were the legal obligation of the petitioning employer pursuant to the applicable regulations.

214.   The USDOL reasonably relied on the fraudulent statements and representations contained in the LCA related to Plaintiff Nunag-Tañedo and approved the LCA.

215.   On or about May 20, 2008, Legal Facilitator Defendants used funds fraudulently obtained from Plaintiff Nunag-Tañedo by Recruiter Defendants for an official check made payable to the USCIS in the amount of $820 to pay for H-1B petition fees that were the legal obligation of the petitioning employer pursuant to the H-1B regulations, and not Plaintiff Nunag-Tañedo.

216.   On or about May 21, 2008, Legal Facilitator Defendants caused to be mailed to the USCIS an I-129 Petition prepared by Legal Facilitator Defendants and signed by Placide and Defendant Silverman, and an I-129 Supplement prepared by Legal Facilitator Defendants and signed by Placide for beneficiary Nunag-Tañedo.   The I-129 Supplement specifically referred to fees that were the legal obligation of the petitioning employer, which Employer Defendants and Legal Facilitator Defendants knew were instead being paid by Plaintiff Nunag-Tañedo.

217.   On or about June 21, 2008, as part of the petition for an H-

1B visa for Plaintiff Nunag-Tañedo, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCA previously submitted to the USDOL.

218.   The USCIS reasonably relied upon the fraudulent LCA and I-129 Supplement submitted in connection with the I-129 Petition for beneficiary Nunag-Tañedo in approving and granting the petition.

219.   Plaintiff Nunag-Tañedo was directly injured by the actions described above in ¶¶ 212-218, *supra*.   But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

220.   On or about July 19, 2007, Placide, with the assistance of Legal Facilitator Defendants, prepared and electronically submitted to the USDOL an LCA related to Plaintiff Cruz.   The LCA fraudulently stated and represented to the USDOL that EBRPSS would comply with the regulations governing the H-1B program while Employer Defendants knew at the time that Plaintiff Cruz would be required to pay for fees and expenses that were the legal obligation of the petitioning employer pursuant to the applicable regulations.

221.   The USDOL reasonably relied on the fraudulent statements and representations contained in the LCA related to Plaintiff Cruz and approved the LCA.

222.   On or about August 1, 2007, Legal Facilitator Defendants

used funds fraudulently obtained from Plaintiff Cruz by Recruiter Defendants for money orders made payable to the USCIS in the amount of $820 to pay for H-1B petition fees that were the legal obligation of the petitioning employer pursuant to the H-1B regulations, and not Plaintiff Cruz.

223. On or about August 1, 2007, Legal Facilitator Defendants caused to be mailed to the USCIS an I-129 Petition and an I-129 Supplement prepared by Legal Facilitator Defendants and signed by Placide for beneficiary Cruz. The I-129 Supplement specifically referred to fees that were the legal obligation of the petitioning employer, which Employer Defendants and Legal Facilitator Defendants knew were instead being paid by Plaintiff Cruz.

224. On or about August 1, 2007, as part of the petition for an H-1B visa for Plaintiff Cruz, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCA previously submitted to the USDOL.

225. The USCIS reasonably relied upon the fraudulent LCA and I-129 Supplement submitted in connection with the I-129 Petition for beneficiary Cruz in approving and granting the petition.

226. Plaintiff Cruz was directly injured by the actions described above in ¶¶ 220-225, *supra*. But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

227. On or about April 8, 2008, Placide, with the assistance of

Legal Facilitator Defendants, prepared and electronically submitted to the USDOL an LCA related to Plaintiff Escuadra. The LCA fraudulently stated and represented to the USDOL that EBRPSS would comply with the regulations governing the H-1B program while Employer Defendants knew at the time that Plaintiff Escuadra would be required to pay for fees and expenses that were the legal obligation of the petitioning employer pursuant to the applicable regulations.

228. The USDOL reasonably relied on the fraudulent statements and representations contained in the LCA related to Plaintiff Escuadra and approved the LCA.

229. On or about June 13, 2008, Legal Facilitator Defendants used funds fraudulently obtained from Plaintiff Escuadra by Recruiter Defendants for a money order made payable to the USCIS in the amount of $820 to pay for H-1B petition fees that were the legal obligation of the petitioning employer pursuant to the H-1B regulations, and not Plaintiff Escuadra.

230. On or about June 13, 2008, Legal Facilitator Defendants caused to be mailed to the USCIS an I-129 Petition prepared by Legal Facilitator Defendants and signed by Placide and Defendant Silverman, and an I-129 Supplement prepared by Legal Facilitator Defendants and signed by Placide for beneficiary Escuadra. The I-129 Supplement specifically referred

91

to fees that were the legal obligation of the petitioning employer, which Employer Defendants knew were instead being paid by Plaintiff Escuadra.

231.   On or about June 13, 2008, as part of the petition for an H-1B visa for Plaintiff Escuadra, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCA previously submitted to the USDOL.

232.   The USCIS reasonably relied upon the fraudulent LCA and I-129 Supplement submitted in connection with the I-129 Petition for beneficiary Escuadra in approving and granting the petition.

233.   Plaintiff Escuadra was directly injured by the actions described above in ¶¶ 227-232, *supra*.   But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

234.   On or about July 1, 2008, Jan Holliday of the non-defendant Caddo Parish School Board, with the assistance of Legal Facilitator Defendants, prepared and electronically submitted to the USDOL an LCA related to Plaintiff Pascual.   The LCA fraudulently stated and represented to the USDOL that Holliday and the Caddo Parish School Board would comply with the regulations governing the H-1B program while they knew at the time that Plaintiff Pascual would be required to pay for fees and expenses that were the legal obligation of the petitioning employer pursuant to the applicable regulations.

235.    The USDOL reasonably relied on the fraudulent statements and representations contained in the LCA related to Plaintiff Pascual and approved the LCA.

236.    Upon information and belief, in or about July, 2008, Legal Facilitator Defendants used funds fraudulently obtained from Plaintiff Pascual by Recruiter Defendants for a money order or official bank check made payable to the USCIS in the amount of $820 to pay for H-1B petition fees that were the legal obligation of the petitioning employer pursuant to the H-1B regulations, and not Plaintiff Pascual.

237.    In or about July, 2008, Legal Facilitator Defendants caused to be mailed to the USCIS an I-129 Petition prepared by Legal Facilitator Defendants and signed by a representative of the Caddo Parish School Board and Defendant Silverman, and an I-129 Supplement prepared by Legal Facilitator Defendants and signed by a representative of the Caddo Parish School Board for beneficiary Pascual.    The I-129 Supplement specifically referred to fees that were the legal obligation of the petitioning employer, which non-Defendant Caddo Parish School Board and Legal Facilitator Defendants knew were instead being paid by Plaintiff Pascual.

238.    In or about July, 2008, as part of the petition for an H-1B visa for Plaintiff Pascual, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCA previously submitted to the USDOL.

239.   The USCIS reasonably relied upon the fraudulent LCA and I-129 Supplement submitted in connection with the I-129 Petition for beneficiary Pascual in approving and granting the petition.

240.   Plaintiff Pascual was directly injured by the actions described above in ¶¶ 234-239, *supra*.  But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

241.   On or about July 24, 2007, Betty Jean Wolfe of the non-defendant Recovery School District, with the assistance of Legal Facilitator Defendants, prepared and electronically submitted to the USDOL an LCA related to Plaintiff Mari.  The LCA fraudulently stated and represented to the USDOL that Wolfe and the Recovery School District would comply with the regulations governing the H-1B program while they knew at the time that Plaintiff Mari would be required to pay for fees and expenses that were the legal obligation of the petitioning employer pursuant to the applicable regulations.

242.   The USDOL reasonably relied on the fraudulent statements and representations contained in the LCA related to Plaintiff Mari and approved the LCA.

243.   Upon information and belief, on or about July 31, 2007, Legal Facilitator Defendants used funds fraudulently obtained from Plaintiff Mari by Recruiter Defendants for a money order or official bank check made

payable to the USCIS in the amount of $820 to pay for H-1B petition fees that were the legal obligation of the petitioning employer pursuant to the H-1B regulations, and not Plaintiff Mari.

244.   On or about July 31, 2007, Legal Facilitator Defendants caused to be mailed to the USCIS an I-129 Petition prepared by Legal Facilitator Defendants and signed by a representative of the Recovery School District and Defendant Silverman, and an I-129 Supplement prepared by Legal Facilitator Defendants and signed by a representative of the Recovery School District for beneficiary Mari.   The I-129 Supplement specifically referred to fees that were the legal obligation of  the petitioning employer, which non-Defendant Recovery School District and Legal Facilitator Defendants knew were instead being paid by Plaintiff Mari.

245.   On or about July 31, 2007, as part of the petition for an H-1B visa for Plaintiff Mari, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCA previously submitted to the USDOL.

246.   The USCIS reasonably relied upon the fraudulent LCA and I-129 Supplement submitted in connection with the I-129 Petition for beneficiary Mari in approving and granting the petition.

247.   Plaintiff Mari was directly injured by the actions described above in ¶¶ 241-246, *supra*.  But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

248.   Fraudulent LCAs related to the other Class Members were prepared and submitted electronically to the USDOL with the assistance of Legal Facilitator Defendants in the same manner as described above in ¶¶ 213, 220, 227, 234, and 241.

249.   The   USDOL   reasonably   relied   on   the   fraudulent statements and representations contained in the LCAs related to the other Class Members and approved the LCAs.

250.   Legal   Facilitator   Defendants   used   funds   fraudulently obtained from the other Class Members by Recruiter Defendants to pay for H-1B petition fees that were the legal obligation of their petitioning employers pursuant to the H-1B regulations, and not the other Class Members, in the same manner as described above in ¶¶ 215, 222, 229, 236, and 243.

251.   Legal   Facilitator   Defendants   caused   to   be   mailed   to   the USCIS I-129 Petitions and I-129 Supplements prepared by Legal Facilitator Defendants and signed by agents of Employer Defendants and the non-defendant Louisiana School Districts for other Class Member beneficiaries, in the same manner as described above in ¶¶ 216, 223, 230, 237, and 244.  The I-129 Supplements specifically referred to fees that were the legal obligation of the petitioning employers, which Employer Defendants, the non-defendant Louisiana School Districts, and Legal Facilitator Defendants knew were instead being paid by the Class Members.

252.   As part of the H-1B visa petitions for the Class Members, Legal Facilitator Defendants caused to be mailed to the USCIS the fraudulent LCAs previously submitted to the USDOL, in the same manner as described above in ¶¶ 217, 224, 231, 238, and 245.

253.   The USCIS reasonably relied upon the fraudulent LCAs and I-129 Supplements submitted in connection with the I-129 Petitions for beneficiary Class Members in approving and granting their petitions.

254.   The Class Members were directly injured by the actions described above in ¶¶ 248-253, *supra*.   But for such actions, Defendants would not have been able to effectuate their unlawful scheme.

**J.   Factual Allegations Regarding the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d))**

255.   The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs.

256.   This is a class action in which members of a class of Plaintiffs are citizens or subjects of a foreign state and some of the Defendants are citizens of a State in the United States.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008 (18 U.S.C. § 1595)
*Louisiana Teacher Class versus*
*Recruiter Defendants and Legal Facilitator Defendants*

257.   Plaintiffs and other Class Members re-allege and

97

incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

### A.    Authority for a Civil Action

258.    Plaintiffs and other Class Members are victims of violations of the following sections of Title 18, Chapter 77 of the United States Code:  18 U.S.C. §§ 1589, 1590, 1592, and 1594(a) and (b).

259.    As set forth in 18 U.S.C. § 1595(a), Plaintiffs and other Class Members may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in a violation" of these provisions.

260.    Recruiter Defendants were perpetrators of the violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and 1594(b).

261.    Legal Facilitator Defendants were perpetrators of the violations of 18 U.S.C. §§ 1589, 1590, 1594(a), and 1594(b).

262.    Recruiter Defendants and Legal Facilitator Defendants knowingly benefited, financially or by receiving anything of value from participation in a venture which each Defendant knew or should have known engaged in violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b).

263.    Plaintiffs bring this claim on behalf of themselves and the

Louisiana Teacher Class against Recruiter Defendants and Legal Facilitator Defendants.

**B.**   **Forced Labor (18 U.S.C. § 1589)**

264.   As set forth in ¶ 90-179.g, *supra*, Recruiter Defendants knowingly provided the labor of Plaintiffs and other Class Members by means of abuse and threatened abuse of law or legal process and by means of a scheme, pattern, or plan intended to cause the Plaintiffs and other Class Members to believe that, if he or she did not perform the labor, he or she would suffer serious harm.

265.   As set forth ¶¶ 180-187, *supra*, Legal Facilitator Defendants knowingly provided the labor of Plaintiffs and other Class Members by means of abuse and threatened abuse of law or legal process and by means of a scheme, pattern, or plan intended to cause the Plaintiffs and other Class Members to believe that, if he or she did not perform the labor, he or she would suffer serious harm.

266.   Recruiter Defendants and Legal Facilitator Defendants knowingly benefited financially from participation in a venture which they knew or should have known was engaged in the acts set forth in ¶¶ 264-265, *supra*.

**C.**   **Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1590)**

267.   As set forth in ¶¶ 90-179.g, *supra*, Recruiter Defendants

99

recruited and transported Plaintiffs and other Class Members for labor and services in violation of 18 U.S.C. §§ 1589, 1592, 1594(a), and 1594(b).

268. As set forth ¶¶ 180-187, *supra*, Legal Facilitator Defendants knowingly aided and abetted Recruiter Defendants' scheme to recruit and transport Plaintiffs and other Class Members in violation of 18 U.S.C. §§ 1589, 1592, 1594(a), and 1594(b).

269. Recruiter Defendants and Legal Facilitator Defendants knowingly benefited financially from participation in a venture which they knew or should have known was engaged in the acts set forth in ¶¶ 267-268, *supra*.

**D.    Unlawful   Conduct   with   Respect   to   Documents   in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1592)**

270. As set forth in ¶¶ 116-122 and 153, *supra*, Recruiter Defendants knowingly removed, confiscated, and possessed the Plaintiffs' and other Class Members' passports and visa papers in the course of a violation, and/or with the intent to violate 18 U.S.C. §§ 1589 and 1594(a).

271. Recruiter Defendants and Legal Facilitator Defendants knowingly benefited financially from participation in a venture which they knew or should have known was engaged in the acts set forth in ¶ 270, *supra*.

**E.    Attempt to Violate 18 U.S.C. §§ 1589, and 1590 (18 U.S.C. § 1594(a))**

272. As set forth in ¶¶ 90-179.g, *supra*, Recruiter Defendants

attempted to violate 18 U.S.C. §§ 1589 and 1590, in violation of 18 U.S.C. § 1594(a).

273.  As set forth in ¶¶ 180-187, *supra*, Legal Facilitator Defendants attempted to violate 18 U.S.C. § 1589, in violation of 18 U.S.C. § 1594(a).

274.  Recruiter Defendants and Legal Facilitator Defendants knowingly benefited financially from participation in a venture which the Defendants knew or should have known was engaged in the acts set forth in ¶¶ 272-273, *supra*.

**F.**  **Conspiracy to Violate 18 U.S.C. §§ 1589, 1590, and 1592 (18 U.S.C. § 1594(b))**

275.  Recruiter Defendants and Legal Facilitator Defendants conspired with each other to violate 18 U.S.C. §§ 1589, 1590, and 1592, in violation of 18 U.S.C. § 1594(b).

276.  Recruiter Defendants, Legal Facilitator Defendants, and Employer Defendants conspired with each other to violate 18 U.S.C. §§ 1589 and 1590, in violation of 18 U.S.C. § 1594(b).

277.  Recruiter Defendants and Legal Facilitator Defendants knowingly benefited financially from participation in a venture which they knew or should have known was engaged in the acts set forth in ¶¶ 275-276, *supra*.

**G.**  **Alternatively, Trafficking with Respect to Peonage, Slavery,**

**Involuntary Servitude, or Forced Labor by violating 18 U.S.C. §§ 1589 (2003), 1592 (2003), and 1594(a) (2003) (18 U.S.C. § 1590 (2003))**

278.   Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the violations of 18 U.S.C. § 1589 (2003) as set forth above, Recruiter Defendants knowingly recruited, transported, harbored and/or obtained Plaintiffs and other Class Members for labor or services in furtherance of the following violations of Title 18, Chapter 77 of the U.S. Code:

a.   Removing, confiscating, or possessing Plaintiffs' and other Class Members' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1589 (2003) and 1590 (2003), in violation of 18 U.S.C. § 1592(a) (2003); and

b.   Attempting to violate 18 U.S.C. §§ 1589 (2003) and 1590 (2003), in violation of 18 U.S.C. § 1594(a) (2003).

279.   Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the violations of 18 U.S.C. § 1589 (2003) as set forth above, Legal Facilitator Defendants knowingly recruited, transported, harbored and/or obtained Plaintiffs and other Class Members for labor or services in furtherance of Recruiter Defendants' and Legal Facilitator Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:  18 U.S.C. §§ 1589 (2003), 1590 (2003), and 1594(a) (2003).

102

1

### H.    **Damages**

2        280.   As a proximate result of the conduct of Recruiter

3

4    Defendants and Legal Facilitator Defendants, Plaintiffs and other Class

5    Members have suffered injuries to their persons and property, and other

6    damages.

7        281.   Plaintiffs and other Class Members are entitled to recover

8

9    compensatory and punitive damages in an amount to be proven at trial,

10   including attorneys' fees and costs.

11                    **SECOND CLAIM FOR RELIEF**
12   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
           18 U.S.C. § 1962(c) and 18 U.S.C.§ 1962(d)
13      *Louisiana Teacher Class versus Recruiter Defendants and Legal*
14                       *Facilitator Defendants;*
        *EBR Teacher Subclass versus all RICO Defendants*
15

16       282.   Plaintiffs re–allege and incorporate by reference each and

17   every allegation contained in the preceding paragraphs as if fully set forth

18
     herein.
19

20       283.   Plaintiffs' and other Class Members' claims under the

21
     Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68
22

23   ("RICO"), are brought against the Recruiter Defendants and the Legal

24   Facilitator Defendants.   EBR Teacher Plaintiffs' and other EBR Teacher

25   Subclass members' claims under RICO are brought against all RICO

26
     Defendants.
27

28       284.   Plaintiffs and other Class Members are "persons" with

103

standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c). EBR Teacher Plaintiffs and other EBR Teacher Subclass members are likewise "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

285.   Each Recruiter Defendant is a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because each such defendant is an individual or entity capable of holding a legal or beneficial interest in property.

286.   Defendant Duran Swinford is a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because she is an individual capable of holding a legal or beneficial interest in property.

287.   Each Legal Facilitator Defendant is a "RICO person" within the meaning of § 1963(1) because each such defendant is an individual or entity capable of holding a legal or beneficial interest in property.

A.   **The RICO Enterprise**

288.   RICO Defendants, together with Defendant EBRPSB, constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4).   Such RICO Enterprise is an ongoing business relationship with the common purposes of:

a.   Recruiting, transporting, providing, processing, and obtaining Filipino teachers with H-1B visas to work at schools in Louisiana;

b.   Providing and maintaining a consistent and acquiescent

labor force for Employer Defendants and the non-defendant Louisiana School Districts; and

       c.    Soliciting and collecting funds from Filipino nationals in connection with procuring H-1B visas and opportunities for employment with Employer Defendants and the non-Defendant Louisiana School Districts.

       289.   The RICO Defendants have used the RICO Enterprise as a vehicle for engaging in multiple RICO predicates acts, as set forth below.

       290.   The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers through the procuring of H-1B visas affect interstate commerce, and frequently require travel and communications across state and international lines.

       291.   The members of the RICO Enterprise function as a continuing unit: as set forth above, the members of the RICO Enterprise have associated for an extended period, and the Enterprise has engaged in continuing activity to further its purposes throughout such period.

       292.   RICO Defendants have violated 18 U.S.C. § 1962(c) because they are associated with an enterprise (the association-in-fact of all the Defendants) engaged in, or the activities which affect, interstate commerce and have, directly or indirectly, conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.

293.   RICO Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

294.   Specifically, RICO Defendants conducted or participated in and/or conspired to conduct the affairs of the RICO Enterprise by engaging in one or more of the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.   Forced labor in violation of 18 U.S.C. § 1589;

b.   Trafficking persons with respect to forced labor in violation of 18 U.S.C § 1590;

c.   Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

d.   Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

e.   Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and/or

f.   Extortion as defined in Cal. Penal. Code § 518.

295.   RICO Defendants utilized the telephone, facsimile, postal system, and/or e-mail of the United States to organize, plan, and coordinate the RICO Enterprise, some examples of which are outlined above in ¶¶ 177-179 and 213-254.

**B.**   **Predicate Acts**

106

<u>Forced Labor: 18 U.S.C. § 1589</u>

296. All RICO Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of willfully, knowingly, and intentionally committing and/or conspiring to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in the First Claim for Relief, ¶¶ 264-266, *supra*.

<u>Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor: 18 U.S.C. § 1590</u>

297. All RICO Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of willfully, knowingly, and intentionally committing and/or conspiring to commit multiple predicate acts of trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1590, and as set forth in the First Claim for Relief, ¶¶ 267-269, *supra*.

<u>Document Servitude: 18 U.S.C. § 1592</u>

298. Recruiter Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of willfully, knowingly, and intentionally committing and/or conspiring to commit multiple predicate acts of document servitude in violation of 18 U.S.C. § 1592, and as set forth in the First Claim for Relief, ¶¶ 270-271, *supra*.

<u>Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343</u>

299. As set forth in the preceding paragraphs, Recruiter

Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of omitting and concealing, and/or conspiring to omit or conceal material information about the extent of recruitment fees as part of a scheme to defraud Plaintiffs and other Class Members. Recruiter Defendants intended to induce false beliefs about the limited extent of the recruitment fees to Recruiter Defendants' advantage and to the severe prejudice of Plaintiffs and other Class Members.

300. As set forth in the preceding paragraphs, including ¶¶ 177-179, Defendants Universal and Lourdes Navarro conducted or participated in the affairs of the RICO Enterprise through a pattern of using the U.S. mails and wire communications, including communications via telephone, fax, internet and/or email, on numerous occasions to further their fraudulent scheme, and it was reasonably foreseeable that the U.S. mail and/or wires would be utilized in furtherance of the fraudulent scheme.

301. These willful, knowing, and intentional acts by Defendants Universal and Lourdes Navarro constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.[4]

---

[4]    This Second Amended Complaint also alleges that other RICO Defendants were aware of Recruiter Defendants' fraudulent scheme, and made wire and mail transmissions in furtherance of such scheme. The Court has ruled that Plaintiffs have not adequately alleged predicate acts of mail or wire fraud by such other defendants and Plaintiffs do not seek to revisit that issue in connection with this Second Amended Complaint. However, the factual allegations regarding those defendants' mail and wire transmissions are retained here in order to preserve the issue for appeal.

Extortion in violation of Cal. Pen. Code § 518

302.   Recruiter Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of threatening Plaintiffs and other Class Members with deportation and financial ruin in violation of Cal. Penal Code §§ 518–19 if they did not pay the fees required under the illegal PARS Contract, Universal Philippine Contract, and Universal California Contract.

303.   Plaintiffs and other Class Members feared financial harm to themselves and their families and/or feared deportation if they did not pay the fees required under the illegal PARS Contract, Universal Philippine Contract, and Universal California Contract.

304.   Recruiter Defendants' deployment of threats to instill fear in Plaintiffs and other Class Members and to secure payment of illegal fees violates Cal. Pen. Code § 518.

**C.   Pattern of Related Racketeering Acts**

305.   RICO Defendants have engaged in the racketeering activity described in this Claim repeatedly beginning in 2007 with respect to more than 350 Filipino teachers.

306.   RICO Defendants, through the RICO Enterprise, rely on the racketeering acts described in this Second Amended Complaint to conduct the regular business activities of the RICO Enterprise.

307. RICO Defendants' racketeering acts have similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other Class Members, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant Filipino H-1B labor force at the EBRPSS and the non-defendant Louisiana School Districts.

308. RICO Defendants' acts have yielded similar results and caused similar injuries to Plaintiffs and other Class Members: Plaintiffs and other Class Members have, *inter alia*, been subjected to exorbitant and illegal fees; and have been forced to take on debt at usurious interest rates as a result of RICO Defendants' unlawful conduct.

309. As set forth in the preceding paragraphs, the racketeering acts have similar participants: the RICO Defendants.

310. As set forth in the preceding paragraphs, RICO Defendants, through the RICO Enterprise, directed their racketeering activities at similar victims: Filipino teachers recruited by Recruiter Defendants to work as teachers in Louisiana public schools pursuant to H-1B visas.

311. RICO Defendants' acts have similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs and other Class Members, submission of fraudulent LCAs in support of petitions for H-1B

visas for Plaintiffs and other Class Members, and use of similar employment practices and policies with respect to Plaintiffs and other Class Members.

**D.    Injury**

312.   As a direct and proximate result of Recruiter Defendants' and Legal Facilitator Defendants' willful, knowing, and intentional acts discussed above, Plaintiffs and other Class Members have suffered injuries to their persons and property:  Plaintiffs and other Class Members have, *inter alia*, been subjected to exorbitant and illegal fees; and have been forced to take on debt at usurious interest rates as a result of Recruiter Defendants' and Legal Facilitator Defendants' unlawful conduct.  Additionally, as a direct and proximate result of all RICO Defendants' willful, knowing, and intentional acts discussed above, EBR Teacher Plaintiffs and other EBR Teacher Subclass Members have suffered injuries to their persons and property as specified above.

313.   Plaintiffs and other Class Members are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

**THIRD CLAIM FOR RELIEF**
EMPLOYMENT AGENCY, EMPLOYMENT COUNSELING, AND JOB LISTING SERVICES ACT
**Cal. Civ. Code § 1812.508**
*Louisiana Teacher Class versus Recruiter Defendants*

314.   Plaintiffs re-allege and incorporate by reference each and

111

every allegation contained in the preceding paragraphs as if fully set forth herein.

315. Recruiter Defendants offered, for a fee, to secure employment for Plaintiffs and other Class Members.

316. Because Recruiter Defendants offered to procure employment for a fee for Plaintiffs and other Class Members, Recruiter Defendants are "employment agencies" under Cal. Civ. Code § 1812.501.

317. Plaintiffs and other Class Members are "jobseekers" under Cal. Civ. Code § 1812.501, as they were seeking employment through the use of Recruiter Defendants' services.

318. Recruiter Defendants willfully and fraudulently misrepresented and/or withheld material information regarding the amount that Plaintiffs and other Class Members would have to pay to secure jobs in the United States.

319. Upon information and belief, Recruiter Defendants willfully misrepresented the amount of pay that certain Plaintiffs and other Class Members would receive for the teaching jobs for which they were recruited.

320. Upon information and belief, Recruiter Defendants willfully misrepresented that Plaintiffs and other Class Members would be guaranteed jobs in the United States.

321.   Recruiter Defendants' conduct is subject to Cal. Civ. Code § 1812.508 because, *inter alia*, they offered to procure employment for a fee while operating in California.

322.   Recruiter Defendants violated Cal. Civ. Code § 1812.508(a) by willfully making, or causing to be made, false, misleading, and deceptive representations and/or omissions concerning the services that the agencies would provide to Plaintiffs and other Class Members as they sought jobs.

323.   Pursuant to Cal. Civ. Code §§ 1812.523(c) and (d), the Court should (a) declare that all contracts between Plaintiffs and other Class Members on the one hand, and Universal and/or PARS on the other, are null and void; (b) require that the Recruiter Defendants refund all sums paid pursuant to those contracts; (c) award treble and punitive damages; and (d) award attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF
UNFAIR BUSINESS PRACTICES
### Cal. Business and Professional Code § 17200, *et seq.*
*Louisiana Teacher Class versus Recruiter Defendants*

324.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set for herein.

325.   Plaintiffs and other Class Members paid Recruiter Defendants fees in respect of securing employment as teachers in the United

113

States.

326. Recruiter Defendants willfully and fraudulently misrepresented and/or withheld material information regarding the amount of fees Plaintiffs and other Class Members would be charged with respect to securing employment as teachers in the United States.

327. Recruiter Defendants' practice was to fraudulently misrepresent and/or withhold material information regarding cost of procuring the employment opportunities they provided.

328. Recruiter Defendants' practice was to threaten Plaintiffs and other Class Members with financial harm to extract fees from Plaintiffs and other Class Members.

329. Recruiter Defendants profited from Plaintiffs' and other Class Members' reliance on the Recruiter Defendants' misrepresentations and/or omissions.

330. Recruiter Defendants made, or caused to be made, false, misleading, and deceptive representations and/or omissions concerning the services that the agencies would provide to jobseeker Plaintiffs and other Class Members.

331. Recruiter Defendants threatened Plaintiffs and other Class Members with deportation and financial ruin and/or deportation if they did not pay the fees required under the illegal PARS Contract, the illegal

114

Universal Philippine Contract, and the illegal Universal California Contract.

332.   Recruiter Defendants' practice of recruiting teachers though fraud and misrepresentation for profit directly caused financial harm to Plaintiffs and other Class Members.

333.   Recruiter Defendants' conduct is subject to Cal. Business and Professions Code § 17200 because Recruiter Defendants operated their recruiting business in California and engaged in unlawful business practices while operating in California.

334.   Recruiter Defendants violated Cal. Business and Professions Code § 17200 by requiring Plaintiffs and other Class Members to enter into contracts by means of the unlawful business practices described above.

335.   The Court should enjoin Recruiter Defendants from enforcing contracts entered into as a result of the unlawful business practices described herein.

### FIFTH CLAIM FOR RELIEF
FRAUD
**Cal. Civ. Code § 1709**
*Louisiana Teacher Class versus Recruiter Defendants*

336.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

337.   Recruiter Defendants falsely misrepresented to Plaintiffs

115

and other Class Members that they could secure teaching positions in the United States by paying the First Recruitment Fee.   Recruiter Defendants purposefully withheld information regarding the Undisclosed Second Recruitment Fee from Plaintiffs and other Class Members before securing the non-refundable First Recruitment Fee as described above. The time, place and content of Recruiter Defendants' misrepresentations is set forth in ¶¶ 197-201, *supra*.

338.   The representations made by the Recruiter Defendants were false by virtue of omitting any mention of the Undisclosed Second Recruitment Fee.   Once the Recruiter Defendants received the First Recruitment Fee, they charged significant additional fees before providing Plaintiffs and other Class Members any opportunity to teach in the United States.   Recruiter Defendants also did not secure job opportunities for all Class Members prior to their arrival in the United States.

339. Recruiter Defendants made these false material representations (via omission) with knowledge of their falsity and with intent to defraud Plaintiffs and other Class Members.   Recruiter Defendants were aware that they would charge Plaintiffs and other Class Members additional fees, but withheld such information until Plaintiffs and other Class Members had already made substantial non-refundable expenditures and, in most cases, were already burdened with substantial debt to pay the First Recruitment Fee.

Second Amended Complaint

Upon information and belief, Recruiter Defendants also knew that a number of Class Members would have to attend job fairs upon arrival in Louisiana and would not have secure offers of employment, even after paying enormous fees to the Recruiter Defendants.

340.   Plaintiffs and other Class Members were unaware of the falsity of Recruiter Defendants' representations.   In reliance on these representations, Plaintiffs and other Class Members paid the First Recruitment Fee.   When Plaintiffs and other Class Members learned of the additional fees, they could not afford to lose the money they had already invested in the venture.   Had Recruiter Defendants properly disclosed the enormous additional fees they intended to charge, Plaintiffs and other Class Members would not have participated in the recruitment process on those terms.

341.   As set forth in ¶¶ 203-212, Recruiter Defendants also informed Plaintiffs and other Class Members they would need to pay $3,920 for their visas, and willfully failed to inform them that part or all of this fee was the legal obligation of the petitioner school districts.   Plaintiffs and other Class Members reasonably relied on this omission, and paid the entire fee as a result.

342.   As a proximate result of Recruiter Defendants' fraud, Plaintiffs and other Class Members suffered severe financial loss and other

1  damages in an amount to be determined at trial.

2  343.  Recruiter Defendants' conduct was willful and malicious.

3  Plaintiffs and other Class Members are therefore entitled to punitive damages

4

5  in an amount sufficient to deter similar conduct in the future.

6  **SIXTH CLAIM FOR RELIEF**

7  NEGLIGENT MISREPRESENTATION

*Louisiana Teacher Class versus Recruiter Defendants*

8

9  344.  Plaintiffs re-allege and incorporate by reference each and

10  every allegation contained in the preceding paragraphs as if fully set forth

11  herein.

12

13  345.  Recruiter Defendants falsely misrepresented to Plaintiffs

14  and other Class Members that they could secure teaching positions in the

15  United States by paying the First Recruitment Fee, as set forth above.

16

17  Recruiter Defendants had no reasonable grounds for believing such

18  representations were true when the representations were made.

19

20  346.  Recruiter  Defendants  made  these  false  material

21  representations with the intent that Plaintiffs and other Class Members would

22  rely on them.

23

24  347.  Plaintiffs and other Class Members were unaware of the

25  falsity of Recruiter Defendants' representations.   In reliance on these

26  representations,  Plaintiffs  and  other  Class  Members  paid  the  First

27  Recruitment Fee.  When Plaintiffs and other Class Members learned of the

28

additional fees, they could not afford to lose the money they had already invested in the venture. Had Plaintiffs and other Class Members known about the enormous additional fees they would not have participated in the recruitment process on those terms.

348. As set forth above, Recruiter Defendants also informed Plaintiffs and other Class Members that they were required to pay approximately $3,920 for their visas. This representation was false because part or all of this fee was in fact the legal obligation of the petitioner school districts. Recruiter Defendants had no reasonable grounds for believing their representations were true when they were made.

349. Plaintiffs and other Class Members were unaware of the falsity of Recruiter Defendants' representations regarding the visa fees. Plaintiffs and other Class Members reasonably relied on Recruiter Defendants' omission, and paid the entire fee as a result.

350. As a proximate result of Recruiter Defendants' negligent misrepresentations as set forth above, Plaintiffs and other Class Members suffered severe financial loss and other damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
DECLARATORY AND EQUITABLE RELIEF
VOIDING PARS AND UNIVERSAL CONTRACTS
BECAUSE CONTRACTS WERE A RESULT OF UNDUE INFLUENCE
*Louisiana Teacher Class versus*
*Defendant PARS and Defendant Universal*

119

351. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

352. The fees mandated by the contracts entered into between Plaintiffs and other Class Members and Universal and between Plaintiffs and other Class Members and PARS are void and unenforceable because Class Members executed the contracts as a result of undue influence and coercion, including, *inter alia*:

a. The contracts were presented to Plaintiffs and other Class Members without prior notice;

b. Plaintiffs and other Class Members were forced to sign the contracts immediately, without an opportunity to deliberate or reflect on the terms of the contract, or to consult third parties about the terms of the contracts;

c. Plaintiffs and other Class Members were threatened that if they refused to sign the PARS Contract and the Universal Philippine Contract, they would not be allowed to go to the United States and that if they refused to sign the Universal California Contract, they would be immediately sent back to the Philippines without refund of any of the enormous fees and other costs they had already paid; and

d. Plaintiffs and other Class Members were under severe

120

threat of serious financial loss because of the substantial debt they had incurred to pay the First Recruitment Fee, described in ¶¶ 101-113, *supra*, which they had incurred before they were made aware of the terms of the contracts.

353.   The fees mandated by the contracts entered into between Plaintiffs and other Class Members and Universal and between Plaintiffs and other Class Members and PARS are void and unenforceable because they were the result of undue influence and coercion.

354.   Universal and PARS were unjustly enriched at the expense of Plaintiffs and other Class Members when Universal and PARS collected invalid fees on their contracts with Plaintiffs and other Class Members.

355.   Universal continues to attempt to collect invalid fees on its contracts with Class Members.

356.   Plaintiffs and other Class Members are entitled to a declaration that the fee provisions of the contracts entered into between Plaintiffs and other Class Members and Universal and Plaintiffs and other Class Members and PARS are void and unenforceable.

357.   Plaintiffs and other Class Members are entitled to restitution of the amounts unjustly obtained and retained by Universal and PARS, in an amount to be proven at trial.

358.   Plaintiffs and other Class Members are entitled to

121

permanent injunctive relief prohibiting Universal from seeking to collect any further fees from them.

## EIGHTH CLAIM FOR RELIEF
### DECLARATORY AND EQUITABLE RELIEF
### VOIDING PARS AND UNIVERSAL CONTRACTS
### BECAUSE CONTRACTS ARE ILLEGAL
*Louisiana Teacher Class versus*
*Defendant PARS and Defendant Universal*

359.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

360.  The contracts entered into between Plaintiffs and other Class Members and PARS and Plaintiffs and other Class Members and Universal are contrary to the laws regulating recruitment of Philippine workers for overseas employment, as described in ¶¶ 85-89, *supra*, because the contracts:

a.    Seek collection of more than one month's expected U.S. salary; and

b.    Seek collection of fees that are not authorized under the POEA rules and regulations.

361.  The contracts entered into between Plaintiffs and other Class Members and PARS are contrary to the laws regulating H-1B visas, as described in ¶¶ 81-84, *supra*, because the contracts required Plaintiffs and other Class Members to pay fees that are the legal obligation of the employer,

not the employee.

362.   The contracts entered into between Plaintiffs and other Class Members and PARS and Plaintiffs and other Class Members and Universal are contrary to applicable laws regulating employment services that procure employment within the State of Louisiana, as described in ¶¶ 85-89, *supra*, because the contracts:

a.   Seek collection of fees on behalf of an employment service procuring employment in Louisiana that was not licensed with the Louisiana Workforce Commission;

b.   Seek collection of fees for procuring employment in Louisiana under contracts that were not pre-approved by the Louisiana Workforce Commission;

c.   Seek collection of fees for procuring employment in Louisiana that extend beyond Plaintiffs' and Class Members' first year of employment; and

d.   Seek collection of fees for procuring employment in Louisiana prior to the applicant's actual commencement of work in Louisiana.

363.   The fees mandated by the contracts entered into between Plaintiffs and other Class Members and Universal and Plaintiffs and other Class Members and PARS are void and unenforceable because they are contrary to law, as described above.

123

364.   Universal and PARS were unjustly enriched at the expense of Plaintiffs and other Class Members when Universal and PARS collected invalid fees pursuant to the contracts with Plaintiffs and other Class Members.

365.   Universal continues to attempt to collect invalid fees on its contracts with Plaintiffs and other Class Members.

366.   Plaintiffs and other Class Members are entitled to a declaration that the fee provisions of the contracts entered into between Plaintiffs and other Class Members and Universal and Plaintiffs and other Class Members and PARS are void and unenforceable.

367.   Plaintiffs and other Class Members are entitled to restitution of the fees unjustly obtained and retained by Universal and PARS, in an amount to be proven at trial.

368.   Plaintiffs and other Class Members are entitled to permanent injunctive relief prohibiting Universal from seeking to collect any further fees from them.

**NINTH CLAIM FOR RELIEF**
DECLARATORY AND EQUITABLE RELIEF
REGARDING ILLEGAL FEES COLLECTED WITHOUT A CONTRACT
*Louisiana Teacher Class versus*
*Defendant PARS and Defendant Universal*

369.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124

370.   Plaintiffs and other Class Members were charged certain fees by Recruiter Defendants that do not appear in either the contract entered into with PARS or the contract entered into with Universal.   These fees include:

       a.     The First Recruitment Fee, described in ¶¶ 101-113, *supra*, and

       b.     Cost of one-way airfare to the United States.

371.   Collection of both the First Recruitment Fee and the cost of airfare is prohibited under the laws regulating recruitment of Philippine workers for overseas employment, as described in ¶¶ 76-80, *supra*.

372.   Collection of the First Recruitment Fee is prohibited under the laws regulating employment services providers in Louisiana, as described in ¶¶ 85-89, *supra*.

373.   Universal and PARS have been unjustly enriched by collection of these illegal fees.

374.   Plaintiffs and other Class Members are entitled to a declaration that the First Recruitment Fee and airfare charge were illegal.

375.   Plaintiffs and other Class Members are entitled to restitution of the fees unjustly obtained and retained by Universal and PARS, in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY

125

State Common Law and Cal. Civ. Code § 3294
*Louisiana Teacher Class versus*
*Legal Facilitator Defendants*

376.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

377.   Legal Facilitator Defendants owed a fiduciary duty to Plaintiffs and other Class Members, based upon the attorney-client relationship Legal Facilitator Defendants established with Plaintiffs and other Class Members.

378.   Legal Facilitator Defendants breached the fiduciary duty owed to each and every Plaintiff and other Class Members, to his/her substantial detriment, by:

a.   Extracting and/or assisting Recruiter Defendants to extract fees from Plaintiffs and other Class Members, which they knew or should have known were the responsibility of EBRPSB and the non-defendant Louisiana School Districts;

b.   Procuring one-year rather than three-year visas for Plaintiffs and other Class Members; and

c.   Otherwise participating in and/or facilitating the trafficking scheme as described in ¶¶ 180-187, *supra*.

379.   Legal Facilitator Defendants' conduct was willful and

malicious.    As detailed in ¶ 378, *supra*, Legal Facilitator Defendants' participation in the trafficking scheme was willful and done in conscious disregard of the legal rights of Plaintiffs and other Class Members, and was intended to cause injury to Plaintiffs and other Class Members.

380.   Legal Facilitator Defendants' conduct proximately caused financial harm to Plaintiffs and other Class Members.

381.   Plaintiffs and other Class Members are entitled to an award of compensatory damages, and an award of punitive damages, in an amount to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
LEGAL MALPRACTICE
State Common Law and Cal. Civ. Code § 3294
*Louisiana Teacher Class versus*
*Legal Facilitator Defendants*

382.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

383.   Legal Facilitator Defendants were attorneys for Plaintiffs and other Class Members, as Legal Facilitator Defendants acknowledged in G-28 forms filed with the U.S. government.

384.   As counsel for Plaintiffs and other Class Members, Legal Facilitator Defendants owed a duty to Plaintiffs and other Class Members to use such skill, prudence, and diligence as members of their profession

commonly possess and exercise.

385. Legal Facilitator Defendants breached this duty, to the substantial detriment of Plaintiffs and other Class Members, by

a. Extracting and/or assisting Recruiter Defendants to extract fees from Plaintiffs and other Class Members, which they knew or should have known were the legal obligation of EBRPSB and the non-defendant Louisiana School Districts;

b. Procuring one-year rather than three-year visas for Plaintiffs and other Class Members; and

c. Otherwise participating in and/or facilitating the trafficking scheme described in ¶¶ 180-187, *supra*, to the severe prejudice of Plaintiffs and other Class Members.

386. Legal Facilitator Defendants' conduct was willful and malicious. As detailed in ¶ 385, *supra*, Legal Facilitator Defendants' participation in the trafficking scheme was willful and done in conscious disregard of the legal rights of Plaintiffs and other Class Members, and was intended to cause injury to Plaintiffs and other Class Members.

387. Legal Facilitator Defendants' conduct proximately caused financial harm to Plaintiffs and other Class Members.

388. Plaintiffs and other Class Members are entitled to an award of damages and an award of punitive damages, in amounts to be

128

determined at trial.

<h2 style="text-align:center"><u>TWELFTH CLAIM FOR RELIEF</u></h2>

THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS<br>
PROTECTION REAUTHORIZATION ACT OF 2008 (18 U.S.C. § 1595)<br>
<em>EBR Teacher Subclass versus</em><br>
<em>Employer Defendants</em>[5]

389. Plaintiffs and other Class Members re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**A.**     <u>**Authority for a Civil Action**</u>

390. Plaintiffs and other Class Members are victims of violations of the following sections of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, 1592, and 1594(a) and (b), as set forth in the First Claim for Relief.

391. As set forth in 18 U.S.C. § 1595(a), Plaintiffs and other Class Members may bring a civil action against the perpetrators of these violations and "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in a violation" of these provisions.

392. Employer Defendants were perpetrators of the violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and 1594(b), and violated the

---

[5]   The Court has granted Employer Defendant EBRPSB's motion to dismiss Plaintiffs' trafficking claim. Plaintiffs continue to assert such claim in this Second Amended Complaint for the sole purpose of preserving the issue of EBRPSB's liability under 18 U.S.C. § 1595 on appeal.

clearly established rights of EBR Teacher Plaintiffs and other EBR Teacher Subclass Members under those provisions.

393.   Employer Defendants have knowingly benefited, and continue to knowingly benefit financially or by receiving something of value from participation in a venture which Employer Defendants knew or should have known engaged in violations of 18 U.S.C. §§ 1589, 1590, 1592, 1594(a), and/or 1594(b).

394.   EBR Teacher Plaintiffs bring this claim on behalf of themselves and the EBR Teacher Subclass against Employer Defendants.

**B.    Forced Labor (18 U.S.C. § 1589)**

395.   As set forth in ¶¶ 190-254, *supra*, Employer Defendants knowingly aided and abetted Recruiter Defendants' and Legal Facilitator Defendants' efforts to provide and obtain the labor of Plaintiffs and other Class Members by means of abuse and threatened abuse of law or legal process and by means of a scheme, pattern, or plan intended to cause the Plaintiffs and other Class Members to believe that, if he or she did not perform the labor, he or she would suffer serious harm.

396.   Employer Defendants have knowingly benefited and continue to knowingly benefit financially and by receiving the value of EBR Teacher Plaintiffs' and other EBR Teacher Subclass members' labor from participation in a venture which Employer Defendants knew or should have

known was engaged in the acts set forth in ¶ 395, *supra*, and in the First Claim for Relief, ¶¶ 264-265, *supra*.

### C.   Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1590)

397.   As set forth in ¶¶ 190-254, *supra*, Employer Defendants knowingly aided and abetted Recruiter Defendants' efforts to recruit and transport Plaintiffs and other Class Members for labor and services in violation of 18 U.S.C. §§ 1589, 1592, 1594(a), and 1594(b).

398.   Employer Defendants have knowingly benefited and continue to knowingly benefit financially and/or by receiving the value of EBR Teacher Plaintiffs' and other EBR Teacher Subclass members' labor from participation in a venture which the Employer Defendants knew or should have known was engaged in the acts set forth in ¶ 397, *supra*, and the First Claim for Relief, ¶¶ 267-268, *supra*.

### D.   Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1592)

399.   Employer Defendants have knowingly benefited and continue to knowingly benefit financially and/or by receiving the value of EBR Teacher Plaintiffs' and other EBR Teacher Subclass members' labor from participation in a venture which Employer Defendants knew or should have known was engaged in the acts set forth in the First Claim for Relief, ¶ 270, *supra*.

**E.    Attempt to Violate 18 U.S.C. §§ 1589, and 1590 (18 U.S.C. § 1594(a))**

400.   As set forth in ¶¶ 190-254, *supra*, Employer Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590 in violation of 18 U.S.C. § 1594(a).

401.   Employer Defendants have knowingly benefited and continue to knowingly benefit financially and/or by receiving the value of EBR Teacher Plaintiffs' and other EBR Teacher Subclass members' labor from participation in a venture which the Employer Defendants knew or should have known was engaged in the acts set forth in ¶ 400, *supra*, and the First Claim for Relief, ¶¶ 272-273, *supra*.

**F.    Conspiracy to Violate 18 U.S.C. §§ 1589, 1590, and 1592 (18 U.S.C. § 1594(b))**

402.   As set forth in ¶¶ 190-254, *supra*, Employer Defendants conspired with Recruiter Defendants and Legal Facilitator Defendants to violate 18 U.S.C. §§ 1589 and 1590 in violation of 18 U.S.C. § 1594(b).

403.   Employer Defendants have knowingly benefited and continue to knowingly benefit financially and/or by receiving the value of EBR Teacher Plaintiffs' and other EBR Teacher Subclass members' labor from participation in a venture which Employer Defendants knew or should have known was engaged in the acts set forth in ¶ 402, *supra*, and in the First Claim for Relief, ¶¶ 275-276, *supra*.

132

**G.    Alternatively, Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor by violating 18 U.S.C. §§ 1589 (2003) and 1594(a) (2003) (18 U.S.C. § 1590 (2003))**

404.   Alternatively, in violation of 18 U.S.C. § 1590 (2003), and in addition to the violations of 18 U.S.C. § 1589 (2003) as set forth above, Employer Defendants knowingly aided and abetted the efforts of Recruiter Defendants and Legal Facilitator Defendants to recruit, transport, harbor, and/or obtain Plaintiffs and other Class Members for labor or services in furtherance of Recruiter Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:  18 U.S.C. §§ 1589 (2003); 1590 (2003), 1594(a) (2003).

**H.    Damages**

405.   As a proximate result of the conduct of Employer Defendants, EBR Teacher Plaintiffs and other EBR Teacher Subclass members have suffered injuries to their persons, businesses, and property, and other damages.

406.   EBR Teacher Plaintiffs and other EBR Teacher Subclass members are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees and costs.

**THIRTEENTH CLAIM FOR RELIEF**
NEGLIGENT HIRING
State Common Law
*EBR Teacher Subclass versus Defendant EBRPSB*

133

407.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

408.   Defendant EBRPSB hired Recruiter Defendants to recruit teachers from the Philippines and continued to employ Recruiter Defendants as its recruiting agents for a substantial time period.

409.   During the relevant time period, Defendant EBRPSB required that any job applicant from the Philippines who wished to apply to work for EBRPSB must do so by utilizing the services of Recruiter Defendants.

410.   Defendant EBRPSB knew or had reason to believe that Recruiter Defendants, and particularly Defendant Lourdes Navarro and Defendant Universal, were unfit for the tasks for which they were hired.

411.   Alternatively, Defendant EBRPSB had a reasonable duty of care to inquire into the fitness of Recruiter Defendants to perform their function.

412.   Defendant EBRPSB breached the duty to inquire into the fitness of Recruiter Defendants.

413.   Defendant EBRPSB's negligence, combined with its insistence that any applicant from the Philippines must utilize Recruiter Defendants' services, caused harm to the EBR Teacher Plaintiffs and other

Second Amended Complaint

EBR Teacher Subclass members by subjecting them to exorbitant fees and resulting monetary loss as a part of Recruiter Defendants' illegal schemes.

414. Defendant EBRPSB's negligence proximately caused the harm suffered by the EBR Teacher Plaintiffs and other EBR Teacher Subclass members.

415. The EBR Teacher Plaintiffs and other EBR Teacher Subclass members are entitled to an award of damages in an amount to be determined at trial.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a. Certifying the First through Eleventh Claims for Relief in this action as class claims pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Louisiana Teacher Class;

b. Designating Plaintiffs as class representatives of the Louisiana Teacher Class pursuant to Federal Rule of Civil Procedure 23, and designating Plaintiffs' counsel as counsel for the Louisiana Teacher Class;

c. Certifying the Second, Twelfth and Thirteenth Claims for Relief in this action as subclass claims pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the EBR Teacher Subclass;

d. Designating EBR Teacher Plaintiffs as representatives of the EBR Teacher Subclass pursuant to Federal Rule of Civil Procedure 23, and

1  designating EBR Teacher Plaintiffs' counsel as counsel for the EBR Teacher

2  Subclass;

3          e.      Declaratory and injunctive relief;

4

5          f.      Compensatory damages;

6          g.      Punitive damages;

7

8          h.      Treble damages as authorized by RICO, 18 U.S.C. § 1964(c) and

9  Cal. Civ. Code § 1812.523(d);

10         i.      An award of costs and attorneys' fees; and

11

12         j.      Such other relief as the Court deems just and appropriate.

13  **TRIAL BY JURY IS DEMANDED ON ALL COUNTS.**

14  Respectfully submitted this 1st day of June, 2011.

15

16

17

18  Lawrence Rosenzweig
    LAWRENCE ROSENZWEIG, PC
19  2730 Wilshire Boulevard, Suite 425
    Santa Monica, California  90403
20  *On behalf of Attorneys for Plaintiffs*

21

22

23

24

25

26

27