**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EAST BATON ROUGE PARISH SCHOOL BOARD, et al., <br><br> Defendants. | Civ. No.: 10-01172-AG-MLG |

### DECLARATION OF TOMASA MARI

1.     My name is Tomasa Mari.  I am one of the Plaintiffs and proposed class representatives in this case.  I have personal knowledge of the facts in this declaration.

2.     I am a national of the Philippines.  I currently reside in Meraux, Louisiana.

3.     I am employed by the Recovery School District, which is a school district administered by the State of Louisiana Department of Education, pursuant to an H-1B visa.  I teach special education.

4.     Prior to teaching in the United States, I taught regular education with inclusion of special education students with mild to moderate disabilities in the Philippines for 19 years.

5.     In the Philippines, I made about 10,000 to 15,000 pesos (approximately $215-$325) per month in this teaching position.  On average, a teacher

with similar experience as me would make about 15,000 to 20,000 pesos (approximately $325-$435) per month.

6.      Around June 2007, I called the PARS International Placement Agency (PARS) about teaching opportunities. I was asked to send my resume and other documents such as my diploma, certificates, and transcript of records. PARS discussed the requirements, including an interview, and that there would be a processing fee of $5,000.00. I was never told at that time there would be a large placement fee that I would be required to pay, which I learned about much later in the process. I also was not told at this time that I would be required to pay 10% of my salary during my second year teaching in the U.S. I sent my resume and documents to the office and was told that I would have an interview soon.

7.      On or about July 18, 2007, I was interviewed by the Recovery School District representatives over video conference. They could see me, but I could not see them. I interviewed with Betty Jean Wolf and others.

8.      Three days after the interview, I received a text message from the PARS office telling me that I passed the interview. I called PARS and spoke with Emilio Villarba, the owner of PARS. He told me to come to the PARS office to produce $ 5 000.00 as soon as possible or else my opportunity would be given to another applicant on the waiting list.

9.      Sometime during the last week of July 2007, I borrowed $5,000 from my niece in Manila and, because I lived in Cebu and she lived in Manila, she went to the PARS office to pay my fees.

10.     Before my embassy interview, I went to the PARS office so that Emilio Villarba could prepare me for the interview.  Emilio addressed a group of about six or seven of us and told us that after the interview we should have our visas sent to the PARS office and he would let us know when they arrived.

11.     After my embassy interview I returned to the PARS office.  Emilio Villarba explained to the group of us that we would have to pay a placement fee.  He told me that based on my teaching experience I would have to pay a placement fee of $10,000, which was 10% of my salary to PARS and 10% to Universal Placement International (Universal).  He said that I should go get the money as soon as possible and that I had to pay the amount before I could get my passport and visa to leave the country. He also told me that I needed to pay for my plane ticket to the United States, and that the ticket would cost $900.  I asked if I could buy my own ticket because I knew I could purchase a cheaper flight, but he said I could not.

12.     This was the first time I learned that I would have to pay these additional fees.  When I heard the additional fee was $10,000, I told Emilio that I did not have that huge amount of money.  It was so much money, but I knew I could not give up the process because I had already paid so much money that I knew would not be returned to me.  Emilio recommended that I use AG Financing and FG Financing to obtain loans. I obtained a loan for $10,000 from AG and for $5,000 from FG to help pay for the cost of my placement fee and pay back the loan from my niece.  The interest rate on the AG and FG loans was 4% per month.

13.     I later asked Emilio Villarba if I could pay $9,000 for my placement fee so that I could spare $1,000 for pocket money and he agreed, so I ultimately paid $4,000 to PARS and $5,000 to Universal.

14.     If I had known from the beginning of this process that I would be required to pay more than $15,000 and 10% of my salary in the U.S. during my second year of teaching, I never would have pursued getting a visa.

15.     On or about September 21, 2007, one day before I flew to the United States, I went to the PARS office.  Emilio Villarba gave me a contract to sign and he told me that I could not receive my passport and visa until I signed the contract and paid my fees.  He said that I would not be able to fly to the United States until I had done both.

16.     I flew to the United States with five other teachers and arrived in Los Angeles, California.  We were taken to the Universal office and required to sign another contract.  When we asked questions about the contract, Lulu Navarro, the owner of Universal, rushed us and told us it was the same contract that we had signed in the Philippines.  I did not have time to read the contract before being required to sign it.

17.     Around October 2007, at the Grand Route apartments, Lulu Navarro, the owner of Universal, held a meeting with the teachers.  There were approximately 18 of the Recovery School District teachers from the Philippines present.  Lulu threatened some of the teachers when they were complaining about our housing complex and asking to move out.  Lulu did not tolerate the questions and complaints, and said, "What, do you want me to send you all back to the Philippines?"  A lot of the teachers knew that Lulu would not tolerate any questions and were scared of her.

18     Lulu sued me in small claims court in California for fees she said I owed her for my second year placement fee.  I called Lulu to tell her that the lawsuit was not fair since I paid a placement fee higher than 20% of my actual salary.  Lulu agreed to credit me for the amount I overpaid if I sent post-dated checks to cover the upcoming months' payments for my second year of teaching.  I sent Lulu five $100 post-dated checks, and Lulu dismissed the lawsuit against me.

19.     Under penalty of perjury under the laws of the United States, I declare that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 13, 2011

_____

Tomasa Mari