Don A. Hernandez (SBN 125119)
Agnes Markarian (SBN 240388)
Martin E. Sullivan (SBN 274279)
HERNANDEZ, SCHAEDEL & ASSOCIATES, LLP
2 North Lake Avenue, Suite 930
Pasadena, CA  91101
Telephone: 626.440.0022
Facsimile: 626.628.1725
Email: dhernandez@hernlaw.com

Attorneys for Defendant/Counterclaimant
Universal Placement International, Inc. and
Defendant Lourdes "Lulu" Navarro

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MAIRI NUNAG-TANEDO, INGRID CRUZ, DONNABEL ESCUADRA, ROLANDO PASCUAL, and TOMASA MARI, on behalf of themselves and other similarly situated individuals,<br><br>   Plaintiffs,<br><br>  vs.<br><br>EAST BATON ROUGE PARISH SCHOOL BOARD, CHARLOTTE D. PLACIDE, MILLIE WILLIAMS, ELIZABETH  DURAN SWINFORD, UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES "LULU" NAVARRO, HOTHELLO "JACK" NAVARRO, PARS INTERNATIONAL PLACEMENT AGENCY, EMILIO V. VILLARBA, ROBERT B. SILVERMAN, and SILVERMAN & ASSOCIATES,<br><br>   Defendants. | Case No. SA CV 10-01172-JAK (MLGx)<br><br>[Hon. John A. Kronstadt]<br><br>**DEFENDANT / COUNTERCLAIMANT UNIVERSAL PLACEMENT INTERNATIONAL, INC.'S AND DEFENDANT LOURDES "LULU" NAVARRO'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: September 2, 2011<br>Time: 9:00 a.m.<br>Courtroom: 750 |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................2

   A.   PLAINTIFFS ARE HIGHLY-EDUCATED
        PROFESSIONALS WHO HAVE EARNED MORE THAN
        $100,000 IN THE UNITED STATES ................................................2

   B.   PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................2

   C.   PLAINTIFFS' TRAFFICKING AND FRAUD-BASED
        ALLEGATIONS ...............................................................................3

III. PLAINTIFFS FAIL TO ESTABLISH ELEMENTS REQUIRED
     BY F.R.C.P. 23(a) ...............................................................................4

   A.   PLAINTIFFS DO NOT DEMONSTRATE THAT THE
        PROPOSED CLASS AND SUB-CLASS MEMBERS ARE
        SUFFICIENTLY NUMEROUS ......................................................4

      1.   Declarations dispute the named Plaintiffs' contentions..........4

      2.   Plaintiffs merely speculate as to the number class and
           sub-class members. .......................................................5

   B.   PLAINTIFFS' FRAUD AND EXTORTION BASED
        CLAIMS DO NOT PRESENT COMMON QUESTIONS OF
        FACT ..............................................................................................5

      1.   All Plaintiffs' claims hinge on alleged
           misrepresentations, but these representations were
           non-uniform, and made on different occasions, by
           different people, under different circumstances.....................6

      2.   Inquiry into class members' reliance on any alleged
           misrepresentations requires individualized proof.................11

      3.   Demands by UPI ranged in variety from simple
           invoices to lawsuits.........................................................13

   C.   PLAINTIFFS CANNOT DEMONSTRATE THAT THEY
        CAN SERVE AS ADEQUATE CLASS
        REPRESENTATIVES.....................................................................14

      1.   Cruz Cannot Assert Main Elements of the Plaintiffs'
           Claims .............................................................................14

      2.   Cruz and Tanedo Seek to Gain Personal Recognition
           as Named Plaintiffs and Harbor a Personal Vendetta
           Against Navarro...............................................................15

      3.   The Named Plaintiffs Are Atypical........................................16

DEFENDANTS UPI'S AND NAVARRO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

        4.      **Plaintiffs' Ability to Recall Only Self-Serving Details Undermines Their Credibility** ...................................17

IV.  **PLAINTIFFS FAIL TO SHOW THE PROPOSED CLASS SHOULD BE CERTIFIED IN ACCORDANCE WITH F.R.C.P. 23(b)** 19

    A.      **THE PRESENT ACTION CANNOT BE CERTIFIED UNDER FED. R. CIV. P. 23(B)(3) BECAUSE INDIVIDUAL QUESTIONS OF FACT AND LAW PREDOMINATE** ...............**19**

        1.      **Plaintiffs' Fraud-Based Claims Require That Each Injured Party Demonstrate Reliance, Which Necessarily Is An Individual Inquiry.** ....................................19

        2.      **Plaintiffs' Extortion-Based Claim Also Requires Individual Inquiries That Will Predominate Over Common Questions** ....................................22

        3.      **Plaintiff's Trafficking Claims** ....................................23

    B.      **CERTIFICATION UNDER FED. R. CIV. P. 23(B)(2) ALSO WOULD BE IMPROPER IN THIS ACTION** ...............................**24**

        1.      **Plaintiffs Concede the Litigation's Primary Purpose is Monetary Damages** ....................................24

        2.      **Individualized Issues Predominate With Respect to Plaintiffs' Calculation of Monetary Damages** ....................................25

V.    **CONCLUSION** ....................................25

DEFENDANTS UPI'S AND NAVARRO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ........................................ 16

*Celano v. Marriot Int'l, Inc.*, 242 F.R.D. 544 (N.D. Cal. 2007) ...................... 4

*Curley v. Cumberland Farms Dairy*, 728 F. Supp. 1123 (D.N.J. 1989) ............. 13, 22

*Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568 (C.D. Cal. 2007) ......... 14, 15, 17, 18

*Garcia v. Felker*, 2008 U.S. Dist. LEXIS 27746 (C.D. Cal. 2008) ...................... 23

*Gen Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) ...................................... 25

*George Lussier Enters v. Subaru of New England*,
286 F. Supp. 2d 86 (D.N.H. 2003) ....................................................... 13, 22

*Goldilocks Corp. of S. Cal. v. Ramkabir Motor Inn*,
26 Fed. Appx. 693 (9th Cir. 2002) ............................................................ 11

*Goldman v. Alhadeff*, 1990 U.S. Dist. LEXIS 11808 (W.D. Wash. Jan. 31, 1990)..17

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. Cal. 1998) ................................ 5

*Kamerman v. Ockap Corp.*, 112 F.R.D. 195 (S.D.N.Y. 1986) ................................ 16

*McCluskey v. Trs. of Red DOT Corp. ESOP & Trust*,
268 F.R.D. 670 (W.D. Wa. 2010) ........................................................... 4

*McLaughlin v. Am. Co.*, 522 F.3d 215 (2d Cir. 2008) .............................................. 21

*Moore v. Paine Webber*, 306 F.3d 1247 (2d Cir. 2002) ........................................... 11

*Parks v. Yates*, 2010 U.S. Dist. LEXIS 140585 (C.D. Cal. 2010) ........................... 13

*Poulos v. Caesar's World*, 379 F.3d 654 (9th Cir. 2004) ...................... 11, 19, 20, 22

*Robinson v. Gillespie*, 219 F.R.D. 179 (D. Kan. 2003) ............................................ 14

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ............................... 15

*Rossini v. Ogilvy & Mather, Inc.*, 80 F.R.D. 131 (S.D.N.Y. 1978) ......................... 16

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
319 F.3d 205, 211, 219 (5th Cir. 2003) ................................................... 20

*Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002) ...............................21

*Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311(4th Cir. 2006).......................24

*UFCW Local 1776, etc. v. Eli Lilly and Co.*, 620 F.3d 121 (2d Cir. 2010) ..............21

*United States v. De La Rosa Dann*,
2011 U.S. App. LEXIS 15012 (9th Cir. July 22, 2011) ...........................................15

*U.S. v. Kozminski*, 487 U.S. 931 (1988) ...................................................23

*Utah v. American Pipe and Construction Co.*, 49 F.R.D. 17 (C.D. Cal. 1969) ..........4

*Wal-Mart Stores, Inc. v. Dukes*, 2011 U.S. LEXIS 4567  (June 20, 2011)...........6, 24

*Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033 (9th Cir. 2006).......................15

*Westways World Travel, Inc. v. AMR, Corp.*,
2005 U.S. Dist. LEXIS 47291 (C.D. Cal. 2005) ......................................................22

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010)...............20

**Statutes**

18 U.S.C. § 1589.............................................................................23

Fed. R. Civ. P. 23(a) ...............................................................1, 4, 19

Fed. R. Civ. P. 23(a)(2) ..................................................................5

Fed. R. Civ. P. 23(b)(3) ...............................................1, 20, 22, 23

Fed. R. Civ. P. 23(a)(4)....................................................................14

Fed. R. Civ. P. 23(b)......................................................................19

Fed. R. Civ. P. 23(b)(2) ...................................................................24

**Other Authorities**

*CALJIC 14.70* ...............................................................................13

DEFENDANTS UPI'S AND NAVARRO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs Mairi-Nunag Tanedo, Ingrid Cruz, Tomasa Mari, Donnabel Escuadra and Rolando Pascual ( "named Plaintiffs") are well-paid teachers from three Louisiana school districts.  Born and educated in the Philippines, they voluntarily sought employment in the U.S. for a variety of reasons, including more money, professional growth and healthcare for their children.  To assist them in navigating the complex, difficult process of obtaining job offers from an American school district, obtaining teaching certificates and securing H-1B visas, the named Plaintiffs selected PARS International Placement Agency ("PARS") and Universal Placement International ("UPI") over other agencies in the Philippines because of PARS' and UPI's success.

Named Plaintiffs attended different seminars, presentations and interviews at different times and in different locations.  Along with other successful applicants, they various and conflicting information about fees that PARS and UPI would charge at different times.  Though named Plaintiffs deny they were given copies of the PARS and UPI contracts to review, other putative class members specifically remember being given the opportunity to carefully reflect and consider the contracts before signing them.  The testimony is undisputed that all applicants were given the opportunity to walk away from the process at any point before committing to borrow money for fees.  But, they each elected to proceed for a variety of reasons.

Plaintiffs now seek to certify a class of all Filipino teachers who obtained teaching positions in Louisiana through PARS and UPI.  They also seek to certify a sub-class of teachers who work for the East Baton Rouge Parish School System ("EBR").  For the reasons set forth below, this Court must reject the motion because the named Plaintiffs fail to establish at least three of the four elements required by Fed. R. Civ. P. 23(a) and make none of the showings required by Rule 23(b)(3) and (b)(2).

## II. SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.   PLAINTIFFS ARE HIGHLY-EDUCATED PROFESSIONALS WHO HAVE EARNED MORE THAN $100,000 IN THE UNITED STATES

Named Plaintiff Mairi Nunag-Tanedo ("Tanedo") teaches special education for EBR and currently earns $44,000 annually.  After studying business, Tanedo received her Bachelor's degree in Custom Administrations and certification in Special Education.  Tanedo Dep. (Exh. E) 86:19-22, 95:10, 101:13-20, 17:11- 20:17.

Donabel Escuadra ("Escuadra"), a special education teacher for EBR earns $52,000 a year and has a Bachelor's degree in Secondary Education and a Master's degree in Special Education.  She has taken several law classes, including contracts law.  Escuadra Dep. (Exh. B) 33:24-34:25, 37:24-38:9, 62:22-23, 95:20-96:12.

Ingrid Cruz ("Cruz") was an instructor at a university prior to coming to the U.S. She has a certificate in Professional Education and a Bachelor's degree in Biology.  She teaches science and robotics at EBR for $40,000 annually.  Cruz serves on the executive board of the American Federation of Teachers.  Cruz Dep. (Exh. A) 219:11-19, 222:13-223:14,  48:11-14, 35:10-13, 39:16-21.

Tomasa Mari ("Mari") earns $45,000 per year as a special education teacher in the Recovery School District.  She has a Bachelor's degree in Elementary Education and a Master's in Special Education.  Mari Dep. (Exh. C) 52:3-6, 78:18-20, 23:9-17.

Rolando Pascual ("Pascual") is a special education teacher with a degree in Special Education earning $42,000 per year.  When his employer, the Caddo Parish School District ("Caddo"), failed to renew his job in the U.S. after the first year, Navarro interceded to convince Caddoand convinced that employer, the Caddo Parish School District, to renew his contract.  Pascual Dep. (Exh. D)19:11-13, 21:7-19, 130:6-25, 50:11-51:5.

### B.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

Named Plaintiffs purport to bring the current litigation on behalf of a class of all Filipino teachers in Louisiana school districts who obtained H-1B visas through UPI

and Navarro, with a subclass of teachers employed by EBR.  SAC ¶¶ 39, 54.  They allege common issues of law, including extortion, fraud, trafficking, and illegal contracts. Pls.' Mem. Supp. Class Certif., 12.  They also assert common issues of fact, related to trafficking and extortion. They allege the class representatives adequately represent the class because they were recruited and employed under the same conditions and sustained the same injuries.  *Id.* at 14-15.  Plaintiffs assert common questions predominate over individual inquiries and the claims arise out of the same nucleus of facts, making claims subject to common proof.  *Id.* at 17.

Plaintiffs also seek certification under Rule 23(b)(2).  SAC ¶ 49.  However, "[p]laintiffs recognize that their claims for monetary relief predominate" over their claims for injunctive relief.  Pls.' Mem. Supp. Class Certif., 20.

C.    PLAINTIFFS' TRAFFICKING AND FRAUD-BASED ALLEGATIONS

Plaintiffs allege UPI and Navarro trafficked the putative class members from the Philippines to the U.S., withholding their travel documents.  SAC ¶¶ 10, 68, 70, 278. Plaintiffs claim this fostered the belief that if Plaintiffs did not work, they would suffer serious harm.  *Id.* at ¶ 264. Plaintiffs allege they relied on false and misleading representations about the job recruitment services UPI and Navarro would provide. *Id.* at ¶ 322.  They allege UPI and Navarro concealed information about required fees, *Id.* at ¶ 299, and  sent mail and wire transmissions to further their fraudulent scheme to the detriment of Plaintiffs and other class members.  *Id.* at ¶ 300.  These misrepresentations were related to expected salaries, availability of positions, and required fees.  *Id.* at ¶¶ 299, 318-319, 322.

UPI and Navarro allegedly failed to inform the teachers of a so-called "Second Recruitment Fee" until after plaintiffs had paid the "First Recruitment Fee."  SAC ¶¶ 197-202.  Plaintiffs claim had they known about the additional fee they would not have continued the recruitment process.  SAC ¶ 340. Plaintiffs request the court declare the fee provisions of the contracts void, and seek.  They also request restitution and permanent injunctive relief prohibiting UPI from collecting any further fees.  SAC ¶¶

357-358, 367-368.

### III.   PLAINTIFFS FAIL TO ESTABLISH ELEMENTS REQUIRED BY F.R.C.P. 23(a)

A.   PLAINTIFFS DO NOT DEMONSTRATE THAT THE PROPOSED CLASS AND SUB-CLASS MEMBERS ARE SUFFICIENTLY NUMEROUS

Plaintiffs must prove the class is "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).*  Generally, courts deny class certification if a class consists of fewer than 20 individuals.  *Celano v. Marriot Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).  Courts have also denied class certification based on numerosity for a class as large as 350 individuals.  *See Utah v. American Pipe and Construction Co.*, 49 F.R.D. 17, 21 (C.D. Cal. 1969).[1]

In *American Pipe*, the Court held the proposed class did not satisfy numerosity. *Id.* at 21.  The Court rejected the plaintiffs' original estimate of 800 potential class members, instead holding that 350 was a more accurate representation of the number of individuals who were actually affected by the alleged conspiracy. *Id*. at 20-21.  It then held that the 350 person class was not so numerous that joinder was impracticable. *Id*. *See also Celano, 242 F.R.D.* at 549 (denying certification because plaintiffs' proposed class was too speculative to establish numerosity).

### 1.   Declarations dispute the named Plaintiffs' contentions.

Named Plaintiffs assert the class consists of 350 teachers and the subclass includes 250 teachers. Pls.' Mem. Supp. Class Certif., 9.  This assumes that all Filipino teachers in Louisiana receiving H-1B visas through UPI suffered from the same facts alleged by the Plaintiffs.  However, at least six other putative class members declare

---

[1]   Courts will look at additional factors to determine numerosity including (1) judicial economy; (2) the geographic dispersion of class members; (3) the members' financial resources; (4) the members' ability to file individual suits; and (5) the effect on future members. *McCluskey v. Trs. of Red DOT Corp. ESOP & Trust*, 268 F.R.D. 670, 674, (W.D. Wa. 2010).

1    that they did not experience the same injury and do not allege the same claims as named

2    Plaintiffs.  Bayarong Decl. ¶ 8-15; Cordero Decl. ¶ 14-16; Dones Decl. ¶ 14-16; Flores

3    Decl. ¶ 10-12; Gamit Decl. ¶ 15-17; Rodriguez Decl. ¶ 13-16.  Some teachers believe

4    Plaintiffs brought the current lawsuit to avoid paying UPI's legitimate fees.  Flore Decl.

5    13; Cordero Decl. 17; Rodriguez Decl. 16.  As in *American Pipe* and *Celano*, such

6    teachers  cannot  be  considered  class  members  for  the  purpose  of  determining

7    numerosity.

8       2.  **Plaintiffs  merely  speculate  as  to  the  number  class  and  sub-class**

9          **members.**

10     Plaintiffs do not base their estimate on a calculation of class members harmed by

11   UPI and Navarro's alleged conduct, but  on the number of teachers UPI and Navarro

12   placed in Louisiana, thus speculating that <u>all</u> teachers were adversely affected by UPI

13   and Navarro's conduct.  They falsely imply that all teachers were harmed by UPI and

14   Navarro's conduct when in fact a number of teachers declare they suffered no harm and

15   actually benefited from UPI and Navarro's services.  Named Plaintiffs provide no

16   further proof to augment the class beyond themselves; five is too small to satisfy

17   numerosity.

18   B. <u>PLAINTIFFS'  FRAUD  AND  EXTORTION  BASED  CLAIMS  DO  NOT</u>

19     <u>PRESENT COMMON QUESTIONS OF FACT</u>

20     A class lacks sufficient commonality unless "there are questions of fact and law

21   which  are  common  to  the  class."   Fed. R. Civ. P. 23(a)(2).   The  commonality

22   preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of

23   Rule 23(b)(3). *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. Cal. 1998).*  In

24   *Hanlon,* class certification was granted where plaintiffs could point to a common fact—

25   an alleged defect Chrysler minivans made between 1984 and 1995.  There is no such

26   common question of fact or law in this case.  Rather, plaintiffs ask the Court to find

27   commonality in non-uniform representations and threats made by different individuals

28   at different times.

The U.S. Supreme Court in *Wal-Mart Stores, Inc. v. Dukes* explained the Rule 23(a) requirements for class certification as follows:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate … that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, [citations omitted], and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied, [citations omitted]. [A]ctual, not presumed, conformance with Rule 23(a) remains…indispensable. Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action [citations omitted]. 2011 U.S. LEXIS 4567 * 21-22 (June 20, 2011) .

Plaintiffs' enumeration of questions of law and fact are nothing more than conclusory recitations of their pleadings.  None of the common questions as to the Louisiana teacher class or EBR teacher subclass, without "rigorous analysis", meet the commonality requirement of Rule 23(a). SAC ¶¶ 43-44, 58. Even a cursory look beyond bare recitals of the Second Amended Complaint ("SAC") demonstrate that individual questions not only are manifest, but in fact predominate overwhelmingly.

1. **All Plaintiffs' claims hinge on alleged misrepresentations, but these representations were non-uniform, and made on different occasions, by different people, under different circumstances.**

Cruz approached PARS on 7/5/07, accepting a job offer on 7/12/07.  Exh. 564; Exh. 565.  She and her mother reviewed the PARS contract prior to signing on 7/23/07.  The next day, Cruz paid PARS $5,000 in application fees.  As of 7/24/07, neither

1  Navarro nor any UPI representative had uttered a single representation to Cruz.

2  Villarba allegedly withheld Cruz's passport on 9/26/07, until she paid her placement

3  fee. Cruz Decl. ¶ 16.  Cruz signed a UPI contract upon arriving in Los Angeles without

4  threat from anyone at UPI.  Exh. A 138: 21-139: 24; 83:1-9; 140:20-141: 31; 60:14-

5  161: 6; 157:2-13; 159:24-160: 8.

6       Mari called PARS in June 2007 on a friend's advice.  School administrators

7  interviewed Mari by video conference on 7/18/07, at PARS' Manila office. Mari Decl.

8  ¶ 7. Mari also attended three PARS seminars.  Mari bought multiple plane tickets to fly

9  from her home in Cebu to PARS' Manila office, despite the existence of "a lot" of other

10  employment agencies in Cebu.  Villarba told Mari about the $5,000 initial fee; she paid

11  on 7/27/07.  Exh. 581. Mari accepted a job offer from Recovery school district on

12  8/2/07, and signed a contract with UPI over a month later on 9/14/07.  Exh. 586; Exh

13  571; Exh. C 27:16-28: 1; 28:6-16; 28:24-29:12; 48:16-49:5; 30:15-17.

14       Tanedo Googled PARS after learning a family friend was placed in the U.S.

15  Tanedo called PARS and was told about a "recruitment blitz" and a PARS presentation

16  to take place on 3/28/08 in Cebu.  Tanedo paid $25 to attend the presentation and was

17  interviewed by EBR administrator Karl Sam.  After passing her interview, Tanedo and

18  other teachers met Navarro in person.  Navarro instructed them to deposit $1,000 as

19  "earmark money" or their papers would not be processed. On that same day, Navarro

20  told Tanedo to prepare about $5,000 and then Tanedo would be "good to go."  Tanedo

21  signed a job offer with EBR on 4/11/08.  She signed the PARS contract on 7/4/08. Exh.

22  E 58:21-59:6; 60:8-19; 60:22-62:3; 68:4-69.5; 77:17-23; 79:2-23; 88:21-89:4; 88:5-9;

23  Exh. 519.

24       Escuadra studied to become a special education teacher starting in 2007 so as to

25  immigrate to the U.S. to benefit her children and escape a failed marriage.  Exh. B 41:4-

26  11.  She considered other employment agencies, including Health Quest and Global.

27  *Id.* at 20:21-21:19. Escuadra first learned of PARS in early March 2008 through a co-

28  worker. *Id.* at 23:10-21. She paid $25 to attend a PARS interview skills seminar led by

1   Villarba in mid-March 2007. *Id.* at 27:13-22; 30:12-31:9. Escuadra was told seminar
2   attendees had "priority" over walk-ins during the 3/28/08 interviews. *Id.* On 3/28/08,
3   EBR representative Swinford interviewed Escuadra at a hotel in Cebu. *Id.* Navarro
4   then met Escuadra and other teachers and explained they must pay $1,000 to secure a
5   spot in the placement program or be replaced. *Id.* at 122:3-8. Escuadra considered the
6   $1,000 demand a "threat." *Id.* at 125:19-24; 134:2-8. On the same day, Villarba told the
7   teachers to prepare $5,000 for fees and costs. *Id.* at 129:6-16. Per Escuadra, Navarro
8   said nothing about a "large placement fee", but did enumerate certain fees and costs and
9   told everyone that she expected a profit for UPI's services. *Id.* at 130:20-131:11;
10   Escuadra Decl. ¶ 8. Early in the process before Escuadra had paid her $5,000 in initial
11   fees, a PARS employee told her there was no possibility of a refund. Exh. B 131:11-
12   21. Escuadra signed a job offer with EBR on 4/15/08. *Id.* at 142:15-17; 144:23-145:9.
13   Escuadra signed a PARS contract and other documents in July 2008, when she knew
14   about placement fees and had been told twice there would be no refunds. *Id.* at 163:10-
15   16. Escuadra signed the contract because she was told by a PARS employee, Lorna,
16   where to sign and because she heard Villarba yelling at a teacher for asking questions.
17   *Id.* at 160:2-16 .

18        In January or February 2008, Pascual was encouraged to apply to PARS by
19   Edelwissa Bayog, who was about to fly to Louisiana to begin her placement with EBR.
20   Pascual applied and was invited to attend an interviewing skills seminar in Quezon City
21   on 3/11/08. Exh. 590.  At the seminar, Villarba told Pascual he would have to pay a
22   $2,000 marketing fee, $1,000 credential fee and about $315 for evaluation fees if he
23   passed the job interview.  On the day of the interview, March 29, 2008, Pascual
24   admitted that did not recall hearing about placement fees, in part because he was most
25   concerned about getting a job offer.  Pascual did not pass the EBR interview.  Pascual
26   Decl. ¶ 11. He then paid $1,000 to PARS so that he would be considered for a position
27   in Boston schools, although Boston did not ultimately hire him. *Id.*; Exh. 592. Pascual
28   Decl. ¶ 14. He then successfully interviewed with the Caddo.  Pascual was given a job

1 offer dated 6/3/08. Exh. 599. He signed a PARS contract and other documents on
2 9/23/08. Exh. D 56:23-57:23; 60:17-61:1; 66:24-67:19; 78:1-21; 75:22-76:5; 102:12-
3 15; 178:1-7.

4       Rafaela Flores and a friend went to PARS' office in June 2007. Flores applied
5 and was told about all the fees that would be required of her, including a 10%
6 placement fee to PARS and UPI based on her expected salary. Flores successfully
7 interviewed with PARS on 7/9/07 and 7/10/07. On 7/17/07, Flores returned to PARS'
8 office to review the PARS and UPI contracts. She was provided with copies of the
9 contracts to review a week before she signed them. When Flores arrived in Los
10 Angeles, she again had time to review the UPI contract prior to signing, although she
11 recognized the contract as the one previously signed in the Philippines. Flores Decl. ¶¶
12 2-5, 8.

13       Annette Gamit found PARS in early 2008 online at, workabroad.com. Gamit
14 was a walk-in for the 3/25/08 interview at the Manila Hotel, among about 400 others.
15 There, she interviewed with EBR representative Robert Webb. On 3/27/08, PARS
16 employee Lorna told Gamit she passed the interview and had to pay a $1,000 marketing
17 fee to proceed. Gamit went to the Sofitel Hotel in Manila where Navarro met her and a
18 group of teachers and explained they would have to pay evaluation, credentialing, visa
19 processing, and placement fees. Navarro encouraged teachers who harbored doubts
20 about the process to forgo the opportunity. Gamit recognized that this investment was
21 a "gamble" since there was no guarantee of obtaining a visa, but decided to move
22 forward. Gamit received a job offer from EBR on 4/9/08. A delay in her credentialing
23 paperwork pushed her start-date back a year. In May 2009, Gamit met with Villarba
24 who again reiterated the placement fee. On 5/11/09, after conferring with her family,
25 Gamit signed the PARS contract in Manila. She paid her placement fee on 5/22/09.
26 When Gamit arrived in Los Angeles on 5/25/09, she took time to review and sign the
27 UPI contract. When Gamit had difficulty in paying the 10% fee owed to UPI, she
28 contacted Navarro who adjusted the pay schedule to accommodate her. Gamit Decl. ¶¶

1  2-6, 11, 12, 16.

2  　　　Luzviminda Bayarong learned of PARS from a friend in February 2008.  She

3  called PARS, was told of interviews taking place in the Manila Hotel on 3/25/08, and

4  attended.  Navarro told Bayarong and about 100 other teachers in a hotel conference

5  room about the fees, including a 10% placement fee.   Navarro encouraged teachers

6  who were unwilling to pay to discontinue the process. On 5/8/09, Bayarong reviewed

7  the UPI contract for two hours before signing it.   Before leaving for the U.S., she met

8  with Villarba who again discussed the 10% placement fees mentioned by Navarro.

9  Bayarong arrived in Los Angeles on 5/25/09 and met with Navarro at the hotel.

10  Navarro gave the teachers contracts to review overnight, which Bayarong did with

11  fellow teachers Aseo, Siaotong and Gamit.  Bayarong returned the signed contract the

12  following morning.  Bayarong Decl. ¶¶ 2, 3, 5, 7.

13  　　　Emenilda Cordero met Villarba in the Philippines in 2007, who told her of

14  PARS' fees, including a 10% placement fee to PARS and UPI for the first two years of

15  employment. In early July 2007, an EBR representative interviewed Cordero via video.

16  Cordero reviewed contracts with UPI and PARS prior to signing them in the

17  Philippines and was given copies to review and keep.  Upon arriving in Los Angeles on

18  8/31/07, Cordero took time to review the UPI contract before signing it.  She was not

19  threatened by Navarro, UPI or PARS. Cordero Decl. ¶¶ 2-4, 9, 15.

20  　　　Arvin Dones paid $3,000 to "Badilla Corporation" in 2005 or 2006 to apply for a

21  U.S work visa.  Dones' visa application was denied and the money was never returned.

22  Dones then learned of PARS from a colleague, contacted PARS and was interviewed

23  for a position in June and July 2007.  EBR representative Daphne Donaldson then

24  extended an offer of employment to Dones.  Immediately thereafter, Villarba explained

25  to Dones the agency fees, including the 10% placement fee by PARS and UPI, based on

26  his expected salary. Dones reviewed his contract with his sister, and was given copies

27  to review prior to signing.  On 7/17/07, Dones signed and returned the PARS and UPI

28  contracts.  Dones' decision to sign the contract was "voluntary, and not coerced or

1  obtained under pressure."  Dones Decl. ¶¶, 2-7, 10, 14-17.

2      Milnor Rodriguez learned of PARS and submitted a resume online.  She, along

3  with several hundred teachers, attended an interview in November 2007 at the Manila

4  Hotel.  Unsuccessful in her first EBR interview, Rodriguez sought qualification in

5  Spanish instruction and was re-interviewed on 3/25/08 in Spanish.  Rodriguez was told

6  of the 10% placement fee by a friend she met during the November 2007 interviews.

7  On 5/26/08, Rodriguez fully reviewed the PARS and UPI contracts and had the

8  opportunity to ask questions of PARS staff, before signing, which she did voluntarily.

9  Rodriguez paid off $8,000 in loans during her first year of teaching in Louisiana.

10      Plaintiffs present no evidence that oral representations made to each of them, if

11  any, were sufficiently uniform.  Now-Supreme Court Justice Sotomayor authored the

12  Second Circuit Court of Appeal's *Moore v. Paine Webber* opinion finds that class

13  certification on RICO fraud claims based upon oral misrepresentations was

14  inappropriate where the plaintiffs failed to present evidence that the representations

15  were materially uniform. 306 F.3d 1247, 1255-1256 (2d Cir. 2002)  Evidence shows

16  oral representations made to teachers by various defendants are materially *non*-uniform.

17  Such representations were generally disparate (e.g., the different marketing fees

18  charged to Pascual and Gamit) when not outright conflicting (e.g., named plaintiffs

19  claimed surprise over the placement fees, but other declarants were clearly told of the

20  fees at the outset of the process).  Class certification based on fraud or extortion is

21  therefore improper.

22      2.  **Inquiry into class members' reliance on any alleged**

23          **misrepresentations requires individualized proof**

24      In order to prevail on RICO and other fraud-based claims, Plaintiffs and other

25  putative class members must have justifiably and detrimentally relied on Defendants'

26  material misrepresentations. *Goldilocks Corp. of S. Cal. v. Ramkabir Motor Inn,* 26

27  Fed. Appx. 693, 696 (9th Cir. 2002).  The Ninth Circuit Court of Appeals in *Poulos v.*

28  *Caesar's World,* 379 F.3d 654, 664-667 (9th Cir. 2004) found this inquiry must be

made with respect to each plaintiff as "the class representatives, like all plaintiffs asserting civil RICO claims, must prove individualized reliance." *Id.* at 664-66. *Poulos* opined that even taking plaintiffs' allegations of misrepresentation as true, it did not necessarily follow that plaintiffs' injuries resulted from the defendants' alleged misrepresentations. *Id.* at 665. The Court's causation analysis focused intensely on individual reliance issues related to the plaintiffs' knowledge, motivations, and expectations. *Id.*

Plaintiffs allege that the teachers first learned after paying a non-refundable First Recruitment fee about a second recruitment fee. SAC at ¶ 123. The inquiry as to when each person was told about the second fee is an individual one. Indeed, several teachers have testified there was no misrepresentation, they were told about the second recruitment fee all along.  Rodriquez Decl. ¶ 7; Cordero Decl. ¶ 2; Dones Decl. ¶ 6.

Even the named Plaintiffs' testimony demonstrates that their motivation, and therefore their purported reliance on Defendants' statements, is different and an individual inquiry. Cruz was only working part-time and needed more money to care for her daughter who required expensive therapy. Exh. A 86:21-87:14. She reviewed the UPI contract with her mother and crossed out some provisions in the compensation section of the contract. *Id.* at 160:14-161:1. Escuadra, on the other hand, was motivated to come to the U.S. to provide medical care for her son and make more money. Exh. B. 35:12-36:4; Exh. 537; 69:20-70:1.  Mari sought a job in the US as early as 2004.  She attended seminars and went back to school in 2006 to get a degree in special education in order to become more attractive to US employers. Exh. C 24:21-25:1; 22:25-23:17; Exh. 574. Tanedo sought "greener pastures," more money, and professional growth. Exh. E 58:8-14. Pascual repeatedly attempted to come to the US wanting to join his family. Exh. D. 75:22-76:5. Moreover, he admitted he did not recall hearing about a fee because he was most concerned about getting a job offer. *Id.* at 78:11-21. Thus, the questions whether 1) Navarro and UPI induced "false beliefs about the limited extent of the recruitment fee" and 2) whether each Plaintiff paid the First Recruitment Fee in

1  reliance on those representations, are individual inquiries and not appropriate for class
2  certification.

3     3.    **Demands by UPI ranged in variety from simple invoices to lawsuits**

4         Extortion claims based on oral threats are inappropriate for class actions since
5  they require a fact-intensive inquiry into the defendants' interaction with particular
6  class members. *Curley v. Cumberland Farms Dairy*, 728 F. Supp. 1123, 1132 (D.N.J.
7  1989). *George Lussier Enters v. Subaru of New England*; 286 F. Supp. 2d 86, 103
8  (D.N.H. 2003). To prove extortion, the Plaintiffs must show they consented to paying
9  the contract fees primarily because of UPI and Navarro's wrongful use of force or fear.
10 *CALJIC 14.70*; *Parks v. Yates*, 2010 U.S. Dist. LEXIS 140585, Fn.16 (C.D. Cal. 2010).
11 This specific wrongful use of force or fear must be common to all class members. *See*
12 *Curley*, 728 F. Supp. 1123 (D.N.J. 1989) (despite some evidence of the defendants'
13 standardized oral representations to each class member, evidence did not relate to
14 alleged pattern of extortion common to all class members).

15        To prove commonality, the Plaintiffs must establish, through individualized
16 proof, that the threat each class member received from UPI or Navarro was part of a
17 plan or pattern. However, there are no common questions of fact concerning Plaintiffs'
18 contention that UPI and Navarro extorted the teachers for payment of the contract fees.
19 As in *Curley*, named Plaintiffs' threat allegations differ wildly:

20     •    Navarro threatened to sue Tanedo, deport her, or have her fired if she did
21          not move from her Old Towne apartment due to the military evacuation
22          for Hurricane Gustav. Exh. E 316:23-317:9.

23     •    Navarro sued Mari for not paying her contract fees, but settled for
24          $951.60, of which Mari only paid $500. Exh. C 69:2-70:20.

25     •    Tanedo was never threatened with a lawsuit by Navarro or UPI. Exh. E
26          318:15-20.

27     •    Escuadra felt threatened when Navarro told her of previously sued
28          teachers. Exh. B 233:1-18. However, Navarro never directly threatened

Escuadra with a lawsuit. Escuadra signed the PARS and UPI contracts because she felt intimidated by Navarro's manner of speech. Exh. B 230:4-21.

- Cruz was sued for blogging activity, not for failing to pay fees. Exh. A 19:16-20.

- Pascual received invoices for fees, which he did not find threatening. Exh. D 206:22-207:9; Exh. 615.

- He states he was threatened in a letter, but conveniently cannot remember what the letter said. Exh. D 210:5-17.

These varying allegations illustrate a lack of common questions of fact even among the named Plaintiffs as to their extortion claim. They were allegedly transmitted through varied means, including in person, over the phone, and by letter.  They threatened the Plaintiffs with different forms of punishment, such as a lawsuit, deportation, and loss of employment.  Moreover, at least six punative class members never received *any* threat from Navarro or UPI.  Bayarong Decl. ¶ 11-13, Cordero Decl. ¶ 15, Dones Decl. ¶ 15, Flores ¶  10, Gamit Decl. ¶  16, Rodriguez Decl. ¶ 14.These disparate allegations do not comprise a plan or pattern, or present common questions of fact with respect to the Plaintiffs' claim that UPI and Navarro extorted fees from the teachers. SAC, ¶¶ 302-304.

C.   PLAINTIFFS CANNOT DEMONSTRATE THAT THEY CAN SERVE AS ADEQUATE CLASS REPRESENTATIVES

"One or more members of a class may sue or be sued as representative parties on behalf of all members only if … the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a)(4).

1.   **Cruz Cannot Assert Main Elements of the Plaintiffs' Claims**

A representative who cannot allege a main element of the class action claim is inadequate. *See Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 578 (C.D. Cal. 2007); *see also Robinson v. Gillespie*, 219 F.R.D. 179, 187 (D. Kan. 2003)(Inquiry into the

1  representative's knowledge is necessary "to ensure that the party is not simply lending

2  his name to a suit controlled entirely by the class attorney").

3  Cruz was sued by Navarro in Los Angeles County Superior Court.  However, she

4  mounted a vigorous defense and not only prevailed, but was awarded her attorneys'

5  fees.  Exh. 546. Cruz cannot credibly assert that Navarro intimidated her, because she

6  fought back and won. Exh. A 26:10-19, 28:6-12;  Exh. 547. Because *res judicata*

7  principles prevent a re-litigation of the breach of contract claim against her, Cruz faces

8  no threat of suit from Navarro.  Cruz therefore cannot assert key elements of the

9  Plaintiffs' extortion and trafficking claims.[2]

10  Cruz cannot assert claims for injunctive relief because the anti-SLAPP motion

11  prevents Navarro from enforcing Cruz's contract with UPI, rendering any possible

12  injunction useless.[3]  Moreover, since Cruz was awarded attorneys' fees, she can claim

13  no damages from the threats of lawsuit. Exh. 547.

14  Cruz has no standing to assert elements of the Plaintiffs' claims.  Thus, she

15  cannot qualify as an adequate representative. *See Evans v. IAC/Interactive Corp.*, 244

16  F.R.D. at 578.

17      2.    **Cruz and Tanedo Seek to Gain Personal Recognition as Named**

18            **Plaintiffs and Harbor a Personal Vendetta Against Navarro**

19  In order for a class representative to be adequate, the representative must have no

20  conflicts of interest with the other class members.  *See Rodriguez v. West Publ'g Corp.*,

21  563 F.3d 948, 959 (9th Cir. 2009).

22  Cruz has sought and received immense personal recognition from her role as a

23

24

25  [2]  See *Yates*, 2010 U.S. Dist. LEXIS 140585 at *38 (holding that intimidation is a
necessary element of extortion) *and United States v. De La Rosa Dann*, 2011 U.S.

26  App. LEXIS 15012 (9th Cir. July 22, 2011) at *18 (holding that intimidation is a
crucial element of a trafficking claim).

27  [3]  See *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1036 (9th Cir. 2006)
(holding that a former employee could not seek injunctive relief when she no longer

28  benefited from the injunction).

named Plaintiff.  She has used her fame to become an executive officer in the American Federation of Teachers ("AFT").  Cruz. Dep. 48:5-14. Cruz has also advertised her story on countless news programs, prompting more acclaim from AFT, who bestowed upon her the International Honoree Award.[4]  Cruz's main goal in continuing this litigation is not to seek the best resolution for the class, but to prolong her fame and approval from AFT.  Her self-interest disqualifies her from serving as a class representative.  *See, e.g., Rossini v. Ogilvy & Mather, Inc*., 80 F.R.D. 131, 135 (S.D.N.Y. 1978), *rev'd on other grounds*, 798 F.2d 590, 595 (2d Cir. 1986) (named plaintiff compromised class's best interests when she used her representative role to gain board position in activist organization).

Furthermore, Cruz and Tanedo have repeatedly filed suit against Navarro in forums that range across the US and Philippines. Cruz. Dep. Exh. 550, 551. Cruz has even lied under oath regarding her residency in the Philippines in order to lead another action against Navarro. Exh. A 75:4-22. Because of this apparent vendetta against UPI and Navarro, neither may serve as class representatives.  *See, e.g., Kamerman v. Ockap Corp*., 112 F.R.D. 195, 197 (S.D.N.Y. 1986) (finding the named plaintiff inadequate because he was preoccupied with "peculiar retaliatory wrongs" allegedly committed by the defendant, bringing multiple suits against the defendant and committing others to filing suit as well).  In the instant case, teacher Dones believes the current suit has been brought by a few disgruntled teachers with a personal vendetta against Navarro, and are in fact trying to extort money from UPI and EBR.  Dones Decl. ¶ 16.

3.   **The Named Plaintiffs Are Atypical**

Conflicts of interest exist when representatives are atypical of the class.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 611 (1997).

Escuadra is atypically sophisticated and has taken several law courses, including

---

[4] AFT Editorial Department, *Filipino Educators Receive Award*, AFTERWORDS, July 10, 2010, http://www.aft.org/convention/summaries/071010/index.html#/7/.

contracts law courses. She earns significantly more than the other plaintiffs, has been offered a job for $72, 000 in Cupertino, and her family owns an employment agency. Exh. B 96:1-12; 62:22-23; 20:21-25; 21:1-13; 44:1-12. Pascual and Mari both made multiple attempts to work in the U.S. before finally succeeding, clearly indicating that their desire to teach in the U.S. was the motivating factor behind their actions.  Exh. C 24:23- 25:1; Exh. D 79:20-80:2; 84:4-18. Thus, Escuadra, Pascual and Mari are not adequate class representatives because their "degree of knowledge, sophistication and reliance" make them "subject to unique defenses which may imperil class recovery." *Goldman v. Alhadeff*, 1990 U.S. Dist. LEXIS 11808 at *4 (W.D. Wash. Jan. 31, 1990).

      **4.**      **Plaintiffs' Ability to Recall Only Self-Serving Details Undermines Their Credibility**

A class representative undermines class claims, and is therefore an inadequate representative, when numerous discrepancies in the representative's testimony cause a fact finder to focus on the credibility of the representative to the detriment of the absent class members. *Evans,* 244 F.R.D. at 578.

Named Plaintiffs characterize themselves as unknowing victims who were coerced into signing contracts, though they are sophisticated enough to wrangle out of answering unfavorable questions during deposition. *See, e.g.* Exh. E 270:8-272:18. Cruz disclaims dates inconvenient to her story, but remembers very specific details favorable to her, such as the purportedly lower placement fee charged by a different agency. She also remembers only the first and fourth page of her UPI contract, but cannot recall pages two and three with the provision regarding fees for the second year, despite her signature on all four pages. Exh. A 146:10-14; 147:11-18; 179:3-180:11; 146:25-147:5; 151:1-152:5; Exh. 553.

Escuadra testified that despite the facts her family owns an employment agency, and she had applied for employment outside the Philippines through other agencies, she did not know what fees other agencies charged and never felt the need to find out. Exh. B 22:5-23:9; 71:25-72: 10. Mari remembered phoning Navarro after injuring  her leg

1   for assistance, but did not remember that Navarro sent her money. Mari recalled, in
2   great detail, urging Navarro to refund some of her fees because her salary was less than
3   UPI and PARS represented it would be, but did not remember whether the reason her
4   salary was never adjusted was because she failed to provide a copy of her W-2 to UPI.
5   Exh. C 75:5-76:9; 18:8-19:5; 136:23-137:8.

6        Despite her detailed recollection of facts favorable to her, Tanedo testified that
7   she "[did not] remember" a total of 26 times during her deposition. She testified that the
8   dates of execution of the contracts she entered into with PARS and UPI were
9   inaccurate, making the dubious argument that though she was careful to sign each page
10  of her declaration, she had actually signed the contracts months later without dating
11  them. Exh. E. 156:11-157:8; Exh. 504, 505, 518, 519.

12       The well-coached testimony of each named Plaintiff is not only untrustworthy, it
13  is also directly at odds with testimony proffered by declarants Flores, Dones, Cordero,
14  Bayarong, Rodriguez, and Gamit, who all recall reviewing and signing their contracts
15  with UPI and PARS on the dates indicated in the contracts.  Cordero Decl. ¶ 4; Flores
16  Decl. ¶ 5; Dones Decl. ¶¶ 6-7; Bayarong Decl. ¶ 4; Rodriguez Decl. ¶ 8; Gamit Decl.
17  ¶12. Some of these declarants believe the instant lawsuit was brought by teachers who
18  simply do not want to pay their contractual obligations, and  believe other teachers
19  share this views and are unwilling to participate in the lawsuit. Rodriguez Decl. ¶¶ 2-9,
20  16-17; Flores Decl. ¶¶12-13; Cordero Decl. ¶¶16-17.The credibility of named Plaintiffs
21  will be a paramount consideration in this case, deeming them inadequate class
22  representatives. *See Evans,* 244 F.R.D. at 578.

## IV.   PLAINTIFFS FAIL TO SHOW THE PROPOSED CLASS SHOULD BE CERTIFIED IN ACCORDANCE WITH F.R.C.P. 23(b)

A.   THE PRESENT ACTION CANNOT BE CERTIFIED UNDER FED. R. CIV. P. 23(B)(3) BECAUSE INDIVIDUAL QUESTIONS OF FACT AND LAW PREDOMINATE

In addition to proving the action satisfies each of the four elements in Fed. R. Civ. P. 23(a), to obtain certification of their proposed class and sub-class, Plaintiffs must also demonstrate the action satisfies one of the conditions set forth in Rule 23(b). They seek certification under subsection (b)(3) and, alternatively, subsection (b)(2). Even they admit the gravamen of this action is predominantly monetary, which is relief that can only be awarded under (b)(3).  The present action cannot be certified under (b)(3) because individual questions of fact predominate over common questions.

1.   **Plaintiffs' Fraud-Based Claims Require That Each Injured Party Demonstrate Reliance, Which Necessarily Is An Individual Inquiry.**

Even assuming that some common questions of fact exist with respect to Plaintiffs' fraud-based claims, those common questions are outweighed heavily by the individual questions of reliance that must be established to prevail on each claim, making certification under subsection (b)(3) improper.

In *Poulos*, the Ninth Circuit considered whether it was possible to demonstrate on a class-wide basis the reliance necessary to pursue a fraud-based civil RICO claim such as that pursued by the Plaintiffs herein.  The court noted, "to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury."  379 F.3d at 664.

*Poulus* specifically found the issues of whether, and to what extent, each of the plaintiffs in the proposed class relied upon the defendants' alleged misrepresentations necessarily were individualized inquiries:

> Even taking the Class Representatives' allegations as true, however,
> and assuming that all plaintiffs in the proposed classes suffered

1         financial loss or other concrete injury as a consequence of playing

2         the machines, it does not necessarily follow that plaintiffs' injuries

3         are causally linked to the Casinos' alleged misrepresentations. *Id.*

4         at 665.

5         The court further wrote that the individual motivations of each member of

6 the proposed class necessarily required an inquiry that could not be completed on

7 a group-wide basis:

8         Gamblers do not share a common universe of knowledge and

9         expectations--one motivation does not "fit all." Some players may

10         be unconcerned with the odds of winning, instead engaging in

11         casual gambling as entertainment or a social activity. Others may

12         have played with absolutely no knowledge or information regarding

13         the odds of winning such that the appearance and labeling of the

14         machines is irrelevant and did nothing to influence their

15         perceptions. Still others, in the spirit of taking a calculated risk,

16         may have played fully aware of how the machines operate. Thus,

17         to prove proximate causation in this case, an individualized

18         showing of reliance is required. *Id*

19     *Poulos* rejected the plaintiffs' efforts to presume reliance, especially where

20 the plaintiffs' claims were, at best, mixed claims of omission and

21 misrepresentation. *Id.* Consequently, the Court ruled, certification under Rule

22 23(b)(3) was improper. *Cf. Yokoyama v. Midland Nat'l Life Ins. Co.,* 594 F.3d

23 1087, 1092 (9th Cir. 2010).

24         Other circuits have held similarly. The Fifth Circuit has ruled that fraud actions

25 requiring proof of individual reliance can never be certified as Fed. R. Civ. P. 23(b)(3)

26 class actions because individual, rather than common, issues will always

27 predominate. *See, e.g., Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.,*

28 319 F.3d 205, 211, 219 (5th Cir. 2003) ("[t]he pervasive issues of individual reliance

1  that generally exist in RICO fraud actions create a working presumption against class

2  certification").

3      Though declining to adopt the Fifth Circuit's "blanket rule," the Second Circuit

4  has twice recently reversed the class certification of a mail and wire fraud-based civil

5  RICO claims.  *See McLaughlin v. Am. Co.,* 522 F.3d 215, 222 (2d Cir. 2008) ("[i]n

6  cases such as this one when mail or wire fraud is the predicate act for a civil RICO

7  claim, the transaction or 'but for' causation element requires the plaintiff to

8  demonstrate that he relied on the defendant's misrepresentation.") Proof of even a

9  widespread and uniform misrepresentation, "only satisfies half of the equation; the

10  other half, reliance on the misrepresentation, cannot be the subject of general

11  proof."  *UFCW Local 1776, etc. v. Eli Lilly and Co.*, 620 F.3d 121, 131-133 (2d Cir. 2010) [5]

12      All named Plaintiffs contend in their declarations that they would not have

13  continued the process with UPI and PARS had they known of the Second Recruitment

14  Fees at the outset.  As set forth above, however, the named Plaintiffs' deposition

15  testimony regarding their reasons for coming to the US calls that testimony into serious

16  question. Exh. A 86:21-14, 160:14-161:1; Exh. B 35:12-36:4, 69:20-70:1; Exh. C

17  24:20-25:1, 22:25-23:17, Exh. E 58:8-14; Exh. D 75:22-76:5, 71:8-18.

18      Therefore, even accepting as true their dubious testimony that they were unaware

19  of the so-called Second Recruitment Fee until shortly before they departed for the US,

20  the question of whether the named Plaintiffs – having received and accepted the highly-

21

22  _____

23  [5] The Eleventh Circuit has held, "when a plaintiff brings a civil RICO case
   predicated upon mail or wire fraud, he must prove that he was 'a target of the
24  scheme to defraud' and that he 'relied to his detriment on misrepresentations made
   in furtherance of that scheme.'"  *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1364 (11th
25  Cir. 2002)(Declining to extend the reliance presumption occasioned by the "fraud-
   on-the-market" theory outside the securities field, *Sikes* ruled the District Court had
26  abused its discretion in finding reliance upon the defendants' allegedly fraudulent
   advertisements could be virtually presumed.)

27

28

desirable, lucrative teaching offers they each had long sought – still would have continued with the visa application process is a question that must be answered individually.  It simply is not susceptible of generalized proof for even the five named plaintiffs, much less the allegedly hundreds of unnamed members of the proposed class and sub-class.

Consequently, certification under Rule 23(b)(3) would be improper because the inquiries into the individual's reliance upon the alleged misrepresentations would predominate any common questions.  *Poulos,* 379 F.3d at 664-667.

### 2. Plaintiffs' Extortion-Based Claim Also Requires Individual Inquiries That Will Predominate Over Common Questions

Class actions based on extortion require a fact-intensive inquiry into the defendant's interaction with particular class members. *George Lussier*, 286 F. Supp 2d at 103.  Class certification is not appropriate for such claims because "any attempt to resolve them in a common trial will break down into a series of individualized mini-trials on issues that will substantially predominate over issues common to the class." *Id*.

"[A] crucial element in proving extortion is the [plaintiff's] fearful state of mind." *Westways World Travel, Inc. v. AMR, Corp.*, 2005 U.S. Dist. LEXIS 47291, 25 (C.D. Cal. 2005). Whether a class member has a subjective or objective fear predominates over common issues. *Id*. at 25. This Court stated "an examination of [defendant's] liability for extortion would therefore require a fact-intensive inquiry into [the defendant's] legal and contractual relationship with each [class member]." *Id*.

In the present case, the putative class members must each prove their fearful state of mind both subjectively and objectively.  This requires knowing what each class member felt in response to an alleged threat.  *See Curley*, 728 F. Supp at 1133 (stating each class member in an extortion action needs to show that he or she was a "victim of extortion").  As stated in *Westways World Travel*, objective and subjective fear can vary greatly.  Even if two class members heard the same alleged threat to pay placement fees, one may have experienced fear while the other did not.  This is

1    especially true with the varying severity of the alleged threats.  For example, while

2    Escuadra claims she felt threatened by Navarro's "intimidating voice," most class

3    members would not experience such fear. The class members, in fact, experienced

4    different threats. This leads to an even greater variation in facts

5        Extortion requires the use of force or fear to be the operating or controlling cause

6    of the Plaintiffs' consent.  *Garcia v. Felker*, 2008 U.S. Dist. LEXIS 27746, 29 (C.D.

7    Cal. 2008). The Plaintiffs allege they paid the placement fees out of fear of deportation

8    or financial ruin.  However, as stated above, each named Plaintiff had unique reasons

9    for wanting to come to the US.  Therefore, establishing whether each class member

10   paid the fees out of fear, or simply because the fee was outweighed by the desire to

11   come to the US, must be determined on an individual basis.

12       Thus, Plaintiffs' claims of extortion by UPI and Navarro require individualized

13   inquiries. The plaintiffs must prove (1) what threat each class member received; (2) the

14   fear each class member experienced in response to the threat; and (3) this fear was the

15   operating reason that each class member consented to the fees. These individual

16   inquiries predominate over any common questions related to extortion.

17       3.    **Plaintiff's Trafficking Claims**

18       Individual inquires plainly predominate in the Plaintiffs' trafficking claims, since

19   the claims require an examination by the jury into the subjective minds of the alleged

20   victims.  To prove trafficking, the Plaintiffs must show fear was the motivation behind

21   their choices.  18 U.S.C. § 1589. As the Supreme Court held in *U.S. v. Kozminski*, 487

22   U.S. 931, 960 (1988), determining the impact of nonphysical coercion, as is alleged

23   here, is a "highly individualized" inquiry.  Even among the named Plaintiffs in this

24   case, there exists a variety of motivations for their choices, as noted above. When one

25   considers the entirety of the class, an inquiry into the Plaintiffs' trafficking claims

26   simply cannot be done according to generalized proof.

27

28

B.     CERTIFICATION UNDER FED. R. CIV. P. 23(B)(2) ALSO WOULD BE IMPROPER IN THIS ACTION

     1.     **Plaintiffs Concede the Litigation's Primary Purpose is Monetary Damages**

The Supreme Court has recently declared that certification pursuant to Rule 23(b)(2) is improper where claims for monetary relief predominate over the claims for injunctive relief. *Wal-Mart Stores, Inc.,* 131 S. Ct. 795. In *Dukes,* the class sought both injunctive relief, to enjoin defendant from continuing its discriminatory practices, and monetary relief in the form of back pay. The Court held class certification was not appropriate because the monetary relief sought in that case was more than just incidental to the requested injunctive relief. *Id.* at 1186*, quoting Zinser v. Accufix Research Inst., Inc.* 253 F. 3d 1180, 1188, *amended,* 273 F.3d 1266 (9th Cir. 2001). ("class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive.")

The Fourth Circuit has explained, "[t]he text of Rule 23(b)(2) says nothing whatsoever about equitable relief, but authorizes class treatment only when the plaintiff seeks predominantly 'injunctive' or 'declaratory' relief….To be sure, injunctive and declaratory relief are equitable remedies. But if the Rules drafters had intended the Rule to extend to all forms of equitable relief, the text of the Rule would say so." *Thorn v. Jefferson-Pilot Life Ins. Co*., 445 F.3d 311, 331(4th Cir. 2006). Thus, "certification under Rule 23(b)(2) is improper when the predominant relief sought is  not injunctive or declaratory, even if the relief is equitable in nature." *Id.*

Plaintiffs admit the primary purpose of the litigation is monetary damages and that their request for injunctive relief does not predominate. Pls.' Mem. Supp. Class Certif., p. 20. Their request for certification under Rule 23(b)(2) is therefore disingenuous.

2.      **Individualized Issues Predominate With Respect to Plaintiffs'**
**Calculation of Monetary Damages**

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Gen Tel. Co. of SW v. Falcon*, 457 U.S. 147, 156 (1982) (internal citations omitted). This determination requires a highly individualized, fact-specific inquiry that makes the proposed class unmanageable.

## V.   CONCLUSION

Based on the foregoing, Defendants UPI and Navarro respectfully request that the Court deny Plaintiffs' Motion for Class Certification

DATED: July 25, 2011                    HERNANDEZ SCHAEDEL &
                                        ASSOCIATES, LLP


                        By: /s/ Don A. Hernandez
                                Attorneys for Defendant/Counterclaimant
                                Universal Placement International, Inc., and
                                Defendant Lourdes "Lulu" Navarro