1  Don A. Hernandez (SBN 125119)
   Agnes Markarian (SBN 240388)
2  Martin E. Sullivan (SBN 274279)
   HERNANDEZ, SCHAEDEL & ASSOCIATES, LLP
3  2 North Lake Avenue, Suite 930
   Pasadena, CA   91101
4  Telephone: 626.440.0022
   Facsimile: 626.628.1725
5  Email: dhernandez@hernlaw.com

6  Attorneys for Defendants,
   Universal Placement International, Inc., and
7  Lourdes "Lulu" Navarro

8

            UNITED STATES DISTRICT COURT

9

     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11

12  MAIRI NUNAG-TANEDO, INGRID          Case No. SA CV 10-01172-JAK (MLGx)
    CRUZ, DONNABEL ESCUADRA,
13  ROLANDO PASCUAL, and TOMASA         [Hon. John A. Kronstadt]
    MARI, on behalf of themselves and other
14  similarly situated individuals,

15              Plaintiffs,             DECLARATION OF AGNES
                                        MARKARIAN IN SUPPORT OF
16          vs.                         DEFENDANTS UPI AND NAVARRO'S
                                        OPPOSITION TO MOTION FOR
17  EAST BATON ROUGE PARISH             CLASS CERTIFICATION
    SCHOOL BOARD, CHARLOTTE D.
18  PLACIDE, MILLIE WILLIAMS,
    ELIZABETH  DURAN SWINFORD,
19  UNIVERSAL PLACEMENT
    INTERNATIONAL, INC., LOURDES
20  "LULU" NAVARRO, HOTHELLO
    "JACK" NAVARRO, PARS
21  INTERNATIONAL PLACEMENT
    AGENCY, EMILIO V. VILLARBA,
22  ROBERT B. SILVERMAN, and
    SILVERMAN & ASSOCIATES,
23
                Defendants.
24

25

26

27

28

## DECLARATION OF AGNES MARKARIAN

I, AGNES MARKARIAN, do hereby declare as follows:

1.	I am an attorney at law duly licensed to practice before all courts in the State of California. I am also an associate at Hernandez, Schaedel & Associates, LLP, counsel of record for Defendant Universal Placement International ("UPI") and Lourdes "Lulu" Navarro ("Navarro"). As to the following facts, I know them to be true of my own personal knowledge and if called as a witness I could and would competently testify thereto:

2.	Attached hereto are true and correct copies of pages from the transcripts of depositions taken in this action. The pages to the following exhibits accurately reflect the questions asked and answered by the witness in the deposition.

| Exhibit | Description |
|---------|-------------|
| A | July 6, 2011 Ingrid Cruz Deposition Transcript (Selected Excerpts) |
| B | June 22, 2011 Donnabel Escuadra Deposition Transcript (Selected Excerpts) |
| C | July 7, 2011 Tomasa Mari Deposition Transcript (Selected Excerpts) |
| D | July 8, 2011 Rolando Pascual Deposition Transcript (Selected Excerpts) |
| E | June 21, 2011 Mairi Nunag-Tanedo Deposition Transcript (Selected Excerpts) |

DECLARATION OF AGNES MARKARIAN

3.     Attached hereto are true copies of documents introduced by Defendants UPI and Navarro during deposition. In each instance, the same exhibit numbers that were cited to during the deposition have been used.

| Exhibit | Description |
|---------|-------------|
| 504 | February 8, 2008 Agreement/Legal Disclosure Between Mari Nunag Tanedo ("Tanedo") and UPI |
| 505 | February 8. 2008 Memorandum of Agreement Between Tanedo and PARS |
| 518 | July 4, 2008 Undertaking Between Tanedo and UPI |
| 519 | July 4, 2008 UPI – Tanedo Placement Contract |
| 537 | October 12, 2008 Email from Donabel Escuadra ("Escuadra") to PARS |
| 546 | April 4, 2009 Order From Superior Court of the State of California in Action Between Navarro and Ingrid Cruz ("Cruz") |
| 547 | June 2, 2010 Appellate Court Opinion re: anti-SLAPP motion in *Navarro v. Cruz*, LASC Case No. BC402506 |
| 550 | January 5, 2011 Ingrid Cruz Complaint against Villarba, et al. with City Prosecutor, Quezon City, Philippines |
| 551 | April 8, 2011 Mairi Nunag-Tanedo Complaint Against Villarba, et al., with City Prosecutor, Quezon City, Philippines |
| 553 | July 23, 2007 Placement Agency Contract Between Cruz and UPI |
| 564 | July 2, 2007 Sign-In Sheet List |
| 565 | July 12, 2007 Offer of Employment to Cruz |

DECLARATION OF AGNES MARKARIAN

| 571 | September 14, 2007 Placement Agency Contract Between Tomasa Mari ("Mari") and UPI |
| 574 | August 7, 2005 Certificate of Attendance at Seminar, "American Special Education System: Its Nuts and Bolts" |
| 581 | July 27, 2007 Processing Fee Receipt |
| 590 | March 11, 2008 Cravings Restaurant Seminar Sigh-In Sheet |
| 592 | April 1, 2008 Rolando Pascual ("Pascual") Application for Massachusetts Educator's Licensure |
| 599 | June 3, 2008 Offer of Employment to Pascual |
| 615 | January 1, 2010 UPI Invoice to Pascual |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on July 25, 2011, at Pasadena, California, United States of America.

Agnes Markarian

DECLARATION OF AGNES MARKARIAN

# EXHIBIT A

# In The Matter Of:

*MAIRI NUNAG-TANEDO*
*v.*
*EAST BATON ROUGE PARISH SCHOOL BOARD*

_____

*CRUZ, INGRID - Vol. 1*

*July 6, 2011*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

INGRID CRUZ - 7/6/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

-----

MAIRI NUNAG-TANEDO, INGRID CRUZ,    )
DONNABEL ESCUADRA, ROLANDO PASCUAL,)
and TOMASA MARI, on behalf of       )
themselves and other similarly      )
situated individuals,               )
                                    )
          Plaintiffs,               )   Case No.
                                    )SACV 10-01172
     vs.                            ) JAK(MLGx)
                                    )
EAST BATON ROUGE PARISH SCHOOL      )
BOARD, CHARLOTTE D. PLACIDE, MILLIE)
WILLIAMS, ELIZABETH DURAN SWINFORD,)
UNIVERSAL PLACEMENT INTERNATIONAL,  )
INC., LOURDES "LULU" NAVARRO, PARS  )
INTERNATIONAL PLACEMENT AGENCY,     )
EMILIO V. VILLARBA, ROBERT B.       )
SILVERMAN, and SILVERMAN &          )
ASSOCIATES,                         )
                                    )
          Defendants.               )
_____ )

VIDEOTAPED DEPOSITION OF

INGRID CRUZ, VOLUME I, PAGES 1 - 301

TAKEN ON

WEDNESDAY, JULY 6, 2011

Reported by:

Cathy A. Reece, RPR, CSR No. 5546

INGRID CRUZ - 7/6/2011

```
 1    then.

 2          Q.   Is she your friend now?

 3          A.   Yes.

 4          Q.   Did you talk with somebody at the union

 5    about getting legal representation?

 6          A.   No.

 7          Q.   So did Mr. Rosenzweig contact you, then,

 8    for the first time?

 9          A.   Yes.

10          Q.   How did that happen?  Did he call you?

11          A.   I barely remember.  Because I was working

12    with -- Mairi was helping with -- me with it.  So I

13    can't remember at that time anymore.

14          Q.   This was Ms. Tanedo?

15          A.   Yes.

16          Q.   When you read over the lawsuit, did you

17    understand that Ms. Navarro had some complaints

18    against you arising out of something called the

19    "Pinoy Teachers Hub blog site"?

20          A.   Yes, sir.

21          Q.   Did you have anything at all to do with

22    that blog site?

23          A.   No.

24          Q.   Had you ever posted any blog entries

25    yourself?
```

INGRID CRUZ - 7/6/2011

```
 1   BY MR. HERNANDEZ:
 2       Q.   Have you seen a copy of this document
 3   before, Ms. Cruz?
 4       A.   Probably.  I'm not really sure.
 5       Q.   Did you -- do you understand sitting here
 6   today that the court's order dismissing my clients'
 7   claims against you was affirmed by the court of
 8   appeal?
 9       A.   Yes.
10       Q.   So is it true, Ms. Cruz, that as you sit
11   here today, you no longer have any threat of being
12   sued for breach of contract by UPI?
13           MR. KNOEPP:  Objection to the form.
14           THE WITNESS:  I realized that when I was
15   informed about the countersuit.
16   BY MR. HERNANDEZ:
17       Q.   So you understand that you cannot be sued
18   for breach of contract by UPI; correct?
19       A.   I think so.
20       Q.   And you understand that you've already
21   been sued by my client for breach of contract and
22   you've already won; correct?
23           MR. KNOEPP:  Objection to the form.
24           Which time are you referring to as far as
25   being sued for breach of contract?
```

INGRID CRUZ - 7/6/2011

```
 1    dismissal; correct?

 2         A.    I think so.  Yes.

 3         Q.    And so you've already won a claim brought

 4    against you for breach of the UPI contract; correct?

 5         A.    I am lead to believe that, yes.

 6         Q.    Okay.  So you are -- are you aware of any

 7    other claims against you currently outstanding by

 8    UPI?

 9         A.    None that I'm aware of.

10         Q.    Are you aware of any other claims against

11    you by my other client, Lourdes Navarro?

12         A.    No.

13         Q.    Now, are you aware that we attempted to

14    bring a counterclaim against you in this pending

15    action?

16         A.    During my conversation with my lawyer.

17         Q.    That's a "yes" or "no."

18         A.    Yes.

19         Q.    Okay.  And are you aware that because your

20    counsel has said that the prior lawsuit was

21    dismissed, that we can no longer bring a

22    counterclaim against you?

23               It's a yes-or-no question.

24         A.    Yes.

25         Q.    And are you aware that because of your
```

INGRID CRUZ - 7/6/2011

```
 1     employment with EBR -- if I may -- if I refer to the
 2     school district as "EBR," will you understand that
 3     I'm referring to the East Baton Rouge Parish --
 4         A.   Yes.
 5         Q.   -- School System?
 6              Okay.  Is it fair to say that your
 7     employment with EBR is routinely done on a
 8     year-to-year basis?
 9         A.   Yes.
10         Q.   It says here that you teach science and
11     robotics.
12              Is that a correct statement?
13         A.   Yes.
14         Q.   What school do you teach at?
15         A.   Scotlandville Middle Pre-Engineering
16     Magnet Academy.
17         Q.   Have you ever worked at a place called,
18     "Crestworth"?
19         A.   That was the previous name of the school.
20         Q.   So it's the same school just a different
21     name?
22         A.   It changed the name.
23         Q.   Is that the only location that you have
24     worked?
25         A.   Yes.
```

INGRID CRUZ - 7/6/2011

```
 1          A.   Not yet.

 2          Q.   What salary did you earn -- you started

 3     with East Baton Rouge sometime in 2007; is that

 4     correct?

 5          A.   Yes.

 6          Q.   What salary did you earn the first year

 7     with EBR?

 8          A.   I think the net -- because I don't really

 9     look at the pay stub, the net would be sometimes 900

10     to $1,000.

11          Q.   You don't have any idea sitting here what

12     your gross income is currently with EBR?

13               MR. KNOEPP:  Objection to the form.

14               THE WITNESS:  Currently?

15     BY MR. HERNANDEZ:

16          Q.   Well, for the past school year, 2010-2011?

17          A.   Annual gross income?

18          Q.   Yes.

19          A.   Somewhere around 40.

20          Q.   $40,000 a year?

21          A.   I think.

22          Q.   Do you know what it was the prior school

23     year, 2009 through 2010?

24          A.   No.

25          Q.   Would it be fair to say it was somewhere
```

INGRID CRUZ - 7/6/2011

Page 48

```
 1        A.   No.  I'm not sure.

 2        Q.   Do you receive a check throughout the

 3   entire year or only the 10 months from EBR?

 4        A.   Throughout the entire year.

 5        Q.   Now, you are a member of the American

 6   Federation of Teachers?

 7        A.   Yes.

 8        Q.   Are you also a member of the Louisiana

 9   Federation of Teachers?

10        A.   Yes.

11        Q.   Do you serve in any capacity as an officer

12   or in any role for the AFT?

13        A.   Just this school year I was appointed as a

14   member of the EBR, of the Executive Board.

15        Q.   How many people are on the Executive Board

16   of EBR?

17        A.   Seven.  More or less seven.  Because

18   sometime -- most of the time -- most of the meetings

19   somebody will be absent, so more or less seven.

20        Q.   Were you elected to that position?

21        A.   No.

22        Q.   How was it that you were appointed?

23        A.   By Mr. Cornell Washington, the president.

24        Q.   The president of EBR's chapter of the AFT?

25        A.   Yes.
```

INGRID CRUZ - 7/6/2011

1    perjury that all of the facts that were contained in

2    the pages between Page 2 and your page were true?

3         A.   Yes.

4         Q.   Starting with the first page of this

5    complaint on Page 1668, it says that you are a

6    resident of Balikatan Village.

7              Is that a true statement?

8         A.   Yes.  That's my parents' house.

9         Q.   But I thought you were a resident in

10   Louisiana?

11        A.   At the moment -- right now, yes.

12        Q.   Are you residing in more than one place?

13        A.   This is my address --

14             MR. KNOEPP:  Objection to the form.

15             THE WITNESS:  -- in the Philippines.

16   BY MR. HERNANDEZ:

17        Q.   This is the address of your parents, not

18   yourself?

19        A.   This is where I lived in the Philippines.

20        Q.   But you're in the United States 10 months

21   a year at least; right?

22        A.   Yes.

23        Q.   Okay.  So at the present time, in fact,

24   you're teaching at the summer camp; right?

25        A.   Yes.

INGRID CRUZ - 7/6/2011

Page 83

```
 1          Q.    The next paragraph says, you came to know
 2    PARS and their job offer to teach in the U.S.A.
 3    through a friend teacher?
 4          A.    Yes.
 5          Q.    Who was that?
 6          A.    Mrs. Vicente, which was a principal at the
 7    school where my children attends to.
 8          Q.    This is at the Philippines?
 9          A.    Yes.
10          Q.    Now, your children attend school here in
11    the United States now?
12          A.    Now, yes.
13          Q.    Where do they attend?
14          A.    Scotlandville Elementary.
15          Q.    Is that a public school?
16          A.    Yes.
17          Q.    How was it that you learned -- what did
18    your friend tell you about PARS?
19          A.    She said that a friend of hers was able to
20    come here through PARS.
21          Q.    Did she say anything else?
22          A.    That PARS is also contacting her for an
23    interview.
24          Q.    Her personally?
25          A.    Yes.
```

INGRID CRUZ - 7/6/2011

```
 1      PARS office on or about June 2007, delivering a copy

 2      of your resume, did you take any steps to apply for

 3      any overseas teaching jobs beyond that which you've

 4      described?

 5          A.   No.

 6          Q.   Do you know the name of the agency?

 7          A.   World Goal Corporation.

 8          Q.   Can you spell that?

 9          A.   World, W-O-R-L-D, G-O-A-L.

10          Q.   Did you sign any contracts with that

11      company?

12          A.   No.

13          Q.   Did you attend any interviews?

14          A.   No.

15          Q.   Did you meet any people in the United

16      States?  No, strike that.

17               So you did not actually apply for a job

18      beyond what you talked about, getting your

19      credentials verified?

20          A.   No.

21          Q.   So when you had walked in to PARS, had you

22      made any decisions whether or not you wanted to work

23      in the United States?

24          A.   There was still an option.

25          Q.   Why was it that you were considering that?
```

INGRID CRUZ - 7/6/2011

```
 1          A.   Because of the needs for the family, but
 2     I'm not sure if I'm ready to leave the girls as
 3     well.
 4          Q.   What do you mean by, "the needs of the
 5     family"?
 6          A.   Well, my daughter was diagnosed with
 7     autism spectrum disorder.  So she needs a lot of --
 8     she needs therapy for that.  It's expensive to get
 9     the therapy.
10          Q.   Is that therapy that can be given in the
11     Philippines?
12          A.   Yes.
13          Q.   So your concern was you needed more money?
14          A.   Yes.
15          Q.   That was one of the reasons why you were
16     considering working in the United States?
17          A.   Yes.
18          Q.   Were there any other reasons?
19          A.   To further my professional career.
20          Q.   How so?
21          A.   I'm a B.S. biology, genetics major.  I was
22     also dreaming of becoming a genetics counselor.
23          Q.   How did you think going -- coming to the
24     United States would help that?
25          A.   Well, a lot of schools -- I know there are
```

INGRID CRUZ - 7/6/2011

```
 1          A.   I can't remember.

 2          Q.   Have you given any testimony in the

 3     Philippines?

 4          A.   No.

 5          Q.   Okay.  I'm going to ask -- I'm going to

 6     place before you some documents that I have marked

 7     as Exhibit 564.  Is that 564 or 565?

 8               I must have marked it wrong.  The sign-in

 9     sheet.  The sign-in sheet is 564.

10               (Exhibit 564 was marked for I.D.)

11               MR. KNOEPP:  Could you hold on a second,

12     please?

13               For the record, is there a reason why --

14     this is like the third document now that doesn't

15     have any Bates numbers on it, and it hasn't been

16     produced to us prior to the deposition today.  Is

17     there a reason why we are seeing documents for the

18     first time at today's deposition that would have

19     been responsive to our document requests?

20               MR. HERNANDEZ:  I'm not aware of any

21     reason.  May I ask my questions?

22          Q.   Exhibit No. 564, if you go down to number

23     12 --

24          A.   Yes.

25          Q.   -- is that your handwriting that
```

INGRID CRUZ - 7/6/2011

1    appears -- is the name your own handwriting?

2         A.   Yes.

3         Q.   Is that the way you write out your name

4    when you're not signing it?

5         A.   The -- depends.  Sometimes it's all in

6    capital letters.

7         Q.   Okay.  The date appearing next to it is

8    July 5, 2007.

9         A.   I see that.

10        Q.   Do you have any reason to believe that you

11   filled out your name on some date other than July 5,

12   2007?

13        A.   I don't remember.

14        Q.   What is the information that appears to

15   the right of your name?  There's your name, there's

16   a dash, and then there's a bunch of numbers.

17             What is that?

18        A.   Cell phone number.

19        Q.   Okay.  Is that information correct as it

20   appears here?

21        A.   I don't remember.

22        Q.   Do you remember signing any sign-in sheet

23   when you went to PARS office?

24        A.   No, I don't.

25        Q.   So you have no memory of Exhibit 564?

INGRID CRUZ - 7/6/2011

```
 1         A.   Yeah.

 2         Q.   Let me show you Exhibit 565.

 3              (Exhibit 565 was marked for I.D.)

 4              MR. HERNANDEZ:  As long as we're making a

 5    record, 551 is a publicly available document.  It's

 6    easily available to both sides.  546 --

 7              MR. KNOEPP:  That's not a reason not to

 8    produce it, though.  You know that.  You know that

 9    that's not a reason not to produce requested

10    documents that would be responsive to a document

11    request.

12              MR. HERNANDEZ:  Yes, it is.

13              MR. KNOEPP:  No, it's not.

14              MR. HERNANDEZ:  546, 547, 549 are all

15    documents that are equally available to you,

16    especially since they were -- since she's seen them.

17              In fact, I think they were obtained from

18    your office, from Mr. Rosenzweig's office, the

19    copies that I'm using.

20         Q.   Looking at 565 now, is that your signature

21    that appears in the box that says, "Acceptance of

22    offer of employment"?

23         A.   It appears.

24         Q.   Is that your signature?  "Yes"?

25         A.   Yes.
```

INGRID CRUZ - 7/6/2011

1        Q.   And you signed this on or about the date

2   indicated, July 12, 2007?

3        A.   On or about.

4        Q.   Well, do you have any reason to believe

5   that you signed this on some date other than July

6   12?

7        A.   I'm not sure.

8        Q.   Do you have any reason to doubt that you

9   signed it on that date?

10        A.   I'm not sure.

11        Q.   As you sit here today, can you articulate

12   any reason why you signed this on some date other

13   than July 12, 2007?

14        A.   We've had frequent visits at PARS and on

15   different dates that I can't recall anymore.

16        Q.   With respect to the address that's-- the

17   street address that appears below your name, was

18   that the location in which you were resident at the

19   time?

20        A.   Yes.

21        Q.   Is that your email address that also

22   appears there?

23        A.   Yes.

24        Q.   This is an offer of employment from EBR

25   for science.

INGRID CRUZ - 7/6/2011

```
 1        Q.   Okay.  At the time that you provided the
 2   $5,000, had you signed any contracts?
 3        A.   I don't remember.
 4        Q.   Do you know whether you had signed any
 5   contracts with PARS?
 6        A.   I'm sorry?
 7        Q.   Do you know whether you had signed any
 8   contracts with PARS?
 9        A.   Sometime.
10        Q.   Well, I'm asking you whether by July 24,
11   2007 you had signed a contract with PARS?
12        A.   I don't remember.
13        Q.   Had you signed any contracts with UPI?
14        A.   I don't remember.
15             MR. KNOEPP:  Objection to the form.
16             MR. HERNANDEZ:  Let me show you two
17   documents that I have had the court reporter mark as
18   Exhibits 552 and 553.
19             (Exhibits 552 & 553 were marked for
20        I.D.)
21   BY MR. HERNANDEZ:
22        Q.   Looking now at Exhibit 552, do you
23   recognize this document?
24        A.   The contract with PARS.
25        Q.   Do you recognize Exhibit 553?
```

INGRID CRUZ - 7/6/2011

```
 1        A.   The front page, yes.

 2        Q.   You recognize the front page?

 3        A.   Yes.

 4        Q.   You don't recognize anything else?

 5        A.   No.

 6        Q.   Okay.  Let's go to 553 and look at the

 7   last page.  The one that has document control No.

 8   642 at the bottom.

 9             Do you have that page before you?

10        A.   642.

11        Q.   Is that your signature that appears on

12   this page?

13        A.   It looks like it.  Yes.

14        Q.   And the date, is that your handwriting?

15        A.   I'm not sure.

16        Q.   You don't know whether that's your

17   handwriting?

18        A.   Yes.

19        Q.   Well, look at the last page of Exhibit

20   552.

21             First of all, is that your signature that

22   appears above the word, "Applicant"?

23        A.   Yes.

24        Q.   And that -- is that your handwriting that

25   appears below that with your name?
```

INGRID CRUZ - 7/6/2011

1      Q.   Do you have any reason to believe that

2  those are not your signatures appearing on any of

3  these pages?

4      A.   Yes.

5      Q.   What reason do you have?

6      A.   As I said earlier, I recognize the front

7  part because of the symbol and recall there was that

8  one last page, one piece -- one-page paper that I

9  was asked to sign after turning in the placement

10  fee.

11          And seeing this logo here down on the

12  front page, I recall this is the one single page

13  that was the last document that I signed.

14      Q.   Is it your testimony that you did not sign

15  Page 2?

16      A.   Yes.  I don't remember signing Page 2.

17      Q.   Is it your testimony that you did not sign

18  Page 3?

19      A.   I don't remember signing Page 3.

20      Q.   Is it your testimony that you did not sign

21  Page 4 either -- neither location?

22      A.   Page 4, this was what's on the back of

23  that single-page paper that I was asked to sign.  It

24  was the front page and this last page that was given

25  to us before we left.

INGRID CRUZ - 7/6/2011

```
 1          Q.   You don't recall ever seeing copies of
 2     Exhibits -- of Pages 2 or 3, despite the fact that
 3     it's something that appears to have -- your
 4     signature appears on it?
 5          A.   I don't recall.
 6          Q.   Now, with respect to the bottom of Page 1,
 7     which bears the number 639, do you see that there is
 8     some language that is crossed out?
 9          A.   Yes.
10          Q.   Did you cross that out yourself?
11          A.   No.
12          Q.   So it's your testimony that somebody else
13     crossed that out?
14          A.   Yes.
15          Q.   Who?
16          A.   Mel Villarba.
17          Q.   Did he cross that out before you signed
18     it?
19          A.   I don't remember.
20          Q.   What about with respect to the top of Page
21     2?
22          A.   No.  I don't remember on Page 2.
23          Q.   Did you cross that out yourself?
24          A.   No.
25          Q.   Do you know who crossed it out?
```

INGRID CRUZ - 7/6/2011

1    BY MR. HERNANDEZ:

2        Q.   In two different declarations, Exhibits

3    550 and 548, you say on or about July 24, 2007 you

4    gave $5,000.  You do that in Paragraph 5 of the

5    declaration you filed or the affidavit you signed

6    for the Philippines and you do that in Paragraph 10

7    of the declaration that you submitted in connection

8    with this proceeding.

9            Do you see that?

10       A.   Because in putting together -- I see that.

11   And in putting together the declaration, I depended

12   on the receipts, because I can't recall the dates

13   anymore.

14       Q.   Okay.  So you admit that you don't know

15   specifically which dates you actually went to the

16   PARS office.

17       A.   To make the payment, yes.

18       Q.   The initial $5,000 payment?

19       A.   Yes.

20       Q.   But you acknowledge that when you made the

21   $5,000 payment, you signed some documents?

22       A.   Some documents, yes.

23       Q.   And you cannot rule out the possibility

24   that among the documents you signed when you

25   deposited the $5,000 on or about July 24, 2007 were

INGRID CRUZ - 7/6/2011

```
 1    BY MR. HERNANDEZ:

 2         Q.   Well, did you --

 3         A.   The dates, I'm not really sure about them.

 4         Q.   Well, you keep referring to something as a

 5    placement fee.  Are you referring to the $5,000 as

 6    the placement fee?

 7         A.   The 7,400.

 8         Q.   Did you sign any contracts when you

 9    deposited the $5,000?

10         A.   I don't remember.

11         Q.   Okay.  So it's possible that you signed

12    552 and 553 when you deposited the $5,000?

13              MR. KNOEPP:  Objection to the form.

14              THE WITNESS:  I'm not sure.

15    BY MR. HERNANDEZ:

16         Q.   You cannot rule that possibility out;

17    correct?

18              MR. KNOEPP:  Objection to the form.

19              THE WITNESS:  No.

20    BY MR. HERNANDEZ:

21         Q.   At the time that you deposited the $5,000,

22    had you ever heard of UPI?

23         A.   No.

24         Q.   At the time that you deposited the $5,000,

25    beyond the voice that you heard on the telephone you
```

INGRID CRUZ - 7/6/2011

```
 1   mentioned this morning, did you have any
 2   conversations with Lourdes Navarro?
 3        A.   No.
 4        Q.   Did anybody from UPI at the time that you
 5   deposited the $5,000 tell you that $5,000 would be
 6   the only money you would ever pay to be able to get
 7   a visa?
 8        A.   No.
 9        Q.   Okay.  Did anybody from PARS tell you
10   that?
11             MR. KNOEPP:  Objection to the form.
12             THE WITNESS:  That wasn't discussed.
13   BY MR. HERNANDEZ:
14        Q.   Okay.  So you had no expectation when you
15   deposited the $5,000 that that would be the sum
16   total of all the money that you would ever pay?
17        A.   Not totally, because when I was browsing
18   through the contract, the part that I remember my
19   mom and I was going through was the first part, Page
20   2, the first paragraph there.
21        Q.   Which contract are you referring to?
22        A.   PARS.
23        Q.   So you knew that there was going to be a
24   placement fee?
25        A.   And that some portion of the $5,000 serves
```

INGRID CRUZ - 7/6/2011

```
 1    as a placement fee already.

 2        Q.   So you had your mom with you at the time

 3    you were reviewing the documents?

 4        A.   When I made the payment.

 5        Q.   The initial $5,000?

 6        A.   The $5,000.

 7        Q.   But you just said, When we were going

 8    through the document with my mom.

 9        A.   Yes.

10        Q.   Okay.  So was she going through the

11    document with you?

12        A.   Yeah, while Mel -- she went through, like,

13    she browsed through the document and I also browsed

14    through it when I signed it.

15        Q.   And did she also browse through the UPI

16    contract when you signed it?

17        A.   No.

18        Q.   So at the time that you deposited the

19    $5,000, you expected that you would have to pay more

20    money to PARS?

21        A.   I wasn't thinking about that.

22        Q.   Well, I thought you just said that you

23    read through the first paragraph at the bottom of

24    Page 2, and you knew that some of the $5,000 would

25    be paid toward a placement fee.
```

INGRID CRUZ - 7/6/2011

1            claims, demands, causes of action."

2      BY MR. HERNANDEZ:

3            Q.   Okay.  Any other provisions?

4            A.   That's all that I can remember right now.

5            Q.   Do you contend that on Page 2 at the very

6      top, Section 3 -- do you contend that provision is

7      improper?

8            A.   Oh, I wasn't able to go through this.  The

9      first 24 months of employment -- yes.

10           Q.   Why?

11           A.   Because normally it would just be one

12     month payment for the placement fee.

13           Q.   What do you mean, "one month payment"?

14           A.   Like the placement fee is equivalent to

15     one month of your salary.

16           Q.   Okay.

17           A.   And after the first year, I believe agency

18     should -- or the client should not be -- us --

19     should not be responsible for any further payments.

20           Q.   And on what basis do you give that

21     testimony?

22           A.   When I was working with the other agency

23     that I worked with.

24           Q.   What other agency?

25           A.   The World Goal Corporation.

1        Q.    Okay.

2        A.    The orientation they gave us was that the

3    placement fee, normal placement fee, would be

4    equivalent to one month of your salary.

5        Q.    When you were meeting with PARS in July

6    2007, did you ask anybody what would be the

7    placement fee?

8        A.    I don't recall.

9        Q.    Did anybody from PARS tell you what would

10   be the placement fee?

11       A.    I don't remember.

12       Q.    When you -- did you ever speak -- prior to

13   the time that you left the Philippines to come to

14   work in the United States in 2007, did you ever

15   speak to anybody at UPI?

16       A.    Yes, I did.

17       Q.    Who?

18       A.    It would either be Divine or Lorna.

19       Q.    I thought you said Divine was with PARS?

20       A.    I'm sorry.  Your question was?

21       Q.    UPI.

22       A.    No.

23       Q.    So -- just so that the record is clear on

24   this, before you left the Philippines, did you speak

25   to anybody that you knew or believed was associated

INGRID CRUZ - 7/6/2011

Page 219

```
 1    University of Rizal System?

 2         A.   Yes.

 3         Q.   Let me show you a letter that I've had the

 4    court reporter mark as Exhibit 559.

 5              (Exhibit 559 was marked for I.D.)

 6    BY MR. HERNANDEZ:

 7         Q.   Do you recognize this document?

 8         A.   Yes.

 9         Q.   What is it?

10         A.   Certification of employment.

11         Q.   Okay.  So this is a letter from the campus

12    director that certified that you were employed as an

13    instructor by the university during the period July

14    2003 through April 2006.

15         A.   Yes.

16         Q.   Do you see that?

17         A.   Yes.

18         Q.   Is that a true statement?

19         A.   Yes.

20         Q.   How many hours did you spend as an

21    instructor during that time frame, each month or

22    each day?

23         A.   I don't recall the number of hours.

24         Q.   Were you full time?

25         A.   No.
```

INGRID CRUZ - 7/6/2011

Page 222

1               Do you see that?

2        A.    Yes.

3        Q.    So you attended those classes at the same

4    time that you were an instructor?

5        A.    Yes.

6        Q.    And this says that you graduated with the

7    title, "Certificate in Professional Education" as

8    per board resolution No. 013-129-05, dated March 15,

9    2005.

10              Is that the date that you got your

11   certificate?

12       A.    I don't remember.

13       Q.    Did you obtain a certificate in

14   professional education?

15       A.    Yes.

16       Q.    And had you graduated by the end of the

17   school year 2004-2005?

18       A.    I don't -- I can't recall if I attended

19   the commencement exercise, but I did graduate.

20       Q.    You don't recall whether you attended the

21   commencement exercise?

22       A.    Yeah.  I can't remember because I think I

23   planned to attend and then something happened.  But

24   I know I did finish all the courses.

25       Q.    Did you get the actual certificate

INGRID CRUZ - 7/6/2011

```
 1    yourself at some point?
 2         A.   Yes.
 3         Q.   Looking now at the second and third page,
 4    this is a transcript from University of the
 5    Philippines, Los Banos.
 6              Is that where you attended undergraduate?
 7         A.   Yes.
 8         Q.   It says here that the date you graduated
 9    was April 15, 2000.
10              Is that correct?
11         A.   Yes.
12         Q.   And you graduated with a degree in -- a
13    Bachelor of Science in biology?
14         A.   Yes.
15         Q.   Do you know whether a record of your
16    graduation was ever sent to the Commission On Higher
17    Education in the Philippines?
18         A.   A record of my graduation?
19         Q.   Yes.
20         A.   I don't know.
21         Q.   Have you ever heard of the Commission On
22    Higher Education?
23         A.   Yes.
24         Q.   What is your understanding of that agency
25    or that entity?
```

INGRID CRUZ - 7/6/2011

1    STATE OF CALIFORNIA          )
                                  )   SS.
2    COUNTY OF LOS ANGELES        )

3

4              I am the witness in the foregoing

5    deposition.

6              I have read the foregoing deposition or

7    have had read to me the foregoing deposition, and

8    having made such changes and corrections as I

9    desired, I certify that the same is true in my own

10   knowledge.

11             I hereby declare under the penalties of

12   perjury under the laws of the United States that the

13   foregoing is true and correct.

14             This declaration is executed this _____

15   day of _____, 2011, at _____

16   California.

17

18

19             _____
                         INGRID CRUZ
20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA          )
                                   )   SS.
 2    COUNTY OF LOS ANGELES        )

 3         I, CATHY A. REECE, CSR No. 5546 for the State

 4    of California, do hereby declare:

 5         That prior to being examined, the witness named

 6    in the foregoing deposition was duly sworn to

 7    testify to the truth, the whole truth, and nothing

 8    but the truth;

 9         That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter reduced to computerized transcription and

12    that the same is a true, correct and complete

13    transcript of said proceedings.

14         Before completion of the transcript,

15    review of the transcript [X] was [ ] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19         I further certify that I am not interested

20    in the outcome of the action.

21         Witness my hand this 18th day of

22    July_____, 2011.

23

24

25    _____
      CATHY A. REECE, RPR, CSR No. 5546
```

# EXHIBIT B

# In The Matter Of:

## *MAIRI NUNAG-TANEDO*
### *v.*
## *EAST BATON ROUGE PARISH SCHOOL BOARD*

---

## *ESCUADRA, DONNABEL - Vol. 1*

### *June 22, 2011*

---

**MERRILL CORPORATION**
LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

DONNABEL ESCUADRA - 6/22/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

-----

MAIRI NUNAG-TANEDO, INGRID CRUZ, )
DONNABEL ESCUADRA, ROLANDO PASCUAL,)
and TOMASA MARI, on behalf of      )
themselves and other similarly     )
situated individuals,,             )
                                   )
          Plaintiffs,              )   Case No.
                                   )SACV 10-01172
     vs.                           ) JAK(MLGx)
                                   )
EAST BATON ROUGE PARISH SCHOOL     )
BOARD, CHARLOTTE D. PLACIDE, MILLIE)
WILLIAMS, ELIZABETH DURAN SWINFORD,)
UNIVERSAL PLACEMENT INTERNATIONAL, )
INC., LOURDES "LULU" NAVARRO, PARS )
INTERNATIONAL PLACEMENT AGENCY,    )
EMILIO V. VILLARBA, ROBERT B.      )
SILVERMAN, and SILVERMAN &         )
ASSOCIATES,                        )
                                   )
          Defendants.              )
_____)

VIDEOTAPED DEPOSITION OF

DONNABEL ESCUADRA, VOLUME I, PAGES 1 - 325

TAKEN ON

WEDNESDAY, JUNE 22, 2011

Reported by:

Cathy A. Reece, RPR, CSR No. 5546

DONNABEL ESCUADRA - 6/22/2011

Page 20

| | | |
|---|---|---|
| 09:50:47 | 1 | Q.   Who are they? |
| 09:50:49 | 2 | A.   They are cousins.  My cousin in Phoenix, |
| 09:50:58 | 3 | Arizona, Juvy Harmon.  And I have a cousin in |
| 09:51:04 | 4 | Maryland.  Her name is Lorena Watson -- Walton.  I'm |
| 09:51:08 | 5 | sorry.  Lorena Walton. |
| 09:51:10 | 6 | Q.   And are either of those teachers? |
| 09:51:13 | 7 | A.   No. |
| 09:51:14 | 8 | Q.   And are either of those cousins here on |
| 09:51:18 | 9 | H-1B visas? |
| 09:51:21 | 10 | A.   No.  They got married to an American. |
| 09:51:24 | 11 | Q.   Are they now citizens? |
| 09:51:26 | 12 | A.   Yes. |
| 09:51:28 | 13 | Q.   Is -- don't let me get this wrong -- |
| 09:51:31 | 14 | Brutus Rayburn, Sr. an American? |
| 09:51:34 | 15 | A.   Yes, sir. |
| 09:51:35 | 16 | Q.   Is he a U.S. citizen? |
| 09:51:37 | 17 | A.   Yes. |
| 09:51:38 | 18 | Q.   Okay.  Now, have you ever worked abroad |
| 09:51:43 | 19 | besides in the Philippines, before? |
| 09:51:45 | 20 | A.   No. |
| 09:51:49 | 21 | Q.   Have you ever tried to apply to an |
| 09:51:52 | 22 | employment agency for employment outside of the |
| 09:51:56 | 23 | Philippines aside from PARS? |
| 09:51:58 | 24 | A.   Yes. |
| 09:51:58 | 25 | Q.   Okay.  What employment agency? |

DONNABEL ESCUADRA - 6/22/2011

Page 21

09:52:02 1       A.    Global.  It is a local agency in Cebu.

09:52:06 2       Q.    Why didn't you accept a position with
09:52:10 3  Global?

09:52:10 4       A.    When I was listening to the orientation, I
09:52:12 5  wasn't very convinced because they didn't give a
09:52:16 6  very definite date or time when we can possibly have
09:52:20 7  the employment in the U.S.  So I didn't want to
09:52:23 8  waste my time with that.

09:52:25 9       Q.    So is it fair to say that you see value in
09:52:29 10 an employment agency that places you quickly?

09:52:33 11      A.    Yes.

09:52:34 12      Q.    The quicker the better?

09:52:36 13      A.    Of course.

09:52:37 14      Q.    Okay.  Now, any other agencies that you
09:52:48 15 may have applied to?

09:52:49 16      A.    I did -- I did not apply.  I was just
09:52:52 17 considering to apply.

09:52:53 18      Q.    And what agencies were those?

09:52:55 19      A.    The Health Quest.

09:53:02 20      Q.    And why didn't you apply to Health Quest?

09:53:05 21      A.    It so happened that their schedule for the
09:53:08 22 interview will take place in May, and PARS, UPI will
09:53:14 23 have their interview in March, so I go first with
09:53:18 24 PARS.

09:53:18 25      Q.    Okay.  Now, did you consider any other

DONNABEL ESCUADRA - 6/22/2011

Page 22

| | | |
|---|---|---|
| 09:53:22 | 1 | employment agencies? |
| 09:53:24 | 2 | A.   After that? |
| 09:53:25 | 3 | Q.   At any time. |
| 09:53:27 | 4 | A.   Just PARS and UPI. |
| 09:53:30 | 5 | Q.   Did you understand anything about the |
| 09:53:33 | 6 | programming for Global and/or Health Quest?  Let me |
| 09:53:37 | 7 | actually rephrase that question. |
| 09:53:40 | 8 | Did you understand how Global proposed to |
| 09:53:43 | 9 | place you? |
| 09:53:45 | 10 | A.   No, I did not understand at all.  That's |
| 09:53:50 | 11 | why I didn't pursue it. |
| 09:53:51 | 12 | Q.   Okay.  They did not provide you with any |
| 09:53:54 | 13 | materials or you did not have access to any Global |
| 09:53:57 | 14 | materials? |
| 09:53:58 | 15 | A.   They just gave us some -- I mean, that |
| 09:54:01 | 16 | was, in that presentation, like services that they |
| 09:54:05 | 17 | have, but it wasn't as specific as I would want to |
| 09:54:09 | 18 | hear. |
| 09:54:11 | 19 | Q.   And when did you consider Global? |
| 09:54:13 | 20 | A.   That was around February of 2008. |
| 09:54:24 | 21 | Q.   And what positions were you seeking? |
| 09:54:27 | 22 | A.   Still special education teacher. |
| 09:54:28 | 23 | Q.   So you don't have any idea of how much |
| 09:54:30 | 24 | Global's services cost? |
| 09:54:32 | 25 | A.   No. |

DONNABEL ESCUADRA - 6/22/2011

Page 23

| | | |
|---|---|---|
| 09:54:33 | 1 | Q.   How about Health Quest's services?   Were |
| 09:54:35 | 2 | you aware? |
| 09:54:36 | 3 | A.   Of the cost? |
| 09:54:37 | 4 | Q.   Of the cost. |
| 09:54:39 | 5 | A.   That was only later, and I have done with |
| 09:54:41 | 6 | PARS. |
| 09:54:44 | 7 | Q.   So, no, you do not -- you were not aware |
| 09:54:47 | 8 | of any costs? |
| 09:54:49 | 9 | A.   I wasn't aware. |
| 09:54:55 | 10 | Q.   Okay.   How did you first hear about PARS? |
| 09:54:58 | 11 | A.   How did I first hear about PARS? |
| 09:55:00 | 12 | Q.   Uh-huh. |
| 09:55:01 | 13 | A.   My co-teacher in the university told me |
| 09:55:05 | 14 | that PARS will be coming to Cebu for the preliminary |
| 09:55:10 | 15 | interview.   That will also happen in March of 2008. |
| 09:55:18 | 16 | Q.   And when did your -- who is your |
| 09:55:21 | 17 | co-teacher? |
| 09:55:22 | 18 | A.   Cynthia Simporos. |
| 09:55:26 | 19 | Q.   When did she tell you this? |
| 09:55:29 | 20 | A.   Around that -- that same month of March, |
| 09:55:35 | 21 | 2008. |
| 09:55:38 | 22 | Q.   So you had never heard of PARS prior to |
| 09:55:41 | 23 | March of 2008? |
| 09:55:42 | 24 | A.   No. |
| 09:55:46 | 25 | Q.   Did she tell you in early March? |

DONNABEL ESCUADRA - 6/22/2011

Page 27

| | | |
|---|---|---|
| 09:59:24 | 1 | BY MR. SULLIVAN: |
| 09:59:24 | 2 | Q. Okay. How long did you speak with |
| 09:59:31 | 3 | Ms. Tanedo last night? |
| 09:59:32 | 4 | A. We actually didn't have much time talking |
| 09:59:35 | 5 | because she has to leave. |
| 09:59:37 | 6 | Q. How much time? |
| 09:59:39 | 7 | A. Not even 10 minutes. When I got inside |
| 09:59:44 | 8 | the room, she was already -- she was laying in bed. |
| 09:59:48 | 9 | And then later after a while, I think that's -- even |
| 09:59:53 | 10 | less, really less than 10 minutes. Five minutes, |
| 09:59:55 | 11 | like that. And she left because she has to be at |
| 10:00:01 | 12 | the airport. |
| 10:00:01 | 13 | Q. Okay. Did you attend any trainings with |
| 10:00:16 | 14 | PARS? |
| 10:00:16 | 15 | A. That was the preinterview, I consider that |
| 10:00:19 | 16 | also as training. |
| 10:00:20 | 17 | Q. And when was that? |
| 10:00:21 | 18 | A. March of 2008. |
| 10:00:23 | 19 | Q. Do you remember the date? |
| 10:00:24 | 20 | A. I cannot remember exactly, but it was |
| 10:00:27 | 21 | about one, two weeks before the actual interview, |
| 10:00:31 | 22 | March 28, 2008. |
| 10:00:33 | 23 | Q. So one to two weeks before the March 28th |
| 10:00:36 | 24 | interview, you -- you had a training session; is |
| 10:00:42 | 25 | that correct? |

DONNABEL ESCUADRA - 6/22/2011

Page 30

| | | | |
|---|---|---|---|
| 10:03:10 | 1 | A. | I remember there were two presenters. |
| 10:03:13 | 2 | Q. | And who did the simulation? |
| 10:03:16 | 3 | A. | It was -- it was -- it was with their |

10:03:21  4   presence, and they did simulations, like they were
10:03:27  5   there, like they acted as the interviewer and we
10:03:31  6   were the ones who will be interviewed.

10:03:33  7       Q.   So the simulation took place one on one
10:03:36  8   between yourself and one --

10:03:38  9       A.   Yes.

10:03:38 10       Q.   -- or two of the presenters?

10:03:40 11       A.   One of the presenters.

10:03:41 12       Q.   And how long did that interview last?

10:03:45 13       A.   It was basically a whole day thing.

10:03:48 14       Q.   And how much did that training session
10:03:51 15   cost you?

10:03:52 16       A.   2,000 pesos.

10:03:54 17       Q.   How much is that in U.S. dollars?

10:03:56 18       A.   In U.S. dollars, that is -- that is 20,
10:03:59 19   25, 26, depending on the value of the dollar at that
10:04:04 20   time, peso and dollar equivalent at that time.

10:04:08 21       Q.   Do you think that was a good value?

10:04:12 22       A.   Yes, it was a good value.

10:04:13 23       Q.   Do you think it helped you on the day of
10:04:15 24   your interviews on March 28th, 2008?

10:04:18 25       A.   Well, that was one thing that Mr. Villarba

DONNABEL ESCUADRA - 6/22/2011

Page 31

| | | |
|---|---|---|
| 10:04:20 | 1 | said.  He said that we will be prioritizing the |
| 10:04:24 | 2 | interview with -- with that payment that we had. |
| 10:04:28 | 3 | And so -- because it cannot be avoided that there |
| 10:04:36 | 4 | would be walk-ins.  So they gave us an assurance |
| 10:04:40 | 5 | that we will be interviewed. |
| 10:04:41 | 6 | Q.   So not only did that cost and your |
| 10:04:44 | 7 | attendance provide you some training, it also put |
| 10:04:47 | 8 | you ahead in the line to be considered on March 28, |
| 10:04:50 | 9 | 2008? |
| 10:04:51 | 10 | A.   Correct. |
| 10:04:53 | 11 | Q.   Did you attend any other trainings prior |
| 10:04:56 | 12 | to your March 28, 2008 interview? |
| 10:05:00 | 13 | A.   With PARS? |
| 10:05:02 | 14 | Q.   With any organization. |
| 10:05:07 | 15 | A.   Work related, yes. |
| 10:05:09 | 16 | Q.   And what were those training sessions? |
| 10:05:13 | 17 | A.   Institutional trainings.  I -- I did train |
| 10:05:21 | 18 | prior to that. |
| 10:05:22 | 19 | Q.   To interview -- |
| 10:05:22 | 20 | A.   No. |
| 10:05:23 | 21 | Q.   -- for a position? |
| 10:05:24 | 22 | A.   No.  As I said, it is work related. |
| 10:05:26 | 23 | Q.   Just work related? |
| 10:05:28 | 24 | A.   Uh-huh. |
| 10:05:29 | 25 | Q.   Did you have any interview trainings prior |

DONNABEL ESCUADRA - 6/22/2011

Page 33

| | | |
|---|---|---|
| 10:06:57 | 1 | A. Which costs do you mean? |
| 10:06:59 | 2 | Q. For placement. |
| 10:07:00 | 3 | A. No. There was never a mention about |
| 10:07:03 | 4 | placement. |
| 10:07:03 | 5 | Q. You'll have to excuse my pauses. I'm |
| 10:07:24 | 6 | flying solo today. |
| 10:07:33 | 7 | Okay. Where did you go to high school? |
| 10:07:34 | 8 | A. My high school, the school where I |
| 10:07:38 | 9 | graduated? |
| 10:07:40 | 10 | Q. Your first high school. |
| 10:07:41 | 11 | A. It was in St. Martin de Porres Academy in |
| 10:07:56 | 12 | Daanbantayan, Cebu, Philippines. |
| 10:08:04 | 13 | Q. And what years did you attend St. Martin |
| 10:08:09 | 14 | de Porres? |
| 10:08:10 | 15 | A. I graduated 1991. That was four years. |
| 10:08:14 | 16 | So 1987 to 1991. |
| 10:08:18 | 17 | Q. And did you immediately begin attending a |
| 10:08:27 | 18 | university after that? |
| 10:08:28 | 19 | A. Yes. |
| 10:08:28 | 20 | Q. Did you also start working immediately |
| 10:08:30 | 21 | after that? |
| 10:08:31 | 22 | A. After I graduated from the university? |
| 10:08:33 | 23 | Q. From high school. |
| 10:08:34 | 24 | A. I -- from high school, I attended college |
| 10:08:39 | 25 | in the university for four years. I graduated 1995. |

Merrill Corporation - Los Angeles
800-826-0277                              www.merrillcorp.com/law

DONNABEL ESCUADRA - 6/22/2011

Page 34

| 10:08:44 | 1 | And that same year, I also started working. |
| 10:08:51 | 2 | Q.   Were you a full-time student at the |
| 10:08:53 | 3 | university? |
| 10:08:54 | 4 | A.   Yes, sir. |
| 10:08:54 | 5 | Q.   And did you work at the time as well? |
| 10:08:56 | 6 | A.   I tutor some kids to sustain from my |
| 10:09:02 | 7 | allowance. |
| 10:09:04 | 8 | Q.   What is your allowance?  What was your |
| 10:09:08 | 9 | allowance during that period of time? |
| 10:09:11 | 10 | A.   200, 200 pesos. |
| 10:09:14 | 11 | Q.   Per week? |
| 10:09:15 | 12 | A.   Per month. |
| 10:09:17 | 13 | Q.   And who gave you that allowance? |
| 10:09:19 | 14 | A.   My aunt. |
| 10:09:27 | 15 | Q.   And what did you -- what was the name of |
| 10:09:28 | 16 | your university? |
| 10:09:30 | 17 | A.   University of San Jose-Recoletos. |
| 10:09:34 | 18 | Q.   What did you study there? |
| 10:09:35 | 19 | A.   It was a sectarian school, I believe, in |
| 10:09:38 | 20 | the standard of -- the standard of the school.  They |
| 10:09:42 | 21 | have high standard.  And majority of the graduates |
| 10:09:49 | 22 | land a good job. |
| 10:09:51 | 23 | Q.   But what subject did you study at the |
| 10:09:53 | 24 | school? |
| 10:09:54 | 25 | A.   Bachelor of secondary education. |

DONNABEL ESCUADRA - 6/22/2011

Page 35

| | | |
|---|---|---|
| 10:10:05 | 1 | Q.    And did you go to any other school after |
| 10:10:06 | 2 | University of San Jose-Recoletos? |
| 10:10:09 | 3 | A.    Yes.  I was -- I attended -- I attended |
| 10:10:12 | 4 | Cebu State College of Science and Technology. |
| 10:10:20 | 5 | Q.    What years did you attend Cebu State |
| 10:10:23 | 6 | College of Science and Technology? |
| 10:10:26 | 7 | A.    2007-2008. |
| 10:10:28 | 8 | Q.    Did you attend for full years in 2007 and |
| 10:10:33 | 9 | 2008 or for partial years? |
| 10:10:36 | 10 | A.    2007-2008, that was starting August up to |
| 10:10:39 | 11 | May of 2008. |
| 10:10:42 | 12 | Q.    August of 2007 until May of 2008, you |
| 10:10:45 | 13 | attended Cebu State College? |
| 10:10:47 | 14 | A.    Yes, sir. |
| 10:10:48 | 15 | Q.    How many semesters is that? |
| 10:10:49 | 16 | A.    That's equivalent to two semesters. |
| 10:10:52 | 17 | Q.    Was there a prerequisite for you to begin |
| 10:10:56 | 18 | your studies at Cebu State College? |
| 10:10:59 | 19 | A.    Yes. |
| 10:10:59 | 20 | Q.    And what was that? |
| 10:11:00 | 21 | A.    That I have my bachelor's degree. |
| 10:11:03 | 22 | Q.    Did it matter what you had your bachelor's |
| 10:11:06 | 23 | degree in? |
| 10:11:07 | 24 | A.    Yes. |
| 10:11:07 | 25 | Q.    And what was the requirement? |

DONNABEL ESCUADRA - 6/22/2011

Page 36

| | | |
|---|---|---|
| 10:11:11 | 1 | A.   I -- I enrolled in that university for my |
| 10:11:15 | 2 | special education.  And so that it will not take me |
| 10:11:18 | 3 | more years to finish it, I should have my bachelor's |
| 10:11:22 | 4 | degree. |
| 10:11:23 | 5 | Q.   Did it matter that you had a bachelor's |
| 10:11:25 | 6 | degree in any particular subject in order for you to |
| 10:11:28 | 7 | enroll in this special education program? |
| 10:11:31 | 8 | A.   No.  Not at all.  Because there are -- |
| 10:11:34 | 9 | there are some who don't have bachelor's degree that |
| 10:11:38 | 10 | were able to enroll for special education.  But the |
| 10:11:41 | 11 | difference is that they will only get a certificate. |
| 10:11:44 | 12 | They will not get a diploma.  That's the main |
| 10:11:47 | 13 | difference. |
| 10:11:47 | 14 | Q.   What is the difference between a |
| 10:11:49 | 15 | certificate and a diploma? |
| 10:11:50 | 16 | A.   The certificate -- the diploma is |
| 10:11:53 | 17 | equivalent to really having finishing everything, |
| 10:11:57 | 18 | and you have gone through with practice teaching. |
| 10:12:02 | 19 | You will have an actual experience of handling |
| 10:12:06 | 20 | special -- I mean, students with special needs.  And |
| 10:12:11 | 21 | it's just like another course, other than my |
| 10:12:19 | 22 | bachelor's in secondary education. |
| 10:12:23 | 23 | Q.   So at the end of your study at Cebu State |
| 10:12:27 | 24 | College, you received a diploma? |
| 10:12:30 | 25 | A.   Let me clarify that one.  My diploma was |

DONNABEL ESCUADRA - 6/22/2011

Page 37

| | | |
|---|---|---|
| 10:12:32 | 1 | done in January of 2008, and I proceed with my |
| 10:12:37 | 2 | master's in special education with that same -- the |
| 10:12:41 | 3 | same college and finish it in May of 2008. |
| 10:12:52 | 4 | Q.   So from August 2007 until January 2008, |
| 10:12:56 | 5 | which is -- August, September, October, November, |
| 10:13:00 | 6 | December, January -- six months, you received your |
| 10:13:06 | 7 | diploma in special education? |
| 10:13:08 | 8 | A.   Yes. |
| 10:13:08 | 9 | Q.   Did you start at the beginning of August |
| 10:13:11 | 10 | and end at the end of January? |
| 10:13:14 | 11 | A.   It was middle of August of 2007. |
| 10:13:21 | 12 | Q.   And when did you end in January? |
| 10:13:24 | 13 | A.   I could not -- I think that was second -- |
| 10:13:28 | 14 | second week of January.  January 9, if I could |
| 10:13:32 | 15 | remember it right.  But that was in January of 2008. |
| 10:13:37 | 16 | Q.   So you actually earned that degree in more |
| 10:13:41 | 17 | like five months? |
| 10:13:43 | 18 | Would you say that's fair? |
| 10:13:44 | 19 | A.   It was fair because I -- I have my |
| 10:13:47 | 20 | bachelor's degree. |
| 10:13:47 | 21 | Q.   I mean, is it fair to say that you earned |
| 10:13:50 | 22 | your diploma in five months of study? |
| 10:13:54 | 23 | A.   Yes. |
| 10:13:54 | 24 | Q.   And then between the middle -- when did |
| 10:13:56 | 25 | you start your master's degree? |

DONNABEL ESCUADRA - 6/22/2011

Page 38

| | | | |
|---|---|---|---|
| 10:14:00 | 1 | A. | Right after that. |
| 10:14:01 | 2 | Q. | In the middle of January? |
| 10:14:02 | 3 | A. | Yes. |
| 10:14:18 | 4 | Q. | When did you earn your bachelor's (sic) |
| 10:14:19 | 5 | degree?  In the month of May? |
| 10:14:22 | 6 | A. | Yes.  May 8 of 2008. |
| 10:14:30 | 7 | Q. | So is it fair to say that you received a |
| 10:14:34 | 8 | master's degree in a little under four months? |
| 10:14:37 | 9 | A. | Yes. |
| 10:14:48 | 10 | Q. | Do you know how long it takes to get a |
| 10:14:52 | 11 | master's degree in special education in the United |
| 10:14:54 | 12 | States? |
| 10:14:54 | 13 | A. | I don't know, but I understand that I was |
| 10:14:56 | 14 | able to take that in that short time because I |
| 10:14:59 | 15 | already had my initial master's units from the |
| 10:15:02 | 16 | University of San Jose-Recoletos and that was |
| 10:15:06 | 17 | credited -- I had that for two years. |
| 10:15:52 | 18 | Q. | Okay.  I'm going to ask the court reporter |
| 10:15:54 | 19 | to mark this Exhibit 523, and she'll provide that to |
| 10:15:59 | 20 | you for your review. |
| 10:16:01 | 21 | | I will pass these around.  Thanks. |
| 10:16:18 | 22 | | (Exhibit 523 was marked for I.D.) |
| 10:16:19 | 23 | BY MR. SULLIVAN: |
| 10:16:32 | 24 | Q. | So did you attend any other schools |
| 10:16:34 | 25 | besides your high school, which was St. Martin de |

DONNABEL ESCUADRA - 6/22/2011

Page 41

| | | | |
|---|---|---|---|
| 10:18:46 | 1 | A. | Currently? |
| 10:18:47 | 2 | Q. | Yes. |
| 10:18:48 | 3 | A. | I don't know. |

10:18:52   4      Q.    When did you begin thinking about studying

10:18:58   5   special education for the purposes of coming to the

10:19:01   6   United States?

10:19:02   7      A.    That same year, 2007.

10:19:07   8      Q.    Why did you want to come to the United

10:19:09   9   States?

10:19:09  10      A.    I wanted to make a good start for me and

10:19:12  11   my children after the marriage crisis that I had.

10:19:18  12      Q.    Were you still married at the time that

10:19:20  13   you decided you wanted to come to the United States?

10:19:22  14      A.    I was still married at that time with my

10:19:24  15   husband, first husband.

10:19:29  16      Q.    And were you still living with him?

10:19:31  17      A.    At the time when I considered that, he was

10:19:34  18   not with us.

10:19:38  19      Q.    Was he -- were you receiving financial

10:19:40  20   support from your husband?

10:19:41  21      A.    It wasn't -- he was -- he was not

10:19:45  22   regularly sending money.

10:19:47  23      Q.    How much would he normally send?

10:19:49  24      A.    6,000 pesos to 7,000 pesos.

10:19:56  25      Q.    Per month?

DONNABEL ESCUADRA - 6/22/2011

Page 62

| | | |
|---|---|---|
| 11:01:14 | 1 | processing. |
| 11:01:17 | 2 | Q.   Now, when did you find out about the -- |
| 11:01:20 | 3 | the next -- what was the next fee?  Strike that. |
| 11:01:25 | 4 | What was the next fee that you paid? |
| 11:01:32 | 5 | A.   My -- my -- my -- my decision at that time |
| 11:01:39 | 6 | really was to make it and complete with what they |
| 11:01:44 | 7 | required as they said during that March 28 of 2008. |
| 11:01:49 | 8 | That is, we have to prepare about $5,000. |
| 11:02:00 | 9 | Q.   I'm going to strike that as nonresponsive, |
| 11:02:04 | 10 | but also withdraw the question. |
| 11:02:12 | 11 | So when you decided in 2007 to go to |
| 11:02:15 | 12 | school for a master's in special education, what are |
| 11:02:17 | 13 | some of the reasons why you wanted to come to the |
| 11:02:20 | 14 | United States? |
| 11:02:20 | 15 | A.   That's my number one reason.  I wanted a |
| 11:02:23 | 16 | good start for my children and myself, move on with |
| 11:02:27 | 17 | our life. |
| 11:02:29 | 18 | Q.   Are they enrolled in school in Louisiana? |
| 11:02:32 | 19 | A.   Yes.  Currently. |
| 11:02:34 | 20 | Q.   Public school? |
| 11:02:35 | 21 | A.   Yes.  In the school where I am teaching. |
| 11:02:43 | 22 | Q.   How much money are you currently earning? |
| 11:02:45 | 23 | A.   $52,000 annual. |
| 11:02:52 | 24 | Q.   What did you earn last year? |
| 11:02:54 | 25 | A.   Come again, sir? |

DONNABEL ESCUADRA - 6/22/2011

Page 69

| | | |
|---|---|---|
| 11:10:56 | 1 | Q.  Do you see where it says master's degree |
| 11:10:59 | 2 | earned on this anywhere? |
| 11:11:05 | 3 | A.  It says here -- |
| 11:11:06 | 4 | Q.  Let me rephrase. |
| 11:11:07 | 5 | A.  -- major specialization. |
| 11:11:10 | 6 | You know what?  Because this one, when I |
| 11:11:13 | 7 | submitted this, this was -- as I said, this was the |
| 11:11:16 | 8 | very first evaluation.  And my master's in special |
| 11:11:19 | 9 | education was not yet reflected with this because I |
| 11:11:23 | 10 | finish it in May of 2008. |
| 11:11:25 | 11 | So the document that I have submitted to |
| 11:11:27 | 12 | them was only the diploma in special education. |
| 11:11:36 | 13 | Q.  Okay.  I'm going to strike that as |
| 11:11:38 | 14 | nonresponsive.  I would like to reask and perhaps |
| 11:11:41 | 15 | rephrase the question a bit. |
| 11:11:44 | 16 | This credential evaluation form does not |
| 11:11:46 | 17 | state that you have earned a master's degree, does |
| 11:11:48 | 18 | it? |
| 11:11:49 | 19 | A.  Yes.  I would like to have it corrected. |
| 11:11:53 | 20 | Q.  Okay.  Why did you want to come to America |
| 11:12:06 | 21 | over any other country? |
| 11:12:09 | 22 | A.  Because it is -- there is really my goal. |
| 11:12:14 | 23 | I was thinking myself if I have to leave my school |
| 11:12:18 | 24 | that is giving me enough salary, then I should also |
| 11:12:23 | 25 | choose the best country where I should go and will |

DONNABEL ESCUADRA - 6/22/2011

Page 70

| | | |
|---|---|---|
| 11:12:27 | 1 | offer a bigger amount. |
| 11:12:32 | 2 | Q.   Did you understand that other foreign |
| 11:12:35 | 3 | countries were -- strike that. |
| 11:12:41 | 4 | Did you understand that America would be a |
| 11:12:43 | 5 | good country for earning a good salary? |
| 11:12:47 | 6 | A.   Yes. |
| 11:12:48 | 7 | Q.   Did you understand that it would be easier |
| 11:12:49 | 8 | to come into the United States than other countries? |
| 11:12:54 | 9 | A.   It is not easy. |
| 11:12:55 | 10 | Q.   Do you understand that -- do you know of |
| 11:12:59 | 11 | any other countries where you thought the salary |
| 11:13:02 | 12 | would be comparable to that of the U.S.? |
| 11:13:05 | 13 | A.   I don't know. |
| 11:13:07 | 14 | Q.   Did you think about moving to the United |
| 11:13:11 | 15 | Kingdom? |
| 11:13:12 | 16 | A.   No. |
| 11:13:15 | 17 | Q.   Do you speak Spanish? |
| 11:13:18 | 18 | A.   Very little. |
| 11:13:22 | 19 | Q.   Did you think about moving to any other |
| 11:13:24 | 20 | English speaking countries? |
| 11:13:28 | 21 | A.   No. |
| 11:13:33 | 22 | Q.   Do your cousins have good lives in the |
| 11:13:36 | 23 | United States by your standards? |
| 11:13:38 | 24 | A.   I haven't met them since I arrived here, |
| 11:13:40 | 25 | so I could not really tell exactly. |

DONNABEL ESCUADRA - 6/22/2011

Page 71

| 11:13:43 | 1 | Q. Did they give you any guidance on your |

11:13:43  1        Q.    Did they give you any guidance on your

11:13:46  2    coming to America?

11:13:47  3        A.    No.

11:13:48  4        Q.    Did you make the decision to come to

11:13:50  5    America on your own?

11:13:53  6        A.    Yes.

11:13:57  7        Q.    At any point in the process with PARS or

11:14:01  8    UPI, did you discuss the fees with your ex-husband,

11:14:07  9    Ruel Escuadra, or his family?

11:14:12  10            MS. PLOTKIN:  Objection.  Compound.

11:14:15  11   BY MR. SULLIVAN:

11:14:15  12       Q.    You can answer.

11:14:16  13       A.    The fees.  When I was in the processing, I

11:14:20  14   mentioned that I need considerable amount of money.

11:14:24  15   That is the $5,000 that was asked by UPI and PARS

11:14:28  16   International, but I did not discuss to him

11:14:32  17   specifics.

11:14:33  18       Q.    What about discussing fees with Ruel

11:14:37  19   Escuadra's family?

11:14:39  20       A.    No.

11:14:47  21       Q.    Did you know if the fees that were being

11:14:49  22   charged by PARS were comparable to other employment

11:14:52  23   agencies in the Philippines?

11:14:53  24       A.    No.

11:15:02  25       Q.    At any point in time, did you feel

DONNABEL ESCUADRA - 6/22/2011

Page 72

| | | |
|---|---|---|
| 11:15:04 | 1 | compelled to do independent research as to the fees |
| 11:15:07 | 2 | that were being charged by PARS? |
| 11:15:10 | 3 | A.   Compelled to make research? |
| 11:15:12 | 4 | Q.   Did you ever think it was a good idea to |
| 11:15:14 | 5 | research the fees that were being charged by PARS? |
| 11:15:25 | 6 | A.   Well, because for me, 5,000, I was |
| 11:15:26 | 7 | thinking -- I think I can make it.  $5,000. |
| 11:15:32 | 8 | Q.   Did you research the fees charged by other |
| 11:15:34 | 9 | employment agencies in the Philippines? |
| 11:15:39 | 10 | A.   I did not. |
| 11:15:39 | 11 | Q.   So although your ex-husband's family with |
| 11:15:42 | 12 | whom you keep in touch opened and operated an |
| 11:15:46 | 13 | employment agency in Manila, you did not contact |
| 11:15:50 | 14 | them about the fees that were being charged by PARS? |
| 11:15:53 | 15 | A.   There is no reason for me to contact them. |
| 11:15:55 | 16 | 2006-2007, that was the crisis, and that separates |
| 11:16:00 | 17 | me from them.  So -- |
| 11:16:14 | 18 | Q.   Was your husband aware that you would |
| 11:16:15 | 19 | likely bring your kids to the United States? |
| 11:16:18 | 20 | A.   Yes.  He signed a parental consent. |
| 11:16:22 | 21 | Q.   Was Ruel Escuadra's family aware that you |
| 11:16:25 | 22 | would be bringing his kids to the United States? |
| 11:16:28 | 23 | A.   Yes, I believe so. |
| 11:16:31 | 24 | Q.   Could you place a value on the education |
| 11:16:35 | 25 | received by your children in the United States? |

DONNABEL ESCUADRA - 6/22/2011

Page 95

| | | |
|---|---|---|
| 11:49:21 | 1 | briefly. |
| 11:49:23 | 2 | VIDEO OPERATOR:  Were you done with your |
| 11:49:23 | 3 | answer? |
| 11:49:24 | 4 | THE WITNESS:  Yes, sir. |
| 11:49:25 | 5 | VIDEO OPERATOR:  The time now is 11:48. |
| 11:49:31 | 6 | End of Tape No. 1.  Off the record. |
| 11:59:55 | 7 | (Recess taken.) |
| 11:59:56 | 8 | VIDEO OPERATOR:  The time now is 11:59. |
| 11:59:58 | 9 | We are back on the record. |
| 11:59:59 | 10 | BY MR. SULLIVAN: |
| 12:00:00 | 11 | Q.   So, Ms. Escuadra, looking at Bates |
| 12:00:05 | 12 | numbered document 1440, the last four digits being |
| 12:00:09 | 13 | 1440 -- |
| 12:00:10 | 14 | A.   1440. |
| 12:00:11 | 15 | Q.   -- we were talking about your potential |
| 12:00:13 | 16 | foray into law. |
| 12:00:15 | 17 | Did you end up going -- taking any law |
| 12:00:17 | 18 | courses? |
| 12:00:17 | 19 | A.   Yes. |
| 12:00:18 | 20 | Q.   What did you take? |
| 12:00:20 | 21 | A.   The bachelor of laws in University of San |
| 12:00:23 | 22 | Jose-Recoletos. |
| 12:00:25 | 23 | Q.   Did you take contract law? |
| 12:00:30 | 24 | A.   I guess I remember I still have that.  And |
| 12:00:34 | 25 | during the last semester. |

DONNABEL ESCUADRA - 6/22/2011

Page 96

| | | | |
|---|---|---|---|
| 12:00:36 | 1 | Q. | So you did take contract law? |
| 12:00:38 | 2 | A. | Yes. |
| 12:00:39 | 3 | Q. | What other types of law classes did you |
| 12:00:42 | 4 | take? | |
| 12:00:43 | 5 | A. | Are you referring to the subjects that I |
| 12:00:46 | 6 | took? | |
| 12:00:47 | 7 | Q. | Yes. |
| 12:00:48 | 8 | A. | I could not remember everything, but I |
| 12:00:50 | 9 | remember property laws, intellectual -- intellectual | |
| 12:00:53 | 10 | property laws. Sales. Political, constitutional | |
| 12:01:01 | 11 | laws one and two. Labor laws -- Labor Code of the | |
| 12:01:07 | 12 | Philippines. | |
| 12:01:17 | 13 | Q. | Okay. And how many courses did you take? |
| 12:01:20 | 14 | A. | How many courses or how many subjects did |
| 12:01:24 | 15 | I took -- take? | |
| 12:01:25 | 16 | Q. | How many courses, designated legal courses |
| 12:01:27 | 17 | did you take? | |
| 12:01:34 | 18 | A. | I could not exactly tell unless I have my |
| 12:01:37 | 19 | transcript. | |
| 12:01:38 | 20 | Q. | Did you offer that transcript when you |
| 12:01:39 | 21 | were applying for teaching positions in the United | |
| 12:01:42 | 22 | States? | |
| 12:01:42 | 23 | A. | I could not remember if that form part of |
| 12:01:46 | 24 | the transcript because, as I have said a while ago, | |
| 12:01:49 | 25 | which I remember, that when we are going to request | |

DONNABEL ESCUADRA - 6/22/2011

Page 122

| | | |
|---|---|---|
| 13:50:05 | 1 | Q.   You don't know how many interviewees -- |
| 13:50:09 | 2 | sorry.  Scratch that. |
| 13:50:11 | 3 | Who did you speak to from various U.S. |
| 13:50:14 | 4 | school districts? |
| 13:50:15 | 5 | A.   I was interviewed by Dr. Elizabeth |
| 13:50:19 | 6 | Swinford. |
| 13:50:20 | 7 | Q.   Were you interviewed by anyone else? |
| 13:50:22 | 8 | A.   No. |
| 13:50:22 | 9 | Q.   It says you were scheduled for an |
| 13:50:24 | 10 | interview with principals from Boston in Paragraph 5 |
| 13:50:28 | 11 | of your declaration. |
| 13:50:30 | 12 | A.   Yes.  I was scheduled for an interview |
| 13:50:33 | 13 | with Dr. Elizabeth Swinford and principals from |
| 13:50:37 | 14 | Louisiana and Boston, but they did not let me go for |
| 13:50:41 | 15 | Boston. |
| 13:50:41 | 16 | Q.   Who did not let you go for Boston? |
| 13:50:45 | 17 | A.   I presume that -- that because after my |
| 13:50:48 | 18 | interview with Dr. Swinford, one of the interviewers |
| 13:50:53 | 19 | asked if they could interview me.  And she said, No, |
| 13:50:57 | 20 | she will be with us.  So I -- so I just -- |
| 13:51:00 | 21 | Q.   Why do you think Ms. Swinford said that? |
| 13:51:03 | 22 | A.   Well, I believe that I have -- I have |
| 13:51:07 | 23 | convinced her for my position. |
| 13:51:12 | 24 | Q.   Do you think you were a qualified |
| 13:51:14 | 25 | candidate that she wanted to hire? |

DONNABEL ESCUADRA - 6/22/2011

Page 125

| | | |
|---|---|---|
| 13:53:42 | 1 | THE WITNESS:  Okay. |
| 13:53:42 | 2 | BY MR. SULLIVAN: |
| 13:54:04 | 3 | Q.  What did Ms. Navarro say to you that day? |
| 13:54:06 | 4 | A.  What did Ms. Navarro say to us that day? |
| 13:54:09 | 5 | That after -- when we went back to the interview |
| 13:54:11 | 6 | area where we were told to, because she would talk |
| 13:54:14 | 7 | to us, she said that we are going to prepare $1,000 |
| 13:54:17 | 8 | for the initial processing fee, which considered as |
| 13:54:21 | 9 | the reservation fee. |
| 13:54:23 | 10 | And she said that -- I wanted this in |
| 13:54:26 | 11 | March 31 -- the interview was Friday.  So March 31, |
| 13:54:30 | 12 | Monday before 12:00.  And if you could -- if you |
| 13:54:32 | 13 | could not deposit this amount, you will be replaced |
| 13:54:39 | 14 | with -- with -- because they had like three stars, |
| 13:54:45 | 15 | two stars, and I was with the three stars.  So they |
| 13:54:47 | 16 | will replace us with two stars. |
| 13:54:50 | 17 | So I -- I had that understanding, that |
| 13:54:52 | 18 | that will reserve my position if I could pay. |
| 13:54:56 | 19 | Q.  Did you think it was unfair that you had |
| 13:54:58 | 20 | to pay $1,000 by Monday, March 31st, 2008? |
| 13:55:04 | 21 | A.  Whether it was fair? |
| 13:55:07 | 22 | Q.  Yes. |
| 13:55:11 | 23 | A.  Fair enough, I think, for those that has |
| 13:55:14 | 24 | that amount.  But may not be necessary for all. |
| 13:55:22 | 25 | Q.  So you think it's unfair that PARS asked |

DONNABEL ESCUADRA - 6/22/2011

Page 129

| | | |
|---|---|---|
| 13:59:42 | 1 | Louisiana; correct? |
| 13:59:44 | 2 | A.   I presume that because she said it. |
| 14:00:05 | 3 | Q.   What else did Mel Villarba say to you on |
| 14:00:07 | 4 | March 28th, 2008?  Am I saying that correctly?  I'm |
| 14:00:10 | 5 | sorry.  One moment, please.  Yes. |
| 14:00:13 | 6 | What else did Mel Villarba say to you on |
| 14:00:15 | 7 | March 28, 2008? |
| 14:00:19 | 8 | A.   On March 28, 2008 when Ms. Lulu Navarro |
| 14:00:24 | 9 | was talking about the fees, she said -- somebody was |
| 14:00:29 | 10 | asking around then, How much are we going to |
| 14:00:31 | 11 | prepare? |
| 14:00:32 | 12 | And Ms. Navarro could not really give a |
| 14:00:36 | 13 | definite amount.  And later I made the follow-up |
| 14:00:39 | 14 | question as to how much, so I could prepare. |
| 14:00:44 | 15 | And Mr. -- it was Mr. Mel Villarba who |
| 14:00:47 | 16 | said, Prepare about $5,000. |
| 14:00:51 | 17 | Q.   So on that day you were the one that |
| 14:00:54 | 18 | asked, How much should we be preparing in order to |
| 14:00:58 | 19 | go through with this placement? |
| 14:01:02 | 20 | A.   I personally made a follow-up question as |
| 14:01:05 | 21 | to that regard. |
| 14:01:07 | 22 | Q.   And was that question made in front of the |
| 14:01:09 | 23 | group or was that made individually? |
| 14:01:12 | 24 | A.   It was in front of the group. |
| 14:01:27 | 25 | Q.   Now, in your declaration in Paragraph 8, |

DONNABEL ESCUADRA - 6/22/2011

Page 130

| 14:01:31 | 1 | halfway down the page, you say, quote: |
| 14:01:36 | 2 | "Another person in the group |
| 14:01:38 | 3 | complained about the amount of |
| 14:01:39 | 4 | money that needed to be sent in a |
| 14:01:40 | 5 | quick amount of time.  And Lulu |
| 14:01:41 | 6 | fussed at him and quickly moved on |
| 14:01:44 | 7 | to other questions." |
| 14:01:45 | 8 | A.   Excuse me.  Where was that? |
| 14:01:46 | 9 | Q.   It's in the middle of Paragraph 8. |
| 14:01:49 | 10 | A.   Paragraph 8. |
| 14:01:50 | 11 | Q.   Starting with, "another person." |
| 14:01:51 | 12 | A.   Okay.  Okay.  Where is that?  You can |
| 14:01:59 | 13 | continue. |
| 14:02:03 | 14 | Q.   Who was that person? |
| 14:02:04 | 15 | A.   I don't know that person.  He was one of |
| 14:02:07 | 16 | those that was selected. |
| 14:02:09 | 17 | Q.   And it was a male? |
| 14:02:11 | 18 | A.   Male. |
| 14:02:12 | 19 | Q.   And what was his complaint? |
| 14:02:14 | 20 | A.   When Ms. Lulu was talking about the $1,000 |
| 14:02:20 | 21 | for reservation fee, and then she was mentioning |
| 14:02:24 | 22 | also about five -- $5,995.  And she said, There are |
| 14:02:31 | 23 | some other fees, attorney's fee, evaluation of your |
| 14:02:35 | 24 | credentials, that was the 595 -- she said -- |
| 14:02:43 | 25 | Ms. Navarro said, $1,000 for the reservation fee, |

DONNABEL ESCUADRA - 6/22/2011

Page 131

| | | |
|---|---|---|
| 14:02:48 | 1 | the WES evaluation for $595. |
| 14:02:53 | 2 | And after that she said there are other |
| 14:02:56 | 3 | fees, attorney's fee.  And she also said that she |
| 14:03:02 | 4 | also expect for profit out of the services that they |
| 14:03:07 | 5 | rendered. |
| 14:03:09 | 6 | Q.   On that day, March 28, 2008, Lourdes |
| 14:03:14 | 7 | Navarro told you and the entire group of teachers |
| 14:03:18 | 8 | that there were other fees and that she expected |
| 14:03:22 | 9 | profit from placing you and other teachers; correct? |
| 14:03:26 | 10 | A.   Correct.  That prompted me to make that |
| 14:03:29 | 11 | follow-up question to make sure. |
| 14:03:39 | 12 | Q.   Now, in Paragraph 8 of your declaration, |
| 14:03:41 | 13 | you don't state that you were the one that made the |
| 14:03:44 | 14 | follow-up question, do you?  Or am I missing that? |
| 14:03:54 | 15 | A.   Let me read this paragraph so I could. |
| 14:04:15 | 16 | Okay.  Now, I think you are referring to |
| 14:04:16 | 17 | this line.  Can I read this? |
| 14:04:18 | 18 | Q.   Sure. |
| 14:04:19 | 19 | A.   Lulu -- okay.  Let me see. |
| 14:04:22 | 20 | "She told us that those who |
| 14:04:24 | 21 | could not pay for $1,000 would be |
| 14:04:27 | 22 | replaced by other applicants. |
| 14:04:30 | 23 | Another person in a group |
| 14:04:32 | 24 | complained about the amount of |
| 14:04:33 | 25 | money that needed to be sent in |

DONNABEL ESCUADRA - 6/22/2011

Page 134

| | | |
|---|---|---|
| 14:07:00 | 1 | ago. |
| 14:07:07 | 2 | Q.   Did she say that the $1,000 in the payment |
| 14:07:10 | 3 | of March 31st, 2008 was nonnegotiable? |
| 14:07:14 | 4 | A.   She did not use the word, "nonnegotiable." |
| 14:07:18 | 5 | But she said that if we cannot pay that amount, we |
| 14:07:22 | 6 | will be replaced. |
| 14:07:24 | 7 | Q.   Is that a threat? |
| 14:07:27 | 8 | A.   I consider that as a threat. |
| 14:07:31 | 9 | Q.   In Paragraph 9 of your declaration, you |
| 14:07:41 | 10 | state that Mr. Villarba referred you to AG Finance |
| 14:07:45 | 11 | so that you could pay these fees; correct? |
| 14:07:51 | 12 | A.   Yes. |
| 14:07:57 | 13 | Q.   What do you mean by, "referred"? |
| 14:07:59 | 14 | A.   We were -- they -- they were giving us |
| 14:08:01 | 15 | information about AG giving loans.  And that if |
| 14:08:09 | 16 | we're interested, we can contact this person so they |
| 14:08:13 | 17 | can send us applications, if we would want to. |
| 14:08:19 | 18 | Q.   Did you research other companies that |
| 14:08:20 | 19 | would be providing loans? |
| 14:08:22 | 20 | A.   I did. |
| 14:08:23 | 21 | Q.   You did? |
| 14:08:24 | 22 | A.   Yes.  Later during the entire processing |
| 14:08:29 | 23 | period. |
| 14:08:29 | 24 | Q.   You said you borrowed $1,000 from the CFO |
| 14:08:47 | 25 | of Pillsbury in the Philippines, Ravi Sivaraman? |

DONNABEL ESCUADRA - 6/22/2011

Page 142

```
14:19:44   1    gift from my sponsor.
14:19:46   2    BY MR. SULLIVAN:
14:19:46   3         Q.   And you borrowed $1,000 from your neighbor
14:19:49   4    in order to pay 595; correct?
14:19:52   5         A.   Yes.  But that was with 10 percent
14:19:54   6    interest per month.
14:19:56   7         Q.   Why did you borrow $1,000 at 10 percent
14:19:59   8    interest in order to pay $595?
14:20:04   9         A.   She's the only one who's willing to at
14:20:05  10    that very time when I really need it.
14:20:07  11         Q.   Why didn't you borrow $595 at 10 percent
14:20:12  12    interest rather than $1,000 at 10 percent interest?
14:20:16  13         A.   Say it again, please.
14:20:18  14         Q.   Why didn't you borrow $595 at 10 percent
14:20:18  15    interest rather than $1,000 at 10 percent interest?
14:20:21  16         A.   Because I would like to reserve the
14:20:23  17    remaining amount to complete the $5,000 that I
14:20:27  18    relied on.
14:20:29  19         Q.   With a debt of $3,515 -- strike that.
14:21:12  20              We're going to mark this exhibit -- what
14:21:14  21    are we on now?  528.  All right.
14:21:36  22              (Exhibit 528 was marked for I.D.)
14:21:40  23    BY MR. SULLIVAN:
14:21:41  24         Q.   Do you recognize this document?
14:21:42  25         A.   Yes, sir.  This is my offer of employment.
```

DONNABEL ESCUADRA - 6/22/2011

Page 144

| | | |
|---|---|---|
| 14:23:03 | 1 | appear like Page 0562? |
| 14:23:07 | 2 | A.   No, sir. |
| 14:23:08 | 3 | Q.   It did not? |
| 14:23:09 | 4 | A.   What's that again? |
| 14:23:12 | 5 | Q.   What I'm asking is, and I'm going to try |
| 14:23:15 | 6 | to be as clear as possible, when you received this |
| 14:23:18 | 7 | offer of employment -- |
| 14:23:20 | 8 | A.   Yes. |
| 14:23:21 | 9 | Q.   -- did it have Millie Williams' signature |
| 14:23:24 | 10 | on it? |
| 14:23:25 | 11 | A.   Yes. |
| 14:23:25 | 12 | Q.   And the date 4-8-08? |
| 14:23:27 | 13 | A.   Yes. |
| 14:23:27 | 14 | Q.   And your signed line on the date was |
| 14:23:31 | 15 | blank; correct? |
| 14:23:32 | 16 | A.   Yes.  Yes.  That's it. |
| 14:23:33 | 17 | Q.   So this would be an accurate copy of the |
| 14:23:35 | 18 | document presignature, pre your signature? |
| 14:23:38 | 19 | A.   Presignature, yes. |
| 14:23:39 | 20 | Q.   And then the last page would be accurate |
| 14:23:41 | 21 | with your signature? |
| 14:23:42 | 22 | A.   I understand it now. |
| 14:23:48 | 23 | Q.   Now, what does this offer of employment |
| 14:23:50 | 24 | say regarding your potential position with East |
| 14:23:55 | 25 | Baton Rouge Parish school system? |

DONNABEL ESCUADRA - 6/22/2011

Page 145

14:24:02  1        A.    It -- it -- it stipulates the job
14:24:16  2    description that I would have for my job and the
14:24:19  3    duties.  And it also stipulates what I can do, my
14:24:25  4    ability to do things.  My training experience, my
14:24:32  5    credentials and working conditions when I will be
14:24:35  6    teaching and the compensation that I will receive.
14:24:38  7        Q.    And as far as your compensation, what does
14:24:39  8    it suggest that you will be earning?
14:24:47  9        A.    $41,000 per year.
14:24:49  10       Q.    Does this match up with what Emilio
14:24:53  11   Villarba discussed with you in July of 2008?
14:24:56  12       A.    In July of 2008?  No.
14:25:02  13       Q.    What's the difference?
14:25:03  14       A.    Big difference, because he said that I
14:25:05  15   would be receiving $54,000.
14:25:10  16       Q.    Did you consider this offer of employment
14:25:13  17   a promise?
14:25:15  18       A.    I consider this as a promise, but also
14:25:19  19   with a -- a -- in mind that I still have to go
14:25:26  20   through with experience and everything to consider
14:25:30  21   as to how much would be the difference.  Since if
14:25:33  22   you remember I said a while ago, that Dr. Swinford
14:25:37  23   even mentioned that it would vary.
14:25:40  24              So when Mr. Mel Villarba mentioned about
14:25:44  25   that, I really believe him because I have that

DONNABEL ESCUADRA - 6/22/2011

Page 160

| | | |
|---|---|---|
| 14:47:47 | 1 | A.   I did. |
| 14:47:48 | 2 | Q.   Why did you sign every single page in this |
| 14:47:51 | 3 | document but to affirm that you had read it? |
| 14:47:54 | 4 | A.   I understand what a contract has to be, |
| 14:47:57 | 5 | but the point of me asking for -- reading this and |
| 14:48:04 | 6 | if I ask questions, is because I know the |
| 14:48:09 | 7 | responsibility. |
| 14:48:09 | 8 | However, at that time there was tension in |
| 14:48:12 | 9 | the office.  And Mr. Villarba at that time when he |
| 14:48:16 | 10 | was in the office he was -- I could hear -- I could |
| 14:48:20 | 11 | hear him clearly that he was arguing with a teacher. |
| 14:48:24 | 12 | And when I asked this and the question was directed |
| 14:48:27 | 13 | to Mr. Villarba, Mr. Villarba was so angry he |
| 14:48:31 | 14 | took -- he got out from the office and said, Whoever |
| 14:48:33 | 15 | is asking questions about anything, they cannot go |
| 14:48:38 | 16 | to the U.S. |
| 14:48:40 | 17 | And there was tension.  There were like |
| 14:48:43 | 18 | more than -- 20, 25 teachers at a time.  I also have |
| 14:48:47 | 19 | a teacher at that time signing a contract that same |
| 14:48:50 | 20 | day with mine.  I could not just exactly determine |
| 14:48:55 | 21 | who was that teacher.  And so -- |
| 14:48:57 | 22 | Q.   If I can interrupt you? |
| 14:48:59 | 23 | A.   I had to answer this -- I mean, I have to |
| 14:49:01 | 24 | sign this.  Lorna was the one said, Sign here, sign |
| 14:49:05 | 25 | here, sign here. |

DONNABEL ESCUADRA - 6/22/2011

Page 163

| | | | |
|---|---|---|---|
| 14:58:10 | 1 | A. | Which one? |
| 14:58:12 | 2 | Q. | 530 and 531. |
| 14:58:15 | 3 | A. | Oh, yes.  This one, 531, 530? |
| 14:58:20 | 4 | Q. | Right. |
| 14:58:20 | 5 | A. | I see that it is with that same date. |

14:58:27   6        Q.    Now, you've already testified that you're

14:58:29   7   not sure that date was correct; correct?

14:58:32   8        A.    Yes, but that was my signature.  I signed

14:58:34   9   it.

14:58:35  10        Q.    Do you recall if these documents were

14:58:36  11   signed on the same day by you?

14:58:38  12        A.    I signed these documents of PARS, this I

14:58:41  13   can really recall that these two documents.

14:58:45  14        Q.    But you signed documents related to PARS

14:58:48  15   on the same day?

14:58:49  16        A.    All the signing were at the same day.

14:58:52  17        Q.    And these are your signatures; correct?

14:58:55  18        A.    Yes.

14:58:59  19        Q.    Did you sign these documents directly

14:59:03  20   after your embassy interview?

14:59:05  21        A.    It was not directly after my embassy

14:59:09  22   interview.  Because after the embassy interview, we

14:59:13  23   still went to PARS, and that was also the time when

14:59:15  24   we were told that we have to come up with $10,800

14:59:20  25   for the placement fee.

DONNABEL ESCUADRA - 6/22/2011

Page 230

| | | |
|---|---|---|
| 17:25:09 | 1 | BY MR. SULLIVAN: |
| 17:25:10 | 2 | Q.   Is it possible? |
| 17:25:11 | 3 | A.   Maybe, yes. |
| 17:25:16 | 4 | Q.   What other threats did Lulu Navarro |
| 17:25:19 | 5 | personally level against you? |
| 17:25:21 | 6 | A.   The first -- the very first time was that |
| 17:25:24 | 7 | when we were in California.  We consider that as a |
| 17:25:28 | 8 | threat.  And then when we start -- |
| 17:25:29 | 9 | Q.   When you say that, what do you mean? |
| 17:25:31 | 10 | A.   I said the very first time when I was in |
| 17:25:34 | 11 | California, I consider that as a threat although |
| 17:25:39 | 12 | that was just a phone call. |
| 17:25:40 | 13 | Q.   Remind me again what was said. |
| 17:25:43 | 14 | A.   When we were in UPI office. |
| 17:25:49 | 15 | Q.   Okay.  And she said what? |
| 17:25:55 | 16 | A.   That the act and -- because they took our |
| 17:26:00 | 17 | visa, they let us sign the contract.  They did not |
| 17:26:03 | 18 | afford me for the time and the chance to be able to |
| 17:26:09 | 19 | read that contract.  And with the way they handle |
| 17:26:12 | 20 | with the voice, intimidating voice, and with the |
| 17:26:16 | 21 | call, that that was intimidating. |
| 17:26:19 | 22 | Q.   Okay.  What is the next instance of |
| 17:26:22 | 23 | Lourdes Navarro personally threatening you? |
| 17:26:25 | 24 | A.   The next was in August, end of August 2008 |
| 17:26:29 | 25 | when we were having a meeting in Great Wall |

DONNABEL ESCUADRA - 6/22/2011

Page 233

17:29:04   1   apartment.  Teachers were complaining about the

17:29:06   2   excessive exorbitant fees that they were -- that she

17:29:11   3   made us pay.  And towards -- within -- within that

17:29:19   4   meeting also, she said -- we were also complaining

17:29:23   5   bringing up the 10 percent for the second year.

17:29:27   6          And she said, I have -- I have with me

17:29:32   7   documents -- she showed that to us.  She said, These

17:29:36   8   are the teachers that I sued because they did not

17:29:39   9   pay the 10 percent.  And if you're not going to pay

17:29:43   10  me the 10 percent, wherever you will go in the U.S.,

17:29:48   11  I can find you.

17:29:49   12         I consider that a really, really a big

17:29:53   13  threat.

17:29:53   14      Q.   And did she threaten you any other time?

17:29:59   15      A.   After that?

17:30:01   16      Q.   Any other time besides those three

17:30:03   17  instances.

17:30:04   18      A.   I could not remember any more.

17:30:12   19      Q.   Does Citywide send you collection notices?

17:30:18   20      A.   No.

17:30:19   21      Q.   How do you know your current outstanding

17:30:22   22  debt with Citywide?

17:30:25   23      A.   I -- we had that -- they had the

17:30:30   24  computations, and I was just keeping my monthly.

17:30:34   25  And every time I could pay, I'm going to email them

DONNABEL ESCUADRA - 6/22/2011

Page 324

1    STATE OF CALIFORNIA                              )
                                           )   SS.
2    COUNTY OF LOS ANGELES                 )

3

4            I am the witness in the foregoing

5    deposition.

6            I have read the foregoing deposition or

7    have had read to me the foregoing deposition, and

8    having made such changes and corrections as I

9    desired, I certify that the same is true in my own

10   knowledge.

11           I hereby declare under the penalties of

12   perjury under the laws of the United States that the

13   foregoing is true and correct.

14           This declaration is executed this _____

15   day of _____, 2011, at _____

16   California.

17

18

19           _____

                     DONNABEL ESCUADRA
20

21

22

23

24

25

DONNABEL ESCUADRA - 6/22/2011

1  STATE OF CALIFORNIA          )
                                )   SS.
2  COUNTY OF LOS ANGELES        )

3      I, CATHY A. REECE, CSR No. 5546 for the State

4  of California, do hereby declare:

5      That prior to being examined, the witness named

6  in the foregoing deposition was duly sworn to

7  testify to the truth, the whole truth, and nothing

8  but the truth;

9      That said deposition was taken down by me in

10 shorthand at the time and place therein named and

11 thereafter reduced to computerized transcription and

12 that the same is a true, correct and complete

13 transcript of said proceedings.

14      Before completion of the transcript,

15 review of the transcript [X] was [ ] was not

16 requested.  If requested, any changes made by the

17 deponent (and provided to the reporter) during the

18 period allowed are appended hereto.

19      I further certify that I am not interested

20 in the outcome of the action.

21      Witness my hand this 1 day of

22 July              , 2011.

23

24

25
                    CATHY A. REECE, RPR, CSR No. 5546

# EXHIBIT C

# In The Matter Of:

*MAIRI NUNAG-TANEDO*
*v.*
*EAST BATON ROUGE PARISH SCHOOL BOARD*

_____

*MARI, TOMASA B. - Vol. 1*

*July 7, 2011*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

TOMASA B. MARI - 7/7/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

-----

| | |
|---|---|
| MAIRI NUNAG-TANEDO, INGRID CRUZ, DONNABEL ESCUADRA, ROLDANDO PASCUAL, and TOMASA MARI, on behalf of themselves and other similarly situated individuals, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. ) SACV 10-01172 |
| vs. | ) JAK(MLGx) ) |
| EAST BATON ROUGE PARISH SCHOOL BOARD, CHARLOTTE D. PLACIDE, MILLIE WILLIAMS, ELIZABETH DURAN SWINFORD, UNIVERSAL PLACEMENT INTERNATIONAL, INC., LOURDES "LULU" NAVARRO, PARS INTERNATIONAL PLACEMENT AGENCY, EMILIO V. VILLARBA, ROBERT B. SILVERMAN, and SILVERMAN & ASSOCIATES, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

VIDEOTAPED DEPOSITION OF

TOMASA B. MARI, VOLUME I, PAGES 1 - 164

TAKEN ON

THURSDAY, JULY 7, 2011

Reported by:

Cathy A. Reece, RPR, CSR No. 5546

TOMASA B. MARI - 7/7/2011

```
 1          Q.    Anything else?

 2          A.    And she threatened some of the teachers.

 3          Q.    Did she threaten you?

 4          A.    Receiving -- yes.

 5          Q.    When did she threaten you?

 6          A.    When I received a lawsuit for a small

 7     claim, that threatens me a lot.

 8          Q.    Did you have any conversations with

 9     Ms. Navarro regarding the lawsuit against you?

10          A.    Yes.

11          Q.    When -- when did you speak with her about

12     it?

13          A.    I can't remember the date, but I can

14     remember what I told her.

15          Q.    What did you tell her?

16          A.    I told her about the extra money that I

17     had with her, since I pay $9,000, and I told her

18     that if I could be sued, by paying in advance for my

19     next 10 percent placement fee.

20               And I even told her that that money, I

21     owed it from AG Financing and AG Financing with 4

22     percent interest, and when we learned that my salary

23     is not the salary that they told me, I been asking

24     if I can get back the money.  But she did not give

25     it back to me.
```

TOMASA B. MARI - 7/7/2011

1          So at that time when I talked to her I

2    told her that if she can also pay the 4 percent

3    interest with extra money I have with her, that will

4    pay off my 10 percent.  But she told me she cannot

5    do that.

6         Q.   So you asked Ms. Navarro to pay -- I'm

7    sorry.  I didn't understand.

8         A.   I told her that money that I owed from AG

9    Financing with 4 percent interest, if she returned

10   the extra amount, I could return it to the financing

11   agency.  That will spare me for the 4 percent

12   interest.

13          Since she did not return it, I told her,

14   The money is with you, so you should be the one to

15   pay the 4 percent interest for that.

16        Q.   And did Ms. Navarro tell you to borrow

17   money from AG Financing?

18        A.   It's Mr. Mel Villarba.

19        Q.   He told you to borrow from them?

20        A.   Yes.

21        Q.   And how much money did you borrow?

22        A.   I borrowed $10,000 from AG Financing and

23   equivalent of 184,000-something in FG Financing.

24   That's pesos.  184,000 pesos.

25        Q.   That's about $4,000, isn't it?

TOMASA B. MARI - 7/7/2011

```
 1    on my second year, because my first year, all my
 2    salary goes to AG and FG.
 3         Q.   How much did you make -- what was your
 4    salary for the first year in the U.S.?
 5         A.   My take-home salary is $1,250.  That was
 6    it.
 7         Q.   What was your annual salary?
 8         A.   Something like 34 -- 34.  I can't fully
 9    remember the figure.
10         Q.   Was it 36,900?
11         A.   That's based on -- that's what they put in
12    my -- in my offer of employment.  When I look at it
13    in my first, it's 34-something that I have -- I'm
14    not really sure, but I'm sure of my take-home fee.
15    After all the deduction is only 1,250 and some
16    cents.
17         Q.   Okay.  Can you tell me where you went
18    to -- about -- a little bit about your education.
19              Where did you go to college?
20              MS. WILLIS:  Objection to form.
21              THE WITNESS:  I graduated in Cebu State
22    College, now Cebu Normal University, taking a
23    Bachelor of Science in elementary education in 1987.
24    BY MS. SULLIVAN:
25         Q.   And at a certain point you went back to
```

TOMASA B. MARI - 7/7/2011

 1    school?

 2        A.   Yes.  I took my master's -- I took some

 3    units in my master's degree in 2008 and some units

 4    in 2009.  And then I can't remember exactly the

 5    date, but I went back to take another units, and

 6    some were 2010 -- I'm not sure -- in the same

 7    school.  And in -- it's not 2010.  I'm not really --

 8    I'm not really sure with the date.

 9            But in 2006 I took my diploma in special

10    education in Cebu -- Cebu Technological School, now

11    Cebu Technological University, for my special ed,

12    and then I took another units for my master's degree

13    and then stop and took another diploma in early

14    childhood education, and then I finished my early

15    childhood education.  I took -- I finished my

16    master's degree, major in special education, just

17    lately.

18        Q.   Okay.  Was that this year?

19        A.   I just finish -- I started it 2007-2008,

20    but I got no chance to finish it there.  So when

21    they offered online, so I just took it this year.

22        Q.   So you were doing that while you were

23    still in Louisiana?

24        A.   Yes.

25        Q.   Why did you decide to go back to school to

TOMASA B. MARI - 7/7/2011

```
 1    get a degree in special education?

 2        A.   I decided because at that time I been

 3    applying for a job in the U.S., and most likely they

 4    are looking for a special education teacher.

 5             And also in my previous school I have

 6    students with disability in an inclusion setting.

 7    So I have to have knowledge of how to deal with

 8    these children.  That's why I decided to go to

 9    school and took a diploma in special education.

10        Q.   Correct me if I'm wrong, but you said that

11    part of the reason was because you knew that -- that

12    you were looking into schools in the U.S. and that's

13    what they were looking for?

14             MS. WILLIS:  Objection to form.

15             THE WITNESS:  I'm applying a job

16    opportunity here in the U.S., and most of those

17    employers asking for a special education teacher.

18    BY MS. SULLIVAN:

19        Q.   When did you first begin applying to jobs

20    in the U.S.?

21        A.   I did it 2004, but I did not pursue

22    because my mother was sick.

23        Q.   And did you apply through an agency?

24        A.   Yes.

25        Q.   What agency?
```

TOMASA B. MARI - 7/7/2011

```
 1        A.   J Construction.

 2        Q.   Was that -- can you spell that?

 3        A.   J.  Just a J.

 4        Q.   Where was that located, the agency?

 5        A.   In Cebu.

 6        Q.   Did you pay any fees to J Construction?

 7        A.   A very minimal amount for the processing.

 8        Q.   Do you remember how much?

 9        A.   I can't remember.

10        Q.   Was J Construction able to get you a

11   position?

12        A.   I was scheduled for an interview, but that

13   time I didn't push through because, as I told you,

14   my mother was -- got a stroke, so that made me stop.

15        Q.   And that was in 2004?

16        A.   That was in 2004.

17        Q.   Did you make any other attempts after that

18   to apply for jobs in the U.S.?

19        A.   No.

20        Q.   So the next time that you applied was

21   through PARS and UPI?

22        A.   Yes.

23             (Exhibit 567 was marked for I.D.)

24   BY MS. SULLIVAN:

25        Q.   Okay.  The court reporter has just placed
```

TOMASA B. MARI - 7/7/2011

Page 27

```
 1    another school I need to give my transcript to -- to

 2    forward all my transcript to another school for my

 3    record.

 4              I'm not really sure.  That was 2006 when I

 5    started my special ed -- diploma in special ed, but

 6    I'm not sure about this document.  But I've been

 7    requesting my record from this school.

 8        Q.   Did you request this in preparation for

 9    applying to a job in the U.S.?

10        A.   I'm not sure.  I'm not sure.

11        Q.   When did you --

12        A.   I can't remember.

13        Q.   When did you first learn about PARS?

14        A.   I learn about PARS sometime in June 2007.

15    Yeah, June 2007.

16        Q.   And who did you -- who did you -- how did

17    you learn about PARS?

18        A.   It's my friend.

19        Q.   What was your friend's name?

20        A.   Concepcion Garcia.

21        Q.   And did she also apply for a job through

22    PARS?

23        A.   Yes.

24        Q.   So the first time you heard about PARS was

25    in June of 2007?
```

TOMASA B. MARI - 7/7/2011

```
 1        A.   Yes.

 2        Q.   And at that time you decided to apply for

 3   a position with PARS?

 4        A.   She convinced me, and then I told her then

 5   we will try.  So that's it.

 6        Q.   And how did you proceed with the process

 7   of applying for a job through PARS?

 8        A.   My friend told me to call PARS.  And then

 9   when I talked to Lorna, she told me to -- I ask

10   about the opportunity, and she told me that there is

11   coming interview.  So I need to pass my documents.

12        Q.   I'm sorry?  That you need to "pass" your

13   documents?

14        A.   Yes.  To submit my documents.

15        Q.   Okay.  And did you submit them?

16        A.   Yes.  I mailed them.

17        Q.   What date did you mail them?

18        A.   I can't remember.

19        Q.   And after that you participated in an

20   interview?

21             MS. WILLIS:  Objection to form.

22             THE WITNESS:  Yes.

23   BY MS. SULLIVAN:

24        Q.   Do you remember the date of that

25   interview?
```

TOMASA B. MARI - 7/7/2011

 1          A.   I'm not really sure, but I think it's

 2     July.  July 2007.

 3          Q.   Was it July 18, 2007?  Does that sound

 4     correct?

 5          A.   Yes.  I think so.

 6          Q.   What happened after your interview?

 7          A.   After the interview I attended a seminar

 8     still in Manila.  I attended three seminars, so that

 9     would be Thursday, Friday and Saturday.  And on the

10     Saturday, Lorna, she's working in PARS, informed me

11     that I passed the interview and I need to go to

12     their office to talk about the processing.

13          Q.   Okay.  And did you go to the office?

14          A.   Yes.

15          Q.   And what happened when you went to the

16     office?

17          A.   So when I went to the office they told me

18     about the processing, the papers that I needed to

19     prepare and the processing fee.

20          Q.   What -- what did they tell you exactly?

21          A.   The processing fee would be $5,000.

22          Q.   And did they explain to you what the fee

23     was for?

24          A.   They told us just for the processing of

25     our visa and for our credential evaluation.

TOMASA B. MARI - 7/7/2011

```
 1        Q.   And did they tell you how much -- what the
 2   breakdown of the payments would be?
 3        A.   No.
 4        Q.   And were you the only person -- were you
 5   the only teacher at that office on that date or were
 6   there others?
 7             MS. WILLIS:  Objection to form.
 8             THE WITNESS:  There's a lot of teachers
 9   there.
10   BY MS. SULLIVAN:
11        Q.   Do you know --
12        A.   But we don't know each other.
13        Q.   Do you know how many?
14        A.   No.  I can't remember.
15        Q.   And who told you about the $5,000
16   processing fee?
17        A.   Mr. Mel Villarba.
18        Q.   And did he say that that was the only fee
19   that you would have to pay?
20        A.   No.
21        Q.   What else did he tell you during that
22   meeting?
23        A.   He told us to prepare some other documents
24   that they needed, and that's it.
25        Q.   Okay.  Did he tell you to prepare for an
```

TOMASA B. MARI - 7/7/2011

```
 1      A.   Yes.

 2      Q.   You've paid the full amount back?

 3      A.   Yes.

 4      Q.   When did you finish paying those off?

 5      A.   I finished it in one year because we were

 6   asked to issue a postdated check.

 7      Q.   You were asked to issue a postdated check

 8   by who?

 9      A.   By the AG Financing.

10      Q.   So you finished paying that off in 2008?

11      A.   I said one year.

12      Q.   So currently the only money you owe is to

13   your niece; is that correct?

14      A.   No.

15      Q.   What else do you owe?

16      A.   I owe a lot of small amounts from my

17   friend because I use it -- every time I fly to

18   Manila I need to purchase a plane ticket because

19   Cebu is like 45 to one hour away from Manila by

20   plane.  So every time I go to PARS I have to spend

21   money.

22      Q.   And did PARS force you to fly to Manila?

23      A.   They're not forcing me, but that's the

24   only office they got.

25      Q.   Did you look into whether there were any
```

```
 1    employment agencies in the city you lived in?

 2         A.   There's a lot.

 3         Q.   Why didn't you apply through them?

 4         A.   I just decided to be with UPI because the

 5    fact that my friend encouraged me to apply with her.

 6         Q.   So do you blame UPI for not having an

 7    office in Cebu City?

 8              MS. WILLIS:  Objection to form.

 9              THE WITNESS:  I don't understand.

10    BY MS. SULLIVAN:

11         Q.   Do you blame UPI for not having an office

12    closer to you?

13         A.   No.

14         Q.   You could have looked into other agencies;

15    right?

16         A.   If I choose to.  But I'm not -- I'm not --

17    during that time I'm not planning.

18         Q.   Sorry?

19         A.   During that time I'm not planning to

20    apply, not unless my friend encouraged me.

21         Q.   And did your friend also get a position

22    with Recovery?

23         A.   Yes.

24         Q.   And is she still here?

25         A.   Yes.
```

TOMASA B. MARI - 7/7/2011

1       Q.   Was it around $40,000?

2       A.   Yes.  Something like that.

3       Q.   And do you -- and you said that your

4   salary for the last year was $47,000?

5       A.   I'm not really sure of the figure, but

6   something like 45.

7       Q.   Do you think all that adds up to more than

8   $100,000?

9       A.   Yes.

10      Q.   So you've made over $100,000 since you've

11   been here; right?

12      A.   I don't think so because there's a lot of

13   deduction.

14      Q.   Are you talking about taxes?

15      A.   Yes.  Insurance.

16      Q.   How much have you paid to date to UPI and

17   PARS?

18      A.   I don't understand.

19      Q.   How much money have you paid to UPI and

20   PARS as of today?

21      A.   I think I paid 9,500.

22      Q.   In total?

23      A.   Yes.

24      Q.   And you think that figure is too high even

25   though you've made over $100,000 since you've been

TOMASA B. MARI - 7/7/2011

Page 53

```
 1   here?

 2               MS. WILLIS:  Objection to form.

 3               THE WITNESS:  Yes.

 4   BY MS. SULLIVAN:

 5       Q.   Since you have been in the U.S. have you

 6   gone back to the Philippines?

 7       A.   No.

 8       Q.   So you haven't visited at all?

 9       A.   No.

10       Q.   Do you own any property in the

11   Philippines?

12       A.   This time, no more.

13       Q.   Did you when -- did you own any property

14   when you first came here?

15       A.   Yes.

16       Q.   What was that?

17       A.   My house.

18       Q.   Did you sell that?

19       A.   My mother-in-law and my father-in-law is

20   living there now, but I didn't sell it.

21       Q.   Do you still own the home?  Do you still

22   own it?

23       A.   I gave it to them.

24       Q.   Did they pay you for it?

25       A.   No.  Because they're very old.
```

TOMASA B. MARI - 7/7/2011

```
 1    find your own place -- strike that.

 2            When you found the second location at

 3    Columbus did you have to pay a deposit for that?

 4        A.   I'm not sure, but I think we do.  But I'm

 5    not sure of the amount.

 6        Q.   Did you understand that in order to move

 7    into a place you would have to pay a deposit?

 8            MS. WILLIS:  Objection to form.

 9            THE WITNESS:  Yes.

10    BY MS. SULLIVAN:

11        Q.   Did you think that Ms. Navarro asking you

12    to deposit money was unreasonable?

13        A.   The deposit is not -- giving the deposit

14    is not unreasonable, but not giving a chance to

15    choose our own place to live, that's for me is

16    unreasonable.

17        Q.   Do you know whether she did that because

18    she was trying to help you?

19        A.   I don't think so, because if it's a help,

20    she should have find a place that would be closer to

21    our school, the fact that we don't have any

22    transportation.

23        Q.   Do you understand -- do you know whether

24    she made an effort to locate a place that was

25    closer?
```

TOMASA B. MARI - 7/7/2011

1        A.    I don't know her.

2        Q.    So what happened when you contacted

3   Ms. Navarro about the lawsuit?

4        A.    I told her, why did she file this lawsuit

5   in fact that I have an extra amount of money from my

6   second year, 10 percent placement?

7            And then I also told her that I don't --

8   if I owe her, I owe only very minimal amount because

9   the money, the 2,000 something extra, I owe that

10  from the agency with an interest of 4 percent.  So

11  if she returned that money to me, I could have

12  return it to the agency without the interest now.

13           Then I told her, So you got the money.

14  You did not return it to me for a year.  So you

15  should be the one to pay the interest of 4 percent

16  and take that 4 percent interest, add it to my

17  excess amount, and that would be part of my 10

18  percent placement fee.

19           But she told me she cannot do that because

20  if she will do that, if everybody know about it,

21  they will follow.  So she just gave me a -- I don't

22  know how much discount.  She just give me an

23  arrangement that I pay a certain amount.  If I

24  remember, it's 900.  I'm not sure.

25           But she told me to issue check and send it

TOMASA B. MARI - 7/7/2011

```
 1    to her before -- so that she can cancel the lawsuit.

 2         Q.   And you agreed to that?

 3              MS. WILLIS:  Objection to form.

 4              THE WITNESS:  Yes, because I cannot do

 5    anything.

 6    BY MS. SULLIVAN:

 7         Q.   So you agreed to pay her $900 -- I believe

 8    it's $941.60 --

 9         A.   Yes.

10         Q.   -- in order for her to dismiss

11    the lawsuit?

12         A.   To cancel, dismiss the case.

13         Q.   And did you make any payments after that

14    agreement?

15         A.   Before she dismissed that, I sent a check.

16    Five checks of $100 per check.

17         Q.   Did you send any other checks?

18         A.   Aside from the five?

19         Q.   Yes.

20         A.   No.

21         Q.   Why not?

22         A.   Because at that point I was so broke,

23    because at the same time I'm still paying my debts

24    in the Philippines.  So that's why I stop.  Knowing

25    the fact also I paid a lot.  A lot.
```

TOMASA B. MARI - 7/7/2011

```
 1        Q.   After she dismissed this lawsuit and you
 2   paid her $500 did you ever try to contact her and
 3   tell her that you couldn't pay the rest?
 4        A.   No.
 5        Q.   Is it true that at a certain point you
 6   injured yourself?
 7        A.   Yes.
 8        Q.   Your leg?
 9        A.   Yes.
10        Q.   What happened?
11        A.   I got a hairline fracture while I'm
12   walking.
13        Q.   And did you contact Ms. Navarro --
14        A.   Yes.
15        Q.   -- to ask her for help?
16        A.   I do, because --
17        Q.   When was this?
18        A.   I can't remember the date.
19        Q.   Do you remember approximately what year it
20   was?
21        A.   I think that's the first year, but I can't
22   remember the date.
23        Q.   What happened when you contacted
24   Ms. Navarro?
25        A.   I tried to ask help.  She promised, but I
```

TOMASA B. MARI - 7/7/2011

```
 1    didn't receive any help.

 2         Q.   Isn't it true that she paid you -- she

 3    sent you money for that, to help you?

 4              MS. WILLIS:  Objection to form.

 5              THE WITNESS:  I can't remember.

 6    BY MS. SULLIVAN:

 7         Q.   You don't remember her giving you money

 8    because you injured yourself?

 9         A.   I can't remember.

10         Q.   But you do remember that she promised to

11    help you; correct?

12              MS. WILLIS:  Objection to form.

13              THE WITNESS:  I called her.  I told her

14    that I really need help, that -- that's it.

15    BY MS. SULLIVAN:

16         Q.   Did she agree to help you?

17         A.   I can't remember.  What I remember is when

18    I got the hairline fracture, I was absent for a

19    week.  And the same Filipino couple who helped me,

20    going to the hospital, and after that another couple

21    helped me.  They take me from my -- from Columbus.

22    They brought me to their residence in La Place, and

23    they allowed me to stay there for a week, and they

24    take care of me.  That's all I can remember.

25         Q.   I thought you testified earlier that
```

TOMASA B. MARI - 7/7/2011

```
 1        A.   Yes.

 2        Q.   How long have you been at Sarah T. Reed

 3   Elementary School?

 4        A.   Four years.

 5        Q.   Have you ever thought about quitting?

 6        A.   No.

 7        Q.   Do you want to go back to the Philippines?

 8        A.   No.

 9        Q.   Who do you report to?

10        A.   I don't understand.

11        Q.   The -- who is the person who you report

12   to?

13        A.   In my school?

14        Q.   Yes.

15        A.   My principal.

16        Q.   Who is that?

17        A.   Daphyne Burnett.

18        Q.   And you understand that your employer is

19   Recovery School District; correct?

20        A.   Yes.

21        Q.   Are you suing Recovery?

22        A.   No.

23        Q.   Why not?

24        A.   I don't have any reason.

25        Q.   Didn't your complaint say that you were
```

TOMASA B. MARI - 7/7/2011

Page 84

```
 1         Q.   In 2007 you found out that you were going
 2    to be approved for a visa to come to the United
 3    States; correct?
 4         A.   Repeat your question, please.
 5         Q.   In 2007 you found out at some point that
 6    your application for a visa had been approved;
 7    correct?
 8              MS. WILLIS:  Objection to form.
 9              THE WITNESS:  Not unless I know that I
10    been approved.
11    BY MS. SULLIVAN:
12         Q.   When did you find out that you had been
13    approved?
14         A.   I cannot remember, but it's 2007.
15         Q.   And did you know how -- how long your visa
16    was valid for?
17         A.   Yes.
18         Q.   And how long was it valid for?
19         A.   One year.
20         Q.   And you knew at the time that it was valid
21    for one year?
22              MS. WILLIS:  Objection to form.
23              THE WITNESS:  Not exactly.
24    BY MS. SULLIVAN:
25         Q.   How long did you think it would -- it was
```

TOMASA B. MARI - 7/7/2011

```
 1        A.   I started October.  October 1 --

 2        Q.   When did the school --

 3        A.   -- October 2 or something --

 4        Q.   When did the --

 5        A.   -- 2007.

 6        Q.   When did the school year begin?  What

 7   date?

 8        A.   I'm not sure of the date because that's

 9   the first time we arrive here.

10        Q.   But was it before you arrived?

11        A.   Yes.  It should be before we arrived.

12        Q.   So my question was:  Was part of the

13   reason that you received less than the salary in the

14   bracket because you arrived after the school year

15   had already started?

16        A.   I don't have any idea about that.

17        Q.   Okay.  Did Ms. Navarro ever ask you for a

18   copy of your W-2?

19        A.   I'm not sure.

20        Q.   Do you know whether you ever provided her

21   a copy of that, of your W-2?

22        A.   I can't remember.

23        Q.   Isn't it true that Ms. Navarro asked you

24   for a copy of your W-2 so that she could adjust the

25   amount that you had paid to UPI and PARS, and you
```

TOMASA B. MARI - 7/7/2011

```
 1    failed to provide the copy?

 2              MS. WILLIS:  Objection to form.

 3              THE WITNESS:  No.  I can't remember.

 4    BY MS. SULLIVAN:

 5         Q.   Do you know one way or another whether she

 6    requested that?

 7              MS. WILLIS:  Objection.  Form.

 8              THE WITNESS:  No.  I can't remember.

 9    BY MS. SULLIVAN:

10         Q.   Do you know whether she made any attempt

11    to refund any part of the fee that you had paid?

12         A.   No.

13         Q.   "No," you don't know or "no," she did not?

14         A.   She did not.

15         Q.   Isn't it true that once you contacted her

16    after you had stopped making payments that that was

17    something that you discussed, that she would credit

18    you part of the money that you had paid if you

19    provided her with a copy of your W-2?

20              MS. WILLIS:  Objection to form.

21              THE WITNESS:  Repeat your question,

22    please.

23    BY MS. SULLIVAN:

24         Q.   Well, at -- you contacted her because you

25    had stopped making payments?
```

TOMASA B. MARI - 7/7/2011

Page 163

```
 1    STATE OF CALIFORNIA           )
                                    )   SS.
 2    COUNTY OF LOS ANGELES         )

 3

 4              I am the witness in the foregoing

 5    deposition.

 6              I have read the foregoing deposition or

 7    have had read to me the foregoing deposition, and

 8    having made such changes and corrections as I

 9    desired, I certify that the same is true in my own

10    knowledge.

11              I hereby declare under the penalties of

12    perjury under the laws of the United States that the

13    foregoing is true and correct.

14              This declaration is executed this _____

15    day of _____, 2011, at _____

16    California.

17

18

19              _____

                         TOMASA B. MARI
20

21

22

23

24

25
```

TOMASA B. MAR 7/7/2011

Page 164

```
 1    STATE OF CALIFORNIA          )
                                   )   SS.
 2    COUNTY OF LOS ANGELES        )

 3         I, CATHY A. REECE, CSR No. 5546 for the State

 4    of California, do hereby declare:

 5         That prior to being examined, the witness named

 6    in the foregoing deposition was duly sworn to

 7    testify to the truth, the whole truth, and nothing

 8    but the truth;

 9         That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter reduced to computerized transcription and

12    that the same is a true, correct and complete

13    transcript of said proceedings.

14         Before completion of the transcript,

15    review of the transcript [X] was [ ] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19         I further certify that I am not interested

20    in the outcome of the action.

21         Witness my hand this 18th day of

22    _____ , 2011.

23

24

25    _____
      CATHY A. REECE, RPR, CSR No. 5546
```

# EXHIBIT D

# In The Matter Of:

*MAIRI NUNAG-TANEDO*
*v.*
*EAST BATON ROUGE PARISH SCHOOL BOARD*

_____

*PASCUAL, ROLANDO - Vol. 1*

*July 8, 2011*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

ROLANDO PASCUAL - 7/8/2011

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

-----

MAIRI NUNAG-TANEDO, INGRID CRUZ,    )
DONNABEL ESCUADRA, ROLDANDO         )
PASCUAL, and TOMASA MARI, on behalf )
of themselves and other similarly   )
situated individuals,               )
                                    )
          Plaintiffs,               )   Case No.
                                    )SACV 10-01172
     vs.                            ) JAK(MLGx)
                                    )
EAST BATON ROUGE PARISH SCHOOL      )
BOARD, CHARLOTTE D. PLACIDE, MILLIE )
WILLIAMS, ELIZABETH DURAN SWINFORD, )
UNIVERSAL PLACEMENT INTERNATIONAL,  )
INC., LOURDES "LULU" NAVARRO, PARS  )
INTERNATIONAL PLACEMENT AGENCY,     )
EMILIO V. VILLARBA, ROBERT B.       )
SILVERMAN, and SILVERMAN &          )
ASSOCIATES,                         )
                                    )
          Defendants.               )
_____)


VIDEOTAPED DEPOSITION OF

ROLANDO PASCUAL, VOLUME I, PAGES 1 - 220

TAKEN ON

FRIDAY, JULY 8, 2011




Reported by:

Cathy A. Reece, RPR, CSR No. 5546

ROLANDO PASCUAL - 7/8/2011

1          Q.   Do you have plans to move to another

2     location?

3          A.   Yes.

4          Q.   Do you know what that other location is?

5          A.   Not yet.

6          Q.   Have you been offered a position -- strike

7     that.

8               Are you currently employed?

9          A.   Yes.

10         Q.   What is your position?

11         A.   Special education inclusion teacher.

12         Q.   Who is your employer?

13         A.   Caddo Parish School Board.

14              THE REPORTER:  I'm sorry?

15              MR. HERNANDEZ:  Caddo.

16              THE WITNESS:  Parish School Board.

17              MR. KNOEPP:  C-A-D-D-O.

18    BY MR. HERNANDEZ:

19         Q.   How long have you been employed as a

20    special education teacher by Caddo Parish School

21    Board?

22         A.   Three years.

23         Q.   Since 2008?

24         A.   Yes.

25         Q.   Is there a particular school that you

ROLANDO PASCUAL - 7/8/2011

```
 1        A.   Yes.
 2        Q.   Where will you be teaching next year?
 3        A.   Mooretown Elementary School.
 4        Q.   So that will be your fourth school in four
 5   years?
 6        A.   Yes.
 7        Q.   What was your salary, your gross annual
 8   salary, as a teacher for the year 2008-2009?
 9        A.   40,000, plus.  Approximately 40,000.
10        Q.   So that was for your first year; correct?
11        A.   Yes.
12        Q.   What was your salary for the year
13   2009-2010?
14        A.   42,000.  Approximately 42,000.
15        Q.   What was your salary for this past year,
16   2010 to 2011?
17        A.   Same salary.
18        Q.   42 -- about 42,000?
19        A.   Approximately 42,000.
20        Q.   What is your expected salary for this
21   upcoming year?
22        A.   I don't know.
23        Q.   Do you have any reason to believe it will
24   be lower?
25        A.   I don't know yet.
```

ROLANDO PASCUAL - 7/8/2011

```
 1   BY MR. HERNANDEZ:

 2       Q.   Did you know that she asked Ms. Holliday

 3   at the end of your first year whether you could be

 4   transferred to another school?

 5           MR. KNOEPP:  Objection to the form.

 6           THE WITNESS:  I have no idea about this.

 7   BY MR. HERNANDEZ:

 8       Q.   Okay.  Look at the next page.

 9           Do you see at the very top --

10       A.   Yes, sir.

11       Q.   -- at the very top a response from her --

12   from Ms. Holliday, says:

13               "We do not have a position for

14           them at this time.  I will let you

15           know if that changes."

16           Do you see that language --

17       A.   Yes.

18       Q.   -- at the very top?

19       A.   Yes.

20       Q.   Okay.  Now, if you go to the next page --

21   skip over that one.

22       A.   Which?

23       Q.   Go to the page that says, "Page 1 of 3."

24       A.   1 of 3.  This one?

25       Q.   Right.  Okay.  Do you see Ms. Navarro's
```

ROLANDO PASCUAL - 7/8/2011

1    response at the top?  It says, "Ms. Jan Holliday."

2              Do you see what follows there?

3        A.   Yes, sir.

4        Q.   Can you read what follows there?

5        A.   "Can you please try to help them?"

6        Q.   Okay.  Did you know that?

7        A.   I don't know about this.

8        Q.   You didn't know that?

9        A.   Yes.

10       Q.   Did you -- so you didn't know about that

11   when you sued my client, Lourdes Navarro, did you?

12       A.   Say that again.

13            MR. KNOEPP:  Objection to the form.

14   BY MR. HERNANDEZ:

15       Q.   You sued my client, Lourdes Navarro;

16   right?

17       A.   Yes.

18       Q.   And you have sued her for all sorts of

19   things, including human trafficking; right?

20       A.   Yes.

21       Q.   And fraud?

22       A.   Yes.

23       Q.   And here she is at the end of your first

24   year asking your employer to try to help you.

25            Do you see that?

ROLANDO PASCUAL - 7/8/2011

```
 1                MR. KNOEPP:  Objection to the form.
 2                THE WITNESS:  I don't know about this.
 3     BY MR. HERNANDEZ:
 4         Q.   And this is -- can you understand -- never
 5     mind.
 6                Do you typically sue people who try to
 7     help you, Mr. Pascual?
 8                MR. KNOEPP:  Objection to the form.
 9     BY MR. HERNANDEZ:
10         Q.   Can you answer my question?
11         A.   What's your question?
12         Q.   Do you typically sue people who try to
13     help you?
14                MR. KNOEPP:  Objection to the form.
15                THE WITNESS:  Yes.
16     BY MR. HERNANDEZ:
17         Q.   You do?
18         A.   Yes.
19         Q.   Let me show you another document that I
20     will mark as the next exhibit, 588.
21                (Exhibit 588 was marked for I.D.)
22     BY MR. HERNANDEZ:
23         Q.   Is that your signature that appears at the
24     bottom of this document --
25         A.   Yes.
```

ROLANDO PASCUAL - 7/8/2011

1          Do you see that?

2     A.   Yes, sir.

3     Q.   Now, is it fair to say that you are

4   earning approximately -- you have been for the last

5   two years earning $42,000 a year here in the United

6   States?

7     A.   Yes, sir.

8     Q.   So that would be about $6,500 a month.

9   Strike that.

10         It is about 10 times the amount of money

11  that you would be earning in the Philippines, isn't

12  it?

13    A.   I think so.

14         MR. KNOEPP:  Objection to the form.

15  BY MR. HERNANDEZ:

16    Q.   It says on paragraph No. 6, in or about

17  January or February 2008 you sent an application to

18  PARS International Placement Agency.

19         Do you see that, Paragraph 6, the first --

20    A.   Yes, sir.

21    Q.   Okay.  I have a number of questions that

22  come out of that.

23         Why was it that you sent an application to

24  PARS?

25    A.   Because I want to apply as a special ed.

ROLANDO PASCUAL - 7/8/2011

```
 1        Q.    How did you come upon PARS as an agency?

 2        A.    Because of my friend.

 3        Q.    What friend was that?

 4        A.    My classmate in special ed.

 5        Q.    And what was it that your friend told you

 6   that led you to PARS?

 7        A.    Go and submit your resume to the PARS, and

 8   then she gave me the address.

 9        Q.    So this was a woman friend who was also a

10   special ed teacher?

11        A.    Yes, sir.

12        Q.    And how did the conversation come about

13   with her about submitting an application to PARS?

14        A.    To my friend?

15        Q.    Yes.

16        A.    The conversation goes like, I asked her

17   about the agency that she went to, and she gave me

18   the agency, at the same time the address.  And then

19   if I have any questions regarding with everything,

20   go and ask with the PARS.

21        Q.    So your friend had used PARS?

22              MR. KNOEPP:  Objection to the form.

23              THE WITNESS:  Yes, sir.

24   BY MR. HERNANDEZ:

25        Q.    Okay.  And at the time that you had this
```

ROLANDO PASCUAL - 7/8/2011

Page 60

```
 1          Q.   So you sent an application to PARS because
 2   you also wanted to teach in the United States; is
 3   that right?
 4          A.   Yes, sir.
 5          Q.   And you wanted to teach in the same school
 6   system as your friend, East Baton Rouge; right?
 7          A.   Yes, sir.
 8          Q.   What -- why did you want to teach there?
 9          A.   Because I already have a degree in special
10   education.
11          Q.   Did you want more money?
12          A.   Yes.
13          Q.   Did you want a better life?
14          A.   Yes.
15          Q.   You didn't want to stay in the
16   Philippines; right?
17          A.   Yes, sir.
18          Q.   So your declaration then goes on to say
19   that a few days later, after you had sent in your
20   application to PARS, you received a text message
21   because of your qualifications and telling you that
22   you should attend a seminar in Quezon City.
23              It said to prepare approximately $25 for
24   the entrance fee to the seminar.  Okay?
25              Did you attend the seminar?
```

ROLANDO PASCUAL - 7/8/2011

1       A.   Yes, sir.

2       Q.   Why?

3       A.   Because it added to my personality,

4    because the seminar is about personality and

5    development.

6       Q.   Nobody forced you to go to the seminar,

7    did they?

8       A.   Yes.

9       Q.   I mean, can I -- can we -- can you agree

10   with my statement that nobody forced you to go?

11      A.   Yes.  Nobody forced me.

12      Q.   You went of your own free will?

13      A.   Yes, sir.

14      Q.   And at this point the only thing you were

15   going to be out-of-pocket was $25; is that right?

16      A.   Yes, sir.

17      Q.   Now, at the time you went to attend the

18   seminar had you talked again with your friend?

19      A.   No conversation.

20      Q.   Did you subsequently talk to her while she

21   was in the United States?

22      A.   Not at all.

23      Q.   The last time you've ever spoken to her in

24   your entire life was when you talked prior to

25   submitting your application to PARS?

ROLANDO PASCUAL - 7/8/2011

```
 1    how to obtain a teaching job?

 2         A.   A little bit, yes.

 3         Q.   Okay.  So was it -- was he the one who

 4    told you how to interview or gave you advice on how

 5    to interview?

 6         A.   A little bit yes.

 7         Q.   And for $25 you got advice on how to

 8    interview with prospective American employers;

 9    right?

10         A.   Yes.

11         Q.   Okay.  Do you recall what any of that

12    advice was?

13         A.   That's what I recall.

14         Q.   You don't recall anything specifically

15    that you were told about how to obtain a teaching

16    job?

17         A.   That's what I recalled.

18         Q.   That's all you recall?

19         A.   Yeah.

20         Q.   So you don't recall anything that you

21    learned at that seminar.

22              Is that fair to say?

23         A.   I think so.

24         Q.   Then it says in Paragraph 8, Mel told you

25    if you passed the job interview you would have to
```

ROLANDO PASCUAL - 7/8/2011

Page 67

```
 1    pay almost $2,000 for a marketing fee, $1,000 for

 2    credential fees and about $315 for evaluation fees.

 3            You recall that he told you all of that;

 4    right?

 5        A.   Uh-huh.

 6        Q.   Do you have a specific recollection of

 7    that?

 8        A.   Say it again.

 9        Q.   Do you have --

10            MR. KNOEPP:  He did a grunt.  I just

11    want -- if you want to clean that up for the record.

12            MR. HERNANDEZ:  Well, I'm going to get

13    there, because I'm not sure what that was.

14            MR. KNOEPP:  Make sure you answer, "yes"

15    or "no" instead of grunting.

16            THE WITNESS:  Okay.

17    BY MR. HERNANDEZ:

18        Q.   Do you recall that Mel told you that?

19        A.   Yes, sir.

20        Q.   So you do recall some things during this

21    presentation, but there are other things that you

22    don't recall; is that right?

23        A.   Yes, sir.

24        Q.   You don't recall anything that he told you

25    about how to get a job, but you do recall the money?
```

ROLANDO PASCUAL - 7/8/2011

1        Q.   So none of the other information that

2    Mr. Villarba said at this meeting, including how to

3    be successful in a job interview -- none of that was

4    important to you?

5        A.   Some of them.

6        Q.   But you don't recall any of that --

7        A.   Yeah.

8        Q.   The only thing you recall is about these

9    particular three fees; right?

10       A.   Yes, sir.

11       Q.   So you don't recall -- is it possible that

12   Mr. Villarba actually did tell you about the later

13   fees and you just don't remember?

14       A.   Say that again.

15       Q.   Is it possible that Mr. Villarba at this

16   seminar actually did mention a placement fee and you

17   just did not recall it?

18       A.   I don't know.

19       Q.   Now, he said that there would be

20   interviews at the Manila Hotel; correct?

21       A.   Yes, sir.

22       Q.   Do you know at that point in time what

23   school district you were hoping to teach in?

24       A.   Yes, sir.

25       Q.   Which one was that?

ROLANDO PASCUAL - 7/8/2011

```
 1        A.   New Jersey.

 2        Q.   Your brother?

 3        A.   New Jersey.

 4        Q.   Your sisters?

 5        A.   New Jersey.

 6        Q.   Okay.  And is this a full brother or a

 7   half-brother?

 8        A.   My full brother.

 9        Q.   Okay.  Is your mother still alive?

10        A.   Yes.

11        Q.   Where does she live?

12        A.   Philippines.

13        Q.   Okay.  Do you have a stepmother?

14        A.   Yes sir.

15        Q.   And does she live with your father in the

16   United States?

17        A.   What do you mean?

18        Q.   Do you know what a "stepmother" is?

19        A.   Yes, sir.

20        Q.   Okay.  Do you have one?

21        A.   She is already deceased.

22        Q.   Okay.  Did your family live in the United

23   States as of March 2008?  Your father, your brother

24   and your sisters, did they already live in the

25   United States then?
```

ROLANDO PASCUAL - 7/8/2011

Page 76

```
 1        A.   Yes, sir.

 2        Q.   Okay.  So was that one of the other

 3   reasons that you wanted to come to the United

 4   States, that your family was located here?

 5        A.   Yes, sir.

 6        Q.   Are there any member -- family -- strike

 7   that.

 8             Are there any members of your immediate

 9   family other than your mother who reside still in

10   the Philippines?

11        A.   Yes.

12        Q.   Who?

13        A.   My aunties and my other relatives.

14        Q.   I'm talking about your immediate family.

15        A.   Which one?

16        Q.   Your brothers, sisters --

17        A.   Brother, sister, yeah.

18        Q.   -- parents.

19        A.   Yeah.  Two.

20        Q.   What's that?

21        A.   Two.

22        Q.   Two still live in the Philippines?

23        A.   Yes, sir.

24        Q.   What do they do?

25        A.   They're working.
```

ROLANDO PASCUAL - 7/8/2011

```
 1        Q.   As teachers?

 2        A.   I don't know.

 3        Q.   Now, it says on paragraph No. 9 that you

 4   went to the Manila Hotel to attend an interview.

 5             Was that also in March?

 6        A.   Yes, sir.

 7        Q.   So that was sometime shortly after you had

 8   attended the initial seminar; right?

 9        A.   Yes, sir.

10        Q.   And it says:

11                 "There were about 300 people

12                 present.  Lulu Navarro, the owner

13                 of UPI, was also present."

14             Is that correct?

15        A.   Yes, sir.

16        Q.   So was Mel Villarba present during this?

17        A.   I don't know.

18        Q.   What do you recall Ms. Navarro saying?

19             First of all, did she have any

20   conversations directly with you, one-on-one?

21        A.   No.

22        Q.   Did she make a presentation to the group

23   of teachers?

24        A.   Not a presentation.  An announcement.

25        Q.   What did she say?
```

ROLANDO PASCUAL - 7/8/2011

Page 78

1       A.   She said that, Just wait for a while.  The
2   employer will come here and then be ready for your
3   documents and then -- that's it, that I remember.
4       Q.   Do you recall anything else that she said?
5       A.   I think that's it.  That's what I recall.
6       Q.   Did she say that there -- did she tell you
7   that there would be no placement fees?
8       A.   I don't know.
9       Q.   Did she tell you that UPI worked for free?
10      A.   I don't know.
11      Q.   Do you recall her saying that?  Did she
12  tell you that there was not going to be any
13  placement fees?
14      A.   At that time I was so busy with my
15  preparation to interview.
16      Q.   You weren't concerned about the amount of
17  placement fees at that time, were you?
18      A.   I think so.
19      Q.   Because you were more concerned about
20  getting a job offer; right?
21      A.   Yes, sir.
22      Q.   And during that session you went to two
23  sessions of interviews, according to Paragraph 10,
24  one in the morning for Baton Rouge; is that right?
25      A.   Yes, sir.

ROLANDO PASCUAL - 7/8/2011

```
 1          Q.    And then you learned also there might be a

 2     possibility in Boston, Massachusetts; right?

 3          A.    Yes, sir.

 4          Q.    And so you did an interview for that as

 5     well; correct?

 6          A.    No.

 7                MR. KNOEPP:  Objection to form.

 8                THE WITNESS:  No, sir.

 9     BY MR. HERNANDEZ:

10          Q.    Well, it says here:

11                     "There were about 300 or more

12                other applicants in the morning

13                session, but I cannot recall how

14                many were present in the afternoon

15                session because I only concentrated

16                on my interview with Baton Rouge."

17                Did you interview with Boston at that

18     time?

19          A.    No, sir.

20          Q.    Okay.  So you were primarily focused on

21     getting a job with Baton Rouge?

22          A.    Yes, sir.

23          Q.    And it says in Paragraph 11 that you

24     interviewed with three personnel from Baton Rouge,

25     but you later learned you did not pass the
```

ROLANDO PASCUAL - 7/8/2011

Page 80

```
 1    interview; is that correct?

 2        A.   Yes, sir.

 3        Q.   When did you learn that?

 4        A.   They said, If you don't receive any

 5    information or any texts, it means you lose.

 6        Q.   Within what period of time?

 7        A.   A couple of weeks.

 8        Q.   So you expected that if you were

 9    successful you would hear within a few weeks --

10        A.   Yes.

11        Q.   -- is that right?

12        A.   Yes, sir.

13        Q.   Now, you understood that the application

14    for a teaching position with Baton Rouge was a

15    competitive process?

16        A.   What do you mean by, "comparative (sic),"

17    sir?

18        Q.   Do you know what I mean when I say,

19    "competitive"?

20        A.   Competitive, yes, sir.

21        Q.   And did you understand that it was a

22    competitive process?

23        A.   Yes, sir.

24        Q.   That not everybody who applied for a

25    position would be offered a job; right?
```

ROLANDO PASCUAL - 7/8/2011

```
 1          Q.    And you were willing to go to Boston to
 2    teach now; right?
 3          A.    Yes, sir.
 4          Q.    So after the -- after you had attended the
 5    seminar that Mr. Villarba had given you and you
 6    heard the presentation at another meeting by
 7    Ms. Navarro and you were told that you had not
 8    passed the Baton Rouge interview, you still wanted
 9    to teach in the United States, didn't you?
10          MR. KNOEPP:  Objection to form.
11          THE WITNESS:  Yes, sir.
12    BY MR. HERNANDEZ:
13          Q.    And so you asked that your name be placed
14    on a list of people who would be willing to teach in
15    Boston; right?
16          A.    I asked my friend if I'm willing to join
17    in the Boston group.  But you need to pay $1,000 to
18    be able to secure your name on the list.
19          Q.    Right.  And that's what you say next in
20    your declaration, "And I paid $1,000" -- this is in
21    Paragraph 11 still.
22          A.    I'm sorry.
23          Q.    Okay.
24                "And I paid $1,000 to PARS to
25                secure my name on the list.  In
```

1         A.   Yes.  Because there's a problem with the

2    Boston, and I don't know what their problem was with

3    PARS.

4         Q.   My question, sir, was:  Were you told that

5    you would need to pay an additional $1,000?

6         A.   No.

7         Q.   So nobody, including Ms. Navarro, told you

8    that to be interviewed instead by the Caddo Parish

9    School District you would have to pay an additional

10   $1,000; is that correct?

11        A.   Yes.

12        Q.   Did you object that you would be

13   interviewed by the Caddo Parish School District

14   rather than the Boston School District?

15        A.   No, sir.

16        Q.    Instead, when -- you said, Fine, and you

17   went to the designated room and interviewed with the

18   Caddo Parish School District personnel; correct?

19        A.   Yes, sir.

20        Q.   And you passed the interview, because the

21   following day you received a text message

22   congratulating you on passing it; correct?

23        A.   Yes, sir.

24        Q.   You subsequently were told, according to

25   Paragraph 16 -- I mean -- sorry -- 15 that you

ROLANDO PASCUAL - 7/8/2011

1        Q.   Why was it that you completed a second

2    form the following day?

3        A.   Because that what they told me to do.

4        Q.   The information on Page 2 is similar but

5    not identical to the information on Page 1.

6             For example, you have on Educational

7    Qualifications, on the third line down you have a

8    post baccalaureate special education, University of

9    Perpetual Help.

10            On the right column on Page 1 you say you

11   earned your degree on October 26, 2006.  On the

12   second page you say, 2006-2007.

13            Do you have an explanation for that?

14       A.   Yes, sir.  Because I was applying for this

15   for a year.

16       Q.   Well, why was it that you provided

17   specific dates of degrees on Page 1 but did not on

18   Page 2?

19       A.   Because of, I think -- I think I was

20   messed up.  It's only a date.  So I was right with

21   the year.  So I'm not exactly -- I don't know what

22   is the exact date or the month of the -- when I was

23   graduated in --

24       Q.   Well, you had those exact?

25       A.   -- special education.

ROLANDO PASCUAL - 7/8/2011

Page 178

```
 1        Q.   Did you understand that Exhibit 609, which
 2   you signed on October 9, 2008, was another copy of
 3   Exhibit 608?
 4        A.   Yes, sir.
 5        Q.   You knew that at the time you signed
 6   Exhibit 609, that they were the same contract?
 7        A.   Yes, sir.  We knew that.
 8        Q.   Did somebody tell you why you were signing
 9   another copy of the placement agency contract?
10        A.   No, sir.
11        Q.   Did you ask?
12        A.   No.
13        Q.   Why not?
14        A.   Because as of that -- we have a jet lag or
15   we have something to, you know -- Ma'am Lulu discuss
16   other things aside from this.
17        Q.   But when you signed Exhibit 609 you knew
18   you already signed one copy of the contract; right?
19        A.   Yes, sir.
20        Q.   Did it not occur to you to ask, Why am I
21   signing another copy of it?
22        A.   We didn't have the time to ask.
23        Q.   How long would it take to ask, Why am I
24   signing another copy?
25        A.   I don't know how long.
```

ROLANDO PASCUAL - 7/8/2011

```
 1              period."
 2              Do you see that language?
 3       A.    Yes, sir.
 4       Q.    And you had two copies of this contract in
 5   your possession.
 6              So did you understand that Universal was
 7   seeking to be paid 10 percent of your current salary
 8   for the year 2009-2010?
 9       A.    Yes, sir.
10       Q.    Did you understand that because they were
11   seeking to be paid 10 percent of that they wanted to
12   see, in order to be accurate, what was the current
13   amount of your earnings for the year 2009-2010?
14       A.    I don't remember how much is it.
15       Q.    I'm not asking you if you remember how
16   much it was.
17              My question to you, sir, is whether you
18   understood that Universal was requesting a copy of
19   your pay stub for the 2009-2010 year so that they
20   could assess you a correct 10 percent placement fee?
21       A.    Yes.  They do.
22       Q.    With respect to Exhibit 614 did you
23   understand that what it was requesting here was a
24   copy of your pay stub reflecting your gross monthly
25   pay for the existing 2009-2010 year?
```

ROLANDO PASCUAL - 7/8/2011

```
 1          A.    I think so.  That's what the letter is.

 2          Q.    Did you understand that at the time?

 3          A.    I think so.

 4          Q.    Did you ever send a copy of any monthly

 5   pay stub for the 2009-2010 year to Universal?

 6          A.    I don't remember.

 7          Q.    Did you, when you received a copy of

 8   Exhibit 614, view it as threatening?

 9          A.    No.

10          Q.    Did you view it as abusive?

11          A.    I think so.

12          Q.    Why?

13          A.    Because it's below -- under here it says:

14                   "We would like to follow up

15                for the payment of October invoice.

16                Attached is the invoice for

17                November 2009."

18          Q.    How did you view that language as abusive?

19          A.    Meaning to say, you need to do it as soon

20   as possible.

21          Q.    How is that any different than a bank

22   sending you a letter asking for payment on a monthly

23   basis?

24          A.    Which --

25          Q.    Well, I asked you if you saw any of the
```

ROLANDO PASCUAL - 7/8/2011

```
 1    same page as one another.
 2              Do you recall seeing this page before?
 3    Yes or no?
 4         A.   I don't recall this, no.
 5         Q.   Okay.  Do you recall ever being threatened
 6    by UPI with a lawsuit?
 7         A.   Yes.  One letter coming from Ma'am Lulu
 8    regarding this fee.
 9         Q.   Is this the letter?
10         A.   No.
11         Q.   What did the letter say?
12         A.   I don't know because we forwarded to the
13    lawyer, and I'm not a lawyer to understand that.
14         Q.   At some point in time did you make a
15    decision not to pay a fee to Universal?
16         A.   That's what the lawyer says to us.  Send
17    the letter to them.
18         Q.   When did you first talk with a lawyer?
19         A.   I don't remember.
20         Q.   Why did you first talk with a lawyer?
21         A.   That's what the advice is to me.
22         Q.   Who advised you?
23         A.   The co-teachers.
24         Q.   How did that come about?
25         A.   Through CFT.
```

ROLANDO PASCUAL - 7/8/2011

```
 1    STATE OF CALIFORNIA           )
                                    )    SS.
 2    COUNTY OF LOS ANGELES         )

 3

 4              I am the witness in the foregoing

 5    deposition.

 6              I have read the foregoing deposition or

 7    have had read to me the foregoing deposition, and

 8    having made such changes and corrections as I

 9    desired, I certify that the same is true in my own

10    knowledge.

11              I hereby declare under the penalties of

12    perjury under the laws of the United States that the

13    foregoing is true and correct.

14              This declaration is executed this _____

15    day of _____, 2011, at _____

16    California.

17

18

19              _____
                          ROLANDO PASCUAL
20

21

22

23

24

25
```

ROLANDO PASCUA 7/8/2011

Page 220

```
1   STATE OF CALIFORNIA          )
                                 )   SS.
2   COUNTY OF LOS ANGELES        )

3        I, CATHY A. REECE, CSR No. 5546 for the State

4   of California, do hereby declare:

5        That prior to being examined, the witness named

6   in the foregoing deposition was duly sworn to

7   testify to the truth, the whole truth, and nothing

8   but the truth;

9        That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter reduced to computerized transcription and

12  that the same is a true, correct and complete

13  transcript of said proceedings.

14       Before completion of the transcript,

15  review of the transcript [X] was [ ] was not

16  requested.  If requested, any changes made by the

17  deponent (and provided to the reporter) during the

18  period allowed are appended hereto.

19       I further certify that I am not interested

20  in the outcome of the action.

21       Witness my hand this 18th day of

22  July , 2011.

23

24

25
                    CATHY A. REECE, RPR, CSR No. 5546
```

# EXHIBIT E

# In The Matter Of:

*MAIRI NUNAG-TANEDO*

*v.*

*EAST BATON ROUGE PARISH SCHOOL BOARD*

_____

*NUNAG-TANEDO, MAIRI - Vol. 1*

*June 21, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

-----

MAIRI NUNAG-TANEDO, INGRID CRUZ,   )
DONNABEL ESCUADRA, ROLANDO PASCUAL,)
and TOMASA MARI, on behalf of      )
themselves and other similarly     )
situated individuals,,             )
                                   )
          Plaintiffs,              )  Case No.
                                   )SACV 10-01172
     vs.                           ) JAK(MLGx)
                                   )
EAST BATON ROUGE PARISH SCHOOL     )
BOARD, CHARLOTTE D. PLACIDE, MILLIE)
WILLIAMS, ELIZABETH DURAN SWINFORD,)
UNIVERSAL PLACEMENT INTERNATIONAL, )
INC., LOURDES "LULU" NAVARRO, PARS )
INTERNATIONAL PLACEMENT AGENCY,    )
EMILIO V. VILLARBA, ROBERT B.      )
SILVERMAN, and SILVERMAN &         )
ASSOCIATES,                        )
                                   )
          Defendants.              )
_____ )


VIDEOTAPED DEPOSITION OF

MAIRI NUNAG-TANEDO, VOLUME I, PAGES 1 - 337

TAKEN ON

TUESDAY, JUNE 21, 2011


Reported by:

Cathy A. Reece, RPR, CSR No. 5546

MAIRI NUNAG-TANEDO - 6/21/2011

Page 17

09:55:32  1    Philippines?

09:55:32  2        A.   Yes.

09:55:33  3        Q.   Can you identify for me where you were

09:55:35  4    educated, starting after high school or what is the

09:55:39  5    equivalent of high school in the United States?

09:55:43  6        A.   It's a secondary -- secondary education is

09:55:46  7    the high school.  It's middle school, plus a

09:55:51  8    little -- like the first year of high school here.

09:55:55  9    And then we go to college.

09:55:57  10       Q.   Okay.  Where did you first go to college?

09:55:59  11       A.   I first went to the -- for two years I

09:56:01  12   went to the University of the Philippines.  That is

09:56:04  13   a state college in the Philippines.  But I finished

09:56:06  14   my bachelor's degree in customs administration in --

09:56:11  15   at PMI Colleges in my home province, Bohol,

09:56:16  16   Philippines.

09:56:17  17       Q.   Okay.  So you've said a number of things,

09:56:19  18   and I want to try to break it down a little bit.

09:56:21  19       A.   Okay.

09:56:22  20       Q.   You attended the state university or the

09:56:24  21   state college for the first two years?

09:56:25  22       A.   Of my college.

09:56:26  23       Q.   And when was that?

09:56:27  24       A.   That was 1990 to 1992.

09:56:31  25       Q.   Did you obtain any degrees?

MAIRI NUNAG-TANEDO - 6/21/2011

Page 18

| | | | |
|---|---|---|---|
| 09:56:33 | 1 | A. | No. |
| 09:56:33 | 2 | Q. | What did you study at the time? |
| 09:56:35 | 3 | A. | It's a business course.  Bachelor's in |

09:56:37  4   business management.

| | | | |
|---|---|---|---|
| 09:56:39 | 5 | Q. | Did you obtain any licenses? |
| 09:56:41 | 6 | A. | No.  On that degree? |
| 09:56:45 | 7 | Q. | Correct. |
| 09:56:46 | 8 | A. | Yes. |
| 09:56:46 | 9 | Q. | And then you subsequently studied |

09:56:49 10   business, you said?

| | | | |
|---|---|---|---|
| 09:56:50 | 11 | A. | Yes. |
| 09:56:50 | 12 | Q. | When was that? |
| 09:56:52 | 13 | A. | That was 1992. |
| 09:56:54 | 14 | Q. | That was when? |
| 09:56:55 | 15 | A. | 1992 to 1999, the next -- |
| 09:57:00 | 16 | Q. | You studied over the next seven years? |
| 09:57:03 | 17 | A. | Yes.  It is -- I study and work at the |

09:57:08 18   same time, so --

| | | | |
|---|---|---|---|
| 09:57:10 | 19 | Q. | Were you a full-time student? |
| 09:57:13 | 20 | A. | Not at all times. |
| 09:57:14 | 21 | Q. | Okay.  And that was a college that you |

09:57:19 22   said was located in your home province?

| | | | |
|---|---|---|---|
| 09:57:22 | 23 | A. | Yes. |
| 09:57:23 | 24 | Q. | Did you obtain any other -- strike that. |
| 09:57:26 | 25 | | Did you attend any other institutions |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 19

09:57:28    1    beyond the two that you've identified?

09:57:30    2        A.    Yes.

09:57:31    3        Q.    How many?

09:57:33    4        A.    Two more.

09:57:34    5        Q.    When did you -- what was the first one?

09:57:37    6        A.    The first one was in the University of

09:57:41    7    Bohol.

09:57:42    8        Q.    When was that?

09:57:42    9        A.    That was -- I think it is around 2004.

09:57:54   10        Q.    So was that after you obtained a

09:57:55   11    bachelor's degree?

09:57:56   12        A.    Yes.  That was after.

09:57:57   13        Q.    Okay.  Let's put a framework on this.

09:57:59   14              When did you obtain a bachelor's degree?

09:58:02   15        A.    That was 1999.

09:58:04   16        Q.    What was the subject?  In what did you get

09:58:07   17    the degree in?

09:58:08   18        A.    Bachelor of Science in customs

09:58:14   19    administration.  Customs --

09:58:16   20        Q.    Customs administration?

09:58:17   21        A.    Uh-huh.

09:58:18   22        Q.    So I thought you said you were studying

09:58:20   23    business?

09:58:21   24        A.    Yes, at the first two years in my college.

09:58:23   25        Q.    Okay.  And then when you went to the other

Merrill  Corporation  -  Los Angeles
800-826-0277                                    www.merrillcorp.com/law

MAIRI NUNAG-TANEDO - 6/21/2011

Page 20

```
09:58:26   1   college over the course of seven years, you were
09:58:29   2   studying customs?
09:58:31   3        A.   Yes.  It's still a business course.
09:58:33   4        Q.   Okay.  And you obtained a Bachelor's of
09:58:37   5   Science degree?
09:58:38   6        A.   Yes.
09:58:38   7        Q.   Did you obtain any licenses before --
09:58:40   8        A.   No.
09:58:40   9        Q.   -- 1999?
09:58:41  10        A.   No.
09:58:42  11        Q.   Okay.  Once you had your bachelor's
09:58:45  12   degree, you said in 2004 you attended another
09:58:48  13   university?
09:58:49  14        A.   Yes.
09:58:49  15        Q.   And what was the -- what were you
09:58:51  16   attending -- what was the course?
09:58:53  17        A.   That's for my special education.
09:58:56  18        Q.   At some point in time did you become a
09:58:59  19   teacher?
09:59:00  20        A.   Yes.
09:59:00  21        Q.   When was that?
09:59:01  22        A.   After college, 1999 to 2001, I work as a
09:59:08  23   preschool teacher at the local day care center.
09:59:12  24        Q.   At the local what?
09:59:14  25        A.   Day care center.
```

MAIRI NUNAG-TANEDO - 6/21/2011

Page 58

```
10:51:56  1        Q.     -- by PARS; correct?
10:51:57  2        A.     Yes.
10:51:58  3        Q.     How did you learn about that presentation?
10:51:59  4        A.     Okay.  That relative I referring to, he --
10:52:03  5    he called to talk with -- not directly with me, but
10:52:08  6    he mentioned during that phone conversation that I
10:52:11  7    need to try PARS as an agency.
10:52:16  8        Q.     So were you at that point in time
10:52:18  9    interested in teaching in the United States?
10:52:21 10        A.     Yes.
10:52:22 11        Q.     Why?
10:52:27 12        A.     Of course, for a greener pasture.
10:52:30 13        Q.     More money?
10:52:31 14        A.     Yes.  And professional growth, too.
10:52:35 15        Q.     So at the time you had this conversation
10:52:38 16    with your relative on the telephone --
10:52:40 17        A.     Yes.
10:52:40 18        Q.     -- and he mentioned the presentation by --
10:52:44 19    now, did he mention the presentation by PARS?
10:52:47 20        A.     No.
10:52:48 21        Q.     Okay.  How did you learn about the
10:52:49 22    presentation by PARS?
10:52:50 23        A.     He mentioned that he had the friend who
10:52:53 24    just came in through PARS.
10:52:55 25        Q.     Okay.  So your relative had a friend who
```

MAIRI NUNAG-TANEDO - 6/21/2011

Page 59

10:52:58  1    came to the United States to teach using PARS?

10:53:03  2        A.   As the agency.

10:53:05  3        Q.   Okay.  Prior to that time you had been

10:53:07  4    thinking about teaching in the United States;

10:53:09  5    correct?

10:53:09  6        A.   Yes.

10:53:10  7        Q.   And one of the reasons was for greener

10:53:12  8    pastures, as you put it?

10:53:15  9        A.   And professional growth.

10:53:17 10        Q.   Professional growth, more money; right?

10:53:20 11        A.   And personal things.

10:53:21 12        Q.   But I still don't have an answer.  More

10:53:25 13    money; correct?

10:53:26 14        A.   It's part of it.

10:53:27 15        Q.   Okay.  Significantly more money, in fact;

10:53:29 16    right?

10:53:31 17        A.   What do you mean, "significantly"?

10:53:33 18        Q.   Well, I mean, you were earning on average

10:53:35 19    of less than $200 a month as a teacher in the

10:53:38 20    Philippines; correct?

10:53:39 21        A.   Yes.

10:53:39 22        Q.   And you thought you could earn a lot more

10:53:42 23    money by teaching in the United States; correct?

10:53:44 24        A.   Yes.

10:53:45 25        Q.   Okay.  Now, did you --

MAIRI NUNAG-TANEDO - 6/21/2011

Page 60

| | | |
|---|---|---|
| 10:53:46 | 1 | A.   But I'm earning that money back in the |
| 10:53:48 | 2 | Philippines, if I may proceed.  But the cost of |
| 10:53:53 | 3 | living in the Philippines, if you have the money, |
| 10:53:55 | 4 | you can still live a life.  Do you get my -- |
| 10:54:00 | 5 | Q.   I understand.  You've answered my |
| 10:54:02 | 6 | question. |
| 10:54:03 | 7 | A.   Yes. |
| 10:54:03 | 8 | Q.   And that's all I needed, was an answer. |
| 10:54:09 | 9 | So he told you that he had a friend who |
| 10:54:13 | 10 | had been successfully placed in the United States |
| 10:54:15 | 11 | through PARS; correct? |
| 10:54:17 | 12 | A.   Yes. |
| 10:54:17 | 13 | Q.   So then what was the next thing that you |
| 10:54:20 | 14 | did? |
| 10:54:21 | 15 | A.   I Googled PARS. |
| 10:54:25 | 16 | Q.   Okay.  So you went to a computer, you |
| 10:54:27 | 17 | Googled PARS, and what did you learn? |
| 10:54:30 | 18 | A.   I got the contact number. |
| 10:54:32 | 19 | Q.   Okay.  And you contacted PARS? |
| 10:54:34 | 20 | A.   Yes. |
| 10:54:35 | 21 | Q.   Okay.  Who did you contact? |
| 10:54:38 | 22 | A.   I don't know who was -- I don't really |
| 10:54:41 | 23 | remember what's the name, but it was a guy who |
| 10:54:44 | 24 | answered the phone.  And then I was -- my intention |
| 10:54:48 | 25 | was to ask on -- you know, how to go about the |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 61

```
10:54:54   1    recruitment process.  And then the guy just told me,
10:54:58   2    there are recruitment blitz going on -- process.  I
10:55:07   3    mean, blitz.
10:55:10   4              MR. KNOEPP:  Blitz.
10:55:10   5              THE WITNESS:  B-L-I-T-Z.
10:55:12   6    BY MR. HERNANDEZ:
10:55:12   7         Q.   A recruitment blitz going on?
10:55:15   8         A.   Yeah.
10:55:16   9         Q.   Okay.
10:55:16  10         A.   And one will be in -- near my province.
10:55:18  11    Near the southern part of the Philippines.
10:55:22  12         Q.   So like a presentation?
10:55:24  13         A.   Yes.  That's it.
10:55:25  14         Q.   And he mentioned to you that there was
10:55:26  15    going to be a presentation by PARS?
10:55:29  16         A.   Yes.
10:55:29  17         Q.   In your province?
10:55:31  18         A.   Near my province.
10:55:32  19         Q.   Okay.  Now, at that point in time -- did
10:55:38  20    you do anything next?
10:55:42  21         A.   Yes.  I asked the guy what do I need to
10:55:45  22    prepare.
10:55:46  23         Q.   What did he tell you?
10:55:49  24         A.   He told me just -- he don't know -- he
10:55:50  25    just told me the date and the place of the
```

MAIRI NUNAG-TANEDO - 6/21/2011

Page 62

| | | |
|---|---|---|
| 10:55:54 | 1 | presentation. |
| 10:55:58 | 2 | Q.   Do you recall that date? |
| 10:55:59 | 3 | A.   It's March 20 -- March 28. |
| 10:56:03 | 4 | Q.   Okay.  Now, you're looking down at your |
| 10:56:07 | 5 | declaration? |
| 10:56:07 | 6 | A.   Yes. |
| 10:56:08 | 7 | Q.   Okay.  So if you look at Exhibit 503, do |
| 10:56:16 | 8 | you recognize this document? |
| 10:56:17 | 9 | A.   Yes. |
| 10:56:17 | 10 | Q.   Okay.  Is that your signature that appears |
| 10:56:20 | 11 | on the last page? |
| 10:56:22 | 12 | A.   Yeah.  Yes.  And in the sides. |
| 10:56:29 | 13 | Q.   So you initialed or put your signature on |
| 10:56:31 | 14 | the side of each page; right? |
| 10:56:34 | 15 | A.   Yes. |
| 10:56:35 | 16 | Q.   Why did you do that? |
| 10:56:38 | 17 | A.   Because I just wanted to make sure that |
| 10:56:40 | 18 | these are the real documents. |
| 10:56:44 | 19 | Q.   Did you do that on your own or did |
| 10:56:47 | 20 | somebody tell you to do that? |
| 10:56:48 | 21 | A.   I did that on my own.  I wanted to be more |
| 10:56:53 | 22 | careful in the documents that I signed. |
| 10:56:55 | 23 | Q.   So that is your signature that appears on |
| 10:56:57 | 24 | each page of this document? |
| 10:56:59 | 25 | A.   Yes. |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 68

| | | |
|---|---|---|
| 11:03:21 | 1 | A. On March 28? |
| 11:03:23 | 2 | Q. Correct. |
| 11:03:24 | 3 | A. I don't remember. |
| 11:03:25 | 4 | Q. Now, let's turn to your declaration. If |
| 11:03:28 | 5 | you can have your declaration available. |
| 11:03:35 | 6 | In your declaration on Paragraph 6, it |
| 11:03:40 | 7 | said that you paid a $25 entrance fee. |
| 11:03:46 | 8 | Is that your recollection? |
| 11:03:47 | 9 | A. In my money. |
| 11:03:48 | 10 | Q. Correct. 1,000 pesos. |
| 11:03:51 | 11 | A. Yes. |
| 11:03:53 | 12 | Q. And there were 200 prospective teacher |
| 11:03:58 | 13 | candidates waiting to be interviewed? |
| 11:04:01 | 14 | A. Around, yes. At that time when I arrived. |
| 11:04:04 | 15 | Q. Let me understand because I was confused |
| 11:04:07 | 16 | by this testimony. |
| 11:04:08 | 17 | A. Okay. |
| 11:04:08 | 18 | Q. Was this a presentation or was this an |
| 11:04:11 | 19 | interview? |
| 11:04:12 | 20 | A. It's -- it was an interview. |
| 11:04:15 | 21 | Q. Okay. So you went on March 28, 2008 with |
| 11:04:20 | 22 | the idea that you were going to be interviewed; is |
| 11:04:22 | 23 | that right? |
| 11:04:24 | 24 | A. No. |
| 11:04:26 | 25 | Q. Okay. So that's why I'm confused. |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 69

11:04:29  1      A.   Yeah.

11:04:31  2      Q.   My -- I'm -- what was it that you thought

11:04:34  3   you were attending on March 28, 2008?  An interview

11:04:39  4   or a presentation?

11:04:41  5      A.   It would be a presentation.

11:04:43  6      Q.   Okay.

11:04:45  7      A.   Yes.

11:04:46  8      Q.   So were -- did you understand that you

11:04:47  9   were going to be interviewed?

11:04:49 10      A.   No.  Not until I was there.  Because

11:04:52 11   that's the only information I got from the guy, that

11:04:55 12   they will be in Waterfront at this time, so just go

11:05:00 13   there and ask the -- because I think the guy was

11:05:04 14   just like a janitor or custodian.

11:05:06 15      Q.   Okay.  So when you went there, was it your

11:05:08 16   expectation that you would be hearing somebody give

11:05:11 17   a presentation?

11:05:14 18      A.   Yes.  Either hearing or I can ask the

11:05:16 19   questions.

11:05:17 20      Q.   Okay.  And at the time had you decided to

11:05:20 21   go forward with the process?  When you first

11:05:22 22   arrived, had you already made up your mind that you

11:05:25 23   were going to apply?

11:05:27 24      A.   No.  When I arrived that day, there was an

11:05:33 25   interview, I asked if I can.  Because I believed

MAIRI NUNAG-TANEDO - 6/21/2011

Page 77

11:13:02   1   went to that room, like around 70, 75 people.

11:13:08   2        Q.   Out of how many?

11:13:10   3        A.   When I went there, I saw like around 200

11:13:12   4   people waiting.

11:13:14   5        Q.   So less than half were --

11:13:16   6        A.   Yes.

11:13:17   7        Q.   Okay.  And you were -- you were part of

11:13:17   8   the group that was successful?

11:13:19   9        A.   Yes.

11:13:20  10        Q.   At this stage?

11:13:21  11        A.   Yes.

11:13:21  12        Q.   Okay.  Then you went to the room that was

11:13:23  13   adjacent.  And then what happened?

11:13:27  14        A.   We were -- we were congratulated, you

11:13:32  15   know.  Welcomed by the people, the -- I remember the

11:13:38  16   people from East Baton Rouge and from PARS and UPI.

11:13:47  17        Q.   Okay.  Now, in Paragraph 7 it says that

11:13:52  18   you were interviewed by Karl Sam.

11:13:56  19        A.   Yes.

11:13:57  20        Q.   I had understood from your testimony that

11:13:59  21   the interview was conducted by somebody from PARS.

11:14:04  22             Was it conducted by PARS or by Mr. Sam?

11:14:08  23        A.   I was interviewed by Mr. Sam.

11:14:14  24        Q.   Okay.  So the prequalification interview

11:14:16  25   that you were talking about was conducted not by

MAIRI NUNAG-TANEDO - 6/21/2011

Page 79

| 11:15:33 | 1 | A. | Yes. |

11:15:37  2       Q.   Now, at that time, what do you recall that

11:15:41  3   Ms. Navarro said to you?

11:15:50  4       A.   That we need to prepare some piece for the

11:15:59  5   process.

11:16:00  6       Q.   Okay.  In Paragraph 10 of your declaration

11:16:01  7   you said:

11:16:03  8              "We were told that we needed

11:16:04  9              to deposit $1,000 into the PARS

11:16:07 10              bank account by Monday, March

11:16:10 11              28" -- I mean, "March 31, 2008 or

11:16:13 12              our papers would not be processed.

11:16:15 13              This was referred to as 'earmark

11:16:17 14              money' so that we would be locked

11:16:19 15              in and could not go to another

11:16:21 16              agency."

11:16:22 17       A.   Yes.

11:16:22 18       Q.   Is that what you were told?

11:16:24 19       A.   Yes.

11:16:25 20       Q.   By whom?

11:16:26 21       A.   By Lulu.

11:16:27 22       Q.   Ms. Navarro?

11:16:28 23       A.   Ms. Navarro.

11:16:30 24       Q.   She told you that?

11:16:32 25            Now, did you sign any documents at that

MAIRI NUNAG-TANEDO - 6/21/2011

Page 86

11:24:58  1    specifics.  You've answered the question.

11:25:05  2            At the time that you signed the last page

11:25:07  3    of Exhibit 507, did you have the other pages before

11:25:10  4    you?

11:25:10  5        A.   Yes.  Because it was --

11:25:13  6        Q.   Yes?

11:25:14  7        A.   Yes.

11:25:14  8        Q.   Okay.  Did you review the other pages

11:25:16  9    before you signed Page 748?

11:25:27 10        A.   Yes.

11:25:35 11        Q.   You understood -- what did you understand

11:25:37 12    was the purpose of this document at the time you

11:25:40 13    signed it?

11:25:42 14        A.   This is part of the process.

11:25:45 15        Q.   Did you understand that this was an offer

11:25:46 16    of employment to you from the East Baton Rouge

11:25:50 17    Parish school system?

11:25:52 18        A.   Yes.

11:25:53 19        Q.   Did you understand that the position they

11:25:54 20    were offering -- it was offering you was the

11:25:57 21    position of a special education teacher?

11:26:01 22        A.   Yes.

11:26:02 23        Q.   Now, with respect to the job description

11:26:05 24    that's provided there, is that your understanding of

11:26:08 25    what work you would be doing for the school

MAIRI NUNAG-TANEDO - 6/21/2011

Page 88

| | | |
|---|---|---|
| 11:27:53 | 1 | Q.   So when you signed this offer of |
| 11:27:55 | 2 | employment, did you understand that you would be |
| 11:27:58 | 3 | paying additional fees? |
| 11:28:01 | 4 | A.   Yes. |
| 11:28:01 | 5 | Q.   Okay.  And you signed Exhibit 507 freely |
| 11:28:08 | 6 | and of your own will; right? |
| 11:28:11 | 7 | A.   Yes. |
| 11:28:11 | 8 | Q.   Nobody forced you to sign it? |
| 11:28:13 | 9 | A.   Nobody. |
| 11:28:14 | 10 | Q.   Okay.  What did you understand you were |
| 11:28:16 | 11 | doing by signing the letter? |
| 11:28:20 | 12 | A.   I'm accepting the job offer. |
| 11:28:23 | 13 | Q.   Okay. |
| 11:28:23 | 14 | A.   Which I thought at that time, since I |
| 11:28:26 | 15 | passed and, you know -- and I paid the 1,000, |
| 11:28:29 | 16 | that -- this is just a -- just part of the process, |
| 11:28:33 | 17 | I just have to do it and get done with it. |
| 11:28:36 | 18 | Q.   And you expected that there were going to |
| 11:28:37 | 19 | be other fees you needed to pay to UPI and PARS |
| 11:28:42 | 20 | throughout the process; right? |
| 11:28:45 | 21 | A.   Yes.  Because on March 28 we were told |
| 11:28:46 | 22 | that there will be like 5,000 something that we need |
| 11:28:48 | 23 | to pay -- that we need to prepare.  And when we -- |
| 11:28:50 | 24 | when we're prepared for that and when we're done |
| 11:28:52 | 25 | paying those, we're good to go.  And that's the |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 89

11:28:56  1    main, you know -- the amount we need to prepare for

11:28:58  2    us to be --

11:28:59  3         Q.   Who told you you would be "good to go"?

11:29:02  4         A.   That's Ms. Navarro.

11:29:06  5         Q.   Was that the word she used?

11:29:08  6         A.   Let me recall, but that is really my

11:29:11  7    understanding at the time.

11:29:12  8         Q.   Well, I -- let me -- what is it that you

11:29:18  9    recall that she actually said to you?

11:29:22 10         A.   To the --

11:29:23 11         Q.   To the best of your recollection.

11:29:24 12         A.   Yeah.  To the best of my -- to the group?

11:29:27 13         Q.   Correct.

11:29:28 14         A.   That we need to prepare -- we just have to

11:29:35 15    prepare this amount and -- I'm not really sure if

11:29:38 16    that's the word she used, that we're good to go.

11:29:43 17    But we just have to prepare this amount and we're

11:29:46 18    good.

11:29:47 19         Q.   Did you have any individual conversations

11:29:49 20    with Ms. Navarro at this time?

11:29:51 21         A.   What time?

11:29:52 22         Q.   In March 28, 2008.

11:29:55 23         A.   No.

11:29:57 24         Q.   And prior to signing Exhibit 507, did you

11:30:02 25    have any conversations directly with Ms. Navarro?

MAIRI NUNAG-TANEDO - 6/21/2011

Page 95

11:36:20  1    five-minute break?

11:36:23  2              VIDEO OPERATOR:  The time now is 11:36.

11:36:29  3    We're going off the record.

11:36:31  4              (Off the record.)

11:48:39  5              VIDEO OPERATOR:  The time now is 11:48.

11:48:41  6    We are back on the record.

11:48:42  7    BY MR. HERNANDEZ:

11:48:43  8        Q.   Ms. Tanedo, what is your current salary

11:48:47  9    from East Baton Rouge?

11:48:54 10        A.   It is somewhere $44,000.

11:48:56 11        Q.   Around $44,000?

11:49:00 12        A.   Yeah.

11:49:01 13        Q.   A year?

11:49:01 14        A.   A year.

11:49:02 15        Q.   What was it last year?

11:49:07 16        A.   I'm sorry, I really don't know the exact.

11:49:10 17    I think it's like 43 or 42.

11:49:16 18        Q.   You started out at $41,000?

11:49:26 19        A.   I think it's 42 or something.

11:49:30 20        Q.   What was your starting salary?

11:49:32 21        A.   I --

11:49:33 22        Q.   I mean, you don't have to be precise, but

11:49:35 23    generally.  You said it was around 42?

11:49:37 24        A.   Yeah.  It's below 45 but above 40.

11:49:41 25        Q.   Your starting salary?

MAIRI NUNAG-TANEDO - 6/21/2011

Page 101

| | | |
|---|---|---|
| 11:55:38 | 1 | A.   Yes.  Well, when we got here, they asked |
| 11:55:45 | 2 | like -- the initial fee for the apartment and some |
| 11:55:51 | 3 | few dollars for food and for hotel and that's it. |
| 11:55:59 | 4 | Q.   Okay.  Would you say that that money -- |
| 11:56:02 | 5 | how much was that? |
| 11:56:06 | 6 | A.   It could be like -- all in all could be |
| 11:56:09 | 7 | like $300.  Something.  When we arrive on July 24. |
| 11:56:14 | 8 | Q.   Okay.  So would it be fair to say that |
| 11:56:16 | 9 | you've paid UPI and PARS less than $17,000? |
| 11:56:20 | 10 | A.   But more than 16,000? |
| 11:56:22 | 11 | Q.   Correct. |
| 11:56:24 | 12 | A.   Yes. |
| 11:56:25 | 13 | Q.   And is it also fair to say that since |
| 11:56:28 | 14 | September 2008, you've earned more than $100,000 |
| 11:56:35 | 15 | from East Baton Rouge? |
| 11:56:38 | 16 | A.   You say earned?  Received. |
| 11:56:40 | 17 | Q.   Gross salary. |
| 11:56:44 | 18 | A.   Gross? |
| 11:56:44 | 19 | Q.   Yes. |
| 11:56:46 | 20 | A.   Yes.  100, yes. |
| 11:56:53 | 21 | Q.   Now, have you -- what percentage do you -- |
| 11:57:01 | 22 | or what amount of additional fee do you understand |
| 11:57:04 | 23 | that UPI seeks from you? |
| 11:57:12 | 24 | A.   What -- can you please make it clearer? |
| 11:57:15 | 25 | Q.   I thought I did.  I'm sorry. |

MAIRI NUNAG-TANEDO - 6/21/2011

Page 156

14:55:32   1   documents at the same time that you signed 518 and

14:55:36   2   519?

14:55:41   3       A.   Yes, I would.  Because during that time

14:55:43   4   that I do remember I signed some documents, bunch of

14:55:47   5   them.  That is, as I said, like, a day or two days

14:55:51   6   before I leave -- I leave.

14:55:54   7       Q.   Two days before you left the Philippines?

14:55:56   8       A.   Yes.

14:55:57   9       Q.   And you left the Philippines when?

14:55:59  10       A.   July 24, I think.

14:56:01  11       Q.   So it's your best recollection that you

14:56:04  12   signed Exhibits 504, 505, 518 and 519 on or about

14:56:11  13   July 22nd?

14:56:15  14       A.   Yeah.  And not on the date.

14:56:17  15       Q.   What's that?

14:56:18  16       A.   And not on the date that was being -- that

14:56:21  17   were written on them.

14:56:22  18       Q.   Okay.  Now, is it your recollection that

14:56:26  19   these documents were blank as to the date at the

14:56:29  20   time you signed them?

14:56:32  21       A.   Yes.

14:56:34  22       Q.   Okay.  So it's your recollection or it

14:56:36  23   would be your best testimony that the dates were

14:56:39  24   added after you had already signed the documents?

14:56:47  25       A.   Please repeat the question.  I was

MAIRI NUNAG-TANEDO - 6/21/2011

Page 157

14:56:48  1   distracted.

14:56:50  2       Q.   Is it your best testimony that the dates

14:56:54  3   were blank at the time that you signed these

14:56:57  4   documents and they must -- they were added after you

14:56:59  5   had signed them?

14:57:01  6       A.   Yes.

14:57:02  7       Q.   All four documents?

14:57:04  8       A.   Yes.

14:57:24  9       Q.   At the time that you signed the documents,

14:57:25 10   was there a notary public that witnessed your

14:57:30 11   signature?

14:57:30 12       A.   There's none.

14:57:32 13       Q.   There was not one at the time?

14:57:34 14       A.   There was none.

14:57:36 15       Q.   So the acknowledgment on Exhibit 505 at

14:57:40 16   the tail end, on the last page, is it your testimony

14:57:44 17   that that is false?

14:57:54 18            MR. KNOEPP:  Objection to the form.

14:57:55 19            THE WITNESS:  Not going to say it's false.

14:57:58 20   What I think, there's no notary public present at

14:58:01 21   the time I signed -- I put my signature on these

14:58:04 22   documents.

14:58:05 23   BY MR. HERNANDEZ:

14:58:05 24       Q.   Well, this notary public, it says -- the

14:58:08 25   signature here says that the person appearing above

MAIRI NUNAG-TANEDO - 6/21/2011

Page 270

17:46:09   1        A.   I know.  I was saying like, honestly, I
17:46:15   2   don't see the point that they did not apply for a
17:46:18   3   three-year visa.  They did not ask for a three-year
17:46:22   4   visa for us as our petitioner if they can still
17:46:25   5   terminate our employment with or without our visa.
17:46:28   6        Q.   So it's your testimony that they have some
17:46:32   7   obligation to apply for a three-year visa for you?
17:46:36   8        A.   I do believe that they can apply for a
17:46:39   9   three-year visa for us.
17:46:43  10        Q.   That's not my question.  Is it your
17:46:44  11   testimony that they had an obligation to apply for a
17:46:47  12   three-year visa for you?
17:46:51  13        A.   The obligation, I don't see the point.
17:46:55  14   They can apply for a three-year visa.  And my -- and
17:46:59  15   my contention is --
17:47:00  16        Q.   Okay.  Go ahead.  I'm sorry.
17:47:02  17        A.   Can I finish?
17:47:03  18        Q.   Certainly.
17:47:03  19        A.   And my contention is --
17:47:06  20        Q.   Well --
17:47:06  21        A.   -- if they should have applied --
17:47:07  22        Q.   I am going to interrupt you because you
17:47:10  23   are -- you are not being responsive.
17:47:14  24        A.   I am.
17:47:15  25        Q.   My question is:  Do you understand the

MAIRI NUNAG-TANEDO - 6/21/2011

17:47:17  1   school board as having an obligation to apply for a

17:47:21  2   three-year visa for you?

17:47:23  3        A.   Yes, they can.

17:47:24  4        Q.   No.  No.  No.  An obligation to.  I'm not

17:47:29  5   saying what they can do.  They can apply for

17:47:31  6   permanent status for you.  They can give you a

17:47:35  7   million dollars.

17:47:35  8            My question is:  Do they have an

17:47:37  9   obligation to apply for a three-year visa for you?

17:47:48 10        A.   I would say, yes.  Again, I would say,

17:47:50 11   yes, then can.  If that's an obligation that they

17:47:53 12   can only apply for a three-year visa, I cannot -- I

17:47:56 13   cannot answer that.

17:47:59 14        Q.   Okay.  You understand what an obligation

17:48:02 15   is?

17:48:03 16        A.   Yes.  That they need to do it.

17:48:05 17        Q.   They are required to.

17:48:07 18        A.   They are required to do it.

17:48:08 19        Q.   Some either legal, moral, ethical, some

17:48:12 20   notion of something compels them to; right?

17:48:17 21            Is that fair?

17:48:18 22        A.   Yes.

17:48:19 23        Q.   Now, are they legally required to do

17:48:22 24   something, like require -- you know, to get a

17:48:24 25   three-year visa for you?

MAIRI NUNAG-TANEDO - 6/21/2011

Page 272

17:48:26   1        A.    Yes.

17:48:26   2        Q.    And that requirement is in your

17:48:29   3    understanding in the law somewhere?

17:48:32   4        A.    Yes, that they can do three year.  They

17:48:34   5    can do -- they can do three --

17:48:35   6        Q.    No.  No.  No.  I'm not talking can.  I'm

17:48:38   7    talking obligation.

17:48:42   8        A.    They did not promise that, but they can.

17:48:44   9    I'm sticking to that.  They can do a three-year visa

17:48:47  10    for us.  Because I wanted -- I wanted to -- to

17:48:50  11    impress that there is really an impact on us having

17:48:53  12    a one-year visa and a three-year visa.

17:48:56  13        Q.    That have an obligation to apply for a

17:48:59  14    three-year visa for you?

17:49:01  15        A.    They can.

17:49:01  16        Q.    But do they have an obligation to?

17:49:06  17        A.    Still, they can do that.

17:49:09  18        Q.    Do they have an obligation to?

17:49:12  19             MR. KNOEPP:  I object.  You're asking a

17:49:13  20    lay witness to provide a legal conclusion.  That is

17:49:16  21    why you're going around and round in circles here.

17:49:20  22    You're asking a lay witness something that calls for

17:49:22  23    a legal conclusion.  And we're going to sit here for

17:49:25  24    hours doing that.  She's not a lawyer.

          25    ///

MAIRI NUNAG-TANEDO - 6/21/2011

Page 316

19:09:52  1      Q.   -- she said that she was going to sue you

19:09:55  2   if you did not move.

19:09:56  3          Is that your testimony?

19:09:57  4      A.   It's part of what -- yes, part of that --

19:09:59  5   part of the conversation is the threat.

19:10:04  6      Q.   Okay.  I want to make sure that we're

19:10:07  7   clear here.

19:10:07  8      A.   Yes.

19:10:08  9      Q.   The night that you were being forced, in

19:10:11 10   your words, to move from the apartment, did you have

19:10:14 11   a conversation with Lulu Navarro?

19:10:16 12      A.   Yes.

19:10:17 13      Q.   And in that conversation did she tell you

19:10:19 14   that she would sue you unless you moved out of the

19:10:22 15   apartment?

19:10:22 16      A.   Yes.  Part of that conversation.

19:10:25 17      Q.   So the answer is yes?

19:10:26 18      A.   Yes.

19:10:27 19      Q.   She said that she was going to sue you?

19:10:28 20      A.   Yes.  Part of that conversation.

19:10:30 21      Q.   Okay.  What did she say she would sue you

19:10:35 22   for?

19:10:35 23      A.   Nothing.  She's -- she's -- she threatened

19:10:38 24   us that -- at first she was trying to explain that

19:10:43 25   we need to move out because it will be used by the

MAIRI NUNAG-TANEDO - 6/21/2011

Page 317

19:10:48  1   military evacuees.  And then we were really asking

19:10:53  2   her that if we can stay.  And then it made her

19:10:59  3   upset.  And it made her -- and she told us that, I

19:11:01  4   was just three hours away from you.  Do you want me

19:11:04  5   to go there?

19:11:04  6        And then the other threats would be, Do

19:11:06  7   you want me to sue you?  And the other threats are,

19:11:08  8   Do you want to go back to the Philippines?  Are you

19:11:14  9   sure you will have employment still?

19:11:16  10       Q.   And this is all because you wanted to stay

19:11:18  11  one more night?

19:11:19  12       A.   Yes.  It's all because we don't want to do

19:11:22  13  what she's telling us, to be -- to move that night.

19:11:28  14       Q.   Okay.  So you agreed to move; right?

19:11:30  15       A.   Yes.

19:11:31  16       Q.   Did you still think you were going to be

19:11:34  17  sued?

19:11:34  18       A.   No.  Because we moved.

19:11:36  19       Q.   Okay.  Did she threaten to sue you any

19:11:42  20  other times?

19:11:47  21       A.   Only on those general meetings.

19:11:51  22       Q.   I'm talking about you specifically.

19:11:53  23       Did she -- did anybody from UPI tell you

19:11:57  24  in a meeting either by -- in person or telephone

19:12:03  25  that they were going to sue you?

MAIRI NUNAG-TANEDO - 6/21/2011

Page 318

```
19:12:05  1        A.   After that?

19:12:05  2        Q.   Correct.

19:12:06  3        A.   Aside from the meetings that I was -- been

19:12:08  4    telling you?

19:12:08  5        Q.   I'm not talking about the meetings.  If

19:12:10  6    the meetings were specifically directed to you, then

19:12:12  7    that's within the question.

19:12:14  8        A.   Okay.

19:12:14  9        Q.   Okay.  Were these meetings -- were you the

19:12:16 10    only person in attendance at these meetings?

19:12:19 11        A.   No.

19:12:20 12        Q.   And was the threat made specifically to

19:12:22 13    you that unless you did something?

19:12:24 14        A.   No.

19:12:25 15        Q.   Okay.  So other than this conversation

19:12:28 16    that you had with Ms. Navarro on the night that you

19:12:30 17    didn't want to move from the apartment, did she ever

19:12:33 18    tell you directly that she was going to sue you?

19:12:51 19        A.   I don't remember any other incident with

19:12:55 20    the threat of suing.

19:12:57 21        Q.   Exactly.

19:12:58 22        A.   Yes.

19:12:59 23        Q.   And you haven't paid any fees for the

19:13:04 24    second year of your employment by EBR; correct?

19:13:10 25        A.   To UPI --
```

MAIRI NUNAG-TANEDO - 6/21/2011

Page 336

1    STATE OF CALIFORNIA          )
                                  )  SS.
2    COUNTY OF LOS ANGELES        )

3

4             I am the witness in the foregoing

5    deposition.

6             I have read the foregoing deposition or

7    have had read to me the foregoing deposition, and

8    having made such changes and corrections as I

9    desired, I certify that the same is true in my own

10   knowledge.

11            I hereby declare under the penalties of

12   perjury under the laws of the United States that the

13   foregoing is true and correct.

14            This declaration is executed this _____

15   day of _____, 2011, at _____

16   California.

17

18

19            _____

                     MAIRI NUNAG-TANEDO
20

21

22

23

24

25

```
1    STATE OF CALIFORNIA          )
                                  )   SS.
2    COUNTY OF LOS ANGELES        )

3         I, CATHY A. REECE, CSR No. 5546 for the State

4    of California, do hereby declare:

5         That prior to being examined, the witness named

6    in the foregoing deposition was duly sworn to

7    testify to the truth, the whole truth, and nothing

8    but the truth;

9         That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter reduced to computerized transcription and

12   that the same is a true, correct and complete

13   transcript of said proceedings.

14        Before completion of the transcript,

15   review of the transcript [X] was [ ] was not

16   requested.  If requested, any changes made by the

17   deponent (and provided to the reporter) during the

18   period allowed are appended hereto.

19        I further certify that I am not interested

20   in the outcome of the action.

21        Witness my hand this 7th day of

22   ____July_____, 2011.

23

24

25
                    CATHY A. REECE, RPR, CSR No. 5546
```

# EXHIBIT 504

## AGREEMENT/LEGAL DISCLOSURE

I hereby acknowledge that I, MARI MAHAL N. TANEDO _____ , have been selected by _____ , a School District in the United States of America. They have agreed to hire me as a teacher and provide me with compensation. That agreement is in writing in the form of a Job Offer Letter. The agreement to hire me as a teacher and pay me compensation is an agreement solely between the School and myself, and that Universal Placement International, Inc. ("UNIVERSAL") and PARS Placement ("PARS") are not parties to that agreement and have no legal obligation with regard to any of the terms of that Agreement. Any dispute over the terms of that agreement is between me and the School.

I further acknowledge that based upon the Job Offer Letter, I am entitled to file an Immigration Petition ("PETITION") with the United States of America to qualify and receive a H-1B Visa. I understand that this Visa will allow me entry into the United States and allow me to work at the School. UNIVERSAL has agreed to co-ordinate with an American attorney to handle my PETITION. I understand that there are many factors involved in determining my qualifications as they relate to the Approval of a H-1B Visa. I further understand that the United States of America, Department of Homeland Security, has the sole authority to grant me entry into the United States. I acknowledge that even though I have paid all of my fees and costs, that I may be denied approval of a Visa and that denial may have nothing to do with the services of UNIVERSAL and/or PARS.

If I am denied a Visa through this program, I acknowledge that the School District may revoke my job offer and that the School District will have no legal liability.

If I am denied a Visa through this program, I acknowledge that I will **NOT** be entitled to any refund of any fees or costs and/or including lawyer's fees. All of the fees and costs have been deemed earned upon the offer and acceptance of a Job Offer Letter and upon the filing of the PETITION.

**THE FINAL RESULT OF THE PETITION HAS NO LEGAL EFFECT ON MY OBLIGATION TO PAY CERTAIN FEES OR COSTS.**

I have been advised and understand that completion of the PETITION is a complicated process that requires the coordination of several Agencies. Specifically, before my PETITION can be approved, I will be required to receive and/or be deemed qualified to receive a license to teach by the State in which the School is located. Neither UNIVERSAL nor PARS has any control over these Agencies. UNIVERSAL and PARS, at all times, will use their best efforts to comply with the requests of the United States. You are hereby advised that in some cases, your PETITION will be denied based upon the failure to supply requested information within the time required. In this event, as stated, you will not be entitled to a refund of the fees or costs paid. Nor will you have any claim as against UNIVERSAL or PARS.

Agreement/Legal Disclosure

Page 1 of 2

DEPOSITION EXHIBIT 509

In certain situations, UNIVERSAL will continue to work on your behalf to obtain the necessary information and/or licenses necessary for me to qualify my entry into the United States of America. This is done solely at the discretion of UNIVERSAL. No legal liability is being created either expressly or through implication.

I hereby acknowledge that I have read this Agreement. By signing below, I further state that I understand the information provided to me and that I agree to be bound by the terms as stated. Although, I am being hired to teach in English in the United States of America, if necessary, this Agreement has been translated to me in a language other English. I further acknowledge that I have been provided with sufficient time to have an attorney of my choice to review and advise me as to the nature, contents and consequences of this Agreement. I further understand that this Agreement, if necessary, will be entered into court proceedings as evidence that you have been advised and agreed to the terms as stated herein.

This agreement shall be governed by and construed in accordance with the laws of the State of California. The parties agree that this agreement shall be enforced within any competent court within the County of Los Angeles, State of California, United States of America.

_____
**Signature**

Feb. 04, 2008
**Date**

MARI MAHAL N. TAHEDO
**Print Name**

SWORN TO AND SUBSCRIBED before me this _____ day of _____, by _____ who is personally known by me or has produced identification. Type of identification produced: _____

_____

NOTARY PUBLIC

Name: _____
My Commission Expires: _____

Page 2 of 2

Agreement/Legal Disclosure

( )

UPI 0000742

# EXHIBIT 505



# PARS INTERNATIONAL PLACEMENT AGENCY
Lic. No. POEA-110-LB-101306-PL

## MEMORANDUM OF AGREEMENT

This Agreement is entered between,

PARS INTERNATIONAL PLACEMENT AGENCY, registered under the laws of Republic of the Philippines with the office address at J & F Divino Arcade #961 Aurora Blvd., Quezon City hereinafter referred to as the AGENCY;

and

MAIRI MAHAL N. TAJEDO _____ of legal age and a resident of
(name of applicant)

22 B Pod 1, CPG EAST AVE, TAGB CITY; BOH hereinafter referred to as APPLICANT;



witnesseth

WHEREAS, the AGENCY is a career expert in many lines of professions and has global access to professional including but not limited to all areas of health, engineering, education, management, commerce, computer, hotel and restaurant, business production and management affairs;

WHEREAS, the AGENCY provides the rare advantage of an international communication link between the APPLICANT from the Philippines and willing and able employers whose offices are located in the United States (U.S.A.) for a quick, effective visa processing and selection of unlimited employment sponsors;

WHEREAS, the AGENCY serves as an 'Info Bank' for employer-sponsor in all categories including but not limited to hospital, schools, governments, constructions, private/religious institutions, associations, etc.;

WHEREAS, the AGENCY has an exclusive process to assist the APPLICANT in determining and finding an employment for which he/she is qualified provided he/she pass the interview;

WHEREAS, the APPLICANT agrees that the AGENCY shall assist him/her in finding an employer, corporation or partnership who is willing to sponsor and employ the APPLICANT in the USA under a PLACEMENT FEE;



DEPOSITION
EXHIBIT
505

UPI 0000232

NOW THEREFORE for and in consideration of the foregoing premises parties hereby agree under the following terms and conditions:

ARTICLE I:
PRINCIPAL DUTIES AND OBLIGATIONS OF THE AGENCY

The AGENCY shall perform the following:

1. Analyze, appraise and evaluate the qualifications of the APPLICANT to establish a program reasonably suited to him/her based on his/her goal, professional license, education, experience and financial commitment with the AGENCY.

2. Submit the application and registration request of the APPLICANT to the USA Employer-Sponsor/Petitioner and Immigration Attorney and perform the various intricate processing of the following documents:

    a. Analysis of qualification and evaluation of transcript
    b. Verifications of School Transcript and Diploma
    c. Verification of Employment
    d. Verification of Professional license/s
    e. Certification of School transcript and credentialing
    f. Verification of NBI/Police Clearance



3. Provide the APPLICANT with guidelines and directions to fulfill the requirements needed by the proper US Government Agencies including but not limited to the Department of Labor, Immigration and Naturalization Service or US Citizenship and Immigration Services for the approval of the APPLICANT'S work authorization, H1-B working visa or green card in the USA;

4. Provide orientation of social, cultural and familiarization in the locale upon arrival in the USA including complying with pertinent immigration laws via referral to an immigration attorney, and acquiring Social Security Number;



5. Acts as liaison in behalf of the APPLICANT in the USA for effective communication with the contact agency, Employer-Sponsor, Immigration Attorney and appropriate US Government agencies;

6. Assist the APPLICANT in finding a initial place to stay, guide him/her to access transportation to his/her place to work; until he/she has settled.

7. Ensure implementation of the guidelines required by the employer-sponsor.

UPI 0000233

## ARTICLE II:
### DISCLOSURE AND WARRANTIES OF THE AGENCY

The AGENCY shall make the following disclosure and warranties:

1. Upon signing of the job offer/employment contract from the employer the APPLICANT agrees to pay an initial down payment of equivalent to one month salary as service fee for the AGENCY. Professional fees of the US Immigration attorney of ___ $ 2,000 ___, and US Citizenship and Immigration Services fees of ___ $ 550 ___ including Premium Processing fee ___ $ 1,000 ___ for the petition of the applicant's H1-B Visa which is to be shouldered by the applicant. The fees are based on the rate provided by the USCIS (www.uscis.gov) and are subject to changes.

2. The approval of the petition is subject to the discretion of the approving agency in the US. Denial of the petition through no fault of the AGENCY shall not hold the AGENCY liable nor shall the AGENCY refund the fees paid to the US Agencies and the lawyer concerned;

3. If the applicant is residing in the Philippines at the execution of this agreement, the AGENCY does not guarantee the departure of the APPLICANT to the USA for employment until the following documents have been issued:

   a. Applicant submits the complete documentation requirements such as the US Transcript Evaluation and Certification of US License within the Agency deadline;

   b. Until a receipt of formal sponsorship letter from the employer petitioner and issuance of the approved VISA (work authorization of green card from USCIS).

4. Should the APPLICANT be approved and subsequently issued a contract by the employer, the term of contract is for one (1) year to be renewed by the employer if it is satisfied with the performance of the applicant. In the event that the applicant shall have been terminated from employment for causes due to the applicant, the Universal Placement, Inc. shall assist the applicant in finding another employment.

### ARTICLE III:
### DUTIES AND RESPONSIBILITIES OF THE APPLICANT

The APPLICANT shall perform the following:

1. Submit two (2) sets of professional resume, two (2) original or certified true copies of transcript of records in a sealed envelope from school registrar's



Page 3 of 5

UPI 0000234

office and diploma from the educational institution where the applicant
graduated, 2x2 photo and NBI Clearance and fingerprinting.

2. Submit an additional qualified documents which includes but not limited to
Income Tax Returns, Certificate of Employment, Professional licenses, Birth
Certificate, Passport and Marriage Certificate if married. The APPLICANT
shall certify in writing under the penalty of perjury that the documents
submitted to the agency are true and correct. Failure of the applicant to
submit the required documents to the AGENCY within the deadline
prescribed will warrant rescission of this Agreement. Rescission of this
Agreement based on this Article is not a waiver of the non-circumvention
provision found in Article IV.

3. Undergo medical check-up (POEA accredited) and submit a medical
certificate bearing the applicants health status that he/she is fit to work
abroad.

4. Provide the Agency with all the necessary information and sign the
application/registration/clearance forms provided by the Agency and the US
Government.

5. the APPLICANT shall at his/her option authorize the Agency in writing to sign
to process the application and registration/clearance forms in behalf of the
applicant to meet the above prescribed deadline.

6. the APPLICANT understands that if his/her performance with the employer-
sponsor is unsatisfactory the working visa may be subject for cancellation and
the applicant may be terminated from work and sent back to the Philippines at
his/her own expense. The APPLICANT must submit to the laws of the US
Government and pay obedience to it.

7. The APPLICANT releases and holds harmless the AGENCY from all liability it
may incur a result of the petition/application being filed on his behalf.

8. The APPLICANT once employed shall not deviate from the terms of his/her
contract. He/she shall not find other employment in the United States until
after his/her contract is terminated. Any deviation from the terms of contract
shall cause the cancellation of his/her visa and the revocation of his/her
license.

## ARTICLE IV:
## NON-CIRCUMVENTION CLAUSE

1. The APPLICANT guarantees not to circumvent the fees for which the
AGENCY is entitled to under this Agreement for services rendered. Identities

UPI 0000235

of Employer-Sponsor are the assets and goodwill of the AGENCY. Any attempt by the APPLICANT to deprive the AGENCY of its fees upon introduction to the employer-sponsor will subject the applicant to damages in the sum of three (3) times the total fee of the AGENCY as agreed upon in this Agreement.

2. The failure of any party to enforce at any time the terms of this agreement shall not be considered as a waiver hereof. Non-compliance of the terms and conditions of this agreement shall cause the rescission of this agreement with cost to the party at fault.

3. The entire agreement shall constitute the incurred agreement and understanding between both parties and shall supersede all prior contemporaneous agreement representation, both oral and written. All signing parties have equally agreed as evidenced by its signature below.

4. During the effectivity and until termination of this agreement, the APPLICANT agrees not to furnish any person, firm, company or corporation engaged in a competitive business with the intent of circumventing the fees of the AGENCY, any information obtained pursuant to this agreement including but not limited to the name of the employer-sponsor, customer, amount of fees, terms and negotiations or other information concerning the company and its business.

5. That the APPLICANT shall not contract-out with other schools, agencies for the purpose of recruiting or placing teachers with the AGENCY schools/agencies clients during the terms of his/her contract and after two (2) years from termination thereof.

ARTICLE V:
GENERAL PROVISION

1. The provisions of this agreement shall be mandatory and the terms and conditions are valid and enforceable. Failure to do so shall render this agreement as null and void and of no effect.

2. This agreement shall remain in full force and in effect. Any clause or section found to be unenforceable shall not invalidate this contract. The remainder of this agreement shall continue to be valid and binding.

3. This contract shall be governed by the Civil Code of the Philippines on the law obligation, in case of differences in the application or interpretation of the provisions hereof, the parties bind themselves to exert utmost and sincere efforts to reconcile the same, and all notices and comments involving

UPI 0000236

unsettled issues shall be in writing delivered to the parties either personally or
by registered mail addressed to the parties at their given addresses herein;

4. Should any of the parties be compelled to seek judicial relief, venue shall be
in the courts situated in the Quezon City, Philippines.

IN WITNESS WHEREOF, we the parties hereunto set our hands and affixed
our signatures on this  2   , day of  Feb. 2008   at Quezon City,
Philippines.

PARS INTERNATIONAL PLACEMENT AGENCY

By:

_____
EMILIO VILLARBA
CTC. NO.
Issued on:
Issued at:

_____
APPLICANT
CTC. NO. 23 25G 0 05
Issued on:  FEB 24, 2008
Issued at:  TAGBILARAN CITY, BOHOL

WITNESSES

_____

A C K N O W L E D G E M E N T

REPUBLIC OF THE PHILIPPINES        )
QUEZON CITY                        ) S.S

BEFORE ME, a Notary Public, personally appeared the following persons
exhibiting their community tax certificate above stated, known to me be the same
persons who executed the foregoing instrument and acknowledgement to me that
the same in their free and voluntary act and deed.

I further certify that this instrument refers to a Memorandum of Agreement
consisting of five (6) pages including this page wherein the acknowledgment is
written and signed by the herein parties and their instrumental witness on each and
every page hereof.

WITNESS MY HAND AND SEAL on the date and place first written above.

Doc No.  19
Page No.  4
Book No.  II
Series of  08

NOTARY PUBLIC
JULCISIMU R. HINANAY, JR.
NOTARY PUBLIC
COMMISSIONS THRES. DEC. 31, 2008
PTR NO. 8340 052, 1-8-2007, Q.C.
TIN NO. 125 - 352 - 859
COMMISSION NO. NP-095-2007-2008
ATTY ROLL NO. 27384

Page 6 of 6

UPI 0000237

# EXHIBIT 518



## PARS INTERNATIONAL PLACEMENT AGENCY
Lic. No. POEA-055-LB-103007-UL



DEPOSITION EXHIBIT 318

## UNDERTAKING

I, _MAIRI MAHAL N. TAÑEDO_ of legal age and a resident of _22 B POB 1, CPG EAST AVE, TAGB. CITY, BOHOL_ have applied for a teaching position in the United States of America through the assistance of PARS INTERNATIONAL PLACEMENT AGENCY a duly licensed agency with the POEA after having been duly sworn under oath do hereby undertake to perform the following:

1. That upon my application for a teaching position I shall abide by the policies set forth in the Memorandum of agreement which I entered into with PARS;
2. That upon y deployment to the US all obligations of PARS to me as their applicant shall now be terminated and that I shall be governed by the rules and regulations set by the school to which I am employed;
3. That once employed as per agreement with the school district I shall agree to wait for at least one (1) year adjustment period before I shall petition my family and bring them to the US. Failure on my part to abide with the undertaking shall be a ground for the termination or non-renewal of the contract.
4. That I shall execute this undertaking to free PARS from any and all liability that may arise.

IN WITNESS WHEREOF I, have signed this undertaking this _9_ day of _July 2008_, at _PARS INTERNATIONAL PLACEMENT_.

_____
APPLICANT

SUBSCRIBED AND SWORN TO before me, applicant exhibiting his/her Community Tax Certificate No. _22356051_, issue on _FEB 8, 2008_ at _TAGBILARAN CITY, Bohol_ I further certify the foregoing is his/her voluntary act and deed.

DULCISIMO G. HINANAY, Jr.
NOTARY PUBLIC
PTR NO. 5766853/1-3-2008/Q.C.
COMMISSION NO. NP-049 (2007-2008
ITY. ROLL NO. 27386 - NO. NP 5

Doc. No. _333_
Page No. _84_
Book No. _IX_
Series of _2008_

961 Aurora Blvd., cor. Anonas St. Cubao, Quezon City    Tel: 436-8999 Fax: 436-8998

UPI 0000743

# EXHIBIT 519



g3345 Wilshire Blvd Suite # 407
Los Angeles, California 90010

# Universal Placement International, Inc.

## PLACEMENT AGENCY CONTRACT

This contract is entered into by and between Universal Placement International, Inc. (hereinafter referred to as "Agency") and ᴅᴀɪʀɪ ᴍᴀʀᴀᴄ ᴏ, ᴛᴀɴᴇᴅᴏ (hereinafter referred to as "Client"). Agency is in the business of arranging and coordinating the hiring of qualified candidates for American Companies ("prospective employers"). Client is willing to be hired by a prospective employer and is willing to hire Agency to facilitate and coordinate the interview process, the actual hiring by employer, and appropriate immigration documentation of Client.

## 1.) SERVICES OF AGENCY

a.) Agency will use its best efforts to find suitable employment for Client, based upon the skill, training and experience of Client. "Employment" can consist of either a temporary or permanent job.

b.) Agency will interview Client and work with Client to make Client suitable and acceptable for employment with prospective employers. This process will include counseling and assistance in the preparation of a resume, appropriate appearance and instruction for succeeding in the interview.

c.) Agency will introduce Client to prospective employers.

d.) Agency will arrange interviews for Client with prospective employers that are suitable to the Client, based upon the Client's skill, training and experience.

e.) Agency will coordinate and oversee any and all necessary procedures of the Department of Homeland Security to allow Client temporary entry into the United States, based upon the acceptance of Client by a prospective employer.

f.) Agency will continue to be available to Client to discuss current problems at the employment, renewal of employment after the expiration of the current assignment, re-assignment to a new employer, or any other reasonable issue or guidance that Client would request.

In Consideration of the Services of Agency, as stated herein, Client hereby agrees as follows:

## A.) COMPENSATION BY CLIENT

1.) At the time of signing this Agreement, Client will pay Agency US$300.00.

Tel # 213.389.8878    Fax # 213.389.8868   Email: UniversalPlmt@aol.com

DEPOSITION
EXHIBIT
5K9

UPI 0000727

2.)     Upon the start of employment, Client will pay Agency US$300.00.

3.)     For the first twenty-four (24) months of employment, Client will pay Agency ten percent (10%) of Client's gross monthly income, payable monthly, commencing with the 1st pay period.

**B.) OBLIGATIONS OF CLIENT**

1.)  Client shall use best efforts to follow the advice and counseling of Agency. Client shall fully cooperate with Agency and Agency's efforts to find suitable employment for Client. Client shall keep Agency informed of Client's current address and other contact information.

2.)  Once employed and allowed into the United States, Client shall agree to follow the rules and laws of the United States and the employer. Client shall use best efforts to maintain the arranged employment and shall not do any intentional act that will result in the termination of employment.

3.)     Client shall mail to Agency, the ten (10%) fee on the first day of each month following employment. Client shall provide Agency with a copy of Client's paycheck(s) paid by the employer for each pay period covered by the ten (10%) monthly fee. Any payment not received by the 5th day of each month shall be considered late, subject to a late fee of US$25.00 and be deemed a breach of this Agreement.

4.)     Client shall maintain all information received by Agency or employer in the strictest of confidence. Client shall not disclose this confidential information to any third party nor shall Client use this confidential information for their own personal benefit. Client shall not arrange any independent job interviews with the employer for themselves or for any other third party. Client further agrees not to do any act to circumvent this Agreement or the relationship between employer and Agency or employer and other Clients covered by like Agreements.

**C.) TERMS OF EMPLOYMENT**

1.)     Client is hereby advised that once a prospective employer agrees to hire a Client, all terms of employment, including but not limited to, hours worked, wages, benefits, and other matters of employment are negotiated directly between Client and employer.

**D.) DISCLOSURES**

1.)     Client is hereby advised and hereby acknowledges that Client is in no way whatsoever, an employee of Agency.  Agency is merely providing a service for a fee.

2.)     Client is hereby advised and hereby acknowledges that Agency does not guarantee the terms of employment, the initial disclosed salary or benefits.  Agency is not responsible for the termination of any employment or any decrease in wages or benefits associated with employment.

3.)     The fees due Agency shall be deemed fully earned and payable upon the introduction of Client to a prospective employer.  If at any time following this introduction, for a period of five (5) years, Client receives employment from the prospective employer, Agency shall be entitled to receive their ten (10%) percent monthly fee as described herein above in paragraph (A)(3).

### E.) TERMINATION

1.)     In the event that Client is terminated as a result of Client's actions, Client shall be responsible to Agency in the amount of US$500.00. The parties acknowledge that this amount is reasonable and assessed to compensate Agency for the income that would have been paid had the Client not committed acts which resulted in the termination of Client. In the event that Client obtains subsequent employment, either with the prior employer or any other employer, within two years from the date of first employment, then Client, in addition to the US$500.00, shall remain responsible to pay Agency their ten (10%) percent fee as described herein above in paragraph (A)(3).

2.)     In the event that Client voluntarily terminates their employment for any reason, and within two years from the date of first employment, obtains employment with any other employer, whether introduced by Agency or not, Client shall remain responsible to Agency for their ten (10%) percent fee as described herein above paragraph (A)(3) and an additional US$1,000.00. The Parties agree and acknowledge that Client would not be in the United States and available for employment except for the actions of Agency and therefore Agency is entitled to and has earned the right to collect said fees. The Parties further acknowledge that the voluntary termination places Agency in a bad light with the employer and jeopardizes Agency's ability to place future clients with employer and other Clients' ability to come to the United States.

3.)     In the event that Client does any act to circumvent this agreement and subsequently obtains employment with the prospective employer or any other employer in the United States then Client shall remain responsible to pay Agency the ten (10%) percent monthly fee as described herein above in paragraph (A)(3).

4.)     In the event that Client is terminated by employer through no fault of their own, then Client shall not be responsible for any Agency fee until such time that Client finds new employment. Upon the procurement of subsequent employment, whether through the efforts of Agency or not, Client shall be responsible to Agency for the ten (10%) percent fee, only for the remaining period, as described herein above in paragraph (A)(3).

### F.) REFUND

1.)     In the event that Agency does not provide Client with at least one interview with a prospective employer, through no fault of the Client, then Agency will refund to Client US$150.00.

### G.) IDEMNIFICATION

1.)     Client shall defend, indemnify and hold Universal Placement, its officers, employees and agents free and harmless from any and all claims, demands, causes of action, costs, expenses, liability, loss, damage or injury, in law or equity, to property or persons, including wrongful death, in any manner arising out of or incident to any alleged acts or omissions or willful misconduct of Client, arising out of or in connection with the performance of the Services, the Project or this Agreement, including without limitation the payment of all consequential damages and attorneys fees and other related costs and expenses. Client shall defend Universal Placement at Clients own cost, expense and risk, any and all such aforesaid suits, actions or other legal proceedings of every kind that may be brought or instituted against Universal Placement, its officers, employees and agents. Client shall pay and satisfy any judgment, award or decree that

may be rendered against Universal Placement, its officers, employees and agents, in any such suit, action, or other legal proceeding. Client shall reimburse Universal Placement, its officers, employees and agents, for any and all legal expenses and costs incurred by each of them in connection therewith or in enforcing the indemnity herein provided. Client's obligation to indemnify shall not be restricted to insurance proceeds, if any, received by Universal Placement, its officers, employees and agents.

## II.) FINAL PROVISIONS

1.) This agreement supersedes any and all other agreements either oral or in writing between the Parties. This agreement is the final and complete agreement as between the Parties, any alleged provisions of any other agreement that are inconsistent with or contradict this agreement are hereby deemed null and void.

2.) This agreement shall be governed by and construed in accordance with the laws of the State of California. The Parties agree that this agreement shall be enforced within any competent court within the County of Los Angeles, State of California, United States of America. If legal proceedings are initiated to enforce this agreement or interpret the provisions of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees incurred, regardless of any court schedule of fees, in addition to any and all allowable costs or other relief available under the law.

DONE this: _July 1, 2008_          In: _MANILA_

CLIENT: _MARI MAHAL D. TABONG_          _[signature]_

                                        Signature

_____          _July 4 2006_

UNIVERSAL PLACEMENT INTERNATIONAL          DATE

UPI 0000730

# EXHIBIT 537

Page 1 of 1

**Subj:** **Reimbursement appeal**
**Date:** 10/12/2008 10:10:42 P.M. Pacific Daylight Time
**From:** donnabelescuadra@yahoo.com
**To:** parsplacement@yahoo.com
**CC:** UniversalPlmt@aol.com

Dear Sir Mel,

Jesus, Mary and Joseph!

I am intentionaly sending this email with a hope that you will take into consideration my personal concern regarding the amount I have paid to you for my placement. I am really having financial difficulty coping with my obligation to two financing agency. That is why I am appealing that you may look into my salary here vis- a vis that of what I have paid. I paid $5,400 times 2 which becomes $10,800. My salary here is only $47,938. ( see attachment).

The net pay I get every payday less the deductions is only $1,800. that makes it $3,600. And for the financing agency, I need to pay $1500 for each financing agency. $600 nalang po ang matitira tapos bahay pa at carpool. Wala napo akong mapadala sa Pinas para sa mga anak ko. They are all depending on me as a single parent. So please lang po, pakibalik po sa excess na $ **1,212.40** para po yan sa mga anak ko.

During our meeting with Mam Lulu, she said I have to wait for the payroll. At isasauli daw ang excess. I relied on her words. So now I have this  Memo from EBR stipulating my salary as attached. I badly need the money because my youngest son is sickly and is the reason why I am here .He needs medicine mentainance. Sana manan po maawa po kayo. Kailangan ko po ang pera. Nagbayad naman po ako ng two months as you asked. Ngayon po ang excess lang ang hinihingi ko.

Kindly deposit the amount of $ 1,212.40 to my BPI savings account # 9780924877. I am praying that you will consider this appeal with urgency. I need it very badly for my son's medical needs. Salamat po.

Donnabel A. Escuadra

DEPOSITION EXHIBIT
537

Monday, October 13, 2008 America Online: UNIVERSALPLMT

# EXHIBIT 546

FILED
LOS ANGELES SUPERIOR COURT

APR 14 2009

JOHN A. CLARKE, CLERK

BY BENJAMIN JEW, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

LOURDES NAVARRO      )     CASE NO.
     )     BC403506
     Plaintiff(s)     )
     )
     Vs.     )     ORDER
     )
INGRID CRUZ     )
     Defendant(s)     )
     )

**DEPOSITION
EXHIBIT
546**

The special motion to strike is GRANTED.

"Resolution of a special motion to strike requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.'" See Sycamore Ridge Apartments, LLC v. Naumann (2007) 157 Cal.App.4th 1385, 1397.

Defendant argues that the alleged conduct falls within CCP Section 425.16(e)(3) which includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." The parties do not dispute that a blog entry on the internet constitutes a statement made in a public forum. Thus, the issue becomes whether the subject matter was "in connection with an issue of public interest."

"The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a

broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." Damon v. Ocean Hills Journalism Club (2000) 85 Cal.App.4th 468, 479. Courts have relied on several guiding principals to determine whether conduct is of "public interest:"

> First, "public interest" does not equate with mere curiosity. (Citation.)  Second, a matter of public interest should be something of concern to a substantial number of people. (Citation.) Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. (Citation.) Third, there should be some degree of closeness between the challenged statements and the asserted public interest (citation); the assertion of a broad and amorphous public interest is not sufficient (citation). Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy . . . .' (Citation.) Finally, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' ( Citation.)  A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.

Weinberg v. Feisel (2003) 110 Cal.App.4th 1122, 1132-33.  Furthermore, "[w]here the issue is of interest only to a limited, definable portion of the public, the protected activity must occur, at a minimum, in the context of an ongoing controversy, dispute or discussion which implements the public policy of encouraging participation in public matters." Du Charme v. International Brotherhood of Electrical Workers, 110 Cal.App.4th 107, 119.

Plaintiff argues that the blog is of interest only to a limited, definable portion of the public. Indeed, defendant's blog is addressed to other Filipino Migrant Teachers participating in plaintiffs' program.  However, because it was posted on an open internet forum, it is viewable by members of the public at large.  Moreover, an argument may be made that the blog is of "public interest" because it also addresses issues such as immigrant exploitation, fraud, and sub-standard housing. See FAC, Ex. A.  in Thomas v. Quintero (2005) 126 Cal.App.4th 635, 661, the court held that a tenant's distribution of leaflets against the landlord was protected activity because it sought public involvement in ongoing controversy over landlord's property management practices.  Id.  The court stated that the Thomas's "protest activities were not an end to themselves, but were coupled with a genuine effort to engage the members of Thomas's congregation in discussing and finding a solution to the disputes—that is, the activity was directed at encouraging participation by the protestors and the church in an 'ongoing controversy, dispute or discussion' . . . ." Id.

Here, defendant's statements expressly seek support in an attempt to change plaintiffs' alleged practices.  Defendant's blog claims that the immigrant teachers are being exploited through practices such as - the overcharging of placement fees, being forced to live in uninhabitable housing quarters, and receiving threats in order to maintain their silence, among other things.  See FAC, Ex. A.  The blog concludes by encouraging others to "stand up" to pursue a common goal.  The communication therefore directly seeks participation in an "ongoing controversy, dispute or discussion."  The topics addressed are not limited to private contractual and/or wage disputes as

plaintiffs claim, but also cover the exploitation and defrauding of a group of immigrant workers.

Defendant has therefore demonstrated that the conduct at issue in this matter is of public interest and falls under CCP Section 426.16(e)(3). The burden now shifts to plaintiffs to demonstrate that there is a probability that they will prevail on the claims. The burden on the plaintiff is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment. Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 823. Plaintiff must make a prima facie showing of facts that would, if proved, support a judgment in plaintiff's favor. The court also considers opposing evidence, but only to determine if it defeats the plaintiff's showing as a matter of law. Lafayette Morehouse, Inc. v. Chronicle Publishing Co. (1995) 37 Cal.App.4th 855, 867.

Plaintiffs' opposition fails to address the merits of its' claims whatsoever. It instead relies on the statement that "because the defendant has not demonstrated that the speech at issue implicates any specific public issue or any specific issue of public interest, the plaintiff need not establish a prima facie case." Opposition, 10:3-5. Defendant, however, has met her burden. Because plaintiffs has failed to make any showing of a probability of prevailing on its' claims. the instant special motion to strike must be granted.

Defendant is entitled to an award of attorneys' fees and costs under CCP Section 426.16(c).

Dated: 4-14-09          _____
                          JUDGE OF THE SUPERIOR COURT

# EXHIBIT 547

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LOURDES NAVARRO et al., | B216885 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC402506) |
| v. | COURT OF APPEAL - SECOND DIST. |
| INGRID CRUZ, | FILED |
| Defendant and Respondent. | JUN 02 2010 |
| | JOSEPH A. LANE           Clerk |
| | Deputy Clerk |

APPEAL from an order of the Superior Court of Los Angeles County.  John P. Shook, Judge.  Affirmed in part, reversed in part and remanded.

Law Offices of William R. Ramsey and William R. Ramsey for Plaintiffs and Appellants.

Lawrence Rosenzweig for Defendant and Respondent.



DEPOSITION EXHIBIT
547

Plaintiffs Lourdes Navarro and Universal Placement International, Inc. (Navarro and UPI, or plaintiffs) appeal from an order of the Los Angeles Superior Court granting the special motion to strike brought by defendant Ingrid Cruz under Code of Civil Procedure section 425.16 (section 425.16), the anti-SLAPP law.[1]  Plaintiffs also appeal from the subsequent award of attorney fees and costs to Cruz in the amount of $31,645.82.  We affirm in part, and reverse in part.

## BACKGROUND

Navarro and UPI filed a verified complaint against Cruz in November 2008, seeking compensatory and punitive damages, injunctive relief, and attorney fees and costs, based on claims of libel, breach of contract, and intentional and negligent interference with prospective economic advantage.  In January 2009, they amended their pleading to add a cause of action for misappropriation of trade secrets.

According to the pleadings, UPI is an internationally recognized placement agency, headed by Navarro, that recruits and places foreign teachers with school systems in the United States.  For a fee, UPI helps foreign teacher candidates to obtain licenses and to meet the various other requirements that federal immigration law and local school systems impose upon those who seek positions in the United States.

The amended complaint alleges that in November 2008, Cruz, a teacher candidate from the Philippines who had contracted with UPI for its placement services, was the author of a "blog" addressed to Philippine teachers based in the United States.  The blog—"Pinoy Teachers Hub"—was alleged to contain false and defamatory statements accusing Navarro and UPI of fraudulent business practices and crimes.  A portion of the blog entitled "Why We Need To Act Together," addressed as "An open letter to our fellow Filipino Migrant Teachers," allegedly asserted that UPI "is defrauding us with our

---

[1]     SLAPP is an acronym for Strategic Lawsuit Against Public Participation.  SLAPP litigation is generally litigation without merit, filed in order to dissuade or punish the exercise of First Amendment rights by defendants.  (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858.)

Ex. 547

hard-earned wages"; that it overcharges and requires premature payment of placement fees and commissions in violation of its contracts and of Philippine law; that it has instituted immoral and unfair schemes, bullying, and intimidation; that "we are treated virtually as modern slaves"; that some teachers have been duped into believing a job was waiting for them when it was not; and that Navarro and UPI have "unlawfully opened our SS document." The amended complaint alleges that the blog and the defamatory statements are knowingly false, and that they were intended to be read by a substantial number of teachers and competitors of UPI, resulting in damage to Navarro's feelings and the plaintiffs' reputations, and depriving them of profits they otherwise would have enjoyed.

On January 4, 2009 Cruz brought an anti-SLAPP motion—a special motion to strike the complaint, and for attorney fees, pursuant to section 425.16. The motion contended that the complaint's allegations are directed against alleged acts in furtherance of the right of free speech in connection with an issue of public interest, and that the plaintiffs could not establish a probability of prevailing.[2]

The plaintiffs opposed the motion on the ground that the blog did not involve the right of free speech in connection with issues of public interest, and therefore is not subject to section 425.16's terms. Contending that the anti-SLAPP motion therefore had failed to meet its threshold burden, they offered no evidence to demonstrate a probability that the action would prevail on the merits. Notably, they offered nothing to contradict Cruz's testimony that she was neither an author of nor a contributor to the blog.

The Superior Court heard and granted the anti-SLAPP motion on April 14, 2009. Its written order holds that the blog, posted on an open internet forum and addressed to other Filipino Migrant Teachers participating in the plaintiffs' program, involved matters

---

[2]     Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

3

Ex. 547

of public interest because it was also viewable by other prospective foreign teachers and
the public at large, and was arguably of interest on subjects such as immigrant
exploitation, fraud, and substandard housing. The order holds that by failing to show any
probability of prevailing on the merits, the plaintiffs failed to meet their burden of proof
under section 425.16. And it holds that Cruz is entitled to attorney fees and costs under
section 425.16, subdivision (c).

Cruz moved for an award of attorney fees and costs in the amount of $31,645.82,
supported by time records. Navarro opposed the fee motion as untimely, excessive, and
undocumented. On June 9, 2009 the trial court granted the requested fees and costs in
their entirety.

Navarro and UPI appeal from the trial court's rulings.[3] Their appeal challenges
the anti-SLAPP ruling on grounds that the order violated their due process rights, and that
relief under section 425.16 was improperly granted because the blog did not address an
issue of public interest. We find no merit in these claims, and therefore affirm the
rulings.

Navarro and UPI appeal also from the award of fees and costs on the ground that
even if the anti-SLAPP ruling was correct, the trial court erred by awarding all fees
incurred on Cruz's behalf rather than limiting its award to only those fees incurred in
connection with the anti-SLAPP motion. We determine that this contention might be well
taken.

# DISCUSSION

### Standards of Review

The question whether the trial court correctly ruled that section 425.16 applies in
this case is the subject of independent review on appeal. (*Kashian v. Harriman* (2002) 98
Cal.App.4th 892, 906; *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th
204, 212 [orders granting anti-SLAPP motions are reviewed de novo].) We review the

---

[3]     An order granting or denying a special motion to strike under section 425.16 is an
appealable order. (§ 425.16, subd. (i).)

Ex. 547

award of attorney fees under the deferential abuse of discretion standard. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130; *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1322.)

**Section 425.16 required a determination whether the statements challenged by the complaint arise from protected activity.**

An anti-SLAPP motion under section 425.16 requires the trial court to engage in a two-step process. First, the court determines whether the defendant has made a prima facie showing that the challenged claim arises from protected activity that is within the statute's definition. If that threshold is met, the court then determines whether the plaintiff has demonstrated a probability that it will prevail on the claim. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

The protected activity that is required in order to satisfy the first prong of this test is an act in furtherance of a person's right of free speech in connection with a public issue, as set forth in subdivisions (e)(3) or (e)(4) of section 425.16. (Section 425.16, subd. (e)(1).)[4] The plaintiffs charge that the relevant statements in this case were blog entries made on the internet, which were statements made in a public forum, as plaintiffs concede. (See *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) The key issue with respect to the applicability of the anti-SLAPP statute therefore is whether the challenged claims were made in connection with issues of public interest within the meaning of section 425.16, subdivision (e).

**The blog's challenged statements were made in connection with issues of public interest.**

Plaintiffs contend that the trial court erred by determining that the blog and the statements on which the plaintiffs' lawsuit rests arose from protected activity. The blog's

---

[4]     Subdivision (e)(3) provides in relevant part that acts in furtherance of a person's free speech rights include statements "made in a place open to the public or a public forum in connection with an issue of public interest." Subdivision (e)(4) encompasses "any other conduct in furtherance of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."

Ex. 547

statements, they contend, were not made in connection with an "issue of public interest," and therefore do not come within subdivision (e)(3) of section 425.16.

Section 425.16's public interest requirement was not met, plaintiffs argue, because the blog's subject and statements involved only private transactions and disputes among members of a very limited group, and because they were not of widespread interest to the public at large, or even if they were, they addressed only the parties' private dispute rather than any specific public issue. Those arguments are belied by plaintiffs' own characterization of the blog, however, as well as by the blog itself.

According to the amended complaint, the blog was posted on an internet forum that was available to the public at large. The blog's initial statement welcomes comments and posts sharing the stories and experiences of its readers—all "pinoy teacher[s] based in the United States," not just those who had contracted with UPI, or who had disputes with UPI. And the title of the blog entry that plaintiffs alleged to be wrongful is an open letter—"Why We Need To Act Together"—addressed not just to the merits of a particular act or dispute, but to ongoing controversies and future actions of importance to its intended audience.[5]

The amended complaint alleges that the blog was intended to address not just "the relationship between UPI and other clients covered by like agreements," but it also identifies the blog and its statements as wrongful specifically because they *are not* directed just to the limited group of foreign teachers who had contracted with UPI. According to plaintiffs, they are "seen and read by a substantial number of teachers," and they were intended to disrupt UPI's potential future "prospective economic relationships" with others—presumably those who are not yet foreign teachers who have contracted with UPI. And according to plaintiffs, "when taken as a whole," the blog and its statements imply "that persons should not do business with the plaintiffs," again

---

[5]     Plaintiffs have not identified anything in the record that shows the number of teachers who had contracted with or had disputes with UPI, or the potential size of the blog's audience.

6

Ex. 547

indicating that the blog's audience includes potential teachers who have no current contractual relationship or dispute with UPI.

As the trial court noted, the blog addressed issues ranging beyond the specific wrongs and breaches claimed to have been suffered by its writer, on issues such as immigrant exploitation, fraud, and substandard housing. These issues would affect and would be of interest to many present and future immigrant teachers—including not just those who had allegedly been victimized, and not even just those who had actually contracted with UPI, but also those who might be considering becoming immigrant teachers through UPI or other such agencies. And the blog expressly sought to rally others to support changes in the claimed practices and in the contractual and other requirements that foreign teachers believed they were forced to accept, and encouraging others "to 'stand up' to pursue a common goal" involving an ongoing controversy.

These are among the characteristics that distinguish this case from the decisions on which the plaintiffs rely. (E.g., *Rivero v. American Fed. Of State, County & Mun. Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [protected activity involving dispute relating to supervisor of just eight employees found not to be issue of public interest]; *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 [public interest is not shown where statements are confined to "parochial particulars" of parties' dispute rather than public interest issues that might be implicated]; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1573 [statements directed solely at specific business practices, without addressing any ongoing controversy or potential public interest issues, does not satisfy first prong under section 425.16.]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 [same]; *Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 10 [demand for arbitration of specific negligence claim involves only private dispute, not potential public interest relating to arbitration].)

*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, is particularly instructive, as the trial court noted. In *Thomas*, the court found that a tenant's distribution of leaflets constituted protected activity with respect to issues of public interest, notwithstanding

7

Ex. 547

that the protest concerned a dispute with his landlord over eviction and involved only a limited audience, because the protest activities "'were not an end to themselves,'" but sought public involvement in an "'ongoing controversy, dispute or discussion . . . .'" (*Id.* at p. 661.)  Here, too, the blog attributed to Cruz addressed the parties' private disputes in the context of an ongoing controversy about the conduct of UPI, the sorts of conduct suffered by other present and future foreign teachers, and the social impact of such conduct on others.  It also constituted a call to future action, specifically seeking its audience's participation in the ongoing discussion and involvement in the ongoing controversy.

These factors satisfy the requirement that the acts and conduct charged in the complaint involve issues of public interest within the meaning of section 425.16.  (See, e.g., *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1467-1470 [communication to single reader leading to ongoing controversy concerning homeowners' association governance involves issue of public interest]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547-1550 [church governing body's allegedly false accusation of sexually predatory conduct, read by at most 100 people, constitutes statement in public interest because reported actions gave rise to ongoing discussion and encouraged public participation in matters of public significance]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898-900 [statements on internet web site about allegedly incompetent broker constitute issue of public interest where it constitutes "cautionary tale" providing consumer protection information to assist others with similar problems]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344[allegedly defamatory newspaper article about medical practitioner's claimed misrepresentations involve issue of public interest where information would assist others in choosing doctors]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [homeowners' association newsletter concerning association governance constitutes matter of public interest]; *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 674-675 [statements designed to persuade union members to vote against candidate in union election constituted matters of public interest]; see also *DuCharme v. International Broth. of Elec. Workers, Local 45*

8

Ex. 547

(2003) 110 Cal.App.4th 107, 119 [issues of interest to members of a particular community, in context of ongoing controversy, debate, or discussion within that community, may constitute issue of public interest under section 425.16].)

The blog's message in this case fits well within the definition of a discussion of issues of public interest with its audience. The trial court therefore correctly determined that section 425.16, subdivision (e)(3), applies.

**The trial court's reliance on subdivision (e)(3) of section 425.16 did not deprive the plaintiffs of due process of law.**

Plaintiffs also claim to have been deprived of due process of law by the trial court's ruling that the challenged claim arises from protected activity under subdivision (e)(3) of section 425.16, while the anti-SLAPP motion relied on subdivision (e)(4) of section 425.16. They offer no authority for that proposition, and it is without merit.

As relevant to this case, subdivision (e)(3) applies to statements or writings made in connection with an issue of public interest; subdivision (e)(4) applies to conduct that is done in furtherance of a free speech right in connection with a public issue or issue of public interest. Subdivision (e)(3) applies here, because the charged conduct constitutes written statements made in a blog—a writing. Subdivision (e)(4) is equally applicable, however, for the blog was just as plainly conduct done in furtherance of its author's free speech rights. (See *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pp. 897-898; *Carver v. Bonds, supra,* 135 Cal.App.4th at p. 342 [subsections (e)(3) and (e)(4) of section 425.16 are not mutually exclusive; both may apply where conduct constitutes communications made in public forum].) The distinction between subdivisions (e)(3) and (e)(4) is in subdivision (e)(3)'s requirement of a public forum, which is not an issue here. (*Terry v. Davis Community Church, supra,* 131 Cal.App.4th at p. 1545.)

The issue in this appeal therefore was the same under both subdivisions (e)(3) and (e)(4): whether the blog concerned issues of public interest. Plaintiffs do not say how they were misled by the identification of subdivision (e)(4) rather than subdivision(e)(3) in the anti-SLAPP motion's notice of motion. We conclude they were not. After all, the memorandum of points and authorities in support of the anti-SLAPP motion argued its

9

merits under subdivision (e)(3), rather than subdivision (e)(4), and plaintiffs' opposition specifically noted the potential applicability of subdivision (e)(3). The trial court acted well within its discretion in excusing and ignoring the claimed defect.

The motion was sufficient to provide plaintiffs with notice of the grounds for the requested relief, and the trial court's reliance on either ground would have been sufficient to invoke the relief provided by section 425.16. Because the plaintiffs made no showing of a probability that their action against Cruz will prevail, the order granting the special motion to strike therefore is affirmed.

**Whether the trial court abused its discretion by awarding the requested attorney fees is unclear from the record.**

Navarro and UPI appeal from the attorney fee award on two grounds. They first contend that the fee award should be reversed because the anti-SLAPP motion should not have been granted in the first instance. This ground we reject because we affirm the order granting the anti-SLAPP motion.

Plaintiffs also contend that in any event the trial court abused its discretion by awarding the requested fees, because the request apparently included fees for time spent on matters other than the anti-SLAPP motion alone. Based on the record before us, we conclude that the plaintiffs' second ground has some merit.

A prevailing defendant on a special motion to strike is entitled as a matter of right to recover attorney fees. (§ 425.16, subd. (c); *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1131.) Plaintiffs concede that prevailing defendant on a special motion to strike is entitled as a matter of right to recover attorney fees under section 425.16, subdivision (c). They argue, however, that a successful defendant is entitled to recover the fees incurred only with respect to the anti-SLAPP motion. The award in this case should be reversed, they contend, because it includes fees incurred with respect to proceedings in the trial court other than just the anti-SLAPP motion.

The decision in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 39 Cal.App.4th at p. 1384, held that the prevailing party on an anti-SLAPP motion was not entitled to recover attorney fees incurred with respect to proceedings other than in

10

Ex. 547

connection with the anti-SLAPP motion itself (although it is not clear from the opinion what was the nature of the other matters for which fees had been requested). Our Supreme Court recited that holding with approval, in dictum, in *S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 381; however there the context was quite different from what is involved here. The holding there was that fees could be recovered only if the anti-SLAPP motion was filed before the action's voluntary dismissal by the plaintiff. (*Id.* at p. 383.)

Some proceedings in this case may not have been devoted directly to the anti-SLAPP motion itself. For example, simultaneously with her anti-SLAPP motion, Cruz moved to quash a subpoena seeking the identity of the person who posted the blog on Google, or in the alternative, to stay the subpoena pending the outcome of the anti-SLAPP motion. Although the portion of the affected time is relatively small (in the area of perhaps 10 percent), there is some indication that the fees requested on Cruz's behalf might represent some time incurred with respect to the motion to quash, and perhaps some other services as well.[6]

The fee motion was supported by counsel's declaration that the fees were incurred "defending this case by preparing the anti-SLAPP motion, protecting my client's right to a speedy hearing on the motion, responding to the opposition papers of Plaintiffs, and preparing for and appearing at the hearing on the motion," as well as for time spent preparing the fee motion, responding to the opposing papers, and attending the fee hearing. Cruz's counsel undoubtedly would contend that this representation was justified because all activities for which his time was incurred were essential to the prosecution of the anti-SLAPP motion, and that Cruz is entitled to reimbursement of her fees with

---

[6]     The day after the complaint was served in this action (and five days after the complaint was filed), plaintiffs filed an ex parte motion for OSC and temporary restraining order seeking removal of the blog. And a few months later the plaintiffs' attorney apparently moved to be relieved as counsel. However there is no indication in the record that Cruz or her counsel were involved in either of these events, or that any of the claimed fees or costs were attributable to them.

11

Ex. 547

respect to them.  The record is not sufficient, however, for us to determine whether that contention (if and when it might be asserted) would be well-taken.

## DISPOSITION

Because we find that Cruz is the prevailing party in this appeal, she is entitled to recover her fees and costs attributable to this appeal.  Although we are reluctant to add to the burdens on the trial court and counsel in this case, we nevertheless find that we must reverse and remand the fee award so that in the course of its determination of the fees and costs to which Cruz is entitled for this appeal, the trial court may also determine whether, and the extent (if any) to which, the $31,645.82 awarded as fees and costs for the trial court proceedings were not incurred in connection with or necessary to the anti-SLAPP motion.  In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


MALLANO, P. J.


ROTHSCHILD, J.

12

Ex. 547

# EXHIBIT 550

Department of Justice
National Prosecution Service
OFFICE OF THE CITY PROSECUTOR
QUEZON CITY

DEPOSITION
EXHIBIT
550

# INVESTIGATION DATA FORM

*To be accomplished by the Office*

**DATE RECEIVED**

*(stamped and initiated):* _____

Time Received: _____

Receiving Staff: _____

**NPS DOCKET NO.:**

XV-03-INV-1 _____ -

Assigned to: _____

Date Assigned: _____

*To be accomplished by complainants/counsel/law enforcer*
*(Use back portion if space is not sufficient)*

**COMPLAINANT/S: Name, Sex, Age & Address**

INGRID CRUZ, and other similarly-situated OFW-teachers in Louisiana, USA

**OFFENSE/s COMMITTED /LAW/s VIOLATED:**

LargeScale and Syndicated Illegal Recruitment under R.A. 8042, Migrant Workers and Overseas Filipinos Act of 1995

**DATE & TIME of COMMISSION:**

varying dates of commission, (alleged violation prescribes in 20 yrs, section 12, R.A. 8042)

1. Has a similar complaint been filed before any other Office?*
2. Is this complaint in the nature of a counter-affidavit?*
   If yes, indicate details below.
3. Is this complaint related to another case before this office?*
   If yes, indicate details below. Malri Mahal Tanedo, Grace Aринque vs. same respondents;

**RESPONDENT/S: Name, Sex, Age & Address**

PARS International Placement Agency; Emilio V. Villarba; The lending companies PJH and AGF; Universal Pacement International, inc.; Lourdes "Lulu" Navarro; East Baton Rouge Parish **WITNESS/es: Name & Address** School System (EBRPSS); and the EBRPSS School Board Members. (see Annexes H - H.15 for witnesses)

**PLACE of COMMISSION:**

PARS International Placement Agency Office at Suite 407, J&F Divino Arcade, 961 Aurora Blvd., Q.C.     YES ___ NO /

YES / NO /

YES / NO ___

I.S. / NPS Docket No.: XV-03-INV-10E-10901 ✓

Handling Prosecutor: ACP Romano

## CERTIFICATION*

I CERTIFY, under oath, that all the information on this sheet are true and correct to the best of my knowledge and belief, that I have not commenced any action or filed any claim involving the same issues in any court, tribunal, or quasi-judicial agency, and that if I should thereafter learn that a similar action has been filed and/or is pending, I shall report that fact to this Honorable Office within five (5) days from knowledge thereof.

INGRID IGNACIO-CRUZ
(Signature over printed name)

SUBSCRIBED AND SWORN TO before me this ___ day of JAN 0 6 2011 , 20 ___ in _____

Non-Prof Driver's License NO 3-07-019307

M.C.M.C. ONGSIAKO-ZULUETA     1/05/2011

UPI 0001667

Ex. 550

Republic of the Philippines
Department of Justice
National Prosecution Service
**Office of the City Prosecutor**
**QUEZON CITY**

INGRID CRUZ,
**And other members of a GROUP of**
**other similarly-situated OFW-teachers**
**in Louisiana, USA**

Complainants,

I.S. No. _____

*For LARGE SCALE &*
*SYNDICATED*
*ILLEGAL RECRUITMENT*
*Under R.A. 8042, Migrant Workers*
*and Overseas Filipinos Act of 1995*

- versus -

**EMILIO V. VILLARBA,**
**PARS International Placement Agency**
**(POEA-registered Local Agency),**
**The Lending companies of The PJH Group,**
**And The AGF,**
**LOURDES "LULU" NAVARRO,**
**UNIVERSAL Placement International, Inc.,**
**(Foreign Principal),**
**EAST BATON ROUGE PARISH SCHOOL SYSTEM,**
**And its School Board Members,**
**(Foreign Employer)**

Respondents.

X ------------------------------------------------------------------ x

## COMPLAINT - AFFIDAVIT

I, INGRID CRUZ, of legal age, married, Filipino citizen, a resident of 1.2 B5 Balikatan Village, Sampaloc, Tanay, Rizal, for myself, with the assistance of counsel, and on behalf of other similarly-situated members of the GROUP of Overseas Filipino Workers-Teachers ("OFW-Teachers") in Louisiana, USA, all of legal age,  and all Filipino citizens, having been duly sworn in accordance with law, hereby depose and state:

1.      On or about June 2007, I sent a resume to PARS International Placement Agency ("PARS")  looking for employment as a teacher in the United States. PARS is owned and run by Emilio V. Villarba ("Mel"), and advertised their principal address as **Suite 407 J & F Divino Arcade, 961 Aurora Blvd., Quezon City, Philippines;**

2.      I came to know of PARS and their job offer to teach in the USA through a friend teacher;

**UPI 0001668**

**Ex. 550**

3.      PARS facilitated for their applicants a series of online interviews with the HR/Recruitment manager of the East Baton Rouge Parish School System (EBRPSS), which I participated in, in June and July of 2007, and from which I was later informed by PARS that I passed the said job interview and was offered a job by the EBRPSS in Louisiana, USA;

4.      On or about August 2, 2007, I signed an offer of employment with the East Baton Rouge Parish School System (EBRPSS) at the office of PARS, which said that my expected annual gross income for the teaching job was **$36,425;**

5.      On or about July 24, 2007, I gave **$5,000.00** to Emilio Villarba which he said was for the **processing fee for my visa and for an out-of-state teaching certificate.** The receipt that I received from Mr. Villarba was a receipt which said UNIVERSAL Placement International, Inc. ("UPI"). Attached hereto **as ANNEX "A"** is a true and correct copy of such receipt. Upon information by Mr. Villarba, and consistent with their acts and operation, PARS and UPI are one and the same, Mr. Emilio Villarba and Lulu Navarro owner and manager of UPI are siblings, and that PARS is the office of UPI in the Philippines, as may be seen in the leaflet distributed to applicants by PARS and attached herewith as **ANNEX "A.1"**;

6.      On or about September 17, 2007, I gave Mr. Villarba an additional **$130 for the processing fee for my visa, $80 for an exit clearance, and $60 for training.** Attached hereto **as ANNEX "B"** are true and correct copies of the receipts;

7.      On or about September 26, 2007, the day before I left the Philippines to the United States, I gave $7,400 to Mr. Villarba. This amount represented **20% of my expected gross income for the first year with the EBRPSS, as placement fees.** In exchange, I received two receipts from Mr. Villarba, one receipt for **$3,700** that said Universal Placement International, and one receipt for **$3,700** that said to PARS International. Attached hereto as **ANNEX "C"** are true and correct copies of said receipts;

8.      In sum, before I could even leave the country I have already paid PARS a total of **$12,670.00** or the following amounts:

        ANNEX "A" = $ 5,000.00 to PARS, processing fee for US Visa and an
        out0of-dtate teaching certificate;
        ANNEX "B" = $ 130, additional processing fee for visa, $80.00 for
        exit clearance; and $60.00 for training;
        ANNEX "C" = $7,400.00 for placement fees equivalent to 20% of my
        expected gross annual income pegged by PARS at $ 37,000.00 or $
        3,083.00 gross per month only;

9.      On or about September 27, 2007, I flew from the Philippines to Los Angeles, California, along with seven (7) other teachers from the Philippines, and met MS. LOURDES "Lulu" NAVARRO for the first time at her office in **3345 Wilshire Blvd, Suite 407, Los Angeles, CA 90010;**

10.      On or about September 27, 2007, Ms. Lulu Navarro made me sign another contract with UNIVERSAL, which is different from the standard contract presented by PARS to POEA in the Philippines, in accordance with Philippine law. In

UPI 0001669

Ex. 550

effect this UNIVERSAL contract replaced and circumvented the provisions of Philippine law. In this new contract, the Foreign Principal Recruitment agency in the USA, which is Universal or UPI, is divested of all solidary liabilities as provided for by law in the Philippines, by the mere signing of this new agreement. In this contract, over and above the fees already collected by PARS from us Filipino teachers recruited in Manila and are now in Los Angeles, California, additional fees are being collected by UPI. A copy of the contract is attached herewith as **ANNEX "D"**.

11.     On September 27, 2007, LULU informed me and the 7 others that she had arranged an apartment for us to stay in and for this I gave LULU **$368.00** for first month's (October, 2007) rent, and additional 3 days for the month of September plus **$100** for deposit. I never signed a lease with the apartment complex;

12.     On September 27, 2007, after arriving in Los Angeles, I went to the Social Security Office in California in order to obtain a social security number (SSN). On September 27, 2007, Lourdes Navarro instructed me and the other teachers to have the social security cards sent to her office in Los Angeles, CA;

13.     On or about November 2007, I received my social security card through one of the other Filipino teachers, and noticed that the envelope had already been opened;

14.     From September 27, 2007 through July 10, 2008, I lived in the apartment complex that Ms. Navarro arranged for us. I lived in a 2-bedroom apartment with 4 other teachers, sharing a bedroom with another teacher. I was informed and believed that the rent for the apartment was **$825**, and that there was a charge of **$150** per month for the furniture. I paid **$243.75** per month while staying at the said apartment ($975/4);

15.     I never borrowed money from any lending companies that PARS & UPI recommended, or the PJH and AGF, even after they insisted that I do so immediately. Instead, I loaned from a bank under my parents' names which I'm paying for up until this time;

16.     On October 3, 2007, I started working as a science teacher at Crestworth Pre-Engineering Magnet Academy earning approximately $37,000 per year.

17.     The Visa that Universal Placement International initially got for me was a one (1) year HIB-Visa as a guest teacher in the USA, which expired in September 2008. From April 30, 2008 through July 31, 2008, I sent UPI a total of **$1,745 to renew my visa** for another year. However, I later found out that the Visa that I received is only good for 6 months, unlike all other teachers which got 1 year visa and they paid the same amount;

18.     On or about October 2008, I received a series of letters from UPI demanding that I send **10% of my second year gross income** by sending 10 post dated checks by November as purportedly stipulated in that UPI Contract which they made as sign as we first arrived in the USA. The letter states that if I do not send the checks by the 24th of November, UPI will charge a late payment fee. Attached hereto as **ANNEX "E"** is a true and correct copy of the letter;

UPI 0001670

Ex. 550

19.     I was charged by Lulu Navarro for Libel alleging therein that I initiated an internet-based blog site which allegedly published defamatory statements against her and UPI.     At no time did I author a blog through Google or the www.pinoyteachershub.blogspot.com. I did not author the blog entry "Mabuhay!" nor did I author or create a blog entitled "Why We Need to Act Together open letter to out fellow Filipino Migrant Teachers." I have read the blog and comments posted there. The information posted on the blog about the way Universal operates is common knowledge among the Filipino teachers placed by Universal. This case was later dismissed at my instance, because they were merely filed by Lulu to further harass me;

20.     On or about September 30, 2009, our group or Filipino guest teachers in Louisiana, USA filed and pursued, with the help of the Louisiana Federation of Teachers (LFT) and the American Federation of Teachers (AFT), a complaint with the Louisiana Workforce Commission in the USA, seeking for nullification of such illegal contract by UPI and conviction of Lulu Navarro for illegal private employment activities in Louisiana where she is apparently operating without the proper licenses and authority, and for refund of all the fees collected from us, Filipino non-immigrant guest teachers in the US, amounting to $ 15,000.00 each, which under the law should have been shouldered by the Employer.   Attached herewith is a copy of such complaint filed for us by the AFT, as **ANNEX "F"**;

21.     Recently, on or about October 27, 2010, with the help of the Southern Poverty Law Center Immigrant Justice Project, our group has also initiated and filed a Civil Complaint/ Class Action in the United States District Court for the Central District of California Southern Division, against all of herein Respondents, including our FOREIGN EMPLOYERS, the EBRPSS, and the EBRPSS School Board members, the FORIGN PRINCIPAL AGENCY, UNIVERSAL Placement International, Inc., Lourdes "Lulu" Navarro, her husband Hothello "Jack" Navarro, and the LOCAL AGENCY, PARS International Placement Agency, Emilio V. Villarba, and also their legal cohorts Atty. Robert B. Silverman and the Silverman and Associates, a copy of this Complaint is also provided herein as **ANNEX "G"**;

22.     On or about December 17, 2010, two (2) of my colleagues, Mairi Mahai Tañedo and Grace A. Atinque filed Criminal Complaints in this Honorable Office, against PARS and Emilio Villarba (Local Recruiters), UPI and Lulu Navarro (as Foreign Principal), and the EBRPSS and their School Board (as Employers), for LARGE SCALE AND SYNDICATED ILLEGAL RECRUITMENT, under REPUBLIC ACT NO. 8042, The MIGRANT WORKERS ACT OF 1995, Docketed as **XV-03-INV-10L-10901**. It is respectfully prayed therefore, that this Complaint, upon filing, be consolidated with this said case for proper and speedy investigation, in consideration that we are all intimately the same and are suing all the same respondents, charging them with the same offenses;

23.     I also bring this Criminal Complaint for and on behalf of other Overseas Filipino Teachers currently employed by the school systems in East Baton Rouge Parish School System (EBRPSS), the Caddo Parish School, Jefferson Parish School and the New Orleans Recovery School District in Louisiana, USA. In SY 2008-2009 alone, the EBRPSS employed approximately 165 Filipino teachers. Now, there are between 250-300 teachers in the aforestated school systems, all recruited by PARS and UPI, their cohorts.  Some of these other teachers' declarations and sworn

UPI 0001671

Ex. 550

statements, duly certified and authenticated by the Philippine Consulate-General in the City of Chicago, State of Illinois, USA, is also attached herewith as ANNEXES "H" TO "H.15" supporting documents, by this Complainant, showing acts perpetrated by the above-cited Respondents constitutive of *Large Scale and Syndicated Illegal Recruitment*. Unfortunately, we cannot all bring this criminal suit together in person as of the moment, as majority of us are currently in the USA, and are not able to come home to our families even for the Holiday season due to the large debts that we have incurred with the PJH and AGF lending agencies, cohorts of PARS and Universal. And also because we are under a one-year H1B visa only, our income under our first year contract goes to pay these large debts as well as additional fees for visa extension.    Attached herewith as ANNEX "H" ARE THE FOLLOWING DECLARATIONS:

|  |  | Declaration (sworn statement) of: |
|---|---|---|
| ANNEX "H" | - | Ian Paul P. Cainglet |
| ANNEX "H.1" | - | Helmar J. Vistal |
| ANNEX "H.2" | - | Jovi Bacani |
| ANNEX "H.3" | - | Bernard T. Pagusara |
| ANNEX "H.4" | - | Cherryle Raganut |
| ANNEX "H.5" | - | Robert Garcia |
| ANNEX "H.6" | - | Angelisa G. Navales |
| ANNEX "H.7" | - | Lorena A. Java |
| ANNEX "H.8" | - | Jave R. Pajuelas |
| ANNEX "H.9" | - | Alfredo C. Caracen |
| ANNEX "H.10" | - | Loida Virina |
| ANNEX "H.11" | - | Rogelio F. Cruz |
| ANNEX "H.12" | - | Corazon A. Lipana |
| ANNEX "H.13" | - | Antonio M. Linjoco |
| ANNEX "H.14" | - | Dionise Reymund S. Malana |
| ANNEX "H.15" | - | Maria Theresa P. Casas |

24.     The above declarations were prepared initially to be filed and submitted to the POEA, as additional supporting documents for an existing administrative complaint filed by our group against PARS and Emilio Villarba for violation of the 2002 POEA Rules, currently being heard under the Office of the POEA Adjudicator Attorney Lusterio.  Upon which complaints, the POEA has *motu propio* preventively suspended the PARS' license to operate as recruitment agency in the Philippines. Our group fully intend to forward the other sworn statements of our other colleagues, which we have filed with the POEA, to this Honorable Office, bearing declarations of other similarly-situated Filipino Overseas guest teachers in Lousiana, USA.

25.     This criminal complaint should not to be construed as forum shopping on the part of this Complainant, even after the filing of the aforestated POEA

5

UPI 0001672

Ex. 550

administrative complaints, because the latter were caused under violation of the 2002 POEA Rules, whereas being charged in this criminal complaint is for violation of R.A. 8042, or the Migrant Workers Act of 1995. Thus, a subsequent decision on the POEA case may not result to preclusion of this complainant's cause of action against these respondents' criminal liability under the facts and circumstances herein presented, and under R.A. 8042;

26.     It is respectfully prayed that this Honorable Office promptly pursue investigation of this case, and Information for Large Scale and Syndicated Illegal Recruitment be filed against the above-cited respondents as soon as possible in order to give us, 200-300 non-immigrant Filipino guest teachers in Louisiana, USA, a chance to be heard in Court, and justice be finally served;

27.     I am willing and able to provide further evidence and relevant information as regards my above allegations, as this Honorable Office may require in the future, and when called to testify regarding the above, I am competent to do so, through my attorneys-in-fact, the **Lopez and Carrasco Law Offices**, through **Atty. Maria Bernadette Carrasco**, with principal address at **No. 240 Aguinaldo Highway, Banco Maragondon Building, Niog 1, Bacoor, Cavite 4102 Philippines**, on whose favor I executed a Special Power of Attorney (SPA), attached herewith as **ANNEX "I"**;

28.     I declare under penalty of perjury under the laws of the Republic of the Philippines that the foregoing is true and correct, and of my personal knowledge.

RESPECTFULLY SUBMITTED.

IN WITNESS WHEREOF, I have set my hand this 05 JANUARY 2011, in QUEZON CITY, Philippines.

INGRID CRUZ
Complainant/Affiant

**CERTIFICATION**

I HEREBY CERTIFY that I have personally examined the affiants and that I am convinced that they voluntarily executed the foregoing complaint-affidavit and that they understood the contents thereof.

M.C.M.C. _____-ZULDETA
DUPTY PROSECUTOR
**ADMINISTERING OFFICER**

6

UPI 0001673

**Ex. 550**

# EXHIBIT 551

REPUBLIC OF THE PHILIPPINES
DEPARTMENT OF JUSTICE
OFFICE OF THE CITY PROSECUTOR
QUEZON CITY

MAIRI MAHAL NUNAG TANEDO,
GRACE ALINSUG ARINQUE, and
Other Members of a Group of about 250
Similarly –situated OFW-teachers in
Louisiana, U.S.A.,

        Complainants,

-Versus-

EMILIO V. VILLARBA,
PARS International Placement Agency,
LOURDES "LULU" NAVARRO,
UNIVERSAL PLACMENT INTERNATIONA, INC.,
EAST BATON ROUGE PARISH SCHOOL SYSTEM,
And EBRPSS SCHOOL BOARD MEMBERS,
        Respondents.
X - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

NPS DOC NO. XV-03-INV-10-L-10991
For: Large Scale Illegal Recruitment &
Estafa.

DEPOSITION
EXHIBIT
551

## RESOLUTION

Complainants Mairi Mahal N. Tanedo and Grace A. Arinque, residents of Poblacion, Anteguera, Bohol and No. 1310, Talamban, Cebu City, respectively, alleged, among others, that

As regards complainant Tanedo, sometime in March, she applied with PARS International Placement Agency (PARS, for brevity) with business address at Suite 407 J&F Divino Arcade Building, 961 Aurora Boulevard, this City, for a job opening in the U.S.A. which she came to know through the Agency's provincial recruitment activity. Tanedo was then assured of placement and employment in a school in the U.S.A. as a teacher by the Head/Proprietor of the said Agency, Emilio Villarba. In consideration of the promised placement and employment, Tanedo paid the total amount of $16,515.00 (from April to July 2008) representing the supposed interview fee, medical exam fee and an in-house seminar fee. She claimed further that the payments were made at the PARS principal office in Quezon City and were received by respondent Lourdes "LULU" Navarro who did not issue any official receipt to her. Tanedo averred that all throughout the transactions, PARS and UPI (Universal Placement International, Inc.) represented as one and the same company by respondent Villarba and Navarro who were siblings. Villarba, who is a brother of Navarro, is the owner of UPI. Villarba or his staff would represent that they have office in the U.S.A. and Navarro would represent as if she was also the director of Villarba and the overall owner of both companies. Respondent Villarba and PARS would represent as an alter-ego of Navarro and the UPI. Then after submitting the required documents by UPI located in 1345 Wilshire Boulevard Suite 407, Los Angeles, California, U.S.A. to PARS, an employment contract was issued to her by PARS before she departed for the U.S.A.

-OVER-

RESOLUTION
NPS DOC. NO. XV-03-INV-10-L-10961                                    PAGE 2

With respect to complainant Arinque, on March 28, 2008 when
PARS conducted an out of office recruitment seminar in Waterfront Hotel,
Cebu City, she tried to register and paid her initial P2,000.00 registration
fee. She was then interviewed by Ms. Jonnie Roll, as an applicant for the
special education or SPED teacher. After which Arinque was informed that
she passed and was promised for hiring by Navarro. The latter informed
Arinque that she will be hired only after payment of the acceptance fee of
P42,500.00 or only until March 31, 2008. Arinque was able to meet the
requirements and deposited the amount with the BDO. Moreover, Villarba
had assessed her credentials to be eligible for the $48,000.00 per annum
salary and that she was required to deposit with PARS on a staggered basis
the 20% of $48,000.00 as placement fees, which she was forced to pay on
that day of her scheduled departure date. But then she was obliged to sign a
contract and pay the corresponding rental for the apartment in California
where she stayed as arranged by Navarro. On January 2009 Navarro
informed her and her companions that they could not go home until the end
of the contract and that they will stay foot as they were hired. For her to
extend the VISA, Arinque has paid three (3) $250.00 checks and a money
order of $320.00 for the USCIS as her VISA will be expiring then on July
30, 2009.

Aggrieved by the foregoing circumstances, complainants filed this
above-captioned complaint.

During the preliminary investigation held for several settings, both
complainants failed to appear and did not re-affirm their complaints. On the
other hand, respondent Villarba submitted his Counter-Affidavit on February
3, 2011 categorically denying the charges against him. Villarba asserted that
Navarro is not an employee of PARS and that she is a citizen of the United
States of America. Navarro is working at UPI with business office in the
State of California, U.S.A and living abroad. She does not hold any office in
the Philippines. Respondent East Baton Rouge Parish School System, which
was impleaded as one of the respondents, is an entity organized and
operating in the United States of America. Its officers are all citizens of and
living in U.S.A. PARS does not have any office nor operating business in the
Philippines.

Respondent Villarba specifically belied the imputations hurled against
them for transactions that allegedly transpired in the Philippines. In so far as
he is concerned, Villarba contended that he is doing business under the name
of PARS and it is duly licensed by the POEA (Philippine Overseas
Employment Administration) to recruit, process and deploy land-based
workers, with POEA License No. 055-LB-103007-LE which was valid until
October 12, 2013.

-OVER-

**Ex. 551**

RESOLUTION
NPS DOC. NO. XV-03-INV-10-L-10901                    PAGE 3

Moreover, Villarba argued that complainants were aware that their
applications for overseas employment will be evaluated, screened and
approved by their respective foreign employers as well as the government of
the U.S.A. That it was through his efforts that complainants received an
offer of employment from various schools in the U.S.A. The individual
petitions for non-immigrant worker (H-1B or Specialty Occupation Worker
Petition) filed by the complainants were duly approved by the U.S.
Department of Homeland Security. Complainants were deployed in the
U.S.A. through the efforts of Villarba.

Considering that the U.S. Citizenship and Immigration Services
(USCIS, for short) required that all applicants must be represented and
assisted by a lawyer, Villarba hired an American Immigration lawyer to
represent the complainants before the USCIS. The lawyer hired charged the
complainants $2,000.00 for his legal services as evidenced by the
acknowledgment receipts issued by Robert Silverman Esq. All subsequent
payments made by the complainants were then remitted by Villarba to the
USCIS in the total amount of US$3,820.00. These remittances were part of
the recruitment process and application to work in the U.S.A. It was the
United States Department of Homeland Security which approved the
complainants' petition for non-immigrant worker (H-1B or Specialty
Occupation Worker Petition).

In sum, Villarba asseverated that he cannot be held liable for the
charges filed against him. To support his counter-affidavit, Villarba
appended the following documents: (1) POEA License No. 055-LB-103007-
UL; (2) Offers of Employment to the complainants; (3) Acknowledgment
Receipts issued by the immigrant lawyer; (4) Notices of Action issued by the
U.S. Department of Homeland Security approving the working visa of the
complainants; (5) Photocopies of the VISA issued by the U.S.A. in favor of
the complainants; (6) Official Receipts issued by the POEA in the name of
the complainants showing their deployment and registration before going to
the U.S.A.

In the meantime before resolving the above-entitled case, the
complainants' counsel filed a Motion to Consolidate the case raffled to the
undersigned with the case of Ingrid Cruz et al. with NPS Doc. No. XV-03-
INV-10-L-00930 raffled to Honorable Assistant City Prosecutor Ivan
Fontoc on February 28, 2011. However, in a resolution dated March 10,
2011 by the Honorable 2nd Assistant City Prosecutor Lambberto C. De Vera,
Chief of Division 5, said Motion filed Atty. Mario Bernardo R. Fanlasco
was denied.

Hence, another hearing on March 31, 2011 for preliminary
investigation was held. Complainants in spite notice sent through their
counsel failed to appear again. Respondent Villarba then opted to submit the
case for resolution.

-OVER-

Ex. 551

RESOLUTION
NPS DOC. NO. XV-03-INV-10-L-10901

After a careful evaluation of the uncorroborated complaints of the complainants and all the evidence submitted by the parties, undersigned finds great paucity of evidence to hold both respondents EMILIO V. VILLARBA and LOURDES "LULU" NAVARRO in their individual capacities, liable for the crimes charged.

"*Illegal recruitment is committed when the two (2) elements concur: First, the offender has no valid license or authority required by law to enable one to engage lawfully in recruitment and placement of workers. Second, he or she undertakes either any activity within the meaning of "recruitment and placement" defined under Art. 13, par. (b), or any prohibited practices enumerated under Art. 34 of the Labor Code. (People vs. Baytic, 398 SCRA 18)*".

Complainants despite their non-appearances during the schedule hearings on several settings, failed to sufficiently establish the foregoing elements of the crime of Illegal Recruitment. With more reasons of the syndicated illegal recruitment charge against both respondents, it will not prosper. The complainants in the above-captioned complaint were not duly authorized by other complainants impleaded, to represent them in filing the case and therefore have no legal personality to pursue the case in their representations.

As to charge of estafa, complainants failed to substantiate that both respondents have misapplied nor converted the money given to them in their personal use. In fact, all the money given by both complainants were all receipted by the receiving officer for specific purposes. Moreover, the charges against respondent Lourdes "Lulu" Navarro who was then not residing here in the Philippines cannot be given due course since the transactions between the complainants and respondent Navarro allegedly contracted and consummated abroad.

WHEREFORE, premises considered undersigned hereby recommends that the complaint for Syndicated Illegal Recruitment and Estafa against respondents EMILIO V. VILLARBA and LOURDES "LULU" NAVARRO be dismissed for insufficiency of evidence and want of jurisdiction, respectively.

Quezon City, Philippines, April 08, 2011.

CORAZON R. ROMANO
Assistant City Prosecutor

RECOMMENDING APPROVAL:

LAMBERTO C. DE VERA
2nd Assistant City Prosecutor
Chief, Division V

APPROVED:

DONALD T. LEE
City Prosecutor

**Ex. 551**

**RESOLUTION**                                                              PAGE 5
NPS DOC. NO. XV-03-INV-10-L-1090)

COPY FURNISHED:

    Mairi Mahal Nunag Tanedo
    Grace Alinsug Arinque
    c/o Atty. Maria Bernadette R. Carrasco
    **Counsel for the Complainants**
    No. 40 Aguinaldo Highway, Brgy. Nicg 1, Bacoor, Cavite.

    Emilio V. Villarba
    c/o Atty. Ramoncito C. Mison
    Counsel for Respondent
    1318-C. Mezzanine, REZA Building
    Quezon Avenue, Quezon City.

    *+ FAX - 436 · 84. 78*

    Lourdes "Luhu" Navarro
    c/o PARS, Suite 407 J&F Divino Arcade Building
    961 Aurora Blvd., Quezon City.

# EXHIBIT 553



85-45 Wilshire Blvd #
Los Angeles, California

# Universal Placement International, Inc.

## PLACEMENT AGENCY CONTRACT

This contract is entered into by and between Universal Placement International, Inc. (hereinafter referred to as "Agency") and ____INGRID LORELEI J. CRUZ____ (hereinafter referred to as "Client"). Agency is in the business of arranging and coordinating the hiring of qualified candidates for American Companies ("prospective employers"). Client is willing to be hired by a prospective employer and is willing to hire Agency to facilitate and coordinate the interview process, the actual hiring by employer, and appropriate immigration documentation of Client.

### I.) SERVICES OF AGENCY

a.) Agency will use its best efforts to find suitable employment for Client, based upon the skill, training and experience of Client. "Employment" can consist of either a temporary or permanent job.

b.) Agency will interview Client and work with Client to make Client suitable and acceptable for employment with prospective employers. This process will include counseling and assistance in the preparation of a resume, appropriate appearance and instruction for succeeding in the interview.

c.) Agency will introduce Client to prospective employers.

d.) Agency will arrange interviews for Client with prospective employers that are suitable to the Client, based upon the Client's skill, training and experience.

e.) Agency will coordinate and oversee any and all necessary procedures of the Department of Homeland Security to allow Client temporary entry into the United States, based upon the acceptance of Client by a prospective employer.

f.) Agency will continue to be available to Client to discuss current problems at the employment, renewal of employment after the expiration of the current assignment, re-assignment to a new employer, or any other reasonable issue or guidance that Client would request.

In Consideration of the Services of Agency, as stated herein, Client hereby agrees as follows:

### A.) COMPENSATION BY CLIENT

i.) At the time of signing this Agreement, Client will pay Agency US$300.00.

Tel # 213.389.8878   Fax # 213.389.8868   Email: UniversalPimi@aol.com

**DEPOSITION EXHIBIT**
553

UPI 0000639



2.)    Upon the start of employment, Client will pay Agency US$300.00.

3.)    For the first twenty-four (24) months of employment, Client will pay Agency ten percent (10%) of Client's gross monthly income, payable monthly, commencing with the 1st pay period.

**B.) OBLIGATIONS OF CLIENT**

1.) Client shall use best efforts to follow the advice and counseling of Agency. Client shall fully cooperate with Agency and Agency's efforts to find suitable employment for Client. Client shall keep Agency informed of Client's current addresses and other contact information.

2.) Once employed and allowed into the United States, Client shall agree to follow the rules and laws of the Unites States and the employer. Client shall use best efforts to maintain the arranged employment and shall not do any intentional act that will result in the termination of employment.

3.)    Client shall mail to Agency, the ten (10%) fee on the first day of each month following employment. Client shall provide Agency with a copy of Client's paycheck(s) paid by the employer for each pay period covered by the ten (10%) monthly fee. Any payment not received by the 5th day of each month shall be considered late, subject to a late fee of US$25.00 and be deemed a breach of this Agreement.

4.)    Client shall maintain all information received by Agency or employer in the strictest of confidence. Client shall not disclose this confidential information to any third party nor shall Client use this confidential information for their own personal benefit. Client shall not arrange any independent job interviews with the employer for themselves or for any other third party. Client further agrees not to do any act to circumvent this Agreement or the relationship between employer and Agency or employer and other Clients covered by like Agreements.

**C.) TERMS OF EMPLOYMENT**

1.)    Client is hereby advised that once a prospective employer agrees to hire a Client, all terms of employment, including but not limited to, hours worked, wages, benefits, and other matters of employment are negotiated directly between Client and employer.

**D.) DISCLOSURES**

1.) Client is hereby advised and hereby acknowledges that Client is in no way whatsoever, an employee of Agency. Agency is merely providing a service for a fee.

2.)    Client is hereby advised and hereby acknowledges that Agency does not guarantee the terms of employment, the initial disclosed salary or benefits. Agency is not responsible for the termination of any employment or any decrease in wages or benefits associated with employment.

3.)    The fees due Agency shall be deemed fully earned and payable upon the introduction of Client to a prospective employer. If at any time following this introduction, for a period of five (5) years, Client receives employment from the prospective employer. Agency shall be entitled to receive their ten (10%) percent monthly fee as described herein above in paragraph (A)(3).

UPI 0000640

## E.) TERMINATION

1.) In the event that Client is terminated as a result of Client's actions, Client shall be responsible to Agency in the amount of US$500.00. The parties acknowledge that this amount is reasonable and assessed to compensate Agency for the income that would have been paid had the Client not committed acts which resulted in the termination of Client. In the event that Client obtains subsequent employment, either with the prior employer or any other employer, within two years from the date of first employment, then Client, in addition to the US$500.00, shall remain responsible to pay Agency their ten (10%) percent fee as described herein above in paragraph (A)(3).

2.) In the event that Client voluntarily terminates their employment for any reason, and within two years from the date of first employment, obtains employment with any other employer, whether introduced by Agency or not, Client shall remain responsible to Agency for their ten (10%) percent fee as described herein above paragraph (A)(3) and an additional US$1,000.00. The Parties agree and acknowledge that Client would not be in the United States and available for employment except for the actions of Agency and therefore Agency is entitled to and has earned the right to collect said fees. The Parties further acknowledge that the voluntary termination places Agency in a bad light with the employer and jeopardizes Agency's ability to place future clients with employer and other Clients' ability to come to the United States.

3.) In the event that Client does any act to circumvent this agreement and subsequently obtains employment with the prospective employer or any other employer in the United States then Client shall remain responsible to pay Agency the ten (10%) percent monthly fee as described herein above in paragraph (A)(3).

4.) In the event that Client is terminated by employer through no fault of their own, then Client shall not be responsible for any Agency fee until such time that Client finds new employment. Upon the procurement of subsequent employment, whether through the efforts of Agency or not, Client shall be responsible to Agency for the ten (10%) percent fee, only for the remaining period, as described herein above in paragraph (A)(3)

## F.) REFUND

1.) In the event that Agency does not provide Client with at least one interview with a prospective employer, through no fault of the Client, then Agency will refund to Client US$150.00.

## G.) IDEMNIFICATION

1.) Client shall defend, indemnify and hold Universal Placement, its officers, employees and agents free and harmless from any and all claims, demands, causes of action, costs, expenses, liability, loss, damage or injury, in law or equity, to property or persons, including wrongful death, in any manner arising out of or incident to any alleged acts or omissions or willful misconduct of Client, arising out of or in connection with the performance of the Services, the Project or this Agreement, including without limitation the payment of all consequential damages and attorneys fees and other related costs and expenses. Client shall defend Universal Placement at Clients own cost, expense and risk, any and all such aforesaid suits, actions or other legal proceedings of every kind that may be brought or instituted against Universal Placement, its officers, employees and agents. Client shall pay and satisfy any judgment, award or decree that



may be rendered against Universal Placement, its officers, employees and agents, in any such suit, action, or other legal proceeding. Client shall reimburse Universal Placement, its officers, employees and agents, for any and all legal expenses and costs incurred by each of them in connection therewith or in enforcing the indemnity herein provided. Client's obligation to indemnify shall not be restricted to insurance proceeds, if any, received by Universal Placement, its officers, employees and agents.

## H.) FINAL PROVISIONS

1.) This agreement supersedes any and all other agreements either oral or in writing between the Parties. This agreement is the final and complete agreement as between the Parties, any alleged provisions of any other agreement that are inconsistent with or contradict this agreement are hereby deemed null and void.

2.) This agreement shall be governed by and construed in accordance with the laws of the State of California. The Parties agree that this agreement shall be enforced within any competent court within the County of Los Angeles, State of California, United States of America. If legal proceedings are initiated to enforce this agreement or interpret the provisions of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees incurred, regardless of any court schedule of fees, in addition to any and all allowable costs or other relief available under the law.


DONE this: _____        In: _____

CLIENT: __Ingrid Lopelei J. Cruz__          Signature _____

                                            23 July '07
_____                    Date _____
UNIVERSAL PLACEMENT INTERNATIONAL

JUL 30 2007    SUBSCRIBED AND SWORN TO BEFORE ME THIS
               4TH DAY OF JUL 30 2007, QUEZON CITY.,
               METRO MANILA.

OC. NO. 221
PAGE NO. 44
BOOK NO. VII          DULCISIMO G. HINANAY, JR.
SERIES OF 2007            NOTARY PUBLIC
                     COMMISSION EXPIRES DEC. 31, 2008
                     PTR NO. 8465052, 1-4-2007 Q.C.
                     TIN NO. 125 - 352 - 255
                     COMMISSION NO. NP-045-2007-2008
                     ATTY. ROLL NO. 27384

UPI 0000642

# EXHIBIT 564

DEPOSITION EXHIBIT 564

# JULY

| Date | # | Name |
|---|---|---|
| 7/2/07 | 1 | DANTE C. ARGANOZA |
| | | English |
| JULY 2, 2007 | 3 | ARIES M. DE GUZMAN |
| " " " | 4 | ARIS U. SION |
| " " " | 5 | HELEN MENDOZA SURCU |
| July 2, 2007 | 6 | NERISSA S. PANGAN |
| July 2, 07 | 7 | BUENAVENTURA B. JACINTO |
| July 03, 2007 | 8 | MYLA B. RITUMALTA |
| July 3, 2007 | 9 | SIMFORIANA P. SORIANO |
| July 3, 2007 | 10 | Dolly Grace Yambao |
| July 5, 2007 | 11 | EUGENIO EMANUEL M. BRIONES |
| July 5, 2007 | 12 | Ingrid Lorelei S. Cruz |
| July 6, 2007 | 13 | Yliana Nina De Leche |
| July 9, 2007 | 14 | MARY GRACE M. AUTER |
| July 9, 2007 | 15 | Rebecca Gallego |
| JULY 9, 2007 | 16 | MARIANO F. MONES JR |
| JOLY 9, 2007 | 17 | CHERRYLEE P. RAGANIT |
| July 10, 2007 | 18 | John Alvin Evangelista |
| July 10, 2007 | 19 | JOSEFA DELIA ARANAS |
| July 10, 2007 | 20 | CRESENCIO T. Guerain |
| July 10, 2007 | 21 | HELEN H. IMPERIAL |
| July 10, 2007 | 22 | Jenaskie T. Bolongan |
| July 11, 2007 | 23 | Randy Maravilla |
| July 11, 2007 | 24 | Nael F. Domigne English |
| July 11, 2007 | 25 | Antonio Eleno |
| July 11, 2007 | 26 | Ermelinda Arevalo |
| July 12, 2007 | 27 | EDWIN DUMAEL |
| July 12, 2007 | 28 | GUINHAWA C. CASICOS |
| July 12, 2007 | 29 | RIZALDY C. MORALES |
| July 12, 2007 | 30 | Ma. Victoria B. GACO |
| July 12, 2007 | 31 | Julibert Gorriceta |
| July 12, 2007 | 32 | Myla G. Alcala |
| July 12, 07 | 33 | Emelita Saturno |
| July 12, 07 | 34 | Milanez Ringaron |
| July 12, 07 | 35 | JOHN KIRBY R. DINGLASAN |

# EXHIBIT 565



**East Baton Rouge Parish School System**

## OFFER OF EMPLOYMENT

**Name:** <u>Ingrid Cruz</u>

**Certification:** <u>Science</u>

**Provider:** <u>Universal Placement Services</u>

Congratulations!!   This is an offer of employment as a classroom teacher with the East Baton Rouge Parish School System for the 2007 - 2008 school year.  This offer is subject to the following contingencies:

- ☐ Completion and Submission of the online application for employment and other required forms and documents.
- ☐ Verification of experience and personal or professional qualifications.
- ☐ Verification of Official Transcripts and/or required credentials.
- ☐ Clearance through a criminal background check.
- ☐ Verification of Eligibility for Teacher Certification by the State of Louisiana from University or Authorized Representative.
- ☐ Copy of Teaching Certificate.
- ☐ Copy of Passing Praxis Scores
- ☐ Participate in Office of Human Resources designated  Professional Development

Initial salary placement is based upon level of education and verification of previous employment as a full time teacher with a school district.

### Acceptance of Offer of Employment

I hereby express my intention to enter into employment as a classroom teacher with the East Baton Rouge Parish School System for the academic year 2007 - 2008 subject to conditions in the above Offer of Employment.

Signature _____

Date _July 12, 2007_

Street Address ████████████████ Apt. #

Home Phone ████████████

City _Taguig City, Philippines_   State _____ Zip _____

Cell Phone ████████████

Email Address _leilamleen@yahoo.com_

PID –from online application

☐ **I reject this offer of employment.  Reason:** _____



DEPOSITION EXHIBIT 565

UPI 0000661

# EXHIBIT 571



23345 Wilshire Blvd Suite # 407
Los Angeles, California 90048

# Universal Placement International, Inc.

## PLACEMENT AGENCY CONTRACT

This contract is entered into by and between Universal Placement International, Inc. (hereinafter referred to as "Agency") and _Tomasa B. Mari_ (hereinafter referred to as "Client"). Agency is in the business of arranging and coordinating the hiring of qualified candidates for American Companies ("prospective employers"). Client is willing to be hired by a prospective employer and is willing to hire Agency to facilitate and coordinate the interview process, the actual hiring by employer, and appropriate immigration documentation of Client.

## I.) SERVICES OF AGENCY

a.) Agency will use its best efforts to find suitable employment for Client, based upon the skill, training and experience of Client. "Employment" can consist of either a temporary or permanent job.

b.) Agency will interview Client and work with Client to make Client suitable and acceptable for employment with prospective employers. This process will include counseling and assistance in the preparation of a resume, appropriate appearance and instruction for succeeding in the interview.

c.) Agency will introduce Client to prospective employers.

d.) Agency will arrange interviews for Client with prospective employers that are suitable to the Client, based upon the Client's skill, training and experience.

e.) Agency will coordinate and oversee any and all necessary procedures of the Department of Homeland Security to allow Client temporary entry into the United States, based upon the acceptance of Client by a prospective employer.

f.) Agency will continue to be available to Client to discuss current problems at the employment, renewal of employment after the expiration of the current assignment, re-assignment to a new employer, or any other reasonable issue or guidance that Client would request.

In Consideration of the Services of Agency, as stated herein, Client hereby agrees as follows:

## A.) COMPENSATION BY CLIENT

1.) At the time of signing this Agreement, Client will pay Agency US$300.00.

. . . . . . . . . . . . . .

Tel # 213.389.8878    Fax # 213.389.8868    Email: UniversalPlmt@aol.com

_Tomasa B. Mari_

DEPOSITION
EXHIBIT
571

UPI 0000932



2.)     Upon the start of employment, Client will pay Agency US$300.00.

3.)     For the first twenty-four (24) months of employment, Client will pay Agency ten percent (10%) of Client's gross monthly income, payable monthly, commencing with the 1st pay period.

## B.) OBLIGATIONS OF CLIENT

1.)  Client shall use best efforts to follow the advice and counseling of Agency. Client shall fully cooperate with Agency and Agency's efforts to find suitable employment for Client.  Client shall keep Agency informed of Client's current addresses and other contact information.

2.)  Once employed and allowed into the United States, Client shall agree to follow the rules and laws of the United States and the employer.  Client shall use best efforts to maintain the arranged employment and shall not do any intentional act that will result in the termination of employment.

3.)     Client shall mail to Agency, the ten (10%) fee on the first day of each month following employment.  Client shall provide Agency with a copy of Client's paycheck(s) paid by the employer for each pay period covered by the ten (10%) monthly fee.  Any payment not received by the 5th day of each month shall be considered late, subject to a late fee of US$25.00 and be deemed a breach of this Agreement.

4.)     Client shall maintain all information received by Agency or employer in the strictest of confidence.  Client shall not disclose this confidential information to any third party nor shall Client use this confidential information for their own personal benefit.  Client shall not arrange any independent job interviews with the employer or their clients or for any other third party.  Client further agrees not to do any act to circumvent this Agreement or the relationship between employer and Agency or employer and other Clients covered by like Agreements.

## C.) TERMS OF EMPLOYMENT

1.)     Client is hereby advised that once a prospective employer agrees to hire a Client, all terms of employment, including but not limited to, hours worked, wages, benefits, and other matters of employment are negotiated directly between Client and employer

## D.) DISCLOSURES

1.)     Client is hereby advised and hereby acknowledges that Client is in no way whatsoever, an employee of Agency.  Agency is merely providing a service for a fee.

2.)     Client is hereby advised and hereby acknowledges that Agency does not guarantee the terms of employment, the initial disclosed salary or benefits.  Agency is not responsible for the termination of any employment or any decrease in wages or benefits associated with employment.

3.)     The fees due Agency shall be deemed fully earned and payable upon the introduction of Client to a prospective employer.  If at any time following this introduction, for a period of five (5) years, Client receives employment from the prospective employer, Agency shall be entitled to receive their ten (10%) percent monthly fee as described herein above in paragraph (A)(3).



## E.) TERMINATION

1.)    In the event that Client is terminated as a result of Client's actions, Client shall be responsible to Agency in the amount of US$500.00. The parties acknowledge that this amount is reasonable and assessed to compensate Agency for the income that would have been paid had the Client not committed acts which resulted in the termination of Client. In the event that Client obtains subsequent employment, either with the prior employer or any other employer, within two years from the date of first employment, then Client, in addition to the US$500.00, shall remain responsible to pay Agency their ten (10%) percent fee as described herein above in paragraph (A)(3).

2.)    In the event that Client voluntarily terminates their employment for any reason, and within two years from the date of first employment, obtains employment with any other employer, whether introduced by Agency or not, Client shall remain responsible to Agency for their ten (10%) percent fee as described herein above paragraph (A)(3) and an additional US$1,000.00. The Parties agree and acknowledge that Client would not be in the United States and available for employment except for the actions of Agency and therefore Agency is entitled to and has earned the right to collect said fees. The Parties further acknowledge that the voluntary termination places Agency in a bad light with the employer and jeopardizes Agency's ability to place future clients with employer and other Clients' ability to come to the United States.

3.)    In the event that Client does any act to circumvent this agreement and subsequently obtains employment with the prospective employer or any other employer in the United States then Client shall remain responsible to pay Agency the ten (10%) percent monthly fee as described herein above in paragraph (A)(3).

4.)    In the event that Client is terminated by employer through no fault of their own, then Client shall not be responsible for any Agency fee until such time that Client finds new employment. Upon the procurement of subsequent employment, whether through the efforts of Agency or not, Client shall be responsible to Agency for the ten (10%) percent fee, only for the remaining period, as described herein above in paragraph (A)(3).

## F.) REFUND

1.)    In the event that Agency does not provide Client with at least one interview with a prospective employer, through no fault of the Client, then Agency will refund to Client US$150.00.

## G.) IDEMNIFICATION

1.)    Client shall defend, indemnify and hold Universal Placement, its officers, employees and agents free and harmless from any and all claims, demands, causes of action, costs, expenses, liability, loss, damage or injury, in law or equity, to property or persons, including wrongful death, in any manner arising out of or incident to any alleged acts or omissions or willful misconduct of Client, arising out of or in connection with the performance of the Services, the Project or this Agreement, including without limitation the payment of all consequential damages and attorneys fees and other related costs and expenses. Client shall defend Universal Placement at Clients own cost, expense and risk, any and all such aforesaid suits, actions or other legal proceedings of every kind that may be brought or instituted against Universal Placement, its officers, employees and agents. Client shall pay and satisfy any judgment, award or decree that

may be rendered against Universal Placement, its officers, employees and agents, in any such suit, action, or other legal proceeding. Client shall reimburse Universal Placement, its officers, employees and agents, for any and all legal expenses and costs incurred by each of them in connection therewith or in enforcing the indemnity herein provided. Client's obligation to indemnify shall not be restricted to insurance proceeds, if any, received by Universal Placement, its officers, employees and agents.

## H.) FINAL PROVISIONS

1.)     This agreement supersedes any and all other agreements either oral or in writing between the Parties. This agreement is the final and complete agreement as between the Parties, any alleged provisions of any other agreement that are inconsistent with or contradict this agreement are hereby deemed null and void.

2.)     This agreement shall be governed by and construed in accordance with the laws of the State of California. The Parties agree that this agreement shall be enforced within any competent court within the County of Los Angeles, State of California, United States of America. If legal proceedings are initiated to enforce this agreement or interpret the provisions of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees incurred, regardless of any court schedule of fees, in addition to any and all allowable costs or other relief available under the law.

DONE this: *SEPTEMBER 14, 2007*          In: _____

CLIENT: *TOMASA B. MARI*          _____
                                                                  Signature

_____          _____
UNIVERSAL PLACEMENT INTERNATIONAL          DATE

SEP 20 2007

DOC. NO. 767
PAGE NO. 75
BOOK NO. IX
series of 2007

UPI 0000935

# EXHIBIT 574



# SPEd

**S**ynergistic

**P**artnership in

**Ed**ucation

*The potential possibilities of any child are the most intriguing and stimulating in all creation.*

This

## CERTIFICATE OF ATTENDANCE

is awarded to

*Tomasa B. Mari*

for actively participating in the Seminar-Workshop on
**"The American Special Education System:
Its Nuts and Bolts"**
held on August 7, 2005
at the Cebu Normal University's Convention Center.

Total No. of Contact Hours: **10**

**NERISSA LINELL JOIE T. CALUB**, M.A.SpEd., M.A.T.E., Ed.D., Ph.D.
Chief Convenor

---

Republic of the Philippines
**CEBU STATE COLLEGE OF SCIENCE AND TECHNOLOGY**
Cebu City Campus, R. Palma St., Cebu City

ISO 9001 : 2000
**QMS**



## COLLEGE OF TECHNOLOGY TEACHER EDUCATION

presents this

# Certificate of Participation

to

## TOMASA B. MARI

for having actively participated in the seminar-workshop on

*"CLASSROOM MANAGEMENT AND DISCIPLINE"*

held at Roco Hall of the Cebu State College of Science and Technology-Cebu City Campus
R. Palma St. Cebu City on May 13, 2006

Given this 13th day of May 2006 at the CSCST, Cebu City Campus
Cebu City, Philippines

**MA. DELIA C. MIÑOZA**
Resource Speaker
MCCS-SPED Coordinator

**RODOLFO B. BURGOS, Ph D.-T.M.**
College Superintendent

**CECILIA ELENA P. DE LOS REYES, Ed.D.**
Dean, CTTE

**DEPOSITION EXHIBIT**
574

UPI 0001547

# EXHIBIT 581

**TOMASA MARI (RSD)**

**PROCESSING FEE RECEIPT**



$1.00 = p46.00          p230,000/p46.00 = $5,000.00



# EXHIBIT 590

## CRAVINGS RESTAURANT
### SEMINAR 11 MARCH '08
### SPED

| # | NAME | M.I. | SURNAME | CONTACT # | TIME |
|---|------|------|---------|-----------|------|
| 1 | MELISSA | N. | RUSOL-CRUZADA | | 6:00 AM |
| 2 | LAURA | R. | JUGUETA | | 8:30 AM |
| 3 | Ma. ROSARIO | G. DAVAO | | | 8:30 am |
| 4 | ROSEMARIE | V. | DELA CRUZ | | 8:35 |
| 5 | Emee | F. Adoptante | | | 8:30 am |
| 6 | Espergencia | P. | Napootan | | |
| 7 | Jan Theresa Mane Pineda | S. | | | |
| 8 | Rolando E. Pascual | R. | Railey | | 8:45 am |
| 9 | Enrico M. Roque Jr | M. | Eric | | 9:10 am |
| 10 | MARIANNE | L. | TAPZON | | 9:00 am |
| 11 | MARY GRACE | A. | VILLANUEVA | | 9:00am |
| 12 | Cherish | | | | |
| 13 | Faith | P. | Sampan | | |
| 14 | cheslene Faye | A. | Agati | | 9:00 am |
| 15 | Raymond P. Sison | p. | Sison | | 12:00 |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |



DEPOSITION EXHIBIT
590

# EXHIBIT 592



**E L A R**

# APPLICATION FOR MASSACHUSETTS EDUCATOR'S LICENSURE

For Official Use Only

*(Please type or print)*

**PART A.   APPLICATION INFORMATION**

1. Social Security Number _____

2. Last Name: *Pascual*     First Name: *Rolando*   MI: *R.*

3. Previous last name(s) *(if applicable, please attach documentation validating name change)*

   Day Telephone Number: ▮▮▮▮▮▮▮

4. Home Address, Street and Apartment Number, if any: *℅ Universal Placement International, Inc.*

   *334 Wilshire Blvd. Suite #407*    City/Town    *Los Angeles*  State   *90010* Zip Code

   Home Telephone Number: (___) ___-____

   E-mail Address, if any: *pascual_rolando@yahoo.com*

5. Date of Birth: ▮▮▮▮▮▮  Month  Day  Year     Gender: ☐ Male  ☐ Female

6. a. Have you previously applied for a Massachusetts Educator License?
      ☐ If YES, cost for each license listed below is $25.
      ☑ If NO, cost is $100. for the first license and $25. for any additional.

   b. Do you currently hold a Massachusetts Educator License?  ☐ Yes  ☑ No
      If yes, Massachusetts License Number _____

7. List the License Field, Grade Level, and Type of EACH License you are applying for:

| License Field | Grade Level | Type |
|---|---|---|
| a. *Special Education* | | |
| b. | | |
| c. | | |

8. **PAYMENT OF FEE AND MAILING** *

   Please enclose with your application a certified check or money order *(no personal checks or cash)* payable to: The Commonwealth of Massachusetts. See page 4 for fee information

   Mail the completed application and supporting documents to:
   Office of Educator Licensure
   350 Main Street, Malden, MA 02148

   Amount enclosed

   $ _____

   *If paying by credit card, check here: ☐ and complete charge card authorization form on page 11.

DEPOSITION EXHIBIT 592

9

9. ▓▓▓▓▓▓▓

Please indicate the official transcripts which you are submitting with your application as well as those that may be coming under separate cover.

These documents are enclosed with this application:                    These documents will follow:

_____                    _____

_____                    _____

_____                    _____

_____                    _____

10. ▓▓▓▓▓▓▓▓▓▓▓

The Massachusetts Department of Education has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data for the purpose of screening prospective and current holders of educator licenses awarded by the Department of Education, and for access to CORI conviction data in the context of proceedings relative to the decertification process. A criminal record check may be conducted for criminal and pending criminal case information only, as authorized, and it will not necessarily disqualify me.

State law requires applicants for licensure to affirm certain information. Please check all of the statements below that apply. If you do not check each statement, please enclose a letter of explanation. We will then contact you and will determine your eligibility for licensure.

*Please check all that apply*

Since completion of my last licensure or renewal application, I certify that:

☑ I have not been convicted of any crime or received deferred adjudication (e.g., continued without a finding) or admitted to sufficient facts, nor am I currently charged with any crime (misdemeanor or felony). [Do not include minor traffic violations.]

☑ I have not been identified by any child protection agency as a perpetrator of child abuse or neglect.

☑ I have not been dismissed for cause from any position I held.

☑ I have not been asked to resign from any position or resigned from any position while under investigation or as a result of discipline.

☑ I have not had a professional license or certificate denied, revoked, suspended, surrendered or annulled, and no action is pending to revoke or suspend any professional license or certificate I hold.

☑ In accordance with MA General Laws Chapter 62C, § 49A, I have filed all state tax returns and paid all Massachusetts taxes required by law, and I am in compliance with all Massachusetts laws relating to payment of child support.

☑ I have read MA General Laws Chapter 119, § 51A (see page 5), which requires educators and others who are paid to care for or work with children to make a report immediately to the Department of Social Services or to the person in charge of the school or institution if there is reasonable cause to believe a child under 18 is suffering physical or emotional injury as a result of abuse, including sexual abuse, or neglect. I understand my obligations under § 51A and the penalties for failure to comply.

☑ I understand and acknowledge that as a condition of holding an educator license, a criminal background check may be conducted for criminal and pending case information as authorized by the Criminal History Systems Board and that a criminal record will not automatically disqualify me.

☑ This application contains no misrepresentations or falsehoods. I understand that misrepresentations or falsehoods may be cause foR denial or revocation of my educator license.

☑ I understand that I must notify the Commissioner of the Massachusetts Department of Education in writing within ten days if in the future the answers to any of these questions change.

Signed under the penalties of perjury:

_Rolando R. Pascual_
Print Your Full Name

_[signature]_
Your Signature

_April 1, 2008_
Today's Date

PART B.   TRANSCRIPTS, AFFIDAVIT, & SIGNATURE PAGE

10

# EXHIBIT 599

# CADDO PARISH SCHOOL BOARD
1961 Midway Shreveport, Louisiana 71108
Tel. (318) 603-6300 * Fax (318) 631-5241
www.caddo.k2.la.us

**DEPOSITION EXHIBIT**
599

## OFFER OF EMPLOYMENT

Dear ROLANDO PASCUAL,

We are please to formally offer you the position of Special Education Teacher at CADDO PARISH SCHOOLS.

### VACANCY FOR THE POSITION OF SPECIAL EDUCATION TEACHER

This is in connection with your application for the position of Special Education Teacher in our School. We favorable considered your application for this position.

### JOB DESCRIPTION

Under the supervision of the site administrator to provide an individualized education program for students, as well as designated "At–Risk" students, to meet their academic and social needs.

### EXAMPLES OF DUTIES:

Provide and individual education program for each student based on the student's IEP Provide group, small group, and individual instruction to meet the student's identified needs. Provide an appropriate classroom environment, which will promote positive student behavior, attitudes, and social skills. Provide direct supervision of the instructional aide/s. Test students and conduct the IEP meeting; to develop appropriate and accurate levels of student performance and tentative goals and objectives for the IEP meeting. Attend/participate in faculty meeting/committees; participate in professional growth activities. Provide instruction through assistance form district approved curriculum and state standards. Share in the sponsorship and/or supervision of student activities when needed. Coordinate special education services with the regular school programs for each individual with special needs enrolled in the resource specialist program. Monitor pupil progress on a regular basis, participate in the

UPI 0000850

review and revision of individualized education programs, as appropriate, and assist in the referral of pupils who do not demonstrate appropriate progress to the site intervention team (CST, SST). Serve as a resource to other site/district staff in instructional techniques/strategies. Provide modified materials and techniques for regular education staff and special education students. Coordinate resources for the special education student. Participate in the multi disciplinary assessment of students for initial placement into special education and triennial reviews. Implement the students IEP. Work within compliance mandates; provide staff development when requested. Perform related duties as assigned.

<u>KNOWLEDGE OF:</u>
Laws and education codes affecting special education, Child growth, development and behavior characteristics of children experiencing education and social dysfunctions.

<u>ABILITY TO:</u>
Modify district adopted curriculum and state standards to meet individual's student needs. Communicate effectively with students, district personnel, staff and parents. Provide supplemental materials when appropriate. Maintain appropriate documentation. Develop a positive classroom environment that promotes learning and fosters appropriate behavior. Develop and maintain open channels of communication between home and school. Administer and interpret assessments; evaluate academic progress. Facilitate special education meetings. Understand and relate to children.

<u>TRAINING AND EXPERIENCE:</u>
Bachelor's degree including courses necessary to meet the credential requirements; Successful student teaching experience.

<u>CREDENTIAL:</u>
A Teaching Credential.

<u>WORKING CONDITIONS:</u>
Special education learning environment pullout and inclusion programs; constant interruptions; lifting, carrying, pushing, pulling, bending, kneeling, reaching and other physical activities as needed. Speaking,

UPI 0000851

listening and observing as needed to provide instruction.  Incumbents may be exposed to hostile or abusive individuals.  Exposure to blood, or other potentially infectious materials, tasks or procedures.

COMPENSATION:

Per the Certified Labor Condition Application relevant to the approved I-129 Petition in your favor, you will receive a salary of $38,145.00 per year. You will render services on a full-time basis, eight hours a day or a total of forty (40) hours per week but depending on the demands of our business activities, you may at times render services beyond regular hours of work for which you will be compensated in accordance with the applicable regulations and labor laws on the matter.

Should you be willing to accept this formal offer of employment, please sign the attached letter of agreement and furnish us a copy immediately. We look forward to having you part of CADDO PARISH SCHOOLS.

The parties hereto have signed this Offer of Employment as follows:


_Jan Holliday_
---------------------------
JAN HOLLIDAY
*Director of Certified Personnel*

6/3/08
---------------------------
DATE


---------------------------
ROLANDO PASCUAL

---------------------------
DATE

# EXHIBIT 615



Universal Placement International, Inc.
3345 Wilshire Blvd, Ste 407 Los Angeles CA 90010
Tel. (800) 608-9968, (213) 3898878

**INVOICE**

DATE:  | January 1, 2010
INVOICE # | Cad-29-010110

| PREVIOUS BALANCE | PAYMENT RECVD |
|---|---|
| $  1,400.00 | |

CHK#

**BILL TO:**
ROLANDO PASCUAL
Ingersoll Elementary School
401 N Hozman St.
SHREVEPORT,LA 71101

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| January 2010 | Placement fee for January 2010 | 4/12 | $  541.76 |
| ADDL FEES: LATE CHARGES | late fee for Oct to December 2009 | | $  75.00 |
| | SUBTOTAL | | $  616.76 |
| | Previous Balance | | $  1,400.00 |
| | Payment Received | | $ |
| | Adjustments / Cr | | $  275.28 |
| | Total Amount Due | | $  2,292.04 |

Note: billing adjustment based on salary schedule

| Previous Balance | **PAY IMMEDIATELY** |
|---|---|
| Subtotal pay on or before | **February 1, 2010** |

**Other Comments**
1. Total Payment due every 1st of the month.
2. Make all checks payable to Universal Placement.
3. Late Payment is subject to penalty fee of $25.00 every 5th of the month.
4. Pleas attach a current payslip with your payment for adjustment.





3345 Wilshire Blvd Suite # 407
Los Angeles, California 90010

# Universal Placement International, Inc.

| | | |
|---|---|---|
| TO | : | ROLANDO PASCUAL |
| DATE | : | January 22, 2010 |
| SUBJECT | : | Placement fee/Final Notice |

Dear Mr. Pascual,

To date, we have not received any call or correspondence pertaining to letters and invoices we've been sending you for payment of placement fee and a copy of your current paystubs.

Your balance is currently 90 days past due to date with a total amount of **$2,292.04** as per attached invoice. If in the event that we don't hear from you fifteen (15) days upon receipt of this notice, we will take legal actions to solve this matter.

Thank you.


UPI Management

Cc: File

Encl: a/s

This is an attempt to collect a debt. Any information obtain will be used for that purpose.

Tel # 213.389.8878   Fax # 213.389.8868   Email: UniversalPlmt@aol.com

UPI 0000914