James M. Knoepp (admitted *pro hac vice*)
Jim.Knoepp@splcenter.org
Daniel Werner (admitted *pro hac vice*)
Daniel.Werner@splcenter.org
Jennifer L. Tse (SBN 260764)
Jennifer.Tse@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, GA  30303
Telephone:  (404) 521-6700
Facsimile:  (404) 221-5857

*Attorneys for Plaintiffs*
*Additional Co-Counsel on Subsequent Pages*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., | Civ. No.: 10-01172-JAK-MLG |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| EAST BATON ROUGE PARISH SCHOOL BOARD, et al., | |
| Defendants. | Hearing Date: September 2, 2011<br>Time: 9:00 a.m.<br>Courtroom:  750 |
| | **HON. JOHN A. KRONSTADT** |

*(Attorney listing continued from first page)*

Mary C. Bauer (admitted *pro hac vice*)
Mary.Bauer@splcenter.org
Sam Brooke (admitted *pro hac vice*)
Sam.Brooke@splcenter.org
Morris S. Dees (admitted *pro hac vice*)
Judy.Bruno@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:  (334) 956-8200
Facsimile:    (334) 956-8481

Dennis B. Auerbach (admitted *pro hac vice*)
dauerbach@cov.com
Jillian Willis (admitted *pro hac vice*)
jwillis@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 662-6000
Facsimile:    (202) 662-6291

Candice N. Plotkin (admitted *pro hac vice*)
cplotkin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, California 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

Susan Johnston (admitted *pro hac vice*)
sjohnston@cov.com
Pamela A. Carter (admitted *pro hac vice*)
pcarter@cov.com
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone:   (212) 841-1000
Facsimile:    (212) 841-1010

Daniel J. McNeil (admitted *pro hac vice*)
dmcneil@aft.org
AMERICAN FEDERATION OF TEACHERS
LEGAL DEPARTMENT
555 New Jersey Ave., N.W.
Washington, DC  20001
Telephone:   (202) 393-6305
Facsimile:    (202) 393-6385

Lawrence Rosenzweig (SBN 72443)
LRPCorp@aol.com
Brent Rosenzweig (SBN 219071)
Brent.Rosenzweig@gmail.com
LAWRENCE ROSENZWEIG, PC
2730 Wilshire Boulevard, Suite 425
Santa Monica, California  90403
Telephone:   (310) 453-0348
Facsimile:    (310) 453-3358

*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................1

I.    PLAINTIFFS SATISFY ALL OF THE ELEMENTS OF RULE
23. ....................................................................................................3

    A.    The Class and Subclass are so Numerous That Joinder
Would be Impracticable. ..........................................................3

    B.    There are Questions of Law and Fact Common to the Class
and Subclass. ............................................................................7

    C.    The Claims of the Named Plaintiffs Are Typical of the
Claims of the Class and Subclass. .........................................12

    D.    The Representative Parties Will Fairly and Adequately
Protect the Interests of the Class and Subclass. ...................14

    E.    Common Question of Law or Fact Predominate. ...................17

        1.    Common Questions Predominate with Respect to
Plaintiffs' TVPA Claims. ...........................................17

        2.    Common Questions Predominate with Respect to
Plaintiffs' RICO Claims .............................................19

        3.    Common Questions Predominate With Respect to
Plaintiffs' State Law Claims. ......................................22

    F.    A Class Action is Superior to Other Available Methods of
Adjudicating this Controversy. .............................................24

II.    PLAINTIFFS HAVE STANDINGTO SUE DEFENDANT
SILVERMAN.................................................................................24

CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Arkansas Ed. Ass'n v. Board of Ed. of Portland, Oregon School Dist.*,
446 F.2d 763 (8th Cir. 1971)................................................................6

*Badhdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383 (C.D. Cal. 2009) ..................3

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1976) ...............................19, 20, 23, 24

*Bublitz v. E.I. du Pont de Nemours and Co.*, 202 F.R.D. 251 (S.D. Iowa
2001)................................................................................................6

*Cameron v. E.M. Adams & Co.*, 547 F.2d 473 (9th Cir. 1976).............................23

*Daggett v. Blind Enters.*, No. CV-95-421-ST, 1996 U.S. Dist. LEXIS
22465 (D. Ore. Apr. 18, 1996) ......................................................16

*Dubin v. Miller*, 132 F.R.D. 269 (D. Colo. 1990) ..........................................14

*Friedman v. 24 Hours Fitness USA, Inc.*, No. CV 06-6282 AHM (CTx),
2009 U.S. Dist. LEXIS 81975 (C.D. Cal. Aug. 25, 2009)...........................4

*Gerardo v. Quong Hop & Co.*, No. C 08-3953 JF (PVT), 2009 U.S. Dist.
LEXIS 60900 (N.D. Cal. July 7, 2009)...............................................5

*Gortat v. Capala Bros.*, No. 07-CV-3629 (ILG), 2010 U.S. Dist. LEXIS
35451 (E.D.N.Y. Apr. 9, 2010) ................................................4, 17

*Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996) ..................................12

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................7, 14, 24

*In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006)....................1, 20

*In re Tobacco II Cases*, 46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009) ................23

*Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507 (9th Cir. 1978)...............17

*Leyva v. Buley*, 125 F.R.D. 512 (E.D. Wash. 1989)..................................5

*Local Joint Exec. Bd of Culinary/Bartender Trust Fund v. Las Vegas
Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001)......................................14

*Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534 (N.D. Cal.
2010)................................................................................23

*Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th
1282, 119 Cal. Rptr. 2d 190 (Cal. App. 2002).............................24

*Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. SACV 10-1172-
AG (MLGx), 2011 U.S. Dist. LEXIS 50754 (C.D. Cal. May 11,
2011)...........................................................................12, 20

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008)................................................8

*Poulos v. Caesar's World*, 379 F.3d 654 (9th Cir. 2004) .....................................21

*Rannis v. Recchia*, 380 Fed. Appx. 646 (9th Cir. 2010) .........................................3

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010)...............................................12

*United States v. Dann*, No. 10-10191, 2011 U.S. App. LEXIS 15012 (9th Cir. July 22, 2011)................................................................................18, 19

*United States v. Kozminski*, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988) ..............................................................................................18

*Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005)...................17

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) ..............23

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) ..........13

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .............23


**STATUTES**

18 U.S.C. § 1589(a) ................................................................................................18

18 U.S.C. § 1589(c)(2) ...........................................................................................18

18 U.S.C. § 1589(c)(4) ...........................................................................................19

18 U.S.C. § 1590(a) ................................................................................................18

18 U.S.C. § 1961(1)(A) ..........................................................................................20

18 U.S.C. § 1961(1)(B) ..........................................................................................20

18 U.S.C. §§ 1961(5), 1962....................................................................................20

18 USC §§ 1589, 1590, 1592 .................................................................................18

Cal. Bus. & Prof. Code § 17200 ............................................................................23


**RULES**

Fed R. Civ. P. 23(c)(1)(C) .....................................................................................20

Fed. R. Civ. P. 23(a)(2) ............................................................................................7

Fed. R. Civ. P. 23(b)................................................................................................3

**REGULATIONS**

20 C.F.R. § 655.731(c)(9)(iii)(C) (2000) ..................................................................9

**PRELIMINARY STATEMENT**

This case involves a common course of conduct by Defendants directed at more than 350 Filipino teachers recruited to teach at Louisiana public schools, and is thus well-suited for class treatment under governing Ninth Circuit authority. *See, e.g., In re First Alliance Mortgage Co.*, 471 F.3d 977, 990 (9th Cir. 2006) (Ninth Circuit favors class treatment of claims stemming from "common course of conduct"). The alternative to a class action would be an unwieldy and inefficient process, wherein courts and juries in this District would be required to decide the same legal and factual questions over and over again in potentially hundreds of separate proceedings.

Defendants make a number of arguments as to why they should not be liable on the merits here, but they do not successfully dispute the commonality of the legal and factual issues to be resolved. Defendant Universal Placement, Inc. ("UPI"), for instance, relies on a few declarations it procured from teachers friendly to defendant Lourdes Navarro, who say they were not misled about fees. But those declarants do not dispute, and indeed confirm, that what UPI (and its Philippine alter ego, PARS International Placement Agency) disclosed or did not disclose about fees generally occurred during large group meetings involving dozens of teachers, and in standard form contracts signed by all putative class members. The factual question of what UPI and PARS did or did not disclose is thus a common one susceptible to common proof. Likewise, the legal issue of whether the actions of UPI and its confederates violated the Trafficking Victims Protection Act ("TVPA") and other provisions of federal and state law are common to all members of the class, as is the question of whether the standard form contracts UPI required each class member to sign should be declared null and void.

Defendant Silverman, too, disputes his liability on the merits, but in so doing only confirms that the central issues to be resolved in this case are common

to the entire teacher class.  Mr. Silverman contends, for instance, that he cannot be deemed to have had an attorney-client relationship with the teachers based on his filing of G-28 notices of appearance naming them as his clients, or his receipt of legal fees paid by the teachers.  But Mr. Silverman does not and cannot dispute that he filed a G-28 form for each and every Plaintiff and other class member, or that each and every Plaintiff and other class member paid precisely the same $2,000 legal fee.  Whether Mr. Silverman had an attorney-client relationship with the teachers based on these facts is thus a common issue susceptible to common proof.  Similarly, whether Mr. Silverman committed malpractice and breached his fiduciary duties by failing to advise the teachers that most of the $5,500 in visa processing fees that each was required to pay should instead have been paid by the employer school districts under federal law is a common question that can and should be resolved the same way for each and every class member.

Defendant EBR, too, contests its liability on the merits, but in so doing just underscores the commonality of the issues before the Court.  EBR disputes that it hired UPI as its exclusive recruiting agent, disputes that it had a duty to investigate the criminal background of Defendant Lourdes Navarro, and contends that it thus cannot be deemed to have engaged in negligent hiring.  But whether or not EBR hired UPI as its recruiting agent, whether or not it had a duty to investigate past criminal acts by UPI's principal,  and whether it fulfilled that duty are questions that pertain equally to each and every class member.  Only EBR's own conduct is relevant to those issues.  Whether EBR has a valid affirmative defense under the Louisiana workers' compensation law is likewise a class-wide issue:  the negligent hiring claim of each class member either is or is not barred by that affirmative defense.

Plaintiffs are confident that they will prevail at trial, but the Court is not being asked to decide the merits at this stage.  Rather, the matter before the Court is simply whether there are sufficient common factual and legal issues to warrant

class treatment of Plaintiffs' claims, whether such common issues predominate, and whether the other requirements of Rule 23 are satisfied.  Plaintiffs have met their burden in this regard, and Defendants have failed to establish a need for substantial individualized inquiries.  Accordingly, the case should be certified as a class action.

## I.   PLAINTIFFS SATISFY ALL OF THE ELEMENTS OF RULE 23.

For a class and subclass to be certified, Plaintiffs must satisfy the requirements of Rule 23(a) and at least one of the three criteria for certification under Rule 23(b).  Fed. R. Civ. P. 23(b).  "Any doubts a court has about class certification should be resolved in favor of certification."  *Badhdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 386 (C.D. Cal. 2009) (citation omitted).  Plaintiffs have met all of the Rule 23 elements with respect to both proposed classes.

### A.   The Class and Subclass are so Numerous That Joinder Would be Impracticable.

Defendants do not dispute Plaintiffs' evidence that there are more than 350 teachers who meet the definition of the Louisiana Teacher Class proposed by the Plaintiffs, or that there are more than 250 teachers who meet the definition of the EBR Teacher Subclass.  (ECF No. 134 at 8 (defining proposed classes); McNeil Decl. at Ex. A (ECF No. 134-6) (H-1B teacher list provided by Defendant UPI broken down by Louisiana school district).)  These numbers easily satisfy the Rule 23(a) numerosity requirement.  *See Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (affirming grant of class certification involving 20 members).

Defendants UPI instead argues that, because six out of approximately 350 putative class members filed declarations claiming they were not injured by UPI and do not wish to pursue their claims, the Plaintiffs fail to establish that the class and subclass are so numerous that joinder is impracticable.  This evidence indicates that a few class members may choose to opt out if the class is certified

but it is not relevant to numerosity.  *See, e.g.*, *Gortat v. Capala Bros.*, No. 07-CV-3629 (ILG), 2010 U.S. Dist. LEXIS 35451, at *11 (E.D.N.Y. Apr. 9, 2010) ("[T]he mere possibility that members of a potential class may choose to opt out in the future is not enough to preclude a finding of numerosity."); *see also Friedman v. 24 Hours Fitness USA, Inc.*, No. CV 06-6282 AHM (CTx), 2009 U.S. Dist. LEXIS 81975, at *11 (C.D. Cal. Aug. 25, 2009) ("There is no requirement that a class be defined to include only those with meritorious claims.  Class certification does not depend on the ability of the named plaintiffs or class members to win on the merits.").

Indeed, the six putative class members selected by UPI have testified that they have not read the Complaint and are generally unaware of even the most basic legal allegations in the case.  For example, they do not understand the Plaintiffs claim that certain fees paid by the class members were the legal obligation of their petitioning school district, do not understand that if Plaintiffs are successful on their claim that those fees should have been paid by the school district that they would be entitled to a recovery, and do not understand what a class action is or that they are potential members in the class.  (Emenilda Cordero Dep. at 7-8[1]; Cordero Dep. at 37-38[2]; Arvin Dones Dep. at 19-22 (unaware that if class certified and Plaintiffs succeed on their claims that he would be entitled to some relief as a member of the class); Rafaela Flores Dep. at 6-7, 14-15, 49-50 (never read complaint, unfamiliar with what a class action is, unaware that she might qualify for relief as a member of the class if claims are successful); Milnor

---

[1]  "Q:  So do you know anything at all about the lawsuit?  A:  No, sir.  The detail, I do not know, really.  Q.  Do you understand that the lawsuit is a class action?  A: I don't know, sir.  Q:  Do you know what a class action is?  No, sir."

[2]  "Q:  Are you aware that if we were successful in that claim, and we were to get this case to go forward as a so-called class action, that you would be entitled to—potentially entitled to some money relief if we were successful?  A:  No, I'm not aware of that.  Q:  Nobody told you that?  A:  No."

Rodriguez Dep. at 8-9, 38, 141-142 (never read complaint, unaware that lawsuit alleges that certain fees should have been paid by the school district, does not know if statement in contract is false if it only required payment of a $300 placement fee before leaving the Philippines when, in fact, a $5,200 payment was required); Anette Gamit Dep. at 9, 16-18, 55 (never read complaint, does not understand what it means to violate the TVPA or what would happen if Plaintiffs prevail on their claims, not aware that lawsuit alleges certain fees should have been paid by the school district); Luzviminda Bayarong Dep. at 15, 80, 81 (never read complaint, "no idea" what claims are being made against EBR).)  In reality, the six putative class members put forward by UPI in an attempt to defeat class certification for the other 350 class members are lay persons who have no idea whether they and other class members have valid legal claims, have been injured, and would be entitled to damages.  Nor should they—that is precisely why a class action should be available to pursue the claims.  *See, e.g.*, *Gerardo v. Quong Hop & Co.*, No. C 08-3953 JF (PVT), 2009 U.S. Dist. LEXIS 60900, at *6 (N.D. Cal. July 7, 2009) (finding Rule 23(a)(1) requirement satisfied where "potential class members are not legally sophisticated" making it difficult for them to bring individual suits); *Leyva v. Buley*, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (joinder of class members extremely burdensome due to their limited knowledge of American legal system).

Moreover, some of the class members selected by UPI to file declarations do not want to participate simply because they fear participation might cause them to lose their jobs, or they feel loyalty to the East Baton Rouge school district.

(Dones Dep. at 101[3]; Flores Dep. at 50[4]; Gamit Dep. at 18-20 (fears that if participated in the lawsuit that her employer would view that unfavorably).)  Such fears were cited by the Eighth Circuit as a reason to certify a class action since they contribute to making joinder impracticable.  *See, e.g.*, *Arkansas Ed. Ass'n v. Board of Ed. of Portland, Oregon School Dist.*, 446 F.2d 763, 765 (8th Cir. 1971) (joinder impracticable because, inter alia, "those teachers who remain in the school system[s] could have a natural fear or reluctance to bring this action on an individual basis"); *see also Bublitz v. E.I. du Pont de Nemours and Co.*, 202 F.R.D. 251, 256 (S.D. Iowa 2001) (citing cases and noting that "the fear recognized in suing one's employer" made joinder impracticable).  The "Manifesto" attached as Exhibit G to the Declaration of Daphne Donaldson (ECF No. 150-1) proves the point.  While the "Manifesto" states that the teachers are aware that this lawsuit will be filed and they hope that "justice will be served" with respect to claims involving UPI, those teachers' primary concern was to assure EBR that they wished to continue to be employed by EBR and to inform EBR that they did not want to participate in the case *against the school board*.

UPI's claims to the contrary notwithstanding, not one of its declarants could point to large numbers of their fellow Filipino teachers who do not wish to participate in the case.  (Cordero Dep. at 67 ("Q:  Do you know whether there are teachers who oppose the lawsuit?  A:  No."); Dones Dep. at 150-151 (no idea as to the number of people who might agree with his views with respect to the lawsuit); Rodriguez Dep. at 82-83 (although declaration states she knows of "many teachers" who do not want to participate in lawsuit, in reality she knew of only

---

[3]  "Q:  So you don't want to lose your job?  A:  Yes.  That's the bottom line.  Q:  Okay.  And you have some concern that if you participate in the lawsuit, you may lose your job?  A:  Yes, sir."

[4]  "Q.  Yes, you would not be interested in any recovery?  A:  I'm not interested.  Q:  Because you have—you feel a loyalty to the school district?  A:  Yes, sir.  Q:  Any other reason?  A:  That's the only reason."

one other person in addition to herself and the other five putative class members selected by Defendants to sign declarations); Gamit Dep. at 21 (no knowledge of whether others want to participate in case or not).)  By contrast, large numbers of teachers *do* wish to pursue the relief sought in this action.  Indeed, more than 125 individuals have signed retainers seeking representation by Plaintiffs' counsel, the Southern Poverty Law Center.  (Rosalinda Gross-Smith Decl. ¶ 2.)  Additional teachers wanted to do so, but SPLC stopped collecting additional retainers after it became clear that the case should be pursued on a class-wide basis.  (Gross-Smith Decl. ¶ 3.)  Additionally, another 20 or more teachers—all of whom are putative class members—are represented by other counsel in Marksville, Louisiana and wish to pursue this litigation.  (Gross-Smith Decl. ¶ 4.)   Further, at least one putative class member acknowledged that, during a Louisiana Workforce Commission administrative proceeding in April 2010, the room was overflowing with Filipino teachers wearing white in support of the claims being asserted against UPI.  (Dones Dep. at 152-153 (noting that approximately 40-50 teachers attended the hearing wearing white while other teachers also supportive of the claims against UPI had to wait outside because the room was at capacity).

Based on the above, Plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

## B.   There are Questions of Law and Fact Common to the Class and Subclass.

Rule 23(a)(2)'s commonality requirement only requires that there be questions of fact *or* law common to the class.  Fed. R. Civ. P. 23(a)(2).  As the Ninth Circuit has stated, "All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir.

2008) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.").   Defendants fail to show a lack of commonality here.  Quite the contrary, Defendants' arguments in many ways prove that there are multiple common legal *and* factual issues present.

For example, almost the entirety of Defendant Silverman's opposition brief focuses on his contention that the facts do not support a finding that he was the attorney for *any* of the Plaintiffs or class members and that he is not liable to *any* of the Plaintiffs or class members because they "had no relationship with him. (ECF No. 156.)  Mr. Silverman's contention is not that the facts or law would support a finding that he had an attorney-client relationship or owed a fiduciary duty to *some* of the Plaintiffs and class members and not others.  Rather, he contends that *none* of the Plaintiffs and class members were his clients and that he owed *none* of them any fiduciary duty.  Whether Mr. Silverman's submission of G-28 notices of entry of appearance forms for *all* of the Plaintiffs and class members as part of their visa applications and his collection of attorneys' fees from *all* of the Plaintiffs and class members (ECF No. 117 at 10-11), is sufficient to establish an attorney-client relationship and fiduciary duties is a threshold factual and legal issue that is common to the entire class.  Likewise, whether Mr. Silverman committed malpractice and breached his fiduciary duties to Plaintiffs and other class members by, *inter alia*, failing to (a) disclose or obtain a waiver of conflicts of interest related to his joint representation of them, UPI/Navarro, and the school districts, and (b) advise them that fees they were paying were legally required to have been paid by his school district clients, are issues common to the entire class.

Likewise, Defendant EBR's argument that a determination as to its tort immunity under Louisiana's workers' compensation law is required presents a common issue.  (ECF No. 168-1 at 16-18.)  Whether the workers' compensation

law even applies to a situation involving non-physical injuries, and whether Plaintiffs' and other class members' injuries as a result of EBR's negligent hiring of UPI "arose out of" their employment relationship, are legal issues that will involve the same analysis and result in the same decision with respect to every EBR subclass member.   Similarly, EBR's argument as to whether it owed a duty to the Plaintiffs and subclass members, and whether EBR may be held liable for actions taken by individuals and entities that formed part of a "single business enterprise" with UPI (ECF No. 168-1 at 20-21), are common questions of law and fact, the determination of which will apply to the entire subclass without differentiation.  Finally, EBR does not, nor could it, dispute that the main element of the Plaintiffs' negligent hiring claim—whether the decision to hire UPI was negligent—is a common issue that turns on the actions (or lack thereof) *EBR* took prior to selecting UPI as its exclusive recruiting agent for Filipino teachers.

For their part, Defendants UPI and Navarro do not dispute that there are common issues of law relevant to the entire class.  Their challenge to commonality is rather based entirely on alleged factual differences between class members.  In fact, however, the evidence demonstrates that the recruitment process for each teacher was largely the same:

- At the outset of the process, all Plaintiffs and other class members were required to pay virtually identical "processing fees" of about $5,500, including approximately $3,820 for visa and attorneys' fees that should have been paid by their petitioning employers.  *See* 20 C.F.R. § 655.731(c)(9)(iii)(C) (2000); McNeil Decl. Ex. B (previously filed as ECF No. 134-6) (listing fees paid by class members, including UPI's declarants, for "I-129 Filing Fee," "Anti-Fraud," "Premium Processing," and "Legal Fee").

- None of the Plaintiffs or declarants selected by UPI was informed by any of the Defendants that the approximately $3,820 they were required to pay for visa and attorneys' fees was actually the petitioning employer's responsibility under federal law.  (Mairi Nunag-Tanedo Decl. ¶ 10 (previously filed as ECF No. 134-1); Ingrid Cruz Decl. ¶ 9 (previously filed as ECF No. 134-2); Donnabel Escuadra Decl. ¶ 8 (previously filed as ECF No. 134-3); Tomasa Mari Decl. ¶¶ 6, 8 (previously filed as ECF No. 134-4); Rolando Pascual Decl. ¶¶ 12, 15 (previously filed as ECF No. 134-5); Cordero

Dep. at 37, 39-40; Dones Dep. at 19; Flores Dep. at 48; Gamit Dep. at 55; Rodriguez Dep. at 16; Bayarong Dep. at 80.)

- All Plaintiffs, declarants, and other class members were later required to sign the same standard-form UPI contract.  The form contracts stipulated that the teacher would have to pay only $300 in fees before leaving the Philippines and commencing employment in the United States. (McNeil Decl. Exs. D-H) (ECF No. 134-6) ("At the time of signing this Agreement, Client will pay Agency US$300.00 . . . . For the first twenty-four (24) months of employment, Client will pay Agency ten percent (10%) of Client's gross monthly income, payable monthly, *commencing with the 1st pay period*.") (McNeil Decl. Exs. D-H) (ECF No. 134-6) (emphasis added).)

- Contrary to the express language of the form contracts, each Plaintiff, declarant selected by UPI, and other class member was required to pay thousands of dollars in placement fees to UPI *before* leaving the Philippines, in thousands of dollars more to UPI's Philippine alter ego, PARS.  (McNeil Decl. Ex. C (ECF No. 134-6) (showing amounts of payments by class members for 10% fee to UPI); Nunag-Tanedo Decl. ¶ 14 (ECF No. 134-1); Cruz Decl. ¶ 15 (ECF No. 134-2); Escuadra Decl. ¶ 16 (ECF No. 134-3); Mari Decl. ¶¶ 11, 15 (ECF No. 134-4); Pascual Decl. ¶ 20 (ECF No. 134-5); Cordero Dep. at 42, 48-51; Dones Dep. at 37-38; Flores Dep. at 51-52; Gamit Dep. at 37, 50; Rodriguez Dep. at 44-45, 59; Bayarong Dep. at 106-107.)

- As a result of having to pay this huge amount up front, in contravention of what the standard-form contract disclosed, each Plaintiff and the declarants needed to incur even more debt than they had already incurred to pay the initial processing fees of approximately $5,500.  (Nunag-Tanedo Decl. ¶ 15 (ECF No. 134-1) (loan of $12,000 at 4% monthly interest rate); Cruz Decl. ¶ 14 (ECF No. 134-2); Escuadra Decl. ¶ 15 (ECF No. 134-3); Mari Decl. ¶ 12 (ECF No. 134-4) (loan of $15,000 at 4% monthly interest rate); Pascual Decl. ¶¶ 12, 15, 18 (ECF No. 134-5); Cordero Dep. at 42; Dones Dep. at 26, 71-72 (loan of $8,000 to $9,000 at 50% annual interest rate); Flores Dep. at 51-52 (loan of $8,000); Gamit Dep. at 37-38; Rodriguez Dep. at 42, 47-49 (loan of approximately $10,000 at 3-4% monthly interest rate), 59-60; Bayarong Dep. at 60-61.)

- Each Plaintiff and declarant needed to pursue employment in the United States to pay back the debts they were forced to incur as a result of the scheme.  (Nunag-Tanedo Decl. ¶ 15 (ECF No. 134-1); Cruz Decl. ¶ 13 (ECF No. 134-2); Mari Decl. ¶ 12 (ECF No. 134-4); Pascual Decl. ¶ 23 (ECF No. 134-5); Cordero Dep. at 43 ("Q:  Would you have been able to repay that [$10,000] loan if you had not accepted employment at East—in the East Baton Rouge School System?  A:  No, sir."); Dones Dep. at 73 ("Q:  Okay.  And without taking the job at East Baton Rouge Public School System, would you have been able to repay the loan?  A:  I wouldn't have the capability of paying the money."); Flores Dep. at 57; Rodriguez Dep. at 53-54.; Bayarong Dep. at 44-45.).

UPI and Navarro focus heavily on alleged differences between class members concerning when they were told about the aggregate amount of the placement fees. But they effectively concede that this is an essentially common issue. (ECF No. 176 at 6 (acknowledging that hundreds of applicants were present when placement fees were allegedly discussed).) Defendants, for example, do not admit that they informed some class members about the placement fees at the outset, yet withheld that information from other class members until later in the process. Rather, Plaintiffs and UPI's declarants have testified that, for the most part, information about fees and the recruitment process more generally was conveyed during large group meetings.[5] While there may be conflicting evidence at trial as to what was disclosed or not disclosed about the placement fees during these large group meetings, the factual issue to be decided by the jury is still a common one that is susceptible to common proof: what happened at the meetings in question. As noted, other key factual issues relevant to Plaintiffs' trafficking claim — e.g., whether defendants ensnared class members in the trafficking scheme by forcing them to pay processing fees that were the legal responsibility of the school districts, and whether UPI and Navarro made misrepresentations to class members by requiring them to make massive placement fee payments up front in the Philippines, in contravention of what was disclosed in the standard-form contracts — are likewise common.

---

[5] *See, e.g.*, Nunag-Tanedo Decl. ¶¶ 6, 9-10 (ECF No. 134-1) (no discussion of placement fees during group meeting of approximately 75 successful applicants at Waterfront Hotel on March 28, 2008); Escuadra Decl. ¶¶ 5, 7-8 (ECF No. 134-3) (no discussion of placement fees during group meeting of approximately 80 successful applicants at Waterfront Hotel on March 28, 2008); Pascual Decl. ¶ 9) (ECF No. 134-5) (approximately 300 people present at Manila Hotel in March, 2008); Gamit Dep. at 23, 25-26 (numerous teachers at Manila Hotel on March 25, 2008); Rodriguez Dep. at 30-32 (hundreds of teachers present at Manila Hotel on March 25, 2008); Bayarong Dep. at 21-22 (attended interview session at Manila Hotel on March 25, 2008.).

These common factual issues give rise to common legal issues related to whether Defendants' conduct violated the TVPA, RICO, and various provisions of applicable state law.  For example, whether UPI's acts amounted to knowingly providing the labor of the Plaintiffs and class members by means of serious harm or threats of serious harm in violation of the TVPA, 18 U.S.C. § 1589(a), and whether Defendants were part of a TVPA "venture" are common legal issues that can be resolved on a class-wide basis based on the jury's determination of common facts.

Likewise, whether Plaintiffs are able to prove all of the elements of their RICO cause of action, including the predicate acts of TVPA violations, will be a common legal issue applicable to the entire class.  To state a civil claim under RICO, Plaintiffs must show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's business or property."  *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. SACV 10-1172-AG (MLGx), 2011 U.S. Dist. LEXIS 50754, at *35 (C.D. Cal. May 11, 2011) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).  Proof related to whether Defendants formed a RICO enterprise and conducted the activities of the enterprise will turn on common facts related to the Defendants' activities, meaning that whatever the final determination, it will apply on a class-wide basis.  And, as will be shown below, whether Defendants engaged in a pattern of racketeering activity by, *inter alia*, committing multiple TVPA violations, also turns on common facts related to the Defendants' activities.

**C.**   **The Claims of the Named Plaintiffs Are Typical of the Claims of the Class and Subclass.**

"[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).  Plaintiffs satisfy this standard.

1    Defendants UPI and Navarro argue that Plaintiffs' claims are not typical

2 because their six declarants testified they "did not feel harmed or damaged."

3 (ECF No. 176 at 8.)  However, as already discussed, each of the six declarants

4 testified at deposition that they were unfamiliar with the legal claims being

5 brought by the Plaintiffs and had no idea, for example, that almost $4,000 of the

6 processing fees that UPI and PARS required them to pay should have been paid by

7 their petitioning employer.  *See* section I.A., *supra*.  The typicality test is not

8 whether class members *believe* they were injured or understand what legal claims

9 they may or may not have, but whether the Plaintiffs and other class members

10 have actually suffered the same injury.  *Wolin v. Jaguar Land Rover N. Am., LLC*,

11 617 F.3d 1168, 1175 (9th Cir. 2010) ("The test of typicality is whether other

12 members have the same or similar injury, whether the action is based on conduct

13 which is not unique to the named plaintiffs, and whether other class members have

14 been injured by the same course of conduct.")  (citation omitted).

15    Here, Plaintiffs and the other class members—including the six

16 declarants—were all subject to the same common course of conduct described in

17 section I.B., *supra*.  This common conduct caused them similar injuries in the

18 form of having to pay fraudulent and illegal fees and incur such significant debt

19 that they had no alternative other than to complete the visa process with

20 Defendants and work in the United States.  *See* section I.B., *supra*.

21    Likewise, EBR Plaintiffs and other subclass members all suffered the same

22 injuries outlined above based on EBR's negligence in hiring UPI as the exclusive

23 recruiter of Filipino teachers.  That hiring decision is common to all subclass

24 members and Plaintiffs' negligent hiring claim is based on *EBR's* own actions.

25 Thus, the claim involves no unique conduct particular to any EBR Plaintiff or

26 subclass member.

27    Accordingly, Plaintiffs more than satisfy the permissive requirements of

28 Rule 23(a)(3).

### D.  The Representative Parties Will Fairly and Adequately Protect the Interests of the Class and Subclass.

Defendants UPI and Navarro make a number of attacks on the five named Plaintiffs' adequacy to serve as class representatives.  Most of these attacks are unsupported by any evidence, and all of them are without merit and should be rejected.

Rule 23(a)(4)'s adequacy of representation requirement involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020 (citation omitted).  The Court need not examine the adequacy of every named plaintiff.  *See Local Joint Exec. Bd of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 n.2 (9th Cir. 2001) ("[T]he adequacy-of-representation requirement is satisfied as long as one of the class representatives is an adequate class representative . . . .").

Defendants UPI and Navarro attack the credibility of lead Plaintiff Nunag-Tanedo on the alleged ground that she made the "dubious argument" during her deposition that the dates on the contract she entered into with PARS was inaccurate.  (ECF No. 160 at 18).  As one court has noted, however, "[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence *so severely undermining plaintiff's credibility* that a fact finder might reasonably focus on plaintiff's credibility to the detriment of the absent class members' claims."  *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990) (emphasis added).

Ms. Nunag-Tanedo's testimony regarding the dates on the documents she was presented is far from "dubious" and does absolutely nothing to undermine her credibility.  At her deposition, Ms. Nunag-Tanedo was presented with Exhibit 505 which—although difficult to read—states that her contract with PARS was

allegedly executed on either February 2, 2008, or February 8, 2008.  (Gross-Smith Decl. Exh. 505.)  However, Ms. Nunag-Tanedo had no contact with PARS or UPI until late March of 2008.  Accordingly, she could not possibly have signed the contract in early February.  (Nunag-Tanedo Decl. ¶ 6 (ECF No. 134-1); Nunag-Tanedo Dep. at 64-67.)

Indeed, Ms. Nunag-Tanedo testified that under her signature on Exhibit 505 is handwriting showing that her government-issued "cedula" or community tax certificate was issued on February 26, 2008—three weeks *after* the contract was dated.  (Gross-Smith Decl. Exh. 505 (noting in the acknowledgement section of the document that the community tax certificate was presented at the time the document was signed).)  This corroborates Ms. Nunag-Tanedo's testimony that she did not sign and could not have signed the contract in early February. Moreover, Defendants produced in discovery another copy of Ms. Nunag-Tanedo's contract, bearing the exact same signatures and the exact same notary seal, but which is not dated. (Gross-Smith Decl. Ex. A.)

Far from undermining Ms. Nunag-Tanedo's credibility, this evidence clearly demonstrates that she did not sign the contract in early February, as UPI alleges.  To the contrary, the evidence indicates that the contract was altered after Ms. Nunag-Tanedo signed it to make it appear that she was informed of the placement fees long before that information was actually disclosed. (*See also* Pascual Dep. at 161-162.) (testifying that he was instructed to put the wrong date on his contract).)  UPI's attack on Ms. Nunag-Tanedo's credibility thus patently fails.  It is indeed UPI's *own* credibility that is sorely lacking.

Defendants also attack Plaintiff Nunag-Tanedo and Plaintiff Cruz on the ground that they "have repeatedly filed suit against Ms. Navarro in forums that range across the US and Philippines."  (ECF No. 160 at 16.)  Yet Defendants point only to two complaints filed in the Philippines—one filed by each Plaintiff—that seek to hold Defendant Navarro and others accountable for violations of that

country's migrant worker law.  Citing no other evidence, Defendants then assert that these actions amount to an "apparent vendetta" against UPI and Navarro that makes Ms. Cruz and Ms. Nunag-Tanedo inadequate class representatives.  (ECF No. 160 at 16.)  But seeking relief in other forums does not amount to a vendetta,[6] nor is it a basis to disqualify a proposed class representative.  *See Daggett v. Blind Enters.*, No. CV-95-421-ST, 1996 U.S. Dist. LEXIS 22465, at *62-*63 (D. Ore. Apr. 18, 1996); *see also Steiner v. Tektronix, Inc.*, No. 90-587-RE, 1991 U.S. Dist. LEXIS 6043, at *9 (D. Ore. Feb. 6, 1991) ("Federal courts have uniformly held that participation by a proposed class representative in other litigations is not a basis for denying class certification.").

With respect to the other named Plaintiffs, Defendants UPI and Navarro argue that they are either "atypically sophisticated" (Plaintiff Escuadra) or inadequate because they made multiple attempts to find work in the United States before being recruited by UPI and PARS (Plaintiffs Pascual and Mari).  (ECF No. 160 at 16-17.)  These arguments are without merit and do not warrant disqualifying these Plaintiffs as class representatives.  Although Defendants claim that Plaintiff Escuadra's sophistication and Plaintiffs Pascual and Mari's motivation to teach in the United States will subject them to "unique defenses," they fail to identify what those unique defenses might be.  Plaintiffs and other class members were all subject to the Defendants' common course of conduct and

---

[6]   Defendants supplement their vendetta argument by citing to the declaration of Arvin Dones, who stated that he believes the current suit has been brought by a few disgruntled teachers with a vendetta against Navarro.  (ECF No. 160 at 16; Dones Decl. ¶ 16.)  What Mr. Dones *believes* is irrelevant as to whether there is any admissible evidence of Plaintiffs actually having a vendetta against Navarro. Moreover, Mr. Dones does not even know any of the Plaintiffs other than Ingrid Cruz.  (Dones Dep. at 65-66, 133, 152.)  Defendants also falsely accuse Ms. Cruz and Ms. Nunag-Tanedo of "attempting to bully" Mr. Dones and Rafaela Flores into silence at an administrative hearing.  (ECF No. 176 at 6.)  However, Mr. Dones and Ms. Flores both admitted that they did not hear or see Ms. Cruz or Ms. Nunag-Tanedo say anything during the Louisiana Workforce Commission hearing.  (Dones Dep. at 152; Flores Dep. at 113-114.)

all signed the same standard form contracts.  Their desire to teach in the United States pursuant to H-1B visas was no different than any other member of the class, and creates no conflicts between them and the class members that would affect adequacy of representation.

Finally, EBR again makes the argument—similar to its numerosity argument—that Plaintiffs are not adequate representatives because there are individuals who do not want to participate in the lawsuit.  (ECF No. 168-1 at 27-28.)  However, as already addressed, a lack of interest by class members in pursuing the case is not a basis to defeat class certification.  *See, e.g.*, *Gortat*, 2010 U.S. Dist. LEXIS 35451, at *11; *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 609 (C.D. Cal. 2005) (rejecting argument that plaintiffs could not adequately represent class where defendants submitted declarations from individuals who did not want to be included in the lawsuit).[7]

For all these reasons, Defendants' attacks on Plaintiffs' adequacy as class representatives fail.

### E.    Common Question of Law or Fact Predominate.

#### 1.    Common Questions Predominate with Respect to Plaintiffs' TVPA Claims.

Defendants UPI and Navarro argue briefly that individual inquiries "plainly" predominate with respect to Plaintiffs' TVPA claims, stating that the jury will have to examine their "subjective minds."  (ECF No. 160 at 23.)

---

[7]  EBR also alleges that the three proposed representatives for the EBR subclass are inadequate because some subclass members have previously been fired by EBR and could perhaps lose potential employment-related claims that are not raised in this action due to res judicata.  (ECF No. 168-1.)  There is no evidence that subclass members have any other claims against Defendants, or that those claims would be the type that they would be required to join with a negligent hiring claim such that res judicata would apply.  In any event, such individuals would be protected by Rule 23's opt-out provisions.  Fed. R. Civ. P. 23(c)(2)(B)(v); *see also Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

1  However, they wholly misstate what is required to show a TVPA violation related

2  to non-physical coercion.

3       UPI and Navarro rely on *United States v. Kozminski*, 487 U.S. 931, 108 S.

4  Ct. 2751, 101 L. Ed. 2d 788 (1988) to support their position.  However, *Kozminski*

5  did not involve non-physical coercion, but rather held that "involuntary servitude"

6  could only be shown through physical or legal coercion that placed the victim in

7  fear.  *Id.*, 487 U.S. at 952.  It was precisely this ruling that caused Congress to

8  pass the TVPA in 2000 to expand the definition of what constitutes harm for the

9  purposes of forced labor.  *See United States v. Dann*, No. 10-10191, 2011 U.S.

10  App. LEXIS 15012, at *23 (9th Cir. July 22, 2011) ("Legislative history suggests

11  that Congress passed [the TVPA] to correct what they viewed as the Supreme

12  Court's mistaken holding in *United States v. Kozminski*") (citation omitted).

13       Because the TVPA requires no showing regarding Plaintiffs' individualized

14  choices or reliance, it is ideally suited for class treatment.  *See* 18 USC §§ 1589,

15  1590, 1592.  The plain language of the TVPA focuses on the actions of

16  *Defendants*, not Plaintiffs.  Liability under the statute is thus a function of

17  Defendants' conduct, and can be proven regardless of the number of Plaintiffs

18  bringing the claim.  *See, e.g.*, 18 U.S.C. § 1589(a) ("Whoever knowingly provides

19  or obtains the labor or services of a person by any one of, or by any combination

20  of, the following means . . . ."); 18 U.S.C. § 1590(a) ("Whoever knowingly

21  recruits, harbors, transports, provides, or obtains by any means, any person for

22  labor or services in violation of this chapter . . . .").

23       Moreover, contrary to Defendants' contentions, concepts such as "serious

24  harm" in the TVPA are assessed based on a "reasonable person" standard.  This

25  makes the TVPA ideal for class certification since no one plaintiff's perspective or

26  subjective position is legally relevant.  *See* 18 U.S.C. § 1589(c)(2) ("The term

27  "serious harm" means any harm, whether physical or nonphysical, including

28  psychological, financial, or reputational harm, that is sufficiently serious, under all

the surrounding circumstances, to compel a *reasonable person* of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.") (emphasis added).  All that needs to be determined under the TVPA is whether a reasonable person would feel compelled to provide his or her labor in light of defendant's conduct.  Likewise, with respect to claims brought pursuant to 18 U.S.C. § 1589(c)(4)—as the Ninth Circuit recently noted in *Dann*—the "linchpin of the analysis" is the intent of the Defendant, not the subjective mind of the Plaintiff.  *See Dann*, 2011 U.S. App. LEXIS 15012 at *29-*30 & n.4; *cf. Blackie v. Barrack*, 524 F.2d 891, 905-906 (9th Cir. 1976) (noting that individual issues such as reliance on a defendants' actions are not applicable where law involves a "reasonable person" standard).

Because common issues clearly predominate over any individual questions, class treatment is appropriate to relieve the courts of the need to decide the same points again and again in potentially hundreds of individual cases concerning the appropriate application of the TVPA.

### 2.   Common Questions Predominate with Respect to Plaintiffs' RICO Claims

The thrust of UPI and Navarro's challenge to certification of Plaintiffs' RICO claims is simple:  they assert that RICO requires a showing of individualized reliance or that Plaintiffs' RICO claims are based on individualized reliance.  (ECF No. 160 at 19-23.)  Defendants are wrong.

By focusing solely on the mail fraud, wire fraud, and extortion racketeering activities, Defendants have ignored Plaintiffs' TVPA claims and the fact that no individual reliance is required to establish a TVPA violation.  It is not necessary for Plaintiffs and other class members to rely on mail and wire fraud or extortion to prove their RICO claims.  All that is required—in addition to proving the other elements of a RICO violation—is that the RICO Defendants engaged in a "pattern

of racketeering activity," by committing at least two acts of "racketeering activity" within 10 years.  18 U.S.C. §§ 1961(5), 1962.  Mail fraud, wire fraud, and extortion are three types of racketeering activity that may be used to prove a RICO violation.  18 U.S.C. §§ 1961(1)(A) (extortion), 1961(1)(B) (mail and wire fraud).  But violations of the TVPA also constitute racketeering activity or "predicate acts" within the meaning of RICO.  18 U.S.C. § 1961(1)(B) (identifying "sections 1581-1592 (relating to peonage, slavery, and trafficking in persons"); *Nunag-Tanedo*, 2011 U.S. Dist. LEXIS 50754, at *36-*37 (noting that Plaintiffs have stated valid claims under the TVPA and, therefore, multiple RICO predicate acts). Because Plaintiffs have alleged that Defendants engaged in hundreds of TVPA violations and therefore a "pattern of racketeering activity," and because the TVPA focuses on the conduct of the Defendants and does not require any showing of individual reliance on the part of Plaintiffs and other class members (*see* Section I.E.1., *supra*), common questions predominate with respect to Plaintiffs' RICO claims.  Therefore, it is not necessary at this stage to engage in an analysis of Defendants' arguments with respect to the other RICO predicate acts of mail fraud, wire fraud, and extortion.  If the Court were to determine at a later date that Plaintiffs cannot prove violations of the TVPA, thereby rendering it inappropriate for use as a RICO predicate act, class certification may be revisited.  Fed R. Civ. P. 23(c)(1)(C) (allowing for the altering  or amending of class certification orders).

However, even were reliance on Defendants' fraudulent actions required to prove a violation of RICO based on the TVPA, the Ninth Circuit has held that claims involving a common course of fraudulent conduct may proceed on a class-wide basis.  *In re First Alliance Mortgage Co.*, 471 F.3d at 990-991; *Blackie*, 524 F.2d at 902 ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not

defeated by slight differences in class members' positions.").[8]  As outlined above, a common course of fraudulent conduct does exist in this case, making it appropriate for class treatment.

Defendants engaged in a common fraudulent scheme wherein they:  (1) extracted an initial required payment of almost $4,000 from all the Plaintiffs and other class members for fees that were the legal responsibility of their petitioning employers, (2) failed to disclose that a placement fee of 30% of their annual salary would be required until after Plaintiffs and other class members had already committed to the process by paying an initial $5,500 in processing fees, (3) required all of the Plaintiffs and other class members to sign standard-form contracts that stated that only a $300 fee would be required prior to leaving the Philippines and commencing employment in the United States, and (4) required all Plaintiffs and other class members—contrary to the express language in the standard-form contracts—to pay 10% of their anticipated annual salary to UPI and 10% of their anticipated annual salary to PARS *before* leaving the Philippines. This common course of conduct by Defendants means that common issues predominate over any individual issues, even though Defendants and Plaintiffs dispute whether class members were informed about the 30% placement fee at the outset.

As indicated above, because disclosure of the placement fees for most teachers either happened or did not happen in large group meetings involving hundreds of teachers and by means of standard-form contracts, the jury will be

---

[8]   Defendants citation to *Poulos v. Caesar's World*, 379 F.3d 654 (9th Cir. 2004) for the proposition that reliance cannot be proved on a class-wide basis for fraud-based RICO claims is misplaced.  In *Poulos*, the Ninth Circuit held that "to prove proximate cause *in this case*, an individualized showing of reliance is required" because of the unique situation involving the subjective motivation of gamblers. *Id.* at 666 (emphasis in original).  The Ninth Circuit was careful to note that its holding is "both narrow and case-specific, and that we have been careful to frame the controlling issue in terms of causation, not reliance." *Id.*

able to make determinations based on common proof that will apply on a class-wide basis.  It is true that the first group of 22 teachers hired by EBR in July 2007 were interviewed in a small batch via video-conference and did not attend large group meetings, and that individualized determinations may need to be made in their cases concerning fee disclosures.  (Cordero Dep. at 20-21; Dones Dep. at 78-79; Flores Dep. at 41-42; *see also* McNeil Decl. Ex. B (listing teachers who were part of "East Baton Rouge/Batch 1".).  But 22 individualized determinations on *one* factual matter does not predominate over more than 300 determinations that can be made based on common proof, nor does it predominate over the other common factual issues relevant to the scheme and that relate to the *entire* 350 member class.  The multiple common legal issues related to all class members also far predominate over the potential need to conduct these 22 individual factual determinations.

### 3. Common Questions Predominate With Respect to Plaintiffs' State Law Claims.

Defendants do not address the issue of predominance with respect to any of the Plaintiffs' state law claims other than common law fraud (Count V) and negligent hiring (Count XIII).[9]  Common questions predominate with respect to those claims, as well as Plaintiffs' other state law claims, making class certification appropriate.

Plaintiffs have already shown that, contrary to UPI and Navarro's assertions, fraud claims are appropriate for class certification based on Defendants' common course of conduct.  With respect to the negligent hiring claim against EBR, there are several common legal questions, the resolution of which do not involve any individual circumstances regarding the Plaintiffs or class

---

[9]  For example, Defendant Silverman does not raise a predominance argument. The arguments he does raise all involve factual and legal questions of whether he had an attorney-client relationship with the Plaintiffs and class members, illustrating that those common questions predominate.

members, as EBR confirms in its opposition papers.  For example, common legal
questions will need to be resolved regarding whether EBR hired UPI as its
recruiting agent, whether or not it had a duty to investigate past criminal acts by
UPI's principal, and whether EBR has a valid affirmative defense under the
Louisiana workers' compensation law.  EBR raises arguments concerning the
statute of limitations and damages related to comparative fault, arguing that
common issues will not predominate over individual ones. (ECF No. 168-1 at 14-
16, 21, 29.)  Courts have held, however, "that the presence of individual issues of
compliance with the statute of limitations does not defeat the predominance of
common questions." *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir.
1976); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st
Cir. 2000).  The Ninth Circuit has also held that "damage calculations alone
cannot defeat certification," as damages are "invariably an individual question."
*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)
(citing *Blackie*, 524 F.2d at 905).

Plaintiffs' other state law claims also involve common legal and factual
issues that do not predominate over individual issues.  For example, Plaintiffs seek
declaratory and injunctive relief voiding the UPI and PARS contracts due to
illegality.  This involves common legal questions of whether the contracts are in
violation of applicable law.

Plaintiffs' claim pursuant to California's Unfair Competition Law ("UCL"),
Cal. Bus. & Prof. Code § 17200, which prohibits unlawful, unfair, or fraudulent
business acts or practices, also involves the predominance of common claims.  As
courts have noted, "liability under the UCL does not require reliance and injury."
*Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534, 543 (N.D. Cal. 2010)
(citation omitted); *In re Tobacco II Cases*, 46 Cal. 4th 298, 320, 93 Cal. Rptr. 3d
559, 576 (2009) ("[R]elief under the UCL is available without individualized
proof of deception, reliance and injury.").  As already discussed, because Plaintiffs

can show uniform and material misrepresentations with respect to various aspects of Defendants' scheme, class certification is appropriate. *See Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292, 119 Cal. Rptr. 2d 190, 197 (Cal. App. 2002) ("'[P]laintiffs satisfy their burden of showing causation as to each by showing materiality as to all.'") (quoting *Blackie*, 524 F.2d at 907 n.2)).

### F.    A Class Action is Superior to Other Available Methods of Adjudicating this Controversy.

Only EBR challenges whether Plaintiffs satisfy Rule 23(b)(3)'s superiority prong, and even then only in the most cursory way.  (ECF No. 168-1 at 30.)  The superiority determination "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023.  As Plaintiffs stated in their opening brief, a class action is superior here for a number of reasons.  (ECF No. 134 at 18-20.)  Most importantly, if class certification is denied it is likely that at least 150 individuals will seek to join the case individually, and perhaps many more.  (Gross-Smith Decl. ¶¶ 2-3 (noting large number of individuals who have already sought representation by SPLC in this case).)  It is thus noteworthy that no Defendant, although they all vigorously oppose class certification, has proposed to this Court a way to effectively manage this case that would be more efficient or orderly than certifying a Rule 23 class.  Tying up the district courts by having every individual class member's case tried individually is both entirely unnecessary and obviously far less efficient than trying this case via the class action mechanism.  In this complex action, individual cases would require large expenditures of judicial and party resources for repetitive determinations.

## II.    PLAINTIFFS HAVE STANDING TO SUE DEFENDANT SILVERMAN.

Defendant Silverman devotes a large portion of his opposition to arguing that the class should not be certified because the Plaintiffs allegedly lack standing

to sue him.  (ECF No. 156 at 14-21.)  This argument is wholly without merit and is simply a re-hash of arguments presented in Mr. Silverman's already rejected motion to dismiss.  The entire basis for Mr. Silverman's new standing argument is that he purportedly did not have an attorney-client relationship with the Plaintiffs or any of the class members, and did not owe them any fiduciary duty.  (ECF No. 156 at 15 ("Plaintiffs have no standing to sue Mr. Silverman because they had no relationship with him.")  But Judge Guilford specifically held that Mr. Silverman's filing of G-28 forms noting his appearances as counsel for Plaintiffs and other class members, and the payment of Mr. Silverman's legal fees by Plaintiffs and other class members, were sufficient to establish an attorney-client relationship under California law.  (ECF No. 117 at 10-11.)  In denying Mr. Silverman's motion to dismiss the malpractice and breach of duty claims, the Court further held that Plaintiffs had alleged a sufficient factual basis for those claims.  (ECF No. 117 at 11-12.)  Mr. Silverman's argument that "[t]here is not one Plaintiff who can assert claims against [him] for Human Trafficking, RICO, Breach of Fiduciary Duty, or Legal Malpractice", (ECF No. 156 at 16), is directly at odds with the denial of his motion to dismiss, which held that Plaintiffs' *have* in fact properly asserted those claims against him.  (ECF No. 117.)  As such, Mr. Silverman's standing argument must be rejected.

## CONCLUSION

For the foregoing reasons, as well as those stated in Plaintiffs' Memorandum in Support of Amended Motion for Class Certification, the Court should grant Plaintiffs' Amended Motion for Class Certification under Fed. R. Civ. P. 23(b)(3) with respect to the two proposed classes, appoint Plaintiffs' counsel as class counsel, and Order class counsel to submit a proposed Notice for approval by the Court pursuant to Fed. R. Civ. P. 23(c)(2)(B).

Respectfully submitted this 19th day of August, 2011.

___/s/ James M. Knoepp_____
James M. Knoepp
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, Georgia  30303
*On behalf of Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to all counsel of record.

/s/ James M. Knoepp_____
August 19, 2011.