PUBLIC MATTER - NOT DESIGNATED FOR PUBLICATION

Filed January 13, 2012

## STATE BAR COURT OF CALIFORNIA

### REVIEW DEPARTMENT

| | |
|---|---|
| In the Matter of | Case Nos. 07-O-11968; 08-O-12328; 07-O-13696; 09-O-12276 |
| RICKEY BRIAN OXMAN, | |
| A Member of the State Bar, No. 72172 | OPINION AND ORDER |
| and | |
| MAUREEN PATRICIA JAROSCAK, | |
| A Member of the State Bar, No. 117677 | |

Respondents Rickey Brian Oxman and Maureen Patricia Jaroscak are husband and wife who operate a law firm. In May 2010, the State Bar Office of the Chief Trial Counsel (State Bar) filed a Notice of Disciplinary Charges (NDC) in four matters. Oxman and Jaroscak were both charged with moral turpitude for using their client trust account (CTA) to evade creditors, commingling personal funds in their CTA and failing to cooperate with disciplinary investigations. Separately, Oxman was charged with one count of failing to report a judicial sanction, and Jaroscak was charged with one count of moral turpitude for breaching her fiduciary duties as a trustee. The hearing judge found them culpable on all counts, and recommended a two-year period of actual suspension for Oxman, and an 18-month actual suspension for Jaroscak.

In Oxman's case, both he and the State Bar seek review. Oxman challenges the finding that he lacked candor, citing insufficient evidence. He argues that this finding unduly influenced the hearing judge's culpability determination, and his limited misconduct warrants no more than

PLAINTIFF'S EXHIBIT 2

a 60-day actual suspension.  The State Bar contends that Oxman should be disbarred based on his serious misconduct, prior discipline record and minimal mitigation.  Jaroscak seeks review in her matter, disputing any wrongdoing as to the CTA or her fiduciary duties as trustee, and asserts that her discipline should be substantially reduced.  The State Bar did not seek review as to Jaroscak and supports the recommended discipline in her case.

We have independently reviewed the record (Cal. Rules of Court, rule 9.12), considering the specific factual findings raised in the appellants' briefs.  (Rules Proc. of State Bar, rule 5.152(C) [any factual error not raised on review is waived by the parties].)  The evidence supports the hearing judge's findings that both Oxman and Jaroscak lacked credibility and at times candor, and that they are culpable on all counts.  However, we conclude they are entitled to less weight in mitigation than assigned by the hearing judge.  Ultimately, we agree that Jaroscak should be suspended for 18 months.  But in light of Oxman's two prior disciplines and lack of candor, a two-year suspension is insufficient.  Instead, we recommend that Oxman be disbarred to protect the public, the courts and the legal profession.

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.     Oxman Failed to Report a Bankruptcy Court Sanction (No. 07-O-11968)**

Oxman represented Raquel Axelrod in a contentious divorce from her husband, Christopher Larson.  Larson was represented by attorney John R. Fuchs.  The divorce spawned several legal actions, including Axelrod's 2002 federal civil rights case brought by Oxman, alleging Fuchs had improperly influenced a witness in the divorce proceeding.  That action ended in April 2004 with the court sanctioning Axelrod and Oxman $29,535.64 in attorney fees payable to Larson and imposing a $10,000 penalty payable to the court for filing a frivolous matter (2004 sanction order).  Oxman and Axelrod were ordered to pay the sanction within 10

days of service.[1]  In May 2004, Larson and Fuchs filed a state court malicious prosecution action against Axelrod and Oxman for bringing the federal action.

In December 2004, Axelrod filed a petition for Chapter 7 bankruptcy to discharge her obligations.  Larson and Fuchs filed an adversary proceeding to block the discharge of Axelrod's obligations to Larson.  In 2005, the court discharged Axelrod's debts other than those subject to nondischargeable litigation and closed the bankruptcy case.  In September 2006, Axelrod moved to reopen the bankruptcy case for court approval of a compromise in which she agreed to pay Larson $95,000 in exchange for releases from Larson and Fuchs to settle their outstanding legal matters, including the pending malicious prosecution action.  The compromise specifically excluded claims of Larson and Fuchs against Oxman.  Oxman objected to the compromise on a theory of equitable subrogation, arguing that he was entitled to that portion of the settlement allocated to Larson and Fuchs under the 2004 sanction order because Oxman had already paid it.  After Oxman's objection was overruled and the compromise was approved, Larson moved for sanctions against Oxman, arguing that Oxman's objection was factually and legally meritless and filed in bad faith to harass Larson.

On March 13, 2007, the bankruptcy court found that Oxman's objection was frivolous and filed for an improper purpose, and ordered him to pay Larson a sanction of $5,084 within 45 days (2007 sanction order).  The bankruptcy court concluded Oxman was not entitled to subrogation because he was primarily liable for the district court's 2004 sanction order, citing findings from the 2004 sanction order that the record suggested Oxman "fabricated the story" on which the case was based, and his "utter miscarriage of his duties as an officer of the Court in the

---

[1] Oxman paid the sanction in May 2006.  Oxman's second discipline matter was based on the 2004 sanction order, wherein he stipulated to failing to maintain only legal or just actions, and failing to timely pay the sanction in violation of a court order.  The record does not support Oxman's claims in his opening brief that the 2004 sanction order was deemed erroneous and he was found to have acted in good faith in his second discipline matter.

- 3 -

filing of the original verified complaint alone warrants the imposition of sanctions." The bankruptcy court served the 2007 sanction order on Oxman at 14126 E. Rosencrans Boulevard (the Rosencrans address), which was the address listed on his pleadings.[2] Shortly thereafter, Oxman received the 2007 sanction order as part of multiple other communications, including several letters, pleadings and at least two facsimiles.

Despite the multiple communications, Oxman testified he was not aware of the 2007 sanction order until four months later, when it was personally served on him at a July 18, 2007 settlement conference in the malicious prosecution matter. Fuchs' associate, Gail S. Gilfillan, personally served Oxman because they wanted him held in contempt for not paying the order, but to pursue contempt they were required to first personally serve him with the order. At the conference, the parties reached an oral agreement to settle their various disputes, whereby Oxman would pay Larson $9,000, which included satisfaction of the 2007 sanction order. Oxman did not notify the State Bar of the 2007 sanction order until August 9, 2007, when he sent a copy of the order along with the settlement agreement that incorporated it.

**Count Two: Failure to Report Judicial Sanctions (Bus. & Prof Code, § 6068, subd. (o)(3))[3]**

Section 6068, subdivision (o)(3), requires attorneys "[t]o report to the [State Bar], in writing, within 30 days of the time the attorney has knowledge of . . . [t]he imposition of judicial sanctions against the attorney. . . ." The hearing judge found that Oxman received timely notice of the 2007 sanction order, but failed to report it to the State Bar until August 2007 in violation

---

[2] Jaroscak and Oxman both testified that they had problems receiving mail at this address for a variety of reasons, including confusion whether it was a boulevard or avenue. Jaroscak testified that she did not consider opening a post office box because she was "too lazy" to drive 20 minutes to pick up mail on a regular basis.

[3] At the parties' request, the hearing judge dismissed with prejudice count one against Oxman that alleged he failed to obey a court order in violation of Business and Professions Code section 6103. Unless otherwise noted, all further references to "sections(s)" are to this code.

this section. Oxman contends that the hearing judge erred because he did not receive the order until July 18, 2007. We give great weight to both candor (i.e., honesty) and credibility (i.e., believability) findings by the hearing judge. (*Chefsky v. State Bar* (1984) 36 Cal.3d 116, 121 [findings based on testimony given great weight since trier of fact in better position to evaluate conflicting statements].) Clear and convincing evidence must support determinations that a witness lacked candor. (*In the Matter of Dahlz* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 269, 282.) The record supports the specific reasons the hearing judge found Oxman was not credible and lacked candor when he testified that he was unaware of the 2007 sanction order until the July 2007 settlement conference.

Oxman also contends that the hearing judge erred in admitting the May 2007 and June 2007 filings Gilfillian mailed to the Rosencrans address, because he was not notified prior to trial that the State Bar intended to introduce them. Gilfillian testified she only alerted the State Bar to this evidence the week before trial, after pretrial disclosures were complete. Further, the exhibits rebutted Oxman's assertion that he did not receive the order until the July 2007 settlement conference in the malicious prosecution action. Finally, Oxman showed no prejudice from the admission because the critical facts of Gilfillian's mailing and faxing the 2007 sanction order multiple times were independently established by her testimony. We find the hearing judge did not abuse his discretion in admitting the exhibits.

Oxman had timely notice of the sanction order served on March 13, 2007, and failed to report it until August 9, 2007. Accordingly, he is culpable of violating section 6068, subdivision (o)(3).

**B.        Jaroscak Breached Her Duties as Trustee and Failed to Cooperate (No. 07-O-13696)**

Lyle and Martha Quatrochi hired Jaroscak primarily for estate planning. In 1992, Lyle and Martha established a Family Trust (Quatrochi Trust), with themselves as co-trustees and

their children, Gerald and Susan, as beneficiaries. In November 2001, several months after Martha died, Lyle named Jaroscak as his agent (attorney in fact) for financial transactions. In December 2001, Lyle sold the family home. Jaroscak received proceeds of approximately $591,374, and placed them in a California National Bank money market account held by the Quatrochi Trust.

In January 2002, Lyle amended the trust to name Jaroscak as sole trustee and Gerald as successor trustee. After Lyle died in June 2002, the trust terms directed Jaroscak to distribute the Quatrochi Trust funds to Gerald and Susan. She distributed over $50,000 to each in July 2002; over $560,000 remained in the trust.[4] By September 2002, Gerald hired attorney Stanley Lieber to help obtain the remaining trust funds.

In response to Lieber's inquiry, Jaroscak sent him a letter on October 11, 2002, stating that she had completed the accounting and anticipated distributing the balance to the beneficiaries the following week. On October 18, 2002, Jaroscak sent Gerald and Susan each a check for $246,257.48, along with an accounting of the trust funds up to that time. She stated that the IRA account (approximately $56,000) would be distributed in about a week after she determined how much to withhold for anticipated taxes, and the money market account (approximately $12,000) would be used first to pay her trustee fees and any other fees. She would distribute the remainder to Gerald and Susan. Jaroscak attached her bill for $11,930.10, which included several thousand dollars in fees for responding to Gerald's State Bar complaint. She stated that she would petition the court for approval if Gerald and Susan disputed her fees.

Gerald disputed Jaroscak's bill and her handling of the trust. However, Jaroscak failed to file a petition with the superior court for approval of her fees and failed to take any further action

---

[4] Gerald complained to the State Bar in early 2002 about Jaroscak's administration of the trust. On July 30, 2002, after the State Bar contacted her, Jaroscak sent a letter explaining her actions as trustee and promising to distribute the Quatrochi Trust balance within 30 days. The State Bar then closed its investigation.

to distribute the remaining trust funds. She did not respond to telephone calls, letters, or requests from Gerald to turn over the trust funds or resign as trustee.[5] In February 2006, Lieber filed a petition in superior court to remove Jaroscak as trustee of the Quatrochi Trust, but was unable to serve her for almost a year. When Jaroscak was finally served with the petition and notified of a February 6, 2007 hearing date, she asked Oxman to handle the matter.

Oxman spoke to Lieber by telephone and sent him a fax on February 5, 2007. In the fax, Oxman summarized the amounts he believed to be in the trust accounts, but stated the firm had not yet received the 2006 annual statements from the bank. He concluded with an offer: "Ms. Jaroscak has asked your clients to pay her fees which were billed in 2002 and total $11,930.10 in fees and costs. If you will do so, Ms. Jaroscak will execute a Substitution of Trustee in favor of your clients and they will be free to manage the accounts as they see appropriate." Oxman and Jaroscak each testified that Jaroscak could not find the file at the time and neither remembered that she had sent Gerald the resignation form in 2003.

Oxman appeared in court without Jaroscak at the February 6, 2007 hearing and obtained a continuance until April 5, 2007. Jaroscak did not file a response to the petition or appear at the April 5 hearing because she decided to allow her default to be taken. On April 23, 2007, the superior court removed Jaroscak as trustee and ordered her to prepare an accounting and release all Quatrochi Trust funds. She did not comply with the court's order.

---

[5] Jaroscak testified that in March 2003 she sent Gerald a Substitution of Trustee form in which she resigned. Gerald did not receive it. Jaroscak did not explain her failure to follow up or to notify the bank of her resignation despite receiving monthly bank statements showing her as trustee until 2008. Nor did she tell Lieber about the substitution form in 2003 or when he later petitioned to remove her as trustee. Jaroscak did not present the form until the pretrial stage of this proceeding, claiming she and Oxman had just found the Quatrochi file on a computer disk about 45 days before trial. The hearing judge found this testimony was not credible and lacked candor. The record supports this finding.

With the court order, Gerald was able to secure the trust funds from the bank without Jaroscak's assistance. On June 6, 2008, the bank issued cashier's checks to the Quatrochi Trust for $14,039.77 and $54,196.82.

On October 17 and November 19, 2007, a State Bar investigator mailed Jaroscak letters asking her to respond in writing to a complaint filed by Lieber. Jaroscak received the letters, but failed to respond.

**Count Three: Moral Turpitude – Breach of Fiduciary Duty (§ 6106)**

Section 6106 provides that an attorney's "commission of any act involving moral turpitude…whether committed in the course of his relations as an attorney or otherwise, … constitutes a cause for disbarment or suspension." A breach of "fiduciary responsibilities can constitute an act involving moral turpitude where such breach involves more than simple negligence." (*In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364, 377.) The hearing judge found that Jaroscak breached her fiduciary duty as trustee and committed acts of moral turpitude in violation of section 6106 by refusing to distribute monies held in trust, failing to respond to the beneficiaries, and failing to comply with the court order directing her to prepare an accounting and release the funds. We agree.

We reject Jaroscak's claim that she resigned as trustee in 2003 because Gerald wanted her to evade tax authorities. Her testimony on this issue was unbelievable and lacked candor. Nevertheless, she has failed to explain how her resignation alleviated her of any obligation to properly release the trust funds to the successor trustee Gerald, to remove her name from the bank account, respond to inquiries from the beneficiaries, or otherwise properly transfer the trust.

"An attorney who accepts the responsibility of a fiduciary nature is held to the high standards of the legal profession whether or not he acts in his capacity of an attorney." (*Worth v. State Bar* (1976) 17 Cal.3d 337, 341.) As such, Jaroscak owed the trust beneficiaries "the utmost

good faith." (*Cutler v. State Bar* (1969) 71 Cal.2d 241, 251.) For over five years, Jaroscak grossly neglected the trust and refused to properly distribute over $68,000 to the beneficiaries, demonstrating a complete disregard of her fiduciary duties. Her actions constitute moral turpitude. (*Bruns v. State Bar* (1941) 18 Cal.2d 667, 671 ["Repeated acts of negligence and omission may involve moral turpitude . . . ."].)

**Count Four: Failure to Cooperate with State Bar Investigation (§ 6068, subd. (i))**

Section 6068, subdivision (i), imposes on attorneys a duty "[t]o cooperate and participate in any disciplinary investigation." Jaroscak stipulated to violating this section when she failed to respond to the two State Bar investigator's letters on October 17 and November 19, 2007.

**C. Oxman and Jaroscak Mismanaged Client Trust Funds and Failed to Cooperate (Nos. 08-O-12328 and 09-O-12276)**

Oxman and Jaroscak jointly face charges for mismanaging their firm CTA. They made numerous deposits and withdrawals of personal funds through their CTA from January until July 2008. Oxman and Jaroscak also deposited into the CTA their income from teaching and lecturing, as well as fees for legal services. Jaroscak then issued checks from the CTA for personal expenses, most significantly payments to South Coast Preschool Academy, which Jaroscak owned. Jaroscak handled the daily CTA transactions while Oxman regularly reviewed and ratified her work.

In December 2007, Jaroscak opened a Manhattan Life Insurance Company Capital Account (Manhattan Life Account) with funds from her mother, Marjorie. Jaroscak testified that she operated this account as trustee of the Marjorie Jaroscak Family Trust (Jaroscak Trust) established December 15, 2007.[6] Jaroscak's name was printed on the account checks as the sole account holder, not as a trustee.

---

[6] A purported trust agreement signed by Marjorie as grantor and Jaroscak as trustee, with both named as beneficiaries along with Jaroscak's two daughters, is not certified or notarized.

Jaroscak deposited $38,500 in funds from the Manhattan Life Account into the CTA from January through July 2008. She claimed the Jaroscak Trust advanced this money as "loans" to the firm's clients to fund their cases. But the firm did not document any loan agreement between the Jaroscak Trust and clients, nor did it repay the advanced funds to the trust. Jaroscak's handling of the money once it was received frequently did not comply with the terms of the purported trust, and she made no effort to perform the duties that would normally be expected of a trustee. Marjorie died in May 2009.

Oxman and Jaroscak were confronted with significant financial obligations from 2007 until the NDC was filed. Between December 2007 and February 2010, the Franchise Tax Board recorded five liens against them totaling $51,310.82 for unpaid taxes, related penalties, interest and collection fees for tax years 2005, 2006 and 2007. The first lien for $10,373.52 was recorded on December 11, 2007 against Oxman, a few days before Jaroscak opened the Manhattan Life Account in her name only. The second lien for $10,725.08 was recorded in April 2008 against Jaroscak, during the time Jaroscak was depositing Manhattan Life Account funds into the CTA. The Franchise Tax Board released the five liens in September 2010.[7] Oxman and Jaroscak testified that they owed no money and had simply not filed tax returns for several years, but they presented no supporting evidence that the liens were released without payment.

Additionally, Oxman and Jaroscak owed money to their attorney for previous discipline investigations and matters. On September 18, 2007, the Los Angeles Superior Court issued an abstract of judgment awarding $24,868.25 to the attorney. This obligation remained outstanding as of November 2010.

---

[7] The NDC was filed May 1, 2010.

The State Bar investigator sent letters to Oxman in February 2009, and Jaroscak in July 2009, requesting written responses about possible CTA misuse.  Both letters went unanswered.

**Count Five:  Commingling (Rules Prof. Conduct, rule 4-100(A)) – Oxman and Jaroscak**

Rule 4-100(A) of the Rules of Professional Conduct requires attorneys to hold client funds in trust and prohibits commingling personal funds in a CTA.[8]  This rule "is violated where the attorney commingles funds or fails to deposit or manage the funds in the manner designated by the rule, even if no person is injured. [Citations.]"  (*Guzzetta v. State Bar* (1987) 43 Cal.3d 962, 976.)  Oxman and Jaroscak improperly commingled funds in violation of this rule by depositing non-client funds into their CTA and then withdrawing them for personal expenses.

**Count Six:  Moral Turpitude – Dishonesty (§ 6106) – Oxman and Jaroscak**

Oxman and Jaroscak contend that the hearing judge erred in concluding the Jaroscak Trust was a sham created to hide from creditors funds given to Jaroscak by her mother.  We agree with the hearing judge that Jaroscak's testimony about the creation and purpose of the trust was not credible, and the evidence fully supports the finding that the Jaroscak Trust was a sham.  But Oxman's and Jaroscak's culpability for moral turpitude does not turn on whether the trust was valid; their use of the CTA as their personal account is sufficient to support the culpability finding.

Like the hearing judge, we find that the Manhattan Life Account funds deposited into the CTA were not legitimately related to clients.  In 2008, Jaroscak deposited about $55,000 in non-client funds into the CTA and withdrew almost the same amount for personal expenses.  She did so shortly after she and Oxman faced approximately $45,000 in potential obligations to tax

---

[8] Specifically, rule 4-100(A) states:  "All funds received or held for the benefit of clients by a member [of the State Bar] or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labeled 'Trust Account,' 'Client's Funds Account' or words of similar import . . . .  [Generally,] no funds belonging to the member or the law firm shall be deposited therein or otherwise commingled therewith . . . ."

authorities and a judgment creditor, and at the same time they faced future tax liability for 2006 and 2007. This evidence circumstantially shows that Oxman and Jaroscak used the CTA to shield their personal assets from creditors. (See *In the Matter of Petilla* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 231, 237 [clear and convincing circumstantial evidence established attorney violated § 6106 by borrowing money he did not intend to repay; absent an admission, such charge is rarely proved by direct evidence].) This conduct is dishonest and amounts to moral turpitude in violation of section 6106. (*Coppock v. State Bar* (1988) 44 Cal.3d 665, 678-679 [use of CTA to evade creditors involves moral turpitude].)

> **Count Seven: Failure to Cooperate with State Bar Investigation (§ 6068, subd. (i))**
> **Count Eight: Failure to Cooperate with State Bar Investigation (§ 6068, subd. (i))**

Oxman (count 7) and Jaroscak (count 8) were each charged with one count of failing to respond to separate 2009 State Bar investigator letters about their CTA. Each received one letter asking for a written response to the investigation, but neither responded. Oxman stipulated to violating section 6068, subdivision (i), but Jaroscak did not. We find Jaroscak also culpable for failing to respond to the investigator letter.

## II. AGGRAVATION AND MITIGATION

The State Bar must prove aggravating circumstances by clear and convincing evidence, while Oxman and Jaroscak bear the same burden to show mitigation. (Rules Proc. of State Bar, tit. IV, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2(b) & (e).)[9]

### A. Oxman's Aggravation Significantly Outweighs His Mitigation

As for Oxman, the hearing judge found four factors in aggravation (prior discipline, multiple acts of misconduct, indifference, and lack of candor), and three in mitigation (cooperation, pro bono/community service, and character evidence). We agree with the aggravation, but find less mitigation.

---

[9] Unless otherwise noted, all further references to "standard(s)" are to this source.

- 12 -

Oxman's record of two prior disciplines (std. 1.2(b)(i)) is a significant factor in aggravation. In 1998, Oxman received a private reproval for failing to perform competently by filing a declaration that was not executed by the declarant, and for failing to cooperate with a State Bar investigation. He received mitigation for his record of no prior discipline and no harm, and there were no factors in aggravation. Then in 2009, Oxman received two years suspension, stayed, and two years probation with conditions for maintaining an unjust action based on the federal civil rights case alleging Fuchs improperly influenced a witness in the divorce proceeding. Oxman also failed to timely pay the 2004 sanction in violation of the court order. His prior discipline record and harm to the parties and the administration of justice were considered in aggravation, and there were no factors in mitigation.

Oxman also engaged in multiple acts of misconduct and demonstrated indifference to the improper use of his CTA. (Stds. 1.2(b)(ii) & (v).) As previously discussed, the hearing judge's finding that Oxman lacked candor in these proceedings is also supported by the record. (Std. 1.2(b)(vi).) Oxman's untruthful testimony hindered the hearing judge's fact-finding and significantly aggravates the underlying misconduct. (*Chang v. State Bar* (1989) 49 Cal.3d 114, 128 ["fraudulent and contrived misrepresentations to the State Bar may perhaps constitute a greater offense than misappropriation"].) We assign no weight in mitigation for cooperation in these proceedings due to Oxman's lack of candor and his failure to cooperate during the investigations. (Std. 1.2(e)(v).)

We find the only mitigating factor to be Oxman's pro bono work for the Plotkin Bail School and various trial competitions. (*Calvert v. State Bar* (1991) 54 Cal.3d 765, 785 [pro bono and community service as mitigating factor].) We do not agree with the hearing judge that Oxman is entitled to even nominal weight for evidence of good character under standard 1.2(e)(vi), since he presented no witnesses in his favor. (*In the Matter of Elkins* (Review Dept.

2009) 5 Cal. State Bar Ct. Rptr. 160, 167 [one witness does not constitute broad range of references from legal and general communities sufficient to establish good character].) Like the hearing judge, we assign no weight in mitigation for Oxman's depression, for which he sought the assistance of the Lawyer Assistance Program (LAP) in 2006. (Std. 1.2(e)(iv).) Oxman failed to establish a nexus between his depression and his misconduct, and failed to show that he no longer suffers from this condition. (*In re Naney* (1990) 51 Cal.3d 186, 197.)

**B.     Jaroscak's Aggravation Outweighs Her Mitigation**

For Jaroscak, the hearing judge found four factors in aggravation (multiple acts of misconduct, significant harm, indifference, and lack of candor), and four in mitigation (no prior discipline, cooperation, pro bono/community service, and character evidence). We agree with the aggravation, but conclude she is entitled to less mitigation.

We agree that Jaroscak engaged in multiple acts of misconduct (std. 1.2(b)(ii)), and significantly harmed the beneficiaries of the Quatrochi trust, who incurred substantial attorney fees and significant delay in receiving the $68,000 (std. 1.2(b)(iv)). We also find she displayed indifference to her improper use of both her CTA and the Quatrochi trust. (Std. 1.2(b)(v).) A significant factor in aggravation is Jaroscak's lack of candor during these proceedings. (Std. 1.2(b)(vi).) As outlined above, the record establishes that her testimony on some matters was neither believable nor truthful. (*In the Matter of Maloney and Virsik* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 774, 791.)

As for mitigation, Jaroscak is entitled to significant credit for the 17 years she practiced law before her misconduct. (Std. 1.2(e)(i)); *In the Matter of Riordan* (Review Dept. 2007) 5 Cal. State Bar Ct. Rptr. 41, 49 [17 years of discipline-free practice "significant" mitigation].) Also, her misconduct is mitigated by her past community service work assisting trial competitions. However, Jaroscak is not entitled to mitigation for her cooperation in this proceeding due to her

lack of candor and her failure to cooperate during the investigations. As with Oxman, we assign no weight in mitigation for Jaroscak's stress and depression because she failed to establish a nexus between her problems and the misconduct, and failed to show that she no longer suffers from the condition. (Std. 1.2(e)(iv).) Finally, we disagree with the hearing judge and find that Jaroscak is not entitled to even nominal weight for evidence of good character under standard 1.2(e)(vi) since she presented no character witnesses.

### III. LEVEL OF DISCIPLINE

**A.     Oxman Should be Disbarred**

The purpose of attorney discipline is not to punish the attorney but to protect the public, the courts and the legal profession. (Std. 1.3.) In determining the appropriate level of discipline, we first consider the standards applicable to this case. While we are "not compelled to strictly follow [the standards] in every case," we look to them for guidance (*In re Young* (1989) 49 Cal.3d 257, 267, fn. 11), and they should generally be given great weight in order to assure consistency in attorney disciplinary cases. (*In re Brown* (1995) 12 Cal.4th 205, 220.) Several standards call for suspension to disbarment.[10] However, in light of Oxman's prior record of discipline, standard 1.7(b) is the most pertinent to our analysis.

Standard 1.7(b) provides that if an attorney has two prior impositions of discipline "the degree of discipline in the current proceeding shall be disbarment unless the most compelling mitigating circumstances clearly predominate." In this case, the aggravation significantly outweighs Oxman's minimal mitigation. We have found four factors in aggravation (prior

---

[10] The other relevant standards are 2.2, 2.3 and 2.6. Standard 2.2(b) provides for at least a three month suspension for commingling and other CTA violations. Standard 2.3 provides for suspension or disbarment for acts of dishonesty or moral turpitude, depending on the extent to which the victim is harmed or misled and on the magnitude of the misconduct and the degree to which it relates to the practice of law. Likewise, standard 2.6(a) provides for disbarment or suspension for a failure to comply with reporting requirements and cooperate in an investigation, depending on the seriousness of the offense and harm, if any, to the victim, with appropriate regard to the purposes of discipline.

discipline, multiple acts of misconduct, indifference, and lack of candor), and only Oxman's pro bono work in mitigation. While his community service is admirable, it is neither compelling nor does it clearly predominate in this case. Thus, the exception to standard 1.7(b) is not applicable and we find no other compelling justification to deviate from the standard.

Oxman's three disciplinary proceedings show a disturbing disregard for the administration of justice, including misrepresentations to courts and a failure to cooperate in discipline proceedings. (*Olguin v. State Bar* (1980) 28 Cal.3d 195, 200 ["false testimony on a material issue is a serious breach of basic standards as well as a breach of the attorney's oath of office and his duties as an attorney"]; *Baca v. State Bar* (1990) 52 Cal.3d 294, 305 [failure to cooperate with State Bar investigation "reflects a disdain and contempt for the orderly process and rule of law on the part of an attorney who has sworn to uphold the law"].) His misconduct was central to the practice of law and was surrounded by his dishonesty. (Std. 2.3.) Further, he and Jaroscak repeatedly passed personal funds through their CTA to evade a court-ordered judgment and properly recorded liens. Standard 1.7(b) guides us to recommend Oxman's disbarment since he is either "unwilling or unable" to conform his behavior to the rules of professional conduct. (*Barnum v. State Bar* (1990) 52 Cal.3d 104, 111.)

We find the totality of the circumstances warrants Oxman's disbarment to protect the public, the courts and the legal profession, to maintain high professional standards by attorneys, and to preserve public confidence in the legal profession. (Std. 1.3.) This recommendation is supported by relevant case law. (*Cain v. State Bar* (1979) 25 Cal.3d 956 [disbarment on third discipline for misappropriation, mismanagement of CTA and untruthful testimony in discipline proceedings]; *In the Matter of Sullivan* (Review Dept. 2010) 5 Cal. State Bar Ct. Rptr. 189 [disbarment for failure to timely report to the State Bar misdemeanor conviction; record of three prior disciplines and no compelling mitigation].)

**B.      Jaroscak Should Receive Discipline Including 18 Months' Suspension**

Like Oxman, Jaroscak committed acts showing unacceptable disregard for the legal system in her evasion of creditors, lack of candor in these proceedings, and repeated failure to cooperate with State Bar investigators.  Further, she caused significant harm to the beneficiaries of the Quatrochi Trust, to whom she owed a fiduciary duty.  The most severe sanction is found in standard 2.3,[11] which calls for actual suspension or disbarment for her acts of moral turpitude.  But Jaroscak's misconduct is significantly mitigated by 17 years of practice without discipline.  We therefore agree with the hearing judge that an 18-month actual suspension is appropriate under the standards and supported by relevant authority.  (*Boehme v. State Bar* (1988) 47 Cal.3d 448 [18-month suspension for single instance of misappropriating $2,500 mitigated by 22 years' prior practice without discipline and illness, aggravated by false testimony, failure to appreciate seriousness of misconduct and failure to make restitution]; *Frazer v. State Bar* (1987) 43 Cal.3d 564 [18-month suspension for multiple acts of improper withdrawal, failure to communicate, and moral turpitude in improper loan transactions with clients mitigated by no prior discipline and psychological condition].)

### IV.  RECOMMENDATIONS

**A.      Rickey Brian Oxman**

We recommend that Rickey Brian Oxman be disbarred from the practice of law in this State and that his name be stricken from the roll of attorneys.

We further recommend that Oxman be ordered to comply with the requirements of California Rules of Court, rule 9.20 and to perform the acts specified in subdivisions (a) and (c)

---

[11] If two or more acts of misconduct are found and different sanctions apply, the most severe sanction should be imposed.  (Std. 1.6(a).)  Like Oxman, the other relevant standards are 2.2(b) for trust account violations and 2.6(a) for her failure to cooperate.

of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this matter.

We further recommend that costs be awarded to the State Bar in accordance with section 6086.10, such costs being enforceable both as provided in section 6140.7 and as a money judgment.

Because we recommend Oxman's disbarment, we order that Oxman be involuntarily enrolled as an inactive member of the State Bar as required by section 6007, subdivision (c)(4), effective 15 days after service of this opinion and order. Oxman will remain on involuntary inactive enrollment pending the final disposition of this proceeding.

**B.     Maureen Patricia Jaroscak**

We recommend that Maureen Patricia Jaroscak be suspended from the practice of law for two years, that execution of that suspension be stayed, and that Maureen Patricia Jaroscak be placed on probation for two years on the following conditions:

1. She must be suspended from the practice of law for the first 18 months of her probation.

2. She must comply with the provisions of the State Bar Act, the Rules of Professional Conduct, and all of the conditions of her probation.

3. Within 10 days of any change in the information required to be maintained on the membership records of the State Bar pursuant to Business and Professions Code section 6002.1, subdivision (a), including her current office address and telephone number, or if no office is maintained, the address to be used for State Bar purposes, she must report such change in writing to the Membership Records Office and the State Bar Office of Probation.

4. She must submit written quarterly reports to the Office of Probation on each January 10, April 10, July 10, and October 10 of the period of probation. Under penalty of perjury, she must state whether she has complied with the State Bar Act, the Rules of Professional Conduct, and all of the conditions of her probation during the preceding calendar quarter. In addition to all quarterly reports, a final report, containing the same information, is due no earlier than 20 days before the last day of the probation period and no later than the last day of the probation period.

5. Subject to the assertion of applicable privileges, she must answer fully, promptly, and truthfully, any inquiries of the Office of Probation that are directed to her personally or in writing, relating to whether she is complying or has complied with the conditions contained herein.

6. Within one year after the effective date of the discipline herein, she must submit to the Office of Probation satisfactory evidence of completion of the State Bar's Ethics School and passage of the test given at the end of that session. This requirement is separate from any Minimum Continuing Legal Education (MCLE) requirement, and she shall not receive MCLE credit for attending Ethics School. (Rules Proc. of State Bar, rule 3201.)

We further recommend that Jaroscak be ordered to take and pass the Multistate Professional Responsibility Examination administered by the National Conference of Bar Examiners during the period of her actual suspension in this matter and to provide satisfactory proof of such passage to the Office of Probation within the same period. Failure to do so may result in suspension. (Cal. Rules of Court, rule 9.10(b).)

We further recommend that Jaroscak be ordered to comply with the requirements of rule 9.20 of the California Rules of Court, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this proceeding. Failure to do so may result in disbarment or suspension.

Finally, we recommend that costs be awarded to the State Bar in accordance with section 6086.10, such costs being enforceable both as provided in section 6140.7 and as a money judgment.

REMKE, P. J.

WE CONCUR:

EPSTEIN, J.

PURCELL, J.