James M. Knoepp (admitted *pro hac vice*)
jim.knoepp@splcenter.org
Michelle Lapointe (admitted *pro hac vice*)
michelle.lapointe@splcenter.org
Daniel Werner (admitted *pro hac vice*)
daniel.werner@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, GA  30303
Telephone:  (404) 521-6700
Facsimile:  (404) 221-5857

*Attorneys for Plaintiffs*
*Additional Co-Counsel on Subsequent Pages*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MAIRI NUNAG-TAÑEDO, et al., | Civ. No.: 10-01172-JAK-MLGx |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OF UNIVERSAL PLACEMENT INTERNATIONAL, INC. AND LOURDES "LULU" NAVARRO** |
| v. | |
| EAST BATON ROUGE PARISH SCHOOL BOARD, et al., | **HEARING DATE:   July 30, 2012** |
| Defendants. | **TIME:                       8:30 a.m.** |
| | **COURTROOM:        750** |
| | **HON. JOHN A. KRONSTADT** |

*(Attorney listing continued from first page)*

Mary C. Bauer (admitted *pro hac vice*)
mary.bauer@splcenter.org
Sam Brooke (admitted *pro hac vice*)
sam.brooke@splcenter.org
Morris S. Dees (admitted *pro hac vice*)
judy.bruno@splcenter.org
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:  (334) 956-8200
Facsimile:   (334) 956-8481


Dennis B. Auerbach (*admitted pro hac vice*)
dauerbach@cov.com
Jillian Willis (*admitted pro hac vice*)
jwillis@cov.com
Gary Feldon (*admitted pro hac vice*)
gfeldon@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  (202) 662-6000
Facsimile:   (202) 662-6291

Candice M. Plotkin
cplotkin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111-5356
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091

PLAINIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel J. McNeil (*admitted pro hac vice*)
dmcneil@aft.org
AMERICAN FEDERATION OF TEACHERS
LEGAL DEPARTMENT
555 New Jersey Ave., N.W.
Washington, DC  20001
Telephone:   (202) 393-6305
Facsimile:   (202) 393-6385

Lawrence Rosenzweig (SBN 72443)
LRPCorp@aol.com
Brent Rosenzweig (SBN 219071)
Brent.Rosenzweig@gmail.com
LAWRENCE ROSENZWEIG, PC
2730 Wilshire Boulevard, Suite 425
Santa Monica, California  90403
Telephone:   (310) 453-0348
Facsimile:   (310) 453-3358

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities .................................................................................ii

I.   INTRODUCTION .................................................................................1

II.  FACTUAL BACKGROUND.................................................................4

III. ARGUMENT.........................................................................................8

    A.  Defendants' Motion for Summary Judgment on Plaintiffs' TVPA Claim Should Be Denied.................................................................8

        1.  Financial Harm Constitutes "Serious Harm" Under Both the Pre-Amendment and Post-Amendment Versions of the TVPA. 8

        2.  There Is a Triable Issue as to Whether the Teachers' Labor Was Procured Through Threats of Serious Financial Harm.....13

        3.  Defendants' Extraterritoriality Argument Is a Red Herring Because Plaintiffs Seek Redress Only for Trafficking Within the United States. .................................................................15

        4.  Defendants' Scheme to Procure Plaintiffs' Labor in the United States Included Unlawfully Confiscating and Controlling Plaintiffs' Passports Until Fraudulent Fees Were Paid.............17

        5.  Defendants' Motion Should Be Denied for the Additional Reason That Defendants Perpetrated Acts in Furtherance of the Trafficking Scheme After December 23, 2008...................19

    B.  Defendants' Motion for Summary Judgment on Plaintiffs' RICO Claim Should Be Denied...................................................................20

IV.  CONCLUSION.........................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blazevska v. Raytheon Aircraft Co.*,
  522 F.3d 948 (9th Cir. 2008) .............................................................. 15

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ........................................................... 19

*John Roe I v. Bridgestone Corp.*,
  492 F. Supp. 2d 988 (S.D. Ind. 2007)............................................... 3, 16

*Leocal v. Ashcroft*,
  543 U.S. 1, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004) ....................... 10

*Morrison v. Nat'l Australia Bank Ltd.*,
  ___ U.S. ___, 130 S. Ct. 2869, 177 L. Ed.2d 535 (2010) ................ 15, 16, 17, 18

*Nattah v. Bush*,
  541 F. Supp. 2d 223 (D.D.C. 2008), *aff'd in part and rev'd in part on other
  grounds*, 605 F.3d 1052 (D.C. Cir. 2010)........................................... 16

*Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*,
  790 F. Supp. 2d 1134 (C.D. Cal. 2011) ............................................... 1

*Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*,
  No. CV10-01172 JAK, 2011 U.S. Dist. LEXIS 152329
  (C.D. Cal. Dec. 12, 2011) .................................................................. 14

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  ___ U.S. ___, 131 S. Ct. 1885, 179 L. Ed. 2d 825 (2011) .................... 9

*TianRui Group Co. v. ITC*,
  661 F.3d 1322 (Fed. Cir. 2011) ........................................................ 16

*United States v. Bradley*,
  390 F.3d 145 (1st Cir. 2004), *judgment vacated on other grounds*,
  545 U.S. 1101 (2005)...................................................................... 1, 16, 17

*United States v. Calimlim*,
    538 F.3d 706 (7th Cir. 2008) ............................................................... 1, 11, 13, 16

*United States v. Dann*,
    652 F.3d 1160 (9th Cir. 2011) .......................................................... 1, 10, 11, 16

*United States v. Hubbard*,
    96 F.3d 1223 (9th Cir. 1996) ........................................................................... 20

*United States v. Jingles*,
    No. 08-15634, 2012 U.S. App. LEXIS 11633 (9th Cir. June 8, 2012) .............. 13

*United States v. Kozminski*,
    487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 788 (1988) ...................................... 10

*United States v. Sanders*,
    67 F.3d 855 (9th Cir. 1995) ............................................................................ 9, 11

*United States v. Sou*,
    No. 09-00345 SOM, 2011 U.S. Dist. LEXIS 81876
    (D. Haw. July 26, 2011)..............................................................................*passim*

**STATUTES**

8 C.F.R. § 214.1(e) ..................................................................................... 4, 6

20 C.F.R. § 655.731(c)(1), (9) ...................................................................... 5

8 U.S.C. § 1184(c)(12)(A) ............................................................................. 5

18 U.S.C. § 1589.....................................................................................*passim*

18 U.S.C. § 1590......................................................................................... 18

18 U.S.C. § 1595.................................................................................7, 18, 19

18 U.S.C. § 1596......................................................................................... 15

18 U.S.C. § 1961(1) ....................................................................................... 3

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 106-939 ..............................................................................*passim*

# I.   <u>INTRODUCTION</u>

Defendants' motion for partial summary judgment is at odds with the law of the case as articulated in the Court's ruling last year on Defendants' motion to dismiss.  In their motion to dismiss, Defendants made precisely the same argument that they do now: that the Trafficking Victims Protection Act, 18 U.S.C. §§ 1581, *et al.* ("TVPA"), was intended only to cover torture, slavery and worker exploitation accompanied by violence or threats of physical injury.  The Court squarely rejected that argument, holding that "the TVPA not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor."  *See* Order Granting in Part and Denying in Part Motion to Dismiss of Defendants Lourdes Navarro and Universal Placement International, Inc. ("UPI Motion to Dismiss Order"), at 14 (Doc. No. 114).[1]  The Court ruled that the TVPA is violated where, as here, a defendant's fraudulent conduct subjects plaintiffs to forced labor in the United States and threats of serious financial harm.  *Id*. at 10-16.

Contrary to Defendants' contention, this was true both before and after the TVPA was amended effective December 23, 2008.[2]  Defendants argue that financial harm did not constitute "serious harm" before the TVPA was amended in 2008.  However, two Courts of Appeal, including the Ninth Circuit, have held that financial harm *did* constitute serious harm under the pre-amendment version of the statute.  *See United States v. Dann*, 652 F.3d 1160, 1167-71 (9th Cir. 2011) (financial harm suffered by victim prior to June 2008 constituted "serious harm" under TVPA); *United States v. Calimlim*, 538 F.3d 706, 712-14 (7th Cir. 2008) (financial harm deemed "serious harm"

---

[1]  *Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011).

[2]  The TVPA was also amended effective December 19, 2003.  The 2003 amendments, however, are not relevant to Defendants' motion.

under pre-December 2008 version of TVPA); *see also United States v. Bradley*, 390 F.3d 145, 150-51 (1st Cir. 2004) (rejecting argument that "serious harm" under pre-amendment version of TVPA was limited to physical harm), *judgment vacated on other grounds*, 545 U.S. 1101 (2005).

The legislative history of the original version of the TVPA likewise makes clear that the term "serious harm" in the statute's pre-amendment version included financial harm.  The House Conference Report issued when the TVPA was enacted in 2000 explains that "serious harm" refers "to a broad array of harms, including *both physical and nonphysical*" and that intentionally causing the victim to believe that his or her family would face bankruptcy in their home country (*i.e.*, financial harm) is an example of threatening a victim with the threat of serious harm.  *See* H.R. Conf. Rep. No. 106-939, at 101 (2000) (emphasis added).  The 2008 amendments to the TVPA merely added an express definition of the term "serious harm" based on this pre-amendment legislative history, and confirmed that "financial" harm indeed constitutes a form of "serious harm" under the statute.  Accordingly, the financial harm suffered by plaintiffs here constitutes actionable "serious harm," regardless of whether the Court applies the pre-amendment or post-amendment version of the TVPA.

Plaintiffs have adduced extensive evidence that they suffered serious financial harm or threats of serious financial harm as a result of Defendants' misconduct.  This includes a declaration by each Plaintiff stating that she or he was forced to incur crushing debt as a direct consequence of fraudulent misrepresentations by Defendants, and was compelled to labor in the United States to pay off such debt.  The Court has already held in the UPI Motion to Dismiss Order that such facts, if proven at trial, are sufficient to support a claim for relief under the TVPA.  UPI Motion to Dismiss Order at 10-16.

Defendants also cannot escape TVPA liability through their argument that the TVPA did not apply extraterritorially until the statute was amended effective December 23, 2008.  Indeed, that argument is a complete red herring because Plaintiffs do not ask

the Court to apply the TVPA extraterritorially.  Extraterritorial trafficking is, by definition, trafficking of persons to work in a *non*-U.S. jurisdiction.  *See, e.g., John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007) (trafficking of persons to work at Liberian rubber plantation was extraterritorial).  The trafficking here, by contrast, did not occur overseas:  rather, it occurred in Louisiana, *i.e.*, within the United States.  It was precisely such acts of trafficking of persons from abroad into the United States that Congress intended to combat when it enacted the TVPA in 2000.  Domestic trafficking of the kind at issue in this case has been prohibited by the TVPA, both before and after the December 2008 amendments.

Defendants' motion for summary judgment based on the December 2008 TVPA amendments fails for the additional reason that Defendants' trafficking scheme continued after December 23, 2008.  Defendants continued, *inter alia*, to place teachers to work in Louisiana public schools, demand and collect fraudulent placement fees from Plaintiffs and other class members, and threaten class members with legal action if such fees were not paid after the effective date of the TVPA amendments.  Accordingly, even if Defendants were correct that their trafficking was not actionable under the pre-amendment version of the TVPA, their acts in furtherance of the trafficking scheme that occurred after the effective date of the amendments would still be actionable under the statute as amended.

Defendants' motion for summary judgment on Plaintiffs' RICO claim is also without merit.  Defendants argue that they are entitled to summary judgment on the RICO claim because there were no predicate acts of trafficking.  But as explained above, that contention is baseless.  Moreover, Plaintiffs have alleged acts of mail and wire fraud, which also constitute predicate acts of racketeering under RICO.  *See* 18 U.S.C. § 1961(1).  Defendants have not moved for summary judgment as to those separate and independently sufficient RICO predicate acts.  Even if the Court were to dismiss Plaintiffs' trafficking claim, therefore, there still would be no basis for the Court to enter summary judgment on the RICO cause of action.

Plaintiffs' TVPA and RICO claims are legally sufficient and supported by significant record evidence.  Accordingly, Plaintiffs are entitled to proceed to trial on those claims.  Defendant's motion for partial summary judgment should be denied.

## II.   FACTUAL BACKGROUND

In this human trafficking and racketeering case, a California labor contractor and its Philippine agent ensnared hundreds of Filipino teachers in an illegal scheme wherein the teachers' labor at Louisiana public schools was procured through threats of serious financial harm and abuse of legal process.  The Court has certified the case as a class action, and Plaintiffs thus assert claims under the TVPA, RICO, and provisions of California state law on behalf of the entire class of several hundred teachers ensnared by Defendants' scheme.  Doc. No. 232.

Beginning in 2007, several public school districts in Louisiana retained Defendant Universal Placement International, Inc. ("UPI"), a California corporation, and its owner, Defendant Lourdes "Lulu" Navarro, a resident of California (collectively with UPI, "Defendants"), to recruit qualified teachers from the Philippines.  Plaintiffs' Supplemental Statement of Facts ("Pls.' SSF") No. 112.  The teachers were brought to the United States pursuant to the H-1B visa program, which allows U.S. employers to hire foreign nationals possessing certain special skills for up to six years.  8 C.F.R. § 214.1(e); Pls.' SSF No. 113.

UPI and its Philippine agent, PARS International Placement Agency ("PARS"), which was operated by Navarro's brother, advertised for teachers in the Philippines and held a series of group meetings there to recruit qualified applicants.  Pls.' SSF Nos. 114-15.  Several Louisiana school districts, including principally the East Baton Rouge Parish School Board ("EBR"), interviewed teachers procured by Defendants and their Philippine agent.  Pls.' SSF No. 116.  During the course of the three school years beginning in 2007, the districts selected more than 350 teachers for placement.  Pls.' SSF No. 117.

Defendants and PARS told the selected teachers that they must pay certain fees, totaling approximately $5,500 (the "Initial Fees"). Pls.' SSF No. 118. These fees were enormous by Philippine standards, and exceeded what Plaintiffs were able to pay. Pls.' SSF No. 119. They also included fees that the employer school districts and not the teachers were required to pay under federal law. Pls.' SSF No. 118; *see also* 8 U.S.C. § 1184(c)(12)(A); 20 C.F.R. § 655.731(c)(1), (9).[3] To raise such substantial funds, the teachers were forced to take on enormous debt. Pls.' SSF No. 120. The teachers were effectively ensnared in the trafficking scheme at that point, because only by obtaining jobs as teachers in the United States could they repay their huge debts. Pls.' SSF No. 123.

The trafficking scheme then turned even more sinister. After the teachers went into debt to pay the initial fees, Defendants and PARS presented them with the devastating news that they would have to pay another, previously undisclosed fee equal to 30 percent of their expected annual income in the United States (the "Second Recruitment Fee")—two-thirds of which was required to be paid up front—as well as the cost of airfare to the United States. Pls.' SSF No. 121. Defendants and PARS required the teachers to sign standard form contracts in the Philippines regarding these additional fees. Pls.' SSF No. 122. These contracts were themselves fraudulent in that they fraudulently stated that *no* placement fees would be due until after the teachers began working in the United States, whereas Defendants in fact demanded that substantial placement fees be paid up front before the teachers began to work. Pls.' SSF No. 124. Because the recruiters would not refund the fees previously paid and because the teachers were already mired in debt incurred to pay the Initial Fees, the teachers had no practical alternative but to do what they were told. Pls.' SSF No. 123. To further compel payment of the fraudulent and previously undisclosed placement fees, PARS held the teachers' passports until they were paid. Pls.' SSF No. 125-126.

---

[3] *See also* Pls.' Supp. Br. re: H-1B Required Wage (Doc. No. 207).

The additional fees the teachers were required to pay up front in the Philippines to continue with the visa process totaled close to $10,000 for most of the teachers (with further fees in the range of $5,000 for most of the teachers due a year after the teachers arrived in the United States).  Pls.' SSF No. 127.  Defendants and PARS knew that the teachers lacked the resources to pay this enormous additional sum (Pls.' SSF No. 128), and thus referred the teachers to selected private lenders who would lend the money at interest rates of 3-5 percent <u>per month</u>.  Pls.' SSF No. 129.  This 3-5 percent per month interest rate translates to an effective rate of 43-80 percent per year (due to compounding), thereby ensnaring the teachers even more deeply in Defendants' trafficking scheme.

Having been forced into crushing debt to pay the more than $15,000 in total upfront fees extracted by Defendants (approximately $5,500 in Initial Fees, plus approximately $10,000 in previously undisclosed placement fees), the teachers finally traveled to the United States.  Pls.' SSF No. 130.  They typically arrived in California and were brought to UPI's office in Los Angeles, where UPI required them to sign a second fraudulent standard form contract reflecting the teachers' purported agreement to pay fees that were in fact extracted by fraudulent means.  Pls.' SSF No. 131. When some of the teachers questioned the contract's terms, UPI and Navarro told them that they would be sent back to the Philippines immediately if they did not sign the contract as written.  Pls.' SSF No. 132. Left with no choice, the teachers signed the contracts and proceeded to travel to Louisiana to begin work.  Pls.' SSF No. 131-132.  As noted above, they had no other way to repay the debts incurred as a result of Defendants' fraud.  Pls.' SSF No. 133.  The teachers could not readily work for another U.S. employer because, as H-1B workers, they were permitted only to work for their visa sponsor, *i.e.*, the Louisiana school district that made them an employment offer.  *See* 8 C.F.R. § 214.1(e) (H-1B nonimmigrant may engage only in authorized employment and "[a]ny unauthorized employment by a nonimmigrant constitutes a failure to maintain status").

Defendants also flagrantly abused legal process in furtherance of their trafficking scheme. When teachers complained about the fees and other mistreatment to which they were subjected, Navarro threatened them with deportation and lawsuits. Pls.' SSF No. 133. For example, when some class members voiced complaints on a blog, the "Pinoy Teachers Hub," Navarro and UPI filed a lawsuit against Plaintiff Ingrid Cruz in California in the false belief that Ms. Cruz had authored the blog. Pls.' SSF No. 134. Through the lawsuit, Defendants also sought to compel Ms. Cruz to pay additional fraudulent placement fees. Pls.' SSF No. 135. The California Court of Appeals ultimately upheld the dismissal of the suit pursuant to California's anti-SLAPP law, which is designed to quickly dispose of baseless litigation filed to dissuade or punish exercise of the constitutional right to free speech. Pls.' SSF No. 136. But Navarro still was successful in extracting additional fees from some class members through her intimidation tactics. Defs.' SUF No. 66.

While Defendants' trafficking scheme began in 2007, Defendants committed acts in furtherance of the scheme after December 23, 2008, the effective date of the TVPA amendments on which Defendants rely in their motion. For example, Defendants continued to place new teachers to work at Louisiana public schools after December 23, 2008; they continued to demand and collect fraudulent placement fees from class members after December 23, 2008; and they continued after December 23, 2008, to bring and prosecute lawsuits against class members who refused to pay the fraudulent fees. Pls.' SSF Nos. 137-141.

Based on the foregoing facts, Plaintiffs have sued Defendants for perpetrating violations of the TVPA. Specifically, Defendants procured the labor of Plaintiffs and other class members through threats of serious financial harm and abuse of legal process. Section 1595 of the TVPA, 18 U.S.C. § 1595, affords members of the Plaintiff class a civil remedy for these TVPA violations.

# III.   ARGUMENT

## A.   **Defendants' Motion for Summary Judgment on Plaintiffs' TVPA Claim Should Be Denied.**

Defendants' motion for summary judgment on Plaintiffs' TVPA claim is without merit.  Defendants make four arguments in support of their motion.  First, Defendants assert that the conduct at issue in this case occurred before the TVPA was amended effective December 23, 2008, and that threats of serious financial harm were not actionable under the pre-amendment version of the statute.  Second, Defendants contend that, in any event, Plaintiffs have not come forward with evidence that they were in fact threatened with serious financial harm.  Third, Defendants argue that the conduct at issue in this case all occurred in the Philippines prior to December 2008 and that the TVPA did not apply extraterritorially before that date.  And finally, Defendants claim that Plaintiffs have no valid cause of action for document servitude under the pre-amendment version of the TVPA.  As shown below, none of these arguments can withstand scrutiny.

### 1.   **Financial Harm Constitutes "Serious Harm" Under Both the Pre-Amendment and Post-Amendment Versions of the TVPA.**

Contrary to Defendants' claim, financial harm has constituted a form of  "serious harm" under section 1589 of the TVPA, 18 U.S.C. § 1589, both before and after the statute was amended effective December 23, 2008.  The original version of the TVPA enacted in 2000 did not limit "serious harm" to physical restraint or violence as Defendants contend.

Both before and after December 23, 2008, the TVPA provided that it was unlawful to provide or obtain a person's labor by means of serious harm or threats of serious harm.  18 U.S.C. § 1589 (2003); 18 U.S.C. § 1589 (2009).  The December 2008 TVPA amendments did not expand this provision.  All that Congress did effective December 23, 2008, was to add an express definition of "serious harm."  Congress defined the term to mean "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and

1   in the same circumstances to perform or continue performing labor or services in order

2   to avoid incurring that harm."  18 U.S.C. § 1589(c)(2) (2009).

3        Defendants argue that the addition of an express definition of "serious harm"

4   which includes "financial" harm suggests that the term cannot be construed to have

5   included financial harm before the amendment date.  But they offer no support for that

6   contention, and, indeed, the opposite is true.  Congress did not *change* the definition of

7   "serious harm" through the December 2008 TVPA amendments.  It simply added an

8   express definition where none had existed before.  "The Ninth Circuit has consistently

9   stated that when an amendment is a clarification, rather than an alteration, of existing

10   law, then it should be used in interpreting the provision in question retroactively."

11   *United States v. Sanders*, 67 F.3d 855, 856 (9th Cir. 1995).  Under controlling Ninth

12   Circuit authority, therefore, the Court should affirmatively look to the definition of

13   "serious harm" added to the TVPA in December 2008 in interpreting what the term

14   meant before the amendment date.  That definition includes "financial" harm.  18 U.S.C.

15   § 1589(c)(2) (2009).

16        Defendants' contention that "serious harm" did not include financial harm before

17   December 23, 2008, is also belied by the plain language of the pre-amendment version

18   of the TVPA.  "[T]he term 'serious harm' is not restricted to serious physical injury in

19   common usage."  *United States v. Sou*, No. 09-00345 SOM, 2011 U.S. Dist. LEXIS

20   81876, at *10 (D. Haw. July 26, 2011).  Rather, it "*also encompass[es] serious*

21   *economic injury*."  *Id.* (emphasis added, citing *Black's Law Dictionary* 784 (9th ed.

22   2009)).  The court should construe "serious harm consistent with this ordinary meaning.

23   *See, e.g., Schindler Elevator Corp. v. United States ex rel. Kirk*, ___ U.S. ___, 131 S. Ct.

24   1885, 1891, 179 L. Ed. 2d 825 (2011) (noting that it is a well-established canon of

25   statutory interpretation that court must first look to ordinary meaning in interpreting

26   word or phrase of statute).

27        Moreover, the pre-December 2008 version of the TVPA made it unlawful to

28   provide or obtain a person's labor "by threats of serious harm to, or physical restraint

against" that person.  18 U.S.C. § 1589 (2003).  By distinguishing "serious harm" from "physical restraint," Congress clearly indicated that the terms were not to be treated as synonymous.  *See Leocal v. Ashcroft*, 543 U.S. 1, 9, 125 S. Ct. 377, 382, 160 L. Ed. 2d 271, 280 (2004) ([W]hen interpreting a statute . . . we construe language . . . in light of the terms surrounding it."); *see also Sou*, 2011 U.S. Dist. LEXIS 81876, at *10.

The legislative history of the original version of the TVPA confirms that the term "serious harm" was not intended to be limited to physical harm, but included financial harm as well.  Congress enacted the TVPA in 2000 "to correct what they viewed as the Supreme Court's mistaken holding in *United States v. Kozminski*" which had "limited the definition of involuntary servitude to 'physical' or 'legal' coercion."  *Dann*, 652 F.3d at 1169.  Consistent with this intent, the House Conference Report issued in connection with the TVPA's enactment stated that serious harm "refers to a broad array of harms, including *both physical and nonphysical*."  *See* H.R. Conf. Rep. No. 106-939, at 101 (emphasis added).  The report explained that the TVPA was intended to "address the increasingly subtle methods of traffickers" who "restrain their victims without physical violence or injury."  *Id.*

The House Conference Report also provided that intentionally causing a trafficking victim to believe that his or her family would face "bankruptcy in their home country" is an example of threatening a victim with "serious harm."  *Id.*  Bankruptcy is obviously a form of *financial*, not physical harm.  The reference to bankruptcy as "serious harm" thus unmistakably demonstrates Congress's intent that financial harm should be treated as a kind of "serious harm" under the original version of the TVPA.

Case law further establishes that the term "serious harm" in the pre-amendment version of the TVPA includes serious financial harm.   The Ninth Circuit so held in *Dann*.  While *Dann* was decided after the effective date of the 2008 TVPA amendments, the trafficking at issue there occurred *before* December 23, 2008.  *See, e.g.,* 652 F.3d at 1164-67 (explaining that Dann was indicted in June 2008 for acts of trafficking in 2006 and 2007).

In *Dann*, the defendant caused her victim to believe that she would suffer serious financial harm if she were to leave defendant's employ.  652 F.3d at 1171.  The Ninth Circuit held that such financial harm constituted actionable "serious harm" under the TVPA.  *Id.*  Consistent with the Ninth Circuit rule that a clarifying amendment "should be used in interpreting the provision in question retroactively" (*Sanders*, 67 F.3d at 856), the Ninth Circuit relied for its conclusion on the fact that the current version of the TVPA explicitly defines "serious harm" to include "financial harm," explaining that such definition was consistent with what Congress intended when it originally enacted the statute in 2000.  652 F.3d at 1169-70 (citing H.R. Rep. No. 106-939).

Similarly, in *United States v. Calimlim*, 538 F.3d 706 (7th Cr. 2008) — a case decided before the TVPA was amended — the Seventh Circuit held that the term "serious harm" includes financial harm.  The Government alleged, *inter alia*, that defendants caused the trafficking victim "to believe that she might be deported and her family seriously harmed because she would no longer be able to send money."  538 F.3d at 710; *see also id.* at 711 ("The Calimlims also knew that not sending money back home was, for Martinez, a 'serious harm.'").  Defendants challenged their convictions on the ground that "there was no evidence of threats of violence or physical coercion."  538 F.3d at 714.  The Seventh Circuit rejected this argument, holding that "[s]ection 1589 is not written in terms limited to overt physical coercion."  *Id.*  The court concluded that the threat of serious financial harm inflicted on the trafficking victim was sufficient to sustain defendants' convictions.  *Id.*

The Ninth Circuit in *Dann* expressly relied on *Calimlim* for its own holding that serious harm includes serious *financial* harm.  652 F.3d at 1170.  This Court likewise relied on *Calimlim* for its holding in the UPI Motion to Dismiss Order that financial harm is sufficient.  *See* UPI Motion to Dismiss Order at 13-15.

Finally in *Sou*, the court specifically considered and rejected the argument that financial harm did not constitute "serious harm" under the pre-December 2008 version of the TVPA.  In that case, a number of Thai workers were defrauded into paying

substantial upfront recruitment fees to procure jobs in the United States, and had to obtain high-interest loans to finance them.  Defendants threatened to send the workers back to Thailand, thus leaving them unable to repay their debts.  2011 U.S. Dist. LEXIS 81876, at *2-3.  The Government charged defendants with trafficking, asserting that they held the workers in fear of serious economic harm.  *Id.*  Defendants moved to dismiss the indictment on the ground that it alleged only threats of financial harm; that the conduct alleged by the Government occurred before the effective date of the 2008 TVPA amendments; and that financial harm did not constitute "serious harm" under the pre-amendment version of the statute.  *Id.* at *7-8.

In denying defendants' motion, the court explained that the threats alleged in the Government's indictment "would result in severe financial losses to the victims and their families."  *Id.* at *12.  The court thus concluded that "the common, ordinary meaning of the term 'serious harm' encompasses the alleged threats to the workers in this case."  *Id.* It held that the legislative history of the TVPA and cases interpreting it further supported the determination that financial harm could constitute "serious harm" under the pre-December 2008 version of the statute.  *Id.* at *12-14.

The Court here should likewise hold that the term "serious harm" includes serious financial harm under both the pre-amendment and post-amendment versions of the TVPA.[4]

---

[4]  Procuring a person's labor through abuse of legal process also constitutes a TVPA violation, both under the pre-amendment and post-amendment versions of the TVPA. *See* 18 U.S.C. § 1589 (2003); 18 U.S.C. § 1589 (2008).  Plaintiffs have alleged that their labor was procured through abuses of legal process here, including threats of deportation. *See* SAC ¶¶ 264-66 (Doc. No. 126).  Defendants' have not moved for summary judgment on that issue.

### 2. There Is a Triable Issue as to Whether the Teachers' Labor Was Procured Through Threats of Serious Financial Harm.

Defendants next argue that Plaintiffs have not come forward with evidence sufficient to support a finding that they were threatened with serious financial harm. That claim too is baseless.

Each Plaintiff has filed a declaration reflecting that she or he was forced to take on substantial debt as a result of Defendants' fraudulent trafficking scheme, and was compelled to labor at Louisiana public schools to pay off that debt. For instance, Plaintiff Donnabel Escuadra has submitted a declaration swearing that (1) she comes from a poor family; (2) she went into debt to pay the initial fees of $5,000 to $5,500 charged by Defendants; (3) only after she paid such initial fees did Defendants disclose that a second much larger fee would be due; (4) she had no choice but to continue with the recruitment process at that point given the debt she had incurred to pay the original fees; (5) she was required to take on even more debt at a usurious interest rate to pay the second, previously undisclosed fee; (6) she was compelled to labor for EBR in order to repay the massive debts she incurred as a direct result of Defendants' fraud; and (7) she was threatened by Defendants with dismissal from her job and lawsuits if she did not comply with Defendants' demands. Escuadra Decl. ¶¶ 8-9, 12, 14-15, 17, 19-20 (attached as Ex. Pls.'- C) (previously filed as Doc. No. 134-3); *see also* Pls.' SSF Nos. 118-129, 132-136 (citing declarations of Plaintiffs Nunag-Tanedo, Cruz, Mari and Pascual).

These facts, if proven at trial, are more than sufficient to establish serious harm. Defendants argue that Plaintiffs have no valid TVPA claim because the harm they faced was not as severe as that faced by the trafficking victim in *Calimlim* and some other trafficking cases. This Court, however, has already rejected that argument. In denying Defendants' motion to dismiss the TVPA claim last year, the Court held that "the TVPA not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor." UPI Motion to Dismiss Order at 14. The Court concluded that the kind of misconduct and harm alleged

in Plaintiffs' Complaint would, if proven at trial, meet the definition of illegal trafficking under the TVPA. *Id*. at 10-16. That is the law of the case and is thus controlling here. *See, e.g., United States v. Jingles*, No. 08-15634, 2012 U.S. App. LEXIS 11633, at *10 (9th Cir. June 8, 2012) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case") (citation and internal quotation marks omitted).

Defendants next contend that Plaintiffs must present evidence about what their assets were at the time they were trafficked in order to withstand summary judgment. As usual, however, they offer no authority for their baseless assertion. Plaintiffs have, *inter alia*, presented evidence through their declarations that they lacked the funds to pay Defendants' fraudulent fees; needed to take on debt at usurious interest rates to pay those fees; and had to pursue employment at Louisiana public schools to repay their debts. Pls.' SSF Nos. 120, 123, 128-29. Navarro herself acknowledged in deposition that she knew the teachers lacked the resources to pay the fraudulent fees imposed and were forced into debt by her actions. Pls.' SSF No. 128. That is more than sufficient to create a triable issue as to whether Plaintiffs' labor was procured through threats of serious financial harm. *See, e.g., Sou*, 2011 U.S. Dist. LEXIS 81876, at *12 (holding that it is a jury question whether trafficking victim's financial injury rises to the level of "serious" harm under the TVPA).

Moreover, the TVPA inquiry appropriately "focus[es] on the Defendant's intent with respect to any threats made against Plaintiffs, and on a reasonable person's perception of those threats." *Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*, No. CV10-01172 JAK (MLGx), 2011 U.S. Dist. LEXIS 152329, at *21 (C.D. Cal. Dec. 12, 2011). Accordingly, "the inquiry will not look at how each Plaintiff perceived the Defendant's actions or whether he or she subjectively felt compelled to work." *Id.* Instead, "the inquiry will look at the Defendant's actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Id.* For this

additional reason, Plaintiffs have no obligation to present evidence concerning the specific amount of their individual assets to support their TVPA claim.

### 3. Defendants' Extraterritoriality Argument Is a Red Herring Because Plaintiffs Seek Redress Only for Trafficking *Within* the United States.

Defendants' argument based on extraterritoriality is likewise without merit. Defendants argue that the Court lacks jurisdiction over Plaintiffs' TVPA claim because the TVPA purportedly did not apply extraterritorially until after December 23, 2008. *See* 18 U.S.C. § 1596 (2008). The trafficking at issue here, however, occurred within the United States, not overseas. Plaintiffs thus seek *domestic*, not extraterritorial application of the TVPA. A defendant is liable for domestic trafficking under either the pre- or post-December 2008 versions of the statute.

In assessing a motion to dismiss or for summary judgment based on the presumption against extraterritoriality, "a court must first inquire into whether applying a statute implicates any issue of extraterritoriality." *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 952 (9th Cir. 2008). Whether a statute is being applied domestically or extraterritorially depends on the "objects of the statute's solicitude;" namely, what it "seeks to regulate" and those it "seeks to protect." *See Morrison v. Nat'l Australia Bank Ltd.*, ___ U.S. ___, 130 S. Ct. 2869, 2884, 177 L. Ed.2d 535 (2010). In *Morrison*, the Supreme Court held that section 10(b) of the Securities and Exchange Act of 1934 was intended to regulate securities trades within the United States. Accordingly, a lawsuit based on a securities trade on a foreign exchange would seek extraterritorial application of section 10(b), even if some of defendant's wrongful acts occurred in the United States. 130 S. Ct. at 2884. Correlatively, a claim based on securities trades through a *U.S. exchange* would constitute a *domestic* application of section 10(b), even if the defendant's deception originated elsewhere. *Id.*

Similarly, the principal harm that the TVPA seeks to combat is the trafficking of foreign persons into the United States and the practice of forced labor in this country. *See, e.g.*, H.R. Rep. 106-939, at 1 (describing the TVPA as an Act "to combat trafficking

of persons . . . *in the United States* and countries around the world") (emphasis added); *id.* at 89 (finding that "Millions of people every year, primarily women and children, are trafficked within or across international borders.  Approximately 50,000 women and children are trafficked into the United States each year."); *id.* at 4 ("Trafficking for such purposes as . . . forced labor has an impact on the *nationwide* employment network and labor market.") (emphasis added).  A lawsuit like this one that is based on such trafficking of foreign persons into the United States for the purpose of providing labor within the United States to U.S.-based entities thus seeks only *domestic* application of the TVPA.  It is irrelevant that much of the deception that induced the teachers to labor in the U.S. occurred in the Philippines.  *See Morrison*, 130 S. Ct. at 2884; *see also TianRui Group Co. v. ITC*, 661 F.3d 1322, 1329 (Fed. Cir. 2011) ("Because foreign conduct is used only to establish an element of a claim alleging a domestic injury and seeking a wholly domestic remedy, the presumption against extraterritorial application does not apply.").

Cases decided under the TVPA make this clear.  In *Roe*, *supra*, the court held that a lawsuit based on trafficking of persons to work on a Liberian rubber plantation sought extraterritorial application of the TVPA.  *Roe*, 492 F. Supp. 2d at 999-1004.  Similarly, in *Nattah v. Bush*, 541 F. Supp. 2d 223 (D.D.C. 2008), the court held that a lawsuit alleging that plaintiff was trafficked to work in Iraq sought extraterritorial application of the statute.  *Id.* at 234-35 & n.11, *aff'd in part and rev'd in part on other grounds*, 605 F.3d 1052 (D.C. Cir. 2010).

By contrast, no court to our knowledge has ever held that a claim based on trafficking of persons into the United States seeks extraterritorial application of the TVPA.  To the contrary, courts applying the pre-amendment version of the TVPA have uniformly held that trafficking of persons from abroad to labor in the United States constitutes an actionable TVPA violation.  *See, e.g., Dann*, 652 F.3d at 1162-63 (victim trafficked from Peru to labor in the United States); *Calimlim*, 538 F.3d at 708 (victim trafficked from the Philippines to labor in the United States); *Bradley*, 390 F.3d at 148

(victim trafficked from Jamaica to labor in the United States); *Sou*, 2011 U.S. Dist. LEXIS 81876, at *1 (victims trafficked from Thailand to labor in the United States).

Defendants argue that all of the misconduct on which Plaintiffs' trafficking claim is based occurred in the Philippines. As noted, however, that is not the relevant inquiry under *Morrison*. *See* 130 S. Ct. at 2884 (rejecting claim that situs of defendant's bad acts determines whether a statute is being applied extraterritorially). What matters are the "objects of the statute's solicitude" (*id.*) — here the trafficking of persons to engage in forced labor in the United States.

In any event, Defendants' premise is wrong: their misconduct occurred in both the Philippines *and* the United States. For example, Defendants entered into a fraudulent trafficking venture with Louisiana school systems in the United States; demanded and collected fraudulent placement fees in the United States; required the teachers to sign fraudulent contracts in the United States; threatened teachers with deportation while they were in the United States; and brought lawsuits against class members in U.S. courts seeking to recover the fraudulent fees. Pls.' SSF Nos. 112, 131-37, 140, 141. These domestic wrongful acts were all part and parcel of the illegal trafficking scheme. Accordingly, even if the situs of Defendants' underlying wrongful acts were dispositive, there still would be no merit to Defendants' claim that Plaintiffs seek extraterritorial application of the TVPA.

**4. Defendants' Scheme to Procure Plaintiffs' Labor in the United States Included Unlawfully Confiscating and Controlling Plaintiffs' Passports Until Fraudulent Fees Were Paid.**

The Court should also deny Defendants' motion for summary judgment concerning the issue of document servitude. Defendants' trafficking scheme included possessing Plaintiffs' passports in the course of procuring their labor in violation of the TVPA. Specifically, Defendants, through their agent in the Philippines, confiscated Plaintiffs' passports and did not return them to Plaintiffs until they paid the fraudulent placement fees Defendants demanded. Pls.' SSF Nos. 125-26. Such confiscation of Plaintiffs' passports was thus an integral part of the trafficking scheme. Defendants are

civilly liable under the TVPA for their agent's acts of trafficking effectuated by means of document servitude.

Defendants argue that Plaintiffs have no valid document servitude claim because their agent confiscated Plaintiffs' passports in the Philippines rather than in the United States.  As explained above, however, Plaintiffs were trafficked to labor *within* the United States.  This case thus involves *domestic*, not extraterritorial application of the TVPA.  Controlling Plaintiffs' passports in the Philippines was part and parcel of Defendants' *domestic* trafficking scheme, just as Defendants' collection of fees from Plaintiffs in the Philippines was part and parcel of such domestic scheme.  Under *Morrison*, it is irrelevant that certain of Defendants' bad acts to facilitate their domestic trafficking scheme occurred outside the United States.  130 S. Ct. at 2884.

Defendants also contend that their passport confiscations are not actionable because the TVPA was not amended to provide a private right of action for violations of section 1592 (which concerns document servitude) until December 2008.  That claim, too, lacks merit.  Section 1595 of the TVPA is the statute's civil remedies provision.  While section 1595 did not provide a direct private right of action for violations of section 1592 until the TVPA was amended in December 2008, the pre-amendment version of section 1595 *did* provide a private right of action for violations of section *1590* of the TVPA.  See 18 U.S.C. § 1595(a) (2003).  Plaintiffs have alleged such section 1590 violations here.  *See* SAC ¶ 278 (Doc. No. 126).

Both before and after December 23, 2008, section 1590 proscribed knowingly recruiting, harboring, transporting, providing or obtaining a person for labor or services "in violation of this chapter."  18 U.S.C. § 1590 (2003); 18 U.S.C. § 1590 (2008).  "This chapter" included section 1592 both before and after the TVPA amendment date.  Accordingly, providing a person's labor through means prohibited by section 1592 constituted a violation of section 1590 under the pre-amendment version of the TVPA.

Plaintiffs have proffered evidence that Defendants violated section 1590 by obtaining and providing their labor through means prohibited by the TVPA, including

document servitude.  *See* Pls.' SSF Nos. 125-26.  Section 1595 provided a civil remedy for such section 1590 violations at the times the violations occurred.  Defendants' motion for summary judgment on the document servitude issue should thus be denied.

> **5.   Defendants' Motion Should Be Denied for the Additional Reason That Defendants Perpetrated Acts in Furtherance of the Trafficking Scheme After December 23, 2008.**

Even if the Court were to accept Defendants' arguments based on the December 2008 TVPA amendments, Defendants still would not be entitled to summary judgment on Plaintiffs' TVPA claim.  That is because they continued to perpetrate violations of the TVPA after the December 23, 2008, effective date of those amendments.[5]

As noted above, Defendants continued to recruit and place new teachers to work at Louisiana public schools after December 23, 2008; they continued to demand and collect fraudulent placement fees from class members after December 23, 2008; and they continued after December 23, 2008 to bring and prosecute lawsuits against class members who refused to pay the fraudulent fees.  Pls.' SSF Nos. 137-141.  The post-amendment version of the TVPA clearly applies to these Defendant acts in furtherance of the trafficking scheme that occurred after the December 2008 effective date of the amendments.  *See, e.g., Ditullio v. Boehm*, 662 F.3d 1091, 1102 (9th Cir. 2011) (explaining that, while TVPA section 1595 could not be applied retroactively, defendant could be held civilly liable for any conduct violating TVPA that occurred *after* statute

---

[5]   Defendants are liable as "perpetrators" of TVPA violations under both the pre-amendment and post-amendment versions of section 1595.  *See* 18 U.S.C. § 1595 (2003); 18 U.S.C. § 1595 (2008).  The TVPA was amended effective December 23, 2008, to also provide a private right of action against anyone who knowingly *benefits* from participation in a trafficking venture.  18 U.S.C. § 1595(a) (2008).

Defendants continued to benefit from their trafficking scheme after December 23, 2008 by, *inter alia*, continuing to collect fraudulent placement fees after that date.  Pls.' SSF Nos. 138-141.  Accordingly, Defendants' acts of trafficking after December 23, 2008, subject them to liability both as perpetrators *and* as knowing beneficiaries of the trafficking scheme.

was amended to create private right of action).  For this additional reason, Defendants'

motion for summary judgment on Plaintiffs' TVPA claim should be denied.

### B.   Defendants' Motion for Summary Judgment on Plaintiffs' RICO Claim Should Be Denied.

Defendants' motion for summary judgment on Plaintiffs' RICO claim is also

unfounded.  Defendants contend that they engaged in no predicate acts of trafficking as a

matter of law.  For the reasons stated above, however, that argument fails.

Moreover, even if the Court were to accept Defendants' assertions concerning the

TVPA, there still would be no basis for the Court to dismiss the RICO claim.  In

addition to predicate acts of trafficking, Plaintiffs have alleged that Defendants engaged

in predicate acts of mail and wire fraud.  In particular, Plaintiffs have alleged that

Defendants used the U.S. mails and wires on multiple occasions in furtherance of a

fraudulent scheme to obtain illegal fees from Plaintiffs and other class members.  *See*

SAC ¶¶ 299-301; *United States v. Hubbard*, 96 F.3d 1223, 1228-29 (9th Cir. 1996) (mail

fraud involves using U.S. mails as "part of the execution of [a] fraudulent scheme").

Defendants have not moved for summary judgment concerning these separate,

independently sufficient RICO predicate acts of mail and wire fraud.  Accordingly,

Plaintiffs may proceed to trial on their RICO claim, regardless of the disposition of their

cause of action under the TVPA.[6]

---

[6]  Plaintiffs have also alleged predicate acts of extortion.  *See* SAC ¶¶ 302-04.
Defendants' argue that the acts in question do not constitute extortion as a matter of law,
but this Court already rejected that argument in its motion to dismiss order entered last
year.  *See* UPI Motion to Dismiss Order at 20-23.

# IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for partial summary judgment should be denied.

/s/ James M. Knoepp
James M. Knoepp
IMMIGRANT JUSTICE PROJECT
SOUTHERN POVERTY LAW CENTER
233 Peachtree Street NE, Suite 2150
Atlanta, Georgia  30303
*On behalf of Attorneys for Plaintiffs*

# <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to all counsel of record.


 /s/ James M. Knoepp

July 13, 2012.